## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UBER TECHNOLOGIES, INC.,

       PLAINTIFF,

  v.

SIMON & SIMON P.C., MARC SIMON,
CLIFTON BURT, PREMIER PAIN &
REHAB CENTER, PC, ETHEL HARVEY,
DANIEL PICCILLO, PHILADELPHIA
SPINE ASSOCIATES, LLC, and LANCE
YARUS,

       DEFENDANTS.

## COMPLAINT

## JURY TRIAL DEMAND

**<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

SUMMARY OF THE ACTION ................................................................................1

THE PARTIES ....................................................................................................4

JURISDICTION AND VENUE .............................................................................6

MEANS AND METHOD OF THE FRAUD ...........................................................7

    A.    Burt's False Injection and Ablation Records ........................................8

    B.    Additional False Treatment Documentation .......................................13

    C.    Yarus's Resulting Future Care Projections ........................................15

    D.    Examples of the Scheme in Operation Against Uber .........................19

        1.    Personal Injury Claimant A ....................................................20

        2.    Personal Injury Claimant B.....................................................23

        3.    Personal Injury Claimant C.....................................................26

        4.    Personal Injury Claimant D ....................................................28

        5.    Personal Injury Claimant E.....................................................31

    E.    Examples of the Scheme in Operation Against Others.......................34

        1.    Personal Injury Claimant AA ..................................................35

        2.    Personal Injury Claimant BB ..................................................37

RACKETEERING ALLEGATIONS ......................................................................39

    A.    Defendants' Misconduct and Respective Basis for Liability..............39

        1.    Simon & Simon and Marc Simon...........................................39

        2.    Premier Pain & Rehab Center and Clifton Burt ....................41

        3.    Chiropractic Defendants ........................................................42

        4.    Lance Yarus ...........................................................................42

    B.    Uber is a Victim of the Scheme and has Suffered Injury ..................42

    C.    The RICO Enterprises........................................................................43

## TABLE OF CONTENTS (continued)

**Page**

    D.      Pattern of Racketeering Activity .......................................................................45

CAUSES OF ACTION ...........................................................................................................57

PRAYER FOR RELIEF ..........................................................................................................62

JURY DEMAND .....................................................................................................................62

Plaintiff Uber Technologies, Inc. ("Uber"), by and through its undersigned attorneys, hereby alleges against Defendants Simon & Simon, P.C. ("Simon & Simon"), Marc Simon, Clifton Burt, Premier Pain & Rehab Center, PC ("Premier Pain & Rehab Center"), Lance Yarus, and the following "Chiropractic Defendants," Ethel Harvey, Daniel Piccillo, and Philadelphia Spine Associates, LLC ("Philadelphia Spine Associates"), as follows:

## SUMMARY OF THE ACTION

1.     The fabrication of fraudulent personal injury claims is a serious and growing problem in Philadelphia and nationwide.  Such fraud results in sweeping harm to the public far beyond those involved in the litigation itself.  It increases insurance rates and transportation costs for the public at large.  In the case of Uber, it increases costs for the many millions who rely on the Uber application as a means to connect with transportation and delivery service providers and reduces the earnings of the many others who earn a livelihood from the application.  These increased costs, and the legal fees Uber must expend to fight these fraudulent claims, directly harm Uber's business.

2.     Uber brings this lawsuit to remediate a fraud scheme that has enriched unscrupulous lawyers and medical providers at the expense of both the defendants in the underlying cases and the personal injury claimants themselves.  The scheme in question is orchestrated and directed by Marc Simon and the Simon & Simon law firm.  The scheme involves efforts to extract settlement value from marginal personal injury claims by fabricating a false record of medical treatment and exaggerated injury.

3.     In order to pursue inflated claims in state court and to extract large settlements from Uber, Simon directs his clients to a network of corrupt medical providers who diagnose non-existent serious injuries and produce false medical records to support claims that the claimant in

question will require a lifetime of expensive medical care.  The scheme is designed to fraudulently transform otherwise low-value claims into million-dollar-plus lawsuits against Uber.

4.      Dr. Clifton Burt and his medical practice are central to the scheme.  Purporting to deliver non-invasive injection and ablation care to alleviate pain, Burt and his practice instead operate at the direction of Marc Simon and the Simon & Simon firm.  The Simon & Simon firm schedules groups of clients to be seen at Burt's clinic in bulk, instructing Burt on the treatment to be administered.  Simon & Simon instructs Burt to perform specific procedures on specific patients at specific times:



*Fig. 1.*

5.      In exchange for producing fraudulent records and providing unnecessary treatment, Burt is compensated directly or indirectly by Marc Simon and Simon & Simon.  Such compensation operates as a bribe.  Marc Simon and Simon & Simon use Burt's resulting false records as the stated foundation for exorbitant projections of future required medical treatment.

Upon information and belief, such future treatment is often not delivered because the underlying purported injuries in fact require no such remedies.

6.      Ethel Harvey, Daniel Piccillo, and their chiropractic practice similarly support the scheme. Simon & Simon refers or steers clients to Harvey and Piccillo shortly after intake. Harvey and Piccillo purport to perform various chiropractic treatments on Simon & Simon clients across dozens of appointments. Some of these purported treatments are not performed at all. The fraudulent records Harvey and Piccillo produce support false diagnoses of serious injuries and are made for the purpose of inflating damages claims.

7.      Before filing a lawsuit, Marc Simon and Simon & Simon direct their clients to Lance Yarus as a final step in effectuating the scheme to inflate these claims. Relying on the fraudulent records produced by Burt and the Chiropractic Defendants, Yarus diagnoses non-existent serious injuries and produces a false report stating that the claimant in question will require a lifetime of expensive ongoing care. Consistent with the fraudulent nature of these reports, Yarus does not even tell the claimants of their dire prognoses, as any legitimate medical provider would. The phantom damages reflected in these reports allow Simon & Simon to maximize their leverage to demand large settlements.

8.      Uber is not the only victim of this scheme. Marc Simon and Simon & Simon have pursued and continue to pursue similar sham litigation against other defendants in Pennsylvania and elsewhere. Burt, Premier Pain & Rehab Center, and Yarus are often critical to these other cases as well, conspiring with Marc Simon and Simon & Simon to diagnose non-existent serious injuries and produce false medical records.

9.      This very Court has taken notice of this scheme, with Judge McHugh noting in *Shelton v. Chaudhry*, "I have yet to see a single case involving the Simon office where any plaintiff

actually pursued the recommended care. I therefore view these reports as litigation documents, bearing little relationship to real world medical care." *Shelton v. Chaudhry*, 763 F. Supp. 3d 675, 687 (E.D. Pa. 2025).

10.     This scheme has tainted dozens of state court lawsuits filed against Uber as well as many more filed against other parties.

11.     When Uber sought discovery into Burt's underlying medical treatment, including by deposition of Burt and his business partner, Dr. Blessen Abraham, Simon & Simon dismissed Uber from each of the nearly thirty cases in which Burt was a treating physician. Upon information and belief, Simon & Simon did so to avoid discovery and thereby conceal its fraudulent scheme.

12.     The fraud at issue here spans many separate cases against different defendants and cannot be remediated on a case-by-case basis. By enacting the federal RICO statute, Congress gave the federal courts the power to address precisely this type of fraudulent pattern. Uber respectfully seeks relief from the Court as authorized by the RICO statute both to recover the harm it has suffered and to prevent further harm to it and to the public going forward.

## THE PARTIES

13.     Plaintiff Uber is a Delaware corporation with its principal place of business in California.

14.     Defendant Simon & Simon is a professional corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all relevant times, Simon & Simon maintained its principal place of business in Pennsylvania.

15.     Defendant Marc Simon resides in and is a citizen of Pennsylvania. At all relevant times, Simon was the managing partner of Defendant Simon & Simon. He and his firm represented the claimants in the cases discussed herein and directed the scheme to manufacture evidence through false medical records and unnecessary treatment. Simon was the subject of two recent

-4-

sanctions proceedings in this Court related to his conduct in other personal injury matters, *Contreras Madrid v. Walmart Stores East, L.P.*, No. 24-5229 (E.D. Pa.) and *Shelton v. Chaudhry, et al*, No. 24-cv-5657 (E.D. Pa.) (now No. 25-cv-249 (M.D. Pa.)).

16.     Defendant Premier Pain & Rehab Center is a professional corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all relevant times, Premier Pain & Rehab Center maintained its principal place of business in Pennsylvania.

17.     Defendant Clifton Burt resides in and is a citizen of New Jersey. At all relevant times, Burt was the owner and operator of Defendant Premier Pain & Rehab Center. Burt and employees acting at his direction accepted mass referrals from Simon & Simon attorneys and proceeded to diagnose non-existent injuries, perform unnecessary medical procedures, and fabricate fraudulent medical records. Burt has been the subject of numerous regulatory enforcement actions, reprimands, and civil RICO lawsuits. These include formal consent orders and reprimands by state medical boards in Virginia, New York, and New Jersey relating to Burt prescribing opioids outside the context of a bona fide practitioner-patient relationship. Burt has also been named as a subject or defendant in numerous civil RICO or civil fraud lawsuits. One civil RICO complaint filed against Burt alleged that he conspired with a provider of medical equipment to defraud automobile insurance companies by writing fraudulent prescriptions for medical equipment that was medically unnecessary, illusory, and not reimbursable. *See Gov't Emps. Ins. Co. v. Med. Equip. Serv., Inc.*, No. 20-cv-3396 (E.D.N.Y. July 28, 2020); *see also Gov't Emps. Ins. Co. v. Physical Therapy & Herniated Disc Ctr., L.L.C.*, No. 20-cv-5139 (D. N.J. Apr. 27, 2020); *Gov't Emps. Ins. Co. v. Acute Med., P.C.*, No. 16-cv-8030 (D. N.J. Oct. 28, 2016).

18.    Defendant Philadelphia Spine Associates is a limited liability company duly organized and existing under the laws of the Commonwealth of Pennsylvania.  At all relevant times, Philadelphia Spine Associates maintained its principal place of business in Pennsylvania.

19.    Upon information and belief, Defendant Ethel Harvey resides in and is a citizen of North Carolina.  At all relevant times, Harvey was a chiropractor at Philadelphia Spine Associates.

20.    Defendant Daniel Piccillo resides in and is a citizen of Pennsylvania. At all relevant times, Piccillo was a chiropractor at Philadelphia Spine Associates.

21.    Defendant Lance Yarus resides in and is a citizen of Pennsylvania.  At all relevant times, Yarus was a medical doctor at Regional Orthopedics. Over the past three years, Yarus has performed approximately 1,278 medical exams of Simon & Simon clients and has been paid about $1.5 million for these services.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under the federal RICO statute.

23.    This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds $75,000, and the controversy is between citizens of different states.

24.    This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367.

25.    Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Eastern District of Pennsylvania and because a substantial amount of the activities forming the basis of this Complaint occurred within the Eastern District of Pennsylvania.

## MEANS AND METHOD OF THE FRAUD

26.    The object of this scheme is to create a fraudulent record of medical treatment to inflate the value of lawsuits against named parties and their insurers to secure larger settlement payouts.  Marc Simon and Simon & Simon carried out the scheme by bribing medical providers with promises of future referrals in exchange for fraudulent medical records and unnecessary treatment—particularly from and by Defendant Burt.  Marc Simon and Simon & Simon constructed a conveyor belt in which employees of Simon & Simon directed personal injury claimants to receive unnecessary treatment from Burt.  Marc Simon and Simon & Simon selected the procedures to be performed and scheduled groups of claimants to receive such procedures en masse.

27.    Uber was named as a defendant in nearly thirty such lawsuits where Burt was directed to deliver unnecessary treatment for the purpose of creating a false evidentiary record. Uber is but one of the many targets of the scheme.

28.    Simon & Simon relies on referrals from other law firms. Simon & Simon advertises itself as willing to take referrals that other firms will not take. Such cases involve minimal, if any, injury. Many of the cases Simon & Simon takes on are low-value or meritless by their nature. Many of these cases arise from minor motor vehicle collisions.

29.    Simon & Simon personnel pressure prospective clients to sign a retention agreement with promises of large settlement payouts without disclosing that substantially all of any recovery will go to Simon & Simon and the medical providers involved in the scheme.  Simon & Simon sometimes threatens to drop the cases of claimants who do not agree to visit the firm's preferred medical providers.

30.    Claimants pursue the same treatment path under Simon & Simon's direction: referrals to a discrete set of chiropractors or physical therapists, subsequent MRIs, and, ultimately,

spinal injections or radiofrequency ablation procedures from Burt. These medical treatments bear no relationship with any underlying injury and are in most instances unnecessary.

31.     After ensuring that claimants receive a wide range of unnecessary treatment, Marc Simon and Simon & Simon direct Yarus or another medical expert selected from a small pool to review the resulting medical records for the purpose of producing a report that finds the claimant will require expensive lifelong medical care due to injuries sustained in the vehicle collisions. These expert reports serve the purpose of translating the fraudulent medical records into documents that can be used in litigation to demand substantial settlements. Many claimants do not go on to actually seek or receive the future medical treatment the reports suggest they will need.

32.     As the final step of the scheme, Marc Simon and Simon & Simon retain an additional expert to calculate the exorbitant expense of such future medical treatment. Simon & Simon utilizes the resulting report to induce payments from the defendants that it sues and their insurers.

### A.     Burt's False Injection and Ablation Records

33.     Defendants Burt and Premier Pain & Rehab Center play a key role in this scheme. Burt delivered or claimed to have delivered injections and radiofrequency ablations to patients at Marc Simon and Simon & Simon's direction. These injections and ablation treatments were minimally invasive treatments that could be performed without general anesthesia and on an outpatient basis. The treatments were essential to the scheme because they were necessary to supply a foundation for predictions of future medical treatment.

34.     Burt's patients did not seek him out from legitimate medical need. Rather, Simon & Simon directed patients to Burt and issued instructions on the specific procedure that he was to deliver.

35.    Simon & Simon issued these directions in scheduling emails that were sent from a medicalsimonlawfirm@gmail.com email account to personnel at Premier Pain & Rehab Center. The emails listed the patients that were to be seen on any particular day. The scheduling emails directed that as many as 10 Simon & Simon clients were to be seen on a single day.

36.    The scheduling emails did not merely direct patients to Burt. They also directed the specific procedure that was to be performed on each patient, before Burt had even examined the patients. The email below—which was produced in discovery in an underlying case in redacted form—illustrates the direction. The email lists the clients to be treated at Premier Pain & Rehab Center on March 31, 2022. It attaches the medical records for each client. It states that a Simon & Simon staff member will conduct a Zoom meeting with each patient. The email also directs the specific treatment that is to be delivered. For example, with respect to the patient to be treated at 4 p.m., the email lists a "LSP RFA" treatment, which denotes a lumbar spine radio frequency ablation treatment.



*Fig. 2 (Reproduction of Fig. 1).*

37.    Simon & Simon also provided car transportation for some clients to get to appointments at Burt's office.

38.    In connection with delivering such treatment, Burt created fraudulent medical records stating that the decision to deliver such ablation treatment was the result of his observations of the patient's pain levels and responses to treatment at the appointment. Burt's records stated that a preliminary treatment was delivered and then a decision was made to administer radiofrequency ablation only thereafter. The medical records contained verbatim recitations of this false treatment rationale, as follows:

| Name | Date | Purported Diagnosis | Stated Treatment Rationale |
|---|---|---|---|
| Claimant B | 5/18/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant C | 7/13/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant D | 11/8/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant E | 8/9/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |

| Name | Date | Purported Diagnosis | Stated Treatment Rationale |
|---|---|---|---|
| Claimant F | 12/28/22 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant G | 2/22/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant H | 3/23/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant I | 4/20/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant J | 5/10/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant K | 5/18/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant L | 10/11/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |

| Name | Date | Purported Diagnosis | Stated Treatment Rationale |
|------|------|---------------------|----------------------------|
| Claimant M | 10/12/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant N | 12/12/23 | Lumbar Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant O | 2/14/24 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant P | 7/10/24 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |

*Fig. 3.*

39.     The statements regarding treatment rationale were knowingly false when made or made with reckless disregard for the truth because they neither reflected the patient's actual conditions nor reflected Burt's actual decision process. In each instance, the treatment was instead the result of direction from Simon & Simon.

40.     Marc Simon and Simon & Simon induced such false statements through lucrative compensation to Burt and Premier Pain & Rehab Center. Since these treatments served no medical purpose, Burt would not have been paid either by patients or their insurers in the ordinary course. Such compensation, together with the promise of a steady stream of future patient referrals from

Simon & Simon, operated as a bribe to induce Burt to produce fraudulent records and provide unnecessary treatment.

41.     Simon & Simon's directions to Burt regarding the treatment protocol to be applied to specific patients constituted unlawful practice of medicine in violation of 63 P.S. § 422.38, and Burt's actions to follow Simon & Simon's directions constituted unprofessional or immoral conduct as a Board-regulated practitioner in violation of 49 Pa. Code § 16.61(a)(6).

42.     Burt and Premier Pain & Rehab Center's collaboration with Marc Simon and Simon & Simon is not limited to lawsuits against Uber. Burt and Premier Pain & Rehab Center have worked at the direction of Marc Simon and Simon & Simon to diagnose non-existent injuries and produce false medical records in cases against other defendants, as well.

**B.     Additional False Treatment Documentation**

43.     In addition to the false records created in connection with Burt's injection and ablation treatments, Marc Simon and Simon & Simon instructed and orchestrated other medical treatment for the purpose of creating a false evidentiary record.

44.     Many claimants first presented to an emergency room and reported pain allegedly resulting from the accident. In most of these cases, emergency room records reflect a diagnosis of a minor injury and a prescription for a minor pain medication such as Tylenol. Simon & Simon claimants who visited the emergency room were discharged within a few hours without being admitted to the hospital. In some cases, the claimant did not visit the emergency room until days or weeks after the subject accident. Upon information and belief, claimants were instructed to visit emergency rooms after retaining Simon & Simon in situations where no such treatment had otherwise been sought.

45.     After an emergency room visit, these claimants typically received chiropractic and physical therapy treatment, often from Defendants Harvey and Piccillo at Philadelphia Spine Associates.

46.     Claimants commonly visited these clinics more than twenty times, typically on a compressed timeframe.

47.     Upon information and belief, in many instances no actual treatment was delivered to the claimants involved. A significant number of the records resulting from such visits were signed within minutes after the scheduled appointment time, despite appointment logs reflecting care that should have required substantially more time. In several instances, records were created and signed *before* the appointment was scheduled to occur.

48.     Records from another clinic controlled by Defendants Harvey and Piccillo, Spinal Associates, contain only the date of the visit, with no indication of the scheduled time, and feature a copy-pasted signature from the attending provider (usually either Harvey or Piccillo).

49.     The combination of unnecessary emergency room visits and subsequent chiropractor records was designed to create a false evidentiary basis for the claim. For example, one claimant was a passenger in a stopped vehicle when a driver using the Uber app reversed into her car at a low rate of speed. A police report from the scene noted no injuries and no damage to either vehicle. The claimant did not seek any medical treatment until two days later, when she visited the emergency room at Temple University Hospital reporting arm pain. Her discharge paperwork from the emergency room suggested she could return to work. Within nine days, however, she had begun an extensive regimen of chiropractic appointments at Philadelphia Spine Associates, regularly reporting her pain to be a "9/10" (severe pain) on the recognized visual

analog scale ("VAS scale") of pain. Upon information and belief, the reported pain level was the result of coaching by Simon & Simon and/or the medical provider.

50.    In a similar case, another claimant was allegedly a passenger of a driver he had connected with through the Uber app. His driver was rear-ended in a low-speed collision. A police report from the scene stated there were no injuries. The claimant did not immediately seek medical treatment. However, the next day, he presented to the emergency room at Temple University Hospital complaining of pain at a "10/10" on the VAS scale, which equates to pain "as bad as it could possibly be." This claimant was discharged with only a suggestion that he take ibuprofen. Nevertheless, five days later, at the direction of Simon & Simon, he was attending his first of 39 appointments at Philadelphia Spine Associates.

### C.    Yarus's Resulting Future Care Projections

51.    Marc Simon and Simon & Simon use these false medical records to manufacture inflated lifetime damages estimates and then use these estimates to induce large settlements from Uber and other defendants.

52.    Marc Simon and Simon & Simon regularly use Defendant Yarus as one such expert. Yarus is presented as an independent evaluator but, in reality, functions as a tool by which Simon & Simon effectuate their scheme. Yarus is selected for his willingness to produce false reports that align with the narrative advanced by Simon & Simon, regardless of the claimant's actual medical condition. Yarus has performed approximately 1,278 medical exams of Simon & Simon clients in the past three years, and Simon & Simon has paid him approximately $1.5 million for these services.

53.    Yarus's reports invariably confirm the existence of serious, permanent injuries and recommend extensive, lifelong medical care.

54.    Each report falsely attributes causation to the subject accident using practically identical language.

55.    Each report also contains substantially similar language falsely describing the relevant injuries:

> There is permanency to the injuries sustained in that this individual is no longer enjoying the same lifestyle, level of comfort, nor activity involving full use of the areas of injury to which they were accustomed prior to sustaining injury in the subject incident. . . . There has been an adverse effect placed on the nerve distribution.

56.    Each report draws virtually the same following conclusion regarding the supposed permanency of the injury:

> It is therefore my opinion that further evaluations and treatments are required based on the current findings given that this individual has not recovered from the effects of the injury sustained in the subject incident, future care is required.

57.    Yarus used nearly identical templates with respect to each of his reports regardless of the actual injury described or the particular circumstances of the patient. In 2023, he used one template. In 2024, he used substantially the same template with slight revisions.

58.    With respect to the template that Yarus used in 2023, in each case he made the following recommendations with respect to each of the following categories of treatment:

- MRI frequency: every other year

- Chiropractor visit frequency: 6-12 visits annually

- Additional orthopedist/physiatrist appointments: 2-4 visits annually

- Trigger point injection frequency: "3 injections every 6 months, for an additional 3 years"

- Radio-frequency ablation frequency: "every 12-18 months"

- Surgical necessity: laminectomies, discectomies, or facetectomies "will be required within the next five years."

- Fusion and stabilization procedures: necessary within 7 years of surgery

59.    With respect to the template that Yarus used in 2024, in each case he made the following recommendations with respect to each of the following categories of treatment:

- MRI frequency: every other year

- Additional orthopedist/physiatrist appointments: 2-4 visits annually

- Trigger point injection frequency: "3 injections every 6 months, for an additional 3 years"

- Percutaneous electrical nerve stimulation treatment frequency: one treatment per month for 3 years

- Radio-frequency ablation frequency: "every 12-18 months"

- Surgical necessity: laminectomies, discectomies, or facetectomies "will be required within the next five years"

- Fusion and stabilization procedures: necessary within 7 years of surgery

60.    The purpose of these medical examiner reports is to create the appearance of independent medical validation for the fraudulent claims. Marc Simon and Simon & Simon utilize these documents to bolster their demands for substantial settlements, presenting them as objective evidence of the need for ongoing care.

61.    In reality, the claimants typically do not pursue the recommended treatment, and there is no genuine medical basis for the dire prognoses described in the reports. Supporting the knowing falsity of his reports, Yarus did not even inform claimants as to his purported belief that their injuries would eventually require surgery.

62.    The uniformity and predictability of Yarus's reports have drawn repeated judicial criticism.

63.    For example, in *Shelton v. Chaudhry*, the court observed: "In this case, as in virtually every case involving Mr. Simon's firm, the plaintiff was examined by a physician after which a life care plan was prepared. Invariably, intensive and costly medical treatment is recommended. But I have yet to see a single case involving the Simon office where any plaintiff actually pursued the recommended care. I therefore view these reports as litigation documents, bearing little relationship to real world medical care." 763 F. Supp. 3d 675, 687 (E.D. Pa. 2025).

64.    The court further noted that when a "firm persistently uses the same forensic examiners, and in every case, without fail, monumental future costs are projected, it becomes difficult to read the reports in question as credibly addressing actual patient needs." *Id.* at n.11.

65.    Similarly, in *Morris v. Sutton*, the judge again highlighted the strategic use of these reports, stating that they "appear to represent a litigation strategy" and that "[t]here would appear to be a legitimate basis on which to question the validity of [Yarus]'s opinions." No. 23-cv-2806, 2025 WL 564932, *1-2 (E.D. Pa. Feb. 19, 2025).

66.    Through these efforts, Marc Simon and Simon & Simon are able to assemble a comprehensive but fraudulent record of purported medical necessity, spanning initial assessments, invasive procedures, and purportedly independent medical examinations. This record is then used to pressure insurers and defendants into paying inflated settlements, despite the absence of any real need for the extensive future care described.

67.    Yarus's involvement in the scheme extends beyond cases against Uber. In a case filed by Marc Simon and Simon & Simon against other parties in Pennsylvania, Yarus examined a claimant and determined that she would need years of expensive medical care including epidural

steroid injections, radiofrequency ablations, laminectomies, discectomies, and facetectomies for each of five different vertebrae levels, and fusion and stabilization surgery. Yarus's report in this case was knowingly false when made, or made with reckless disregard for the truth, because dashcam video footage of the motor vehicle accident in question clearly indicated that the claimant suffered no injuries in the collision. And in a case filed by Marc Simon and Simon & Simon against other parties in New Jersey, Yarus produced a detailed report diagnosing a number of injuries and stating that a lifetime of expensive medical care would be necessary. When questioned under oath, the claimant in the case testified that Yarus had never examined her in person, making the statements in his report knowingly false.

68.     Marc Simon and Simon and the Simon & Simon firm effectuated this scheme by using the false medical treatment history as the basis for filing lawsuits against Uber and others. Such lawsuits were in furtherance of the scheme's goal: to convert marginal motor vehicle claims into million-dollar-plus lawsuits against Uber and other defendants. Simon & Simon filed dozens of such tainted lawsuits, attempting to extract settlements from the named defendants well in excess of the value of their clients' alleged injuries.

69.     In 2025, Uber served subpoenas in certain of the lawsuits that had been filed against it, seeking depositions of Burt and his business partner Dr. Abraham. Simon & Simon quickly dismissed Uber from all of the nearly thirty cases involving Burt. Simon & Simon and Burt did so to avoid discovery and conceal the scheme described herein. Each of the Burt-involved cases against Uber was dismissed. Many of those cases, however, remain pending against the other defendants that Simon & Simon had sued.

**D.      Examples of the Scheme in Operation Against Uber**

70.     The following cases illustrate the pattern of corrupt activity directed at Uber.

### 1. Personal Injury Claimant A

71.     On April 26, 2024, at approximately 6:13 p.m., Personal Injury Claimant A was driving a vehicle that was struck by another driver, causing Claimant A to collide with a third car. Police officers responded to the scene of the accident, which occurred in Philadelphia, Pennsylvania. Claimant A reported no injuries; neither did any other person at the scene. Airbags did not deploy, and no ambulance was called.

72.     Claimant A never visited the emergency room. Instead, on May 9, 2024, Claimant A traveled to Philadelphia Spine Associates for alleged treatment of non-existent neck and back injuries by Defendant Harvey. Over the months that followed, Claimant A purportedly traveled to Philadelphia Spine Associates for approximately 27 treatment sessions by Defendants Harvey and Piccillo. Such treatment was directed by the Simon & Simon firm.

73.     Upon information and belief, these appointments at Philadelphia Spine Associates did not occur as described in the treatment reports. Each of the 27 treatment reports contain the same boilerplate statement that "Patient currently complains of the following: <u>Headaches, Neck Pain, Low Back Pain, Mid Back Pain</u>."  Two of the treatment reports were e-signed by Harvey within a few minutes of the start time of the treatment sessions (August 1 and August 12, 2024). Thirteen treatment sessions reports were e-signed in a batch over one hour on June 24, 2024 by someone using the e-signatures of Harvey and Piccillo, as shown in the following chart:

| Purported Date of Treatment Session | Purported Provider for Treatment Session | Name used for e-signature | Date of e-signature | Time of e-signature |
|---|---|---|---|---|
| 5/9/24 | Harvey | Harvey | 6/24/24 | 12:10 p.m. |

| 5/13/24 | Harvey | Harvey | 6/24/24 | 12:12 p.m. |
|---|---|---|---|---|
| 5/16/24 | Harvey | Harvey | 6/24/24 | 12:45 p.m. |
| 5/20/24 | Harvey | Harvey | 6/24/24 | 12:46 p.m. |
| 5/23/24 | Harvey | Harvey | 6/24/24 | 12:47 p.m. |
| 5/28/24 | Harvey | Harvey | 6/24/24 | 12:49 p.m. |
| 5/31/24 | Piccillo | Piccillo | 6/24/24 | 12:58 p.m. |
| 6/3/24 | Harvey | Harvey | 6/24/24 | 1:00 p.m. |
| 6/8/24 | Piccillo | Piccillo | 6/24/24 | 1:01 p.m. |
| 6/11/24 | Piccillo | Piccillo | 6/24/24 | 1:02 p.m. |
| 6/13/24 | Piccillo | Piccillo | 6/24/24 | 1:04 p.m. |
| 6/18/24 | Harvey | Harvey | 6/24/24 | 1:05 p.m. |
| 6/20/24 | Harvey | Harvey | 6/24/24 | 1:09 p.m. |

*Fig. 4.*

74.     Marc Simon and the Simon & Simon firm subsequently directed Claimant A to Defendants Burt and Premier Pain & Rehab Center. On November 12, 2024, Defendant Burt examined Claimant A and recommended an L5 medial branch nerve block and a bilateral L5 radiofrequency ablation. Such treatments were medically unnecessary and causally unrelated to any accident, given that Claimant A had suffered no injury. Such treatments were delivered at the direction of Marc Simon and the Simon & Simon firm.

75.     Defendant Burt falsely represented in a resulting medical record with respect to Claimant A, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5

radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that

this statement was false when made given that Claimant A had suffered no such trauma. Among

other things, the MRI records for Claimant A showed that there was no such injury.  The treating

radiologist described the MRI of Claimant A's cervical spine as an "[e]ssentially negative

examination" and noted that "disc height is preserved throughout" and that "disc margins are

unremarkable." The same treating radiologist described the MRI of Claimant A's lumbar spine as

a "[n]egative examination" and stated that "disc signal and disc height are preserved" and there

was "no evidence of herniated nucleus pulposus or foraminal stenosis."

76.     Marc Simon and Simon & Simon then directed Claimant A to visit Defendant Yarus

for a medical examination. The resulting report falsely stated as follows:

> CONCLUSIONS: The following injuries occurred as a result of the subject incident
> in which [Claimant A] was involved on April 26, 2024:
> 1.     Cervical strain and sprain . . .
> 2.     Lumbar strain and sprain . . .
> 3.     Facetogenic pain mediated by L3-4, L4-5 and L5-SS1 injured in the subject
>        incident of April 26, 2024.
> 4.     Chronic pain secondary to subject incident-related injuries . . .
> 5.     Alteration of activities secondary to subject incident-related injuries . . .

77.     The report went on to state falsely that "[b]ased on the current history, examination

findings, the opportunity to review submitted records, hard copy study review of the imaging

studies, clinical experience, and any applicable research, it is my opinion, to a reasonable degree

of medical certainty, that the injuries and conditions . . . were directly caused by the subject

incident of April 26, 2024." Finally, Yarus stated falsely that "[i]t is my opinion, to a reasonable

degree of medical certainty, that this individual sustained a serious and permanent impairment of

function in regard to the injuries sustained in the subject accident." Yarus knew or acted with

reckless disregard for the fact that these statements were false when made given that Claimant A

did not suffer a serious injury that was in any way causally connected to the accident.

78.    Yarus then produced a report falsely concluding that Claimant A would require multiple invasive surgeries including "laminectomies, discectomies, and facetectomies for each of the target levels identified at L3-4, L4-5, and L5-S1," as well as "fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies." Additionally, Yarus's report falsely stated that Claimant A would require a lifetime of "[m]edical surveillance" including MRIs, chiropractic care, physical therapy, and other invasive spinal procedures such as epidural steroid injections and further radiofrequency ablations. Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant A suffered no serious injury and did not require this lifetime of treatment. Simon & Simon then used Yarus' false and fraudulent report to obtain a "life care plan," which estimated that the treatment contemplated by Yarus would cost more than $1 million over the course of Claimant A's lifetime.

79.    As with other Simon & Simon clients who were treated by Burt, there is no evidence Claimant A has sought or plans to seek any of the future treatment Yarus stated would be necessary—indeed, there is no evidence Claimant A has sought further treatment at all.

## 2.    Personal Injury Claimant B

80.    A substantially similar pattern is evident in a lawsuit stemming from an accident that occurred on November 12, 2022, at approximately 7:55 p.m. in Philadelphia, Pennsylvania. At that time, Personal Injury Claimant B sat in the back seat of a car that was stopped at an intersection. Claimant B had requested the ride through the Lyft app. The car stopped in front of the vehicle she was riding in reversed to avoid being hit by a SEPTA bus that was making a wide turn. This car in front, which was using the Uber app at the time, lightly tapped the front bumper of the car that Claimant B was in. The police responded to the scene. Claimant B reported no injuries, and neither did any other passenger. No airbags deployed, no ambulance was called, and no tows were needed.

-23-

81.    On November 14, 2022—two days after the incident—Claimant B visited the emergency room at Temple University Hospital.  She was given a steroid shot in her arm for pain and told she could return to work the next day.

82.    On November 23, 2022, Claimant B traveled to Philadelphia Spine Associates and Daniel Piccillo at the direction of Simon & Simon.  On that date, Claimant B claimed to have pain in her neck and back that was level 9 of 10.  Over the months that followed, Claimant B purportedly traveled to Philadelphia Spine Associates and Piccillo and Harvey for approximately 17 follow-up visits.

83.    The treatment sessions did not occur as indicated in the records.  The records instead cut and pasted boilerplate recitals without regard to the actual facts.  Each of the 17 visit records state that (a) "Patient currently complains of the following:  <u>Neck Pain, Mid Back pain, Low Back Pain</u>"; (b) that "Joint fixations with bio-mechanical alterations of the surrounding areas were noted with hypomobility"; (c) that "The following techniques Chiropractic Manipulation, Arthrostim were applied to the areas of subluxation"; and (d) that "Treatment was effective, tolerated well, and without incident."

84.    Simon & Simon also directed Claimant B to Defendants Burt and Premier Pain & Rehab Center.  On May 18, 2023, Burt reviewed Claimant B's MRI records and diagnosed Claimant B with a "disc bulge at C3-4, C4-5," which "resulted from automobile accident." Defendant Burt knew or acted with reckless disregard for the fact that the statement was false when made given that Claimant B had suffered no such injury.  This diagnosis was false and was facially inconsistent with the actual MRI records.  The treating radiologist who had performed that MRI had noted that "disc signal and disc height are preserved," that there "is no evidence of herniated nucleus pulposus or foraminal stenosis," and that it was in general a "negative examination."

85.    Nevertheless, Burt recommended and performed a "C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation," a procedure that was entirely unnecessary based on Claimant B's non-existent injuries.

86.    Simon & Simon next directed Claimant B to Yarus for a purportedly independent medical examination.  Yarus's report began by describing the accident itself in a blatantly false manner, stating that Claimant B "hit the seat in front of her" when "[a]nother vehicle struck the vehicle in which she was traveling."  This type of physical reaction would not be possible from the actual collision that occurred—another car backing into the front of Claimant B's car at a low rate of speed.  Yarus then falsely stated the following:

> CONCLUSIONS: the following injuries occurred as a result of the subject incident in which [Claimant B] was involved occurring on November 12, 2022.
> 1.  Cervical strain/sprain . . .
> 2.  Facetogenic pain mediated by C4-5, C5-6 injured in the subject accident . . .
> 3.  Cervicular dorsopathy/cervical facet syndrome.
> 4.  C5 radiculopathy.
> 5.  Chronic pain secondary to subject incident-related injuries . . .
> 6.  Alteration of activities secondary to subject incident-related injuries . . .

87.    Yarus used the fraudulent records produced by Burt, Harvey, and Piccillo at the direction of Simon & Simon to falsely state that "it is my opinion that the injuries and conditions as they are outlined herein were directly caused by the subject incident of November 12, 2022" and that "[t]here is permanency to the injuries sustained[.]"  This statement was knowingly false or made with reckless disregard for the truth when made because Claimant B suffered no such injury.

88.    Yarus then used the fraudulent medical records to produce a false report concluding that Claimant B would require multiple invasive surgeries including "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C4-5, C5-6," as well

as "fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies." Additionally, Yarus's report falsely stated that Claimant B would require a lifetime of "[m]edical [s]urveillance" including MRIs, chiropractic care, physical therapy, and other invasive spinal procedures such as epidural steroid injections and further radiofrequency ablations. Yarus knew or acted with reckless disregard for the fact that these statement were false when made, given that Claimant B suffered no serious injury and did not require such treatment. Simon & Simon then used Yarus' fraudulent report to obtain a "life care plan" estimating that the treatment contemplated by Yarus would cost nearly $900,000 over the course of Claimant B's lifetime. These calculations were false. Upon information and belief, Claimant B did not go on to pursue the care Yarus projected.

### 3. Personal Injury Claimant C

89.     On March 10, 2023, at approximately 5:18 p.m., Personal Injury Claimant C was driving in a rented car wearing his seatbelt when he allegedly struck another driver, also in a rented vehicle, on the rear driver's side, in Philadelphia, PA. After the accident, police responded to the scene. Claimant C and the others involved reported no injuries. The police report noted that Claimant C's car had "minor damage to the front bumper, hood, and fenders, but was drivable" and that the other car had "minor damage" and was "also drivable." Airbags did not deploy, and no ambulance was called.

90.     Over 24 hours after the alleged accident, Claimant C visited the Thomas Jefferson University Hospital Emergency Room. He reported being involved in a car accident the night before. He was treated with a lidocaine patch, Tylenol, and Advil. An X-ray of his thoracic and lumbar spine was ordered, which showed no fracture or dislocation. Claimant C denied having any neck pain and there was "no diagnosis found." He was discharged with instructions to take ibuprofen and alternate ice and heat on sore areas.

91.    Four days later, Claimant C went to a Philadelphia chiropractor, Passyunk Chiropractic and Rehabilitation, for purported treatment of non-existent neck and back injuries, rating his pain as a 7 out of 10.  Over the following months, Claimant C traveled to Passyunk Chiropractic and Rehabilitation for 12 treatment sessions.  He was also prescribed a back brace and an electric muscle stimulation unit.  Some or all of these treatment sessions did not occur as indicated in the treatment records.  The visit notes appear to have been filled out two at a time, with the signature and style of noting injuries substantially matching on each 2-visit sheet.  Further, the visit sheets note the number of the visit (2, 4, 6, 8, 10) in the bottom corner of the visit sheet— as if they were prepared for signature ahead of time.  Claimant C rated his pain as a 7 or 8 (severe pain) for each alleged visit.  Defendant Simon & Simon was listed as the payor on the resulting bill issued from each visit.

92.    Simon & Simon subsequently directed Claimant C to Burt.  On July 13, 2023, four months after Claimant C denied neck pain during his emergency room visit, Defendant Burt examined Claimant C and noted that Claimant C complained of cervical (neck) pain at level 8 of 10.  Burt recommended a C6 medial branch nerve block and bilateral C6 radiofrequency ablation procedures. He then proceeded with such procedures.

93.    Such treatment was medically unnecessary, given that Claimant C had suffered no injury.  For the purpose of adding the expense of such injection to the claim, Defendant Burt falsely represented with respect to Claimant C, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation."  Upon information and belief, Defendant Burt knew or acted with reckless disregard for the fact that the statement was false when made, given that Claimant C had suffered no such trauma.

94.     It was reasonably foreseeable to Defendant Burt that such false statements would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through interstate wires to Simon & Simon for further transmission by interstate wires to an insurance carrier. Such record was in fact so mailed and transmitted. As such, each record was executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343).

95.     Simon & Simon next directed Claimant C to Joseph Lee, another physician who regularly works with Simon & Simon and Burt to produce expert reports, for an allegedly independent medical examination. Lee's report used the fraudulent records produced by Burt and the other defendants to falsely state that "as a direct result of the motor vehicle accident on 3/10/23," Claimant C had suffered "[c]ervical pain and radiculopathy secondary to C3-4, C4-5 central disc herniation, C5-6 right sided disc herniation with nerve root compression." Lee stated that "it is of my medical opinion within a reasonable degree of medical certainty that the injuries and/or conditions outlined in this report were caused and/or aggravated by the motor vehicle accident on 3/10/23," and that Claimant C "suffered a serious and permanent injury to his cervical spine due to the motor vehicle accident on 3/10/23."

96.     Lee then used these fraudulent records to state that Claimant C "will require further treatment" throughout the course of his life, including "repeat cervical radiofrequency ablations (1-2 times a year)" and "cervical surgery" involving three separate disc replacements or fusions. Lee used this prognosis to produce a "lifetime care" estimate of over $1.3 million.

### 4.      Personal Injury Claimant D

97.     On July 23, 2023, at approximately 5:30 p.m. Personal Injury Claimant D was a passenger in a vehicle that was involved in a low-speed collision with a SEPTA bus. After the accident, police and EMS responded to the scene. Airbags did not deploy. Claimant D claims that she presented that day to Temple Hospital's emergency department, but she left before being seen.

98.    The following morning, Claimant D presented to Chestnut Hill Hospital's Emergency Department. She was quickly discharged with a lidocaine patch and instructions to take ibuprofen as needed. The emergency room providers noted that there was no reason for imaging at the time.

99.    Two days later, Claimant D went to Philadelphia Spine Associates and Defendant Daniel Piccillo for purported treatment of non-existent neck and back injuries at the direction of Defendant Simon & Simon. Over the months that followed, Claimant D purportedly traveled to Philadelphia Spine Associates and Defendants Piccillo and Harvey for approximately 22 treatment sessions. Such treatment was directed by the Simon & Simon firm. Claimant D rated her pain as an 8 out of 10 (severe) for 19 of the 22 alleged visits.

100.    Each visit record produced by Defendants Harvey and Piccillo documented multiple purported treatments, including infrared therapy, mechanical traction therapy, electrical stimulation, and chiropractic adjustment. Some or all of these treatment sessions did not occur as described in the treatment records. Each treatment record stated that trigger point massage was performed by a licensed massage therapist for exactly 15 minutes. However, Claimant D later reported to an independent medical examiner that her chiropractic treatments consisted of sitting in a chair and getting electrical stimulation. She denied getting chiropractic adjustments or massages.

101.    In particular, several of Defendant Harvey's treatment sessions did not occur as described. Defendant Harvey electronically signed or caused to be signed records from three visits before the listed appointment time, indicating that these appointments and treatments did not take place as described, if at all. Defendant Harvey electronically signed or caused to be signed five

additional records within 11 minutes of the scheduled appointment time—an interval inconsistent with the duration of care documented in the records.

102.    If such treatment occurred at all, it was medically unnecessary, given that Claimant D had suffered no injury.  For the purpose of adding the expense of such treatments to the personal injury claim, Defendants Piccillo and Harvey falsely represented in numerous records that Claimant D received massages, mechanical traction therapy, electrical stimulation, and chiropractic adjustment.  Upon information and belief, Defendants Harvey and Piccillo knew or acted with reckless disregard for the fact that the statements were false when made, given that Claimant D did not receive such treatments as described, and that any treatment she did receive was not necessary, as she suffered no injury.

103.    On several occasions between June 26, 2023 and November 2, 2023 Defendants Piccillo and Harvey caused records of their treatments of Claimant D to be transmitted through interstate wires to a cloud-based platform of a company located in a different state.  Each such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

104.    Simon & Simon subsequently directed Personal Injury Claimant D to Burt.  On November 8, 2023, Defendant Burt examined Claimant D and recommended a L5 medial branch nerve block and bilateral L5 radiofrequency ablation procedures.  He then documented that he proceeded with such procedures.  These procedures did not occur as described.  In reviewing the record and radiograph images from the procedure, an independent medical examiner noted that there was no evidence that the medial branch nerves were injected and that the standard procedure for the medial branch blocks was not followed.  The same report states that Claimant D herself

admitted in a deposition on August 27, 2024 that she had received only one injection and not the multiple injections reflected in Burt's records.

105.    If such treatment occurred at all, it was medically unnecessary, given that Claimant D had suffered no injury.  For the purpose of adding the expense of such injection to the personal injury claim, Defendant Burt falsely represented with respect to Claimant D, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation."  Upon information and belief, Defendant Burt knew or acted with reckless disregard for the fact that the statement was false when made because Claimant D suffered no such injury.

### 5.    Personal Injury Claimant E

106.    On February 22, 2023, at approximately 6:46 p.m. Personal Injury Claimant E was a passenger in a vehicle that was involved in a low-speed rear-end accident with another vehicle. Police responded to the accident.  No parties were injured; no ambulance was called; and no tow was needed.

107.    The following afternoon, Claimant E presented to Temple University Hospital's Emergency Department.  He was seen, diagnosed with a sprain, and discharged within two hours with instructions to take acetaminophen as needed.  Medical providers at Temple University Hospital instructed Claimant E to follow up with the Emergency Department if his symptoms worsened.

108.    Claimant E did not do as instructed, nor did he follow up with his regular primary care doctor.  Instead, on February 28, 2023, six days after the accident, Claimant E went to Philadelphia Spine Associates and Defendant Harvey for purported treatment of non-existent neck and back injuries at the direction of Defendant Simon & Simon.  Over the next several months, Claimant E purportedly traveled to Philadelphia Spine Associates and Defendants Piccillo and

Harvey for approximately 38 additional treatment sessions.  Upon information and belief, some or all of these sessions did not occur as described in the treatment reports. Despite these visits allegedly occurring over a range of dates, both Defendant Piccillo and Defendant Harvey signed several records in a span of a few minutes, suggesting that the Defendants had not reviewed the records in detail, or that the visits and treatment described may not have occurred at all. Additionally, in several instances the Defendant who signed the record was not the Defendant listed as the treating provider for that appointment—further suggesting that the treatment or appointments may not have occurred in the manner described, if at all.

109.    In each visit record, Defendants Harvey and Piccillo documented some combination of multiple purported treatments, which included infrared therapy, mechanical traction therapy, electrical stimulation, and chiropractic adjustment.  Every visit record also stated that trigger point massage was performed by a licensed massage therapist for 15 minutes. These sessions did not occur as described in the treatment reports.  Claimant E later stated in a deposition that he only received massages, and perhaps at some point unspecified "exercises," at Philadelphia Spine Associates.

110.    If such treatment occurred at all, it was medically unnecessary.  For the purpose of adding the expense of such treatments to the personal injury claim, Defendants Piccillo and Harvey falsely represented in numerous records that Claimant E received a myriad of treatments at each appointment.  Upon information and belief, Defendants Harvey and Piccillo knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant E did not receive all such treatments and that any treatment he did receive was not necessary based on the severity of his injury.

111.     On several occasions between February 28, 2023, and October 10, 2023, Defendants Piccillo and Harvey caused records of their purported treatments of Claimant E to be transmitted through interstate wires to a cloud-based platform of a company located in a different state. Each such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

112.     Marc Simon and Simon & Simon subsequently directed Claimant E to Burt. On August 9, 2023, Defendant Burt examined Claimant E and recommended an L5 medial branch nerve block and a bilateral L5 radiofrequency ablation. He then documented that he proceeded with such procedures.

113.     If such treatment occurred at all, it was medically unnecessary. For the purpose of adding the expense of such injection to the personal injury claim, on August 9, 2023, Defendant Burt falsely represented with respect to Claimant E, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Upon information and belief, Defendant Burt knew or acted with reckless disregard for the fact that any treatment Claimant E received was not necessary based on the severity of his injury.

114.     Claimant E's medical records related to his treatment with Philadelphia Spine Associates and Burt do not accurately reflect the treatment that was actually delivered. Claimant E was still undergoing chiropractic treatment with Philadelphia Spine Associates after his purported injections. However, despite Burt's records reflecting an improvement in Claimant E's pain, the chiropractic records do not reflect a commensurate decrease in pain at visits following the injection and ablation procedure. In fact, the chiropractic records make no mention of Burt's procedure anywhere in the treatment records or final examination record. Upon information and

belief, this suggests that the chiropractic visits that purportedly occurred after the Burt injections did not occur at all.

115.    Claimant E initially did not initially inform his regular primary care provider that he was receiving treatment from Burt and Philadelphia Spine Associates.

116.    Simon & Simon also directed Claimant E to Yarus for a medical examination. Yarus's report, dated November 30, 2023, used the fraudulent records produced by Burt and the other defendants to falsely state that Claimant E's injuries were permanent and "directly caused by the subject incident of February 22, 2023." In that report, Yarus interpreted Claimant E's MRIs as showing a "disc bulge/protrusion, extrusion-type herniation" in Claimant E's cervical spine and a "protrusion/extrusion-type herniation" in Claimant E's lumbar spine.   However, none of Claimant E's other providers, nor a subsequent medical records reviewer, interpreted the MRIs as indicating a protrusion or herniation.  Additionally, it appears that Yarus did not consult any pre-accident medical records when forming his opinion, including records indicating that Claimant E was diagnosed with back pain with radiation as of February 2022.

117.    Yarus then used these fraudulent records to falsely state that Claimant E would require, among extensive other treatments, surgical intervention "within the next five years." Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant E suffered no serious injury and did not require such treatment.  This report, along with the underlying records, was later used to generate a phony estimated lifetime cost of care of over $1.5 million.

**E.    Examples of the Scheme in Operation Against Others**

118.    Uber has not been the only victim of Defendants' scheme. The following examples illustrate the pattern of corrupt activity in cases against other defendants.

### 1. Personal Injury Claimant AA

119.    On December 22, 2022, at approximately 3:00 p.m., Personal Injury Claimant AA

was a passenger in a motor vehicle that was involved in a side-swipe collision with another vehicle.

Airbags in the vehicle did not deploy. Dashcam footage of the collision in question shows that

Claimant AA, who was seated in the rear passenger side seat and was wearing a seatbelt, did not

suffer an injury. The screenshots below show the passenger immediately before and immediately

after the collision.

*Before Incident*                                              *After Incident*



*Fig. 5.*

120.    A police accident report produced after the fact noted that the physical condition of

all individuals involved was "apparently normal" and that Claimant AA "state[d] no injuries at

time of report."

121.    The next day, Claimant AA visited the emergency room at Nazareth Hospital.

Claimant AA received x-rays at Nazareth, which were unremarkable and showed no fracture or

subluxation. Claimant AA was discharged with a prescription for naproxen, which she later testified she did not even bother to fill.

122.    On January 9, 2023, Claimant AA first visited Philly Spine Center. Upon information and belief, she did so at the direction of Simon & Simon. Even though she had suffered no injury, Claimant AA returned to Philly Spine Center for approximately 42 follow-up visits over the next seven months.

123.    On September 12, 2023, Claimant AA was examined by Yarus. Upon information and belief, this examination occurred at Simon & Simon's direction. Despite the fact that Claimant AA suffered no injuries in the collision, Yarus produced a report stating that as a result of the accident, Claimant AA had suffered a number of injuries, including "[c]ervical strain/sprain, cervical myositis, somatic and segmental dysfunction cervical spine, enthesopathy of the cervical spine," "[f]acetogenic pain mediated by C4-5, C5-6 and C6-7; L4-5 and L5-S1," and "[c]hronic pain secondary to subject incident related injuries sustained on [December 22, 2022]." Yarus stated that it was his "opinion that the injuries and conditions as they are outlined herein were directly caused by the subject incident of [December 22, 2022]" and that the "injuries that were sustained in the subject incident are permanent and highly susceptible to re-injury." Yarus then stated that Claimant AA would eventually require future treatment including: "[m]edical surveillance," "repeat visits to the treating chiropractors, 6-12 times annually," "2-4 annual visits to an orthopedist/physiatrist," "[e]pidural and/or facet injections . . . at the frequency of 3 injections every 6 months, for an additional 3 years," "radiofrequency ablations every 12 to 18 months," "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C4-5, C5-6, and C6-7; L4-5 and L5-S1," "[f]usion and stabilization procedures," and "postoperative physical therapy." These statements were knowingly false when made, or made with reckless

disregard for the truth, given that Claimant AA had not suffered a serious injury in the incident in question. Yarus's report, along with other false documents created in the course of Claimant AA's treatment, was later used to generate a false estimated lifetime cost of care of over $1.5 million.

124.    On November 30, 2023, Marc Simon and Simon & Simon filed a lawsuit alleging that Claimant AA had "suffered serious, severe and permanent bodily injuries, including, to the neck, back and headaches." Upon information and belief, this statement, and any subsequent failure to correct it, was knowingly false when made or was made with reckless disregard for the truth because Claimant AA suffered no such serious injury.

### 2.    Personal Injury Claimant BB

125.    On October 8, 2022, at approximately 7:00 p.m., Personal Injury Claimant BB was a passenger in a motor vehicle involved in a collision. Claimant BB was transported via ambulance to Jefferson Hospital, where she complained of knee pain, headache, and rib pain. Imaging studies of Claimant BB's left knee, chest, and head revealed no apparent injury.

126.    According to Claimant BB, she and another passenger decided to contact an attorney following the incident. They called a law firm, which referred them to Simon & Simon.

127.    In her deposition, Claimant BB testified that all of her medical providers were connected with Simon & Simon, and that Simon & Simon instructed her which doctors to see, arranged transportation to her appointments, and directed the procedures and treatments she would receive.

128.    Beginning on October 13, 2022, Claimant BB was directed by Simon & Simon to attend physical therapy appointments and evaluations with Dr. Eric Rosin, another practitioner to whom Marc Simon and Simon & Simon refer patients. According to Claimant BB's testimony, Simon & Simon—not the physical therapist—mandated that she attend at least 15 appointments.

Over the months that followed, Claimant BB purportedly attended approximately 14 treatment sessions, despite the fact that the hospital imaging reports showed no serious injury.

129.    Simon & Simon subsequently directed Claimant BB to Defendants Burt and Premier Pain & Rehab Center. On April 13, 2023, Defendant Burt examined Claimant BB and recommended a medial branch nerve block and radiofrequency ablation procedures in Claimant BB's knee. Such treatments were medically unnecessary and causally unrelated to any accident, given that Claimant BB had suffered no injury. Such treatments were delivered at the direction of the Simon & Simon firm.

130.    Claimant BB stated in a deposition that Simon & Simon, rather than a medical provider, scheduled the procedure with Dr. Burt and that the decision to proceed with the procedure was made by personnel at Simon & Simon before Claimant BB had even been examined by Burt.

131.    Claimant BB was subsequently scheduled for an appointment with Lance Yarus. Yarus produced a report dated October 3, 2023, which stated that he "had the pleasure and privilege of evaluating [Claimant BB] in person in my Philadelphia office on October 3, 2023." However, Claimant BB claimed that she canceled her appointment with Yarus and specifically testified that "I think I talked to [him] over the phone or something, but I never went in person."

132.    Yarus's report included details of a physical examination, such as assessments of range of motion and various physical tests that could not have been performed over the phone. Upon information and belief, this report was produced at the direction of Simon & Simon. Despite that fact that Claimant BB suffered no injuries in the collision, Yarus's report stated that as a result of the accident, Claimant BB had suffered a number of injuries, and would require multiple invasive surgeries, including "laminectomies, discectomies, and facetectomies for each of the target levels identified at C4-5, C5-6, and C6-7," trans arthroscopic surgery for the left knee, as

well as "fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies." Additionally, Yarus's report stated that Claimant BB would require a lifetime of "medical surveillance" including MRIs, chiropractic care, physical therapy, and other invasive procedures such as epidural steroid injections and further radiofrequency ablations.

133.    These statements were knowingly false when made, as Yarus had not physically examined Claimant BB and objective evidence available at the time made clear that Claimant BB had not suffered a serious injury. Yarus's report, along with other false documents created in the course of Claimant BB's treatment, was later used to generate a phony estimated lifetime cost of care pursuant to Defendants' scheme to defraud.

**RACKETEERING ALLEGATIONS**

134.    At all relevant times, Defendants' scheme was in violation of 18 U.S.C. §§ 1962(c) and/or (d) of the RICO statute as further set forth below.

**A.     Defendants' Misconduct and Respective Basis for Liability**

**1.     Simon & Simon and Marc Simon**

135.    As described above, Defendant Simon & Simon and Defendant Marc Simon organized and effectuated this scheme.  Defendant Simon & Simon and Defendant Marc Simon have participated and likely will in the future participate in this scheme by accepting clients with low-value or meritless claims, funneling them through a conveyor belt of unnecessary medical treatment, directing Defendant Premier Pain and Rehab Center and Defendant Clifton Burt, Defendant Yarus, and other medical providers to produce fraudulent medical records, and using those fraudulent medical records to pursue fraudulent and/or inflated claims against Uber in Pennsylvania state court.

136.    Marc Simon has been the subject of two sanctions proceedings in this Court related to his conduct in other personal injury cases.  In *Shelton v. Chaudhry*, 763 F. Supp. 3d 675 (E.D.

Pa. 2025), Judge McHugh imposed Rule 11 sanctions against Simon for misrepresenting the

existence of venue in this district, and in the process flatly contradicting representations he previously

made to the Court in seeking to avoid sanctions. Judge McHugh found that Simon had made a "totally

unfounded assertion of jurisdiction" by misrepresenting the citizenship of certain defendants to defeat

removal on the basis of diversity jurisdiction. *Id.* at 679. In his decision awarding sanctions, Judge

McHugh also noted that:

> Mr. Simon requests that this Court consider his firm's investment into the
> case, contending that "my firm has worked with him to get the best medical
> care for his injuries.. .] Not exactly. In this case, as in virtually every case
> involving Mr. Simon's firm, the plaintiff was examined by a physician after
> which a life care plan was prepared. Invariably, intensive and costly
> medical treatment is recommended. But I have yet to see a single case
> involving the Simon office where any plaintiff actually pursued the
> recommended care. I therefore view these reports as litigation documents,
> bearing little relationship to real world medical care.

*Id.* at 687.

137.    In *Contreras Madrid v. Wal-Mart Stores, L.P.*, No. 24-cv-5229, 2025 WL 1698701,

at *3 (E.D. Pa. June 17, 2025), Judge Pappert imposed Rule 11 sanctions against Simon and his

co-counsel for "failing to conduct a reasonable inquiry into their claims against [two of the

defendants], which lacked any evidentiary support." Judge Pappert found that Simon had failed

to conduct an investigation into the defendant's involvement in the accident, and noted that:

> What's more, it seems this failure is part of a troubling pattern. Beginning
> in at least 2022, in slip-and-fall cases against retail stores, Simon and
> Gosnear identified non-diverse individuals they could label a manager and
> stamped his or her name on a standard-form complaint with rinsed-and-
> repeated allegations. These claims were seemingly designed to preclude
> federal jurisdiction, so no research was done into their veracity. Pursuant
> to this practice, Simon and Gosnear conducted no inquiry into whether
> Sanabria or Henry participated in the slip-and-fall alleged here.

*Id.* at *5.

138.    The court further noted that, at the show-cause hearing, Simon testified that firm protocol authorized paralegals to prepare complaints, sign, and file them.  Judge Pappert noted that Simon, despite testifying otherwise, could not have read the complaints before filing, in light of the obvious errors in the complaints.

### 2.    Premier Pain & Rehab Center and Clifton Burt

139.    Premier Pain & Rehab Center and Clifton Burt have participated and likely will in the future continue to participate in the scheme by diagnosing non-existent injuries, performing unnecessary medical procedures, and producing fraudulent medical records at the direction of Simon & Simon and Marc Simon.

140.    The fraudulent documents produced by Defendant Premier Pain & Rehab Center and Defendant Burt are crucial to advancing Simon & Simon's scheme.  Defendant Burt's diagnosis of a serious back injury and performance of an invasive procedure allows Simon & Simon to justify much larger initial settlement demands.

141.    Upon information and belief, Defendant Burt participates in Simon & Simon's scheme because he has few if any other options to legitimately earn a living as a pain management physician due to his lengthy legal and regulatory history.

142.    In 2009, the Virginia Board of Medicine formally reprimanded Defendant Burt for prescribing controlled substances to individuals "outside of a bona fide practitioner-patient relationship."  The Board found that Defendant Burt had prescribed these substances without personally conducting physical examinations, in violation of state law, and without the required licensure from the Board of Pharmacy.  Defendant Burt subsequently received reprimands from the medical board of New Jersey and New York for the same conduct.

143.    In 2011, the Drug Enforcement Administration (DEA) revoked Defendant Burt's registration to prescribe controlled substances in New Jersey and Virginia due to violations of the Controlled Substances Act, citing the same pattern of conduct as described.

### 3.    Chiropractic Defendants

144.    As described above, Harvey, Piccillo, and Philadelphia Spine Associates have participated and likely will in the future continue to participate in the scheme by diagnosing non-existent injuries, performing unnecessary medical procedures, and producing fraudulent medical records at the direction of Simon & Simon and Marc Simon.  The volume of fraudulent medical records that the chiropractic Defendants produce plays a key role in advancing the scheme and assisting in the efforts of the enterprise's corrupt endeavors.  The high volume of alleged treatments allows Simon & Simon to paint the picture of a serious injury, and to justify more invasive procedures allegedly performed by Burt.  The records produced by the Chiropractic Defendants are fraudulent, purporting to memorialize treatment that was either unnecessary, not administered as described, or never administered at all.

### 4.    Lance Yarus

145.    As described above, Defendant Lance Yarus has conspired to advance the scheme by using the fraudulent documents produced by Defendant Burt and the Chiropractic Defendants to produce fraudulent reports asserting that the individual claimants have suffered serious injuries and will require a lifetime of expensive medical care.  These reports allow Marc Simon and Simon & Simon to fraudulently transform low-dollar cases into million-dollar-plus personal injury lawsuits.  Yarus produces these reports at the direction of Marc Simon and Simon & Simon.

### B.    Uber is a Victim of the Scheme and has Suffered Injury

146.    Uber is a victim of this scheme because it has incurred substantial expense in defending these false or inflated claims.  The unnecessary medical treatments provided through

Defendants' scheme of fraud, and the false medical records supporting the necessity of those treatments, allowed Simon & Simon and Marc Simon to attempt to fraudulently induce significantly larger settlement payments out of Uber in these personal injury lawsuits. As such, Uber has been forced to incur legal costs in defending these lawsuits in excess of what would have otherwise been required. These costs have included out-of-pocket costs, including attorney's fees, fees for independent medical examiners, and costs and expenses related to discovery to investigate the false statements and unnecessary treatments that resulted from the scheme. But for Simon & Simon's fraud scheme, these cases would have either never been filed or would have been resolved for nuisance value. The injury here was the direct and foreseeable result of the scheme.

147.    These inflated costs damaged Uber in its business or property. This damage was the direct result of Defendants' pattern of racketeering activity.

148.    The scheme remains ongoing given that the underlying lawsuits continue.

**C.    The RICO Enterprises**

149.    Simon & Simon constitutes an ongoing enterprise, as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Defendant Marc Simon operated, managed, and controlled the firm directly in furtherance of the scheme through a pattern of racketeering activity. Simon understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) the diagnosis of non-existent injuries, (ii) the production of fraudulent medical records regarding those injuries that could be used to argue damages in resulting litigation, and (iii) the use of the fraudulent medical records and false statements to advance such litigation. Defendants Yarus, Burt, Premier Pain & Rehab Center, Harvey, Piccillo, and Philadelphia Spine Associates conspired to assist the Simon & Simon enterprise's involvement in corrupt endeavors through their production of fraudulent medical records at Marc Simon's direction and other actions described above.

-43-

150.     Premier Pain & Rehab Center also constitutes an ongoing enterprise, as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Defendant Burt operated, managed, and controlled the medical practice directly in furtherance of the scheme.  Marc Simon and Simon & Simon participated in the management of Premier Pain & Rehab Center by referring clients to the practice, scheduling those clients' appointments, and directing Burt to perform specific procedures and produce resulting fraudulent records and through a payment arrangement that operated as a bribe.  Yarus and the Chiropractic Defendants conspired to assist the Premier Pain & Rehab Center enterprise's involvement in corrupt endeavors through their referrals for attorney-directed treatment and their production of fraudulent medical records.

151.     Alternatively, Marc Simon, Simon & Simon, Burt, and Premier Pain & Rehab Center together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Such defendants form a group of persons associated together in fact for the common purpose of carrying out the fraudulent course of conduct directed at Uber and others described above. Each of these defendants understood that their ability to extract financial rewards from the pursuit of fraudulent claims against Uber and others depended on (i) the diagnosis of non-existent injuries, (ii) the production of fraudulent medical records regarding those injuries that could be used to argue damages in resulting litigation, and (iii) the use of the fraudulent medical records and false statements to advance such litigation.

152.     These defendants share a longstanding relationship with each other, acted for each other's common benefit, and depended on one another and their respective activities for such benefit. Simon & Simon and Marc Simon directed their clients to Burt and Premier Pain & Rehab Center with the understanding that Burt would diagnose non-existent injuries, perform unnecessary treatment, and produce fraudulent medical records.  The relationship was cemented

by payments made directly or indirectly to Premier Pain & Rehab Center by Marc Simon and Simon & Simon.

153.    The association-in-fact enterprise itself is distinct from the culpable persons and their respective corrupt activities.  Each such culpable person worked to operate the larger association-in-fact enterprise and manage its affairs through their corrupt patterns of referrals, attorney-directed medical treatments, and production of fraudulent records.

154.    The predicate acts of wire and mail fraud described herein could not have been accomplished without the participation of each of the applicable individual Defendants.  Each party played a critical role and depended on the others to carry out their respective roles in furtherance of the scheme, including the initial client intake by Marc Simon and others acting at his direction; the direction and coordination of unnecessary medical care by Simon & Simon; the provision of unnecessary medical care by Burt and Premier Pain & Rehab Center; the production of fraudulent medical records by Burt and Premier Pain & Rehab Center at the direction of Simon & Simon; and the use of those fraudulent documents to make insurance demands and advance phony lawsuits by Marc Simon and Simon & Simon.

155.    At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires and because its activities were directed at and intended to influence Uber, an out-of-state corporation.

**D.    Pattern of Racketeering Activity**

156.    Defendants' scheme constitutes a pattern of racketeering activity.  The pattern of racketeering activity includes, among other things, commission of the predicate acts in violation of the federal mail and wire fraud statutes: 18 U.S.C. §§ 1341 and 1343.

157.     Defendants committed these acts willfully, knowingly, and recklessly.

158.     As discussed herein, Defendants Marc Simon and Simon & Simon made numerous materially false statements knowingly, and with reckless disregard for the truth, in demand letters and litigation documents.  It was reasonably foreseeable to Marc Simon and Simon & Simon that these records would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through the interstate wires to Uber and/or Uber's insurance carriers.  These records were in fact so mailed and transmitted.  Thus, each such letter or communication was prepared and executed in violation of the federal mail and wire fraud statutes (18 U.S.C. §§ 1341, 1343). And as discussed herein, Defendants Marc Simon and Simon & Simon also directed the production of fraudulent medical records by Defendants Burt, Yarus, Harvey, and Piccillo.  Defendants Marc Simon and Simon & Simon directed the production of these statements knowingly, and with reckless disregard for the truth.  It was reasonably foreseeable to Simon that the interstate wires would be used in furtherance of the scheme by, for example, the sending of the fraudulent documents to Simon & Simon for further transmission by interstate wires to Uber or an insurance carrier or by the uploading of the fraudulent documents to a patient records portal by interstate wires.  Such records were in fact so transmitted.  Thus, each such record was prepared and executed in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

159.     As discussed herein, Defendant Burt and Premier Pain & Rehab Center made numerous materially false statements knowingly, and with reckless disregard for the truth, in medical and billing records.  It was reasonably foreseeable to Burt and Premier Pain & Rehab Center that the U.S. mail or private or commercial carrier or the interstate wires would be used in furtherance of the scheme by, for example, the sending of false or misleading statements to Simon & Simon for further transmission by interstate wires to Uber or an insurance carrier.  Such records

were in fact so mailed and transmitted. Thus, each such record was prepared and executed in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

160.    As discussed herein, Defendants Piccillo, Harvey, and Philadelphia Spine Associates made numerous materially false statements knowingly, and with reckless disregard for the truth, in medical and billing records. It was reasonably foreseeable to Piccillo, Harvey, and Philadelphia Spine Associates that the interstate wires would be used in furtherance of the scheme by, for example, the sending of the fraudulent documents to Simon & Simon for further transmission by interstate wires to Uber or an insurance carrier or by the uploading of the fraudulent documents to a patient records portal by interstate wires. Such records were in fact so transmitted. Thus, each such record was prepared and executed in violation of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343.

161.    Defendants' commission of predicate acts and use of interstate wires and mails in furtherance of the scheme included the following specific examples with respect to Personal Injury Claimant A:

a.    On December 30, 2024, Marc Simon and Simon & Simon used the interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back, neck, legs and forearms"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others ills and injuries, including to the back, neck, legs and forearms"; and that all of Claimant A's injuries are "permanent in nature" On January 16, 2025, Simon and Simon & Simon caused said complaint to be served on Uber and its insurer via the U.S. mails. Such uses of the interstate

wires and U.S. mails were reasonably foreseeable and were in furtherance of the scheme and in violation of the federal wire fraud and mail fraud statutes (18 U.S.C. §§ 1341, 1343).

b.     On November 12, 2024, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant A's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Upon information and belief, Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through the interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.     On May 9, 2024, Harvey produced a document reflecting Claimant A's purported chiropractic treatment that included the following false statement: "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." On June 24, 2024, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between May 9, 2024, and August 20, 2024, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 26 records including similar false statements. Harvey and Piccillo electronically signed these documents and caused them to be transmitted to another state via an electronic patient records portal. Harvey, Piccillo, and Philadelphia Spine Associates thereafter caused all fraudulent documents to be transmitted to Marc Simon and Simon & Simon via the

interstate wires. Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

d.     On December 3, 2024, Yarus produced a document reflecting his examination of Claimant A and his review of Claimant A's medical records. Among other false statements, this document stated that "it is my opinion, to a reasonable degree of medical certainty, that the injuries and conditions as they are outlined herein were directly caused by the subject incident of April 26, 2024," and that it is "my opinion, to a reasonable degree of medical certainty, that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via the interstate wires. Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

162.    Defendants' commission of predicate acts and use of interstate wires and mails in furtherance of the scheme included the following specific examples with respect to Personal Injury Claimant B:

a.     On June 20, 2024, Marc Simon and Simon & Simon used the interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others ills and injuries, including to the back"; that all of

Claimant B's injuries are "permanent in nature" On July 1, 2024, Marc Simon and Simon & Simon caused said complaint to be served on Uber and its insurer via the U.S. mails. Such uses of the interstate wires and U.S. mails were reasonably foreseeable and were in furtherance of the scheme and in violation of the federal wire fraud and mail fraud statutes (18 U.S.C. §§ 1341, 1343).

b.      On May 18, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant B's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Upon information and belief, Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through the interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

c.      On November 23, 2022, Harvey produced a document reflecting Claimant B's purported chiropractic treatment that included the false statement that "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." Also on November 23, 2022, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between November 23, 2022, and July 20, 2023, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 16 records including similar false statements. Harvey and Piccillo

electronically signed or caused to be signed all of these documents and caused them to be transmitted to another state via an electronic patient records portal.  Harvey, Piccillo, and Philadelphia Spine Associates thereafter caused all fraudulent documents to be transmitted to Marc Simon and Simon & Simon via the interstate wires.  Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

       d.      On August 21, 2023, Yarus produced a document reflecting his examination of Claimant B and his review of Claimant B's medical records.   Among other false statements, this document stated that "it is my opinion that the injuries and conditions as they are outlined herein were directly caused by the subject incident of November 12, 2022," and that it is "my opinion that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident."  Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via the interstate wires.  Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

163.    Defendants' commission of predicate acts and use of interstate wires and mails in furtherance of the scheme included the following specific examples with respect to Personal Injury Claimant C:

       a.      On October 30, 2023, Marc Simon and Simon & Simon used the interstate wires to file a complaint and initiate a lawsuit against Uber.  This complaint falsely stated that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back and neck"; that "Plaintiff suffered various serious and permanent personal injuries,

serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others ills and injuries, including to the back and neck"; that all of Claimant C's injuries are "permanent in nature" On November 14, 2023, Marc Simon and Simon & Simon caused the complaint to be served on Uber and its insurer via the U.S. mails. Such uses of the interstate wires and U.S. mails were reasonably foreseeable and were in furtherance of the scheme and in violation of the federal wire fraud and mail fraud statutes (18 U.S.C. §§ 1341, 1343).

b.      On July 13, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant C's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Upon information and belief, Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through the interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

164.   Defendants' commission of predicate acts and use of interstate wires and mails in furtherance of the scheme included the following specific examples with respect to Personal Injury Claimant D:

a.      On December 29, 2023, Marc Simon and Simon & Simon used the interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated that "Plaintiff has sustained serious permanent personal injury and damages, including to

the back and right leg"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others ills and injuries, including to the back and right leg"; that all of Claimant D's injuries are "permanent in nature." Such uses of the interstate wire was reasonably foreseeable and were in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

      b.      On November 8, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant D's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Upon information and belief, Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through the interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

      c.      On July 26, 2023, Piccillo produced a document reflecting Claimant D's purported chiropractic treatment that included the false statement that "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." Also on July 26, 2023, Piccillo electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between July 26, 2023, and November 2, 2024, Harvey and Piccillo produced and electronically signed or caused to be signed an additional

21 records including similar false statements. Harvey and Piccillo electronically signed or caused to be signed these documents and caused them to be transmitted to another state via an electronic patient records portal. Harvey, Piccillo, and Philadelphia Spine Associates thereafter caused such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via the interstate wires. Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

165.    Defendants' commission of predicate acts and use of interstate wires and mails in furtherance of the scheme included the following specific examples with respect to Personal Injury Claimant E:

a.    On February 15, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back and neck"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others ills and injuries, including to the back and neck"; and that all of Claimant E's injuries were "permanent in nature." Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

b.    On August 9, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant E's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation."

Upon information and belief, Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through the interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. As such, such records were transmitted in furtherance of the scheme and in violation of the federal wire fraud statute (18 U.S.C. § 1343).

      c.    On February 28, 2023, Harvey produced a document reflecting Claimant E's purported chiropractic treatment that included the false statement that "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." On March 1, 2023, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between February 28, 2023, and October 10, 2023, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 38 records that included similar false statements. Harvey and Piccillo electronically signed or caused to be signed these documents and caused them to be transmitted to another state via an electronic patient records portal. Harvey and Piccillo thereafter caused all 39 such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via the interstate wires. Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

      d.    On November 30, 2023, Yarus produced a document reflecting his examination of Claimant E and his review of Claimant E's medical records. Among other false statements, this document stated that "it is my opinion that the injuries and conditions

-55-

as they are outlined herein were directly caused by the subject incident of February 22, 2023," and that it is "my opinion that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of the interstate wires was reasonably foreseeable and was in furtherance of the scheme and in violation of the federal wire fraud statutes (18 U.S.C. § 1343).

166.    The predicate acts all relate to each other as part of a common plan. The Defendants' roles in the scheme all depended on each other—Simon & Simon and Marc Simon identified clients and directed them through a conveyor belt of unnecessary treatment; Premier Pain & Rehab Center, Clifton Burt, and the Chiropractic Defendants diagnosed non-existent injuries, performed unnecessary medical treatments, and produced fraudulent medical records; and Simon & Simon and Marc Simon then used these fraudulent records to pursue phony claims against Uber. Each Defendant was aware of its respective role within the larger scheme.

167.    The predicate acts further relate to the enterprise of Simon & Simon, the enterprise of Premier Pain & Rehab Center, and the association-in-fact enterprise described above. A specific threat of repetition exists with respect to each predicate act. Such predicate acts are a regular way of conducting the ongoing law firm, medical practice, and association-in-fact enterprises at issue herein. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

168.    The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme was not ongoing.

## CAUSES OF ACTION

### COUNT I
### RICO Enterprise Violation (18 U.S.C. § 1962(c))
### Simon & Simon Enterprise
### (Against Marc Simon)

169.     Uber incorporates by reference each and every allegation in paragraphs 1 through 168 above.

170.     The Simon & Simon law firm is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

171.     Simon knowingly conducted and/or participated, directly or indirectly, in the conduct of Simon & Simon's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

172.     Simon's racketeering activities, as described in detail in this Complaint, included:

173.     Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

174.     Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

175.     Simon knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

176.     Uber has been injured in its business and property by reason of the above-described conduct.

177.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**RICO Enterprise Violation (18 U.S.C. § 1962(c))**
**Premier Pain & Rehab Center Enterprise**
**(Against Marc Simon, Simon & Simon, and Clifton Burt)**

178.    Uber incorporates by reference each and every allegation in paragraphs 1 through 168 above.

179.    Premier Pain & Rehab Center is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

180.    Marc Simon, Clifton Burt, and Simon & Simon knowingly conducted and/or participated, directly or indirectly, in the conduct of Premier Pain & Rehab Center's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

181.    Marc Simon, Clifton Burt, and Simon & Simon's racketeering activities, as described in detail in this Complaint, included:

182.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

183.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

-58-

184.    Marc Simon, Clifton Burt, and Simon & Simon knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

185.    Uber has been injured in its business and property by reason of the above-described conduct.

186.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT III**
**RICO Enterprise Violation (18 U.S.C. § 1962(c))**
**Association-in-Fact Enterprise**
**(Against Marc Simon, Simon & Simon, Clifton Burt, Premier Pain & Rehab)**

187.    Uber incorporates by reference each and every allegation in paragraphs 1 through 168 above.

188.    At all relevant times herein, Defendants Marc Simon, Simon & Simon, Clifton Burt, and Premier Pain & Rehab constituted an "enterprise," as that term is defined in 18 U.S.C. § 1961(4).  These defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce.  Marc Simon, Simon & Simon, Clifton Burt, and Premier Pain & Rehab participated in the operation or management of the enterprise.

189.    These defendants' racketeering activities, as described in detail in this Complaint, included:

    a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent

nature in a scheme to defraud Uber and others out of money or property by means of materially false representations; and

b.     Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

190.    Marc Simon, Simon & Simon, Clifton Burt, and Premier Pain & Rehab Center knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

191.    Uber has been injured in its business and property by reason of the above-described conduct.

192.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT IV
### RICO Conspiracy Violation (18 U.S.C. § 1962(d))
### (Against All Defendants)

193.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 168 above.

194.    For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree together with each other, and with others whose names are known or unknown, to conduct and participate, directly and/or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity set forth herein in violation of 18 U.S.C. § 1962(d).

-60-

195.    This pattern of racketeering activity in which the Defendants intentionally conspired to engage involved the specific acts as described in detail in this Complaint constituting wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341.

196.    All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

197.    Uber has been injured in its business and property by reason of the above-described conduct.

198.    By reason of its injury, Uber is entitled to equitable relief under 18 U.S.C. § 1964(a). It is also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V**
**Unjust Enrichment**
**(Against Clifton Burt, Premier Pain & Rehab Center, Lance Yarus, and the Chiropractor Defendants)**

199.    Uber incorporates herein by reference each and every allegation in paragraphs 1 through 168 above.

200.    Clifton Burt, Premier Pain & Rehab Center, and the Chiropractor Defendants have been and will continue to be unjustly enriched by benefits received pursuant to the fraudulent scheme, including through payments derived directly or indirectly from Marc Simon and Simon & Simon. Such benefit was received at Uber's expense given that Uber has been required to incur substantial legal expense as a result of the scheme.

201.    Principles of equity and good conscience require restitution of any such benefits received by Clifton Burt, Premier Pain & Rehab Center, and the Chiropractor Defendants.

202.    Uber demands judgment against Clifton Burt, Premier Pain & Rehab Center, and the Chiropractor Defendants, jointly and severally, for restitution of all such benefits received.

## PRAYER FOR RELIEF

1.      For restitution;

2.      For general damages according to proof at trial, trebled according to statute;

3.      For prejudgment interest;

4.      For reasonable attorneys' fees and costs;

5.      For punitive damages;

6.      For an order under 18 U.S.C. § 1964(a) or under this Court's inherent powers granting all appropriate equitable relief to prevent and restrain violations of 18 U.S.C. § 1962, including by directing Defendants to divest themselves of any interest, direct or indirect, in the above enterprises; imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in; and dissolving or reorganizing the above enterprises;

7.      For disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver; and

8.      For such other relief as the Court may deem appropriate.

## JURY DEMAND

Uber demands a trial by jury on all issues so triable.

Dated: September 18, 2025

ROHN KURLAND, P.C.

By: _____

Amy Kurland, Bar No. 37419
AKurland@rohnkurland.com
1700 Market St, Suite 1005
Philadelphia, PA 19103
Telephone: +1.215.770.0320
Facsimile: +1.215.717.9697

PERKINS COIE LLP

David W. T. Daniels (*pro hac vice*
application forthcoming)
DDaniels@perkinscoie.com
Sydney Veatch (*pro hac vice* application
forthcoming)
SVeatch@perkinscoie.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

David B. Massey (*pro hac vice* application
forthcoming)
DMassey@perkinscoie.com
William Wilder (*pro hac vice* application
forthcoming)
WWilder@perkinscoie.com
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900
Facsimile: +1.212.977.1649

Michael R. Huston (*pro hac vice*
application forthcoming)
MHuston@perkinscoie.com
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: +1.602.351.8000
Facsimile: +1.602.648.7000

*Attorneys for Plaintiff Uber Technologies, Inc.*