**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UBER TECHNOLOGIES, INC. and FEDERAL EXPRESS CORPORATION, | CIVIL ACTION |
| PLAINTIFFS, | No. 2:25-cv-05365-MAK |
| v. | |
| SIMON & SIMON P.C., MARC SIMON, CLIFTON BURT, PREMIER PAIN & REHAB CENTER, PC, ETHEL HARVEY, DANIEL PICCILLO, PHILADELPHIA SPINE ASSOCIATES, LLC, and LANCE YARUS, | |
| DEFENDANTS. | |

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMAND**

**TABLE OF CONTENTS**

Page

SUMMARY OF THE ACTION ..................................................................................................1

THE PARTIES ...........................................................................................................................5

JURISDICTION AND VENUE .................................................................................................8

MEANS AND METHOD OF THE FRAUD .............................................................................8

    A.    Burt's False Treatment Records ...............................................................11

    B.    Additional False Treatment Documentation ...........................................20

    C.    Yarus's Resulting Future Care Projections .............................................22

    D.    Simon & Simon's Misuse of the Fraudulent Records and Reports ....................27

    E.    Examples of the Scheme in Operation Against Uber ........................................29

        1.    Personal Injury Claimant A ...................................................................29

        2.    Personal Injury Claimant B .....................................................................33

        3.    Personal Injury Claimant C .....................................................................38

        4.    Personal Injury Claimant D ...................................................................41

        5.    Personal Injury Claimant E .....................................................................45

        6.    Personal Injury Claimant H ...................................................................50

        7.    Personal Injury Claimant Q ...................................................................57

        8.    Personal Injury Claimant R .....................................................................62

        9.    Personal Injury Claimant S .....................................................................66

        10.    Personal Injury Claimant T .....................................................................69

    F.    Examples of the Scheme in Operation Against FedEx ....................................72

        1.    Personal Injury Claimant U ...................................................................72

        2.    Personal Injury Claimant V ...................................................................75

        3.    Personal Injury Claimant W ...................................................................80

    G.    Examples of the Scheme in Operation Against Others .....................................83

**TABLE OF CONTENTS (continued)**

**Page**

1.  Personal Injury Claimant BB ...............................................................83

2.  Personal Injury Claimant CC ...............................................................86

3.  Personal Injury Claimant DD ..............................................................89

4.  Personal Injury Claimant EE ...............................................................93

5.  Personal Injury Claimant FF ................................................................96

6.  Personal Injury Claimant GG ...............................................................99

RACKETEERING ALLEGATIONS ....................................................................104

A.  Defendants' Misconduct and Respective Basis for Liability ..........................104

1.  Simon & Simon and Marc Simon ........................................................104

2.  Premier Pain & Rehab Center and Clifton Burt ....................................106

3.  Ethel Harvey, Daniel Piccillo, and Philadelphia Spine
    Associates .......................................................................................107

4.  Lance Yarus ....................................................................................108

B.  Uber is a Victim of the Scheme and has Suffered Injury ...............................108

C.  FedEx is a Victim of the Scheme and has Suffered Injury .............................108

D.  The RICO Enterprises .........................................................................109

E.  Pattern of Racketeering Activity ............................................................112

1.  Claimant A .....................................................................................114

2.  Claimant B .....................................................................................115

3.  Claimant C .....................................................................................117

4.  Claimant D .....................................................................................118

5.  Claimant E .....................................................................................119

6.  Claimant H .....................................................................................120

**TABLE OF CONTENTS (continued)**

**Page**

7.    Claimant Q ........................................................................................121

8.    Claimant R ........................................................................................123

9.    Claimant S.........................................................................................124

10.    Claimant T ........................................................................................124

11.    Claimant U ........................................................................................124

12.    Claimant V ........................................................................................126

13.    Claimant W .......................................................................................127

14.    Claimant BB ......................................................................................127

15.    Claimant CC ......................................................................................128

16.    Claimant DD......................................................................................129

17.    Claimant EE.......................................................................................130

18.    Claimant FF .......................................................................................130

19.    Claimant GG......................................................................................131

CAUSES OF ACTION .......................................................................................132

PRAYER FOR RELIEF ......................................................................................137

JURY DEMAND..................................................................................................137

Plaintiffs Uber Technologies, Inc. ("Uber") and Federal Express Corporation ("FedEx"), by and through their undersigned attorneys, hereby allege against Defendants Simon & Simon P.C. ("Simon & Simon"), Marc Simon, Clifton Burt, Premier Pain & Rehab Center, PC ("Premier Pain & Rehab Center"), Lance Yarus, Ethel Harvey, Daniel Piccillo, and Philadelphia Spine Associates, LLC ("Philadelphia Spine Associates"), as follows:

## SUMMARY OF THE ACTION

1. The fabrication of fraudulent personal injury claims is a serious and growing problem in Philadelphia and nationwide. Such fraud results in sweeping harm to the public far beyond those involved in the litigation itself. It increases insurance rates and transportation costs for the public at large.

2. In the case of Uber, it increases costs for the many millions who rely on the Uber application as a means to connect with transportation and delivery service providers and reduces the earnings of the many others who earn a livelihood from the application. These increased costs, and the legal fees Uber must expend to fight these fraudulent claims, directly harm Uber's business.

3. In the case of FedEx, it increases costs for the countless individuals, families, and businesses who rely on FedEx's delivery and logistics services to ship and order goods of all kinds.

4. Uber and FedEx bring this lawsuit to remediate a fraud scheme that has enriched unscrupulous lawyers and medical providers at the expense of both the defendants in the underlying personal injury cases and the claimants themselves. The scheme in question is orchestrated and directed by Marc Simon and Simon & Simon. The scheme involves efforts to extract settlement value from marginal personal injury claims by fabricating a false record of medical treatment and exaggerated injury.

-2-

5.      In order to pursue artificially inflated claims in state court and to extract larger settlements, Marc Simon and Simon & Simon direct their clients to a network of corrupt medical providers who diagnose non-existent serious injuries, deliver unnecessary medical treatment, and produce false medical records to support claims that the claimant in question will require a lifetime of expensive medical care. The scheme is designed to fraudulently transform otherwise worthless or low-value claims into million-dollar-plus lawsuits.

6.      Dr. Clifton Burt and his medical practice are central to the scheme. Purporting to independently deliver injection and ablation care to alleviate pain, Burt and his practice instead operate at the direction of Marc Simon and the Simon & Simon firm. The Simon & Simon firm schedules groups of clients to be seen at Burt's clinic in bulk, instructing Burt on the purported treatment to be administered. Simon & Simon instructs Burt to create a record of specific procedures on specific patients at specific times:



*Fig. 1.*

7. Burt performs these procedures not out of medical necessity but for the purpose of fabricating fraudulent medical records to support Simon & Simon's lawsuits. In exchange for producing fraudulent records and providing unnecessary treatment, Burt is compensated directly or indirectly by Marc Simon and Simon & Simon. Such compensation operates as a bribe. Marc Simon and Simon & Simon use Burt's resulting false records as the stated foundation for exorbitant projections of future required medical treatment. Such future treatment is often not delivered because the underlying purported injuries in fact require no such remedies.

8. Ethel Harvey, Daniel Piccillo, and their chiropractic practice, Philadelphia Spine Associates, similarly support the scheme. Simon & Simon refers or steers clients to Harvey, Piccillo, and Philadelphia Spine Associates shortly after intake. Harvey, Piccillo, and Philadelphia Spine Associates purport to perform various chiropractic treatments on Simon & Simon clients across dozens of appointments. Some of these purported treatments are not performed at all. The fraudulent records Harvey, Piccillo, and Philadelphia Spine Associates produce support false diagnoses of serious injuries and are made for the purpose of artificially inflating damages claims. Among other things, Harvey, Piccillo, and Philadelphia Spine Associates in each instance knowingly advance the scheme by agreeing with Simon & Simon to refer claimants to receive an MRI, typically to be conducted by a designated radiologist, a step required to support both Burt's purported treatment and false future care projections.

9. Before filing a lawsuit, Marc Simon and Simon & Simon direct their clients to Lance Yarus as a final step in effectuating the scheme to artificially inflate these claims. Utilizing the fraudulent records produced by Burt and other providers, Yarus fabricates diagnoses of serious injuries and produces a false report stating that the claimant in question will require a lifetime of expensive ongoing care. Multiple Simon & Simon clients have testified that they never sought

such treatment. The phantom damages reflected in these reports allow Simon & Simon to maximize their leverage to demand large settlements.

10.     Marc Simon and Simon & Simon go beyond their role as legal counsel and take on an active role in directing Burt, Yarus, and others in creating fraudulent documents. The lawsuits based on these fraudulent documents are sham litigation. Absent Burt's purported treatment and Yarus's fraudulent reports, the underlying lawsuits would not have been brought, would have been resolved through the no-fault system, or could have been resolved through compulsory arbitration. Additionally, many cases brought on behalf of claimants who purchased "limited tort" motor vehicle insurance would have been limited to recovery of minimal out-of-pocket medical expenses without the fraudulent documents. The scheme is intended to and does in fact result in litigation costs and expenses, including settlement costs, that would not have otherwise been incurred by its targets.

11.     Uber and FedEx are not the only victims of this scheme. Marc Simon and Simon & Simon have pursued and continue to pursue similar sham litigation against other defendants in Pennsylvania and elsewhere. Burt, Premier Pain & Rehab Center, and Yarus are often critical to these other cases as well, conspiring with Marc Simon and Simon & Simon to deliver unnecessary medical treatment, fabricate diagnoses of serious injuries, and produce false medical treatment records and bills.

12.     This very Court has taken notice of this scheme, with Judge McHugh noting in *Shelton v. Chaudhry*, "I have yet to see a single case involving the Simon office where any plaintiff actually pursued the recommended care. I therefore view these reports as litigation documents, bearing little relationship to real world medical care." 763 F. Supp. 3d 675, 687 (E.D. Pa. 2025). Judge Pappert also specifically called out Simon & Simon's use of "bogus expert witnesses and

life care planners" during a hearing preceding his imposition of Rule 11 sanctions on Marc Simon and another Simon & Simon attorney in *Contreras Madrid v. Wal-Mart Stores, L.P.*, No. 24-cv-5229, ECF No. 23 at *7 (E.D. Pa. Apr. 14, 2025).

13.     This scheme has tainted dozens of state court lawsuits filed against Uber and FedEx, as well as many more filed against other parties.

14.     Uber, FedEx, and other targets of the scheme relied on Defendants' misrepresentations. Such reliance resulted in, among other things, settlement payments that would not have been made or that would have been made in a lesser amount but for the fraud.

15.     When Uber sought discovery into Burt's underlying medical treatments, including by deposition of Burt and his business partner, Dr. Blessen Abraham, Simon & Simon dismissed Uber from each of the then-pending nearly thirty cases in which Burt was a treating physician. Upon information and belief, Marc Simon and Simon & Simon did so to avoid discovery and thereby conceal their fraudulent scheme.

16.     The fraud at issue here spans many separate cases against different defendants and cannot be remediated on a case-by-case basis. By enacting the federal RICO statute, Congress gave the federal courts the power to address precisely this type of fraudulent pattern. Uber and FedEx respectfully seek relief from the Court as authorized by the RICO statute both to recover for the harm each has suffered and to prevent further harm to each party and to the public going forward.

**THE PARTIES**

17.     Plaintiff Uber is a Delaware corporation with its principal place of business in California.

18.     Plaintiff FedEx is a Delaware corporation with its principal place of business in Tennessee. In 2024, Federal Express Corporation d/b/a FedEx Express, FedEx Ground Packages

-5-

Systems, Inc., and other FedEx entities merged to form Federal Express Corporation, which is a successor in interest to those entities.

19.    Defendant Simon & Simon is a professional corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all relevant times, Simon & Simon maintained its principal place of business in Pennsylvania.

20.    Defendant Marc Simon is an individual who resides in and is a citizen of Pennsylvania. At all relevant times, Simon was the managing partner of Defendant Simon & Simon. He and Defendant Simon & Simon represented the claimants in the cases discussed herein and directed the scheme to manufacture evidence through false medical records and unnecessary treatment. Simon was the subject of two recent sanctions proceedings in this Court related to his conduct in other personal injury matters, *Contreras Madrid v. Wal-Mart Stores East, L.P.*, No. 24-5229 (E.D. Pa.) and *Shelton v. Chaudhry, et al*, No. 24-cv-5657 (E.D. Pa.) (now No. 25-cv-249 (M.D. Pa.)).

21.    Defendant Premier Pain & Rehab Center is a professional corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all relevant times, Premier Pain & Rehab Center maintained its principal place of business in Pennsylvania.

22.    Defendant Clifton Burt is an individual who resides in and is a citizen of New Jersey. At all relevant times, Burt was the owner and operator of Defendant Premier Pain & Rehab Center. Burt and employees acting at his direction accepted mass referrals from Simon & Simon and proceeded to diagnose non-existent injuries, perform unnecessary medical procedures, and fabricate fraudulent medical records. Burt has been the subject of numerous regulatory enforcement actions, reprimands, and civil RICO lawsuits. These include formal consent orders and reprimands by state medical boards in Virginia, New York, and New Jersey relating to Burt

prescribing opioids outside the context of a bona fide practitioner-patient relationship. One civil RICO complaint filed against Burt alleged that he conspired with a provider of medical equipment to defraud automobile insurance companies by writing fraudulent prescriptions for medical equipment that was medically unnecessary, illusory, and not reimbursable. *See Gov't Emps. Ins. Co. v. Med. Equip. Serv., Inc.*, No. 20-cv-3396 (E.D.N.Y. July 28, 2020); *see also Gov't Emps. Ins. Co. v. Physical Therapy & Herniated Disc Ctr., L.L.C.*, No. 20-cv-5139 (D.N.J. Apr. 27, 2020); *Gov't Emps. Ins. Co. v. Acute Med., P.C.*, No. 16-cv-8030 (D.N.J. Oct. 28, 2016). Another civil RICO complaint filed against Burt and his now-business partner Blessen Abraham alleged that they conspired together with others to defraud an automobile insurance company by, among other things, misrepresenting the severity of patients' problems, diagnosing patients with objectively unverifiable injuries, and conducting and billing for excessive and medically unnecessary medical tests. *See Gov't Emps. Ins. Co. v. Brunswick Health Center, PC.* et al., No. 22-cv-6496 (D.N.J. Nov. 07, 2022).

23.     Defendant Philadelphia Spine Associates is a limited liability company duly organized and existing under the laws of the Commonwealth of Pennsylvania. At all relevant times, Philadelphia Spine Associates maintained its principal place of business in Pennsylvania.

24.     Defendant Ethel Harvey is an individual who resides in and is a citizen of North Carolina. Harvey was a chiropractor at Philadelphia Spine Associates.

25.     Defendant Daniel Piccillo is an individual who resides in and is a citizen of Pennsylvania. At all relevant times, Piccillo was a chiropractor at Philadelphia Spine Associates.

26.     Defendant Lance Yarus is an individual who resides in and is a citizen of Pennsylvania. At all relevant times, Yarus was a medical doctor at Regional Orthopedics. Since

2017, Yarus has purported to perform thousands of medical exams of Simon & Simon clients and has been paid more than $3 million for his services.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under the federal RICO statute.

28.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds $75,000, and the controversy is between citizens of different states.

29.     Venue is proper pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in the Eastern District of Pennsylvania and because a substantial amount of the activities forming the basis of this Amended Complaint occurred within the Eastern District of Pennsylvania.

## MEANS AND METHOD OF THE FRAUD

30.     The object of this scheme is to create a fraudulent record of medical treatment to artificially inflate the value of lawsuits against named parties and their insurers to secure larger settlement payouts. Marc Simon and Simon & Simon carried out the fraud scheme by bribing medical providers for production of fraudulent medical records and provision of unnecessary treatment—particularly from and by Defendant Burt. Marc Simon and Simon & Simon constructed a conveyor belt in which employees of Simon & Simon directed personal injury claimants to receive unnecessary treatment from Burt. Marc Simon and Simon & Simon selected the procedures to be performed and scheduled groups of claimants to receive such procedures en masse.

31.     Marc Simon and Simon & Simon go beyond their role as legal counsel. They take an active role in directing Burt, Yarus, and other medical providers to create fraudulent documents. The lawsuits based on these fraudulent documents are sham litigation. They are objectively baseless because, among other things, as discussed below, they involve no substantial injury and

no claim for damages for which a claimant could recover in a personal injury suit. They are subjectively baseless because Marc Simon and Simon & Simon know the lawsuits are fraudulent and play an active role in directing the creation of fraudulent documents.

32.    Uber was named as a defendant in nearly thirty such lawsuits in 2022, 2023, and 2024 where Burt was directed to deliver unnecessary treatment for the purpose of creating a false evidentiary record. FedEx was named as a defendant in dozens of such lawsuits over the past five years. The fraud scheme remains ongoing, and Uber and FedEx are but two of its many targets.

33.    Marc Simon and Simon & Simon rely on referrals from other law firms. Marc Simon and Simon & Simon advertise themselves as willing to take referrals that other firms will not take. These cases include potential claimants involved in motor vehicle accidents who hold "limited tort" insurance policies, which do not allow such claimants to recover for non-economic damages for a litigated claim. The typical case referred to Simon & Simon involves minimal, if any, injury. Ordinarily, these types of claims would not result in litigation because they would be resolved through an administrative no-fault process or would not be brought at all. To the extent claims were brought at all, they would ordinarily be subject to the Philadelphia Court of Common Pleas' compulsory arbitration program for cases with an amount in controversy of $50,000 or less.

34.    The Philadelphia Court of Common Pleas and other courts in Pennsylvania relied on Marc Simon and Simon & Simon's misrepresentations regarding the amount in controversy of these lawsuits in declining to order the cases to compulsory arbitration.

35.    Simon & Simon personnel pressure prospective clients to sign a retention agreement with promises of large settlement payouts without disclosing that substantially all of any recovery will go to Simon & Simon and the medical providers involved in the scheme. Simon

& Simon sometimes threatens to drop the cases of claimants who do not agree to visit the firm's preferred medical providers.

36.    Claimants pursue the same treatment path under Simon & Simon's direction: referrals to a discrete set of chiropractors or physical therapists, subsequent MRIs, and, ultimately, purported radiofrequency ablation procedures from Burt. These medical treatments bear no relationship to any underlying accident and are, in most instances, unnecessary.

37.    After ensuring that claimants receive a wide range of unnecessary treatment, Marc Simon and Simon & Simon direct Yarus or another medical expert selected from a small pool to review the resulting medical records for the purpose of producing a false report that finds the claimant will require expensive lifelong medical care due to injuries sustained in the motor vehicle accidents. Each participant in the scheme acts with the understanding and agreement that their fraudulent medical records will be used as a basis to demand substantial settlements and assert sham claims in litigation. Many claimants do not go on to actually seek or receive the future medical treatment the reports suggest they will need.

38.    As the final step of the scheme, Marc Simon and Simon & Simon retain an additional expert to calculate the exorbitant expense of such future medical treatment. Marc Simon and Simon & Simon utilize the resulting report to induce payments from the defendants that it sues and their insurers.

39.    Marc Simon and Simon & Simon are also able to present these exorbitant future care cost calculations to a jury as economic damages, allowing them to transform a case that never would have been litigated or that would have been resolved in an arbitration or otherwise with minimal out-of-pocket expenses into a million-dollar-plus demand. Such sham litigation results in substantial defense costs and settlement expenses that would not have otherwise been incurred. As

targets of the scheme, Uber and FedEx have incurred defense costs and settlement expenses that would not have otherwise been incurred in reliance on the fraud.

### A.    Burt's False Treatment Records

40.    Defendants Burt and Premier Pain & Rehab Center play a key role in this scheme. Burt delivered or claimed to have delivered injections and radiofrequency ablations to patients at Marc Simon and Simon & Simon's direction. These ablation treatments could be performed without general anesthesia and on an outpatient basis. The treatments were essential to the scheme because they were necessary to supply a foundation for identification of a serious injury and predictions of future needed medical treatment.

41.    A radiofrequency ablation uses heat to destroy tissue. In the pain management context, this involves using a precisely placed needle to heat and destroy nerve endings. The procedure is more serious and invasive than other pain management procedures like epidural steroid injections. A radiofrequency ablation is an irreversible procedure that uses a large needle to destroy an area of tissue approximately the size of a blueberry.

42.    A proper radiofrequency ablation requires performance of one or two medial branch block injections and a reasonable waiting period after each injection to assess whether the radiofrequency ablation will in fact deliver the desired pain relief.

43.    Although purporting to perform a proper radiofrequency ablation, the procedure that Burt performed was in fact a simulacrum of treatment designed to create a false record to support the scheme. Among other things, the claimed waiting period to begin the radiofrequency ablation after performing the medial branch block would have been insufficient for the medial branch block to perform its diagnostic purpose as designed. Further, an accurate assessment of the effectiveness of the medial branch block cannot be done when a patient is under the influence of anesthetic drugs or when the patient is not provided sufficient autonomy to decide on the efficacy

-11-

of the treatment in a home setting with the use of a self-reported pain diary. The low frequency of follow-up visits by Simon & Simon claimants to Premier Pain & Rehab Center—which would have been essential had the procedures been performed as stated—further confirms the falsity of the treatment records.

44.    Burt's patients did not seek him out from legitimate medical need. Rather, Simon & Simon directed patients to Burt and issued instructions on the specific procedure that he was to deliver.

45.    Simon & Simon issued these directions in scheduling emails that were sent from a medicalsimonlawfirm@gmail.com email account to personnel at Premier Pain & Rehab Center. The emails listed the patients that were to be seen on any particular day. The scheduling emails directed that as many as 10 Simon & Simon clients were to be seen on a single day.

46.    The scheduling emails did not merely direct patients to Burt. They also directed the specific procedure that was to be purportedly performed on each patient, before Burt had even examined the patients. The first email below—which was produced in discovery in an underlying case in redacted form—illustrates this direction. The email lists the clients to be treated at Premier Pain & Rehab Center on March 31, 2022. It attaches the medical records for each client. It states that a Simon & Simon staff member will conduct a Zoom meeting with each patient. The email also directs the specific treatment that is to be delivered. For example, with respect to the patient to be treated at 4:00 p.m., the email lists a "LSP RFA" treatment, which denotes a lumbar spine radio frequency ablation treatment.



*Fig. 2 (Reproduction of Fig. 1).*

47.     The email below, which was produced in redacted form in a separate underlying

lawsuit, relays similar instructions.



-13-

*Fig. 3.*

48.     Simon & Simon exercised direct control over claimants' appointments at Premier Pain & Rehab Center. In addition to scheduling the claimant's appointment, providing their medical records to Burt, and directing the procedure to be purportedly performed, Simon & Simon provided a car service that drove claimants to and from their appointments.

49.     Simon & Simon also instructed and caused Premier Pain & Rehab Center to set up video calls between the claimant and a staff member from Simon & Simon at the conclusion of a claimant's appointment with Burt.

50.     Simon & Simon's directions to Burt regarding the treatment protocol purportedly to be applied to specific patients constituted unlawful practice of medicine in violation of 63 P.S. § 422.38, and Burt's actions to follow Simon & Simon's directions constituted unprofessional or immoral conduct as a Board-regulated practitioner in violation of 49 Pa. Code § 16.61(a)(6).

51.     In connection with purportedly delivering such treatment, Burt created fraudulent medical records stating that the decision to deliver such ablation treatment was the result of his observations of the patient's pain levels and responses to treatment at the appointment. Burt's records stated that a preliminary treatment was delivered and then a decision was made to administer radiofrequency ablation only thereafter. For Uber claimants, the medical records contained verbatim recitations of this false treatment rationale, as follows:

| Claimant | Date of Burt Appointment | Purported Diagnosis | Stated Treatment Rationale |
|---|---|---|---|
| Claimant A | 11/12/24 | Radiculopathy, Lumbar Facet Syndrome | "The patient did report 40% improvement for 2 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |

| Claimant | Date of Burt Appointment | Purported Diagnosis | Stated Treatment Rationale |
|---|---|---|---|
| Claimant B | 5/18/23 | Disc Bulge, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant C | 7/13/23 | Radiculopathy, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant D | 11/8/23 | Lumbar Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant E | 8/9/23 | Radiculopathy, Lumbar Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant G | 2/22/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant H | 3/23/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant I | 4/20/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |

| Claimant | Date of Burt Appointment | Purported Diagnosis | Stated Treatment Rationale |
|---|---|---|---|
| Claimant K | 5/18/23 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant L | 10/11/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant M | 10/12/23 | Lumbar Facet Joint Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant N | 12/12/23 | Lumbar Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant O | 2/14/24 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant P | 7/10/24 | Cervicalgia, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |

| Claimant | Date of Burt Appointment | Purported Diagnosis | Stated Treatment Rationale |
|---|---|---|---|
| Claimant Q | 4/6/23 | Radiculopathy, Lumbar Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant R | 1/3/24 | Radiculopathy, Lumbar Facet Syndrome, Cervical Facet Syndrome | "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." |
| Claimant S | 1/4/24 | Radiculopathy, Cervical Facet Syndrome | No Burt report available; Yarus report states that "[a]fter Dr. Burt provided MBBs, there was 40% improvement for 20 minutes" and "[d]ecision was made to proceed to radiofrequency ablations" |
| Claimant T | 1/30/24 | Radiculopathy, Cervical Facet Syndrome | No Burt report available; Yarus report states that "[a]fter Dr. Burt provided MBBs, there was 40% improvement for 20 minutes" and "[d]ecision was made to proceed to radiofrequency ablations" |

*Fig. 4.*

52.    The statements regarding treatment rationale were knowingly false when made or made with reckless disregard for the truth because they neither reflected the patient's actual conditions nor reflected Burt's actual decision process. In each instance, the treatment was instead the result of direction from Simon & Simon.

53.    A copy of Burt's appointment notes produced in discovery in an underlying action reveals that his appointment report is not a legitimate individualized medical record, but is instead constructed as a fill-in-the-blank form for Burt to complete during patient appointments. Aside

from basic variable details such as patient name, date of service, and sometimes the anatomical level, the report's content is primarily composed of predetermined, default statements which remain constant across patient files.



*Fig. 5.*

54.     Substantial portions of the report consist of default statements that appear pre-typed with fill-in-the-blank portions, which are not informed by actual clinical observation or tailored medical decision-making. For instance, the critical phrase "Mr./Ms.__ presents with pain symptoms which resulted from automobile accident" appears as a boilerplate default statement automatically attributing symptoms to a motor vehicle accident, irrespective of the patient's specific history or factual circumstances.

55.     The report further defaults to the assertion that "neck/back facet joint pain is the worst pain," without reference to the patient's subjective complaints or objective findings. This

predetermined statement is used to set the stage for the "recommended" interventions and does not reflect a genuine individualized medical assessment.

56.    Crucially, the Burt's form defaults to a finding that "it is medically necessary to perform __ medial branch nerve block followed by radiofrequency ablation," a recommendation that appears as a blanket justification for these procedures rather than the result of a specific clinical rationale. The language automatically asserts the necessity for these interventions regardless of patient presentation or actual medical need. This statement is followed by the typed language that "[t]he decision was then made to proceed with radiofrequency ablation at the same level." Together, these statements confirm that Burt's treatment is fraudulent and not based on legitimate analysis.

57.    As these reports show, Burt's procedures were not determined according to genuine medical necessity but were instead selected as part of a predetermined scheme.

58.    Marc Simon and Simon & Simon induced such false statements through lucrative compensation to Burt and Premier Pain & Rehab Center. Premier Pain & Rehab Center received a flat payment of several thousand dollars per radiofrequency ablation procedure performed on Simon & Simon claimants. For some or all of the relevant period, the per-procedure payment was $3,200. Simon & Simon indirectly caused such payments to be made through a third-party funder. The payments were made in the guise of a purchase of Premier Pain & Rehab Center's receivables, but since bills were not otherwise sent to insurers or patients for such work, this structuring of such payments was itself fraudulently designed to conceal the bribe.

59.    The purchase of the receivable also permitted the capture of settlement proceeds from Simon & Simon's own clients. Rather than charging clients the actual cost of Burt's medical

treatment, Simon & Simon instead utilized the inflated and misleading face amount of the purchased receivable.

60.     The per-procedure compensation Premier Pain & Rehab Center and Burt received, together with the promise of a steady stream of future patient referrals from Simon & Simon, operated as a bribe to induce Burt to produce fraudulent records and provide unnecessary treatment. Simon & Simon is responsible for referring many patients whom Burt treats at Premier Pain & Rehab Center, making this an effective inducement.

**B.      Additional False Treatment Documentation**

61.     In addition to the false records created in connection with Burt's injection and ablation treatments, Marc Simon and Simon & Simon instructed and orchestrated other medical treatment for the purpose of creating a false evidentiary record.

62.     Many claimants first presented to an emergency room and reported pain allegedly resulting from the accident at issue. In most of these cases, emergency room records reflect a diagnosis of a minor injury and a prescription for a mild pain medication such as acetaminophen or ibuprofen. Simon & Simon claimants who visited the emergency room were discharged within a few hours without being admitted to the hospital. In some cases, the claimant did not visit the emergency room until days or weeks after the subject accident. Some claimants were instructed by Simon & Simon to visit emergency rooms after retaining Simon & Simon, in situations where no such treatment had otherwise been sought.

63.     Following the accident and after retaining Simon & Simon, the firm directs these claimants to a conveyor belt of preselected treatment providers and medical experts, including Defendants Harvey and Piccillo at Philadelphia Spine Associates, Defendant Clifton Burt at Premier Pain & Rehab Center, and Yarus.

64.     Typically, the claimants first see chiropractors or physical therapists for fifteen or more visits, often on a compressed timeframe.

65.     Upon information and belief, in some instances no actual chiropractic treatment was delivered to the claimants involved. A significant number of the treatment records purporting to describe such visits were signed within minutes after the scheduled appointment time, despite appointment logs reflecting care that should have required substantially more time. In several instances, treatment records were created and signed *before* the appointment was scheduled to occur.

66.     The combination of unnecessary emergency room visits and subsequent chiropractor records was designed to create a false evidentiary basis for the Simon & Simon clients' claims. For example, one claimant was a passenger in a stopped vehicle when a driver logged into the Uber application reversed into her car at a low rate of speed. A police report from the scene noted no injuries and no damage to either vehicle. The claimant did not seek any medical treatment until two days later, when she visited the emergency room at Temple University Hospital. Her discharge paperwork from the emergency room suggested she could return to work. Within nine days, however, she had begun an extensive regimen of chiropractic appointments at Philadelphia Spine Associates, regularly reporting her pain to be a "9/10" (severe pain) on the recognized visual analog scale ("VAS scale") of pain. Upon information and belief, the reported pain level was the result of coaching by Simon & Simon and/or the medical provider rather than a legitimate experience of pain.

67.     In a similar case, another claimant was allegedly a passenger of a driver he had connected with through the Uber application. His driver was rear-ended in a low-speed collision. A police report from the scene stated there were no injuries. The claimant did not immediately

-21-

seek medical treatment. However, the next day, he presented to the emergency room at Temple University Hospital complaining of pain at a "10/10" on the VAS scale, which equates to pain "as bad as it could possibly be." This claimant was discharged with only a suggestion that he take ibuprofen. Nevertheless, five days later, at the direction of Simon & Simon, he was attending his first of 39 appointments at Philadelphia Spine Associates.

68.    The chiropractors and physical therapists who work with Simon & Simon, including Defendants Harvey and Piccillo at Philadelphia Spine Associates, perform another important function in the scheme by referring claimants for MRIs.

69.    Burt and Yarus purport to rely on claimants' MRIs in their own diagnoses and recommendations. The standard of care generally requires an MRI for the treatments that Burt purports to deliver.

70.    The chiropractors and physical therapists who work with Simon & Simon direct almost all Simon & Simon personal injury claimants for MRIs, which are typically performed by a designated individual at Open MRI of Bala Cynwyd.

71.    Upon information and belief, these providers are instructed by Simon & Simon to refer claimants to receive MRIs from that individual.

72.    Obtaining an MRI performs the important function of giving Burt's radiofrequency ablation procedures the appearance of legitimacy, while also providing a basis for Yarus or another medical expert to claim that the claimants will need regular MRIs in the future.

C.    **Yarus's Resulting Future Care Projections**

73.    Marc Simon and Simon & Simon use the false medical records generated by Defendants Burt, Premier Pain & Rehab Center, Harvey, Piccillo, and Philadelphia Spine Associates to manufacture artificially inflated lifetime damages estimates and then use these estimates to induce large settlements from Uber, FedEx, and others. To do so, Marc Simon and

-22-

Simon & Simon transmit these records to a purportedly independent expert with the understanding that such expert will produce a report falsely representing a need for exorbitant future medical expenses for the claimant.

74.    Marc Simon and Simon & Simon regularly use Defendant Lance Yarus as one such expert. Yarus is presented as an independent evaluator but, in reality, functions as a device by which Simon & Simon effectuate their scheme. Yarus is selected for his willingness to produce false reports that align with the narrative advanced by Simon & Simon, regardless of the claimant's actual medical condition.

75.    Marc Simon and Simon & Simon have paid Yarus substantial compensation for his large volume of work. From 2017 through 2024, Yarus purported to perform thousands of reports and/or examinations for Simon & Simon clients. Yarus purports to have been paid more than $3 million by Simon & Simon in this time period for these reports and accompanying deposition testimony.

76.    Yarus typically meets with Simon & Simon claimants in an office on the same floor of the same office building as the Simon & Simon offices in Philadelphia.

77.    Yarus's reports in Simon & Simon cases invariably confirm the existence of serious, permanent injuries caused by the subject accident and recommend extensive, lifelong medical care. Yarus has admitted that he has identified a serious injury, found causal attribution, and recommended lifetime medical care in 100% of the hundreds of cases in which he has testified for Simon & Simon clients.

78.    Yarus's reports falsely attribute causation to the subject accident using nearly identical language.

79.    The reports also contain nearly identical language falsely describing the relevant injuries:

> There is permanency to the injuries sustained in that this individual is no longer enjoying the same lifestyle, level of comfort, nor activity involving full use of the areas of injury to which they were accustomed prior to sustaining injury in the subject incident. . . . There has been an adverse effect placed on the nerve distribution.

80.    The reports draw virtually the same conclusion regarding the supposed permanency of the injuries, as follows:

> It is therefore my opinion that further evaluations and treatments are required based on the current findings given that this individual has not recovered from the effects of the injury sustained in the subject incident, future care is required.

81.    Yarus used nearly identical language with respect to substantially all of his reports regardless of the actual injury described or the particular circumstances of the patient, such as age, underlying medical condition, or the nature of the accident.

82.    In each of the Simon & Simon cases against Uber discussed in this Amended Complaint where Yarus provided a report in 2023, he made the following substantially identical recommendations for lifelong care regardless of the age, underlying medical condition, or purported injury to the claimant:

- MRI frequency: every other year

- Chiropractor visit frequency: 6-12 visits annually

- Additional orthopedist/physiatrist appointments: 2-4 visits annually

- Trigger point injection frequency: 3 injections every 6 months for an additional 3 years

- Radio-frequency ablation frequency: every 12-18 months

- Surgical necessity: laminectomies, discectomies, or facetectomies will be required within the next five years.

- Fusion and stabilization procedures: necessary within 7 years of surgery

83. In each of the Simon & Simon cases against Uber discussed in this Amended Complaint where Yarus provided a report in 2024, he made the following substantially identical recommendations for lifelong care regardless of the age, underlying medical condition, or purported injury to the claimant:

- MRI frequency: every other year

- Additional orthopedist/physiatrist appointments: 2-4 visits annually

- Trigger point injection frequency: 3 injections every 6 months for an additional 3 years

- Percutaneous electrical nerve stimulation treatment frequency: one treatment per month for 3 years

- Radio-frequency ablation frequency: every 12-18 months

- Surgical necessity: laminectomies, discectomies, or facetectomies will be required within the next five years

- Fusion and stabilization procedures: necessary within 7 years of surgery

84. The purpose of Yarus's medical examiner reports is to create the appearance of genuinely independent medical validation for the fraudulent claims. Marc Simon and Simon & Simon utilize these documents to bolster their demands for substantial settlements, presenting them as objective evidence of the need for ongoing care.

85. In reality, the claimants typically do not pursue the recommended treatment, and there is no genuine medical basis for the dire prognoses described in the reports. Multiple Simon

& Simon claimants whom Yarus stated would certainly require extensive treatments including future surgeries testified that they had not sought and had no plans to seek further treatment.

86.     Yarus's reports allow Marc Simon and Simon & Simon to complete the process of converting low-value cases that would not have otherwise been brought or that would have been resolved through compulsory arbitration into million-dollar-plus litigation claims by creating the appearance of independent medical validation for non-existent serious injuries in cases where actual out-of-pocket costs were minimal.

87.     Yarus's reports advance the fraud scheme in two additional ways. First, in certain scheme cases where the claimant has purchased only "limited tort" auto insurance coverage, Yarus's diagnosis of a "serious injury" entitles the claimant to pain and suffering damages. And second, Pennsylvania law requires damages from incurred medical expenses in auto insurance injury cases to be capped at 110% of Medicaid reimbursement rates. This limitation does not apply to estimated future expenses. The Yarus reports are vehicles to present supposed future expense information to a jury.

88.     The uniformity and predictability of Yarus's reports have drawn repeated judicial criticism.

89.     For example, in *Shelton v. Chaudhry*, Judge McHugh observed: "In this case, as in virtually every case involving Mr. Simon's firm, the plaintiff was examined by a physician after which a life care plan was prepared. Invariably, intensive and costly medical treatment is recommended. But I have yet to see a single case involving the Simon office where any plaintiff actually pursued the recommended care. I therefore view these reports as litigation documents, bearing little relationship to real world medical care." 763 F. Supp. 3d 675, 687 (E.D. Pa. 2025).

90.    Judge McHugh further noted that when "a firm persistently uses the same forensic examiners, and in every case, without fail, monumental future costs are projected, it becomes difficult to read the reports in question as credibly addressing actual patient needs." *Id.* at n.11.

91.    Similarly, in *Morris v. Sutton*, Judge McHugh again highlighted the strategic use of these reports, stating that they "appear to represent a litigation strategy" and that "[t]here would appear to be a legitimate basis on which to question the validity of [Yarus]'s opinions." No. 23-cv-2806, 2025 WL 564932, at *1–*2 (E.D. Pa. Feb. 19, 2025).

92.    Through these efforts, Marc Simon and Simon & Simon are able to assemble a comprehensive but fraudulent record of purported medical necessity, spanning initial assessments, invasive procedures, and purportedly independent medical examinations. This record is then used to pressure insurers and defendants into paying artificially inflated settlements, despite the absence of any real need for the extensive future care described.

93.    Yarus's involvement in the scheme extends beyond cases against Uber and FedEx. In a case filed by Marc Simon and Simon & Simon against other parties in New Jersey, Yarus produced a detailed report diagnosing a number of injuries and stating that a lifetime of expensive medical care would be necessary. When questioned under oath, the claimant in the case testified that Yarus had never examined her in person, making the statements in his report knowingly false.

94.    Yarus himself does not assign specific dollar amounts to the reports he produces. Marc Simon and Simon & Simon typically take Yarus's report and then forward it to a second expert, often with a firm called the Verity Group. This second expert assigns dollar figures to the unnecessary treatments Yarus recommends.

**D.    Simon & Simon's Misuse of the Fraudulent Records and Reports**

95.    Marc Simon and the Simon & Simon firm effectuated this fraud scheme by using the false medical treatment history as the basis for filing and pursuing sham lawsuits against Uber,

FedEx, and others. Such lawsuits were in furtherance of the scheme's goal: to convert marginal motor vehicle and slip-and-fall claims into million-dollar-plus lawsuits against Uber, FedEx, and other defendants.

96.    Absent the fraud, these claims would have been resolved through Pennsylvania's no-fault mechanism or, if brought at all, could have been resolved through compulsory arbitration without the added cost and expense resulting from the defense of a case in the Court of Common Pleas alleging millions in future medical expenses. Additionally, many cases brought by plaintiffs who had purchased "limited tort" motor vehicle insurance would have been limited to recovery of minimal out-of-pocket medical expenses. Absent the scheme, such cases would have been resolved through the no-fault process or not have been brought at all.

97.    Where such cases are settled, the amount paid in settlement is substantially higher as a result of the scheme and in reliance on the fraud.

98.    Uber, FedEx, and others targeted by the scheme relied upon the misrepresentations made in the false medical records. Such reliance resulted in, among other things, settlement payments that would not have been made or that would have been made in a lesser amount but for the fraud.

99.    In 2025, Uber served subpoenas in certain of the lawsuits that had been filed against it, seeking depositions of Burt and his business partner Blessen Abraham and incurred attendant expense thereby. Simon & Simon quickly dismissed Uber from each of the then-pending nearly thirty cases involving Burt. Upon information and belief, Simon & Simon did so to avoid discovery and conceal the scheme described herein. Each of these Burt-involved cases was dismissed as against Uber. Many of those cases, however, remained pending against the other defendants that Simon & Simon had sued.

E.    **Examples of the Scheme in Operation Against Uber**

100.    The following cases illustrate the pattern of corrupt activity as directed at Uber.

1.    **Personal Injury Claimant A**

101.    On April 26, 2024, at approximately 6:13 p.m., Personal Injury Claimant A was driving a vehicle that was struck by another driver, causing Claimant A to collide with a third car. Police officers responded to the scene of the accident, which occurred in Philadelphia, Pennsylvania. Claimant A reported no injuries; neither did any other person at the scene. Airbags did not deploy, and Claimant A drove his vehicle home after the accident.

102.    Claimant A never visited the emergency room. Claimant A suffered no substantial accident-induced injury, including no significant injury to the neck or back.

103.    On May 9, 2024, Claimant A traveled to Philadelphia Spine Associates for alleged treatment of neck and back injuries by Defendant Harvey. Over the months that followed, Claimant A purportedly traveled to Philadelphia Spine Associates for approximately 26 follow-up sessions with Defendants Harvey and Piccillo. Such treatment was directed by the Simon & Simon firm.

104.    Upon information and belief, these appointments at Philadelphia Spine Associates did not occur as described in the treatment reports. Each of the 27 treatment reports contain the same boilerplate statement that "Patient currently complains of the following: <u>Headaches, Neck Pain, Low Back Pain, Mid Back Pain</u>." Two treatment session reports were e-signed by Harvey within a few minutes of the start time (before treatment ended) for the treatment sessions (August 1 and August 12, 2024).

105.    Defendant Harvey referred Claimant A to Open MRI of Bala Cynwyd for MRIs of the lumbar spine and cervical spine, where Claimant A was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. Harvey's MRI referral was intended to and did advance the fraud scheme because the fact of having received an MRI—

whatever its result—was necessary for Burt to justify his eventual purported pain management treatments and for Yarus to prepare his eventual fraudulent report. Burt delivered his unnecessary treatment and Yarus prepared his fraudulent report even where, as was the case here, the MRI results came back as "negative" and/or "essentially negative[.]"

106. Marc Simon and the Simon & Simon firm also directed Claimant A to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

107. On November 12, 2024, Burt examined Claimant A and reviewed Claimant A's MRI records. Burt's report from the visit diagnosed Claimant A with "radiculopathy, lumbar region" and "lumbar dorsopathy/facet syndrome" and stated that his pain "resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant A had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

108. Marc Simon and Simon & Simon also directed Claimant A to Yarus for a purportedly independent medical examination.

109. Yarus's report, dated December 3, 2024, fraudulent diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

> CONCLUSIONS: The following injuries occurred as a result of the subject incident in which [Claimant A] was involved occurring on April 26, 2024:
> 1.    Cervical strain and sprain …
> 2.    Lumbar strain and sprain …

3.      Facetogenic pain mediated by L3-4, L4-5 and L5-SS1 injured in the subject incident of April 26, 2024.

4.      Chronic pain secondary to subject incident-related injuries …

5.      Alteration of activities secondary to subject incident-related injuries …

110.    Yarus's report also used the fraudulent records produced by Burt, Harvey, and Piccillo and the MRI records from Open MRI of Bala Cynwyd at the direction of Simon & Simon to falsely state that "it is my opinion, to a reasonable degree of medical certainty, that the injuries and conditions . . . were directly caused by the subject incident of April 26, 2024." Yarus's report also stated falsely that "[i]t is my opinion, to a reasonable degree of medical certainty, that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident."

111.    Yarus's report also falsely stated that Claimant A would require multiple invasive surgeries including "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at L3-4, L4-5, and L5-S1," as well as "fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies." Additionally, Yarus's report falsely claimed that Claimant A would require a lifetime of "[m]edical surveillance" including MRIs, chiropractic care, and other spinal procedures such as epidural steroid injections and further radiofrequency ablations.

112.    Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant A suffered no substantial injury from the subject accident, including no significant injury to his neck or back.

113.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant A's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant A's case. Yarus did so in return for compensation from Simon & Simon in

the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

114.    Simon & Simon then used Yarus's false and fraudulent report to obtain a report from a "life care planner" that estimated that the treatment contemplated by Yarus would cost more than $1 million over the course of Claimant A's lifetime. Claimant A did not seek and has stated he has no plans to seek the future treatment Yarus claimed would be necessary.

115.    On or about December 30, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant A claiming that Claimant A had "sustained serious permanent personal injuries and damages, including to the back, neck, legs and forearms"; that he had "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back, neck, legs and forearms"; and that all of Claimant A's injuries were "permanent in nature[.]" Marc Simon and Simon & Simon demanded payment of more than $600,000, and used Yarus's report and the evidence of treatment purportedly provided by Burt, Premier Pain & Rehab Center, Harvey, Piccillo, and Philadelphia Spine Associates to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no serious injury, including no substantial injury to the neck or back.

116.    On May 12, 2025, Uber was voluntarily dismissed without prejudice from Claimant A's case after Uber served subpoenas seeking deposition testimony and document production from Burt and his business partner Blessen Abraham.

117.    Claimant A's case remains ongoing as to the remaining parties.

## 2. Personal Injury Claimant B

118. Personal Injury Claimant B is a relative of Personal Injury Claimants CC and DD, who were also represented by Simon & Simon and treated by Burt in personal injury cases that shared many similarities. Claimants CC and DD are discussed further *infra*.

119. On November 12, 2022, at approximately 6:20 p.m. in Philadelphia, Pennsylvania, Claimant B was seated in the back seat of a car that was stopped at an intersection. Claimant B had requested the ride through the Lyft app. The car stopped in front of the vehicle she was riding in reversed to avoid being hit by a SEPTA bus that was making a wide turn. This car in front, which was driven by a driver logged into the Uber application at the time, lightly tapped the front bumper of the car that Claimant B was in. The police responded to the scene. Claimant B reported no injuries, and neither did any other passenger. No airbags deployed, no ambulance was called, and no tows were needed.

120. On November 14, 2022—two days after the incident—Claimant B visited the emergency room at Temple University Hospital. Emergency room records reflect that Claimant B reported lower back pain and did not report neck pain. Upon information and belief, Claimant B visited the emergency room after communicating with Simon & Simon regarding a potential lawsuit. She was given a steroid shot in her arm for pain, up to 10 days of mild pain medication, and told she could return to work the next day.

121. On November 23, 2022, Claimant B traveled to Philadelphia Spine Associates and Daniel Piccillo at the direction of Simon & Simon. Over the months that followed, Claimant B purportedly traveled to Philadelphia Spine Associates and Piccillo and Harvey for approximately 16 follow-up visits. Such treatment was directed by the Simon & Simon firm.

122. Philadelphia Spine Associates medical records consist of cut and pasted boilerplate recitals without regard to the actual facts. Each of the 17 visit records contain verbatim recitations

-33-

that (a) "Patient currently complains of the following: <u>Neck Pain, Mid Back Pain, Low Back Pain</u>"; (b) "Joint fixations with bio-mechanical alterations of the surrounding areas were noted with hypomobility"; (c) "The following techniques Chiropractic Manipulation, Arthrostim were applied to the areas of subluxation"; and (d) "Treatment was effective, tolerated well, and without incident."

123.    Defendant Piccillo referred Claimant B to Open MRI of Bala Cynwyd for MRIs of the lumbar spine and cervical spine, where she was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. Piccillo's MRI referral was intended to and did advance the scheme because an MRI was crucial to Burt's eventual purported pain management treatments and Yarus's eventual fraudulent report. The MRIs were performed on March 9, 2023. The lumbar MRI came back "negative." The cervical MRI displayed shallow disc bulging, which an independent medical expert confirmed reflected typical degeneration, not accident-related trauma.

124.    Simon & Simon also directed Claimant B to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

125.    On May 18, 2023, Burt examined Claimant B and reviewed Claimant B's MRI records. Burt's report from the visit diagnosed Claimant B with a "[d]isc bulge at C3-4, C4-5" and "cervical dorsopathy/facet syndrome," with pain that "resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant B

had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

126.    Burt's May 18, 2023 report falsely describes the procedures Burt performed. The documented needle placement in the imaging attached to the report does not correspond to accepted medial branch anatomy for performance of a legitimate medial branch block for diagnostic assessment purposes. The report also states that after the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only 34 seconds between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report. At most Burt waited approximately 34 seconds, and the decision to administer the RFA was predetermined and directed by Simon & Simon.

127.    Marc Simon and Simon & Simon also directed Claimant B to Yarus for a purportedly independent medical examination.

128.    Yarus's report, dated August 21, 2023, began by describing the accident itself in a false manner, stating that Claimant B "hit the seat in front of her" when "[a]nother vehicle struck the vehicle in which she was traveling." This type of physical reaction would not be possible from the actual collision that occurred—another car backing into the front of Claimant B's car at a low rate of speed.

-35-

129.    Yarus's report fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

CONCLUSIONS: The following injuries occurred as a result the subject incident in which [Claimant B] was involved occurring on November 12, 2022.
1.  Cervical strain/sprain …
2.  Facetogenic pain mediated by C4-5, C5-6 injured in the subject accident …
3.  Cervicular dorsopathy/cervical facet syndrome.
4.  C5 radiculopathy.
5.  Chronic pain secondary to subject incident-related injuries …
6.  Alteration of activities secondary to subject incident-related injuries …

130.    Yarus's report also used the fraudulent records produced by Burt, Harvey, and Piccillo and the MRI records from Open MRI of Bala Cynwyd at the direction of Simon & Simon to falsely state that "it is my opinion that the injuries and conditions as they are outlined herein were directly caused by the subject incident of November 12, 2022" and that "[t]here is permanency to the injuries sustained[.]"

131.    Yarus's report also falsely stated that Claimant B would require multiple invasive surgeries including "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C4-5, C5-6," as well as "fusion and stabilization procedures." Additionally, Yarus's report falsely stated that Claimant B would require a lifetime of "[m]edical [s]urveillance" including MRIs, chiropractic care, and other procedures such as epidural steroid injections and further radiofrequency ablations.

132.    Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant B suffered no substantial injury from the subject accident, including no significant injury to her neck or back.

133.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant B's need for future medical care to fraudulently pursue an artificially inflated

recovery in Claimant B's case. Yarus did so in return for compensation from Simon & Simon in the form of a direct payment of approximately $750 for the report, as well as the promise, implicit or explicit, of up to millions of dollars in payment for similar false reports in numerous other cases.

134.    Simon & Simon then used Yarus's fraudulent report to obtain a report from a "life care planner" estimating that the treatment contemplated by Yarus would cost nearly $900,000 over the course of Claimant B's lifetime. Claimant B did not go on to pursue the care Yarus projected.

135.    On or about June 20, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant B claiming that Claimant B had "sustained serious permanent personal injuries and damages, including to the back"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back"; and that all of Claimant B's injuries were "permanent in nature[.]" In connection with this suit, Simon & Simon demanded payment of $1,500,000, and used Yarus's report and the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center and Harvey, Piccillo, and Philadelphia Spine Associates to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury, impairment, disfigurement, and/or aggravation of pre-existing conditions.

136.    On May 12, 2025, Uber was voluntarily dismissed without prejudice from Claimant B's case after Uber served subpoenas seeking deposition testimony and document production from Burt and his business partner Blessen Abraham.

137.    On November 17, 2025, Claimant B's case against the remaining defendant ended in a full jury verdict for the defense.

### 3.    Personal Injury Claimant C

138.    On March 10, 2023, at approximately 5:18 p.m., Personal Injury Claimant C was driving in a rented car wearing his seatbelt when he allegedly struck another driver, also in a rented vehicle, on the rear driver's side, in Philadelphia, PA. After the accident, police responded to the scene. Claimant C and the others involved reported no injuries. The police report noted that Claimant C's car had "minor damage to the front bumper, hood, and fenders, but was drivable" and that the other car had "minor damage" and was "also drivable." Airbags did not deploy, and no ambulance was called.

139.    Over 24 hours after the alleged accident, Claimant C visited the Thomas Jefferson University Hospital Emergency Room. He reported being involved in a car accident the night before. He was treated with a lidocaine patch, Tylenol, and Advil. An X-ray of his thoracic and lumbar spine was ordered, which showed no fracture or dislocation. Claimant C denied having any neck pain. He was discharged with instructions to take ibuprofen and alternate ice and heat on sore areas.

140.    On March 15, 2023, Claimant C went to a Philadelphia chiropractor for purported treatment of non-existent serious neck and back injuries, rating his pain as a 7 out of 10. Over the following months, Claimant C purportedly traveled to the chiropractor for 11 follow-up treatment sessions. Defendant Simon & Simon was listed on the resulting bill issued from each visit.

141.    Simon & Simon also directed Claimant C to Burt for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

142.   On July 13, 2023, Burt examined Claimant C and reviewed Claimant C's MRI records. Burt's report from the visit diagnosed Claimant C with "radiculopathy, cervical region" and "cervical dorsopathy/facet syndrome," with pain that "resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant C had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

143.   Burt's July 13, 2023 report does not accurately describe the procedures Burt performed. The needle placement reflected in the imaging attached to the report does not match the needle placement described in the report. The report also states that after the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only 73 seconds between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

144.   Marc Simon and Simon & Simon also directed Claimant C to another physician who regularly works with Simon & Simon and Burt to produce expert reports, for a purportedly independent medical examination.

145.    The report, dated October 20, 2023, used the fraudulent records produced by Burt to falsely state that "as a direct result of the motor vehicle accident on 3/10/23," Claimant C had suffered "[c]ervical pain and radiculopathy secondary to C3-4, C4-5 central disc herniation, C5-6 right sided disc herniation with nerve root compression." The physician stated that "it is of my medical opinion within a reasonable degree of medical certainty that the injuries and/or conditions outlined in this report were caused and/or aggravated by the motor vehicle accident on 3/10/23," and that Claimant C "suffered a serious and permanent injury to his cervical spine due to the motor vehicle accident on 3/10/23."

146.    The physician then used these fraudulent records to state that Claimant C "will require further treatment" throughout the course of his life, including "repeat cervical radiofrequency ablations (1-2 times a year)" and "cervical surgery" involving three separate disc replacements or fusions. Marc Simon and Simon & Simon used this prognosis to produce a "lifetime cost of care" estimate of over $1.3 million.

147.    On or about October 30, 2023, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant C claiming that Claimant C had "sustained serious permanent personal injuries and damages, including to the back and neck"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back and neck"; and that all of Claimant C's injuries were "permanent in nature[.]" In connection with this suit, Simon & Simon demanded payment of more than $1,600,000, and used the physician's report and the evidence of treatment supposedly provided by Burt and Premier Pain & Rehab Center to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew

-40-

or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

148.     On April 1, 2025, Uber was voluntarily dismissed without prejudice from Claimant C's case after Uber served subpoenas seeking deposition testimony and document production from Burt and his business partner Blessen Abraham.

149.     Claimant C's case has settled.

### 4.     Personal Injury Claimant D

150.     On July 23, 2023, at approximately 5:30 p.m. Personal Injury Claimant D was a passenger in a vehicle that was involved in a low-speed collision with a SEPTA bus. After the accident, police and EMS responded to the scene. Airbags did not deploy, and damage to the vehicle and bus was minor. Claimant D claims that she presented that day to Temple Hospital's emergency department, but she left before being seen.

151.     On July 24, 2023, Claimant D presented to Chestnut Hill Hospital's Emergency Department. She was quickly discharged with lidocaine patches and instructions to take mild pain medication (ibuprofen) as needed. The emergency room providers noted that there was no reason for imaging at the time.

152.     On July 26, 2023, Claimant D went to Philadelphia Spine Associates and Defendant Daniel Piccillo for purported treatment of neck and back injuries at the direction of Defendant Simon & Simon. Over the months that followed, Claimant D purportedly traveled to Philadelphia Spine Associates and Defendants Piccillo and Harvey for approximately 21 follow-up treatment sessions, for which those Defendants submitted bills totaling approximately $5,342 to Uber's PIP insurance provider and received payment. Such treatment was directed by the Simon & Simon firm. Claimant D rated her pain as an 8 out of 10 (which represents severe pain) for 19 of the 22 alleged visits.

153.    Each medical treatment record produced by Defendants Harvey and Piccillo documented multiple purported treatments, such as infrared therapy, mechanical traction therapy, electrical stimulation, and chiropractic adjustment. Some or all of these treatment sessions did not occur as described in the treatment records. Each treatment record stated that trigger point massage was performed by a licensed massage therapist for exactly 15 minutes. However, Claimant D later reported to an independent medical examiner that her chiropractic treatments consisted of sitting in a chair and getting electrical stimulation. She denied getting chiropractic adjustments or massages.

154.    In particular, several of Defendant Harvey's treatment sessions did not occur as described. Defendant Harvey electronically signed or caused to be signed records from three visits before the listed appointment time, indicating that these appointments and treatments did not take place as described, if at all. Defendant Harvey electronically signed or caused to be signed at least three additional records within 11 minutes of the scheduled appointment time—an interval inconsistent with the duration of care documented in the records.

155.    To the extent such treatment occurred at all, it was medically unnecessary, given that Claimant D suffered no substantial accident-induced injury, including no significant injury to the neck or back. For the purpose of adding the expense of such treatments to the personal injury claim, Defendants Piccillo and Harvey falsely represented in numerous records that Claimant D received massages, mechanical traction therapy, electrical stimulation, and chiropractic adjustment. Upon information and belief, Defendants Harvey and Piccillo knew or acted with reckless disregard for the fact that the statements were false when made, given that Claimant D did not receive such treatments as described, and that any treatment she did receive was not necessary, as she suffered no significant injury.

-42-

156.    Defendant Harvey referred Claimant D to Open MRI of Bala Cynwyd for an MRI of the lumbar spine, where she was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. The MRI was performed on or about October 18, 2023. Harvey's MRI referral was intended to and did advance the scheme because an MRI was crucial to Burt's eventual purported pain management treatments. The MRI displayed a mild disc bulge, which an independent medical expert later confirmed reflected typical disc degeneration that was unrelated to any single event. Despite having directed Claimant D for the MRI, Harvey and Picillo never recorded either a medical reason for the MRI referral or the results in Claimant D's appointment records.

157.    Simon & Simon also directed Personal Injury Claimant D to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

158.    On November 8, 2023, Defendant Burt examined Claimant D and reviewed Claimant D's MRI records. Burt's report from the visit diagnosed Claimant D with "lumbar dorsopathy/facet syndrome," and with pain that "resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant D had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

159.    Burt's November 8, 2023 report does not accurately describe the procedures Burt performed. The report also states that after the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation

at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only approximately two minutes between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

160.    Claimant D stated in a deposition that she had received only one injection and not the multiple injections reflected in Burt's false records.

161.    If such treatment occurred at all, it was medically unnecessary, given that Claimant D had suffered no significant injury. For the purpose of adding the expense of such injection to the personal injury claim, Defendant Burt falsely represented with respect to Claimant D, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that this statement was false when made because he knew or recklessly disregarded the fact that Claimant D suffered no significant injury.

162.    Marc Simon and Simon & Simon also directed Claimant D to another doctor with whom Simon & Simon regularly works, for a purportedly independent medical examination.

163.    The doctor's report, dated December 19, 2023, falsely stated that Claimant D had "sustained an aggravation of her L5-S1 disc protrusion" and "post-traumatic lumbar radiculopathy on the left." The report also falsely stated that all treatment incurred was "both reasonable and necessary, as well as causally related to the motor vehicle accident." Finally, the report falsely

-44-

stated that Claimant D would require years of medical care, including lumbar epidural steroid injections, medial branch blocks, radiofrequency ablations, and a microdiscectomy and nerve root decompression surgery.

164. Simon & Simon then used the fraudulent report to obtain a report from a "life care planner" estimating that the treatment contemplated by the doctor would cost over $400,000 over the course of Claimant D's lifetime.

165. On or about December 29, 2023, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant D claiming that Claimant D had "sustained serious permanent personal injuries and damages, including to the back and right leg"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back and right leg"; and that all of Claimant D's injuries were "permanent in nature[.]" In connection with this suit, Simon & Simon demanded payment of $1,250,000, and used the evidence of treatment purportedly provided by Burt and Premier Pain & Rehab Center, Harvey, Piccillo, and Philadelphia Spine Associates to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

166. On February 3, 2025, Uber was voluntarily dismissed without prejudice from Claimant D's case.

167. Claimant D's case concluded in a settlement.

### 5.    Personal Injury Claimant E

168. On February 22, 2023, at approximately 6:46 p.m. Personal Injury Claimant E was a passenger in a vehicle that was involved in a low speed rear-end accident with another vehicle.

The police responded to the scene. Claimant E reported no injuries, and neither did any other passenger. No ambulance was called, no tow was needed, and damage to the vehicles was minor.

169. The following afternoon, Claimant E visited the emergency room at Temple University Hospital. Emergency room records indicate that he was seen, diagnosed with a sprain, and discharged within two hours with instructions to take a mild pain medication (acetaminophen) as needed. Medical providers at Temple University Hospital instructed Claimant E to follow up with Internal Medicine and to return to the Emergency Department if his symptoms worsened.

170. Claimant E did not do so, nor did he follow up with his regular primary care doctor. Instead, on February 28, 2023, six days after the accident, Claimant E traveled to Philadelphia Spine Associates and Defendant Harvey at the direction of Defendant Simon & Simon. Over the next several months, Claimant E purportedly traveled to Philadelphia Spine Associates and Defendants Piccillo and Harvey for approximately 38 additional treatment sessions. Upon information and belief, some or all of these sessions did not occur as described in the treatment reports.

171. In each treatment record, Defendants Harvey and Piccillo documented some combination of multiple purported treatments, which included infrared therapy, mechanical traction therapy, electrical stimulation, and chiropractic adjustment. Every treatment record also stated that trigger point massage was performed by a licensed massage therapist for 15 minutes. But Claimant E later stated that he only received massages, and perhaps at some point unspecified "exercises," at Philadelphia Spine Associates.

172. If such treatment occurred at all, it was medically unnecessary and performed for the purpose of adding the expense of such treatments to the personal injury claim. Upon information and belief, Defendants Harvey and Piccillo knew or acted with reckless disregard for

-46-

the fact that their statements were false when made given that Claimant E did not receive all treatments described and that any treatment he did receive was not necessary because he suffered no substantial accident-induced injury, including no significant injury to the neck or back.

173.    Defendant Harvey also referred Claimant E to Open MRI of Bala Cynwyd for MRIs of the cervical and lumbar spine, where he was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. The MRIs were performed on or about June 26, 2023. The MRIs reflected mild degeneration and did not indicate traumatic injury.

174.    Defendant Harvey referred Claimant E for the MRI in furtherance of the scheme, rather than based on legitimate medical need. Harvey's MRI referral was intended to and did advance the scheme because an MRI was crucial to Burt's eventual purported pain management treatments and Yarus's eventual fraudulent report. Despite Harvey having directed Claimant E for the MRI, the only reference to the MRI in Claimant E's Philadelphia Spine Associates appointment records is in the final report on October 2, 2023.

175.    Defendant Piccillo faxed records to Defendant Simon & Simon regarding Claimant E's treatment. First, on June 27, 2023—the day after Open MRI of Bala Cynwyd performed Claimant E's MRI—Piccillo faxed Simon & Simon Claimant E's MRI results. Then, on October 31, 2023, Piccillo faxed Simon & Simon Claimant E's full treatment records. Each of these faxes was reasonably foreseeable and made in furtherance of the scheme.

176.    Marc Simon and Simon & Simon also directed Claimant E to Defendants Burt and Premier Pain & Rehab. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

-47-

177.    On August 9, 2023, Defendant Burt examined Claimant E and reviewed Claimant E's MRI records. Burt's report from that visit diagnosed Claimant E with "lumbar dorsopathy/facet syndrome," "radiculopathy, lumbar region," and with pain that "resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant E had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

178.    Burt's August 9, 2023 report does not accurately describe the procedures Burt performed. The report states that after the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only approximately 90 seconds between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

179.    Claimant E was still undergoing chiropractic treatment with Philadelphia Spine Associates after his purported injections. However, despite Burt's records reflecting an improvement in Claimant E's pain, the chiropractic records do not reflect a commensurate decrease in pain at visits following the injection and ablation procedure. In fact, the chiropractic records make no mention of Burt's procedure anywhere in the treatment records or final

examination record. This discrepancy reflects that the radiofrequency ablation was not effective, that it was not performed as recorded, that Philadelphia Spine Associates were falsely recording pain symptoms different from what Claimant E experienced, or some combination of these three factors.

180. Simon & Simon also directed Claimant E to Yarus for a purportedly independent medical examination. Yarus's report, dated November 30, 2023, used the fraudulent records produced by Burt, Harvey, and Piccillo to falsely state that Claimant E's injuries were permanent and "directly caused by the subject incident of February 22, 2023." In that report, Yarus interpreted Claimant E's MRIs as showing a "disc bulge/protrusion, extrusion-type herniation" in Claimant E's cervical spine and a "protrusion/extrusion-type herniation" in Claimant E's lumbar spine. However, none of Claimant E's other providers, nor a subsequent medical records reviewer, interpreted the MRIs as indicating a protrusion or herniation. Additionally, Yarus's report failed to mention pre-accident medical records indicating that Claimant E was diagnosed with back pain with radiation as early as February 2022.

181. Yarus then used these fraudulent records to falsely state that Claimant E would require, among extensive other treatments, surgical intervention in the form of "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C5-6, left; L5-S1 bilateral" "within the next five years." Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant E suffered no substantial accident-induced injury and did not require such treatment.

182. Simon & Simon then used Yarus's fraudulent report and the underlying records to obtain a report from a "life care planner" estimating that the treatment contemplated by Yarus would cost over $1.5 million over the course of Claimant E's lifetime.

183.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant E's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant E's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

184.    On or about February 15, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant E claiming that Claimant E had "sustained serious permanent personal injuries and damages, including, to the back and neck"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back and neck"; and that all of Claimant E's injuries were "permanent in nature[.]" In connection with the suit, Simon & Simon demanded payment of more than $1,850,000, and used Yarus's report and the evidence of treatment purportedly provided by Burt and Premier Pain & Rehab Center and Harvey, Piccillo, and Philadelphia Spine Associates to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

185.    On January 17, 2025, Uber was voluntarily dismissed without prejudice from Claimant E's case.

186.    Claimant E's case concluded in a settlement.

### 6.    Personal Injury Claimant H

187.    On December 22, 2022, in the early hours of the morning, Personal Injury Claimant H was stopped at a red light when a car travelling at a low rate of speed rear-ended Claimant H's car. The driver who hit Claimant H's car was logged into the Uber application. Claimant H was

wearing a seatbelt at the time of the accident. His airbags did not deploy, and he did not report any injuries at the scene of the accident. Neither police nor an ambulance came to the scene. Claimant H drove home following the accident.

188.    Claimant H did not visit the emergency room or his primary care provider following the accident.

189.    Instead, on December 30, 2022, at the direction of Simon & Simon, Claimant H visited a chiropractic practice. At his intake appointment, Claimant H reported pain, including neck pain. He reported that his discomfort was a 3 out of 10 and that it was noticeable approximately 30% of the time. The chiropractic practice's medical records from that first appointment assigned Claimant H a "[n]eck disability index" score reflecting that Claimant H had "minimal disability," meaning that the "patient can cope with most living activities" and "[u]sually no treatment is indicated apart from advice on lifting sitting and exercise."

190.    Between December 30, 2022 and February 6, 2023, Claimant H attended approximately 17 appointments at this chiropractic practice. The medical records from these appointments generally reflect that Claimant H reported his discomfort at around the 3 out of 10 he reported during his first appointment.

191.    On February 6, 2023, the chiropractic practice directed Claimant H for an MRI. The MRI, which was completed on February 20, 2023 showed diffuse disc bulging in the cervical spine. Claimant H was approximately 63 years old at the time of the MRI. Multiple physicians who reviewed the MRI concluded that the MRI showed age-appropriate degeneration and no signs of traumatic injury related to the December 22, 2022 car accident.

192.    Between February 10, 2023 and March 22, 2023, Claimant H attended approximately 17 more appointments at the chiropractic practice.

193.    Simon & Simon also directed Claimant H to Defendants Burt and Premier Pain & Rehab Center. Burt's medical records from a March 23, 2023 appointment state that Claimant H reported cervical pain rated as a 2-3 out of 10. Burt examined Claimant H and recommended a C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation. Such treatments were medically unnecessary and causally unrelated to the subject auto accident. Such treatments were delivered at the direction of the Simon & Simon firm.

194.    Defendant Burt falsely represented in a resulting medical record with respect to Claimant H, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that this statement was false when made given that the procedure was not medically necessary.

195.    Burt's March 23, 2023 report does not accurately describe the procedures Burt performed. The documented needle placement in the imaging attached to the report does not correspond to accepted medial branch anatomy for performance of a legitimate medial branch block for diagnostic assessment purposes. The report also states that after the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only approximately 1 minute and 41 seconds between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

-52-

196.    Premier Pain & Rehab Center was paid $3,200 by a third-party funder for the procedure. Premier Pain & Rehab Center's records reflect that it nominally billed $15,600 for the procedure despite accepting payment of $3,200. This was consistent with Premier Pain & Rehab Center's practice of providing the third-party funder who paid for Simon & Simon claimants' radiofrequency ablation procedures with receivables for amounts far larger than the payments Premier Pain & Rehab Center actually received from the third-party funder for performing the procedures. Again, the bill was itself fraudulent given that it did not reflect the cost of the procedure but instead was used by the funder and/or Simon & Simon to siphon from Claimant H to Simon & Simon a greater share of the potential settlement recovery.

197.    Between March 24, 2023 and July 10, 2023, Claimant H attended approximately 21 additional appointments at the chiropractic practice. The practice's medical records from this period again assigned Claimant H a "neck disability index" score reflecting that Claimant H had "minimal disability" meaning that the "patient can cope with most living activities" and "[u]sually no treatment is indicated apart from advice on lifting sitting and exercise."

198.    Marc Simon and Simon & Simon directed Claimant H to visit Defendant Yarus for a purportedly independent medical examination, which occurred on June 13, 2023. The resulting report falsely stated as follows:

> CONCLUSIONS: The following injuries occurred as a result of the subject incident in which [Claimant H] was involved occurring on December 22, 2022:
> 1.    Cervical strain and sprain …
> 2.    C3-4 intervertebral disk displacement, protrusion/extrusion herniation right greater than left foraminal narrowing.
> 3.    C4-5 intervertebral disk displacement, protrusion/extrusion herniation with bilateral foraminal narrowing.
> 4.    C5-6 intervertebral disk displacement, disk protrusion/extrusion-type herniation with bilateral neural foraminal narrowing.
> 5.    C6-7 intervertebral disk displacement with disk protrusion/extrusion herniation, left greater than right neural foraminal narrowing.

6. C7-T1 intervertebral disk displacement, disk protrusion/extrusion herniation indenting the ventral thecal sac with bilateral neural foraminal narrowing.

7. Cervical dorsopathy/cervical facet syndrome.

8. Cervical diskogenic and facetogenic pain secondary to subject incident related injuries sustained on December 22, 2022.

9. Chronic pain secondary to subject incident related injuries sustained on December 22, 2022.

10. Alteration of activities secondary to subject incident related injuries sustained on December 22, 2022.

199. The report went on to state falsely that "it is my opinion that [Claimant H's] injuries and/or conditions as they are outlined herein were directly caused by the subject incident of December 22, 2022."

200. Yarus then produced a report falsely concluding that "[b]ecause of the permanent nature of the documented injuries," Claimant H would require multiple invasive surgeries including "laminectomies, diskectomies and facetectomies for each of the target levels at C3-4 through C7-T1," as well as "fusion stabilization procedures." Additionally, Yarus's report falsely stated that Claimant H would require a lifetime of "[m]edical surveillance" including MRIs, chiropractic care, and other spinal procedures such as epidural steroid injections and further radiofrequency ablations. Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant H suffered no substantial accident-induced injury, including no significant injury to the neck or back.

201. Simon & Simon then used Yarus's false and fraudulent report to obtain a report from a "life care planner," which estimated that the treatment contemplated by Yarus would cost over $550,000 over the course of Claimant H's lifetime.

202. Yarus produced his report knowing Simon & Simon would use his false statements about Claimant H's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant H's case. Yarus did so in return for compensation from Simon & Simon in

the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

203.    Following his chiropractor appointment on July 10, 2023, Claimant H did not attend any additional medical appointments until October 26, 2023, when he attended a second appointment with Defendant Burt and Premier Pain & Rehab Center.

204.    Burt's records from that appointment record that Claimant H reported cervical pain rated as a 2 out of 10. Defendant Burt examined Claimant H and recommended a C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation. Such treatments were medically unnecessary and causally unrelated to any accident, given that Claimant H had suffered at worst a neck sprain/strain in an accident that had occurred ten months before.

205.    Defendant Burt falsely represented in a resulting medical record with respect to Claimant H, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that this statement was false when made given that the procedure was not medically necessary. Defendant Burt's medical records otherwise falsely record what occurred, including by falsely recording: "The patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level."

206.    Burt's October 26, 2023 report does not accurately describe the procedures Burt performed. The documented needle placement in the imaging attached to the report does not correspond to accepted medial branch anatomy for performance of a legitimate medial branch block for diagnostic assessment purposes. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because

-55-

the procedure Burt actually performed was materially different than the procedure he described in the report.

207.    On November 27, 2023 Claimant H returned to the chiropractic practice for another appointment. Between December 2023 and January 2024, Claimant H attended approximately 14 additional appointments with the chiropractic practice. The medical record from one of his final appointments in January 2024 noted that Claimant H rated his discomfort as a 1 out of 10 and reported it was noticeable approximately 5% of the time. The medical record described his prognosis as "good."

208.    Nevertheless, Defendant Yarus produced a supplemental report regarding Claimant H on March 10, 2024 falsely projecting future medical care. Defendant Yarus did not substantively revisit any of the conclusions in his earlier report. Instead, Defendant Yarus stated: "As I indicated in my narrative, [Claimant H] required future care and validated the opinion by having additional treatment rendered."

209.    As with other Simon & Simon clients who were treated by Burt, Claimant H did not seek or have plans to seek any of the additional future treatment Yarus stated would be necessary. On December 13, 2024, Claimant H testified that he had not had any treatment since his final chiropractor appointment in January of that year. He also testified that he had no surgeries planned, and that no one had ever advised him of any recommendation to undergo surgery.

210.    On or about April 29, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant H claiming that Claimant H had "sustained serious permanent personal injuries and damages, including to the lower back, as well as neck pain"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and other

-56-

ills and injuries, including to the lower back, as well as neck pain"; and that all of Claimant H's injuries are "permanent in nature[.]" Throughout the pendency of that litigation, into mid-2025, Simon & Simon cited Yarus's June 2023 report and its claims regarding the permanent nature of Claimant H's injuries and his need for surgeries as supporting demands as high as $1,400,000. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that the claims in the aforementioned filings were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

211. On May 30, 2025, Uber was voluntarily dismissed without prejudice from Claimant H's case after Uber served subpoenas seeking deposition testimony and document production from Burt and his business partner Blessen Abraham.

212. Claimant H's case concluded in a settlement.

### 7. Personal Injury Claimant Q

213. On November 13, 2022, at approximately 4:26 p.m., Personal Injury Claimant Q was a passenger in a vehicle that was involved in a rear-end accident with another vehicle. Claimant Q left the scene before police arrived, and received a ride to her home from an acquaintance. Damage to the car Claimant Q was in was limited to the right corner of the rear bumper. No airbags deployed, ambulance services were not required, and a police report regarding the scene noted no injuries were reported.

214. Later that night, Claimant Q went to Albert Einstein Medical Center's Emergency Department, where she was seen and ultimately diagnosed with "Motor Vehicle Collision – minor" and discharged with Tylenol, ibuprofen, and lidocaine patches. Her physician in the emergency room noted that she was "well-appearing in no acute distress."

215. Three days after the accident, Claimant Q sought treatment for alleged neck and back injuries at Philadelphia Spine Associates, under the care of Defendants Harvey and Piccillo. The appointment was arranged by staff members from Simon & Simon.

216. Claimant Q purportedly continued to visit Philadelphia Spine Associates and Defendants Piccillo and Harvey for approximately 20 treatment sessions between November 16, 2022 and March 31, 2023. Her treatment was directed by Simon & Simon.

217. The treatment sessions did not occur as indicated in the records. Like other claimants, Claimant Q's records contain verbatim descriptions of symptoms and purported treatment, lacking regard for the actual facts and circumstances of her care. The records repeatedly state that Claimant Q was experiencing numbness and tingling into her extremities, and that she had seen a medical doctor for these issues. This is contrary to documentation from other providers and Claimant Q's own testimony. Additionally, each of the 20 visit records asserts that Claimant Q was experiencing neck pain, when, in fact, she testified that any neck pain resolved by the end of 2022.

218. Defendant Piccillo referred Claimant Q to Open MRI of Bala Cynwyd for cervical and lumbar spine MRIs, where she was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. Claimant Q obtained these MRIs on March 20, 2023. The cervical MRI showed no injuries or degenerative changes, while the lumbar spine MRI largely showed degenerative changes without compression or stenosis. According to an independent medical examiner, neither MRI provided any objective data of a structural injury or traumatic progression of the pre-existing degeneration as a result of the accident.

219. Defendant Piccillo referred Claimant Q for the MRI in furtherance of the scheme, rather than legitimate medical need. Piccillo's MRI referral was intended to and did advance the

scheme because an MRI was crucial to Burt's eventual purported pain management treatments and Yarus's eventual fraudulent report.

220. On April 12, 2023, within minutes of the last appointment record being signed, and in furtherance of the scheme, Defendant Piccillo faxed Simon & Simon all of Claimant Q's treatment records.

221. Claimant Q was then told that her treatment at Philadelphia Spine Associates was over and that she was "moving on to see Dr. Burt." Simon & Simon scheduled an appointment for Claimant Q with Defendants Burt and Premier Pain & Rehab Center and arranged for a car service to provide her with transportation to and from the appointment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

222. On April 6, 2023, Defendant Burt examined Claimant Q and reviewed Claimant Q's MRI records. Burt's report from the visit diagnosed Claimant Q with "radiculopathy, lumbar region," "lumbar dorsopathy/facet syndrome," and "strain of muscle, fascia, or tendon of back" with "pain symptoms which resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that the statement was false when made, given that he knew that Claimant Q had suffered no substantial injury, including no significant injury to the neck or back.

223. Burt's April 6, 2023 report does not accurately describe the procedures Burt performed. The imaging attached to the report reflects only two needles being used for the medial branch block. To properly block the L5–S1 facet joint, two medial branch nerves per side must be targeted, requiring a minimum of four needles for a bilateral block. The report also states that after

the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only three minutes between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

224.    Simon & Simon also directed Claimant Q to Defendant Yarus for a purportedly independent medical examination, which was conducted exclusively via teleconference.

225.    Yarus's report, dated June 22, 2023, fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included statements that Claimant Q "sustained a serious and permanent impairment of function in regard to the lumbar spine," that these injuries were "directly caused by the subject incident of November 13, 2022," and that "[c]osts associated with the treatment provided are to be considered medically necessary, reasonable, causally related to the subject incident of November 13, 2022; invoicing and billing reviewed for testing and treatment facilities reflect fair and usual and customary fees for the services provided to [Claimant Q] for the subject incident related injuries sustained on November 13, 2022."

226.    Yarus's report also used fraudulent records produced by Burt and the other defendants to falsely conclude that Claimant Q would require "laminectomies, discectomies, and facetectomies for each of the target levels at L3-4, L4-5, and L5-S1," as well as a lifetime of medical care and other spinal procedures, including injections and repeated radiofrequency

-60-

ablations. Yarus knew, or acted with reckless disregard for the fact that these statements were false, as Claimant Q suffered no substantial accident-induced injury and did not require such extensive treatment.

227.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant Q's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant Q's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

228.    Simon & Simon used Yarus's false and fraudulent report to obtain a report from a "life care planner," which estimated that the treatment contemplated by Yarus would cost more than $800,000 over Claimant Q's lifetime.

229.    An orthopedic surgeon who examined Claimant Q and reviewed Yarus's report expressed particular concern regarding Yarus's recommendation for surgery, noting that Claimant Q's MRI provided "objective evidence that she does not have any compression" of her lumbar spine—the primary indication for a laminectomy.

230.    As with other Simon & Simon clients treated by Burt and evaluated by Yarus, Claimant Q did not seek and had no plans to seek the future treatment that Yarus concluded was necessary, and on which Simon & Simon based its demands. Claimant Q testified at deposition in February 7, 2024 that she had no appointments scheduled other than a standard physical with a primary care provider.

231.    On July 25, 2023, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant Q. This complaint falsely stated that "Plaintiff has sustained serious permanent personal injuries and damages, including, to the neck, as well as back pain"; that

"Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the neck, as well as back pain"; and that all of Claimant Q's injuries are "permanent in nature." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

232.    On May 13, 2025, Uber was voluntarily dismissed without prejudice from Claimant Q's case after Uber served subpoenas seeking deposition testimony and document production from Burt and alerted Simon & Simon of intent to do the same regarding his business partner Blessen Abraham.

233.    Claimant Q's case ended in a settlement.

### 8.    Personal Injury Claimant R

234.    At approximately 3:30 p.m. on October 11, 2023, Claimant R was riding an electric scooter that collided with a vehicle reversing at a low speed. The collision resulted in only a small bend to the rear basket of the scooter and nearly no damage to the car. The airbags on the reversing car did not deploy, no tows were needed, and no ambulance was called to the scene. After the accident, Claimant R continued home on his scooter, which involved a six-block scooter ride, a 30-minute train ride, and an additional 15-minute scooter ride. Several hours later, Claimant R reported the incident to the police who responded to Claimant R's home where Claimant R stated that the car struck the basket of his scooter. Claimant R refused medical treatment, stating that he would see his own doctor. No specific injuries were reported.

235.    An hour after speaking with the police, Claimant R visited the Thomas Jefferson University Hospital Emergency Room complaining of right ankle pain and reporting that the

scooter struck his ankle but that he was able to hop off. He noted no other injuries at the time, and an exam revealed a full range of motion in his neck. An X-ray revealed no fracture or malalignment. Claimant R was diagnosed with ankle pain and discharged with instructions to rest, elevate, and ice his leg, and to follow up with a primary care provider or an orthopedist.

236. Defendant Simon & Simon directed Claimant R to a chiropractor beginning on October 14, 2023 where for the first time, Claimant R complained of neck, low back, and shoulder pain in addition to the ankle pain.

237. Over the months that followed, Claimant R traveled to the chiropractor for numerous treatment sessions focused predominately on his neck and back. Upon information and belief, some or all of these sessions did not occur as described. For example, despite these visits allegedly occurring over a range of dates and with a variety of different providers, 38 out of the approximately 42 total chiropractic appointment records state that Claimant R received precisely 18 minutes of exercise time and 8 minutes of manual therapy to his cervical and lumbar spine.

238. If such treatment occurred at all, it was medically unnecessary and designed to add expense of such treatments to the personal injury claim, given that Claimant R did not report neck, shoulder, or back pain in the emergency room. Defendant Simon & Simon knew or acted with reckless indifference to the fact that these records were false, given that Claimant R suffered no significant injury, and that the treatments were unnecessary and were for the purpose of fabricating a claim.

239. As with the other claimants described above, the treating chiropractor referred Claimant R to Open MRI of Bala Cynwyd to obtain lumbar and cervical spine MRIs, as would be needed to justify Defendant Burt's recommendations. Claimant R was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw.

240.    Simon & Simon also directed Claimant R to Defendants Premier Pain & Rehab Center and Burt for treatment. On January 3, 2024, Defendant Burt examined Claimant R and recommended a cervical medial branch nerve block and cervical radiofrequency ablation procedures. Claimant R declined to receive the treatment. Such treatment would have been medically unnecessary, given that Claimant R had suffered no significant injury.

241.    Burt's report from the visit diagnosed Claimant R with "radiculopathy, cervical region," "cervical dorsopathy/facet syndrome," "radiculopathy, lumbar region," and "lumbar dorsopathy/facet syndrome." Burt's report from the visit also stated that "it is medically necessary to perform cervical medial branch nerve block followed by bilateral cervical radiofrequency ablation." Defendant Burt knew or acted with reckless indifference to the fact that the statement was false when made given that Claimant R suffered no substantial accident-induced injury, including no significant injury to the neck or back.

242.    Marc Simon and Simon & Simon also directed Claimant R to Yarus for a purportedly independent medical examination.

243.    Yarus's report, dated March 26, 2024, began by describing the accident itself in a false manner, stating that Claimant R "was hit by a vehicle, causing him to fall to the ground. His leg was pinned under the vehicle." This statement contradicted all other evidence of the subject scooter collision.

244.    Yarus's report fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject scooter collision with boilerplate language including that "as a result of the subject incident," Claimant R suffered injuries including "[c]ervical strain…," "C3-C4 intervertebral disc displacement…," "C4-C5 symptomatic dis bulging…," and "[c]ervical dorsopathy/cervical facet syndrome." Like with other claimants, Yarus used the fraudulent records

produced by Burt to falsely state that Claimant R suffered serious injuries that would require a lifetime of medical care, including "laminectomies, diskectomies, and facetectomies for each of the target levels at C3-4 through C5-6; L5-21" "within the next five years," and that his injuries "were directly caused by the subject incident of October 11, 2023." Defendant Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant R suffered no substantial accident-induced injury, including no significant injury to the neck or back.

245.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant R's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant R's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

246.    Simon & Simon then transmitted Yarus's report to a lifecare planner to generate a lifetime cost report. The evaluator, referring to Yarus's recommendations, generated a cost report of over $1.6 million in care.

247.    Simon & Simon knew or acted with reckless disregard for the fact that these records were false, given that Claimant R suffered no substantial accident-induced injury, and that the treatments were unnecessary and were for the purpose of fabricating a claim.

248.    On May 31, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant R. This complaint falsely stated that "Plaintiff has sustained serious permanent personal injuries and damages, including to both ankles, neck, back, left arm and bicep"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing

conditions and others [sic] ills and injuries, including to both ankles, neck, back, left arm and bicep"; and that all of Claimant R's injuries are "permanent in nature." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

249.    On May 12, 2025, Uber was voluntarily dismissed without prejudice from Claimant R's case.

250.    Claimant R's case ended in a settlement.

### 9.    Personal Injury Claimant S

251.    On October 6, 2023, Claimant S and her son (Claimant T, whose case is described below) were involved in a minor accident on South 74th Street and Holstein Avenue in Philadelphia. Claimant S claimed that she and her son were passengers in a car driven by a driver logged into the Uber application that swerved to avoid a pothole and hit a car in the next lane. Police and EMS were not called, the airbags did not deploy, and no tows were needed. The damage to both cars was minor.

252.    Later that evening, Claimant S visited Lankenau Medical Center complaining of "generalized achiness sensation and some mild pain to her left knee." Claimant S was assessed and found to have a normal range of motion, no cervical back issues, and no spine tenderness. Claimant S was discharged with instructions to follow up with a primary care provider. Sometime after this visit, Claimant S retained Simon & Simon as her attorney.

253.    On October 11, 2023, Claimant S traveled to a physical therapy practice, complaining of a "9/10" pain to her neck and upper back. Over the course of several months, medical records show that there were approximately 30 total visits billed to this physical therapy practice.

254. Claimant S was also referred to Open MRI of Bala Cynwyd, where she was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. The MRI taken in connection with this visit was negative.

255. Simon & Simon also directed Claimant S to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment purportedly performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

256. On January 4, 2024, Burt examined Claimant S and reviewed Claimant S's MRI records. Burt's report from the visit diagnosed Claimant S with cervical radiculopathy and cervical dorsopathy/facet syndrome. Burt reported that it was medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation. If such treatment occurred at all, it was medically unnecessary. Defendant Burt knew or acted with reckless disregard for the fact that any treatment Claimant S received was not necessary because he knew that Claimant S suffered from no substantial accident-related injury, including no significant injury to the neck or back.

257. Simon & Simon also directed Claimant S to Yarus for a purportedly independent medical examination.

258. Yarus's report, dated April 2, 2024, fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

1. Cervical strain and sprain …
2. Facetogenic pain mediated by C4-C5, left, injured in the subject incident of October 6, 2023.
3. C4, C5 left cervical radiculopathy:
4. Posttraumatic cervicogenic headaches …

-67-

    5.      Chronic pain secondary to subject incident related injuries sustained on October 6, 2023.

    6.      Alteration of activities secondary to subject incident related injuries sustained October 6, 2023.

259.    Yarus's report also falsely stated that these injuries would require years of additional treatment including additional radiofrequency ablations, rhizotomies, and surgical intervention including "laminectomies, diskectomies, and facetectomies" at C4-5 "within the next five years" and fusion and stabilization procedures. He further stated that "the injuries and conditions as they are outlined herein were directly caused by the subject incident of October 6, 2023." Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant S suffered no substantial injury and did not require this lifetime of treatment.

260.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant S's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant S's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

261.    Simon & Simon then used Yarus's false and fraudulent report to obtain a report from a "lifecare planner," which estimated that the treatment contemplated by Yarus would cost over $700,000 over the course of Claimant S's lifetime.

262.    On June 28, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant S. The complaint falsely stated that Claimant S "sustained serious permanent personal injuries and damages"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the

-68-

neck, left arm, back, left leg and waist"; and that all of Claimant S's injuries are "permanent in nature."

263.    On May 14, 2025, Uber was voluntarily dismissed without prejudice from Claimant S's case after Uber served subpoenas seeking deposition testimony and document production from Burt and his business partner Blessen Abraham.

264.    Claimant S's case is ongoing as to the remaining parties.

### 10.    Personal Injury Claimant T

265.    Claimant S's son, Claimant T, underwent a remarkably similar pattern of treatment in connection with the same October 6, 2023, accident. On the same day as his mother, Claimant T visited the Lankenau Medical Center Emergency Room, complaining of neck and shoulder pain, where he reported being in a car that was "sideswiped." X-rays taken of his cervical spine and shoulder were concluded to be normal, showing no fracture or dislocation, and his cervical back was assessed to have a normal range of motion. He was discharged and given a prescription for a muscle relaxant.

266.    On October 11, 2023, Claimant T traveled with his mother Claimant S to a physical therapy practice for purported treatment of neck and shoulder injuries. Claimant T did so at Simon & Simon's direction. Over the next few months, Claimant T traveled to this physical therapy practice for approximately 27 treatment sessions.

267.    On December 6, 2023, Claimant T was directed to visit Open MRI of Bala Cynwyd, where he was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. MRIs taken of his cervical and lumbar spine were both negative.

268.    Despite Claimant T's clear lack of significant injury, Simon & Simon then directed him to Defendants Premier Pain & Rehab Center and Burt. Burt's treatment was delivered at the direction of Marc Simon and the Simon & Simon firm.

269.    On January 30, 2024, mere weeks after Claimant T's MRIs had shown no significant injury, Burt examined Claimant T and reviewed Claimant T's MRI records. Burt's report from the visit diagnosed Claimant T with cervical radiculopathy and cervical dorsopathy/facet syndrome. Burt reported that it was medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation. If such treatment occurred at all, it was medically unnecessary. Defendant Burt knew or acted with reckless disregard for the fact that any treatment Claimant T received was not necessary because he knew that Claimant T suffered from no substantial accident-related injury, including no significant injury to the neck or back.

270.    Simon & Simon also directed Claimant T to Yarus for a purportedly independent medical examination.

271.    Yarus's report, dated April 2, 2024, fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

1. Cervical strain/sprain...
2. Facetogenic pain mediated by C4-5, C5-6 and C6-7 injured in the subject incident of October 6, 2023.
3. Cervical dorsopathy/cervical facet syndrome.
4. Bilateral C5, C6 cervical radiculopathy.
5. Bilateral C6 nerve root traction injury.
6. Lumbar strain and sprain….
7. Facetogenic pain mediated by L4-5 and L5-Sl injured in the subject incident of October 6, 2023.
8. Lumbar dorsopathy/lumbar facet syndrome.
9. Lumbar facetogenic pain mediated by L4-5 and L5-Sl injured in the subject incident of October 6, 2023.
10. Chronic pain secondary to subject incident-related injuries sustained on October 6, 2023.
11. Alteration of activities secondary to subject incident-related injuries sustained on October 6, 2023.

272.    Yarus's report also stated that these injuries would require years of additional treatment including additional radiofrequency ablations, epidural injections, and surgical intervention including "laminectomies, diskectomies, and facetectomies for each of the target levels identified at C4-5, C5-6, and C6-7; L4-5 and L5-S1" "within the next five years" and fusion and stabilization procedures. The report stated that "the injuries and conditions as they are outlined herein were directly caused by the subject incident of October 6, 2023." Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant T suffered no substantial accident-induced injury, including no significant injury to the neck or back. As of the date of the filing of the Amended Complaint, there is no indication that Claimant T has pursued any of these additional treatments.

273.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant T's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant T's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

274.    Simon & Simon then used Yarus's false and fraudulent report to obtain a report from a "life care planner," which estimated that the treatment contemplated by Yarus would cost over $2,300,000 over the course of Claimant T's lifetime. On or about June 28, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against Uber on behalf of Claimant T. The complaint falsely stated that Claimant T "sustained serious permanent personal injuries and damages"; that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and

others [sic] ills and injuries, including to the lower back, neck and left shoulder"; and that all of Claimant T's injuries are "permanent in nature."

275.   On May 14, 2025, Uber was voluntarily dismissed without prejudice from Claimant T's case after Uber served subpoenas seeking deposition testimony and document production from Burt and his business partner Blessen Abraham.

276.   Claimant T's case is ongoing as to the remaining parties.

**F.      Examples of the Scheme in Operation Against FedEx**

277.   The following cases illustrate the pattern of corrupt activity as directed at FedEx.

**1.      Personal Injury Claimant U**

278.   On or around February 15, 2024, in Philadelphia, Pennsylvania, Personal Injury Claimant U was a passenger in a vehicle that he alleges was side swiped by a FedEx vehicle. No police report was filed for the incident, no ambulance was called, and Claimant U did not seek emergency care following the incident. To date, FedEx has not identified any objective information establishing that the alleged collision actually occurred.

279.   On February 19, 2024, four days after the incident, Claimant U traveled to Defendants Philadelphia Spine Associates, Harvey, and Piccillo complaining of pain in his head, neck, back, and hip. Upon information and belief, this was at the direction of Simon & Simon. Over the months that followed, he attended approximately 51 follow-up appointments that Philadelphia Spine Associates attributed to the February 15, 2024 incident.

280.   Defendant Harvey referred Claimant U to Open MRI of Bala Cynwyd for MRIs of the lumbar spine and cervical spine, where he was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. Harvey's MRI referral was intended to and did advance the scheme because an MRI was crucial to Burt's eventual purported pain management treatments. The MRIs were performed on April 25, 2024, which an independent

medical expert described as showing degenerative disease without any objective evidence of a traumatic injury.

281. Despite the fact that the MRIs were completed relatively early in Claimant U's purported chiropractic treatment, neither Defendant Harvey nor Piccillo mention the results in their later treatment records until Piccillo's final report generated on August 21, 2024. This reflects that the MRI was intended to advance the scheme rather than serve a legitimate medical need.

282. On August 21, 2024, Defendant Piccillo rendered a final report regarding Claimant U's chiropractic care, which he signed and transmitted on August, 21, 2024. In that report, Defendant Piccillo falsely stated that Claimant U suffered several post traumatic injuries that were "directly related to the motor vehicle accident on 02/15/2024," and that "the treatment rendered was reasonable, necessary, and directly related to the above injuries."

283. Piccillo's report further stated that Claimant U's injuries were permanent, and that Claimant U would need future care, including pain medication, MRIs, and future physical therapy.

284. These statements were not made for Claimant U's medical care. Rather they were made to allow Simon & Simon to claim that Claimant U suffered serious and permanent injuries, in pursuit of higher settlement values. Upon information and belief, Defendant Piccillo knew or acted with reckless disregard for the fact that these statements were false when made, given that Claimant U suffered no substantial accident-induced injury. It was reasonably foreseeable that these statements would be transmitted to others by Simon & Simon through the interstate mail and wires.

285. On October 7, 2024, Claimant U was in a second car accident unrelated to FedEx.

286. Simon & Simon also directed Claimant U to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically

unnecessary, not causally related to the subject accident supposedly involving FedEx, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

287.    On November 13, 2024, Burt examined Claimant U and reviewed his MRI records. Burt's report from the visit diagnosed Claimant U with injuries which "resulted from automobile accident" and "lumbar dorsopathy/facet syndrome." Burt's report from the visit also stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant U had suffered no substantial accident-induced injury, including no significant injury to his back.

288.    The procedure was not performed on that day, because Claimant U first needed to seek medical clearance related to a medication he was taking.

289.    On November 15, 2024, Claimant U returned to Philadelphia Spine Associates for treatment purportedly related to his October 7, 2024 car accident. Appointment records show that, from November 15, 2024, to June 2, 2025, he attended chiropractic appointments where he only complained of pain to his shoulder, hip, and knee. He did not complain about, or seek treatment for, pain in his neck or back.

290.    Claimant U returned to Premier Pain & Rehab Center on December 4, 2024. The report generated on that date reflects the same statements as the report on November 13, 2024. The report also states that Burt performed a medial branch block, and after the medial branch block, "[t]he patient did report 40% improvement for 2 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." A two-minute waiting period is insufficient to form any type of legitimate diagnostic conclusion regarding the efficacy of a potential radiofrequency ablation, demonstrating that the decision to proceed to the radiofrequency ablation

was in fact predetermined at the direction of Simon & Simon. Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

291. Claimant U had purportedly attended a chiropractor appointment at Philadelphia Spine Associates on the morning of December 4, 2024, the day of Burt's procedure. The notes from that chiropractor session include no mention of back pain.

292. On or about March 26, 2025, Marc Simon and Simon & Simon filed a sham lawsuit against FedEx on behalf of Claimant U and another plaintiff (who had also been directed to Premier Pain & Rehab Center) in which they claimed that Claimant U had "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries including, to the neck, whiplash and hip[.]" In connection with the suit, Simon & Simon demanded payment of $750,000 for Claimant U and used the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center and Harvey, Piccillo, and Philadelphia Spine Associates to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that the aforementioned claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

293. As of the filing date of this Amended Complaint, the matter remains in active litigation.

### 2. Personal Injury Claimant V

294. On October 8, 2023, at approximately 12:00 p.m., near 3678 Emerald Street in or Philadelphia, Claimant V was the driver of a vehicle involved in an accident with a FedEx vehicle,

which he claims backed up into the front end of his vehicle. No airbags deployed. Police did not respond to the scene, and no ambulance came to the scene.

295.    On October 9, 2023, Claimant V traveled to a chiropractic practice at the direction of Simon & Simon. As stated by Claimant V at his deposition, his "lawyer told [him to] start going to therapy."

296.    Immediately following his first appointment at the chiropractic practice, Claimant V visited the emergency room at Temple University Hospital. Emergency room records reflect that Claimant V claimed low back and ankle pain but had inconsistent reports of neck pain. He received an X-ray of his ankle, which was negative, and the provider assessed his back pain as "likely muscular."

297.    Over the months that followed, Claimant V purportedly traveled to the chiropractic practice for approximately 9 follow-up visits, occasionally with substantial gaps between visits.

298.    A provider at the chiropractic practice referred Claimant V to obtain a CT of his lumbar and cervical spine. Both CTs were performed on December 28, 2023. The lumbar CT showed "no lumbar spine abnormality." Similarly, the cervical CT was normal and showed "no acute cervical spine abnormality."

299.    Simon & Simon also directed Claimant V to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

300.    On March 13, 2024, Burt examined Claimant V and reviewed his CT records. Burt's report from the visit diagnosed Claimant V with pain symptoms which "resulted from automobile accident[,]" as well as "lumbar dorsopathy/facet syndrome" and "radiculopathy,

-76-

lumbar region." Burt's report from the visit also stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant V had suffered no substantial accident-induced injury, including no significant injury to his back, as demonstrated by his CT.

301.    Burt's March 13, 2024 report does not accurately describe the procedures Burt performed. The report states that after the medial branch block, "[t]he patient did report 40% improvement for 20 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." This is the same default language contained in other Burt examination reports. However, the imaging attached to the report indicates a wait time of only 57 seconds between the medial branch block injection and the radiofrequency ablation, a time interval which precludes valid diagnostic treatment. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in this report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

302.    Marc Simon and Simon & Simon also directed Claimant V to Yarus for a purportedly independent medical examination.

303.    Yarus's report, dated June 4, 2024, began by describing the accident itself in a false manner, stating that the airbags deployed and that Claimant V's "chest hit the steering wheel from the impact." In his deposition, Claimant V did not describe such an impact to his chest and stated that airbags did not deploy in the accident.

304.    Yarus's report fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

> CONCLUSIONS: the following injuries occurred as a result of the subject
> incident in which [Claimant V] was involved occurring on October 8, 2023:

1. Cervical strain/sprain …
2. Cervical dorsopathy/cervical facet syndrome.
3. Cervical facetogenic pain mediated by C3-4, C4-5, C5-6 injured in the subject incident …
4. Lumbar strain and sprain …
5. Number [sic] doorstop [sic]/lumbar facet syndrome.
6. Lumbar facetogenic pain mediated by L4-5 and L5-S1…
7. Right ankle strain and sprain.
8. Aggravation of prior right ankle injury.
9. Right ankle ligamentous instability, lateral.
10. Chronic pain secondary to subject incident-related injuries…
11. Alteration of activities secondary to subject incident-related injuries…

305.    Yarus's report also used the fraudulent records produced by Burt at the direction of Simon & Simon to falsely state that "it is my opinion, to a reasonable degree of medical certainty, that the injuries and conditions as they are outlined herein were directly caused by the subject incident of October 8, 2023" and that "[t]here is permanency to the injuries sustained[.]"

306.    Yarus's report also falsely stated that Claimant V would require multiple invasive surgeries including "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C3-4, C4-5, and C5-6; L4-5 and L5-S1" as well as "fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies[.]" Additionally, Yarus's report dated June 4, 2024 falsely stated that Claimant V would require a lifetime of "[m]edical [s]urveillance" including MRIs, medical treatment, and spinal procedures such as epidural steroid injections and further radiofrequency ablations.

307.    Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant V suffered no substantial injury from the subject accident, including no significant injury to his neck or back.

-78-

308. Yarus produced this report knowing Simon & Simon would use his false statements about Claimant V's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant V's case. Yarus did so in return for compensation from Simon & Simon in the form of a direct payment for the report, as well as the promise, implicit or explicit, of up to millions of dollars in payment for similar false reports in numerous other cases

309. Simon & Simon then used Yarus's fraudulent report to obtain a "medical cost projection" estimating that the treatment contemplated by Yarus would cost more than $2,500,000 over the course of Claimant V's lifetime.

310. On November 22, 2024, Marc Simon and Simon & Simon filed a sham lawsuit against FedEx on behalf of Claimant V claiming that Claimant V had "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, neck, back, ankles reaggravated injury." In connection with this filing, Simon & Simon later demanded payment of $1,975,000 using Yarus's report and the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

311. On February 27, 2025, Claimant V returned to Defendants Premier Pain & Rehab Center and Burt for a second RFA procedure. Burt's report from that visit diagnosed Claimant V with pain symptoms which "resulted from automobile accident[,]" as well as "lumbar dorsopathy/facet syndrome" and "radiculopathy, lumbar region." Burt's report also stated that it was "medically necessary to perform L5 medial branch nerve block followed by bilateral L5

radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant V had suffered no substantial accident-induced injury, including no significant injury to his back, as demonstrated by his CT.

312.    On or about November 24, 2025, the matter was settled in exchange for a payment made in reliance on the fraud.

### 3.    Personal Injury Claimant W

313.    On December 3, 2024, at approximately 2:35 p.m., in Tioga County, Pennsylvania, Claimant W was a driver of a vehicle involved in a low-speed accident with a FedEx vehicle when the FedEx vehicle lost traction due to ice on the roadway. Police responded to the scene and interviewed the parties. During the interview, Claimant W reported that he was wearing his seatbelt at the time of the accident and sustained no injuries from the accident. No airbags deployed. Neither of the vehicles suffered disabling damage.

314.    On December 5, 2024—two days after the incident—Claimant W visited his primary care provider. Appointment records reflect that Claimant W was examined and diagnosed with a neck strain, which the provider anticipated would resolve within two weeks. Claimant W reported in that appointment that he did not wish to pursue physical therapy.

315.    On December 12, 2024, Claimant W traveled to a chiropractic practice. Over the months that followed, Claimant W purportedly traveled to this practice for approximately 38 visits.

316.    A provider at this practice referred Claimant W to obtain an MRI of his cervical spine. The MRI was performed on December 27, 2024.

317.    On January 14, 2025, Claimant W again visited his primary care provider, with complaint of illness unrelated to his neck. He did not report neck pain in that appointment.

318.    Simon & Simon next directed Claimant W to Defendants Burt and Premier Pain & Rehab Center for treatment.

319.    On February 5, 2025, Burt examined Claimant W and diagnosed him with "cervical dorsopathy/facet syndrome."

320.    Claimant W returned to Premier Pain & Rehab Center on February 19, 2025. Defendant Burt falsely represented in a resulting medical record with respect to Claimant W, "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." The report also falsely states that after the medial branch block, "[t]he patient did report 40% improvement for 2 minutes. The decision was then made to proceed with radiofrequency ablation at the same level." A two-minute waiting period is insufficient to form any type of legitimate diagnostic conclusion regarding the efficacy of a potential radiofrequency ablation, demonstrating that the decision to proceed to the radiofrequency ablation was in fact predetermined at the direction of Simon & Simon. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the procedure performed in his report were false because the procedure Burt actually performed was materially different than the procedure he described in the report.

321.    On February 26, 2025, Claimant W attended a routine follow-up appointment with his primary care provider. Records from that appointment stated that Claimant W mentioned the incident and that he had an injection and reported that he was feeling better and had a "very active" life.

322.    Simon & Simon also directed Claimant W to another physician who regularly works with Simon & Simon to produce export reports for a purportedly independent medical examination.

323.    This expert's report, dated June 17, 2025, falsely diagnosed injuries and causally attributed those injuries to the subject accident.

324.    The report also used the fraudulent records produced by Burt at the direction of Simon & Simon to falsely state that "[a]s a result of the MVA, [Claimant W] sustained a serious impairment of bodily function and injuries, which are permanent."

325.    The report also falsely stated that Claimant W would require a lifetime of medical care, including MRIs, chiropractic care, and spinal procedures, including further radiofrequency ablations and a "posterior cervical laminectomy."

326.    Simon & Simon then used this fraudulent report to obtain a "medical cost projection" estimating that the treatment contemplated by the report would cost over $500,000.

327.    On or about July 23, 2025, Marc Simon and Simon & Simon filed a sham lawsuit against FedEx on behalf of Claimant W. In connection with this filing, Simon & Simon demanded payment of $3,850,000 and used the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center to support this demand.

328.    This complaint falsely stated that "Plaintiff suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the neck and back, with post traumatic disc herniation and post traumatic radiculomyelopathy"; and that all of Claimant W's injuries are "permanent in nature." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

329.    As of the filing date of this Amended Complaint, the matter remains in active litigation.

### G.    Examples of the Scheme in Operation Against Others

330.    Plaintiffs have not been the only victims of Defendants' scheme. The following examples illustrate the pattern of corrupt activity in matters targeting other parties.

#### 1.    Personal Injury Claimant BB

331.    On October 8, 2022, at approximately 7:00 p.m., Personal Injury Claimant BB was a passenger in a motor vehicle involved in a collision. Claimant BB was transported via ambulance to Jefferson Hospital, where she complained of knee pain, headache, and rib pain. Imaging studies of Claimant BB's left knee revealed no fracture, and studies of her chest and head revealed no apparent injury.

332.    Claimant BB and another passenger decided to contact an attorney following the incident. They called a law firm, which directed them to Simon & Simon.

333.    All of Claimant BB's subsequent medical providers were connected with Simon & Simon. Simon & Simon instructed her which doctors to see, arranged transportation to her appointments, and directed the procedures and treatments she would receive.

334.    Simon & Simon directed Claimant BB to attend physical therapy appointments and evaluations with a physical therapy provider. Simon & Simon—not anyone at the physical therapy office—mandated that she attend at least 15 appointments. Over the months that followed, Claimant BB purportedly attended approximately 14 treatment sessions, despite the fact that the hospital imaging reports showed no significant injury.

335.    A provider at this practice directed Claimant BB to Open MRI of Bala Cynwyd for MRIs of the cervical spine and left knee, which were performed on or about December 6, 2022. Claimant BB was seen by the same radiologist that other claimants referred to Open MRI of Bala

Cynwyd typically saw. The MRI of the left knee was normal, and the cervical MRI was similarly "essentially negative[.]"

336. Simon & Simon also directed Claimant BB to Defendants Burt and Premier Pain & Rehab Center. On April 13, 2023, Defendant Burt examined Claimant BB and recommended a medial branch nerve block and radiofrequency ablation procedures in Claimant BB's knee. Such treatments were medically unnecessary and causally unrelated to any accident, given that Claimant BB had suffered no substantial injury from the subject accident. Such treatments were delivered at the direction of the Simon & Simon firm.

337. Simon & Simon scheduled the procedure with Burt and decided that Claimant BB should undergo the procedure before Claimant BB had even been examined by Burt.

338. Simon & Simon also directed Claimant BB to Yarus for a purportedly independent medical examination.

339. Yarus produced a report dated October 3, 2023, which stated that he "had the pleasure and privilege of evaluating [Claimant BB] in person in my Philadelphia office on October 3, 2023." However, Claimant BB stated in her deposition that she canceled her appointment with Yarus and never met with him in person. Yarus's report included details of a physical examination, such as assessments of range of motion and various physical tests that could not have been performed over the phone. This report was produced at the direction of Simon & Simon.

340. Yarus's report fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

1. Cervical strain/sprain...
2. Cervical facetogenic pain mediated by C4-5, C5-6 and C6-7 injured in the subject incident of October 8, 2022.
3. Cervical dorsopathy/cervical facet syndrome.
4. Lumbar strain and sprain…
5. Lumbar radiculitis (clinical), left greater than right.

6. Left knee contusion.
7. Left knee internal derangement.
8. Left knee medical meniscus tear (clinical).
9. Left knee effusion/synovitis.
10. Left knee patellar tilt, post-traumatic.
11. Chronic pain secondary to subject-incident-related injuries sustained on October 8, 2022.
12. Alteration of activities secondary to subject-incident-related injuries sustained on October 8, 2022.

341. Yarus's report also stated these injuries would require a lifetime of "medical surveillance" including MRIs, chiropractic care or physical therapy, and other procedures such as epidural steroid injections and further radiofrequency ablations, as well as surgical intervention, including "laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C4-5, C5-6, and C6-7" "within the next five years," trans arthroscopic surgery for the left knee, as well as "fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies." The report stated that "the injuries and conditions as they are outlined herein were directly caused by the subject incident of October 8, 2022."

342. These statements were knowingly false when made, as Yarus had not physically examined Claimant BB and because he knew or recklessly disregarded the fact that Claimant BB suffered no substantial injury from the subject accident, including no significant injury to her neck or back.

343. Yarus produced this report knowing Simon & Simon would use his false statements about Claimant BB's need for future medical care to fraudulently pursue an artificially inflated recovery. Yarus did so in return for compensation from Simon & Simon in the form of a direct payment of hundreds of dollars for the report, as well as the promise, implicit or explicit, of up to millions of dollars in payment for similar false reports in numerous other cases.

344. On or about January 23, 2024, Simon & Simon filed a sham lawsuit on behalf of Claimant BB. The complaint falsely stated that defendants caused Claimant BB to suffer "various

serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back, neck, right hip and shoulder" and that Claimant BB's injuries were "permanent in nature." In connection with this suit, Simon & Simon demanded payment of over $75,000 and used Yarus's report and the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

345.    On or around March 19, 2025, the parties entered into a settlement.

### 2.    Personal Injury Claimant CC

346.    On December 4, 2021 at approximately 6:00 p.m., Claimant CC, a family member of Claimant B and Claimant DD (below), claimed that she slipped and fell over the cover of a fuel storage tank while on the premises of a Speedway gas station. An ambulance on scene transported Claimant CC to Temple University Hospital, where Claimant CC was evaluated for complaints of right knee and ankle pain. Claimant CC did not report neck or back pain. X-rays of both areas showed that there was no fracture. A CT scan showed no findings of malalignment or bone lesions. Claimant CC was prescribed Tylenol, given a return to work note for December 13, 2021, and instructed to follow up with her family physician for any additional treatment.

347.    Like her family members Claimant B and Claimant DD, Claimant CC retained Simon & Simon, which directed her to a series of medical providers.

348.    Claimant CC did not seek treatment with her family physician. Instead, as directed by Simon & Simon and again like Claimant B and Claimant DD, Claimant CC traveled to Philadelphia Spine Associates for alleged treatment of neck and lower back injuries. Claimant CC

purportedly underwent treatment sessions with Philadelphia Spine Associates over a six-month period from December 10, 2021 through June 24, 2022.

349.    On May 25, 2022, Claimant CC received an MRI from Open MRI of Bala Cynwyd. While the MRI of Claimant CC's cervical spine showed several disk protrusions, the MRI of Claimant CC's lumbar spine was negative, and "showed no diskopathic or facetogenic changes."

350.    Simon & Simon also directed Claimant CC to Defendants Burt and Premier Pain & Rehab Center. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

351.    On June 8, 2022, Defendant Burt examined Claimant CC and recommended medial facet branch blocks for the cervical spine, followed by radiofrequency ablation procedures for the cervical spine at bilateral C6. Such treatments were medically unnecessary and causally unrelated to any accident, given that Claimant CC had suffered no significant injury.

352.    Marc Simon and Simon & Simon also directed Claimant CC to visit Defendant Yarus for a purportedly independent medical examination.

353.    Yarus's report, dated July 11, 2022, stated as follows:

> **CONCLUSIONS**: The following injuries occurred as a result the subject incident fall sustained by [Claimant CC] December 4, 2021:
> 1. Cervical strain/sprain, cervical myositis, somatic and segmental dysfunction cervical spine, enthesopathy cervical spine.
> 2. Multi-level cervical disk displacement with protrusion/extrusion right greater than left C2-3, C3-4, C4-5.
> 3. C5-6, a 6 mm disk herniation/sequestration with cranial and caudal subligamentous extension, displacement of the spinal cord, occupation of the neural foramina on the left, suspect root compression C5.
> 4. C6-7, a 2.5 mm disk protrusion/extrusion type eccentric left.
> 5. C6-7 disk protrusion/extrusion type eccentric left.
> 6. Left C5 nerve root radiculopathy.
> 7. Cervical dorsopathy/facet syndrome.

8. Cervical diskopathic and facetogenic pain secondary to the subject incident related injuries sustained December 4, 2021.
9. Lumbar strain and sprain, lumbar myositis, somatic and segmental dysfunction lumbar spine, enthesopathy lumbar spine.
10. Lumbar dorsopathy/lumbar facet syndrome.
11. Lumbar facetogenic pain secondary to subject incident related injuries sustained December 4, 2021.
12. Contusion right knee and ankle, with right knee and ankle strain and sprain.
13. Chronic pain secondary to subject incident related injuries sustained on December 4, 2021.

354. Yarus's report also used the fraudulent records produced by Burt, and the MRI records from Open MRI at the direction of Simon & Simon to falsely state that, "it is my opinion that [Claimant CC]'s injuries and/or conditions as they are outlined directly resulted from the subject incident December 4, 2021." Yarus also stated that "[i]t is my opinion that [Claimant CC] sustained a serious and permanent impairment of function in regard to the cervical and lumbar spine and right ankle directly resulting in the subject incident of December 4, 2021."

355. Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant CC suffered no substantial injury from the subject accident.

356. Yarus's report also falsely stated that Claimant CC would require multiple invasive surgeries including invasive diskectomies for each of the C2-3 through C6-7 areas "within the next five years," as well as "fusion stabilization procedures because of disk removal and creation of the stress risers to be done seven years subsequent to the diskectomies being performed." Additionally, Yarus's report stated that Claimant CC would require additional surgeries for her ankle, as well as subsequent chiropractic care and physical therapy.

357. Yarus knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant CC did not suffer a significant injury that was in any way causally connected to the accident.

-88-

358.     Yarus produced this report knowing Simon & Simon would use his false statements about Claimant CC's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant CC's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

359.     On or about July 22, 2022, Marc Simon and Simon & Simon filed a sham lawsuit on behalf of Claimant CC falsely claiming that defendants caused Claimant CC to sustain "serious and permanent personal injuries." Simon & Simon demanded payment of over seventy-five thousand dollars and used Yarus's report and the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that the aforementioned claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

### 3.     Personal Injury Claimant DD

360.     On August 8, 2019 at approximately 9:43 a.m., in Philadelphia, Pennsylvania, Claimant DD, yet another member of Claimant B's and Claimant CC's family, was in a collision with another driver. The police responded to the scene and issued a report indicating that there were no injuries and that no tow was needed. No ambulance was needed.

361.     Like his family members, Claimants B and CC, Claimant DD then retained Simon & Simon, which directed him to a series of medical providers in order to inflate the value of Claimant DD's claim.

362.     On October 21, 2019, Claimant DD received MRIs of his lumbar and cervical spine at Open MRI of Bala Cynwyd, where he was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. The lumbar MRI was negative other than a

congenital condition. The cervical MRI noted "shallow disc protrusions" but was "impossible to quantify due to some image degradation."

363.    Simon & Simon directed Claimant DD to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

364.    On July 30, 2020, as with Claimant DD's other family members, Burt examined Claimant DD and reviewed Claimant DD's MRI records. Burt's report from the visit diagnosed Claimant DD with C3-C4 and C4-C5 disc protrusions, "cervical disc displacement[,]" "radiculopathy, cervical region" and "cervical dorsopathy/facet syndrome," as well as with pain that "resulted from automobile accident." Burt's report from the visit stated that it was "medically necessary to perform C3-C4 and C4-C5 medial branch nerve block followed by radiofrequency ablation." Defendant Burt knew or acted with reckless disregard for the fact that these statements were false when made given that Claimant DD had not suffered a substantial accident-induced injury, including no significant injury to the neck.

365.    An independent medical examination on March 24, 2022, confirmed that the treatments provided by Burt were not only unnecessary, but also cause for concern. He noted that "[c]oncerningly, there is absolutely no radiographic or clinical support to validate the medical decision-making of [] Dr. Burt [] to perform minimally invasive interventions in a neurologically normal young male with normal MRI scans of both the cervical and lumbar spine." Burt knew or acted with reckless disregard in providing unnecessary treatment given that Claimant DD had "normal cervical spinal architecture" and did not suffer a serious injury that was causally connected to the accident.

366. Simon & Simon also directed Claimant DD to Yarus for a purportedly independent medical exam.

367. Yarus's report dated September 3, 2020, was based on a Zoom call with Claimant DD that took place in March of 2020. Yarus's report fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

> CONCLUSIONS: the following injuries occurred as a result of the subject incident in which [Claimant DD] was involved occurring August 8, 2019
> 1. Cervical strain and sprain …
> 2. C3-4 left disk protrusion.
> 3. C4-5 left disk protrusion…
> 4. Lumbar strain and sprain…
> 5. Cervicular dorsopathy/facet syndrome.
> 6. Lumbar dorsopathy/facet syndrome.
> 7. Chronic pain secondary to motor vehicle accident-related injuries …
> 8. Diminution of activities secondary to motor vehicle accident-related injuries …

368. Yarus's report also used the fraudulent records produced by Burt and the MRI records from Open MRI of Bala Cynwyd at the direction of Simon & Simon to falsely state that "it is my opinion that [Claimant DD] did sustain a serious and permanent impairment of function…from the subject incident of August 8, 2019" and that "[t]here is permanency to the injuries sustained[.]"

369. Yarus's report also falsely stated that Claimant DD would require multiple invasive surgeries including "discectomies for the cervical spine" as well as "fusion and stabilization procedures." Additionally, Yarus's report falsely stated that Claimant DD would require a lifetime of medical studies and interventional procedures including MRIs, epidural steroid injections and further radiofrequency ablations.

370.    Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant DD did not suffer a substantial injury from the subject accident, including no significant injury to the neck or back.

371.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant DD's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant DD's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

372.    The independent medical expert who examined Claimant DD on March 24, 2022 confirmed Claimant DD's lack of serious injury, concluding "there is no objective basis to support [Claimant DD's] ongoing complaints nor the need for future and/or ongoing treatment." The expert further confirmed that Yarus's opinions were entirely baseless. The expert's review of Claimant DD's MRIs revealed "no evidence of clinically relevant structural compromise." Based on his assessment, the expert concluded, "the MRI findings alone completely contradict all the opinions expressed in Dr. Yarus's 'expert' report as outlined in this medical narrative. There are no findings related to this injury mechanism that substantiate any of the opinions rendered by Dr. Yarus."

373.    On or about March 16, 2021, Simon & Simon electronically filed a sham lawsuit on behalf of Claimant DD. The complaint falsely stated that defendants caused Claimant DD to sustain "serious permanent personal injuries and damages." In connection with the suit, Simon & Simon demanded payment and used Yarus's report and the fabricated evidence of unnecessary treatment purportedly provided by Burt and Premier Pain & Rehab Center to support this demand. Marc Simon and Simon & Simon knew or recklessly disregarded the fact that the aforementioned

claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

### 4.    Personal Injury Claimant EE

374.    On April 8, 2021, at approximately 5:15 p.m., Claimant EE was driving in Philadelphia when she was rear-ended by another vehicle. Airbags did not deploy, and there was no ambulance on scene.

375.    The following day, Claimant EE presented to the Emergency Room at University of Pennsylvania Hospital. Claimant EE underwent an X-ray of her hand which showed no fractures present. An examination of her back concluded that Claimant EE had a "normal range of motion" and a "full passive range of motion without pain." She was diagnosed with a hand sprain, advised to use mild pain medication (ibuprofen and Tylenol), and was released from the hospital.

376.    Claimant EE then retained Simon & Simon, which directed her to a series of medical providers.

377.    Two weeks after the accident, despite her lack of significant injury Claimant EE traveled to Philadelphia Spine Associates and Daniel Piccillo at the direction of Simon & Simon. Over the months that followed, Claimant EE was purportedly seen for 29 additional visits to Defendants Piccillo and Philadelphia Spine Associates.

378.    On July 13, 2021, Claimant EE traveled to Open MRI of Bala Cynwyd for MRIs of her cervical and lumbar spine, where she was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. A report issued in connection with these MRIs concluded that "there is no imaging evidence of injuries as a result of the accident on April 8, 2021." Simon & Simon also directed Claimant EE to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically

unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

379.    On September 8, 2021, Burt examined Claimant EE and reviewed Claimant EE's MRI records. Burt's report from the visit diagnosed Claimant EE with "lumbar dorsopathy/facet syndrome." Burt's report stated that it was "medically necessary to perform L4 medial branch nerve block followed by bilateral L4 radiofrequency ablation." If such treatment occurred at all, it was medically unnecessary. Defendant Burt knew or acted with reckless disregard for the fact that his statements were false when made, given that Claimant EE had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

380.    Marc Simon and Simon & Simon also directed Claimant EE to Yarus for a purportedly independent medical examination.

381.    On May 9, 2022, Yarus examined Claimant EE and issued a report. Yarus's report fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

> CONCLUSIONS: the following injuries occurred as a result of the subject incident in which [Claimant EE] was involved occurring on April 8, 2021:
> 1.  Cervical strain and sprain …
> 2.  Lumbar strain and sprain …
> 3.  L2-3, left bulge/protrusion.
> 4.  L3-4, left disk bulge/protrusion.
> 5.  Lumbar dorsopathy/lumbar facet disease.
> 6.  Lumbar diskopathic and facetogenic pain…
> 7.  Chronic pain secondary to subject incident related injuries …
> 8.  Cervical radiculitis/radiculopathy….
> 9.  Diminution of activities secondary to subject incident related injuries …

382.    Yarus's report also used the fraudulent records produced by Burt, Piccillo, and Open MRI of Bala Cynwyd at the direction of Simon & Simon to falsely state that "[t]here is permanency to the injuries that [Claimant EE] sustained inclusive of the lumbar spine, right wrist

and hand" and that these injuries "were directly caused by the subject incident in which she was involved on April 8, 2021."

383. Yarus's report also falsely concluded that Claimant EE would require surgical intervention including discectomies and fusion of her spine and surgical procedures for her right hand. Additionally, the report falsely stated that Claimant EE would require a lifetime of medical studies, including MRIs and chiropractic care, and other spinal procedures such as further radiofrequency ablations.

384. Despite these findings, Claimant EE did not pursue additional treatment.

385. Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded that Claimant EE suffered no substantial injury from the subject accident, including no significant injury to her neck or back.

386. Yarus produced this report knowing Simon & Simon would use his false statements about Claimant EE's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant EE's case. Yarus did so in return for compensation from Simon & Simon in the form of payment of hundreds of dollars for the report, as well as the promise—whether implicit or explicit—of up to millions of dollars in payment for similar false reports in other cases.

387. On August 22, 2022 Claimant EE was examined by an independent medical expert, who confirmed Claimant EE's lack of serious injury. The report found that "[o]n physical examination at this time, [Claimant EE] is in no acute distress" and that it was suspected that "a significant component of symptom magnification" had taken place. Noting that Claimant EE was not currently seeking medical treatment, the report concluded that based on a physical examination, "I do not believe this individual has obtained a serious impairment of bodily function as a result of the accident of April 8, 2021 regarding her right upper extremity."

388.     These findings were further confirmed by a second independent medical examination performed by a different expert who conducted a physical examination and reviewed Claimant EE's medical reports. This second expert concluded "the lumbar facet block administered by Dr. Burt [was] completely unnecessary in the relationship to the injury, and there is no rational reason to anticipate the procedures directed to the lumbar spine and the associated costs which are outlined by Dr. Yarus."

389.     On or about September 22, 2021, Simon & Simon electronically filed a sham lawsuit on behalf of Claimant EE. The complaint falsely stated that defendants caused Claimant EE to sustain "severe and permanent injuries." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

### 5.     Personal Injury Claimant FF

390.     On May 12, 2020 at approximately 12:30 p.m., Claimant FF was involved in a car accident when he was rear-ended on Tabor Avenue in Philadelphia. Airbags did not deploy, and no ambulance was called. Claimant FF then retained Simon & Simon.

391.     Simon & Simon directed Claimant FF to a chiropractic practice. He was purportedly provided chiropractic treatment there from May 19, 2020 through July 29, 2020, totaling approximately 24 visits.

392.     Claimant FF was also referred to Open MRI of Bala Cynwyd, where he was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw.

393.     Simon & Simon also directed Claimant FF to Philadelphia Spine Associates. Claimant FF traveled there on August 6, 2020 and was evaluated by Defendant Piccillo. On this

occasion, Piccillo diagnosed sprained ligaments of the cervical spine and recommended chiropractic treatment three times per week.

394.    Simon & Simon also directed Claimant FF to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary, not causally related to the subject accident, and was delivered at the direction of Marc Simon and the Simon & Simon firm.

395.    On October 22, 2020, Burt examined Claimant FF and reviewed Claimant FF's MRI records. Burt's report from the visit diagnosed Claimant FF with radiculopathy in the lumbosacral region. Burt recommended bilaterial lumbar medial branch nerve blocks and radiofrequency ablations at L4, L5, and S1. Burt then documented that he performed these procedures. If such treatment occurred at all, it was medically unnecessary. Defendant Burt knew or acted with reckless disregard for the fact that these statements and recommendations were false when made given that Claimant FF had suffered no substantial accident-induced injury, including no significant injury to the neck or back.

396.    Marc Simon and Simon & Simon also directed Claimant FF to Yarus for a purportedly independent medical examination.

397.    On December 22, 2020, Claimant FF was evaluated by Yarus exclusively by teleconference. Yarus's report fraudulently diagnosed a broad range of non-existent injuries and causally attributed those injuries to the subject accident using boilerplate language that included the following:

> CONCLUSIONS: the following injuries occurred as a result of the subject incident in which [Claimant FF] was involved occurring on May 12, 2020
> 1. Cervical strain and sprain…
> 2. Multilevel disc protrusions cervical spine….
> 3. Bulging discs C4–5.
> 4. C5–6, C6–7 disc protrusions; C5–6 eccentric right, C6–7 eccentric left.

5. C7 – T1 disc protrusion, compromising the left neural foramen.
6. Clinical correlation advised in regard to right C6 nerve root, left C7 nerve root, and left C8 nerve root.
7. Disk protrusion….
8. Cervical dorsopathy/cervical facet syndrome.
9. Left C6 radiculopathy.
10. Lumbar strain and sprain….
11. L3 – 4, 2.5 mm broad-based disk protrusion…
12. L4 – 5, 3.5 mm broad-based disk protrusion…
13. L5 – S1, a 2 mm midline disk protrusion.
14. Lumbar dorsopathy/lumbar facet syndrome.
15. Lumbar radiculopathy, left L5 – S1.
16. Chronic pain secondary to motor vehicle accident-related injuries…
17. Diminution of activity secondary to motor vehicle accident-related injuries…

398.    Yarus concluded that Claimant FF sustained "serious and permanent" injuries to the cervical, thoracic, and lumbar spine that were "directly caused by the subject incident of May 12, 2020." His report used the fraudulent records produced by Burt and others.

399.    Yarus's report also falsely stated that Claimant FF would require multiple invasive surgeries "for the cervical, thoracic, and lumbar spine regions." Additionally, the report falsely stated Claimant FF would require a lifetime of medical studies and interventional procedures, including epidural and/or facet injections, rhizotomies, neurotomies, and further radiofrequency ablations. Despite these findings, Claimant FF did not seek the care Yarus projected.

400.    Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant FF suffered no substantial injury from the subject accident, including no significant injury to her neck or back.

401.    Yarus produced this report knowing Simon & Simon would use his false statements about Claimant FF's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant FF's case. Yarus did so in return for compensation from Simon & Simon in

the form of a direct payment of hundreds of dollars for the report, as well as the promise, implicit or explicit, of up to millions of dollars in payment for similar false reports in numerous other cases.

402.    Simon & Simon then used Yarus's fraudulent report to obtain a "medical cost projection" estimating that the treatment contemplated by Yarus would cost approximately $390,000 over the course of Claimant FF's lifetime.

403.    On or about February 8, 2021, Simon & Simon electronically filed a sham lawsuit on behalf of Claimant FF. The complaint falsely stated that defendants caused Claimant FF to sustain "various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

### 6.    Personal Injury Claimant GG

404.    On or about June 17, 2021, Claimant GG was allegedly involved in a motor vehicle accident near the intersection of West Godfrey Avenue and North Broad Street. A police report was filed, and neither Claimant GG nor anyone else involved in the accident reported any injuries. No airbags deployed.

405.    Claimant GG decided to contact a personal injury firm following the accident. This personal injury firm then referred Claimant GG to Simon & Simon.

406.    On June 18, 2021, Claimant GG went to the emergency room at Chestnut Hill Hospital complaining of neck, arm, back, and leg pain. Claimant GG underwent a physical examination, which concluded that she had full range of motion throughout her back and neck.

407.    On June 21, 2021, Claimant GG traveled to Defendants Philadelphia Spine Associates and Daniel Piccillo at the direction of Simon & Simon. Claimant GG purportedly

traveled to Philadelphia Spine Associates and Piccillo for approximately 36 follow-up visits between June and November 2021.

408. The day after Claimant GG purportedly started treatment at Defendant Philadelphia Spine Associates, on June 22, 2021, Claimant GG made a second visit to the Emergency Room at Chestnut Hill Hospital for an unrelated medical condition. The physical examination from that appointment concluded that Claimant GG was negative for back pain and that she had normal range of motion in her cervical back. Nonetheless, Claimant GG subsequently purported to attend dozens of sessions with Philadelphia Spine Associates.

409. Claimant GG was referred to Open MRI of Bala Cynwyd for MRIs of the lumbar spine and cervical spine, where she was seen by the same radiologist that other claimants referred to Open MRI of Bala Cynwyd typically saw. The MRIs were performed on July 29, 2021. The lumbar MRI was a negative examination. The cervical MRI displayed shallow disc bulging and degeneration, not signs of accident-induced trauma.

410. On September 29, 2021, Claimant GG was directed to Defendants Burt and Premier Pain & Rehab Center for treatment. The treatment performed by Burt thereafter was medically unnecessary and not causally related to the subject accident.

411. Burt's report from the visit diagnosed Claimant GG with lumbar facet joint syndrome. Burt's report states that he performed a lumbar medial branch nerve block. The report also states that after the medial branch block, there was 40% improvement for 20 minutes, and the decision was made to proceed with a radiofrequency ablation. This is the same default recitation contained in other Burt examination reports. Defendant Burt knew or acted with reckless disregard for the fact that the statements describing the medical necessity of the procedure, casual attribution to the subject accident, and procedure performed in this report were materially false.

412.   Claimant GG stated at a deposition that she did not remember Defendant Burt.

413.   Marc Simon and Simon & Simon also directed Claimant GG to Yarus for a purportedly independent medical examination.

414.   Yarus's report, dated January 17, 2022, fraudulently diagnosed non-existent injuries and causally attributed those injuries to the subject accident with boilerplate language that included the following:

> CONCLUSIONS: the following injuries occurred as a result of the subject motor vehicle incident in which [Claimant GG] was involved occurring on June 16, 2021.
> 1. Cervical strain and sprain, cervical myositis, somatic and segmental dysfunction cervical spine, enthesopathy of the cervical spine.
> 2. Cervical dorsopathy/cervical facet syndrome.
> 3. C4-5, central disk protrusion.
> 4. C5-6, disk protrusion with foraminal encroachment.
> 5. Left cervical radiculitis/radiculopathy (clinical).
> 6. Lumber strain and sprain, lumbar myositis, somatic and segmental dysfunction lumbar spine, enthesopathy of lumbar spine.
> 7. Lumbar dorsopathy/lumbar facet syndrome.
> 8. Lumbar facetogenic mediated pain, bilateral L5.
> 9. Chronic pain secondary to subject incident-related injuries sustained on June 16, 2021.
> 10. Diminishment of activities secondary to subject incident-related injuries sustained on June 16, 2021.

415.   Yarus's report also used the fraudulent records produced by Burt as well as Philadelphia Spine Associates' records and the MRI records from Open MRI of Bala Cynwyd at the direction of Simon & Simon to falsely state that "it is my opinion that [Claimant GG's] injuries and/or conditions as they are outlined were caused directly by the subject incident of June 16, 2021" and that Claimant GG "sustained a serious and permanent impairment[.]"

416.   Yarus's report also falsely stated that Claimant GG would require annual radiofrequency ablation procedures, annual MRI imaging of the cervical and lumbar spine, and follow-up visits to chiropractors and physicians.

417.    Yarus knew or acted with reckless disregard for the fact that these statements in his report were false when made because he knew or recklessly disregarded the fact that Claimant GG suffered no substantial injury from the subject accident and would not require the future care Yarus claimed would be necessary.

418.    Claimant GG did not actually seek the future care Yarus claimed she would need. On February 16, 2024, Claimant GG testified that she had not sought any additional treatment since her appointment with Yarus.

419.    Additionally, on November 22, 2022, Claimant GG was examined by an expert for an independent medical examination, which confirmed that the medical procedures performed by Burt and recommended by Yarus were unnecessary. The report concluded that "there was no reason for medial branch blocks" administered by Burt, and even if they were needed, "radiofrequency ablation was not necessary or indicated and inconsistent with the guidelines established by the American Society of Interventional Pain Physicians or Medicare guidelines." A physical examination on that day found that Claimant GG had "no limitations on physical examination" and that therefore "[a]ny reason for a life care plan is not necessary and indicated. It is inaccurate as she does not require any additional treatment."

420.    Yarus produced his report knowing Simon & Simon would use his false statements about Claimant GG's need for future medical care to fraudulently pursue an artificially inflated recovery in Claimant GG's case. Yarus did so in return for compensation from Simon & Simon in the form of a direct payment of hundreds of dollars for the report, as well as the promise, implicit or explicit, of up to millions of dollars in payment for similar false reports in numerous other cases.

Simon & Simon then used Yarus's fraudulent report to obtain a medical cost projection estimating that the treatment contemplated by Yarus would cost hundreds of thousands of dollars over the course of Claimant GG's lifetime.

421.    On February 17, 2022, Simon & Simon electronically filed a sham lawsuit on behalf of Claimant GG in the Court of Common Pleas, Philadelphia County. The Complaint falsely stated that the subject accident caused Claimant GG "serious permanent personal injuries and damages." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

422.    Public records available on the Philadelphia trial court's docket revealed that Claimant GG had previously filed a personal injury lawsuit in May of 2017, seeking to recover for substantially similar injuries.

423.    During her deposition on February 16, 2024, Claimant GG denied any knowledge of a prior accident, or prior lawsuits, leading defendants to file a counterclaim for insurance fraud against Claimant GG.

424.    On or about August 15, 2024, defendant removed the litigation to federal court in the Eastern District of Pennsylvania.

425.    On or about August 16, 2024, Simon & Simon electronically filed an amended complaint on behalf of Claimant GG in the Eastern District of Pennsylvania. The complaint falsely stated that the accident caused Claimant GG to sustain "serious, severe and permanent bodily injury." Marc Simon and Simon & Simon knew or recklessly disregarded the fact that such claims were false when made because they knew or recklessly disregarded the fact that the subject accident caused no such injury or aggravation of pre-existing conditions.

**RACKETEERING ALLEGATIONS**

426.    At all relevant times, Defendants' scheme was in violation of 18 U.S.C. §§ 1962(c) and/or (d) of the RICO statute as further set forth below.

**A.     Defendants' Misconduct and Respective Basis for Liability**

**1.     Simon & Simon and Marc Simon**

427.    As described above, Defendant Simon & Simon and Defendant Marc Simon organized and effectuated this scheme. Defendant Simon & Simon and Defendant Marc Simon have participated and likely will in the future participate in this scheme by taking clients who never would have brought a claim or whose claim would have been resolved through no-fault coverage or compulsory arbitration, funneling them through a conveyor belt of unnecessary medical treatment, directing Defendant Premier Pain & Rehab Center and Defendant Clifton Burt, Defendant Yarus, and other medical providers to produce fraudulent medical records, and using those fraudulent medical records to pursue fraudulent and artificially inflated claims against Uber, drivers who were logged into the Uber application at the time of an accident, FedEx, and other parties in Pennsylvania state court.

428.    Marc Simon has been the subject of two sanctions proceedings in this Court related to his conduct in other personal injury cases. In *Shelton v. Chaudhry*, 763 F. Supp. 3d 675 (E.D. Pa. 2025), Judge McHugh imposed Rule 11 sanctions against Marc Simon for misrepresenting the existence of venue in this district, and in the process flatly contradicted representations he previously made to the Court in seeking to avoid sanctions. Judge McHugh found that Marc Simon had made a "totally unfounded assertion of jurisdiction" by misrepresenting the citizenship of certain defendants to defeat removal on the basis of diversity jurisdiction. *Id*. at 679. Judge McHugh found that Marc Simon's misrepresentations went "beyond negligence and [were]

-104-

willful," and that they were part of "a clear pattern of litigation abuse." *Id.* at 684, 686. In his decision awarding sanctions, Judge McHugh also noted that:

> Mr. Simon requests that this Court consider his firm's investment into the case, contending that "my firm has worked with him to get the best medical care for his injuries." . . . Not exactly. In this case, as in virtually every case involving Mr. Simon's firm, the plaintiff was examined by a physician after which a life care plan was prepared. Invariably, intensive and costly medical treatment is recommended. But I have yet to see a single case involving the Simon office where any plaintiff actually pursued the recommended care. I therefore view these reports as litigation documents, bearing little relationship to real world medical care.

*Id.* at 687.

429.    In *Contreras Madrid v. Wal-Mart Stores, L.P.*, No. 24-cv-5229, 2025 WL 1698701, at *3 (E.D. Pa. June 17, 2025), Judge Pappert imposed Rule 11 sanctions against Marc Simon and his co-counsel for "failing to conduct a reasonable inquiry into their claims against [two of the defendants], which lacked any evidentiary support." Judge Pappert found that Marc Simon had failed to conduct an investigation into one of the defendant's involvement in the accident, and noted that:

> What's more, it seems this failure is part of a troubling pattern. Beginning in at least 2022, in slip-and-fall cases against retail stores, [Marc] Simon and Gosnear identified non-diverse individuals they could label a manager and stamped his or her name on a standard-form complaint with rinsed-and-repeated allegations. These claims were seemingly designed to preclude federal jurisdiction, so no research was done into their veracity. Pursuant to this practice, [Marc] Simon and Gosnear conducted no inquiry into whether Sanabria or Henry participated in the slip-and-fall alleged here.

*Id.* at *5.

430.    The court further noted that, at the show-cause hearing, Marc Simon testified that firm protocol authorized paralegals to prepare, sign, and file complaints. *Id.* at *6. Judge Pappert noted that Marc Simon, despite testifying otherwise, could not have read the complaints before filing, in light of the obvious errors in the complaints. *Id.*

-105-

431.    In a later Errata submitted to the court regarding his testimony at the show-cause hearing, Marc Simon stated that, despite testifying otherwise at the show-cause hearing, he does not personally review each complaint before it is filed. *Contreras Madrid v. Wal-Mart Stores, L.P.*, No. 24-cv-5229, ECF No. 44, at *1 (E.D. Pa. Dec. 17, 2025). He further stated that despite that discrepancy, in every case filed by Simon & Simon, Simon personally reviews the case file, evaluates the underlying facts, and approves the filing of the lawsuit. *Id.*

### 2.    Premier Pain & Rehab Center and Clifton Burt

432.    Premier Pain & Rehab Center and Clifton Burt have participated and likely will in the future continue to participate in the scheme by diagnosing non-existent injuries, performing unnecessary medical procedures, and producing fraudulent medical records at the direction of Simon & Simon and Marc Simon.

433.    The fraudulent documents produced by Defendant Premier Pain & Rehab Center and Defendant Burt are crucial to advancing Simon & Simon's scheme. Defendant Burt's diagnosis of a serious back injury and performance of a radiofrequency ablation procedure allows Simon & Simon to justify much larger settlement demands.

434.    In 2009, the Virginia Board of Medicine formally reprimanded Defendant Burt for prescribing controlled substances to individuals "outside of a bona fide practitioner-patient relationship." The Board found that Defendant Burt had prescribed these substances without personally conducting physical examinations, in violation of state law, and without the required licensure from the Board of Pharmacy. Defendant Burt subsequently received reprimands from the medical board of New Jersey and New York for the same conduct.

435.    In 2011, the Drug Enforcement Administration (DEA) revoked Defendant Burt's registration to prescribe controlled substances in New Jersey and Virginia due to violations of the Controlled Substances Act, citing the same pattern of conduct as described.

436.    Prior to joining Simon & Simon's scheme, Burt did not practice medicine in Pennsylvania and was not licensed to practice in Pennsylvania. In 2020 and 2021, Burt sought and obtained authorization to practice in Pennsylvania specifically so that he could perform procedures at Premier Pain & Rehab Center. During the relevant period, Burt resided in Clifton, New Jersey. Burt typically commuted approximately 90 miles to Premier Pain & Rehab Center one day per week, during which day he would perform the radiofrequency ablation procedures scheduled by Simon & Simon for that week, bringing in tens of thousands of dollars in revenue in that one day of performing procedures on Simon & Simon claimants.

437.    During the relevant period, Burt also owed significant debts. As of 2023, Burt owed the United States approximately $235,000 in back taxes, and owed the State of New Jersey an additional $45,000 in back taxes. The combination of Burt's legal difficulties and debts provided him a specific and powerful motive to engage in the scheme.

### 3.    Ethel Harvey, Daniel Piccillo, and Philadelphia Spine Associates

438.    As described above, Harvey, Piccillo, and Philadelphia Spine Associates have conspired to advance the scheme by diagnosing non-existent serious injuries, performing unnecessary medical procedures, and producing fraudulent medical records at the direction of Simon & Simon and Marc Simon. The fraudulent medical records that Harvey, Piccillo, and Philadelphia Spine Associates produce play a key role in knowingly advancing the scheme and assisting in the efforts of the enterprise's corrupt endeavors. The high volume of alleged treatments allows Simon & Simon to paint the picture of a serious injury, to create the false appearance that genuine conservative care was attempted, and to justify more invasive procedures allegedly performed by Burt. The records produced by the Harvey, Piccillo, and Philadelphia Spine Associates are fraudulent, purporting to memorialize treatment that was either unnecessary, not administered as described, or never administered at all. The MRI referrals provided by Harvey,

-107-

Piccillo, and Philadelphia Spine Associates also play an essential role in providing the appearance of legitimacy to the procedures allegedly performed by Burt.

### 4.     Lance Yarus

439.    As described above, Defendant Lance Yarus has conspired to advance the scheme by using the fraudulent documents produced by Defendant Burt and other medical providers to produce fraudulent reports asserting that the individual claimants have suffered serious injuries and will require a lifetime of expensive medical care. These reports allow Marc Simon and Simon & Simon to fraudulently transform low-dollar cases into million-dollar-plus personal injury lawsuits. Yarus produces these reports at the direction of Marc Simon and Simon & Simon.

### B.     Uber is a Victim of the Scheme and has Suffered Injury

440.    Uber is a victim and repeat target of this scheme. Uber has incurred substantial expense, including defense costs, in litigating and settling false or artificially inflated claims. As such, Uber has been forced to incur legal expense in defending these lawsuits in excess of what would have otherwise been required. These expenses include attorneys' fees, fees for independent medical examiners, costs and expenses related to discovery to investigate the false statements and unnecessary treatments, and costs from inflated settlements in reliance on the fraud that resulted from the scheme, including but not limited to the pattern cases specifically identified in this Amended Complaint. But for the scheme, such expense would not have been incurred. The injury here was the direct and foreseeable result of the scheme.

441.    These artificially inflated costs damaged Uber in its business or property. This damage was the direct result of Defendants' pattern of racketeering activity.

### C.     FedEx is a Victim of the Scheme and has Suffered Injury

442.    FedEx is a victim and repeat target of this scheme. FedEx has incurred substantial expense, including defense costs, in litigating and settling false or artificially inflated claims. As

such, FedEx has been forced to incur legal expense in defending these lawsuits in excess of what would have otherwise been required. These expenses include attorneys' fees, fees for independent medical examiners, costs and expenses related to discovery to investigate the false statements and unnecessary treatments that resulted from the scheme, and costs from inflated settlements in reliance on the fraud that resulted from the scheme, including but not limited to the pattern cases specifically identified in this Amended Complaint. But for the scheme, FedEx would not have incurred such costs. The injury here was the direct and foreseeable result of the scheme.

443.    These artificially inflated costs damaged FedEx in its business or property. This damage was the direct result of Defendants' pattern of racketeering activity.

444.    The scheme remains ongoing given that the underlying lawsuits continue.

**D.    The RICO Enterprises**

445.    Simon & Simon constitutes an ongoing enterprise, as the term enterprise is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Marc Simon operated, managed, and controlled the firm directly in furtherance of the scheme through a pattern of racketeering activity. Marc Simon understood that his ability to extract financial rewards from the pursuit of fraudulent claims against Uber, FedEx, and others depended on (i) the diagnosis of non-existent serious injuries, (ii) the production of fraudulent medical records regarding those injuries that could be used to argue damages in resulting litigation, and (iii) the use of the fraudulent medical records and false statements to advance such litigation. Defendants Yarus, Burt, Premier Pain & Rehab Center, Harvey, Piccillo, and Philadelphia Spine Associates conspired to assist the Simon & Simon enterprise's involvement in corrupt endeavors through actions including (i) their production of fraudulent medical records at Marc Simon's direction, (ii) their referrals of claimants for attorney-directed treatment including MRIs and other procedures, and (iii) other actions described above.

-109-

446.     Premier Pain & Rehab Center also constitutes an ongoing enterprise, as the term enterprise is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce. Burt operated, managed, and controlled the medical practice directly in furtherance of the scheme. Marc Simon and Simon & Simon participated in the management of Premier Pain & Rehab Center by referring clients to the practice, scheduling those clients' appointments, transporting clients to those appointments, directing Burt to perform specific procedures and produce resulting fraudulent records, and through a payment arrangement that operated as a bribe. Yarus, Harvey, Piccillo, and Philadelphia Spine Associates conspired to assist the Premier Pain & Rehab Center enterprise's involvement in corrupt endeavors through actions including (i) their production of fraudulent medical records at Marc Simon's direction, (ii) their referrals of claimants for attorney-directed treatment including MRIs and other procedures, and (iii) other actions described above.

447.     Alternatively, Marc Simon, Simon & Simon, Burt, and Premier Pain & Rehab Center together constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Such defendants form a group of persons associated together in fact for the common purpose of carrying out the fraudulent course of conduct directed at Uber, FedEx, and others described above. Each of these Defendants understood that their ability to extract financial rewards from the pursuit of fraudulent claims against Uber, FedEx, and others depended on (i) the diagnosis of non-existent serious injuries, (ii) the production of fraudulent medical records regarding those injuries that could be used to argue damages in resulting litigation, and (iii) the use of the fraudulent medical records and false statements to advance such litigation.

448.     These Defendants share a longstanding relationship with each other, acted for each other's common benefit, and depended on one another and their respective activities for such

-110-

benefit. Simon & Simon and Marc Simon directed their clients to Burt and Premier Pain & Rehab Center with the understanding that Burt would diagnose non-existent serious injuries, perform unnecessary treatment, and produce fraudulent medical records. The relationship was cemented by payments made directly or caused indirectly to Premier Pain & Rehab Center by Marc Simon and Simon & Simon.

449.    Lance Yarus, Ethel Harvey, Daniel Piccillo, and Philadelphia Spine Associates conspired to advance the scheme through this association-in-fact enterprise by producing fraudulent records that they understood to be necessary to allow the members of the association-in-fact enterprise to fabricate damages claims.

450.    The association-in-fact enterprise itself is distinct from the culpable persons and their respective corrupt activities given that the work of the enterprise also encompassed legitimate claims and treatment. Each such culpable person worked to operate the larger association-in-fact enterprise and manage its affairs through their corrupt patterns of referrals, attorney-directed medical treatments, and production of fraudulent records.

451.    The predicate acts of wire and mail fraud described herein could not have been accomplished without the participation of each of the applicable individual Defendants. Each party played a critical role and depended on the others to carry out their respective roles in furtherance of the scheme, including the initial client intake by Marc Simon and others acting at his direction; the direction and coordination of unnecessary medical care by Simon & Simon; the provision of unnecessary medical care by Burt and Premier Pain & Rehab Center; the production of fraudulent medical records by Burt and Premier Pain & Rehab Center at the direction of Simon & Simon; and the use of those fraudulent documents to make insurance demands and advance phony lawsuits by Marc Simon and Simon & Simon.

452. At all relevant times, the enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c) through its use of mail and interstate wires and because its activities were directed at and intended to influence Uber and FedEx, each of which are out-of-state corporations.

E. Pattern of Racketeering Activity

453. Defendants' scheme constitutes a pattern of racketeering activity. The pattern of racketeering activity includes, among other things, commission of the predicate acts in violation of the federal mail and wire fraud statutes: 18 U.S.C. §§ 1341 and 1343.

454. Defendants committed these acts willfully, knowingly, and recklessly.

455. As discussed herein, Marc Simon and Simon & Simon made numerous materially false statements knowingly, and with reckless disregard for the truth, in demand letters and litigation documents. It was reasonably foreseeable to Marc Simon and Simon & Simon that these records would be subsequently sent by U.S. mail or private or commercial carrier and transmitted through interstate wires to Uber, FedEx, and/or associated insurance carriers. These records were in fact so mailed and transmitted. Thus, each such letter or communication was prepared and executed in violation of 18 U.S.C. §§ 1341 and 1343. And as discussed herein, Marc Simon and Simon & Simon also directed the production of fraudulent medical records by Burt, Yarus, Harvey, and Piccillo. Marc Simon and Simon & Simon directed the production of these statements knowingly, and with reckless disregard for the truth. It was reasonably foreseeable to Marc Simon that interstate wires would be used in furtherance of the scheme by, for example, sending fraudulent documents to Simon & Simon for further transmission by interstate wires to Uber, FedEx, or an insurance carrier, or by uploading fraudulent documents to a patient records portal

by interstate wires. Such records were in fact so transmitted. Thus, each such record was prepared and executed in violation of 18 U.S.C. §§ 1341 and 1343.

456.    As discussed herein, Burt and Premier Pain & Rehab Center made numerous materially false statements knowingly, and with reckless disregard for the truth, in medical and billing records. It was reasonably foreseeable to Burt and Premier Pain & Rehab Center that the U.S. mail or private or commercial carrier or interstate wires would be used in furtherance of the scheme by, for example, sending false or misleading statements to Simon & Simon for further transmission by interstate wires to Uber, FedEx, or an insurance carrier. Such records were in fact so mailed and transmitted. Thus, each such record was prepared and executed in violation of 18 U.S.C. §§ 1341 and 1343.

457.    As discussed herein, Piccillo, Harvey, and Philadelphia Spine Associates made numerous materially false statements knowingly, and with reckless disregard for the truth, in medical and billing records. It was reasonably foreseeable to Piccillo, Harvey, and Philadelphia Spine Associates that interstate wires would be used in furtherance of the scheme by, for example, sending fraudulent documents to Simon & Simon for further transmission by interstate wires to Uber, FedEx, or an insurance carrier or by uploading fraudulent documents to a patient records portal by interstate wires. Such records were in fact so transmitted. Thus, each such record was prepared and executed in violation of 18 U.S.C. §§ 1341 and 1343.

458.    As discussed herein, Yarus made numerous materially false statements knowingly, and with reckless disregard for the truth, in medical records and reports. It was reasonably foreseeable to Yarus that interstate wires would be used in furtherance of the scheme by, for example, sending fraudulent documents to Simon & Simon for further transmission by interstate wires to Uber, FedEx, or an insurance carrier or by uploading fraudulent documents to a patient

records portal by interstate wires. Such records were in fact so transmitted. Thus, each such record was prepared and executed in violation of 18 U.S.C. §§ 1341 and 1343.

459.    Defendants' commission of predicate acts and use of interstate wires and mails in furtherance of the scheme included the following specific example or examples with respect to each Claimant:

### 1.    Claimant A

460.    On December 30, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back, neck, legs and forearms." On January 16, 2025, Marc Simon and Simon & Simon caused said complaint to be served on Uber and its insurer via the U.S. mails. Such uses of interstate wires and U.S. mails were reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. §§ 1341 and 1343.

461.    On November 12, 2024, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant A's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

462.    On May 9, 2024, Harvey produced a document reflecting Claimant A's purported chiropractic treatment that included the following false statement: "[i]t is my opinion, within a

reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." On June 24, 2024, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between May 9, 2024 and August 20, 2024, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 26 records that included similar false statements. Harvey and Piccillo electronically signed these documents and caused them to be transmitted to another state via an electronic patient records portal. Harvey, Piccillo, and Philadelphia Spine Associates thereafter caused all such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

463.    On December 3, 2024, Yarus produced a document reflecting his examination of Claimant A and his review of Claimant A's medical records. Among other false statements, this document stated that it is "my opinion, to a reasonable degree of medical certainty, that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 2.    Claimant B

464.    On June 20, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back." On July 1, 2024, Marc Simon and Simon & Simon caused said complaint to be served on Uber and its insurer via U.S. mails. Such uses of interstate wires and U.S. mails

were reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. §§ 1341 and 1343.

465.    On May 18, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant B's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

466.    On November 23, 2022, Harvey produced a document reflecting Claimant B's purported chiropractic treatment that included the false statement that "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." Also on November 23, 2022, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between November 23, 2022, and July 20, 2023, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 16 records that included similar false statements. Harvey and Piccillo electronically signed or caused to be signed all these documents and caused them to be transmitted to another state via an electronic patient records portal. Harvey, Piccillo, and Philadelphia Spine Associates thereafter caused all such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

467.    On August 21, 2023, Yarus produced a document reflecting his examination of Claimant B and his review of Claimant B's medical records. Among other false statements, this document stated that it is "my opinion that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation 18 U.S.C. § 1343.

### 3.    Claimant C

468.    On October 30, 2023, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back and neck." On November 14, 2023, Marc Simon and Simon & Simon caused the complaint to be served on Uber and its insurer via U.S. mails. Such uses of interstate wires and U.S. mails were reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. §§ 1341 and 1343.

469.    On July 13, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant C's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

####     4.      Claimant D

470.    On December 29, 2023, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injury and damages, including to the back and right leg." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

471.    On November 8, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant D's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

472.    On July 26, 2023, Piccillo produced a document reflecting Claimant D's purported chiropractic treatment that included the false statement that "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." Also on July 26, 2023, Piccillo electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between July 26, 2023, and November 2, 2024, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 21 records that included similar false statements. Harvey and Piccillo electronically signed or caused to be signed these documents and caused them to be transmitted to another state via an electronic patient records portal. Harvey, Piccillo, and

-118-

Philadelphia Spine Associates thereafter caused all such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 5.    Claimant E

473.    On February 15, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including to the back and neck." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

474.    On August 9, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant E's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

475.    On February 28, 2023, Harvey produced a document reflecting Claimant E's purported chiropractic treatment that included the false statement that "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." On March 1, 2023, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between February 28 and October 10, 2023, Harvey and Piccillo produced and electronically signed or caused to be signed an additional 38 records that included similar false

statements. Harvey and Piccillo caused these documents to be transmitted to another state via an electronic patient records portal. Harvey and Piccillo thereafter caused all such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

476.    On November 30, 2023, Yarus produced a document reflecting his examination of Claimant E and his review of Claimant E's medical records. Among other false statements, this document stated that it is "my opinion that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 6.    Claimant H

477.    On or about April 29, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including to the lower back, as well as neck pain." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

478.    On or about March 23, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant H's treatment: "Based on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Burt and Premier Pain & Rehab Center knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false

statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

479. On or about June 13, 2023, Yarus produced a document reflecting his examination of Claimant H and his review of Claimant H's medical records. Among other false statements, this document stated that "it is my opinion that [Claimant H's] injuries and/or conditions as they are outlined herein were directly caused by the subject incident of December 22, 2022," that Claimant H's injuries were "permanent[,]" and it was "reasonably probable" within a "reasonable degree of medical certainty" that Claimant H would require "[s]urgical intervention" including but not limited to "laminectomies, diskectomies and facetectomies for each of the target levels at C3-4 through C7-T1." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 7.    Claimant Q

480. On July 25, 2023, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including, to the neck, as well as back pain." On July 28, 2023, Marc Simon and Simon & Simon caused the complaint to be served on Uber and its insurer via the U.S. mails. Such uses of interstate wires and U.S. mails were reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. §§ 1341 and 1343.

481. On April 6, 2023, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant Q's treatment: "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial

branch nerve block followed by bilateral L5 radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

482.    Harvey produced a document reflecting Claimant Q's purported chiropractic treatment that included the following false statement: "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." On December 7, 2022, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between December 7, 2022, and April 12, 2023, Harvey and Piccillo electronically signed or caused to be signed additional records that included similar false statements. Harvey and Piccillo then caused them to be transmitted to another state via an electronic patient records portal. On April 12, 2023, Piccillo caused all such fraudulent documents to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

483.    On June 22, 2023, Yarus produced a document reflecting his examination of Claimant Q and his review of Claimant Q's medical records. Among other false statements, this document stated that it is "my opinion that this individual sustained a serious and permanent impairment of function in regard to the lumbar spine resulting from the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

-122-

**8.     Claimant R**

484.    On May 31, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that "Plaintiff has sustained serious permanent personal injuries and damages, including to both ankles, neck, back, left arm and bicep." On June 10, 2024, Marc Simon and Simon & Simon caused the complaint to be served on Uber via the U.S. mails. Such uses of interstate wires and U.S. mails were reasonably foreseeable, were in furtherance of the scheme, and in violation of 18 U.S.C. §§ 1341 and 1343.

485.    On January 3, 2024, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant R's treatment: "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform cervical medial branch nerve block followed by bilateral cervical radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

486.    On March 26, 2024, Yarus produced a document reflecting his examination of Claimant R and his review of Claimant R's medical records. Among other false statements, this document stated that it is "my opinion that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 9.    Claimant S

487.    On or about June 28, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated, among other similar false statements, that Claimant S "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the neck, left arm, back, left leg and waist." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 10.    Claimant T

488.    On or about June 28, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against Uber. This complaint falsely stated that Claimant T "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the lower back, neck and left shoulder." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 11.    Claimant U

489.    Harvey produced a document reflecting Claimant U's purported chiropractic treatment that included the following false statement: "[i]t is my opinion, within a reasonable degree of chiropractic certainty, that the injuries sustained are a direct result of the incident described above." On February 21, 2024, Harvey electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Between February 21 and August 21, 2024, Harvey and Piccillo electronically signed or caused to be signed additional records that included similar false statements. Harvey and Piccillo then caused

-124-

them to be transmitted to another state via an electronic patient records portal. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

490.    Piccillo produced a document reflecting Claimant U's purported chiropractic treatment that included the following false statements: "the above listed injuries are directly related to the motor vehicle accident on 02/15/2024, and further, the treatment rendered was reasonable, necessary, and directly related to the above injuries." On August 21, 2024, Piccillo electronically signed or caused to be signed this document and caused it to be transmitted to another state via an electronic patient records portal. Upon information and belief, Piccillo and Philadelphia Spine Associates caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

491.    On December 4, 2024, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant U's treatment: "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral cervical radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

492.    On or about March 26, 2025, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against FedEx. This complaint falsely stated, among other

similar false statements, that Claimant U "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and other ills and injuries including, to the neck, whiplash and hip." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 12.    Claimant V

493.    On March 13, 2024, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant V's treatment: "[b]ased on duration and severity of symptoms, CT findings, and exam findings, it is medically necessary to perform L5 medial branch nerve block followed by bilateral L5 radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

494.    On June 4, 2024, Yarus produced a document reflecting his examination of Claimant V and his review of Claimant V's medical records. Among other false statements, this document stated that it is "my opinion, to a reasonable degree of medical certainty, that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

495.    On or about November 22, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against FedEx. This complaint falsely stated, among other similar false statements, that Claimant V "suffered various serious and permanent personal

-126-

injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and other ills and injuries, neck, back, ankles reaggravated injury." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 13.    Claimant W

496.    On February 19, 2025, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant W's treatment: "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C6 medial branch nerve block followed by bilateral C6 radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

497.    On or about July 23, 2025, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit against FedEx. This complaint falsely stated, among other similar false statements, that Claimant W "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the neck and back, with post traumatic disc herniation and post traumatic radiculomyelopathy." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 14.    Claimant BB

498.    On October 3, 2023, Yarus produced a document reflecting his examination of Claimant BB and his review of Claimant BB's medical records. Among other false statements,

this document stated that "the injuries that were sustained in the subject incident are permanent..." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

499.    On or about January 23, 2024, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit. This complaint falsely stated, among other similar false statements, that Claimant BB "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions and others [sic] ills and injuries, including to the back, neck, right hip, and shoulder." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 15.    Claimant CC

500.    On July 11, 2022, Yarus produced a document reflecting his examination of Claimant CC and his review of Claimant CC's medical records. Among other false statements, this document stated that Claimant CC "sustained a serious and permanent impairment of function in regard to the cervical and lumbar spine and right ankle directly resulting in the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

501.    On or about July 22, 2022, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit. This complaint falsely stated, among other similar false statements, that Claimant CC "suffered various serious and permanent personal injuries, serious impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions, and others [sic] ills and injuries, including to the back, butt and right leg, as

-128-

well as a sprained right ankle." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 16. Claimant DD

502. On July 30, 2020, to further the scheme, Burt and Premier Pain & Rehab Center falsely stated in connection with Claimant DD's treatment: "[b]ased on duration and severity of symptoms, MRI findings, and exam findings, it is medically necessary to perform C3-C4 and C4-C5 medial branch nerve block followed by radiofrequency ablation." Burt knew or recklessly disregarded the fact that this statement was false when made. Burt and Premier Pain & Rehab Center caused the record containing this and other such false statements to be transmitted through interstate wires to Marc Simon and Simon & Simon for use in the resulting lawsuit. Such records were transmitted in furtherance of the scheme and in violation of 18 U.S.C. § 1343.

503. On September 3, 2020, Yarus produced a document reflecting his examination of Claimant DD and his review of Claimant DD's medical records. Among other false statements, this document stated that it is "my opinion that [Claimant DD] did sustain a serious and permanent impairment of function in regard to the spinal column including the cervical and lumbar spine areas from the subject incident of August 8, 2019." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

504. On or about March 16, 2021, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit. This complaint falsely stated, among other similar false statements, that Claimant DD "suffered severe and permanent injuries, including to the side, back, and neck." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 17.    Claimant EE

505.    On May 9, 2022, Yarus produced a document reflecting his examination of Claimant EE and his review of Claimant EE's medical records. Among other false statements, this document stated that it is "my opinion that [Claimant EE] sustained a serious and permanent impairment of function in regard to the lumbar spine, directly resulting in the subject incident of April 8, 2021." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

506.    On or about September 22, 2021, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit. This complaint falsely stated, among other similar false statements, that Claimant EE "suffered severe and permanent injuries, including lower back and right hand." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 18.    Claimant FF

507.    On December 22, 2020, Yarus produced a document reflecting his examination of Claimant FF and his review of Claimant FF's medical records. Among other false statements, this document stated that it is "my opinion that [Claimant FF] sustained a serious and permanent impairment of function in regard to the cervical, thoracic, and lumbar spine regions that resulted directly from the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

508.    On February 8, 2021, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit. This complaint falsely stated, among other similar false statements, that Claimant FF "suffered various serious and permanent personal injuries, serious

impairment of bodily function and/or permanent serious disfigurement and/or aggravation of pre-existing conditions." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

### 19.    Claimant GG

509.    On January 17, 2022, Yarus produced a document reflecting his examination of Claimant GG and his review of Claimant GG's medical records. Among other false statements, this document stated that "[Claimant GG] sustained a serious and permanent impairment of function in regard to the cervical spine directly resulting from the subject incident." Yarus thereafter caused this fraudulent document to be transmitted to Marc Simon and Simon & Simon via interstate wires. Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

510.    On February 17, 2022, Marc Simon and Simon & Simon used interstate wires to file a complaint and initiate a lawsuit. This complaint falsely stated, among other similar false statements, that Claimant GG "suffered various serious and permanent personal injuries, including to the left side of the body, left arm, neck, left shoulder, left leg and left thigh." Such use of interstate wires was reasonably foreseeable, in furtherance of the scheme, and in violation of 18 U.S.C. § 1343.

511.    The predicate acts all relate to each other as part of a common plan. The Defendants' roles in the scheme all depended on each other—Simon & Simon and Marc Simon identified clients and directed them through a conveyor belt of unnecessary treatment; Premier Pain & Rehab Center, Burt, Philadelphia Spine Associates, Harvey, Piccillo, and Yarus diagnosed non-existent serious injuries, performed unnecessary medical treatments, and produced fraudulent medical records; and Simon & Simon and Marc Simon then used these fraudulent records to pursue

phony claims against Uber, FedEx, and others. Each Defendant was aware of its respective role within the larger scheme.

512.    The predicate acts further relate to the enterprise of Simon & Simon, the enterprise of Premier Pain & Rehab Center, and the association-in-fact enterprise described above. A specific threat of repetition exists with respect to each predicate act. Such predicate acts are a regular way of conducting the ongoing law firm, medical practice, and association-in-fact enterprises at issue herein. Hence, the pattern of activity is part of an open-ended and ongoing scheme.

513.    The acts also occurred over a substantial period of time and hence constitute a pattern of activity even if the scheme were not ongoing.

## CAUSES OF ACTION

### COUNT I
### RICO Enterprise Violation (18 U.S.C. § 1962(c))
### Simon & Simon Enterprise
### (Against Marc Simon)

514.    Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 513 above.

515.    The Simon & Simon law firm is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

516.    Simon knowingly conducted and/or participated, directly or indirectly, in the conduct of Simon & Simon's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

517.    Simon's racketeering activities, as described in detail in this Amended Complaint, included:

a. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent

-132-

nature in a scheme to defraud Uber, FedEx, and others out of money or property by means of materially false representations; and

        b.     Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber, FedEx, and others out of money or property by means of materially false representations

518. Simon knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

519. Uber and FedEx have each been injured in their business and property by reason of the above-described conduct.

520. Uber and FedEx are each entitled to equitable relief under 18 U.S.C. § 1964(a). They are also each entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT II**
**RICO Enterprise Violation (18 U.S.C. § 1962(c))**
**Premier Pain & Rehab Center Enterprise**
**(Against Marc Simon, Simon & Simon, and Clifton Burt)**

521. Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 513 above.

522. Premier Pain & Rehab Center is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

523. Marc Simon, Clifton Burt, and Simon & Simon knowingly conducted and/or participated, directly or indirectly, in the conduct of Premier Pain & Rehab Center's affairs through a pattern of racketeering activities, as defined in 18 U.S.C. § 1961(1)(A).

524.    Marc Simon, Clifton Burt, and Simon & Simon's racketeering activities, as described in detail in this Amended Complaint, included:

a. Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber, FedEx, and others out of money or property by means of materially false representations; and

b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber, FedEx, and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

525.    Marc Simon, Clifton Burt, and Simon & Simon knowingly and willfully associated with the enterprise and conducted and participated in the conduct of the enterprise's affairs, through a pattern of racketeering activity.

526.    Uber and FedEx have each been injured in their business and property by reason of the above-described conduct.

527.    Uber and FedEx are each entitled to equitable relief under 18 U.S.C. § 1964(a). They are also each entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### COUNT III
### RICO Enterprise Violation (18 U.S.C. § 1962(c))
### Association-in-Fact Enterprise
### (Against Marc Simon, Simon & Simon, Clifton Burt, Premier Pain & Rehab)

528.    Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 513 above.

529.    At all relevant times herein, Defendants Marc Simon, Simon & Simon, Clifton Burt, and Premier Pain & Rehab constituted an "enterprise," as that term is defined in 18 U.S.C. § 1961(4). These defendants constituted a group of individuals and legal entities associated in fact, which was engaged in, and the activities of which affected, interstate commerce. Marc Simon, Simon & Simon, Clifton Burt, and Premier Pain & Rehab participated in the operation or management of the enterprise.

530.    These Defendants' racketeering activities, as described in detail in this Amended Complaint, included:

a.    Violations of the federal wire fraud statute, 18 U.S.C. § 1343, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber, FedEx, and others out of money or property by means of materially false representations; and

b.    Violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon voluntarily and intentionally devising and/or participating with knowledge of its fraudulent nature in a scheme to defraud Uber, FedEx, and others out of money or property by means of materially false representations and use of the mail for the purpose of executing these fraudulent representations.

531.    Marc Simon, Simon & Simon, Clifton Burt, and Premier Pain & Rehab Center knowingly and willfully associated with the association-in-fact and conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

532.    Uber and FedEx have each been injured in their business and property by reason of the above-described conduct.

-135-

533.    Uber and FedEx are each entitled to equitable relief under 18 U.S.C. § 1964(a). They are also each entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT IV**
**RICO Conspiracy Violation (18 U.S.C. § 1962(d))**
**(Against All Defendants)**

534.    Plaintiffs incorporate herein by reference each and every allegation in paragraphs 1 through 513 above.

535.    For at least the time period referenced herein, Defendants did unlawfully, knowingly, and intentionally combine, conspire, and agree to facilitate or further a scheme which, if completed, would include a pattern of racketeering activity committed by at least one conspirator, in violation of 18 U.S.C. § 1962(d).

536.    This pattern of racketeering activity which the Defendants intentionally conspired to facilitate or further involved the specific acts as described in detail in this Amended Complaint constituting wire fraud in violation of 18 U.S.C. § 1343 and mail fraud in violation of 18 U.S.C. § 1341.

537.    All of these predicate acts constituted "racketeering activity" as defined in 18 U.S.C. § 1961(1)(A).

538.    Uber and FedEx have each been injured in their business and property by reason of the above-described conduct.

539.    By reason of their injury, Uber and FedEx are each entitled to equitable relief under 18 U.S.C. § 1964(a). They are also entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

1.      For general damages according to proof at trial, trebled according to statute;

2.      For prejudgment interest;

3.      For reasonable attorneys' fees and costs;

4.      For punitive damages;

5.      For an order under 18 U.S.C. § 1964(a) or under this Court's inherent powers granting all appropriate equitable relief to prevent and restrain violations of 18 U.S.C. § 1962, including by directing Defendants to divest themselves of any interest, direct or indirect, in the above enterprises; imposing restrictions on the future activities of such Defendants, including, but not limited to, prohibiting Defendants from engaging in the same type of endeavor as the above enterprises engaged in; and dissolving or reorganizing the above enterprises;

6.      For disgorgement, imposition of a constructive trust, and appointment of a monitor and/or receiver; and

7.      For such other relief as the Court may deem appropriate.

## JURY DEMAND

Uber and FedEx demand a trial by jury on all issues so triable.

Dated: January 26, 2026

**ROHN KURLAND, P.C.**


By: /s/ Amy Kurland
    Amy Kurland, Bar No. 37419
    AKurland@rohnkurland.com
    1700 Market St, Suite 1005
    Philadelphia, PA 19103
    Telephone: +1.215.770.0320
    Facsimile: +1.215.717.9697


**PERKINS COIE LLP**

David W. T. Daniels (admitted *pro hac vice*)
DDaniels@perkinscoie.com
Michael Wadden (admitted *pro hac vice*)
MWadden@perkinscoie.com
Sydney Veatch (admitted *pro hac vice*)
SVeatch@perkinscoie.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

David B. Massey (admitted *pro hac vice*)
DMassey@perkinscoie.com
William Wilder (admitted *pro hac vice*)
WWilder@perkinscoie.com
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900
Facsimile: +1.212.977.1649

Michael R. Huston (admitted *pro hac vice*)
MHuston@perkinscoie.com
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone:  +1.602.351.8000
Facsimile:  +1.602.648.7000

*Attorneys for Plaintiffs Uber Technologies, Inc. and Federal Express Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court through the CM/ECF system. By electronically filing, the CM/ECF system shall send notification of such filing to counsel of record for each party and those registered to receive a Notice of Electronic Filing for this case.

Dated:  January 26, 2026

**PERKINS COIE LLP**

By: /s/ David W. T. Daniels_____
David W. T. Daniels
DDaniels@perkinscoie.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

*Counsel for Plaintiffs Uber Technologies, Inc. and Federal Express Corporation*

-139-