UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Uber Technologies Inc., | . | Docket #: 2:25-cv-05365-MAK |
| Plaintiff, | . | |
| | . | United States Courthouse |
| vs. | . | Philadelphia, PA |
| | . | April 14, 2026 |
| Simon & Simon P.C., et al. | . | 10:02 a.m. |
| Defendants. | . | |

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE MARK A. KEARNEY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:

Amy Kurland, Esq.
Rohn Kurland
1700 Market Street
Suite 1005
Philadelphia, PA 19103

Michael R. Huston, Esq.
Perkins Coie LLP
2525 East Camelback Road
Suite 500
Phoenix, AZ 85016

Michael J. Wadden, Esq.
Perkins Coie LLP
700 13th Street, NW
Suite 800
Washington, DC 20005

| | |
|---|---|
| For The Defendants: | |
| Simon & Simon, PC | Daniel E. Rhynhart, Esq.<br>Blank Rome LLC<br>130 North 18th Street<br>Philadelphia, PA 19103 |
| | James Timothy Smith, Esq.<br>Blank Rome LLC<br>130 North 18th Street<br>Philadelphia, PA 19103 |
| Clifton Burt and<br>Premier Pain & Rehab<br>Center, PC | Stephanie Nolan Deviney, Esq.<br>Fox Rothschild LLP<br>Suite 100<br>P.O. Box 673<br>Exton, PA 19341 |
| Daniel Piccillo and<br>Philadelphia Spine<br>Associates, LLC | Andrew P. Baratta, Esq.<br>Baratta Law LLC<br>3500 Reading Way<br>The Loft at Woodmont<br>Huntingdon Valley, PA 19006 |
| Lance Yarus | John J. Higson, Esq.<br>Dilworth Paxson LLP<br>1650 Market Street, Suite 1200<br>Philadelphia, PA 19103 |
| Audio Operator: | Kimberli White |
| Transcribing Firm: | CRC Salomon<br>2201 Old Court Road<br>Baltimore, MD 21208<br>410-821-4888 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

Index

| Witnesses: | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| None | | | | | |

| EXHIBITS: | Marked | Received |
|---|---|---|
| None | | |

THE BAILIFF: The Honorable Mark A. Kearney presiding.

THE COURT: Good morning. Please be seated.

UNIDENTIFIED SPEAKER: Good morning, Your Honor.

UNIDENTIFIED SPEAKER: Good morning, Your Honor.

THE COURT: We're here this morning in the matter of -- the requested oral argument in the matter of Uber Technologies versus Simon & Simon. May I have the entry of appearance first who will be speaking on behalf of Uber and FedEx?

MS. KURLAND: Good morning, Your Honor. Amy Kurland from Ruhn Kurland. My colleague, Michael Wadden (sic) from Perkins Coie will be arguing.

THE COURT: Thank you. Michael -- I'm sorry? Michael Wadden. Okay.

MS. KURLAND: Michael Huston.

MR. HUSTON: Huston, Your Honor.

THE COURT: Thank you, Mr. Wadden.

MS. KURLAND: Oh, sorry.

MR. HUSTON: It's all right.

THE COURT: And on behalf of -- who will be speaking on behalf of -- I know there's two people speaking on behalf of Simon & Simon. Who will be speaking on behalf of Simon & Simon?

MR. SMITH: Good morning, Your Honor. Jim Smith. Myself and my partner, Dan Rhynhart.

THE COURT: And how will you split those arguments?
MR. SMITH: So I'm taking the Noerr-Pennington issue. He's taking the causation issue.
THE COURT: Okay.
MR. SMITH: And I'm jumping ahead a little bit, but Mr. Baratta is going to talk about the conspiracy issue.
THE COURT: Okay. Well -- okay. We'll talk about that. Okay.
MR. SMITH: Got it.
THE COURT: And who's -- who's -- so who's speaking on behalf of Mr. Burt and -- Dr. Burt or Mr. Burt and Premier Pain?
MS. NOLAN DEVINEY: Your Honor, Stephanie Nolan Deviney from Fox Rothchild. However, we have ceded our time to other counsel at our table unless Your Honor wants to hear from us.
THE COURT: Okay. Fine. And on behalf of Dr. Piccillo, Philadelphia Spine and Premier Pain?
MR. BARATTA: Good morning, Your Honor. Andrew Baratta. I will speak on behalf of those.
THE COURT: Good morning, Mr. Baratta.
MR. BARATTA: Good morning.
THE COURT: And on behalf of Dr. Yarus?
MR. HIGSON: John Higson, Your Honor. I've also deferred my time -- ceded my time to counsel.

THE COURT: All right. Thank you very much.

MR. HIGSON: Thank you.

MR. HUSTON: Your Honor, sorry. Just in the interest of making a clean record, have -- my name is Michael Huston. I'm going to be arguing on behalf of the plaintiffs. Michael Wadden is my colleague, but he -- he's here in court today, but he's not going to be arguing.

THE COURT: All right.

MR. HUSTON: So I just wanted to --

THE COURT: So Mr. Huston will be making the argument?

MR. HUSTON: Yes, sir. Thank you.

THE COURT: Thank you. Thank you for correcting that.

MS. KURLAND: Sorry.

MR. HUSTON: No problem.

THE COURT: All right. So Counsel's asked for oral argument today. We originally declined it till we saw the briefs. We have approximately a little bit over an hour before we have another hearing. So I have a variety of questions, but I'm hoping you may address them in your -- the nature of your argument.

I want to focus today on Noerr-Pennington. All right. That's what I want to focus on, on issues that have to do with everybody.

But I want to first start with a question for Uber and ask is this way. You have the very similar complaint in

-- before Judge Merchant in the Eastern District. In that complaint and in this complaint, you define racketeering activity under 1961(1)(a). Look at all your paragraphs. You have, like, ten of them.

Maybe I have the wrong definition 1961(a). 1961(a) is a threat or act involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or limited -- or listed chemical under the Controlled Substances Act.

Are you accusing Simon & Simon of selling drugs, murdering, arsoning?

MR. HUSTON: No, Your Honor.

THE COURT: So the case does not belong here, right? That's your whole case. The racketeering activity is 1961(a) -- 1961(1)(a). Look at your complaint. Throughout it -- by the way, in front of Judge Merchant as well, same allegation.

MR. HUSTON: I'm sorry, Your Honor. I think I need just a moment. If --

THE COURT: Yeah. That a -- I'll give you the paragraph. Hold on. Replete throughout your complaint is 1961(1)(a).

MR. HUSTON: So --

THE COURT: That's the -- you're defining racketeering activity as murder and arson, et cetera. Am I wrong about that?

MR. HUSTON: Well, it's not murder and arson in this case. Of course, we haven't alleged that, Your Honor. I think wire fraud and mail fraud.

THE COURT: That's not (1)(a). In fact, that's a different section of the -- Congress put that in a whole different section. I just want to be sure we're on the right page.

MR. HUSTON: Sure.

THE COURT: Am I dealing with wire fraud, mail fraud, or am I dealing with murder and arson?

MR. HUSTON: It's certainly not murder and arson, Your Honor. It's mail fraud and wire fraud.

THE COURT: Then you have a problem with your complaint, right? And this is your second shot a complaint, and you haven't pled that. You define racketeering activity as murder, arson, et cetera.

MR. HUSTON: So I think it's (1)(b), Your Honor. And if we've cited (1)(a) mistakenly --

THE COURT: Oh, I can give you the cites. It's not -- you have cited it. It's in your brief. It's in your opinion. It's in Judge Merchant. It's in front of a judge in this other district in Florida. I mean, it's the same pleading. Just tell me now. I'm just trying to understand, is it a murder/arson case or it's a wire fraud case?

MR. HUSTON: It's -- it's a wire --

THE COURT: Just one counsel at a time, sir.
MR. HUSTON: It's a wire fraud and mail fraud --
THE COURT: Right.
MR. HUSTON: -- case, Your Honor.
THE COURT: So what do you want to do here??
MR. HUSTON: I think -- I guess if we need to, I would respectfully request leave to amend the complaint to correct that if that's the nature of the error.
THE COURT: Well, let's assume you're successful and you go to trial. I have a jury instruction that has to be under (1)(a), right?
MR. HUSTON: I think we would amend the complaint before that in order to create -- make sure that we're --
THE COURT: Like, today?
MR. HUSTON: I'm sorry, Your Honor?
THE COURT: Like, today?
MR. HUSTON: If it necessary, we'd like to move for leave to amend the complaint to make that correction, if that's -- yes, Your Honor.
THE COURT: Well, it's curious because no defendant raised it. Although Judge Merchant's aware of it, no defendant raised it here. So that's kind of like I don't know how they can claim prejudice. They didn't know it either or didn't say anything to me about it.
MR. HUSTON: I'll defer to my friends who represent

the defendants on their position on the specific issues.

THE COURT: Okay. I don't want to take any more time.

Mr. Rhinehart, any concern?

MR. RHINEHART: Yes, Your Honor. You've raised a very good point.

THE COURT: Any concern in amending? Mr. Smith, he's looking at you. Help me out.

MR. SMITH: We believe that -- well, we believe --

THE COURT: Any concern?

MR. SMITH: We believe they should not be given leave to amend but for other reasons.

THE COURT: I know that.

MR. SMITH: And that will be clear soon.

THE COURT: But to correct -- everyone knows -- it's throughout the complaint also, they're talking about wire fraud and our friends from -- our counsel for Dr. Burt makes an interesting argument about just couldn't possibly be wire fraud. Calls it a ridiculous, interesting interpretation of interstate wire fraud. Maybe that person doesn't do criminal law, but interstate wire fraud is any time you use the internet. Third Circuit, pretty good guidance. So I don't -- to call it ridiculous was not exactly right.

So Mr. Smith, any concern in them amending just to correct A?

MR. SMITH: Your Honor, obviously, we would oppose

amending. They had an opportunity to amend, but I recognize that the defendants did not make that argument.

THE COURT: Correct.

MR. SMITH: So.

THE COURT: Okay. Let's go to the other defendants. On behalf of the Burt defendants?

MS. NOLAN DEVINEY: Your Honor, we join in the position of the Simon & Simon defendants.

THE COURT: Okay. Well, on behalf of the -- Dr. Yarus?

MR. HIGSON: Your Honor, we would stay consistent with our co-defendants.

THE COURT: Okay. And on behalf of the Philadelphia -- sorry -- Party Piccillo and Philadelphia Spine?

MR. BARATTA: Join in that position, Your Honor.

THE COURT: Okay. All right. So first things first is we're going to have another round of this because you just can't -- I don't know what -- I mean, you have a very similar problem, but maybe a more Draconian remedy would happen in the Southern -- in the Eastern District of New York. But you can't copy complaints under the wrong statute. Congress has them separated for good reason.

Nobody's accusing -- before anybody reads this in the papers, nobody's accusing these law firms and these doctors of committing murder, arson, extortion, bribery, et cetera. This

is a wire and mail fraud case, allegedly.

Okay. Mr. Smith, I'll hear from you on Noerr-Pennington, sir.

MR. SMITH: Thank you, Your Honor. May I proceed?

THE COURT: Please. However you wish.

MR. SMITH: Thank you so much, Your Honor.

Your Honor, may I just introduce our client who's in the courtroom today? Marc Simon's here. Mr. Simon, could I ask you to stand up?

THE COURT: Thank you, Mr. Simon. Nice to see you again.

MR. SMITH: Your Honor, and again, just very quickly, the roadmap, obviously subject to whatever you approve is --

THE COURT: Please.

MR. SMITH: I would focus on Noerr-Pennington. Mr. Rhinehart's going to focus on causation. Mr. Barrata on conspiracy.

THE COURT: We're not getting there.

MR. SMITH: Okay. And I figured we're gonna --

THE COURT: It's going to be you.

MR. SMITH: -- we're going to run out of time.

THE COURT: It's going to be you.

MR. SMITH: Okay.

THE COURT: The whole case -- the whole case comes to be as Noerr-Pennington.

MR. SMITH: I think it does, Your Honor.

THE COURT: Did you see Judge Bibas's opinion a couple weeks ago?

MR. SMITH: I'm sorry?

THE COURT: Did you see -- I don't mean to be bossy this way, but did you see Judge Bibas's opinion a couple weeks ago?

MR. SMITH: I did not, Your Honor. I apologize.

THE COURT: That's okay. Your office should go back and look at it.

MR. SMITH: Yeah.

THE COURT: Fascinating opinion. Judge Bibas sitting in the District of Delaware by designation.

MR. SMITH: Okay. We will get it.

THE COURT: All about petitioning activity by -- when it's outside the course of the government petition. In other words, one party -- one person in a conspiracy writing to another person in the conspiracy, a la doctors writing to other doctors, eventually writing to Simon & Simon. And finding that that is not protected by -- not in a doctor's context -- in a competitive context.

MR. SMITH: Yes.

THE COURT: Okay. That is under trade secrets case. It's call -- so saying that the communication down the line, even though it didn't end up in a lawsuit, are not petitioning

activity. I don't want you to address it today. It's unfair to you.

MR. SMITH: Yeah.

THE COURT: But it really governs a lot what I'm thinking today.

MR. SMITH: Okay, Your Honor. Could we have --

THE COURT: Of course, it's a colleague. It's not a Third Circuit opinion, but it's a colleague.

MR. SMITH: Yeah, understood, Your Honor. Could we have an opportunity to put a small --

THE COURT: Sure. Take a look at it.

MR. SMITH: -- brief in on that?

THE COURT: Yeah. Take a look at it.

MR. SMITH: Thank you so much, Your Honor.

Your Honor, let me just begin by saying that we're aware of the legal test that causes us to be here today?

THE COURT: Which is it?

MR. SMITH: Well --

THE COURT: Is it California or is it here? Is it three steps or two steps?

MR. SMITH: I think it's three steps, Your Honor.

THE COURT: Okay.

And that's what I'm going to argue to you.

THE COURT: Okay.

And I'm fully --

THE COURT: So you think it's a series of incidents, right? It's not a single incident?

I think that's right, Your Honor.

THE COURT: Okay. All right.

MR. SMITH: And I think -- well, so -- so anyway, I just want to make sure that, you know, we're here under the 12(b)(6) standard, and we're not running from that, Your Honor. We understand that you need to accept these facts as they're pleaded in this complaint and construe them in a light most favorable to the plaintiff.

I will say that as difficult it is, we understand, but in the event that we would be unsuccessful here, I just want to say this, and I'll say it one time, the defendants wholly reject these allegations in this complaint. But we know that that's not for today.

THE COURT: Right.

MR. SMITH: Today, we --

THE COURT: These are allegations on.

MR. SMITH: Yes.

THE COURT: That Court's well aware of that.

MR. SMITH: Understood, Your Honor. And I will suggest, too, as I get deeper into this argument, that I think my adversaries are running from the legal test, particularly when we look at the analysis that needs to be done under the Noerr-Pennington Doctrine.

And I know you're familiar with it. We read the Romero (phonetic) case. We read that very carefully, where the Court acknowledged that counterclaims did not fit within the exception. Romero was not a RICO case. And we believe that the decision from the Central District of Florida that we cite heavily --

THE COURT: Ford.

MR. SMITH: -- Ford -- is a case that you're -- obviously, you're not bound by it. We understand that. We believe that it is --

THE COURT: Ford is interesting. Let's talk about Ford just for a minute, Attorney Smith. The idea that -- and I want to understand your reasoning on this. In Ford as I understand it, the information that was fraudulent was attorney billing information throw into Lemon Law cases. And saying if you win, then the prevailing party gets fees. And the fees were false. The fees were fraudulent -- allegedly fraudulent. The bills were allegedly fraudulent.

MR. SMITH: Well, actually, I think they actually -- there were admissions that they were fraudulent, Your Honor.

THE COURT: Well, right. Whatever. Okay. So -- and the court there, our colleague in the Central District, held that this is not -- well, take me through it as you understand it, and then compare it to Judge Baylson's decision in Dougherty (phonetic).

MR. SMITH: So, sure. And I'll get to Dougherty, because Dougherty is one footnote, footnote 13, with no explanation. And I'll come back to Dougherty in a second.

THE COURT: That never works. But go ahead. Tell me how you explain Dougherty's reasoning as to what is essentially a petitioning activity relative to --

MR. SMITH: Sure. May I walk you through my analysis of Ford first?

THE COURT: Yeah, that'd be helpful.

MR. SMITH: And then get to Dougherty --

THE COURT: That's exactly what I'm asking.

THE COURT: -- to Dougherty, Your Honor?

THE COURT: Yeah, please.

MR. SMITH: And Ford, as you know, involved false allegations under oath about the truth of billings or lack thereof. There were tens of thousands of false and unrecorded time billings. There was more than $100 million that Ford had paid in connection with settlements where these affidavits and declarations were submitted to other courts that contained these inflated bills and the like. And the Court in Ford granted a motion to dismiss not once, but twice.

And I will tell Your Honor, Mr. Stoolman brought to my attention, I want to make sure you know it as well.

THE COURT: He gets credit.

MR. SMITH: That there is an appeal that was filed

there. So I just want --

THE COURT: I'm aware of that. Yes.

MR. SMITH: Okay. Got it. And I would respectfully suggest to you, Your Honor, that Ford provides the roadmap for you to dismiss this case.

And I start with the first question that Ford asks under the Noerr-Pennington Doctrine, which is, does the lawsuit impose a burden on petitioning rights. And there's a distinction that is made in Ford that I think -- I just want to impress upon the Court. And I quote from the decision, Your Honor. "The question at this stage is not whether the conduct at issue is fraudulent or abusive." So we need to put all of those allegations in the complaint that we accept as true and put them to the side because the Court says, "But instead whether the successful of the lawsuit would constitute a burden on petitioning rights."

And I don't think it can be argued seriously, Judge, that in fact this would not only be a burden, but it would eliminate. And so I think the first -- the answer to the first question under Noerr-Pennington is absolutely.

THE COURT: Let's do Noerr-Pennington. Let's take away from Ford a minute. What is the -- and you have a difficult position because you're speaking out for defendants in different positions. But I mean, there's a -- the petitioning activity, if you look at paragraph 460 of the

amended complaint --

MR. SMITH: I have it right here, Your Honor.

THE COURT: Okay. Thank you. In there -- and you make a point of this in your memoranda, that the plaintiff talks at length about the idea of what Simon & Simon did. And in there, they define it as essentially two things: filing and serving. Okay. Filing and serving.

MR. SMITH: Yes.

THE COURT: Okay. Let's assume I agree with you that that would be almost definitionally petitioning activity.

MR. SMITH: Filing and serving?

THE COURT: Okay.

MR. SMITH: Yes.

THE COURT: Okay. Now take me to the next stage down. So I want you to do it in steps, petitioning activity. Because Ford, there was no real doubt that it was petitioning activity. The petitions, the fees came in attached to whatever the case was.

MR. SMITH: Yeah. There were legitimate Lemon Law claims that were being made. I don't think there's any question about that.

THE COURT: And attached to it were -- when they won, the prevailing party came in and wanted fees.

MR. SMITH: And in --

THE COURT: And they had phony --

MR. SMITH: Inflated fee petitions. Yes, sir.

THE COURT: All right. So take it from that and ask me -- and answer it this way. Does Noerr-Pennington apply to Yarus's -- well, Yarus's -- well, let's come back to Yarus. Apply to Burt's reports and the spine reports? In other words, they are doing medical information that's being sent, and there's no governmental input there. There's nothing there, unlike the attorney's bill going directly to a court. How do you draw that distinction?

MR. SMITH: So -- so here's how I draw it, Your Honor. And this is where I suggest it to you that I think that my adversaries are running away from their complaint.

If you go back to the language in Ford, Ford talks about the Noerr-Pennington doctrine protects petitioning activity incidental to and in anticipation of petitioning activities.

THE COURT: Right.

MR. SMITH: The Court also said in Ford, petitioning activity includes documents in which the plaintiffs or defendants make representations and present arguments to support their request that the Court does need to do something. If you start with just paragraph 4 of their amended complaint and read through it, this -- the -- this is according to the plaintiff's theory, Your Honor. All of this is a scheme. The scheme starts with the doctors, the doctors' treatment, the

doctors' reports that all serve as the basis for the filing.

THE COURT: All right. Let me help you out here. That's California. Judge Bibas -- and it's unfair to you -- literally three weeks ago --

MR. SMITH: I can't believe I didn't get it.

THE COURT: I know. Blame Mr. Stoolman -- and I'm kidding, Mr. Stoolman. The -- literally three weeks ago, Judge Bibas had this in a different context, again, any competitive conduct, trade secret conduct, and in there, we had communications going back and forth to allow them to create the fundamentals for the lawsuit. Got it?

MR. SMITH: I'm with you.

THE COURT: The underlying -- you can read it.

MR. SMITH: I will, sir.

THE COURT: You'll have a chance to brief it.

MR. SMITH: Yes.

THE COURT: But just assume that's the hypothetical. And I'll give you more time.

MR. SMITH: Thank you.

THE COURT: Just assume that's the hypothetical. If that's true and Judge Bibas goes on to say the petition clause does not reach those kinds of communications. It does not go that far. And he says exactly what you said. Nobody in this circuit is yet to find what incidental to litigation means.

MR. SMITH: Yes.

THE COURT: And we've known that, and Judge Bibas just confirmed that. This Third Circuit has never opined on what's incidental enough. But what he says is that pre-litigation, now -- and he makes the point about the only things that thus far have been applied to Noerr-Pennington have been demand pre-litigation threat letters, okay? You're asking me to extend Noerr-Pennington to a communication that would involve every expert that's ever retained pre-litigation, and say, "Look, it says it all goes into the ball of wax of eventually a complaint that goes into city hall in this kind, or state court somewhere," that that's all Noerr-Pennington.

And I'm asking you, give me a rule or reason on the petition clause that would allow that to be true.

MR. SMITH: So here's the distinction, Your Honor.

THE COURT: Okay.

MR. SMITH: And I'll read to you the last sentence in paragraph 4 of the amended complaint.

THE COURT: Okay. Please.

MR. SMITH: "The scheme involves efforts to extract settlement value from marginal personal injury claims by fabricating a false record of medical treatment and exaggerated injury." It starts there, according to their complaint.

THE COURT: Okay.

MR. SMITH: That's the scheme. So this is not a case where you have -- according to their complaint, where you have

doctors who go off, do treatment, provide reports, and then sometime thereafter, the lawyers involve themselves in some wrongful activity. The wrongful activity begins at the very beginning, according to their complaint.

So if you look at the Ford case, I respectfully suggest to you that's incidental, too. It has to be. Because if you take out the medical records and the like, where's the scheme?

THE COURT: And if I take out the underlying communications -- oh, let me ask you this way. The difference between Ford and Montway (phonetic), which is Judge Bibas' decision, and other decisions like it, is that in Ford, it's organically with the lawyer who's bringing the case. In other words, the lawyer creates his own fraudulent bills. He's the lawyer who's bringing the case.

MR. SMITH: Well, actually, Your Honor, I would I want to say that this case goes further than Ford because the filing of the Lemon Law claims were not alleged to be fraudulent.

THE COURT: Right.

MR. SMITH: The fraud happened during the resolution of the Lemon Law claims when the lawyers elected to drive up the settlement value by submitting inflated attorney's fees, affidavits, and declarations.

Here, the fraud started right out of the gate according to their complaint. It's when Marc Simon is alleged

to call the doctors and tell them, "This is the treatment they need to get," which according to the plaintiff's complaint wasn't necessary. "This is the report that you need to write," which according to the complaint was a fraud because the treatment was never necessary in the first place. And then that led to an increased value in the case, which led Uber to have to pay more money or whoever paid the money. I think Farmers did.

THE COURT: Does the petition clause -- if I accept paragraph 4 in your argument --

MR. SMITH: And 5 and 6, Your Honor. It gets deeper the --

THE COURT: It does get much deeper. That's the whole argument. I'm not going into specificity. But if I accept that, why are we running away from WeInk (phonetic)? Why are we running away from the idea that Noerr-Pennington does not protect fraudulent conduct?

MR. SMITH: Because it does, Your Honor. It does. Think about what happened in Ford. Those lawyers -- some of those lawyers admitted that they executed false declarations and affidavits that led to Ford paying $100 million, and what the Court said there is Noerr-Pennington protected that conduct. Protected it. That --

THE COURT: And in your view, it not only protects the lawyer, it protects every person along the chain because the

chain is designed from ab initio to create a false claim.

MR. SMITH: Absolutely, Your Honor.

THE COURT: Okay. Does it matter, like in Ford, that there is a -- for purposes of today, there is a valid negligence claim? In other words, this is all challenging the damages, inflated damages to coercive settlements.

MR. SMITH: Yes.

THE COURT: Right. Okay. Does it matter that -- do we bifurcate, do we partition out the idea that these are actually real negligence claims? And so, and this is really a question for your friends. But I'm asking you, do we separate it out on Noerr-Pennington and say, "Look, there is a valid claim as to negligence. Simon & Simon was bringing a valid negligence claim."

MR. SMITH: I think that analysis gets introduced on the sham litigation exception. And here we brought to your attention, Judge, that when you're looking at whether a claim is objectively baseless or not, there are 21 different lawsuits that they mention.

THE COURT: Okay.

MR. SMITH: Fourteen of them settled. One plaintiff's verdict came in since they amended the complaint.

THE COURT: Okay. So --

MR. SMITH: So I would suggest --

THE COURT: So on the second step, okay. So it

doesn't go to petitioning activity. It goes to --

MR. SMITH: Sham litigation.

THE COURT: It goes to sham litigation.

MR. SMITH: Or the absence of.

THE COURT: Right. Objective, subjective. Okay. Got it.

MR. SMITH: I would respectfully submit that to you.

THE COURT: I understand. It makes sense. Okay. Continue.

MR. SMITH: And I don't -- should I keep going, or?

THE COURT: Yes, please.

MR. SMITH: Okay. So I would submit to you that under petitioning activity, I think if you look at the language of Ford and you follow it as I suggested to the Court, I think our case is more within the Noerr-Pennington doctrine than -- than the Ford case was because the fraud was from the very inception.

THE COURT: Okay. Dougherty, Judge Baylson, you pointed out footnote 13.

MR. SMITH: Yes. One sentence. And I know that's not a reason to not pay attention to it, Your Honor.

THE COURT: Yes.

MR. SMITH: But I would --

THE COURT: Especially to one of his colleagues.

MR. SMITH: I understand.

THE COURT: Plaintiff's claims are not based solely on Hurlick's petitioning activities before the Virginia State Court. Rather, the complaint alleges that the defendant took part in an ongoing scheme meant to induce annuitants. There's a whole series of conduct there.

MR. SMITH: And it's the word solely that gives the plaintiff's their argument, right?

THE COURT: Yes. Okay. Right.

MR. SMITH: That somehow the petitioning activity must be solely. And the -- if the word solely were removed from that one sentence in footnote 13, they wouldn't have an argument. And I submit to you, Your Honor, in that opinion, there's no real discussion about incidental to.

THE COURT: Right.

MR. SMITH: And I would submit to you --

THE COURT: Well, it don't deal with Noerr-Pennington, really.

MR. SMITH: And I agree with that. It was a --

THE COURT: It's not really a focus.

MR. SMITH: And I understand if I were in their position, I'd be holding on to that footnote and that sentence, too. I understand it. It's helpful to their case.

But what it doesn't do, Your Honor, is address the law on incidental to. And I would submit to you that when you apply the analysis of Ford and incidental to, the legal test

isn't solely, because solely reads out incidental to.

THE COURT: You would have to agree with me, Mr. Smith, that there is no case law now. We would be the first persons to say, beyond pre-litigation threat letters, demand letters, nobody's extended Noerr-Pennington that far.

MR. SMITH: In the Third Circuit?

THE COURT: Yes, sir.

MR. SMITH: Oh, yeah. I would agree with you that --

THE COURT: Ford is out there.

MR. SMITH: Yeah.

THE COURT: So Ford is what --

MR. SMITH: I think Ford's on all fours here for the reasons that I talked about.

THE COURT: Okay. Anyone else --

MR. SMITH: Well, I think Sosa does it.

THE COURT: Okay.

MR. SMITH: But Sosa's from the --

THE COURT: Third Circuit.

MR. SMITH: Yeah. But I think they're the two cases that we principally rely upon, Your Honor.

THE COURT: Okay. Is the idea that -- again, let me do it this way, the -- backwards. Let me go from the -- sort of the reverse side of your argument for a minute and ask it this way. Does it matter that -- to you that -- let me do it this way. Why don't you address -- why don't you address -- it

goes to -- you're going to tell me it goes to the second part, the sham litigation.

So let's -- let's assume that I agree with you on all of this, including -- in fact the closer one to you is Yarus because that essentially in the state court would be the report that would suffice to support a -- a injury, right? They actually go to Simon & Simon.

MR. SMITH: Well, that's just the roll-up, Judge. Without the underlying medical reports --

THE COURT: No, I got you. I got you.

MR. SMITH: Yeah.

THE COURT: So -- but my point is would you draw a distinction -- hypothetical, would you draw a distinction between the doctor who you -- the patient goes to see for their own whim, goes and sees a doctor, and the doctor sends the report to the lawyer, as opposed to the allegation here where Simon & Simon sends the patient to the doctor?

MR. SMITH: I think it's a critical distinction. Because in this complaint, the alleged sending by Mr. Simon is the beginning of the scheme, as opposed to the patient who goes and sees a doctor, and that's ancillary to the scheme. Maybe not even a part of the scheme at all.

But here, they can't run away from their complaint, and their complaint is not that a person went to see a doctor and the like. The complaint is that Mr. Simon directed them to

go see the doctor, directed the treatment.

THE COURT: To see this doctor.

MR. SMITH: To see X doctor, whether it's Dr. Burt or whoever their -- that's what their complaint says.

THE COURT: Okay.

MR. SMITH: So -- and that's a critical distinction, I think, because --

THE COURT: Okay.

MR. SMITH: -- it's not only incidental to, it's a core part of the scheme.

THE COURT: Okay. So other than Ford, I have WeInk, and have a series of cases that talk about other petition clause, that fraud is not covered. Okay. So the allegation is fraud. How do I get around that other than Ford?

MR. SMITH: I -- I think Ford and Sosa get you around it, Your Honor.

THE COURT: Okay.

MR. SMITH: And the point --

THE COURT: What do I do with WeInk? What do I do with our circuit?

MR. SMITH: I'm sorry?

THE COURT: What do I do with WeInk?

MR. SMITH: I think that no court in our circuit has taken this issue and addressed it squarely, and I think to the extent that there were others, I think those cases are

distinguishable. I don't know them all off of the -- you know, as I stand here today.

THE COURT: Okay.

MR. SMITH: But I look at Ford and say it's -- I think it's an undeniable proposition that what went on in Ford was not just an allegation in the complaint but admitted fraud. There were declarations where people admitted that they didn't work the hours or they took their hours and were working more than 24 hours a day, or, you know, put in hundreds of more hours than they have put in and the like.

THE COURT: Does the -- do the alleged misrepresentations to your view go to the core of the case? In other words, in our circuit, it has to go to the core of the case.

MR. SMITH: I think it does, Your Honor.

THE COURT: Okay. That's what I'm a little bit lost on. Because -- help me out here. Unlike Lemon Law, which provides a statutory right to fees and thus Ford brings it in as part of an element, how is it in here? These people -- if they establish negligence, a jury in city hall could've gave them $1. Say, "Look, you were hit by a guy, but you only -- you had no injuries, so we only gave you a $1," or $10 or whatever.

So the core -- isn't the core of the case negligence?

MR. SMITH: No. I don't think it is, Your Honor.

THE COURT: Do you need -- but do you still see -- they don't -- they can still show causation, but I'm talking about -- not the RICO case.

MR. SMITH: Right.

THE COURT: I'm talking about the underlying tort. They can show accident, negligence, causation, car hit me, and I have damages. Now the question for you is, yeah, Judge, they have phony damages. The allegation is they have phony damages. But is that really the core of it?

MR. SMITH: I think it is, Your Honor. Remember, if you go back, according to their amended complaint, the scheme starts at the time of the accident. The contact to Simon & Simon, who then begins directing everything, directing the treatment that they claim is a fraud, directing the reports that they claim is a fraud. It's all part of a fraudulent scheme, according to them.

THE COURT: So the damages does go to the core of the case in your view?

MR. SMITH: I think it does.

THE COURT: Okay. Why don't you address briefly -- I want to hear from them, and then I'll come back to you. Why don't you address briefly why you believe, even if it's petitioning act, if all of it is petitioining activity, that meets the second test of Noerr-Pennington, the --

MR. SMITH: The sham litigation?

THE COURT: The sham litigation section.

MR. SMITH: Sure. So, Your Honor, and again, I go back to not just Ford but the Third Circuit.

THE COURT: Yeah.

MR. SMITH: So I'll start for Ford, and if I may, the court in Ford said a sham situation involves a defendant whose activities are not generally aimed at procuring favorable governmental action at all. We know that's not the case here.

THE COURT: Um-hum.

MR. SMITH: Because by their own admission, the -- there were accidents. What they're claiming is you took an accident that basically had no value, and you made it be much more expensive for the defendants -- or the defendants in the underlying cases to settle.

So reading on then, that court said, "Not one who genuinely seeks to achieve his governmental result but does so through improper means," which is exactly what they're alleging here. There's no question that there was a basis for the lawsuits. What they're claiming is that the conduct in the lawsuits was fraudulent and that these cases should've been resolved for dollars substantially less than the dollars that they were resolved to the extent they've been resolved, and I think 14 of the 21 of them have been resolved. And again, there's been a plaintiff's verdict since, as I mentioned.

So we cited cases to Your Honor about lawsuits

producing favorable outcomes. We cited the PRE case. And what is the implications of winning a lawsuit? What are the implications of settling a lawsuit? And when you read the PRE case coupled with the Ford case, I think you have to conclude that they can't meet that test. These lawsuits were not objective baseless, which goes to the second --

THE COURT: Because -- I think I was trying to help you out. I was trying to understand earlier. Because there was a negligence claim.

MR. SMITH: Yes.

THE COURT: Okay. And there was, for everyone's belief, some damage. It's just the quantum of damage, correct?

MR. SMITH: I think that's exactly how their amended complaint has to be read, Your Honor.

THE COURT: Okay. So when I read it that way -- all right. So that -- so if you don't have objectively baseless, it's over. The sham exception doesn't apply.

MR. SMITH: I think that's right, Your Honor.

THE COURT: Okay.

MR. SMITH: And I think there's case law that we cited for that.

THE COURT: Okay.

MR. SMITH: But if you get to the subjectively baseless test, we quoted the Campbell decision from the Third Circuit, Your Honor, where the Court talked about the motive in

filing was unlawful. And the Court said you look at indifference to the outcome of the suit, insufficient potential recovery to justify bringing the suit, the decision to settle primarily for the benefit of collateral injuries inflicted through the legal process.

None of that is a part of this complaint.

THE COURT: You looked to -- you tell us in your brief at page 13 -- you tell me in your brief to -- Your Honor, focus to the filing success, what has happened. But if we get to that analysis in the Third Circuit, it's a whole variety of things. You'd agree with that, right? I think the Third Circuit calls it a wholistic approach?

MR. SMITH: It's the Campbell case, I would submit to you, Your Honor. That I just --

THE COURT: Okay.

MR. SMITH: That I read from.

THE COURT: But you're -- now you're going beyond your brief. Because your brief said just look at the -- look at our successes. I mean, look at the number of cases settled, et cetera. We -- they couldn't have been baseless because they paid for it.

MR. SMITH: I think that there's --

THE COURT: But that's only one factor; is it not?

MR. SMITH: I think it's one factor, Your Honor.

THE COURT: And when I have a wholistic analysis,

don't I have to take that into discovery?

MR. SMITH: No.

THE COURT: If I get -- if I get past petitioning activity, I agree with you --

MR. SMITH: Yes.

THE COURT: And I agree with the objective basis, okay, don't I have to then still do a wholistic approach?

MR. SMITH: I think you can do it based upon the allegations in the complaint and even when you give them every fair inference that can be derived from it, Your Honor, you still can conclude that these lawsuits were not subjectively baseless because there was an accident. There's no evidence that this -- the pursuit of the lawsuit was for some collateral motive unrelated to trying to recover money, which is what Campbell talks about.

THE COURT: All right.

MR. SMITH: So I submit to you, when you just read through the allegations of the complaint, the amended complaint that they're stuck with, I think you can come to that conclusion. And frankly, Judge, I say most respectfully, I think you can get there easily.

THE COURT: Okay. Let me hear from your friend, because I have more questions for him at this stage. Thank you, sir.

MR. SMITH: Thank you, Your Honor.

THE COURT: Okay. Mr. Huston, I'll hear from you, but let's start with your idea of -- defense tells me that it's all petitioning activity. Do you draw a detection as you did at paragraph 460 between what Simon & Simon did in filing the complaint and what other people did in helping them, assist them, getting them information?

MR. HUSTON: I think the way we think about it, Your Honor, is that the heart of the fraud, the mail andwire fraud that we've alleged, is occurring at the moment that Dr. Burt and Yarus are putting their name, their signature on documents that they know to be false, attesting to medical procedures that either they did not perform or that, even more strikingly, they did perform on claimants who did not need them. That is the essence of the fraud.

That's clear --

THE COURT: The essence of the fraud thus it roll into petitioning activity?

MR. HUSTON: I'm sorry, Your Honor, I didn't --

THE COURT: Would it then roll into petitioning activity?

MR. HUSTON: It's not petitioning activity under any sensible, I think, interpretation of the First Amendment, Your Honor.

THE COURT: But your complaint repeatedly says that it's all one big scheme. Your 1962(d) is all conspiracy. So

if it's a conspiracy, aren't you alleging that Yarus and Burt and Piccillo and these guys all know that they're going into -- it's all going to end up in a complaint?

MR. HUSTON: Well, I don't think the -- I think it's important to draw a distinction between the very last thing you said. They all certainly need to know, and we have alleged, and I think we have substantiated that with factual allegations --

THE COURT: So they all seem to know it's going to end up in a complaint.

MR. HUSTON: They all know that they are part of the scheme. They all -- and they are all -- they're taking their actions with the intent to facilitate that scheme. That's the standard for conspiracy. They -- I don't think it matters that they know that the specifics of it's going to end up in a complaint in court. And that's the leap that the defendants need to try to argue that this is petitioning activity and take advantage of Noerr-Pennington.

THE COURT: Okay, hold on a second.

MR. HUSTON: Sure.

THE COURT: Let's not ignore as judges what we know as men. The allegation you make is that somebody from Mr. Simon's office, him or somebody else, calls the doctor --

MR. HUSTON: Yes.

THE COURT: And says, "Hey, here comes Mr. Jones."

MR. HUSTON: Yes.

THE COURT: "Do a report," And in walks Burt on one day a week and does the exam. Your allegation is he comes in one day a week and does the examination. Gets, what, $3,000 a day for doing that. That's your allegation. Okay. And then he goes home, back to New Jersey. And you're not thinking that -- so a lawyer calls him and says, "See Joe Jones." He sees him. He sends the paperwork -- am I wrong about that?

MR. HUSTON: You're right. I just think it's even more striking because what we've actually alleged and what we have introduced documents to show is that Simon & Simon calls Dr. Burt and says, "Please see Mr. Jones and give him an RAF."

THE COURT: Exactly.

MR. HUSTON: The lawyers are directing the treatment.

THE COURT: Thank you. Thank you. That's my point.

MR. HUSTON: Okay.

THE COURT: So what does Dr. -- how else do I interpret it fairly or plausibly that Dr. Burt does not know that he is preparing something for a lawyer for purposes of seeking redress for Mr. Jones?

MR. HUSTON: Sure.

THE COURT: Including through a complaint.

MR. HUSTON: Sure, Your Honor. Understood completely. I think the key point is that as a matter of law, as a matter of what the First Amendment protects, whether Dr. Burt knows

that the false document that he's being directed by Marc Simon to prepare is going to end up in a fraudulent legal complaint to be filed to a court or a fraudulent insurance claim to be submitted to an insurance company is legally irrelevant. Neither is protected by the First Amendment.

And so I think if you just imagine that everything we've alleged in our case -- first of all, obviously, assume everything is true as the Court obviously will. But imagine instead that what the defendants were doing here, everything works exactly the same way except the defendants, armed with the false Yarus reports, the false Burt reports, the chiropractic reports about treatments that never happened, imagined that they took all that, and they went to the insurance companies of the claimants and said, "We've got -- you need to pay out 1.5 million."

THE COURT: That'd be Motway. That's Judge Bibas' opinion.

MR. HUSTON: It is.

THE COURT: That'd be Motway.

MR. HUSTON: But it's all state, Your Honor, from the Fifth Circuit. It's St. Luke's Hospital. It's case after case after case after case, all of which have said that is absolutely RICO. That is fraud. It is not protected by the First Amendment. And my submission is --

THE COURT: Okay. So that's different. Okay. You

slid on me. You slid away from petitioning activity. I'll get you there. But with petitioning activity, would they -- wouldn't it all be -- your whole theory is that Burt's doing this for purposes of getting -- extracting a higher settlement. That's your theory.

MR. HUSTON: I think I would say Burt is doing it to get paid $3,200 in every instance, Your Honor.

THE COURT: Well, that's not what you pled. That's not -- but I can point out a cite. You repeatedly said it's done for one common conspiracy, to extract higher settlements from Uber and FedEx.

MR. HUSTON: Absolutely. Absolutely. That is the way that they're operating.

THE COURT: Okay. Okay. So let's -- so you have -- all right. So let's go to the fraud exception. Your friend tells me that -- he just says essentially look beyond WeInk and look beyond these cases of fraud.

MR. HUSTON: Yes.

THE COURT: That the First Amendment somehow in this context protects fraudulent statements. Okay. If it's petitioning activity.

MR. HUSTON: Right.

THE COURT: Your view of that?

MR. HUSTON: Sure, Your Honor. I think my view is two things. I start from the first principal point that the

Supreme Court has said over and over again that fraud is not protected by the First Amendment. I think it's also just important to take a step back and understand the consequences of embracing that argument that I think Your Honor is right in your suggestion to my friend and your question, no court has accepted in circumstances like this. If the defendants are right about Noerr-Pennington, it's an immunity. It means that they could not be criminally prosecuted by the government. Not civil, that the government could not bring a fraud action for what Dr. Burt is doing to the claimants who walk into his office.

It would mean that if the defendants were -- if everything else were the same in our complaint except the accidents did not exist and Simon & Simon took one step further and said, "You know what? We're just going to start manufacturing the evidence of the car accidents. The car accidents will be staged," it means they're immune I think I heard my friend say. That's an extraordinary proposition that I think is just unsupported --

THE COURT: But that's not this case. There's no --

MR. HUSTON: That's right.

THE COURT: You're not alleging that Simon & Simon made up the accidents. The accidents occurred.

MR. HUSTON: As best we can tell in this -- as best we can tell in the cases that we've reviewed, Your Honor.

THE COURT: You're now going to allege that the accidents didn't occur?

MR. HUSTON: We have not. But my point is --

THE COURT: So we have real accidents. We have real accidents, and we have -- let me -- answer the question this way. Why isn't this lawyers honoring their duty of professional responsibility and saying, "I'm advocating vigorously, diligently for my client, to maximize his recovery?"

MR. HUSTON: Certainly, Your Honor. It's because every one of us when steps into your courtroom takes an oath that we are going to represent ourselves truthfully.

THE COURT: That's great. And go see our disciplinary board. How is that -- how is that not -- I mean my point is this. Where do you give me a rule of reason to say when you write this, Your Honor, think of this as fraud as opposed to advocacy?

MR. HUSTON: Sure. Understood, Your Honor. I think the answer to that is whether Marc Simon and Simon & Simon are motivated by purportedly by representing the interests of their clients or securing as much money as they think they can does not excuse their knowingly direction to the doctors to prepare false documents that are going to be submitted through the mail and over the wires.

So again, I think the way to think about the case is

what's the heart of the scheme? Is it occurring in the context within a litigation that exists as in Ford? No.

What is happening here is you have Marc Simon directing the doctors to make false evidence, false records. That's fraud. That's mail and wire fraud. And then the mere fact that --

THE COURT: If you draw a distinction, Counsel --

MR. HUSTON: Sure.

THE COURT: I appreciate your patience. Would you draw a distinction if -- you just made a distinction I hadn't thought about, and that is that Ford is in the context of pre-existing litigation.

MR. HUSTON: I think that's one distinction, Your Honor. Yes. Among a couple. Um-hum.

THE COURT: I get what you're saying. In the middle of a litigation, you win. You prevail, and now you show up with phony bills, which as prevailing party --

MR. HUSTON: Yes.

THE COURT: All right.

MR. HUSTON: I think that's one important distinction between Ford and this case.

THE COURT: I'll come to the other ones.

MR. HUSTON: This is not the only one. Yes.

THE COURT: Okay. All right. For that same reason, would you think Ford would apply to a lawyer -- let's say it

never happens, but let's just assume maybe it does happen once in a while, a lawyer writes the expert reports for her client, and the expert report is replete with advocacy with no basis in facts, just to help get a bigger number.

MR. HUSTON: Yes.

THE COURT: Okay. Same thing under Ford, would be protected under Ford because there, like in Ford, it's in connection with litigation. The lawyer's writing it. So are you drawing distinction between pre-litigation and litigation?

MR. HUSTON: I think that's one distinction that we're drawing. I don't mean to suggest it's the only one, but I do think it's a relevant one. I think the facts that Your Honor just described and the hypothetical sound to me very similar to the Donzinger (phonetic) case in the Second Circuit.

THE COURT: Right.

MR. HUSTON: Where, of course, you know, that case was valid. That case was allowed to proceed, and it was held to stay by the Second Circuit a legitimate RICO claim.

THE COURT: It went through this Court.

MR. HUSTON: It went -- yes, it did, Your Honor. And so I don't want to say I think the case for the defendants in that hypothetical is perhaps stronger because the fraud is allegedly occurring within the context of an existing litigation.

I still think Donzinger states a correct rule in

interpreting the text of the RICO Act. I think Congress designed this tool to weed out fraud. And Congress certainly did not create any exception to the text of the statute that would apply to lawyers because just because they have a duty of -- you know, just because they're advocating for their clients. I also think that's one important point here, because the Noerr-Pennington doctrine, as the Court awares -- as the Court is aware, is really just an application of the traditional principle that court interprets statutes to avoid constitutional problems. But where the text of the statute is clear, it has to be implemented.

THE COURT: What other distinction do you draw with Ford?

MR. HUSTON: Sure. I think that, within Ford, the -- the activity that is alleged to be false, it's not just a -- it's not just a time sequence. It's not just pre versus during litigation. It's that the essence of the -- the -- the predicate acts that were alleged in Ford were themselves litigation filings.

It would be like if, in a hypothetical lawsuit, somebody came into court and said, your predicate RICO acts were your face brief. You're -- you know, your false -- your knowingly false complaint; but again, that's not the essence of our scheme. That is -- that did happen in this case. We certainly allege that, but the scheme, the focus of our scheme,

is Marc Simons direction to the doctors to create fraudulent documents, and my point, to Your Honor, is that's not petitioning activity.

The fact that Simon knows that he's going to take those documents, and he's eventually going to put them, you know, submit them to a court; that doesn't provide an immunity against the creation of false evidence, because if it did, it would mean that people who intentionally manufacture evidence cannot be criminal convicted for it. It would mean people could stage accidents, and they bring lawsuits (indiscernible), and there's no court that has ever held as much under the Noerr-Pennington doctrine, in this circuit or any other.

THE COURT: Would -- would you draw a distinction, or do a think could draw a distinction in saying, Simon & Simon have Noerr-Pennington, for paragraph 460, as you allege and repeatedly, so used interstate wires to file a complaint, initiate a lawsuit, okay, that's your wire. Okay, but they don't have Noerr-Pennington for earlier. Is that possible?

MR. HUSTON: I -- I -- I don't think so, respectfully, Your Honor, and -- and -- and I think the reason for it is, you -- I don't think it makes sense to apply an immunity doctrine that sort of carves up --

THE COURT: Why?

MR. HUSTON: -- well, because it -- it would mean that -- because even if that conduct is -- I think it -- the

question -- you know, I think the doctrine would go to whether the filing of the complaints can themselves be the predicate acts, as I'm looking ahead to like how you -- the Court would instruct the jury --

THE COURT: Right.

MR. HUSTON: -- at the end of a case. I think it would be important to direct the jury as to, these are the predicate acts that we've alleged; and the predicate acts that we've alleged here is the creation of the fraudulent documents that are -- submission of them through the mail and wires, and Marc Simon's direction that it happened. That's the case we're going to put on and prove to Your Honor, and to the jury.

THE COURT: Isn't the interstate -- isn't the nexus for RICO, paragraph 460; and are we -- are we claim it? Use interstate wires to file a complaint, initiate a lawsuit. So, if -- if -- if -- if that's immune, is Marc Simon out, and -- Simon & Simon, are they out, because that action of filing a lawsuit -- now, put away fraud for a moment. I understand you say it's fraud, Judge, it doesn't count.

MR. HUSTON: Yes.

THE COURT: Now, but -- I'll put that at the minute, but wouldn't that be able to be segregated? Wouldn't we be able to say, wait a second, that con -- we sep -- we get immunity for certain types of conduct in cases. You think Noerr-Pennington can't be -- I don't know. You don't think

Noerr-Pennington can be severed out?

MR. HUSTON: I don't think you can apply -- maybe it just comes back to the fact that because it's fraud, Noerr-Pennington can't apply --

THE COURT: Or maybe --

MR. HUSTON: -- I -- I -- I'm not, so, you know, I think that's -- I think that's probably the harm of it for me.

THE COURT: How about a lawyer --

MR. HUSTON: Sure.

THE COURT: -- who doesn't know? How about the lawyer? How about the hapless lawyer who doesn't know that all the materials he got -- that -- that he -- that -- that he, you know, your allegation is he directs the -- he directs the -- go to see Dr. Jones --

MR. HUSTON: Yeah.

THE COURT: -- and Dr. Jones gives him false information. A lawyer doesn't know.

MR. HUSTON: So, I don't think he's that -- that hypothetical lawyer is immune under Noerr-Pennington, Your Honor, but I think probably the allegations are not going to state a claim for relief, if the -- if the charge is a fraud. If the -- if the lawyer --

THE COURT: Because he didn't participate in the fraud. He had no knowledge of fraud.

MR. HUSTON: -- doesn't -- he didn't -- he wasn't a

co-conspirator or he --

THE COURT: Okay.

MR. HUSTON: -- wasn't intention -- he wasn't directing the activity.

THE COURT: Okay.

MR. HUSTON: You can't sort of stumble into RICO liability --

THE COURT: And you think --

MR. HUSTON: -- typically.

THE COURT: -- you think that -- isn't your -- (indiscernible), isn't your nexus for -- for wire fraud, or filing of the complaint?

MR. HUSTON: No. That does -- I think -- not -- that is not the only one, and Your Honor, that --

THE COURT: What else is there?

MR. HUSTON: -- I mean, that -- we certainly allege that that occurred. I don't want to run away from it as my friends say, we're -- we're happy to accept --

THE COURT: What else is there?

MR. HUSTON: Well, it's the -- it's Dr. Burritt's (phonetic) transmission --

THE COURT: I know. Marc Simon. What's Marc Simon's nexus, other than paragraph 460, etc.?

MR. HUSTON: He's using the wires. He's directing Spirt (phonetic), and the pain doctors, to prepare knowingly

false statements. He's sending emails telling --

THE COURT: Oh, I got it.

MR. HUSTON: -- telling them to --

THE COURT: Okay.

MR. HUSTON: -- do that. He's -- they're making phone calls. They're having Zoom meetings. So, all of -- this -- this is Simon's use of the wires, I mean, and frankly, really the submission of the wires is the false -- once the false documents gets traded, it gets submitted over the wires, that's the act of fraud. Our point is, Simon & Simon are directing that to occur. Whether he does that over the telephone, by letter, or by email, as in this case, any of that would suffice for RICO liability.

THE COURT: Okay. Back to the fraud for a moment. If the fraud exception -- how do you get around Ford, when you had admittedly, fraudulent documents given to a tribunal with false bills, and they still said no -- Noerr -- Noerr-Pennington does not apply?

MR. HUSTON: Well, I think, Your Honor, we don't read -- we don't read Ford. As you say, or as I -- as was noted, Ford is up on appeal, and I -- I don't think that that's the -- I don't think that we necessarily agree with Ford's reading, but be that as it may, even if Your Honor were inclined to follow Ford again, I think the critical distinction there is that the allegation in the RICO action, in the RICO claim in

that case, is that within the context of an ongoing litigation, the essence of the fraud was -- was a document -- the preparation of a document to be submitted to the court, the attorney billing records in that case.

Here, it's very different on at least two different levels. One, as we've discussed, is the pre-litigation conduct versus existing litigation, but the second, and I think actually even more important point, is that the fraud is being perpetrated for the purpose of manufacturing false documents, and whether those documents get sent to an insurance company to try to extract an unlawful claim, which case after case has recognized constitutes fraud, and again, I think the courts have also recognized even if you then -- that -- that conduct that is classic RICO, Allstate, St. Luke's Hospital, it doesn't become immune just because you operationalize the fraud slightly differently by attempting to extract money from the insurance company by going through the Pennsylvania Court of Common Pleas.

THE COURT: Okay. I don't know if I followed you --

MR. HUSTON: Okay.

THE COURT: -- on Ford. Why -- you disagree with Ford, I gather.

MR. HUSTON: We do.

THE COURT: It's on appeal. Do you agree with your friend about Judge Baylson's footnote 13?

MR. HUSTON: In what respect, Your Honor?

THE COURT: Bachery (phonetic). I mean, in other words, that this was not petitioning -- in other words, there's conduct here that goes beyond -- and counsel points out the same thing I highlighted, solely. I mean, Judge Baylson used the word solely.

MR. HUSTON: He does.

THE COURT: This case did not have, for example, the complaint. If you didn't have paragraph 460 for each claimant, that's the paragraph I'll file (indiscernible). If you didn't have that, would you be in Judge Baylson's land, and because you're not, you're not in Judge Baylson's land.

MR. HUSTON: No. I -- I definitely don't think so, Your Honor. I mean --

THE COURT: Okay.

MR. HUSTON: -- we are in Judge Baylson -- I think Judge Baylson is noting that the exception, the Noerr -- the application of Noerr-Pennington that's been recognized by some courts like Ford, is quite limited, and that makes sense given that the First Amendment generally doesn't prohibit -- doesn't protect fraud. So, I think that, you know, the starting point here ought to be that if there's First Amendment protection, it's really -- in the context of, you know, admitted or alleged fraud, it's really quite narrow, and I think that's what Judge Baylson is saying. He's saying, if you have a circumstance

where the only thing all of the fraud -- the fraud exists solely within the context of litigation, then maybe that would be the circumstance where the Noerr-Pennington doctrine applies.

But, Judge Baylson is saying, this -- his case is not a case where the fraud existed solely within litigation, and that's our circumstance too. The fraud does not exist -- there's no petitioning happening when Dr. Burt (phonetic) is signing, and Dr. -- and Mr. Yarris (phonetic) are signing false documents. So, they can't take advantage of any alleged Noerr-Pennington exception, and the -- the fraud that is occurring here, because it not solely within the context of litigation, it is not protected by the First Amendment.

THE COURT: Did I just hear you -- I want to make sure I heard you correctly that -- that the doctors cannot take advantage of Noerr-Pennington, because they were not directly petitioning the court. Is that your understanding?

MR. HUSTON: That is one --

THE COURT: This governmental body?

MR. HUSTON: -- that is one -- that's --

THE COURT: Even --

MR. HUSTON: -- one reason among, I think a couple, why they don't have entitled -- they're not entitled to Noerr-Pennington.

THE COURT: Okay. What else? Why else?

MR. HUSTON: Well, again, because they are engaged -- because the First Amendment doesn't protect fraud, and because when they -- they are not engaged in any kind of petitioning activity themselves. I think those are the two principal reasons.

THE COURT: Okay. All right. Even though you -- you allege that but for, essentially, but for those mailings, those communications from doctors, Simon wouldn't have a fraud. I mean, Simon is not a doctor. He can't contrive these.

So, you're saying, Simon has -- needs those fraudulent experts to give him that information, to do his petition, and you're saying, yeah, but that's not petitioning.

MR. HUSTON: Yes. I think that's --

THE COURT: You literally -- your view -- in your view, Noerr-Pennington only applies to lawyers.

MR. HUSTON: Well --

THE COURT: I mean in this context. In the context of filing a lawsuit.

MR. HUSTON: I -- I think so. That's right, Your Honor. They're the only ones who can arguably be seen to be petitioning, and that's -- the reason why I think you can be confident that's correct, is Dr. Burt -- you know, Mr. Yarris could have done exactly the same things for purposes of perpetrating an insurance fraud scam like in the Allstate case, like in St. Luke's Hospital. No one would even entertain the

idea that that const -- that that activity is petitioning that is protected by the First Amendment through Noerr-Pennington, and my point is, this is exactly the same type of scheme.

They're trying to get -- to extract payments that they cannot get, that they are not entitled to, that they know they are not entitled to, from insurers, from defend -- from the companies Uber and FedEx, and the mere fact that they're choosing to do it by sort of leveraging a fraud in the court system as opposed to engaging in fraud directly by submitting false claims to the insurers, that's not -- they don't get First Amendment protection just because they abused the court system in that.

THE COURT: Let's you and I do a decision tree for a minute.

MR. HUSTON: Okay.

THE COURT: Just stick with me for a second. If I agree with you, do I draw a distinction on Noerr-Pennington and say, okay, one, Simon & Simon have petitioning -- I think Simon & Simon have petitioning activity. I think you would agree with that. They filed the complaints.

MR. HUSTON: I think -- I don't think that's -- I don't -- I don't -- I'm not meaning to quibble. I don't think that that -- they -- they filed the complaint, certainly. I don't think that that's petitioning activity that's protected by Noerr-Pennington --

THE COURT: Okay. I got -- I got it.
MR. HUSTON: Okay.
THE COURT: Let's do the factors.
MR. HUSTON: Okay.
THE COURT: Because you're going down to the second one. All right.
MR. HUSTON: Yes.
THE COURT: So, it's petitioning activity.
MR. HUSTON: Okay, understood, Your Honor, yes.
THE COURT: So -- so, you and I are writing our law school exam. Petitioning activity check for Simon & Simon. You're saying for the others --
MR. HUSTON: Nobody else.
THE COURT: -- they -- they don't have petitioning activity.
MR. HUSTON: Correct.
THE COURT: All right, all right. So, they -- they lose there. They don't get Noerr-Pennington.
MR. HUSTON: Yes.
THE COURT: All right. So, now we're stuck with Simon & Simon, and now we're going, and I think everyone agrees it's the series test. It's the Third Circuit test. We look at this in a holistic manner.
MR. HUSTON: Yes.
THE COURT: Am I correct? Okay. I think -- I think

counsel agrees with you. Okay. So, these people were actually in an -- there's no dispute they were in an accident. They were in an accident, allegedly, in an Uber vehicle or with a FedEx driver, and -- and they claim to have causation of some form of injury.

Now, put aside whether it's settled, won, I don't whether that -- that's one factor in holistic thing, but how is -- how is a Judge to find that that's not -- that that -- that that has some basis to it? I mean, the people -- the people who were actually come to Mr. Simon, they had -- they needed -- they need a lawyer. He -- he -- he -- they have negli -- alleged negligence, they think it the Uber driving and/or the FedEx truck, and they have some measure of damages. How is that base -- how is that not have a basis to -- to fit -- to go to -- if we're going to the sham, the sham exception.

MR. HUSTON: Sure, Your Honor, and -- and -- with -- I want to answer that question directly, and I promise that I will, but just --

THE COURT: Okay.

MR. HUSTON: -- in the interest of clarifying the decision tree, can I step back one moment to --

THE COURT: Yeah.

MR. HUSTON: -- to Simon, because I think -- I think I may have misspoke, or I don't want there to be any confusion about this.

THE COURT: Okay.

MR. HUSTON: Simon and -- are -- the reason why Your Honor should reject Noerr-Pennington as to Simon & Simon, is not solely because of the sham litigation exception, and that's -- that was Your Honor's question --

THE COURT: Okay. Why else?

MR. HUSTON: -- and I want to answer that, but before we get there, Simon & Simon are not -- they are not engaged in petitioning activity because we talked about, I think Your Honor understands my argument that the doctors don't have petitioning. When Simon & Simon were directing the creation of that fraud, that is not petitioning activity, and that was the argument I was trying to make about why Simon & Simon too, it might be different when you're talking about the -- the down the line consequence, you know, Simon & Simon filing the complaint, that's not the heart of our RICO predicate acts here, and so the -- the fundamental point that I hope to just clarify is, when -- you know, again, I think you understand my argument about why Burt and the doctors are not engaged in petitioning. They're engaged in the perpetrate -- knowing perpetration of false documents.

When Marc Simon is directing them to do that, telling Dr. Burt to give radio, you know, frequency ablations to doctors who don't need them -- or excuse me, the claimants who don't need them, and signed his name on those forms, that's not

petitioning activity either. So, that is, I think, the easiest way in Your Honor's decision tree to sort of reject -- reject Noerr-Pennington as to all of the Defendants. I promised I would answer Your Honor's question.

THE COURT: Yeah, let's go --

MR. HUSTON: Which is --

THE COURT: -- let's assume --

MR. HUSTON: -- assuming that you reject --

THE COURT: -- it's --

MR. HUSTON: -- my argument --

THE COURT: Well, no, no --

MR. HUSTON: Okay.

THE COURT: -- but let's assume I'm still stuck with the complaint. Right? Because that is petitioning activity.

MR. HUSTON: What is pet -- I'm sorry, Your Honor.

THE COURT: Mr. Simon's signature and his lawyer's signature on a complaint in City Hall --

MR. HUSTON: So, that later -- right, that happens later --

THE COURT: I got it.

MR. HUSTON: -- in our sequence, yes --

THE COURT: So, that -- see, I don't -- I don't know if I -- I'm going to look at -- I'm going to have you (indiscernible). I can't imagine Noerr-Pennington can't protect some conduct and not others. He couldn't be protected

for the filing of his complaint even though it -- forget fraud -- forget -- forget --

MR. HUSTON: Okay. Yup, understood.

THE COURT: -- forget objectively basis --

MR. HUSTON: Sure.

THE COURT: -- that test, but that's -- but I think you would have to agree that that filing of the complaint is petitioning activity. The filing of the complaint is petitioning activity.

MR. HUSTON: I understand that argument --

THE COURT: All right, fine. Well --

MR. HUSTON: -- Your Honor --

THE COURT: -- you disagree with that?

MR. HUSTON: I think it -- I -- I guess Your Honor asked me to assume, you know, to -- to -- to set aside the fact that it's fraud --

THE COURT: No.

MR. HUSTON: -- and so, so I accept that argument.

THE COURT: Column 1 --

MR. HUSTON: I accept that, yes.

THE COURT: -- petitioning activity. Element A.

MR. HUSTON: But only with respect to the submission in court, and again --

THE COURT: I got you.

MR. HUSTON: -- that -- our point is that's not the

heart of the -- the RICO predicate acts that are charged against Marc Simon --

THE COURT: That may very well be true.

MR. HUSTON: -- and Simon & Simon.

THE COURT: I mean we're -- so, now let's -- let's assume, just for entertaining you --

MR. HUSTON: Okay.

THE COURT: -- let's just be certain that we get to the second part.

MR. HUSTON: Okay.

THE COURT: He files the complaint, his firm files the complaint knowing that, in your view, that it's false, but that damages -- see, I have to see these complaints, and this is part of what the problem is in 12(e)(6) (phonetic), but typically these complaints don't say -- they -- you know, all of them say you (indiscernible) severe bodily injury, right, and -- and so, that's presumed to be damages more than $10, right? Something like that. Some kind of nuisance damage for being hit by a car.

MR. HUSTON: Mm-hmm.

THE COURT: Okay. Would you agree with me, that if he didn't say that, if he just said accident, causation, suffered injury, and didn't put severe, that he would have a -- he would have a basis for his lawsuit, or his client's lawsuit?

MR. HUSTON: So, I -- I think the answer is still no,

Your Honor, but it has to do with some of the -- with the reasons that we've described, and attempted to describe in our complaint about the way that the insurance system works in Philadelphia. So, first of all, there's mandatory arbitration in the Court of Common Pleas for -- for claims whose alleged damages are $50,000 or less --

THE COURT: Are all these cases in Philadelphia County? Are all these claims in Philadelphia County?

MR. HUSTON: I believe the answer to that is yes, Your Honor.

THE COURT: Okay, all right.

MR. HUSTON: I'm not a hundred percent certain --

THE COURT: I didn't quite pick that up, but okay.

MR. HUSTON: -- but -- so, I -- but I -- I think -- there's -- I think the point is, there's multiple gatekeeping steps that exist that mean that a lawsuit where a claimant has, whose genuine damages are none at all, or $10, the cost of the Ibuprofen. Some of these claimants went to the emergency room at Simon & Simon's direction, and they said I've got pain, and the doctors, you know, examined them and says, what you need is some acetaminophen, go buy some at CVS, or buy a hot pack and put it on.

THE COURT: Okay.

MR. HUSTON: So, if that's their damages, is like literally the cost of the acetaminophen at CVS, right, it's $10

or $20, or whatever, there's going to be multiple gatekeeping functions, both in the court system, and in their insurance coverage that are going to mean that you would never file a lawsuit at all for those things, and that's the ess -- that's why every dollar of damages that we are forced to incur to defend these actions that are submitted are real damages to our injury or property, in the words of the statute.

THE COURT: So, even though they have three of the four elements, excuse me, they have four elements of the negligence claim, it's just that you have a disagreement with the proof on the fourth element of damages. They're phoney'ing up the proof on damages. That's your complaint.

MR. HUSTON: Yes.

THE COURT: Okay.

MR. HUSTON: People who weren't injured --

THE COURT: And you --

MR. HUSTON: -- they're alleging more injury.

THE COURT: -- and you believe somehow that that -- that -- they -- that one factor, is enough to make an objective -- the whole case objectively based.

MR. HUSTON: Yes, because that's an element of the claim, and indeed, it's a critical element without which the claim both could not proceed in court, and would not proceed in court. We could certainly put on -- we will put on --

THE COURT: It could proceed in court. It would just

proceed in a different court.

MR. HUSTON: It --

THE COURT: It will still have to go to a governmental body.

MR. HUSTON: -- it would go -- but it would go to the mandatory arbitration --

THE COURT: Yeah, but still go --

MR. HUSTON: -- system, the value of --

THE COURT: -- but that's -- that's a claim for some -- that's a discovery issue. That mean -- I mean that may be some claim, but the point is -- the point is, they still have a claim.

MR. HUSTON: Well, they might have a claim, Your Honor, but they don't have a claim that would ever be filed in court, because no --

THE COURT: Why?

MR. HUSTON: -- because no lawyer would pay, would -- would accept a claim with $10 in damages. They're not going to bring (inaudible) that other firms won't. They ask -- they actively solicit referrals from other plaintiff's personal injury lawyers that are not economically viable, and Simon & Simon says, we'll take those cases to court.

Why is Simon & Simon the only ones who are willing to take these cases? It's because they've got the deal worked out with Dr. Burt and Yarris to come in and say that case that's

worth $10 in damages --

THE COURT: I -- I --

MR. HUSTON: -- it's actually worth 1.5 million.

THE COURT: -- I respect the pedigree of the firm you're coming from, but let me give you a little reality. People bring cases all the time in -- in state court, and try to (indiscernible) here that may be worth $8, okay? They bring them, and without fee shifting, because they have certain type of principled views of things. What I'm getting at is the four elements are met, are they not?

MR. HUSTON: I think they're not in this respect, Your Honor. When the -- the suit is objectively baseless, and subjectively baseless, because Simon & Simon knows that when they file that action in court, and they tell the Defendants, this is a case whose value is $1.5 million because Dr. Yarris said so, after all of the phony medical records --

THE COURT: They tell who that? Who do they tell that to?

MR. HUSTON: Well, they tell the Defendants, the -- Uber and FedEx.

THE COURT: Where?

MR. HUSTON: Well, in their --

THE COURT: That's not your -- where?

MR. HUSTON: -- in their complaint, and in --

THE COURT: In their complaint they say severe injury,

don't they --

MR. HUSTON: Yes.

THE COURT: -- and they say -- and damages in excess of $50,000 (indiscernible) the arbitration.

MR. HUSTON: Correct.

THE COURT: They don't say a million five.

MR. HUSTON: Well, I mean, they are certainly -- they certainly have Dr. Yarris's reports, which they submit.

THE COURT: They don't -- they don't submit that to a court. That's not petitioning activity. They have that --

MR. HUSTON: Yeah.

THE COURT: -- and maybe in connection with some discovery they send it over to Uber.

MR. HUSTON: Yeah. I think that's right, Your Honor. Certainly, that does happen.

THE COURT: So, the petitioning activity doesn't say a million five. (Indiscernible) saying it as --

MR. HUSTON: Okay.

THE COURT: -- we have damages, and they're in excess of the $50,000 arbitration limits, right?

MR. HUSTON: Yes.

THE COURT: Okay. So, help me out there. How is that -- so -- so -- so a lawyer that -- (indiscernible) --

MR. HUSTON: Yeah.

THE COURT: -- what distinguishes this lawyer from

another lawyer that says, you know what, we're just going to say it and hopefully we'll get enough damages later and we'll get there. I mean, that happens all the time, and what makes Mr. Simon different that way --

MR. HUSTON: Well, I think what makes --

THE COURT: -- or objectively baseless?

MR. HUSTON: -- what makes Mr. Simon different is he knows that the only way he was able to assert to the -- first of all, he knew it was false when he told the court that he had damages above $50,000, and the only way that he knows that he's going to be able to represent to anybody, to the court, to the Defendants, FedEx and Uber, that the case is worth more than $50,000, is because he helped and directed the facilitation -- the creation of the Yarris report and the Burt fraud, fraudulent document.

THE COURT: So, if discovery -- if I let you get into the discovery on this, and we do claimant by claimant and we say, okay, why doesn't Mr. Simon say to me and to you, yeah, I had no idea. These guys had this injury and I think it's worth -- and I -- I believe it's more than 50,000. He doesn't say a million five. He would say it's worth more than $50,000.

MR. HUSTON: I'm sorry, who is the "he" in that sentence, Your Honor?

THE COURT: Mr. Simon just has to understand, he has to -- or his firm has to understand that hey, this could be

worth more than $50,000. He doesn't have to think it's a million five, he has to think it's worth more than 50.

MR. HUSTON: Well --

THE COURT: Your harm is Judge (indiscernible) decided in the Major Trials Program, or whatever it is down there.

MR. HUSTON: Yes --

THE COURT: Okay.

MR. HUSTON: -- that is -- that's a core part of our harm, and you're -- I mean, to me that sounds like a Summary Judgment argument. If Marc Simon thinks --

THE COURT: That's what my point is.

MR. HUSTON: Yeah.

THE COURT: That's my point, and so if we get into discovery, is the theory then -- does the theory shift for you and say, oh no, Judge, it's not the petitioning activity, it's the actual litigation, because they did say $50,000; and so, it's not hard to get $50,000 in damages. Somebody loses work in a right -- in a good job, they might lose $50,000 in damages. So, what -- how do we do this? How do we know it's -- how do we know that it's baseless --

MR. HUSTON: Sure.

THE COURT: -- when you file the lawsuit? I mean, in other words, couldn't the doctors -- the doctors are lying to me. Let's assume that Simon knows that doctors are lying to me, all right? Let's assume that's true.

MR. HUSTON: Okay, great.
THE COURT: Okay. I'm just saying -- you -- that's what you say.
MR. HUSTON: We do. We absolutely believe --
THE COURT: So, the doctors -- if the doctors --
MR. HUSTON: -- that's true, and --
THE COURT: -- the doctors are lying to me.
MR. HUSTON: -- we've alleged it, yes. Okay.
THE COURT: But Simon thinks, okay, I don't really care, because the guy -- in Philadelphia County, he still has $50,000 worth of losses because he lost work for a week, and consortium, and -- and everything else, and he has, you know, he has ongoing medical concerns. He has a bad neck now. Tell me how you draw that distinction when we get down the line. It sounds like to me Mr. Simon and every lawyer then, is put to a test to say, you've got to have verifiable numbers before you say $50,000 or more.
MR. HUSTON: No, no. I totally understand the Court's concern.
THE COURT: Okay.
MR. HUSTON: I just think it's very, very far away from what we have alleged here.
THE COURT: I agree with you.
MR. HUSTON: Okay, okay.
THE COURT: Let's assume Mr. Simon -- let's assume Mr.

Simon knows they're false, just take it there.

MR. HUSTON: Yes, but --

THE COURT: He knows -- he says, I don't care, okay. Dr. Burt -- Dr. Burt's been disbarred everywhere he goes to. I'm not going to listen to him anyway.

MR. HUSTON: Right.

THE COURT: I'm not going to listen to Yarris, he's just a guy I'm paying a lot of money to. I'm a trial lawyer. I've been in the room, $50,000 is going to be the real number for this case, okay, and that's a valid signature, okay? He comes to this court, he says 75,000. That's a valid signature. Who decides whether that's objectively baseless? He thinks that's true. Why would I find that's objectively baseless?

MR. HUSTON: Sure. So, I think two reasons, Your Honor, but -- and -- and the first, and I think the most important one actually is, our allegations, what we believe we were going to prove through discovery is much, much more egregious than that. It's not that Marc Simon allegedly just knew that the doctors were perpetrating a fraud. Marc Simon is the person who directed the doctors to perpetrate the fraud. That's at the very core of our complaint.

We're not trying to impose some type of, you know, negligent standard on the Plaintiffs' part to be super, you know, to independently verify every expert. That's not even close to what we're saying here. Our point is, Marc Simon is

the person directing the doctors to create those false reports.

That's what we're going to prove to the jury, and if we prove that, if we show that Simon knew that these cases had no -- had no damages above 50,000, just for the sake of keeping it simple. In fact, I think actually as some of the -- the ultimate records go, you know, you're talking about, arguably, claims for damages that are more like 6,000, 10,000, something like that, but let's just keep it below 50,000.

If Marc -- if Marc Simon knows, with absolute certainty, these cases could never get into court, they would have to go to mandatory arbitration, because they're not even arguably worth more than $50,000, and the only way that I can sign something and submit it to a court that says the case should be brought in court and is outside the context of the mandatory arbitration system, is because of Dr. Yarris's report that I directed him to generate saying that he has -- the claimant has $1.5 million in damages, that's objectively and subjectively baseless.

It's subjectively baseless, because Marc Simon knows that that case is a sham. It has no business being in that court. It can't be in that court if he accurately represented the facts, and it's objectively --

THE COURT: Just to draw a fine line here. The subject -- the petitioning activity in your world then is not filing the complaint, it's filing the complaint marking off

$50,000 or more.

MR. HUSTON: I think --

THE COURT: Put together an activity, put the activity with Yarris and everybody to the side for a moment. I'm talking about --

MR. HUSTON: Okay.

THE COURT: -- the filing of the complaint. It's not -- in paragraph -- it's not Simon used interstate wires to file a complaint, interlineated in that should be, filed a complaint seeking more than 50 -- the $50,000, because initiating the lawsuit, he could have done for $10 and he's be in municipal court or somewhere, right? So, to file a complaint -- so, at the -- if we get later -- here's my -- here's my legal question.

If we get later on into the case, and we sit there and we say okay, Mr. Simon, there's now a Summary Judgment record, does immunity then come back into the case? If Mr. Simon is able to persuade us that, yeah, I -- I -- I've done this for 30 years. I know what these cases are worth, and by the way, every case in my judgment in Philadelphia is worth $50,000, and I just needed that for settlement purposes, not to go to court.

MR. HUSTON: Okay.

THE COURT: What do I do then?

MR. HUSTON: So, I think it -- I think Noerr-Pennington, as an immunity doctrine, as a doctrine that is

based in the First Amendment, could come into the case, depending on what the facts reveal themselves to be in discovery. I don't think it's like a, you know, now or never type of doctrine. If the -- if discovery shows that Marc Simon has, if the facts are similar to what Your Honor just laid out, and Marc Simon can prove through discovery, or you know, provide -- or introduce evidence that would allow a reasonable jury to conclude or really introduce evidence such that the only reasonable conclusion the jury could draw, is that he --

THE COURT: All right. Okay, by a different standard, but go ahead. Go ahead, go ahead.

MR. HUSTON: I'm sorry. I'm just trying to --

THE COURT: Finish up. I know what you're saying.

MR. HUSTON: If -- if at Summary Judgment, applying the Summary Judgment standard --

THE COURT: I got you, right. Okay.

MR. HUSTON: -- Marc Simon establishes that he didn't know any of this. He wasn't involved in the perpetration of Burt's and Yarris's fraud --

THE COURT: No, that's not my question. My question is, even assuming he knew it. Even assuming he knew these were all -- no disrespect to your client, they all were -- doctors were just on the take.

MR. HUSTON: Yup.

THE COURT: Okay? Even assuming he knew all that, but

he still says, you know what, case in Philadelphia County, they're worth $50,000 for anything, right, and I can fairly -- consistent with my oath as a lawyer, check off the box that says $50,000 or more. At that stage, forget what he knows about the doctors being bad. Forget what he knows he told the doctors to do it. Forget all that. At the time he signs it -- at the time he signs it he says, every case in -- I'm just trying to jump up a number.

MR. HUSTON: Yeah. Certainly, Your Honor --

THE COURT: His petitioning activity then is not objectively baseless --

MR. HUSTON: So, I still --

THE COURT: -- correct?

MR. HUSTON: -- the -- my answer is going to be no, but it's because of one specific thing --

THE COURT: Okay.

MR. HUSTON: -- really, and it's really only one. In -- in the sort of sequence that Your Honor lays out, and that's that he told them to do it. If Simon & Simon told them to do it, so can -- I think it's because --

THE COURT: He told them to do it, but that's petition -- but he told them to do it, but he -- so, he tells them to do it and he says, okay, well that's just them. It's good discovery. I call up a friend of mine, he's a construction guy, I say hey look, I got a case, a guy slipped and fell in a

truck. You know, what do you think, the guy's getting (indiscernible)? I don't necessarily believe him. He may not necessarily believe him. He may not say believe him, he may say every case is worth more than $50,000. That's what I'm not getting from you.

MR. HUSTON: Right. So, I -- I -- that -- I don't think that -- I --

THE COURT: Why not?

MR. HUSTON: I mean --

THE COURT: What's your fact (indiscernible) --

MR. HUSTON: No, an objective jury could never conclude -- I -- I get -- I mean, no objective jury could conclude that where a guy goes into the --

THE COURT: Is that what we're left with? Are we now -- am I now the quasi prescient jury that says, okay, every -- every Plaintiff's lawyer now has to say, look, I'm going to be tested, because 50 is a low number, right; 50 is a low number, 75 is a low number now, but 50 is low number, and you say, okay, I have to retest the Plaintiff's lawyer, because even assuming he did all that conduct, okay, if it -- if at the end of the day I were to find on Summary Judgement -- again, I'm -- I'm just trying preview discovery --

MR. HUSTON: Sure.

THE COURT: -- if he were to do that, wouldn't that be enough in Noerr-Pennington to come in and say, look, at the

time I filed this complaint, here's the 70 -- here's the 8,000 cases filed in Philadelphia County in the last 4 years, and man oh man, a lot of people got $55,000. Would that be object -- would his claim -- would his case then be objectively baseless?

MR. HUSTON: It's going to be objectively baseless in -- in a circumstance like the ones that we have alleged in the complaint, where the claimant presented at a hospital and a real doctor told him, you need Ibuprofen, and he said -- if he -- If Marc Simon says, I think that case is worth -- actually worth $50,000 in damages, that's objectively baseless, at least I think a jury of this court could conclude --

THE COURT: I didn't -- I didn't --

MR. HUSTON: -- that that is objectively --

THE COURT: -- read you alleged that Mr. Simon --

MR. HUSTON: -- because --

THE COURT: -- Mr. Simon doesn't have a medical degree, right? I don't think so.

MR. HUSTON: That's -- as far as I know, that's correct, but Your Honor, the reason why that I think has to be the case is were it otherwise, there is no sham litigation exception. The attorney who engages in the most naked fraud on the court that you can imagine will always come in and say, I subjectively believed --

THE COURT: Respectively, massive difference if you

help me out. Massive difference. If the lawyer himself is creating his own phony records, the lawyer knows these are my -- this is my information, these are phony. The lawyer in the antitrust context knows that this is phony. I'm creating this for a phony reason. The lawyer in Ford knows I'm creating my own felony bills.

Here, he may -- and he's submitting to a court, and he knows when he gives them to the court they're false, he -- the lawyer in Ford can't say, hey wait a second, I know my know my bills are fraudulent but they would have been that worth anyway. Simon can say, I think -- and (indiscernible) asking you, Simon can respectively -- he can say, even though all this stuff is wrong, I still believe it's worth more than $50,000, and in that context, isn't he protected by Noerr-Pennington?

MR. HUSTON: No. I think not. Not in a circumstance where he knowingly directed the creation of the fraudulent documents. In my -- in my --

THE COURT: Okay.

MR. HUSTON: -- view, I think those are --

THE COURT: Even if he -- any -- because -- then I think I'm going about it a different way. Let me ask you this way. The significance of Simon doing it, is he sends it to Uber's adjusters and lawyers and says, pay me, right?

MR. HUSTON: Yes, absolutely, and --

THE COURT: That's not petition --

MR. HUSTON: -- FedEx's as well.

THE COURT: -- that's not -- and FedEx, all right. That's not petitioning activity though.

MR. HUSTON: I agree.

THE COURT: Okay. So -- so, whatever he does to jump up the number, fraudulent, all that stuff, all you alleged for the purposes of today, that does not mean that when he filed the complaint he didn't think he had $50,000 in damages, correct? I mean, he thinks the number is worth one five. It doesn't mean -- it doesn't by converse mean that he doesn't think he has 50, does it? By way of a pleading, does it?

MR. HUSTON: I -- Your Honor, I'm --

THE COURT: Lawful high standard.

MR. HUSTON: -- I'm sorry. I'm -- maybe I'm not understanding the Court's question. I'm trying to, I'm --

THE COURT: Okay. So, you -- you have a number that says a million five, and I send it off to Uber, okay?

MR. HUSTON: Yes.

THE COURT: That's for purposes of settlement. That's not petitioning activity. His petitioning activity is filing a complaint that says check, $50,000 or more. It's not what you say here. It's not initiate a lawsuit. It's initiate a lawsuit seeking $50,000 or more. That's your harm, correct?

MR. HUSTON: That's a key part of our harm. I don't think that's the full extent of our harm, but that's a --

THE COURT: What else is the harm?

MR. HUSTON: Well, again, Your Honor, I think if the -- if the actual damages, if a jury concludes that the actual claimant's entitlement is to $10, I think we can show that the lawsuit would never have been filed (indiscernible). I think we can introduce an expert who would say, no -- Simon & Simon nor any other Plaintiff's attorney in this jurisdiction is going to file that case on a contingency fee agreement alleging $10 in damages, and if they did --

THE COURT: You find that expert. I'd love to see that report.

MR. HUSTON: Okay, even if they can --

THE COURT: I'm being serious.

MR. HUSTON: -- okay, okay, okay. Even if they can't -- even if not, Your Honor --

THE COURT: You got to come spend some time down here.

MR. HUSTON: -- I think the point is even -- even -- even if the nature of the harm is that Simon & Simon says, if they had been truthful, Simon & Simon would have filed the case, but said this case is worth $10 in damages, they would have told Uber that. We -- I think the Court can, you know, rely on its judicial experience and common sense to know that a demand that comes in for $10 in damages to FedEx and Uber, it's going to be handled dramatically differently in terms of litigation spend, as opposed to a case that comes in from Simon

& Simon that says, this claimant has $1.5 million in damages.

THE COURT: I think that's true.

MR. HUSTON: That's our harm in this case. That's our injury to our property.

THE COURT: That -- I agree with you. I -- I'm still focused on (indiscernible). I have to jump, but let me -- I don't want to hear from Mr. Smith (indiscernible) something, but let me ask you this way. There are four other cases, at least I know of that are pending, that you're involved in -- in a couple of them --

MR. HUSTON: We are, Your Honor.

THE COURT: -- (indiscernible) Judge Merchant and down in Miami.

MR. HUSTON: Yes.

THE COURT: Okay. My friends in Miami tell me that they are waiting to see what Judge Merchant does. Is that correct?

MR. HUSTON: Yes, Your Honor.

THE COURT: Okay. Why should I do any different?

MR. HUSTON: Well --

THE COURT: I mean, I know you're waiting to move forward, but why would I do -- in other words, are the cases -- when I looked at the complaint, I saw that -- by the way, I saw the problem with A and one in a New York case first after I came here. Why is it that -- that I should -- I'm third in

line, why should I take primacy here?

MR. HUSTON: Well, for two reasons, Your Honor. The first is that substantive allegations against each Defendant are different, as you would expect --

THE COURT: Right. Lawyers doing different things, right.

MR. HUSTON: -- in a RICO conspiracy case. I mean, they're -- they are subspecies of a larger -- a larger --

THE COURT: But Noerr-Pennington is in all three, right?

MR. HUSTON: Well, it -- I can tell you, Your Honor, it is -- it is not remotely the central focus of the case before Judge Merchant --

THE COURT: Oh.

MR. HUSTON: -- and have it, you know, we argued back -- they have asserted the Noerr-Pennington doctrine in that case, but we just argued that case a couple of --

THE COURT: February 26th.

MR. HUSTON: -- yes, before Judge Merchant. I argued it in front of her. Noerr-Pennington did not argue nearly as much -- occupied nearly as much time in those --

THE COURT: Well, that's because of me. I'm forcing Mr. Smith to answer, that doesn't mean --

MR. HUSTON: Well, it's the first argument in their brief and their Amended Complaint, Your Honor, and I'm saying

they have prioritized -- these Defendants have prioritized Noerr-Pennington in a way that the Defendants in Judge Merchant's court have not.

THE COURT: But Judge Merchant has to address Noerr-Pennington, because it's an immunity doctrine right up front.

MR. HUSTON: I agree with that, Your Honor, but again, I think that the substance of the allegations is different. So, even if Judge Merchant were to conclude that there's a problem with the complaint in that case, it's not necessarily going to determine the answer to the Noerr-Pennington question here, because --

THE COURT: But if I do, if I say it's -- if I say one way or another, doesn't that affect her?

MR. HUSTON: Well, only in the sense that the Court is addressing related issues. You know, they're both arguments based on Noerr-Pennington --

THE COURT: Well, but --

MR. HUSTON: -- so I would think the Court -- the Judges will, you know, Your Honor would be --

THE COURT: Let me ask --

MR. HUSTON: -- influenced by her and vice versa, I would think.

THE COURT: Yeah. Let me ask a different -- let me ask a different -- let me ask a different way. If -- if I -- I see no other -- and help me if I -- other than -- other than

-- I see -- (indiscernible). I have not seen a case anywhere, help me if I'm wrong, I've looked at your brief case, the case in your brief that show -- and maybe I missed it, but shows that a case where there's been this type of decision on Noerr-Pennington where it's lawyer complaints with one element fraudulent, okay? That is there -- in other words, the case that I see, they're rife with fraud, that the whole petition is fraud.

As you point out, actually it never happened. You know, the Allstate cases, right? The complete fraud on -- that's an insurance company, but not --

MR. HUSTON: Yes.

THE COURT: -- Noerr-Pennington --

MR. HUSTON: Right.

THE COURT: -- but tying the cases, why would I -- it would seem to me, discretion is better served by letting the colleagues address what they're doing first, because if I decided, my -- would I be literally the first Judge to decide -- you're doing these cases around the country, but would I be the first Judge to decide this question on the Noerr-Pennington basis?

MR. HUSTON: Well, either --

THE COURT: If I decide on the Noerr-Pennington basis?

MR. HUSTON: -- as of today, we will have argued the Motions to Dismiss before both Your Honor and Judge Merchant.

I don't know who --

THE COURT: Who's going to decide first. Okay.

MR. HUSTON: -- who would --

THE COURT: But Florida is just waiting, right?

MR. HUSTON: Florida is stayed, and the case -- there's a case in California --

THE COURT: California, right.

MR. HUSTON: -- that -- that we're briefing is ongoing on Motions to Dismiss --

THE COURT: That was -- that's in L.A., and that was filed after us, right?

MR. HUSTON: -- we haven't -- that's correct, Your Honor.

THE COURT: And that's a Sosa, that's a Sosa jurisdiction.

MR. HUSTON: It's governed by Ninth Circuit law in the Central District of California.

THE COURT: Right.

MR. HUSTON: Yes, Your Honor.

THE COURT: Okay.

Let me hear from your friend.

MR. HUSTON: Thank you, Your Honor.

THE COURT: I do have to jump in.

Mr. Smith, I want to give you about 10 minutes, and I want to ask you -- I want to ask you the -- I want you to start

with that last question. Is there a reason that we should be jumping ahead. Is there something about this case to your clients and the others that make sense for us to jump ahead of other people on this, and be the first to (indiscernible).

MR. SMITH: So, Your Honor, let me just begin by telling you, I wasn't at the other arguments. I'm not involved in the other arguments --

THE COURT: That makes sense.

MR. SMITH: -- and the like, but I get reports about them.

THE COURT: Okay.

MR. SMITH: So, my knowledge is as good as the reports that I get, and --

THE COURT: Okay.

MR. SMITH: -- hopefully Rhynhart's given me good reports.

THE COURT: He would.

MR. SMITH: Yeah, I'm sure he would.

So, Your Honor, here -- we thought about this and we anticipated this question, and we are asking you to decide this Motion.

THE COURT: Okay. Why?

MR. SMITH: Well, in part --

THE COURT: Why me decide it?

MR. SMITH: -- in part --

THE COURT: If I deny -- if I deny your motion, it sets in all types of implications. You point out very well in your memorandum that the wrath of Khan is going to come down in discovery. All of a sudden, every Plaintiff's lawyer is going to be scared, and why would I jump ahead if somebody's already considering this now for 6 weeks?

MR. SMITH: Because, Your Honor, and respectfully, we think that we've given you a clear road map to dismiss this case. We think we have, and I want to respond to some of the other arguments --

THE COURT: All right.

MR. SMITH: -- that were made --

THE COURT: Okay. So, you want me to decide.

MR. SMITH: -- along the way. We do want you to decide the case, Your Honor --

THE COURT: Are -- and I --

MR. SMITH: -- and it's --

THE COURT: -- suspect --

MR. SMITH: -- you know, when you're facing --

THE COURT: Excuse me. I suspect your friends are not in those cases either, right? It's only -- in other words, the theory, that is I mean the doctors and stuff are not -- they wouldn't be in those cases --

MR. SMITH: Correct.

THE COURT: -- because it's all -- it's all unique to

each district, right?

MR. SMITH: It is, Your Honor.

THE COURT: Yeah, okay.

MR. SMITH: It is, and Your Honor, if I could just add there's a human element to this too.

THE COURT: Okay, Mr. Simon.

MR. SMITH: You know, when you're -- when you're on the other end of that V and you're looking down the barrel of these things --

THE COURT: I understand.

MR. SMITH: -- it's not pleasant.

THE COURT: Okay. Then both sides want me to decide, okay.

MR. SMITH: It's difficult.

THE COURT: That's what I'm asking. Okay.

MR. SMITH: Your Honor, I --

THE COURT: Tell me the response to the -- this point about the $50,000. Am I --

MR. SMITH: I'll start --

THE COURT: -- what am I missing here?

MR. SMITH: -- I'll start there, because I think, and this happens, I think there's language in the opinions that just get -- gets ignored when you -- you know, when my adversary addresses the Court, and I want to go back to Ford. Ford, when Ford talked about objectively baseless, the

following language, here's what's not objectively baseless. One who genuinely seeks to achieve his governmental result, but does so through improper means, and your questions focused on the legitimacy of a filing. There's no question that these were lawsuits that could be brought. The debate now is, well, should he have checked the box for 50,000, which I'll come back to in a second about mandatory arbitration and the like, because you have the right to an automatic appeal, and you can get right into the --

THE COURT: Oh, that's right. Anyway.

MR. SMITH: Yeah. So --

THE COURT: Even if you -- even if you lost --

MR. SMITH: -- that's -- that argument is -- has no credibility.

THE COURT: Right. So, even a 10 -- even a 10,000 -- even the $5,000 guy can get a civil --

MR. SMITH: Exactly. Everybody can. You may have to start there --

THE COURT: Right, okay.

MR. SMITH: -- but then you check the box, and suddenly, you know, so you go through a process and then you get there. So, that -- that argument I would submit to you, and here, if you look at their complaint, Judge, that's exactly what they're alleging, which is seeks to achieve his governmental result, but does so through improper means, and

the improper means were, you win it, you directed these docs to give treatment that they shouldn't have give -- given. You've directed these docs to prepare reports, then you took those reports, you filed a lawsuit and rolled them all up, and got more money than you should have. So, I think -- I think that squarely fits within the language in Ford.

Second point, and I think we all need to get comfortable with this, which is, and I'm reading again from the Ford decision, Your Honor. The First Amendment requires that we protect some falsehoods in order to protect speech that matters. There's a difference when you go to the courthouse.

It started decades ago with this Noerr-Pennington doctrine. Where the court said, when you go to the courthouse and petition, there are implications that flow from it, and ultimately, that led to the Ford decision, where ever as -- as you saw, Your Honor, the court, you know, dismissed that RICO case, despite the fact that there were admissions that lawyers were filing false declarations, false affidavits, filing them in court that led to more money than they otherwise would have gotten; $100 million Ford paid.

Third point. They're trying to convince you that there's a temporal component here --

THE COURT: Right.

MR. SMITH: -- with the, you know, the incidental too. There's not. Again, they're not looking at all the language.

I'll read to you, Your Honor, Ford. The Noerr-Pennington doctrine protects petitioning activity incidental to, and in anticipation of petitioning activities -- and in petition -- and in anticipation of petitioning activities. That was Sosa.

Remember, in Sosa, they were the letters that went out before the lawsuit got filed --

THE COURT: Right.

MR. SMITH: -- and the court said, protected by Noerr-Pennington. So, I submit to you that you can't just ignore the language of the law here in order to fit it in the box that they want to put it in. It just doesn't work. A couple of other points, Your Honor.

There was a suggestion here that somehow the docs aren't within the scope of Noerr-Pennington, and Dockerty (phonetic) cites Giles. Giles is from the District Court in New York. Giles dismissed a RICO claim under the Noerr-Pennington doctrine and found that the title agents were -- and the lawyers were within the ambit of the Noerr-Pennington doctrine, and I -- I have to say that, and look, I respect these guys. They're good lawyers, and they're from a fine law firm, but I don't think they made a argument in their brief that said docs are out on Noerr-Pennington because they didn't file a petition in the courthouse.

I don't -- I looked at these briefs many times, pretty

carefully. So, I would submit to you -- and then, finally, Judge --

THE COURT: No, their argument is -- right. That's the first time I heard that, but I think it's a little different. Go ahead, go ahead. Say your fourth point. Go ahead.

MR. SMITH: And then -- and then I want to make just two other points --

THE COURT: All right.

MR. SMITH: -- and I'll answer questions you have and I'll sit down.

THE COURT: Thank you.

MR. SMITH: So, paragraphs 4 and 5. I just want -- I want to make sure this is crystal clear to the court. In order to pursue artificially inflated claims in state court, and to extract larger settlements, Simon -- Marc Simon and Simon & Simon directed their clients to a network of corrupt providers who diagnosed non-existent serious injuries. Paragraph 6, where there were directions to Burt and his practice to operate at the direction of Burt, you know, for the same thing; to -- you know, to -- to have treatments that shouldn't have been given in (indiscernible).

So, again, this is all part of one continuous scheme according to this complaint. So, and it's -- it has to fit within, incidental to, and in anticipation of, the language in

Ford that gets us within the Noerr-Pennington doctrine, Your Honor.

THE COURT: Except again -- we're -- we're -- all right. So, I'm going to give you -- I'm going to give both sides a time to look at Judge Bibas's (phonetic) decision, and my (indiscernible).

MR. SMITH: Yeah. I was going to touch on that last. So, as you might expect, I've gotten about 18 notes while I was sitting there, wanting me to make arguments about Bibas, and I said, I ain't doing it. I -- this --

THE COURT: No, you'll have to do that.

MR. SMITH: -- this motion is too important --

THE COURT: That's -- that's not -- no, no, you'll have time to do that.

MR. SMITH: Yeah.

THE COURT: I don't -- I -- I -- it -- it's -- it focuses on incident two.

MR. SMITH: Got it.

THE COURT: So, that's what I want you to look at. Okay? All right.

MR. SMITH: And Your Honor, unless you have other questions, I'll sit down.

THE COURT: Okay. I -- I think I've understood the answer. You want us to resolve it, regardless of what's happening in -- in front of Judge Merchant. You'd like us to

-- I understand. The rest of your arguments are well briefed. I'm not -- note, I'm not disrespecting any (indiscernible) you've prepared for today. Thank you. They're not -- they're not -- it's not intended to do that.

You asked for oral argument, and I granted it when I saw the absence of law, frankly, on Noerr-Pennington, on some issues, and -- and -- that's been fully addressed today. What is -- last question, because I -- I -- I'll look it up. I suspect not, well, you're not I don't think, Mr. Smith, but Mr. Huston, are you in the Ford case?

MR. HUSTON: No, Your Honor.

THE COURT: Okay. All right.

MR. HUSTON: Do you -- I'm sorry. Do you mean --

THE COURT: Not you. Is your law firm in the Ford case?

MR. HUSTON: No.

THE COURT: Okay.

MR. HUSTON: No, Your Honor.

THE COURT: Thank you. That's what I was going to ask. Okay. Thank you, counsel. The matter is taken under advisement. Well presented.

MR. SMITH: Your Honor, thank you so much for giving us argument.

THE CLERK: All rise.

MR. HUSTON: Your Honor, may I ask, could we have an

opportunity to put a submission in on Bibas?

THE COURT: Yeah, you can do it. It's not Bibas, it's Mottway (phonetic).

MR. HUSTON: Oh, sorry.

THE COURT: I was right about the Judge.

MR. SMITH: Oh, Judge, sorry, and Your Honor --

THE COURT: Both sides -- both sides can, yeah. I'm not going to do one side, but -- but I'm saying, I'm just thinking -- well, I -- there'll be order about that, but my thought on this murder charge is that we should probably (indiscernible) arson/robbery charge is that we should probably wait and see, because I don't want to moot all the hard work that's gone on so far, which would happen if you amended the complaint. By definition, it would moot what hard work by these people, and you, in answering it. So, let's deal with the merits, and if it goes forward, there'll be leave to amend to correct that, and there may be other things that -- for example, I am concerned about that paragraph that paragraph that talks about filing a complaint.

It's not filing a complaint you're worried about. It's filing a complaint in excess of 50,000 -- that may be triggering $50,000 or more. That's how I understand -- at least for -- at least for purposes of one argument. So, I understand your -- I do understand your fraud arguments (indiscernible). That will be something I would leave for

another day. I don't want anybody amending complaints and mooting things with all the hard work we've just done.

MR. HUSTON: Understood, Your Honor. We'll -- we'll --

THE COURT: An Order will be entered. Thank you very much.

MR. SMITH: Thank you.

MR. HUSTON: Thank you, Your Honor.

(At 11:35 a.m., hearing concluded.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeds in the above-entitled matter.

April 15, 2026

Kathryn Reed Date

**WORD INDEX**


< $ >
**$1** 31:21, 22
**$1.5** 66:15 72:17 81:1
**$10** 31:22 62:17 63:17, 25 65:18 66:1 73:11 80:4, 9, 20, 23
**$100** 17:17 24:21 90:20
**$20** 64:1
**$3,000** 39:4
**$3,200** 41:7
**$5,000** 89:16
**$50,000** 63:6 67:4, 20 68:10, 13, 21 69:1, 16, 17, 18 70:11, 17 71:9 72:12 73:1, 10, 20 75:2, 4 76:4 77:11 78:13 79:8, 21, 23 88:18 95:22
**$55,000** 77:3
**$8** 66:7

< 1 >
**1** 61:19
**1)(a** 8:4, 18 9:11
**1)(b** 8:17
**1.5** 40:15 66:3
**10** 85:24 89:15
**10,000** 72:7 89:15
**10:02** 1:1
**100** 2:1
**1005** 1:1
**11:35** 96:9
**12(b)(6** 15:7
**12(e)(6** 62:14
**1200** 2:1
**13** 17:2 26:19 27:11 35:8 52:25
**130** 2:1
**13th** 1:1
**14** 1:1 33:23
**15** 96:22
**1650** 2:1
**1700** 1:1
**18** 93:8
**18th** 2:1
**19006** 2:1
**19103** 1:1 2:1
**19341** 2:1
**1961(1)(a** 7:3, 15, 21
**1961(a** 7:5, 14
**1962(d** 37:25

< 2 >
**2:25-cv-05365-MAK** 1:1
**20005** 1:1
**2026** 1:1 96:22
**21** 25:18 33:23
**21208** 2:1
**2201** 2:1
**24** 31:9
**2525** 1:1
**26th** 82:18

< 3 >
**30** 73:18
**3500** 2:1

< 4 >
**4** 20:22 22:17 24:10 77:2 92:13
**410-821-4888** 2:1
**460** 18:25 37:4 47:15 48:14 50:23 53:9

< 5 >
**5** 24:11 92:13
**50** 69:2 73:10 76:17, 18 79:11
**50,000** 68:20 72:4, 8 89:6 95:21
**500** 1:1

< 6 >
**6** 24:11 87:6 92:18
**6,000** 72:7
**673** 2:1

< 7 >
**70** 77:1
**700** 1:1
**75** 76:18
**75,000** 71:11

< 8 >
**8,000** 77:1
**800** 1:1
**85016** 1:1

< A >
**a.m** 1:1 96:9
**ab** 25:1
**ablations** 59:23
**able** 48:22, 23 68:8, 11 73:18
**absence** 26:4 94:6
**absolute** 72:9
**absolutely** 18:20 25:2 40:23 41:12 70:4 78:24
**abused** 56:11
**abusive** 18:12
**accept** 15:8 18:13 24:9, 14 50:18 61:18, 20 65:18
**accepted** 42:6
**accident** 32:6, 12 33:12 36:12 58:2, 3 62:22
**accidents** 33:11 42:14, 16, 17, 23 43:2, 4, 5 47:10
**accurately** 72:21
**accusing** 7:10 11:23, 24
**acetaminophen** 63:21, 25
**achieve** 33:16 89:2, 24
**acknowledged** 16:3
**act** 7:6, 9 32:23 46:1 51:10
**action** 33:8 42:9 48:17 51:25 66:14
**actions** 38:13 64:6
**actively** 65:20
**activities** 20:16 27:2 33:7 91:3, 4
**activity** 7:3, 14, 24 8:15 13:15 14:1 17:6 18:25 19:10, 15, 16 20:15, 19 23:3 26:1, 13 27:9 32:23 36:4 37:3, 17, 20, 21 38:17 41:1, 2, 21 46:15 47:3 50:4 55:4 56:1, 19, 24 57:8, 11, 15 59:9, 12 60:1, 14 61:8, 9, 21 67:10, 16 69:15 72:24 73:3 75:10 79:3, 20 91:2
**acts** 46:18, 21 48:3, 8 59:16 62:1
**actual** 69:16 80:3
**add** 88:4
**address** 6:19 14:1 27:23 28:25 32:20, 22 83:4 84:17
**addressed** 30:24 94:7
**addresses** 88:24
**addressing** 83:15
**adjusters** 78:23
**admission** 33:10
**admissions** 16:20 90:17
**admitted** 24:20 31:6, 7 53:23
**admittedly** 51:16
**advantage** 38:18 54:10, 16
**adversaries** 15:23 20:12
**adversary** 88:24
**advisement** 94:21
**advocacy** 43:17 45:3
**advocating** 43:7 46:5
**affect** 83:13
**affidavits** 17:18 23:23 24:21 90:18
**agents** 91:18
**ago** 13:3, 7 21:4, 7 90:12
**agree** 19:9 27:18 28:2, 8 29:3 35:11 36:4, 6 51:22 52:24 56:17, 19 61:7 62:21 70:23 79:4 81:5 83:6
**agreement** 80:8
**agrees** 57:21 58:1
**ahead** 5:5 17:4 48:3 74:11 86:2, 3 87:5 92:5, 6
**aimed** 33:7
**ain't** 93:10
**al** 1:1
**allegation** 7:16 29:16 30:13 31:6 32:8

38:22 39:3, 5 49:13 51:25
**allegations** 15:14, 18 17:15 18:13 36:9, 18 38:7 49:20 71:16 82:3 83:7
**allege** 43:1 46:25 47:15 50:16 55:7
**alleged** 8:2 23:18, 25 29:19 31:11 37:9 38:6 39:10 40:7 46:15, 18 48:8, 9 53:23 54:10 58:12 63:5 70:8, 22 77:7, 15 79:6
**allegedly** 12:1 16:17, 18 45:23 58:3 71:18
**alleges** 27:3
**alleging** 33:17 38:1 42:22 64:17 80:8 89:24
**allow** 21:10 22:13 74:7
**allowed** 45:17
**Allstate** 52:14 55:24 84:10
**ambit** 91:19
**amend** 9:7, 12, 18 10:11 11:1 95:16
**amended** 19:1 20:22 22:17 25:22 32:11 34:13 36:18 82:25 95:13
**amending** 10:6, 23 11:1 96:1
**Amendment** 37:22 39:25 40:5, 24 41:19 42:2 53:20, 22 54:13 55:2
56:2, 11 74:1 90:9
**Amy** 1:1 4:10
**analysis** 15:24 17:7 25:15 27:25 35:10, 25
**ancillary** 29:21
**and/or** 58:12
**Andrew** 2:1 5:19
**andwire** 37:8
**annuitants** 27:4
**answer** 18:19 20:3 43:5, 19 58:17 59:7 60:4 62:25 63:9 75:14 82:23 83:10 92:10 93:24
**answering** 95:15
**anticipated** 86:20
**anticipation** 20:15 91:3, 4 92:25
**antitrust** 78:4
**anybody** 11:23 68:11 96:1
**anyway** 15:5 71:5 78:11 89:10
**apologize** 13:8
**appeal** 17:25 51:21 52:24 89:8
**appearance** 4:8
**APPEARANCES** 1:1
**application** 46:8 53:18
**applied** 22:5
**applies** 54:4 55:15
**apply** 20:3, 5 27:25 34:17 44:25 46:4 47:21 49:2, 4 51:18
**applying** 74:14
**appreciate** 44:9
**approach** 35:12 36:7
**approve** 12:13
**approximately** 6:17
**April** 1:1 96:22
**arbitration** 63:4 65:6 67:4, 20 72:11, 15 89:7
**arguably** 55:20 72:6, 12
**argue** 14:23 38:17 82:20
**argued** 18:17 82:15, 17, 19 84:24
**arguing** 4:12 6:5, 7
**ARGUMENT** 1:1 4:6 6:10, 16, 20 10:17 11:2 15:22 24:10, 14 27:7, 12 28:23 42:4 59:10, 13, 19 60:10 61:10, 18 69:10 82:24 89:13, 22 91:22 92:3 94:5, 23 95:23
**arguments** 5:1 20:20 83:15 86:6, 7 87:10 93:9 94:1 95:24
**armed** 40:10
**arson** 7:6, 24 8:1, 10, 11, 16 11:25
**arson/robbery** 95:11
**arsoning** 7:11
**artificially** 92:15
**aside** 58:6 61:15
**asked** 6:15 61:15 94:5
**asking** 17:11 22:6, 12 25:11 78:11 86:20 88:15
**asks** 18:6
**assert** 68:8
**asserted** 82:16
**assist** 37:5
**Associates** 2:1
**assume** 9:9 19:9 21:17, 20 29:3 40:7 45:1 60:7, 13 61:15 62:6 69:24, 25 70:25
**assuming** 60:8 74:21, 25 76:20
**attached** 19:17, 22
**attempted** 63:2
**attempting** 52:16
**attention** 17:23 25:17 26:21
**attesting** 37:11
**Attorney** 16:12, 14 52:4 77:22 80:7
**attorney's** 20:8 23:22
**Audio** 2:1
**automatic** 89:8
**avoid** 46:9
**aware** 9:21 14:16 15:20 18:2 46:8
**awares** 46:7
**AZ** 1:1

< B >
**Bachery** 53:2
**back** 13:9 17:3 20:4, 13 21:10 32:11, 21 33:3 39:6 42:3 49:3 51:14 58:21 73:17 82:15 88:24 89:6
**backwards** 28:22
**bad** 70:13 75:5
**BAILIFF** 4:1
**ball** 22:9
**Baltimore** 2:1
**Baratta** 2:1 5:6, 19, 20, 21, 22 11:15
**Barrata** 12:16
**barrel** 88:8
**base** 58:14
**based** 27:1 36:8 64:20 74:1 83:16
**baseless** 25:18 34:6, 16, 24 35:20 36:12 66:12, 13 68:6 69:20 71:12, 13 72:18, 19 75:11 77:5, 6, 11 88:25 89:1
**basically** 33:12
**basis** 21:1 33:18 36:6 45:3 58:9, 14 61:4 62:24 84:21, 23
**Baylson** 26:18 53:5, 16, 17, 25 54:5
**Baylson's** 16:24 52:25 53:11, 12
**beginning** 23:4 29:20
**begins** 23:3 32:13
**behalf** 4:8, 20, 21, 22 5:11, 17, 20, 23 6:5 11:6, 9, 13
**belief** 34:12
**believe** 10:8, 10 16:4, 10 21:5 32:22 63:9 64:18 68:20 70:4 71:16 76:2, 3 78:13

**believed** 77:24
**belong** 7:13
**benefit** 35:4
**best** 42:24
**better** 84:16
**beyond** 28:4 35:17 41:16, 17 53:4
**Bibas** 13:12 21:3, 8, 21 22:1 23:11 40:16 93:9 95:1, 2
**Bibas's** 13:2, 6 93:5
**bifurcate** 25:9
**big** 37:25
**bigger** 45:4
**bill** 20:8
**billing** 16:15 52:4
**billings** 17:15, 17
**bills** 16:18 17:20 23:14 44:17 51:17 78:6, 10
**bit** 5:5 6:17 31:16
**Blame** 21:6
**Blank** 2:1
**board** 43:14
**bodily** 62:16
**body** 54:19 65:4
**bossy** 13:5
**bound** 16:9
**Box** 2:1 75:3 89:6, 20 91:11
**bribery** 7:7 11:25
**brief** 8:20 14:12 21:15 35:7, 8, 18 46:22 82:25 84:2, 3 91:22
**briefed** 94:1
**briefing** 85:8
**briefly** 32:20, 22
**briefs** 6:17 91:25
**bring** 42:9 47:10 65:19 66:6, 7
**bringing** 23:13, 15 25:13 35:3
**brings** 31:18
**brought** 17:22 25:16 72:14 89:5
**burden** 18:8, 15, 18
**Burritt's** 50:20
**Burt** 2:1 5:11 10:16 11:6 30:3 37:9 38:1 39:2, 12, 18, 25 40:11 41:6 42:10 54:8 55:22 59:19, 23 65:25 68:14 71:4 92:19, 20
**Burt's** 20:5 41:3 71:4 74:19
**business** 72:20
**buy** 63:21

**< C >**
**California** 14:19 21:3 85:6, 7, 17
**call** 10:22 13:24 24:1 75:24
**Calls** 10:18 35:12 38:23 39:7, 11 51:6
**Camelback** 1:1
**Campbell** 34:24 35:13 36:15
**car** 32:6 42:16 62:19
**care** 70:10 71:3
**carefully** 16:2 92:1
**carves** 47:22
**case** 7:13, 14 8:2, 24 9:4 12:1, 24 13:23 16:2, 4, 8 18:5 19:17 22:24 23:5, 13, 15, 17 24:6 26:15, 16 27:22 28:3 31:12, 14, 24 32:3, 18 33:8 34:1, 4, 20 35:13 40:7, 21, 22 42:20 43:25 44:21 45:14, 16, 17, 21 46:24 48:6, 11 51:12 52:1, 4, 11 53:8 54:5, 6 55:24 64:20 65:25 66:15 68:12 71:10 72:13, 20 73:15, 17, 20 74:1 75:1, 7, 25 76:4 77:4, 10, 21 80:8, 20, 25 81:3, 24 82:7, 12, 17 83:9 84:1, 2, 4, 6 85:5, 6 86:2 87:9, 15 90:17 94:10, 15
**cases** 16:15 28:19 30:12, 25 33:14, 20, 25 35:19 41:17 42:25 48:24 63:7 65:22, 24 66:6 72:3, 10 73:19 77:2 81:8, 22 84:10, 15, 19 87:21, 23
**causation** 5:3 12:16 32:2, 6 58:4 62:22
**causes** 14:16
**ceded** 5:14, 25
**Center** 2:1
**Central** 16:5, 22 82:12 85:17
**certain** 48:24 62:8 63:12 66:8
**certainly** 8:11 38:6 43:10 46:2, 25 50:16 56:23 64:24 67:7, 8, 15 75:9
**certainty** 72:10
**CERTIFICATION** 96:16
**certify** 96:17
**cetera** 7:24 8:16 11:25 35:20
**chain** 24:25 25:1
**challenging** 25:5
**chance** 21:15
**charge** 49:21 95:10, 11
**charged** 62:1
**check** 57:11 75:3 79:21 89:20
**checked** 89:6
**chemical** 7:9
**chiropractic** 40:12
**choosing** 56:8
**Circuit** 10:21 14:8 21:24 22:2 28:6, 18 30:20, 23 31:13 33:3 34:25 35:10, 12 40:21 45:14, 18 47:12 57:22 85:16
**circumstance** 53:25 54:3, 7 77:7 78:15
**circumstances** 42:6
**cite** 16:5 41:9
**cited** 8:18, 20 33:25 34:1, 20
**cites** 8:19 91:16
**city** 22:10 31:20 60:17
**civil** 42:9 89:16
**claim** 9:23 25:1, 5, 13, 14, 17 32:14, 15 34:9 40:3 45:18 48:14 49:21 51:25 52:11 58:4 64:10, 22, 23 65:9, 11, 12, 13, 14, 18 77:4 91:17
**claimant** 53:9 63:17 68:17 72:17 77:8 81:1
**claimants** 37:13 40:14 42:10 59:24 63:18
**claimant's** 80:4
**claiming** 33:11, 19
**claims** 19:20 22:20 23:18, 21 25:10 27:1 56:10 63:5, 8 72:7 92:15
**clarify** 59:18
**clarifying** 58:20
**classic** 52:14
**clause** 21:21 22:13 24:9 30:13
**clean** 6:4
**clear** 10:13 37:15 46:11 87:8 92:14
**CLERK** 94:24
**client** 12:7 43:8 45:2 74:22
**clients** 43:21 46:5 86:3 92:17
**client's** 62:24
**Clifton** 2:1
**close** 71:25
**closer** 29:4
**co-conspirator** 50:1

**co-defendants** 11:12
**coercive** 25:6
**Coie** 1:1 4:12
**collateral** 35:4 36:13
**colleague** 4:11 6:6 14:7, 8 16:22
**colleagues** 26:24 84:17
**Column** 61:19
**come** 17:3 20:4 32:21 36:19 44:22 58:10 65:25 73:17 74:1 76:25 77:23 80:16 87:3 89:6
**comes** 12:24 38:25 39:3 49:3 71:11 80:23, 25
**comfortable** 90:8
**coming** 66:5
**committing** 11:25
**common** 41:10 52:18 63:5 80:22
**communication** 13:24 22:7
**communications** 21:10, 22 23:10 55:8
**companies** 40:14 56:7
**company** 40:4 52:10, 17 84:11
**compare** 16:24
**competitive** 13:21 21:8
**complaint** 6:25 7:2, 15, 20 8:14 9:7, 12, 18 10:15 15:9, 14 18:13 19:1 20:12, 22 22:9, 17, 22, 25 23:4, 25 24:2, 4 25:22 27:3 29:19, 23, 24, 25 30:4 31:6 32:11 34:14 35:6 36:9, 18 37:5, 24 38:3, 10, 16 39:22 40:2 42:13 46:23 47:16 48:15 50:12 53:9 56:23 59:16 60:14, 17 61:1, 7, 8 62:11, 12 63:3 64:12 66:24, 25 71:21 72:25 73:7, 9, 12 77:1, 8 79:8, 21 81:23 82:25 83:9 89:23 92:24 95:14, 19, 20, 21
**complaints** 11:21 48:2 56:20 62:13, 15 84:5 96:1
**complete** 84:10
**completely** 39:23
**component** 90:22
**con** 48:23
**concern** 10:3, 6, 9, 23 70:19
**concerned** 95:18
**concerns** 70:13
**conclude** 34:4 36:11 74:8 76:12, 13 77:12 83:8
**concluded** 96:9
**concludes** 80:3
**conclusion** 36:20 74:9
**conduct** 18:11 21:9 24:17, 23 27:5 33:19 47:25 48:24 52:6, 13 53:4 60:25 76:20
**confident** 55:22
**confirmed** 22:2
**confusion** 58:24
**Congress** 8:5 11:21 46:1, 2
**connection** 17:18 45:8 67:12
**consequence** 59:15
**consequences** 42:3
**considering** 87:6
**consistent** 11:11 75:3
**consortium** 70:12
**conspiracy** 5:6 12:17 13:17, 18 37:25 38:1, 14 41:10 82:7
**const** 56:1
**constitute** 18:15
**constitutes** 52:12
**constitutional** 46:10
**construction** 75:24
**construe** 15:9
**contact** 32:12
**contained** 17:19
**context** 13:20, 21 21:8 41:20 44:1, 11 45:23 52:1 53:23 54:2, 12 55:17 72:14 78:4, 14
**contingency** 80:8
**Continue** 26:9
**continuous** 92:23
**contrive** 55:9
**controlled** 7:8, 9
**converse** 79:10
**convicted** 47:9
**convince** 90:21
**copy** 11:21
**core** 30:10 31:12, 13, 24 32:9, 17 69:8 71:21
**correct** 9:7 10:14, 24 11:3 34:12 45:25 55:22 57:16, 25 67:5 75:13 77:20 79:9, 23 81:17 85:12 87:24 95:17 96:17
**correcting** 6:12
**correction** 9:18
**correctly** 54:15
**corrupt** 92:17
**cost** 63:18, 25
**could've** 31:20
**counsel** 5:15, 25 9:1 10:16 44:7 53:4 58:1 94:20
**Counsel's** 6:15
**count** 48:19
**counterclaims** 16:3
**country** 84:19
**County** 63:8 70:10 75:1 77:2
**couple** 13:2, 6 44:14 54:22 81:10 82:17 91:12
**coupled** 34:4
**course** 8:2 13:16 14:7 45:16
**COURT** 1:1 2:1 4:2, 5, 13, 17, 20 5:1, 4, 7, 10, 17, 21, 23 6:1, 6, 8, 10, 12, 15 7:13, 19, 23 8:4, 9, 13, 19 9:1, 3, 5, 9, 14, 16, 20 10:2, 6, 9, 12, 14 11:3, 5, 9, 13, 16 12:5, 10, 14, 18, 20, 22, 24 13:2, 5, 9, 12, 15, 23 14:4, 7, 11, 13, 17, 19, 22, 24 15:1, 4, 16, 18, 20 16:3, 7, 11, 21, 22 17:4, 9, 11, 12, 13, 20, 24 18:2, 10, 14, 21 19:3, 9, 12, 14, 22, 25 20:2, 8, 17, 18, 21 21:2, 6, 13, 15, 17, 20 22:1, 10, 15, 18, 23 23:9, 19 24:9, 13, 22, 24 25:3, 8, 20, 23, 25 26:3, 5, 8, 11, 14, 18, 22, 24 27:1, 3, 8, 14, 16, 19 28:2, 7, 9, 11, 14, 16, 18, 21 29:5, 10, 12 30:2, 5, 8, 11, 17, 19, 22, 23 31:3, 11, 16 32:1, 5, 17, 20 33:1, 4, 6, 9, 15 34:7, 11, 15, 19, 22, 25 35:1, 7, 15, 17, 23, 25 36:3, 6, 16, 22 37:1, 16, 19, 24 38:9, 16, 19, 21, 25 39:2, 13, 15, 17, 22 40:3, 8, 16, 19, 25 41:8, 14, 19, 23 42:1, 5, 20, 22 43:1, 4, 13 44:7, 9, 15, 19, 22, 24 45:6, 15, 19 46:7, 9, 12, 21 47:6, 11, 13, 23 48:3, 5, 13, 21 49:5, 8, 10, 16, 23 50:2, 5, 8, 10, 15, 19, 22

51:2, 4, 14 52:3, 17, 19, 21, 24
53:2, 8, 15
54:14, 17, 19, 21, 25 55:6, 14, 17
56:8, 11, 13, 16
57:1, 3, 5, 8, 10, 14, 17, 20, 25
58:19, 22 59:1, 6 60:5, 7, 9, 11, 13, 16, 20, 22
61:4, 6, 11, 13, 17, 19, 21, 23, 24
62:3, 5, 8, 11, 21
63:5, 7, 11, 13, 23 64:2, 8, 14, 16, 18, 23, 24, 25
65:1, 3, 7, 9, 15, 16, 22 66:2, 4, 6, 14, 17, 21, 23, 25
67:3, 6, 9, 10, 12, 16, 19, 22, 25
68:6, 9, 11, 16, 24 69:4, 7, 11, 13, 22 70:2, 5, 7, 9, 20, 23, 25
71:3, 7, 11
72:10, 13, 14, 21, 23 73:3, 7, 12, 21, 23 74:10, 13, 16, 20, 25 75:10, 13, 16, 21 76:8, 10, 14, 24 77:12, 13, 15, 17, 23, 25
78:7, 8, 18, 20, 25 79:2, 5, 13, 16, 19 80:1, 10, 13, 16, 21 81:2, 5, 12, 15, 19, 21
82:5, 9, 14, 18, 22 83:3, 4, 12, 14, 17, 18, 20, 23
84:13, 15, 23
85:2, 4, 7, 10, 14, 18, 20, 23 86:8, 11, 14, 17, 22, 24
87:1, 11, 13, 16, 18, 20, 25 88:3, 6, 10, 12, 15, 17, 20, 24 89:10, 12, 15, 19 90:13, 16, 19, 23 91:8, 9, 16 92:3, 9, 12, 14, 15 93:3, 11, 13, 16, 19, 23
94:12, 14, 17, 19
95:2, 5, 7 96:5
**Courthouse** 1:1
90:11, 13 91:24
**courtroom** 12:8
43:11
**courts** 17:19
52:12 53:19
**Court's** 15:20
70:18 79:15
**coverage** 64:3
**covered** 30:13
**CRC** 2:1
**create** 9:13
21:10 25:1
46:3 47:1 72:1
**creates** 23:14
**creating** 78:2, 4, 5
**creation** 47:7
48:9 59:11
68:14 78:16
**credibility**
89:14
**credit** 17:24
**criminal** 10:19
47:9
**criminally** 42:8
**critical** 29:18
30:6 51:24
64:22
**Cross** 3:1
**crystal** 92:14
**curious** 9:20
**CVS** 63:21, 25

**< D >**
**damage** 34:12
62:18
**damages** 25:6
32:7, 8, 17
58:13 62:13, 17
63:6, 17, 24
64:5, 6, 11, 12
65:18 66:1
67:3, 19 68:2, 10 69:17, 19
72:4, 7, 17
77:11 79:8
80:3, 9, 20, 23
81:1
**Dan** 4:25
**Daniel** 2:1
**Date** 96:23
**day** 31:9 39:3, 4, 5 76:21 96:1
**DC** 1:1
**deal** 27:16
65:24 95:15
**dealing** 7:7, 8
8:9, 10
**debate** 89:5
**decades** 90:12
**decide** 84:18, 20, 23 85:2
86:20, 24 87:13, 15 88:12
**decided** 69:4
84:18
**decides** 71:12
**decision** 16:5, 24 18:10 23:12
34:24 35:3
56:13 58:21
60:2 84:4 90:9, 15 93:5
**decisions** 23:12
**declarations**
17:19 23:23
24:20 31:7
90:18
**declined** 6:16
**deeper** 15:22
24:11, 13
**defend** 56:6
64:6
**defendant** 9:20, 21 27:3 33:6
82:3
**Defendants** 1:1
2:1 10:1 11:2, 5, 6, 8 15:13
18:23 20:20
33:13 38:16
40:9, 10 42:6, 12 45:21 60:3
66:14, 19 68:12
83:1, 2
**defense** 37:2
**defer** 9:25
**deferred** 5:25
**define** 7:2
8:15 19:6
**defining** 7:23
**definitely** 53:13
**definition** 7:5
95:14
**definitionally**
19:10
**degree** 77:18
**Delaware** 13:13
**demand** 22:5
28:4 80:23
**deny** 87:1
**depending** 74:2
**derived** 36:10
**describe** 63:2
**described**
45:13 63:2
**designation**
13:13
**designed** 25:1
46:2
**despite** 90:17
**detection** 37:3
**determine** 83:10
**Deviney** 2:1
5:13, 14 11:7
**diagnosed** 92:18
**difference**
23:10 77:25
78:1 90:11
**different** 8:5, 6
18:24 21:8
25:18 40:25
52:5 59:14
65:1 68:4, 7
74:10 78:21
81:19 82:4, 5
83:7, 23, 24
92:5
**differently**
52:16 80:24
**difficult** 15:11
18:23 88:14
**diligently** 43:8
**Dilworth** 2:1
**Direct** 3:1 48:7
**directed** 29:25
30:1 40:1
68:13 71:20
72:16 78:16
90:1, 3 92:17
**directing** 32:13, 14 39:14 44:4
50:4, 24 51:11
59:11, 22 72:1
**direction** 43:22
47:1 48:11
63:19 92:20
**directions** 92:19
**directly** 20:8
54:16 56:9
58:17
**directs** 49:13
**disagree** 52:21
61:13
**disagreement**
64:10
**disbarred** 71:4
**disciplinary**
43:13
**discovery** 36:1
65:10 67:13
68:16, 17 69:14
71:17 74:3, 4, 6
75:24 76:22
87:4
**discretion** 84:16
**discussed** 52:6
**discussion** 27:13
**dismiss** 17:21
18:5 84:25
85:9 87:8
**dismissed**
90:16 91:17
**dispute** 58:2
**disrespect** 74:22
**disrespecting**
94:2
**distinction** 18:9
20:9 22:14
29:13, 18 30:6
38:5 44:7, 10,

13, 20 45:9, 10 46:12 47:13, 14 51:24 56:17 70:14
**distinguishable** 31:1
**distinguishes** 67:25
**DISTRICT** 1:1 7:1 8:22 11:20 13:13 16:5, 22 85:17 88:1 91:16
**Dockerty** 91:15
**Docket** 1:1
**docs** 90:1, 3 91:14, 23
**doctor** 29:14, 15, 17, 21, 24 30:1, 2, 3 38:23 55:9 77:9
**doctors** 11:24 13:18, 19 20:25 21:1 23:1 24:1 43:22 44:4 47:1 50:25 54:15 55:8 59:10, 19, 24 63:20 69:23, 24 70:5, 7 71:19, 20 72:1 74:22 75:5, 6 87:22
**doctor's** 13:20
**Doctrine** 15:25 18:7 20:14 26:15 46:7 47:12, 21 48:1 54:3 73:25 74:4 82:16 83:5 90:13 91:2, 18, 20 93:1
**document** 40:1 52:2, 3 68:15
**documents** 20:19 37:10 39:11 43:23 47:2, 5 48:9 51:9, 16 52:9, 10 54:10 59:21 78:17
**doing** 20:6 39:5 40:9 41:3, 6 42:10 78:22 82:5 84:17, 19 93:10
**dollar** 64:5
**dollars** 33:21
**Donzinger** 45:14, 25
**doubt** 19:16
**Dougherty** 16:25 17:1, 2, 3, 10, 12 26:18
**Dougherty's** 17:5
**Dr** 5:11, 17, 23 10:16 11:9 30:3 37:9 39:12, 17, 18, 25 42:10 49:14, 16 50:20 54:8, 9 55:22 59:23 65:25 66:15 67:8 71:4 72:15
**Draconian** 11:19
**dramatically** 80:24
**draw** 20:9, 10 29:12, 13 37:3 38:5 44:7, 10 46:12 47:13, 14 56:17 70:14 72:23 74:9
**drawing** 45:9, 11
**drive** 23:21
**driver** 58:4
**driving** 58:12
**drugs** 7:10
**duty** 43:6 46:4

< E >
**earlier** 34:8 47:18
**easiest** 60:1
**easily** 36:21
**East** 1:1
**EASTERN** 1:1 7:1 11:20
**economically** 65:21
**efforts** 22:19
**egregious** 71:18
**either** 9:23 37:12 60:1 84:22 87:21
**elected** 23:21
**electronic** 2:1 96:18
**element** 31:19 61:21 64:11, 21, 22 84:5 88:5
**elements** 64:9 66:10
**eliminate** 18:19
**email** 51:12
**emails** 51:1
**embracing** 42:4
**emergency** 63:19
**engaged** 55:1, 3 59:8, 19, 20
**engages** 77:22
**engaging** 56:9
**entered** 96:5
**entertain** 55:25
**entertaining** 62:6
**entitled** 54:23 56:5, 6 96:19
**entitlement** 80:4
**entry** 4:7
**error** 9:8
**Especially** 26:24
**Esq** 1:1 2:1
**ess** 64:4
**essence** 37:14, 16 46:17, 23 52:2
**essentially** 17:5 19:6 29:5 41:16 55:7
**establish** 31:20
**establishes** 74:17
**et** 1:1 7:24 8:16 11:25 35:19
**event** 15:12
**eventually** 13:19 22:9 47:5
**everybody** 6:23 73:4 89:17
**everyone's** 34:11
**evidence** 36:12 42:16 44:4 47:7, 8 74:7, 8
**exactly** 10:22 17:11 21:23 33:17 34:13 39:13 40:10 55:23 56:3 89:17, 23
**exaggerated** 22:21
**exam** 39:3 57:11
**examination** 39:4
**examined** 63:20
**example** 53:8 95:18
**exception** 16:4 25:16 34:17 41:15 46:3 51:15 53:17 54:11 58:15 59:4 77:22
**excess** 67:3, 19 95:21
**excuse** 43:22 59:24 64:9 87:20
**executed** 24:20
**EXHIBITS** 3:1
**exist** 42:14 54:7 63:16
**existed** 54:6
**existing** 44:12 45:23 52:7
**exists** 44:2 54:1
**expect** 82:4 93:8
**expensive** 33:13
**experience** 80:22
**expert** 22:8 45:2, 3 71:24 80:6, 10
**experts** 55:11
**explain** 17:5
**explanation** 17:3
**extend** 22:6
**extended** 28:5
**extent** 30:25 33:22 79:25
**Exton** 2:1
**extortion** 7:7 11:25
**extract** 22:19 41:10 52:11, 16 56:4 92:16
**extracting** 41:4
**extraordinary** 42:18

< F >
**fabricating** 22:21
**face** 46:22
**facilitate** 38:13
**facilitation** 68:13
**facing** 87:19
**fact** 8:4 18:18 29:4 44:6 47:4 49:3 56:7 61:15 72:5 76:10 90:17
**factor** 35:23, 24 58:7 64:19
**factors** 57:3
**facts** 15:8 45:4, 12 72:22 74:2, 5
**factual** 38:7
**fair** 36:10
**fairly** 39:18 75:2

**false** 16:17 17:14, 16 22:21 24:20 25:1 37:11 40:1, 11 43:23 44:4 46:15, 22, 23 47:7 49:16 51:1, 8, 9, 16 52:9 54:9 56:10 59:21 62:12 68:9 71:1 72:1 78:8 90:18
**falsehoods** 90:10
**familiar** 16:1
**far** 21:23 22:5 28:5 70:21 77:19 95:13
**Farmers** 24:8
**Fascinating** 13:12
**favorable** 15:10 33:7 34:1
**February** 82:18
**FedEx** 4:9 41:11 56:7 58:4, 13 66:20 68:12 79:2 80:23
**FedEx's** 79:1
**fee** 20:1 66:8 80:8
**fees** 16:16, 17 19:17, 23 23:22 31:18
**fell** 75:25
**felony** 78:6
**Fifth** 40:21
**figured** 12:19
**file** 47:16 48:15 53:10 64:3 66:14 69:22 73:8, 12 80:8 91:24
**filed** 17:25 40:3 56:20, 23 65:14 73:9 77:1, 2 79:7 80:5, 19 85:11 90:4 91:7
**files** 62:11
**filing** 19:6, 7, 11 21:1 23:17 35:1, 9 37:4 48:2, 17 50:12 55:18 59:15 61:1, 7, 8 72:25 73:7 79:20 89:4 90:18 95:19, 20, 21
**filings** 46:19
**finally** 92:1
**find** 21:24 58:8 71:13 76:21 80:10
**finding** 13:19
**Fine** 5:17 61:11 72:23 91:21
**Finish** 74:13
**Firm** 2:1 62:11 66:4 68:25 91:22 94:14
**firms** 11:24 65:19
**first** 4:8 6:24 11:16 17:8 18:6, 19 24:5 28:3 37:22 39:25 40:5, 7, 24 41:19, 25 42:2 53:20, 22 54:13 55:2 56:2, 11 63:4 68:8 71:15 74:1 81:24 82:3, 24 84:17, 18, 20 85:2 86:4 90:9 92:4
**fit** 16:3 58:14 91:11 92:24
**fits** 90:6
**five** 67:6, 17 68:21 69:2 79:9, 17
**Florida** 8:22 16:5 85:4, 5
**flow** 90:14
**focus** 6:21, 22 12:15, 16 27:19 35:8 46:25 82:12
**focused** 81:6 89:3
**focuses** 93:17
**follow** 26:14 51:24
**followed** 52:19
**following** 89:1
**footnote** 17:2 26:19 27:11, 21 52:25
**forced** 64:5
**forcing** 82:22
**Ford** 16:7, 8, 11, 12, 13 17:8, 14, 17, 20 18:4, 6, 9, 22 19:16 20:13, 18 23:5, 11, 12, 17 24:19, 21 25:3 26:14, 16 27:25 28:9, 11 30:11, 14, 15 31:4, 5, 18 33:3, 5, 6 34:4 44:2, 11, 21, 25 45:6, 7 46:13, 14, 18 51:15, 20, 21, 24 52:21, 22 53:19 78:5, 9 88:24, 25 90:6, 9, 15, 20 91:1 93:1 94:10, 14
**Ford's** 28:12 51:22
**foregoing** 96:17
**forget** 61:1, 2, 4 75:4, 5, 6
**form** 58:5
**forms** 59:25
**forth** 21:10
**forward** 81:22 95:16
**found** 91:18
**four** 64:9 66:9 81:8
**fours** 28:12
**Fourteen** 25:21
**fourth** 64:11 92:5
**Fox** 2:1 5:14
**frankly** 36:20 51:7 94:6
**fraud** 8:3, 9, 12, 24 9:2 10:15, 18, 19, 20 12:1 23:20, 24 24:4 26:16 30:13, 14 31:6 32:14, 15 37:8, 14, 16 40:23 41:15, 17 42:1, 9 43:16 44:5 45:22 46:2 48:18, 19 49:3, 21, 24 50:11 51:10, 14, 15 52:2, 8, 12, 15 53:21, 24 54:1, 6, 7, 11 55:2, 8, 24 56:8, 9 59:12 61:1, 16 68:14 71:19, 20 74:19 77:22 84:7, 8, 10 95:24
**fraudulent** 16:14, 17, 18, 20 18:12 23:14, 18 24:17 32:15 33:20 40:2, 3 41:20 47:1 48:9 51:16 55:10 68:15 78:10, 16 79:6 84:6
**frequency** 59:23
**friend** 36:22 41:15 42:5, 18 52:25 75:24 85:21
**friends** 9:25 10:16 25:11 50:18 81:15 87:20
**front** 7:16 8:21 82:20 83:5 93:25
**full** 79:25
**fully** 14:25 94:7
**functions** 64:2
**fundamental** 59:17
**fundamentals** 21:11
**Further** 3:1 23:17 42:14

< G >
**gambling** 7:6
**gate** 23:24
**gatekeeping** 63:16 64:1
**gather** 52:22
**generally** 33:7 53:20
**generate** 72:16
**genuine** 63:17
**genuinely** 33:16 89:2
**getting** 12:18 37:6 41:4 66:9 76:1, 5
**Giles** 91:16, 17
**give** 7:19 8:19 21:18 22:12 36:9 39:12 43:15 55:11 59:23 66:5 85:24 90:2 93:4
**given** 10:10 51:16 53:19 86:15 87:8 90:2 92:22
**gives** 27:6 49:16 78:8
**giving** 94:22
**go** 9:10 11:5 13:9 17:4 20:13 21:22 23:1 26:1 28:22 29:7 30:1 31:12, 13

32:11, 17 33:2 41:15 43:13 48:1 49:13 58:14 60:5 63:21 65:3, 5, 7 72:6, 11 73:21 74:11 88:24 89:21 90:11, 13 92:5
**goes** 21:21 22:9, 10 23:17 26:1, 3 29:1, 14, 15, 20 34:6 39:6 53:4 71:4 76:13 95:16
**going** 5:6 6:5, 7 11:17 12:16, 20, 21, 22 14:23 20:8 21:10 24:14 26:10 29:1 35:17 38:2, 3, 9, 15 40:2 42:15 43:1, 12, 23 47:4, 5 48:12 49:20 52:17 57:5, 21 58:15 60:23 64:1, 3 65:18 68:1, 11 71:5, 7, 9, 17 72:2 75:14 76:16 77:6 78:21 80:8, 24 83:10 85:2 87:3, 4 93:4, 7 94:19 95:8
**gonna** 12:19
**Good** 4:2, 3, 4, 10, 24 5:19, 21, 22 10:5, 21 11:22 69:18 75:23 86:12, 15 91:21
**gotten** 90:20 93:8
**governed** 85:16
**government** 13:16 42:8, 9
**governmental** 20:7 33:8, 16 54:19 65:3 89:2, 25
**governs** 14:4
**granted** 17:21 94:5
**great** 43:13 70:1
**guess** 9:6 61:14
**guidance** 10:21
**guy** 31:21 70:10 71:8 75:25 76:13 89:16
**guys** 38:2 68:19 91:21
**guy's** 76:1

**< H >**
**hall** 22:10 31:20 60:17
**handled** 80:24
**hapless** 49:11
**happen** 11:19 45:1 46:24 67:15 95:13
**happened** 23:20 24:19 35:9 40:12 48:11 84:9
**happening** 44:3 54:8 93:25
**happens** 45:1 60:18 68:3 88:22
**happy** 50:18
**hard** 69:17 95:12, 14 96:2
**harm** 49:7 69:4, 9 79:23, 24, 25 80:1, 18 81:3
**hear** 5:15 12:2 32:21 36:22 37:1 54:14 81:7 85:21
**heard** 42:18 54:15 92:4
**hearing** 6:18 96:9
**heart** 37:8 44:1 59:16 62:1
**heavily** 16:6
**held** 16:22 45:17 47:11
**Help** 10:7 21:2 31:17 34:7 45:4 67:22 78:1 83:25 84:2
**helped** 68:13
**helpful** 17:9 27:22
**helping** 37:5
**Hey** 38:25 68:25 75:25 78:9
**high** 79:13
**higher** 41:4, 10
**highlighted** 53:5
**Higson** 2:1 5:24 6:2 11:11
**hit** 31:21 32:6 62:19
**Hold** 7:20 38:19
**holding** 27:21
**holistic** 57:23 58:7
**home** 39:6
**Honor** 4:3, 4, 10, 16, 24 5:13, 15, 19, 24 6:3 7:12, 17 8:2, 12, 17 9:4, 15, 19 10:4, 25 11:7, 11, 15 12:4, 6, 7, 12 13:1, 8 14:6, 9, 14, 15, 21 15:3, 7, 21 16:20 17:12, 22 18:4, 11 19:2 20:10, 24 22:14 23:16 24:11, 18 25:2 26:21 27:12, 23 28:20 30:16 31:15, 25 32:10 33:2, 25 34:14, 18, 25 35:8, 14, 24 36:10, 25 37:8, 18, 23 39:23 40:20 41:7, 24 42:4, 25 43:10, 16, 18 44:14 45:12, 20 47:2, 20 48:12 49:20 50:14 51:19, 23 53:1, 14 55:20 57:9 58:16 59:3, 10 60:15 61:12, 14 63:1, 10 65:14 66:12 67:14 68:23 71:15 74:5 75:9, 18 77:20 79:12 80:2, 15 81:11, 18 82:2, 11, 25 83:6, 19 84:25 85:13, 19, 22 86:5, 19 87:7, 15 88:2, 4, 16 90:9, 16 91:1, 13 93:2, 21 94:11, 18, 22, 25 95:6 96:3, 8
**HONORABLE** 1:1 4:1
**honoring** 43:6
**Honor's** 59:5 60:2, 4
**hope** 59:17
**hopefully** 68:2 86:15
**hoping** 6:19
**Hospital** 40:21 52:14 55:25 77:8
**hot** 63:22
**hour** 6:17
**hours** 31:8, 9, 10
**human** 88:5
**hundred** 63:12
**hundreds** 31:9
**Huntingdon** 2:1
**Hurlick's** 27:2
**Huston** 1:1 4:15, 16, 19 6:3, 4, 9, 10, 11, 14 7:12, 17, 22 8:1, 8, 11, 17, 25 9:2, 4, 6, 12, 15, 17, 25 37:1, 7, 18, 21 38:4, 11, 20, 24 39:1, 9, 14, 16, 21, 23 40:18, 20 41:6, 12, 18, 22, 24 42:21, 24 43:3, 10, 18 44:8, 13, 18, 20, 23 45:5, 10, 16, 20 46:14 47:19, 24 48:6, 20 49:2, 6, 9, 15, 18, 25 50:3, 6, 9, 13, 16, 20, 24 51:3, 5, 19 52:20, 23 53:1, 7, 13, 16 54:18, 20, 22 55:1, 13, 16, 19 56:15, 21 57:2, 4, 7, 9, 13, 16, 19, 24 58:16, 20, 23 59:2, 7 60:6, 8, 10, 12, 15, 18, 21 61:3, 5, 10, 12, 14, 18, 20, 22, 25 62:4, 7, 10, 20, 25 63:9, 12, 14, 24 64:13, 15, 17, 21 65:2, 5, 8, 13, 17 66:3, 11, 19, 22, 24 67:2, 5, 7, 11, 14, 18, 21, 24 68:5, 7, 22 69:3, 6, 8, 12, 21 70:1, 4, 6, 8, 18, 21, 24 71:2, 6, 14 73:2, 6, 22, 24 74:12, 14, 17, 24 75:9, 12, 14, 17 76:6, 9, 11, 23 77:6, 14, 16, 19 78:15, 19, 24 79:1, 4, 12, 14, 18, 24 80:2, 12, 14, 17 81:3, 11, 14, 18, 20 82:2, 7, 11,

15, 19, 24 83:6, 14, 18, 21 84:12, 14, 22, 24 85:3, 5, 8, 12, 16, 19, 22 94:10, 11, 13, 16, 18, 25 95:4 96:3, 8
**hypothetical** 21:17, 20 29:13 45:13, 22 46:20 49:19

< I >
**Ibuprofen** 63:18 77:9
**idea** 16:12 19:5 24:16 25:9 28:21 37:2 56:1 68:19
**ignore** 38:21 91:10
**ignored** 88:23
**imagine** 40:6, 8 60:24 77:23
**imagined** 40:13
**immune** 42:17 48:16 49:19 52:15
**immunity** 42:7 47:6, 21 48:24 73:17, 25 83:5
**implemented** 46:11
**implications** 34:2, 3 87:2 90:14
**important** 38:5 42:3 44:20 46:6 48:7 52:8 71:16 93:12
**impose** 18:8 71:22
**impress** 18:10
**improper** 33:17 89:3, 25 90:1
**inaudible** 65:19
**inception** 26:17
**incident** 15:2 93:17
**incidental** 20:15 21:24 22:3 23:6 27:13, 24, 25 28:1 30:9 90:24 91:2 92:25
**incidents** 15:1
**inclined** 51:23
**includes** 20:19
**including** 29:4 39:22
**increased** 24:6
**incur** 64:5
**independently** 71:24
**Index** 3:1
**indifference** 35:2
**indiscernible** 47:10 50:11 53:10 60:24 62:16 66:7 67:4, 17, 23 69:4 76:2, 10 78:11 80:5 81:6, 7, 12 84:1 86:4 92:22 93:6 94:2 95:11, 25
**induce** 27:4
**inference** 36:10
**inflated** 17:20 20:1 23:22 25:6 92:15
**inflicted** 35:4
**influenced** 83:21
**information** 16:14, 15 20:6 37:6 49:17 55:11 78:3
**initiate** 47:17 48:15 79:22
**initiating** 73:10
**initio** 25:1
**injured** 64:15
**injuries** 31:22 35:4 92:18
**injury** 22:20, 22 29:6 58:5 62:16, 23 64:7, 17 65:21 66:25 68:19 81:4
**input** 20:7
**instance** 41:7
**instruct** 48:4
**instruction** 9:10
**insufficient** 35:2
**insurance** 40:3, 4, 14 52:10, 17 55:24 63:3 64:2 84:11
**insurers** 56:6, 10
**intended** 94:4
**intent** 38:13
**intention** 50:3
**intentionally** 47:8
**interest** 6:3 58:20
**interesting** 10:17, 18 16:11
**interests** 43:20
**interlineated** 73:9
**internet** 10:21
**interpret** 39:18
**interpretation** 10:18 37:22
**interpreting** 46:1
**interprets** 46:9
**interstate** 10:19, 20 47:16 48:13, 15 73:8
**introduce** 12:7 74:7, 8 80:6
**introduced** 25:15 39:11
**involve** 22:7 23:2
**involved** 17:14 74:18 81:9 86:6
**involves** 22:19 33:6
**involving** 7:6
**irrelevant** 40:4
**issue** 5:2, 3, 6 18:12 30:24 65:10
**issues** 6:22 10:1 83:15 94:7
**its** 80:22

< J >
**James** 2:1
**Jersey** 39:6
**Jim** 4:24
**job** 69:18
**Joe** 39:7
**John** 2:1 5:24
**join** 11:7, 15
**Jones** 38:25 39:7, 12, 20 49:14, 16
**JUDGE** 1:1 7:1, 16 8:21 9:21 13:2, 6, 12 16:24 18:17 21:3, 7, 21 22:1 23:11 25:17 26:18 29:8 32:7 36:20 40:16 48:19 52:25 53:5, 11, 12, 16, 17, 24 54:5 58:8 69:4, 15 81:12, 16 82:13, 19 83:2, 4, 8 84:18, 20, 25 89:23 92:2 93:5, 25 95:5, 6
**Judgement** 76:21
**judges** 38:21 83:19
**Judgment** 69:10 73:16, 20 74:14, 15
**judicial** 80:22
**jump** 75:8 79:5 81:6 85:23 86:3 87:5
**jumping** 5:5 86:2
**jurisdiction** 80:7 85:15
**jury** 9:10 31:20 48:4, 7, 12 72:2 74:8, 9 76:11, 12, 15 77:12 80:3
**justify** 35:3

< K >
**Kathryn** 96:23
**KEARNEY** 1:1 4:1
**keep** 26:10 72:8
**keeping** 72:4
**key** 39:24 79:24
**Khan** 87:3
**kidding** 21:7
**kidnapping** 7:6
**Kimberli** 2:1
**kind** 9:22 22:10 55:3 62:18
**kinds** 21:22
**knew** 68:9 71:19 72:3 74:21, 25
**know** 4:21 9:22, 23 10:12 11:18 15:6, 14 16:1 17:14, 23 21:6 26:20 31:1, 9 33:8 37:11 38:2, 6, 9, 11, 15, 21 39:18 42:15 45:16 46:5, 22 47:6 48:1, 25 49:6, 10, 11, 13, 17 50:22 52:19 53:21, 23 55:22 56:5 59:15, 18, 23 60:22 61:15 62:15 63:20 68:1 69:19, 20 70:12 71:22, 24

72:6 73:19 74:3, 6, 13, 18 75:1 76:1 77:19 78:9 80:21, 22 81:9, 21 82:15 83:15, 19 84:10 85:1 87:19 88:7, 23 89:21 90:16, 24 92:20, 21
**knowing** 59:20 62:12
**knowingly** 43:22 46:23 50:25 78:16
**knowledge** 49:24 86:12
**known** 22:1
**knows** 10:14 39:25 47:4 66:13 68:8, 10 69:24 71:1, 3 72:9, 19 75:4, 5 78:2, 4, 5, 8
**Kurland** 1:1 4:10, 11, 15, 18 6:13

< L >
**L.A** 85:10
**la** 13:18
**lack** 17:15
**laid** 74:5
**Lance** 2:1
**land** 53:11, 12
**language** 20:13 26:13 88:22 89:1 90:6, 25 91:11 92:25
**larger** 82:8 92:16
**Law** 2:1 10:20 11:24 16:15 19:19 23:18, 21 27:23 28:3 31:17 34:20 39:24 57:10 85:16 91:11, 21 94:6, 14
**Lawful** 79:13
**lawsuit** 13:25 18:7, 15 21:11 34:2, 3 36:13 46:20 47:17 48:15, 18 55:18 62:24 63:16 64:4 69:22 73:11 79:22, 23 80:5 90:4 91:7
**lawsuits** 25:18 33:19, 20, 25 34:5 36:11 47:10 89:5
**lawyer** 23:13, 14, 15 24:25 29:16 39:7, 19 44:25 45:2 49:8, 11, 17, 19, 22 58:11 65:17 67:23, 25 68:1 70:15 71:8 75:3 76:16, 19 78:1, 2, 3, 5, 9 84:5 87:4
**lawyers** 23:2, 21 24:19, 20 39:14 43:6 46:4 55:15 65:21 78:23 82:5 90:17 91:19, 21
**lawyer's** 45:8 60:16
**lays** 75:18
**leap** 38:16
**leave** 9:7, 18 10:10 95:16, 25
**led** 24:6, 21 90:15, 19
**left** 76:14
**legal** 14:16 15:23 27:25 35:5 40:2 73:13
**legally** 40:4
**legitimacy** 89:4
**legitimate** 19:19 45:18
**Lemon** 16:15 19:19 23:18, 21 31:17
**length** 19:5
**letter** 51:12
**letters** 22:6 28:4, 5 91:6
**letting** 84:16
**levels** 52:6
**leveraging** 56:8
**liability** 50:7 51:13
**light** 15:9
**limited** 7:8 53:19
**limits** 67:20
**line** 13:24 59:15 70:14 72:23 82:1
**listed** 7:8
**listen** 71:5, 7
**literally** 21:4, 7 55:14 63:25 84:18
**litigation** 21:24 22:6 25:16 26:2, 3 29:2 32:25 33:1 44:2, 12, 16 45:8, 9, 24 46:17, 19 52:1, 7 54:2, 6, 12 59:4 69:16 77:21 80:25
**little** 5:5 6:17 31:16 66:5 92:4
**LLC** 2:1
**LLP** 1:1 2:1
**Loft** 2:1
**Look** 7:3, 15 13:10 14:11, 13 15:24 18:25 22:8 23:5 25:12 26:13 31:4, 21 35:1, 18, 19 41:16, 17 57:22 60:23 75:25 76:16, 25 89:23 91:20 93:5, 19 94:8
**looked** 35:7 81:23 84:2 91:25
**looking** 10:7 25:17 48:3 88:8 90:25
**lose** 57:18 69:18
**loses** 69:17
**losses** 70:11
**lost** 31:16 70:11 89:12
**lot** 14:4 71:8 77:3
**love** 80:10
**low** 76:17, 18
**Luke's** 40:21 52:14 55:25
**lying** 69:23, 24 70:7

< M >
**mail** 8:3, 9, 12 9:2 12:1 37:8 43:23 44:5 48:10
**mailings** 55:7
**Major** 69:5
**making** 6:4, 10 51:5
**man** 77:2, 3
**mandatory** 63:4 65:6 72:11, 15 89:7
**manner** 57:23
**manufacture** 47:8
**manufacturing** 42:16 52:9
**map** 87:8
**Marc** 12:8 23:25 40:1 43:19 44:3 47:1 48:11, 16 50:22 59:22 62:2 69:10 71:18, 19, 25 72:9, 19 74:4, 6, 17 77:10 92:16
**marginal** 22:20
**MARK** 1:1 4:1
**Marked** 3:1
**Market** 1:1 2:1
**marking** 72:25
**massive** 77:25 78:1
**materials** 49:12
**matter** 4:5, 6 7:7 25:3, 8 28:24 39:24 94:20 96:19
**matters** 38:14 90:11
**maximize** 43:8
**MD** 2:1
**mean** 8:22 11:18 13:5 18:24 35:19 42:12 43:14 45:11 47:8, 9, 24 50:16 51:7 53:2, 5, 14 55:9, 17 58:9 62:5 63:16 64:3 65:10 67:7 68:3 69:9, 22 76:9, 12 79:7, 9, 10 81:21 82:7, 23 87:22 94:13
**meaning** 56:22
**means** 21:24 33:17 42:7, 17 89:3, 25 90:1
**meant** 27:4
**measure** 58:13
**medical** 20:6 22:21 23:7 29:9 37:11 66:16 70:13 77:17
**meet** 34:5
**meetings** 51:6
**meets** 32:24
**memoranda** 19:4
**memorandum**

87:3
**men** 38:22
**mention** 25:19
**mentioned** 33:24
**Merchant** 7:1, 16 8:21 81:12, 16 82:13, 19 83:4, 8 84:25 93:25
**Merchant's** 9:21 83:3
**mere** 44:5 56:7
**merits** 95:16
**met** 66:10
**Miami** 81:13, 15
**Michael** 1:1 4:11, 13, 15 6:4, 5
**middle** 44:15
**million** 17:17 24:21 40:15 66:3, 15 67:6, 17 68:21 69:2 72:17 79:17 81:1 90:20
**mine** 75:24
**minute** 16:12 18:22 28:23 48:21 56:14
**minutes** 85:24
**misrepresentations** 31:12
**missed** 84:3
**missing** 88:20
**misspoke** 58:24
**mistakenly** 8:18
**Mm-hmm** 62:20
**moment** 7:18 37:9 48:18 51:14 58:21 73:4
**money** 24:7 36:14 43:21 52:16 71:8 90:5, 19
**Montway** 23:11
**moot** 95:12, 14
**mooting** 96:2
**morning** 4:2, 3, 4, 5, 10, 24 5:19, 21, 22
**motion** 17:21 86:21 87:1 93:12
**Motions** 84:25 85:9
**motivated** 43:20
**motive** 34:25 36:14
**Mottway** 95:3
**Motway** 40:16, 19
**move** 9:17 81:21
**multiple** 63:15 64:1
**municipal** 73:11
**murder** 7:6, 24 8:1, 10, 11, 16 11:25 95:10
**murder/arson** 8:24
**murdering** 7:11

**< N >**
**naked** 77:22
**name** 6:4 37:10 59:25
**narrow** 53:24
**nature** 6:19 9:8 80:18
**nearly** 82:20, 21
**necessarily** 51:22 76:2, 3 83:9
**necessary** 9:17 24:3, 5
**neck** 70:13
**need** 7:17 9:6 15:8 18:12 20:21 24:2, 3 32:1 37:13 38:6, 17 40:15 58:11 59:24, 25 63:21 77:9 90:7
**needed** 58:10 73:21
**needs** 15:24 55:10
**negli** 58:11
**negligence** 25:5, 10, 13, 14 31:20, 24 32:6 34:9 58:12 64:10
**negligent** 71:23
**Neither** 40:5
**network** 92:17
**never** 17:4 22:2 24:5 40:12 45:1 64:3 72:10 74:3 76:11 80:5 84:9
**New** 11:20 39:6 81:24 91:17
**nexus** 48:13 50:11, 23
**Nice** 12:10
**Ninth** 85:16
**Nobody's** 11:23, 24 28:5
**Noerr** 12:2 49:3 51:17 53:17 54:10, 23 73:24 83:4 84:4 91:9, 17
**Noerr-Pennington** 5:2 6:21 12:15, 25 15:25 18:7, 20, 21 20:3, 14 22:5, 7, 11 24:16, 22 25:12 26:15 27:16 28:5 32:24 38:18 42:7 46:7 47:12, 15, 18 48:25 49:1, 19 51:17 53:18 54:3, 16 55:15 56:2, 17, 25 57:18 59:3 60:3, 24 76:25 78:14 82:9, 16, 20 83:2, 10, 16 84:13, 20, 23 90:12 91:1, 15, 19, 23 93:1 94:6
**Nolan** 2:1 5:13 11:7
**non-existent** 92:18
**North** 2:1
**note** 94:2
**noted** 51:20
**notes** 93:8
**noting** 53:17
**nuisance** 62:18
**number** 35:19 45:4 71:9 75:8 76:17, 18 79:6, 9, 16
**numbers** 70:16
**NW** 1:1

**< O >**
**oath** 17:15 43:11 75:3
**object** 77:3
**Objective** 26:5 34:6 36:6 64:20 76:11, 12
**objectively** 25:18 34:16 61:4 64:20 66:12 68:6 71:12, 13 72:17, 22 75:11 77:4, 6, 11, 14 88:25 89:1
**obscene** 7:7
**obviously** 10:25 12:13 16:9 40:7, 8
**occupied** 82:21
**occur** 43:2 51:11
**occurred** 42:23 50:17
**occurring** 37:9 44:1 45:23 54:11
**office** 13:9 38:23 42:11
**Oh** 4:18 8:19 23:10 28:8 51:2 69:15 77:3 82:14 89:10 95:4, 6
**Okay** 4:14 5:4, 7, 8, 17 10:2 11:5, 9, 13, 16 12:2, 19, 23 13:9, 14, 23 14:6, 22, 24 15:4 16:21 18:3 19:3, 7, 9, 12, 14 22:6, 15, 18, 23 25:3, 8, 20, 23, 25 26:5, 8, 12, 18 27:8 28:14, 16, 21 30:5, 8, 11, 13, 17 31:3, 16 32:20 34:11, 15, 19, 22 35:15 36:7, 22 37:1 38:19 39:5, 16 40:25 41:14, 20 44:24 45:6 47:17 50:2, 5 51:4, 14 52:19, 20 53:15 54:25 55:6 56:15, 18 57:1, 2, 4, 9, 25 58:1, 19 59:1, 6 60:12 61:3 62:7, 10, 21 63:11, 13, 23 64:14 66:7 67:18, 22 68:18 69:7 70:1, 2, 8, 9, 20, 24 71:3, 10 73:6, 16, 22 74:10, 16, 25 75:16, 23 76:15, 19, 20 78:18 79:5, 16, 17 80:12, 14 81:15, 19 84:6 85:2, 20 86:11, 14, 22 87:13 88:3, 6, 12, 13, 15 89:19

93:20, 23 94:12, 17, 20
**Old** 2:1
**once** 17:21 45:1 51:8
**ones** 44:22 55:20 65:23 77:7
**ongoing** 27:4 52:1 70:13 85:8
**operate** 92:19
**operating** 41:13
**operationalize** 52:15
**Operator** 2:1
**opined** 22:2
**opinion** 8:21 13:2, 6, 12 14:8 27:12 40:17
**opinions** 88:22
**opportunity** 11:1 14:10 95:1
**oppose** 10:25
**opposed** 29:16, 20 43:16 56:9 80:25
**ORAL** 1:1 4:6 6:15 94:5
**order** 9:13 90:10 91:11 92:14 95:9 96:5
**organically** 23:13
**originally** 6:16
**ought** 53:22
**outcome** 35:2
**outcomes** 34:1
**outside** 13:16 72:14

**< P >**
**P.C** 1:1
**P.O** 2:1
**PA** 1:1 2:1
**pack** 63:22
**page** 8:7 35:8
**paid** 17:18 24:7 35:21 41:7 90:20
**Pain** 2:1 5:12, 18 50:25 63:20
**papers** 11:24
**paperwork** 39:8
**paragraph** 7:20 18:25 20:22 22:17 24:10 37:4 47:15 48:14 50:23 53:9, 10 73:8 92:18 95:18
**paragraphs** 7:3 92:13
**part** 27:4 29:1, 22 30:10 31:19 32:15 35:6 38:11 62:9, 14 69:8 71:23 79:24 86:23, 25 92:23
**participate** 49:23
**particularly** 15:23
**partition** 25:9
**partner** 4:25
**Party** 11:14 13:17 16:16 19:23 44:17
**patience** 44:9
**patient** 29:14, 17, 20
**Paxson** 2:1
**pay** 24:7 26:21 40:15 65:17 78:23
**paying** 24:21 71:8
**payments** 56:4
**PC** 2:1
**pedigree** 66:4
**pending** 81:9
**Pennington** 12:3 49:4 54:11, 24 73:25 83:5 84:5 91:10, 18
**PENNSYLVANIA** 1:1 52:17
**people** 4:21 31:7, 19 37:5 47:8, 9 58:1, 9 64:15 66:6 77:3 86:4 95:15
**percent** 63:12
**perform** 37:12, 13
**Perkins** 1:1 4:12
**perpetrate** 59:20 71:20
**perpetrated** 52:9
**perpetrating** 55:24 71:19
**perpetration** 59:21 74:18
**person** 10:19 13:17, 18 24:25 29:24 71:20 72:1
**personal** 22:20 65:20
**persons** 28:4
**persuade** 73:18
**pet** 60:15
**petitioining** 32:23
**petition** 13:16 21:21 22:13 24:9 30:12 55:11 75:21 78:25 84:7 90:14 91:3, 24
**petitioning** 13:15, 25 17:6 18:8, 16, 25 19:10, 15, 16 20:14, 15, 18 26:1, 13 27:2, 9 32:23 36:3 37:3, 17, 19, 21 38:17 41:1, 2, 21 47:3 53:3 54:8, 17 55:4, 12, 21 56:1, 18, 19, 24 57:8, 11, 14 59:9, 11, 12, 20 60:1, 14 61:8, 9, 21 67:10, 16 69:15 72:24 75:10 79:3, 20 91:2, 3, 4
**petitions** 19:17 20:1
**Philadelphia** 1:1 2:1 5:18 11:13, 14 63:4, 7, 8 70:10 73:20 75:1 77:2
**Phoenix** 1:1
**phone** 51:5
**phonetic** 16:2, 25 23:11 24:15 45:14 50:21, 25 53:2 54:8, 9 62:14 91:16 93:5 95:3
**phoney'ing** 64:11
**phony** 19:25 32:8 44:17 66:16 78:2, 3, 4, 5
**Piccillo** 2:1 5:18 11:14 38:2
**pick** 63:13
**place** 24:5
**Plaintiff** 1:1 15:10 19:4
**plaintiffs** 6:5 20:19 71:23
**plaintiff's** 20:24 24:2 25:21 27:1, 7 33:24 65:20 76:16, 19 80:7 87:4
**plausibly** 39:18
**pleaded** 15:9
**pleading** 8:23 79:11
**Pleas** 52:18 63:5
**pleasant** 88:11
**Please** 4:2 12:5, 14 17:13 22:18 26:11 39:12
**pled** 8:15 41:8
**point** 10:5 19:4 22:4 29:12 30:18 39:15, 24 41:9, 25 43:3, 14 46:6 47:2 51:10 52:8 53:21 56:3 59:17 61:25 63:15 65:11 69:11, 13 71:25 80:17 84:9 87:2 88:17 90:7, 21 92:5
**pointed** 26:19
**points** 53:4 91:13 92:8
**position** 10:1 11:8, 15 18:23 27:21
**positions** 18:24
**possible** 47:18
**possibly** 10:17
**potential** 35:2
**practice** 92:19
**pre** 22:5 34:1, 3 44:11 46:16
**predicate** 46:18, 21 48:2, 8 59:16 62:1
**prejudice** 9:23
**pre-litigation** 22:3, 8 28:4 45:9 52:6
**Premier** 2:1 5:11, 18
**preparation** 52:3
**prepare** 40:2 43:22 50:25 90:3

**prepared** 94:3
**preparing** 39:19
**prescient** 76:15
**present** 20:20
**presented** 77:8 94:21
**presiding** 4:1
**presumed** 62:17
**pretty** 10:21 91:25
**prevail** 44:16
**prevailing** 16:16 19:23 44:17
**preview** 76:22
**primacy** 82:1
**primarily** 35:4
**principal** 41:25 55:5
**principally** 28:20
**principle** 46:9
**principled** 66:9
**prioritized** 83:1
**probably** 49:7, 20 95:10, 11
**problem** 6:14 8:13 11:19 62:14 81:24 83:9
**problems** 46:10
**procedures** 37:11
**proceed** 12:4 45:17 64:23, 25 65:1
**Proceedings** 2:1
**proceeds** 96:18
**process** 35:5 89:21
**procuring** 33:7
**produced** 2:1
**producing** 34:1
**professional** 43:7
**Program** 69:5
**prohibit** 53:20
**promise** 58:17
**promised** 60:3
**proof** 64:11, 12
**property** 64:7 81:4
**proposition** 31:5 42:18
**prosecuted** 42:8
**protect** 24:17 53:21 55:2 60:25 90:10
**protected** 13:20 24:22, 23 40:5, 23 42:2 45:7 54:13 56:2, 24 60:25 78:14 91:9
**protection** 53:22 56:11
**protects** 20:14 24:24, 25 39:25 41:20 91:2
**prove** 48:12 71:17 72:2, 3 74:6
**provide** 23:1 47:6 74:7
**providers** 92:17
**provides** 18:4 31:18
**purportedly** 43:20
**purpose** 52:9
**purposes** 25:4 39:19 41:4 55:23 73:21 79:7, 19 95:23
**pursue** 92:15
**pursuit** 36:13
**put** 8:5 14:10 18:12, 14 31:9, 10 47:5 48:12, 18, 21 58:6 62:23 63:22 64:24 70:15 73:3 91:12 95:1
**putting** 37:10

**< Q >**
**quantum** 34:12
**quasi** 76:15
**question** 6:24 18:6, 11, 20 19:21 25:11 32:7 33:18 42:5 43:5 48:1 58:17 59:5 60:4 73:14 74:20 79:15 83:10 84:20 86:1, 20 89:4 94:8
**questions** 6:18 36:23 89:3 92:10 93:22
**quibble** 56:22
**quickly** 12:12
**quite** 53:19, 24 63:13
**quote** 18:10
**quoted** 34:24

**< R >**
**racketeering** 7:2, 14, 23 8:15
**radio** 59:23
**RAF** 39:12
**raised** 9:21, 22 10:4
**reach** 21:22
**read** 16:1, 2 20:23 21:13 22:16 34:3, 14, 15 35:16 36:17 51:19, 20 77:15 91:1
**Reading** 2:1 33:15 51:22 90:8
**reads** 11:23 28:1
**real** 19:16 25:10 27:13 43:4 64:6 71:9 77:9
**reality** 66:5
**really** 14:4 25:10 27:17, 19 32:9 46:8 51:8 53:23, 24 70:9 74:8 75:17
**reason** 11:22 22:12 26:21 43:15 44:24 47:20 54:22 55:21 59:2 77:20 78:5 86:1
**reasonable** 74:7, 9
**reasoning** 16:13 17:5
**reasons** 10:11 28:13 55:5 63:2 71:14 82:2
**Received** 3:1
**recognize** 11:1
**recognized** 52:12, 13 53:18
**record** 6:4 22:21 73:16
**recorded** 2:1
**recording** 2:1 96:18
**records** 23:7 44:4 52:4 66:16 72:6 78:2
**recover** 36:14
**recovery** 35:3 43:9
**Recross** 3:1
**Redirect** 3:1
**redress** 39:20
**Reed** 96:23
**referrals** 65:20
**regardless** 93:24
**Rehab** 2:1
**reject** 15:14 59:3 60:2, 8
**related** 83:15
**relative** 17:6
**relevant** 45:12
**relief** 49:21
**rely** 28:20 80:22
**remedy** 11:19
**Remember** 32:10 91:6
**remotely** 82:12
**removed** 27:10
**repeatedly** 37:24 41:9 47:16
**Replete** 7:20 45:3
**report** 24:3 29:5, 16 39:2 45:3 68:14 72:15 80:11
**reports** 20:5 21:1 23:1 29:9 32:14 40:11, 12 45:2 67:8 72:1 86:9, 12, 16 90:3, 4
**represent** 9:25 43:12 68:11
**representations** 20:20
**represented** 72:21
**representing** 43:20
**request** 9:7 20:21
**requested** 4:6
**requires** 90:9
**resolution** 23:20
**resolve** 93:24
**resolved** 33:21, 22, 23
**respect** 53:1 61:22 66:4, 11 91:20
**respectfully** 9:7 18:3 23:5 26:7 36:20 47:19 87:7
**Respectively** 77:25 78:12
**respond** 87:9
**response** 88:17
**responsibility** 43:7
**rest** 94:1
**result** 33:16

89:2, 25
**retained** 22:8
**retest** 76:19
**reveal** 74:2
**reverse** 28:23
**reviewed** 42:25
**Rhinehart** 10:3, 4
**Rhinehart's** 12:16
**Rhynhart** 2:1 4:25
**Rhynhart's** 86:15
**RICO** 16:4 32:3 40:23 45:18 46:1, 21 48:14 50:6 51:13, 25 52:14 59:16 62:1 82:7 90:16 91:17
**ridiculous** 10:18, 22
**rife** 84:7
**right** 4:19 6:1, 8, 15, 21 7:13 8:6, 14 9:3, 11 10:22 11:16 15:2, 3, 4, 16 16:21 19:2 20:2, 17 21:2 23:19, 24 25:8 26:5 27:7, 8, 14 29:6 31:18 32:4 34:16, 18 35:11 36:16 39:9 41:15, 22 42:4, 7, 21 44:19, 24 45:15 48:5 55:6, 19 57:6, 17, 20 60:14, 18 61:11 62:16, 18 63:11, 25 67:14, 20 69:18, 25 71:6 73:12 74:10, 16 75:2 76:6, 17 77:18 78:23 79:2 82:5, 6, 10 83:5 84:10, 14 85:4, 7, 11, 18 87:11, 21 88:1 89:8, 9, 10, 15, 19 90:23 91:8 92:3, 9 93:4, 20 94:12 95:5
**rights** 18:8, 16
**rise** 94:24
**Road** 1:1 2:1 87:8
**roadmap** 12:13 18:4
**robbery** 7:7
**Rohn** 1:1
**roll** 37:16, 19
**rolled** 90:4
**roll-up** 29:8
**Rome** 2:1
**Romero** 16:2, 4
**room** 63:19 71:9
**Rothchild** 5:14
**Rothschild** 2:1
**round** 11:17
**Ruhn** 4:11
**rule** 22:12 43:15 45:25
**run** 12:21 29:23 50:17
**running** 15:7, 23 20:12 24:15, 16

**< S >**
**sake** 72:4
**Salomon** 2:1
**saw** 6:16 81:23, 24 90:16 94:6
**saying** 13:24 14:15 16:15 43:7 44:15 47:14 53:25 54:5 55:10, 12 57:12 67:17 70:2 71:25 72:16 74:13 82:25 95:8
**says** 18:14 21:23 22:3, 9 30:4 37:24 38:25 39:7, 12 41:16 63:20 65:22 68:1 71:3, 11 72:13 75:1, 4, 7, 23 76:15 77:10 78:23 79:17, 21 80:18 81:1
**scam** 55:24
**scared** 87:5
**scheme** 20:24, 25 22:19, 24 23:8 27:4 29:20, 21, 22 30:10 32:11, 16 37:25 38:12, 13 44:1 46:24, 25 56:3 92:23
**school** 57:11
**scope** 91:15
**seated** 4:2
**second** 8:14 17:3 25:25 29:1 32:24 34:6 38:19 45:14, 18 48:23 52:7 56:16 57:5 62:9 78:9 89:7 90:7
**secret** 21:9
**secrets** 13:23
**section** 8:5, 6 33:1
**securing** 43:21
**see** 12:10 13:2, 5, 6 29:14, 24 30:1, 2, 3 32:1 39:7, 12 43:13 49:14 60:22 62:13 80:10 81:16 83:25 84:1, 7 95:12
**seeking** 39:20 73:10 79:23
**seeks** 33:16 89:2, 24
**seen** 55:20 84:1
**sees** 29:15, 21 39:7
**segregated** 48:22
**selling** 7:10
**send** 67:13 79:17
**sending** 29:19 51:1
**sends** 29:15, 17 39:8 78:22
**sense** 26:8 47:21 53:19 80:22 83:14 86:3, 8
**sensible** 37:22
**sent** 20:6 52:10
**sentence** 22:16 26:20 27:11, 21 68:23
**sep** 48:23
**separate** 25:11
**separated** 11:22
**sequence** 46:16 60:21 75:18
**series** 15:1 27:5 30:12 57:22
**serious** 80:13 92:18
**seriously** 18:17
**serve** 21:1
**served** 84:16
**service** 2:1
**serving** 19:7, 11
**set** 61:15
**sets** 87:2
**settle** 33:14 35:3
**settled** 25:21 35:19 58:6
**settlement** 22:20 23:22 41:4 73:21 79:19
**settlements** 17:18 25:6 41:10 92:16
**settling** 34:3
**severe** 62:16, 23 66:25
**severed** 49:1
**sham** 25:16 26:2, 3 29:2 32:25 33:1, 6 34:17 58:15 59:4 72:20 77:21
**shift** 69:14
**shifting** 66:8
**shot** 8:14
**should've** 33:20
**show** 32:2, 6 39:11 44:16 72:3 80:4 84:3
**shows** 74:4 84:3
**sic** 4:11
**side** 18:14 28:23 73:4 95:8
**sides** 88:12 93:5 95:7
**sign** 72:13
**signature** 37:10 60:16, 17 71:10, 11
**signed** 59:25
**significance** 78:22
**signing** 54:9
**signs** 75:6, 7
**similar** 6:25 11:18 45:13 74:5
**Simon** 1:1 2:1 4:7, 22, 23 7:10 11:8 12:8, 10 13:19 19:5 23:25 25:13 29:7, 17, 19, 25 32:12, 13 37:4 39:11 40:1 42:14, 22 43:19 44:3 47:4, 14 48:16, 17 50:22 51:10 55:8, 9,

10 56:18, 19 57:11, 20, 21 58:10, 23 59:2, 3, 8, 11, 13, 15, 22 62:2, 4 63:19 65:21, 22, 23 66:13 68:4, 7, 18, 24 69:10, 24 70:9, 15, 25 71:1, 18, 19, 25 72:3, 9, 19 73:8, 16, 17 74:4, 6, 17 75:19 77:10, 15, 17 78:11, 12, 22 80:6, 18, 19, 25 81:1 88:6 92:16, 17
**Simons** 47:1
**Simon's** 12:8 38:22 48:11 50:22 51:7 60:16 63:19
**simple** 72:5
**single** 15:2
**sir** 6:11 9:1 12:3 20:1 21:14 28:7 36:24
**sit** 73:15 92:11 93:22
**sitting** 13:12 93:9
**situation** 33:6
**slid** 41:1
**slightly** 52:16
**slipped** 75:25
**small** 14:10
**Smith** 2:1 4:24 5:2, 5, 9 10:6, 8, 10, 13, 23, 25 11:4 12:2, 4, 6, 12, 15, 19, 21, 23 13:1, 4, 8, 11, 14, 22 14:3, 6, 9, 12, 14, 18, 21 15:5, 17, 19, 21 16:8, 12, 19 17:1, 7, 10, 14, 25 18:3 19:2, 8, 11, 13, 19, 24 20:1, 10, 18 21:5, 12, 14, 16, 19, 25 22:14, 16, 19, 24 23:16, 20 24:11, 18 25:2, 7, 15, 21, 24 26:2, 4, 7, 10, 12, 20, 23, 25 27:6, 9, 15, 18, 20 28:3, 6, 8, 10, 12, 15, 17, 19 29:8, 11, 18 30:3, 6, 9, 15, 18, 21, 23 31:4, 15, 25 32:4, 10, 19, 25 33:2, 5, 10 34:10, 13, 18, 20, 23 35:13, 16, 22, 24 36:2, 5, 8, 17, 25 81:7 82:23 85:24 86:5, 9, 12, 15, 18, 23, 25 87:7, 12, 14, 17, 19, 24 88:2, 4, 7, 11, 14, 16, 19, 21 89:11, 13, 17, 20 90:24 91:9 92:7, 10, 13 93:7, 12, 15, 18, 21 94:9, 22 95:6 96:7
**solely** 27:1, 6, 10 28:1 53:5, 6 54:2, 6, 12 59:4
**solicit** 65:20
**somebody** 38:22, 23 46:21 69:17
**somebody's** 87:5
**soon** 10:13
**sorry** 4:13, 18 6:3, 13 7:17 9:15 11:14 13:4 30:21 37:18 60:15 68:22 74:12 79:14 94:13 95:4, 6
**sort** 28:22 47:22 50:6 56:8 60:2 75:18
**Sosa** 28:15 30:15 85:14 91:5, 6
**Sosa's** 28:17
**sound** 2:1 45:13 96:18
**sounds** 69:9 70:15
**Southern** 11:20
**speak** 5:20
**SPEAKER** 4:3, 4
**speaking** 4:8, 20, 21, 22 5:10 18:23
**specific** 10:1 75:15
**specificity** 24:14
**specifics** 38:15
**speech** 90:10
**spend** 80:16, 25
**Spine** 2:1 5:18 11:14 20:5
**Spirt** 50:25
**split** 5:1
**squarely** 30:24 90:6
**St** 40:21 52:14 55:25
**stage** 18:11 19:14 36:23 47:10 75:4
**staged** 42:17
**stand** 12:9 31:2
**standard** 15:7 38:14 71:23 74:10, 15 79:13
**start** 6:24 18:6 20:22 33:5 37:2 41:25 42:15 85:25 88:19, 21 89:18
**started** 23:24 90:12
**starting** 53:21
**starts** 20:25 22:22 32:12
**state** 22:10 27:2 29:5 40:20 49:21 66:6 92:15
**statements** 41:20 51:1
**STATES** 1:1 45:25
**statute** 11:21 46:3, 10 64:7
**statutes** 46:9
**statutory** 31:18
**stay** 11:11 45:18
**stayed** 85:5
**step** 25:25 42:3, 14 58:21
**Stephanie** 2:1 5:13
**steps** 14:20, 21 19:15 43:11 63:16
**stick** 56:16
**Stoolman** 17:22 21:6, 7
**Street** 1:1 2:1
**striking** 39:10
**strikingly** 37:12
**stronger** 45:22
**stuck** 36:19 57:20 60:13
**stuff** 78:13 79:6 87:22
**stumble** 50:6
**subject** 12:13 72:24
**subjective** 26:5
**subjectively** 34:23 36:11 66:13 72:18, 19 77:24
**submission** 40:24 48:10 51:8 61:22 95:1
**submit** 26:7, 12 27:12, 15, 24 35:13 36:17 47:6 67:8, 9 72:13 89:22 91:10 92:1
**submitted** 17:19 40:4 43:23 51:9 52:3 64:6
**submitting** 23:22 56:9 78:7
**subspecies** 82:8
**substance** 7:8 83:7
**Substances** 7:9
**substantially** 33:21
**substantiated** 38:7
**substantive** 82:3
**success** 35:9
**successes** 35:19
**successful** 9:9 18:15
**sudden** 87:4
**suddenly** 89:21
**suffered** 62:22
**suffice** 29:6 51:13
**suggest** 15:22 18:4 20:11 23:6 25:24 45:11
**suggested** 26:14
**suggestion** 42:5 91:14
**suit** 35:2, 3 66:12
**Suite** 1:1 2:1
**Summary** 69:9 73:16 74:14, 15 76:21
**super** 71:23
**support** 20:21 29:6
**Supreme** 42:1
**sure** 8:6, 8 9:13 14:11 15:6 17:1, 7, 23 33:2 38:20 39:21, 23 41:24 43:18 44:8

46:14 49:9 54:14 58:16 61:5 69:21 71:14 76:23 86:18 92:14
**suspect** 87:18, 20 94:9
**system** 56:9, 12 63:3 64:2 65:8 72:15

< T >
**table** 5:15
**take** 10:2 14:11, 13 16:23 18:21 19:14 20:2 23:7, 9 36:1 38:17 42:3 47:4 54:10, 15 65:22, 24 71:1 74:23 82:1
**taken** 30:24 94:20
**takes** 43:11
**talk** 5:6, 7 16:11 30:12
**talked** 28:13 34:25 59:9 88:25
**talking** 10:15 32:2, 5 59:14 72:6 73:5
**talks** 19:5 20:13 36:15 95:19
**Technologies** 1:1 4:7
**telephone** 51:12
**tell** 8:23 17:4, 22 24:1 29:1 35:7, 8 42:24, 25 66:14, 17, 19 70:13 81:15 82:11 88:17
**telling** 51:1, 3 59:22 86:6
**tells** 37:2 41:16 75:22
**temporal** 90:22
**ten** 7:4
**tens** 17:16
**terms** 80:24
**test** 14:16 15:23 27:25 32:24 34:5, 24 57:22 61:6 70:16
**tested** 76:17
**text** 46:1, 3, 10
**Thank** 4:13, 17 6:1, 2, 11, 12 12:4, 6, 10 14:14 19:3 21:19 36:23, 25 39:15 85:22 92:12 94:3, 19, 20, 22 96:5, 7, 8
**that'd** 17:9 40:16, 19
**theory** 20:24 41:3, 5 69:14 87:22
**thereof** 17:16
**thing** 38:5 45:6 53:5 54:1 58:7 75:15 92:20
**things** 11:16 19:6 22:4 35:11 41:25 55:23 64:4 66:9 82:5 88:9 95:17 96:2
**think** 7:17 8:2, 17 9:6, 12 13:1 14:21 15:1, 3, 5, 22 16:19 18:9, 17, 19 19:20 20:11 24:7, 19 25:15 26:13, 14 28:12, 15, 19 29:18 30:7, 15, 23, 24, 25 31:4, 15, 25 32:10, 19 33:23 34:4, 7, 13, 18, 20 35:11, 22, 24 36:8, 19, 21 37:7, 22 38:4, 7, 14 39:9, 24 40:6 41:6, 24 42:2, 4, 17, 19 43:16, 18, 21, 25 44:13, 20, 25 45:10, 12, 21, 25 46:1, 6, 14 47:14, 19, 20, 21, 25 48:1, 6, 24, 25 49:2, 7, 18, 20 50:8, 10, 13 51:19, 21, 22, 24 52:7, 12 53:13, 16, 21, 24 54:22 55:4, 13, 19, 21 56:18, 19, 21, 22, 24 57:21, 25 58:12, 23 59:9, 18 60:1 61:6, 14 62:25 63:14, 15 66:11 67:14 68:5, 19 69:1, 2 70:21 71:14, 15 72:5 73:2, 24 74:3 75:20 76:1, 7 77:10, 12, 18, 20 78:11, 15, 19, 21 79:8, 11, 25 80:2, 4, 5, 17, 21 81:2 83:7, 18, 22 87:8, 9 88:21, 22 90:5, 7 91:22 92:4 93:23 94:9
**thinking** 14:5 39:6 95:9
**thinks** 69:10 70:9 71:12 79:9
**Third** 10:21 14:8 22:2 28:6, 18 33:3 34:24 35:10, 11 57:22 81:25 90:21
**thought** 44:11 86:19 95:10
**thousands** 17:16
**threat** 7:6 22:6 28:4
**three** 14:20, 21 21:4, 7 64:8 82:9
**throw** 16:15
**till** 6:16
**time** 5:14, 25 9:1 10:2, 20 12:21 15:13 17:17 21:18 32:12 46:16 66:6 68:3 75:6, 7 77:1 80:16 82:21 92:4 93:5, 14
**times** 91:25
**Timothy** 2:1
**title** 91:18
**today** 6:6, 16, 21 9:14, 16 12:8 14:1, 5, 16 15:15, 17 25:4 31:2 79:7 84:24 94:3, 7
**told** 68:9 75:5, 19, 21, 22 77:9 80:21
**tool** 46:2
**tort** 32:5
**totally** 70:18
**touch** 93:7
**trade** 13:23 21:9
**traded** 51:9
**traditional** 46:8
**Transcribing** 2:1
**TRANSCRIPT** 1:1 2:1 96:17
**transcription** 2:1
**transmission** 50:21
**treatment** 20:25 22:21 23:1 24:1, 5 30:1 32:14 39:14 90:2
**treatments** 40:12 92:21
**tree** 56:13 58:21 60:2
**trial** 9:10 71:8
**Trials** 69:5
**tribunal** 51:16
**triggering** 95:22
**truck** 58:13 76:1
**true** 18:13 21:21 22:13 40:8 62:3 69:25 70:6 71:13 81:2
**truth** 17:15
**truthful** 80:19
**truthfully** 43:12
**try** 38:17 52:11 66:6
**trying** 8:23 34:7, 8 36:14 56:4 59:13 71:22 74:12 75:8 76:22 79:15 90:21
**twice** 17:21
**two** 4:21 14:20 19:6 28:19 41:24 52:5 55:4 71:14 82:2 92:8 93:17
**tying** 84:15
**type** 56:3 66:8 71:22 74:4 84:4
**types** 48:24 87:2
**typically** 50:9 62:15

< U >
**Uber** 1:1 4:6, 8 6:24 24:6 41:11 56:7 58:3, 12 66:20 67:13 68:12 79:17 80:21, 23
**Uber's** 78:23
**ultimate** 72:6
**ultimately** 90:15

**Um-hum** 33:9 44:14
**undeniable** 31:5
**underlying** 21:13 23:9 29:9 32:5 33:14
**understand** 8:23 15:8, 11 16:9, 13, 14, 23 26:8, 25 27:20, 22 34:8 42:3 48:18 59:18 61:10 68:24, 25 70:18 88:10 94:1 95:22, 24
**understanding** 54:17 79:15
**understands** 59:10
**understood** 14:9 15:21 39:23 43:18 57:9 61:3 93:23 96:3
**unfair** 14:1 21:3
**UNIDENTIFIED** 4:3, 4
**unique** 87:25
**UNITED** 1:1
**unlawful** 35:1 52:11
**unrecorded** 17:16
**unrelated** 36:14
**unsuccessful** 15:12
**unsupported** 42:19
**use** 10:20 48:14 51:7

< V >
**valid** 25:4, 12, 13 45:17 71:10, 11
**Valley** 2:1
**value** 22:20 23:22 24:6 33:12 65:8 66:15
**variety** 6:18 35:10
**vehicle** 58:3
**verdict** 25:22 33:24
**verifiable** 70:16
**verify** 71:24
**versa** 83:21
**versus** 4:7 46:16 52:7
**viable** 65:21
**vice** 83:21
**view** 24:24 31:12 32:18 41:23, 24 55:14, 15 62:12 78:19
**views** 66:9
**vigorously** 43:8
**Virginia** 27:2
**vs** 1:1

< W >
**Wadden** 1:1 4:11, 14, 17 6:6
**wait** 48:23 78:9 95:12
**waiting** 81:16, 21 85:4
**walk** 17:7 42:10
**walks** 39:2
**want** 6:21, 22, 24 8:6 9:5 10:2 14:1 15:6, 12 16:13 17:23 18:1, 9 19:15 23:16 32:21 45:21 50:17 54:14 58:17, 24 59:7 81:7 85:24, 25 87:9, 13, 14 88:12, 24 91:12 92:7, 13, 14 93:19, 24 95:12 96:1
**wanted** 6:9 19:23
**wanting** 93:9
**wants** 5:15
**Washington** 1:1
**wax** 22:9
**Way** 2:1 6:25 7:16 13:6 20:3 23:10 28:22, 24, 25 34:15 37:7 40:10 41:12 43:6, 25 60:2 63:3 68:4, 8, 10 72:12 73:19 78:21, 22 79:11 81:8, 23 83:2, 13, 24 87:14
**weed** 46:2
**week** 39:3, 4 70:11
**weeks** 13:3, 6 21:4, 7 87:6
**WeInk** 24:15 30:11, 19, 22 41:16
**Well** 5:7 7:16 8:1 9:9, 20 10:8 11:9 14:18 15:5, 20 16:19, 21, 23 17:23 20:4 23:16 27:16 28:15 29:8 38:4 41:8 47:24 50:20 51:19 55:1, 16 60:11 61:11 62:3 65:13 66:19, 22 67:7 68:5 69:3 75:23 79:1 80:2 81:20 82:2, 11, 22, 24 83:14, 17 84:22 86:23 87:2 89:5 94:1, 9, 21 95:9
**went** 29:24 31:5 40:13 45:19, 20 63:18 91:6
**We're** 4:5 8:6 9:13 11:17 12:18, 19, 21 14:15 15:6, 7 42:15 45:10 48:11 50:18 57:20, 21 58:15 62:5 68:1 71:22, 25 72:2 76:14 85:8 93:3
**we've** 8:18 22:1 37:9 39:10 40:7, 14 42:25 48:8, 9 52:6 63:2 70:8 87:8 96:2
**whim** 29:15
**White** 2:1
**wholistic** 35:12, 25 36:7
**wholly** 15:13
**willing** 65:23
**win** 16:16 44:16 90:1
**winning** 34:2
**wire** 8:3, 9, 12, 24, 25 9:2 10:15, 17, 19, 20 12:1 44:5 47:17 50:11
**wires** 43:24 47:16 48:10, 15 50:24 51:7, 8, 9 73:8
**wish** 12:5
**Witnesses** 3:1
**won** 19:22 58:6
**Woodmont** 2:1
**word** 27:6, 10 53:6
**words** 13:17 20:5 23:14 25:5 31:13 53:3 64:7 69:23 81:22 84:6 87:21
**work** 31:8 69:17 70:11 91:12 95:12, 14 96:2
**worked** 65:24
**working** 31:8
**works** 17:4 40:10 63:3
**world** 72:24
**worried** 95:20
**worth** 66:1, 3, 7 68:12, 19, 21 69:1, 2 70:11 72:12 73:19, 20 75:2 76:4 77:10, 11 78:10, 13 79:9 80:20
**wrath** 87:3
**write** 24:3 43:16
**writes** 45:2
**writing** 13:17, 18, 19 45:8 57:10
**wrong** 7:5, 24 11:21 39:8 78:13 84:2
**wrongful** 23:3

< Y >
**Yarris** 54:9 55:22 65:25 66:15 68:14 71:7 73:4
**Yarris's** 67:8 72:15 74:19
**Yarus** 2:1 5:23 11:10 20:4 29:4 37:10 38:1 40:11
**Yarus's** 20:4
**Yeah** 7:19 13:11 14:3, 9, 13 17:9, 13 19:19 28:8, 10, 19 29:11 32:7 33:4 49:15 55:12 58:22 60:5 65:7 67:11, 14, 24 68:18 69:12

73:*18* 75:*9*
83:*23* 86:*18*
88:*3* 89:*11*
93:*7*, *15* 95:*2*, *7*
**years** 73:*19*
77:*2*
**York** 11:*20*
81:*24* 91:*17*
**Yup** 61:*3*
74:*24*

**< Z >**
**Zoom** 51:*6*