**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UBER TECHNOLOGIES, INC.,** *et al.* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 25-5365** |
| | : | |
| **SIMON & SIMON P.C.,** *et al.* | | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                               **May 11, 2026**

Two transportation companies known for their drivers being on the roads throughout our District, Uber and FedEx, became frustrated with paying lawyers to defend and settle lawsuits brought against them by one local law firm on behalf of persons claiming Uber or FedEx drivers caused them severe personal injuries over the past few years. The companies claim a personal injury lawyer and his firm direct their new clients to chiropractors, pain specialists, and other medical professionals who in turn create fraudulent medical records for those clients. The records serve as a basis to sue in Philadelphia state court, seek more than $50,000 in damages, and then persuade Uber's and FedEx's lawyers and risk evaluators to defend the claims or pay more in settlements. So, in addition to disputing each claim in the Philadelphia courts on its merits (or alleged lack of merit), Uber and FedEx now sue the lawyers suing them and treating doctors for racketeering activities. Uber and FedEx seek, among other things, to recover the wide variety of costs defending the underlying Philadelphia court cases, other losses, and remove the law firm's management.

The lawyers and doctors move to dismiss. They first argue their conduct is immune from liability because all they are allegedly doing is proceeding as advocates consistent with their clients/injured persons' right to petition the courts for personal injury recovery under the First Amendment's Petition Clause. We do not agree Petition Clause immunity bars the claims at this

stage as we cannot say now whether Uber and FedEx will prove a fraudulent scheme not immunized from suit. We find Uber and FedEx sufficiently pleaded the lawyers directed the doctors to produce fraudulent medical records which informed their demands for compensation far beyond the actual injuries. The lawyers and doctors also argue the doctrine of res judicata requires we dismiss based on the settlement agreements and orders in the pleaded Philadelphia state court cases and the *Rooker-Feldman* doctrine precludes relitigating earlier fully-resolved disputes. We do not agree these doctrines require dismissal at this stage given the exhaustive allegations. The lawyers and doctors also challenge the pleaded facts claiming no basis for racketeering including how their alleged conduct proximately caused Uber and FedEx to pay fees and costs and voluntarily settle claims at an agreed number. They may be shown correct soon enough. But we are reviewing allegations and today allow the parties to proceed with discovery including into the extent the doctors' reports informed the lawyers' decision to bring these cases and then seek more than $50,000 in their complaints. And whether these lawyers' statements of "severe" injuries and "disfigurement" are fraudulent. We also need to understand if the lawyers' and doctors' conduct caused Uber and FedEx to pay legal fees and settlements rather than continue disputing the underlying claims on the merits.

## I.      Alleged Facts & Public Record

Philadelphia lawyer Marc Simon and the law firm Simon & Simon, P.C. filed dozens of identified lawsuits in the last four years in Philadelphia County against Uber Technologies, Inc. and Federal Express Corporation on behalf of persons involved in motor vehicle accidents with their drivers.[1] The Simon & Simon clients in these cases typically suffered minimal or no injuries from the accident.[2] Many clients also purchased "limited tort" motor vehicle insurance limiting recovery to minimal out-of-pocket medical expenses.[3] But upon retention, Simon & Simon

directed their new clients to "a conveyor belt of preselected treatment providers and medical experts."[4] These medical providers included Ethel Harvey and Daniel Piccillo at Philadelphia Spine Associates, Clifton Burt at Premier Pain & Rehab Center, and Lance Yarus.[5] Drs. Harvey and Piccillo are chiropractors.[6] Dr. Burt is a pain management physician.[7] Dr. Yarus is a physician who performs medical examinations and prepares reports used in litigation.[8]

### *Directed medical treatment leading to filed complaints in Philadelphia courts.*

The course of treatment for the Simon & Simon clients followed a consistent sequence— "referrals to a discrete set of chiropractors or physical therapists, subsequent MRIs, and, ultimately, purported radiofrequency ablation procedures."[9] Clients first attended chiropractic or physical therapy appointments, often with Drs. Harvey or Piccillo.[10] Drs. Harvey and Piccillo referred clients for MRIs, which were performed by a designated radiologist at Open MRI of Bala Cynwyd.[11] The lawyers instructed Drs. Harvey and Piccillo to make these referrals.[12] The MRI results were negative or "essentially" negative, showed only mild degenerative changes, or revealed no objective evidence of traumatic or accident-related injury.[13] Drs. Harvey and Piccillo then continued a regimen of repeated chiropractic treatment visits also at the lawyers' direction which generated a high volume of treatment records reflecting extensive care.[14] In several instances, Drs. Harvey and Piccillo did not deliver chiropractic treatment as described in the records or generated treatment reports for a client using cut-and-pasted boilerplate statements and verbatim recitations.[15] Drs. Harvey and Piccillo also signed treatment records within minutes of a scheduled appointment time, despite logs reflecting care which would have required more time, or created and signed records before the appointment was scheduled to occur.[16] Drs. Harvey and Piccillo then transmitted the treatment records through an electronic patient records portal to the lawyers.[17]

The lawyers also directed their clients to Dr. Burt for pain management treatment before filing a complaint.[18] The lawyers sent scheduling emails to Dr. Burt identifying the clients to be seen on a given day and instructing Dr. Burt on the procedures to be performed on each client before any independent examination.[19] These emails directed treatment of many of the lawyers' clients on the same day.[20] The lawyers also provided Dr. Burt with their clients' medical records in advance of the appointments.[21] The lawyers controlled the logistics of its clients' appointments with Dr. Burt, arranging transportation to and from Premier Pain & Rehab Center, and requiring clients to participate in video calls with the lawyers' staff following their appointments.[22]

Dr. Burt typically performed radiofrequency ablations, a procedure more invasive than other forms of pain management and involving the use of a needle to heat and destroy nerve tissue, on these clients at the lawyers' direction.[23] Dr. Burt relied on clients' MRI results (often ordered by Drs. Harvey and Piccillo) in forming diagnoses and treatment recommendations.[24] Dr. Burt then created treatment records stating his "decision to deliver such ablation treatment was the result of his observations of the patient's pain levels and responses to treatment at the appointment."[25] These records included repeated and standardized language across patients and used pre-typed statements and fill-in-the-blank fields rather than individualized clinical observation.[26] The records also included identical or substantially similar statements attributing the client's symptoms to a motor vehicle accident and deeming the procedures medically necessary.[27] In many instances, the treatment records described procedures and clinical observations inconsistent with the timing and details reflected in the underlying imaging and appointment data.[28] Dr. Burt then transmitted the treatment records to the lawyers over interstate wires.[29] The lawyers compensated Dr. Burt and Premier Pain & Rehab Center on a flat fee, per-procedure basis for radiofrequency ablations performed on its clients.[30] The lawyers structured these payments through a third-party funder as

purchases of receivables rather than direct payments for treatment.[31] Premier Pain & Rehab Center did not otherwise bill insurers or patients for this work.[32]

The lawyers next directed their clients to Dr. Yarus or another medical expert for an independent medical examination and directed the expert to prepare reports projecting their clients' future medical care needs and damages.[33] Simon & Simon provided Dr. Yarus with the medical records generated by Drs. Burt, Harvey, and Piccillo as the bases for his reports.[34] Dr. Yarus typically met with the clients in an office located in the same building as Simon & Simon's Philadelphia office.[35] Dr. Yarus's reports "confirm[ed] the existence of serious, permanent injuries caused by the subject accident and recommend extensive, lifelong medical care."[36] He identified serious injury, causation, and the need for lifetime care in "100% of the hundreds of cases in which he has testified for Simon & Simon clients."[37] The reports used nearly identical language in attributing causation, describing the injuries, and concluding the injuries were permanent regardless of the client's age, medical history, or the nature of the accident.[38] The reports helped "convert[] low-value cases that would not have otherwise been brought or that would have been resolved through compulsory arbitration into million-dollar-plus litigation claims by creating the appearance of independent medical validation for non-existent serious injuries in cases where actual out-of-pocket costs were minimal."[39] Dr. Yarus did not assign dollar amounts to the future care needs identified in his reports.[40] Dr. Yarus transmitted the reports to the lawyers over interstate wires.[41] The lawyers forwarded Dr. Yarus's reports to a second expert who assigned dollar figures to the future treatments Dr. Yarus recommended.[42]

The lawyers then "assemble[d] a comprehensive but fraudulent record" from the medical records and expert reports prepared by Drs. Harvey, Piccillo, Burt, and Yarus and used the record to file lawsuits against Uber, FedEx, and other corporations.[43] These lawsuits relied on the

treatment histories, radiofrequency ablation procedures, and future-care reports to support claims for substantial damages, including "artificially inflated lifetime damages estimates."[44] The high volume of chiropractic treatments from Drs. Harvey and Piccillo created the appearance of a serious injury, suggested conservative care had been attempted, and supported the use of more invasive procedures.[45] Their MRI referrals supported the ablation procedures and provided the "appearance of legitimacy" for those procedures.[46] Dr. Burt's ablation procedures then supplied a foundation for identifying serious injury and future treatment.[47] Dr. Yarus's reports presented the findings as independent medical evaluations and projected extensive future care needs.[48]

### *Use of medical records in complaints and settlement demands.*

The lawyers structured their damages claims based on the directed medical records. It relied on projected future expenses, which are not subject to statutory limits on incurred medical costs, and also used the face value of receivables associated with Dr. Burt's procedures in presenting damages claims.[49] The diagnosis of a serious injury further allowed Simon & Simon to seek non-economic damages in cases involving limited tort coverage.[50] The records and reports allowed Simon & Simon to allege damages exceeding $50,000 which placed the cases outside the Philadelphia Court of Common Pleas' compulsory arbitration program.[51] Absent these materials, the lawyers' claims "would have been resolved through Pennsylvania's no-fault system or, if brought at all, through compulsory arbitration" or "limited to recovery of minimal out-of-pocket medical expenses."[52]

The lawyers used the "artificially inflated lifetime damages estimates" to "induce large settlements from Uber, FedEx, and others."[53]  They presented the medical records and expert reports as "objective evidence" of ongoing care needs to support its settlement demands.[54] The lawyers "used [these materials] to pressure insurers and [Uber] into paying artificially inflated

settlements, despite the absence of any real need for the extensive future care described."[55] Uber relied on the representations made by Attorney Simon, Simon & Simon, and Drs. Harvey, Piccillo, Burt, and Yarus in evaluating and resolving the claims against it.[56] In the cases Uber settled, it paid "substantially higher" amounts than it otherwise would have and, in some instances, made payments it would not have made at all.[57] The lawyers also dismissed Uber from approximately thirty cases involving Dr. Burt with similar claims after Uber sought subpoenas and depositions of Dr. Burt and Premier Pain & Rehab Center.[58]

### Uber and FedEx claim racketeering in addition to disputing the claims in state court.

Uber sued Marc Simon, Simon & Simon, Clifton Burt, Premier Pain & Rehab Center, Ethel Harvey, Daniel Piccillo, Philadelphia Spine Associates, and Lance Yarus under the Racketeer Influenced and Corrupt Organizations Act. It alleges these lawyers and doctors orchestrated a scheme to generate and litigate fraudulent personal injury claims in Philadelphia courts arising from motor vehicle accidents involving Uber and FedEx drivers.[59] Uber asserts multiple racketeering theories: an enterprise involving Attorney Simon, an enterprise involving the Simon Defendants and Dr. Burt, an association-in-fact enterprise involving the Simon Defendants, Dr. Burt, and Premier Pain & Rehab, and a conspiracy involving the trial lawyers and all named medical professionals.[60] It alleges injury to business and property arising from lawyers' and doctors' conduct, including expenses incurred in defending and resolving purportedly fraudulent personal injury claims.[61] Uber further alleges the scheme increases its operating costs and affects pricing, service costs, and earnings.[62] Uber seeks compensatory damages; prejudgment interest; attorney's fees; punitive damages; equitable relief, including orders requiring the lawyers and doctors to divest interests in the alleged enterprises, imposing restrictions on future activities, and

dissolving or reorganizing the enterprises; and disgorgement, imposition of a constructive trust, and appointment of a monitor or receiver.[63]

## II.     Analysis

The lawyers and doctors jointly move to dismiss arguing: (1) *Noerr-Pennington* bars these racketeering claims; (2) Uber lacks standing because it fails to plead proximate causation; (3) lawyers' litigation activities are not predicate acts and the doctors' alleged acts are not wire or mail fraud; (4) Uber fails to plead conduct of an enterprise; (5) res judicata bars Uber's claims; (6) *Rooker-Feldman* bars Uber's claims; and (7) Uber fails to state a conspiracy claim under the Act.[64]

We first address the threshold legal defenses affecting the claims against all the lawyers and medical professionals. We then study the sufficiency of the pleaded racketeering claims. We deny the Motion to dismiss after finding no bar or immunity on all claims subject to proofs and later study and find Uber sufficiently pleaded racketeering activity. Discovery will aid us, and possibly the jury, to better evaluate if the trial lawyers' advocacy is based on a fraudulent scheme of predicate wire and mail fraud.

### A.  Uber pleads fraudulent activity excluded from *Noerr-Pennington* immunity.

The lawyers and doctors move to dismiss all claims arguing they are simply petitioning courts for redress arising from Uber's negligence. [65] The First Amendment Petition Clause protects their right to zealously advocate for their allegedly injured clients.  The question is whether the lawyers and doctors contrived the extent of the injuries which then caused Uber to hire lawyers and pay settlement in some cases based on medical records it now believes are fraudulent across a repeated pattern of claims. The immunity, known as the *Noerr-Pennington* doctrine, may bar Uber's claims if all alleged conduct constitutes protected petitioning activity protected by the First Amendment right to petition and thus cannot support liability for racketeering.

The *Noerr-Pennington* doctrine "provides broad immunity from liability to those who petition the government, including administrative agencies and courts, for redress of their grievances."[66] The doctrine originated in the context of antitrust litigation but our Court of Appeals has expanded it to other areas of the law.[67] Protection extends to citizens' petitioning activities generally, including the filing of a lawsuit.[68] But it "does not immunize 'every concerted effort that is genuinely intended to influence governmental action.'"[69] There must be "some sort of 'valid petitioning activity'" and the scope of immunity "depends 'on the source, context, and nature of the competitive restraint at issue.'"[70]

*Noerr-Pennington* immunity also does not extend to petitioning activity which constitutes a "sham."[71] This exception applies where the litigation "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . ."[72] In other words, "[t]here is no immunity under *Noerr-Pennington* . . . where the petitioning is merely a 'sham' designed solely as a form of harassment."[73] The inquiry "hinges on whether the petitioner sought to use the invocation of governmental process—as opposed to the result of that process—to harm competition. If the former, the petition is a sham, and no immunity attaches. If the latter, the petition is not a sham, and the sham exception does not apply."[74]

The lawyers contend "[t]he only 'predicate acts' allegedly committed by [them] are 'fil[ing] a complaint and initiat[ing] a lawsuit' and/or 'caus[ing] said complaint to be served'" which is "undeniably protected petitioning activity."[75] The doctors argue alleged pre-filing predicate acts are protected petitioning activity because Uber describes the medical records and reports as "litigation documents" which "appear to represent a litigation strategy essentially admitting the medical professionals prepare the records "in anticipation of petitioning activity" so

any "alleged 'misrepresentations' constitute 'petitioning' whether made before or after litigation is filed."[76]

The lawyers and doctors also argue the sham litigation exception to *Noerr-Pennington* does not apply. They emphasize the exception is "very narrow" and requires Uber to plead both objective and subjective baselessness.[77] They allege underlying lawsuits are not objectively baseless because many resulted in settlements or favorable outcomes and Uber fails to plead subjective baselessness because the lawsuits sought the ordinary goal of litigation—monetary recovery—and do not reflect misuse of the process.[78] The lawyers and medical professionals further argue Uber's allegations of fraud cannot establish objective baselessness absent facts showing the misrepresentations "alter[ed] the 'core' of the negligence actions or otherwise deprive[d] them of their legitimacy."[79] They argue alleged misrepresentations at most concern the extent of injury or damages and do not go to the "core" of the claims.[80]

Uber counters argues the doctors' treatment, referrals, and creation of medical records and reports are not petitioning activity and the lawyers' directing and facilitating the fraud scheme likewise fall outside protected petitioning.[81] Uber also emphasizes the First Amendment does not protect fraud making *Noerr-Pennington* inapplicable and the sham litigation exception otherwise applies.[82]

### 1. *Noerr-Pennington* immunity does not extend to the alleged pre-filing conduct.

Let's start with the obvious. The lawyers' filing and serving complaints constitute classic petitioning activity and fall squarely within *Noerr-Pennington* immunity. They cannot be sued for racketeering for filing and serving complaints absent the sham exception for a pattern or practice of successive fraudulent filings undertaken to harass and extract settlement value through the process of litigation.

But we have much more. The dispute instead centers on the alleged pre-filing conduct—the lawyers' direction to the doctors to create false medical records and reports and, in required return, the doctors' alleged unnecessary treatment creating records furthering the fraud. We do not treat this conduct as petitioning activity merely because the lawyers later used the medical record in setting demands. We instead ask whether the pre-filing conduct is sufficiently "incidental" to protected petitioning to warrant immunity.

*Noerr-Pennington* immunity may apply "to activities 'incidental' to litigation, like sending 'presuit letters' to a would-be defendant that 'threaten[ ] legal action and mak[e] legal representations.'"[83] But our Court of Appeals "has never opined on when conduct is 'incidental' enough to litigation to be covered by *Noerr-Pennington*, noting only that 'prelitigation threat letters' sent to a potential defendant might qualify."[84] The scope of what qualifies as "incidental" remains unsettled.

Judge Bibas, sitting by designation a couple of months ago in the District of Delaware, declined to extend *Noerr-Pennington* immunity in an anti-competitive litigation context to "communications with third parties that do not threaten litigation" in *Montway LLC v. Navi Transport Services LLC*.[85] Montway reported a competitor to a private industry board for fraud and misconduct, ultimately "alert[ing the board] to the conduct giving rise to [its] claim [against the competitor] for trade secret misappropriation."[86] The competitor then countersued Montway based on those communications and Montway asserted *Noerr-Pennington* immunity on the grounds its communications were "incidental" to its suit against the competitor.[87]

Judge Bibas rejected this argument and drew a distinction between conduct directed to the government and communications with third parties.[88] He explained *Noerr-Pennington* protects petitioning activity and certain conduct closely tied or "incidental" to it because withholding

11

protection in such a context could burden access to the courts.[89] But this rationale does not extend to communications with third parties who are not themselves threatened with litigation.[90] Such conduct is not directed to the government and is "unrelated to [a party's] ability to petition a court."[91] Judge Bibas reasoned where "Montway and [the third party] did not have a dispute," allowing suit based on those communications "cannot burden Montway's right to petition a court to remedy such a dispute."[92] Extending immunity to such conduct would "stretch[] the word 'incidental' beyond recognition."[93]

The lawyers and doctors argue Uber admits the challenged conduct falls squarely within protected petitioning activity by pleading the medical records are not merely "related to" litigation but are alleged to be "*essential* to" the underlying lawsuits themselves.[94] They contend the alleged prelitigation conduct and records contain the same substantive assertions later "asserted in a petition" and are therefore "sufficiently related" to the ability to petition.[95] Uber counters its allegation the lawyers' direction to create and transmit false records is not protected petitioning because it is neither directed to the government nor involves communications with an opposing party threatened with litigation.[96] It maintains extending immunity to such conduct would stretch the "incidental" to petitioning doctrine "beyond recognition" by transforming a narrow protection for demand letters into sweeping immunity for the manufacture of false evidence.[97]

The alleged conduct here differs in meaningful ways from the types of prelitigation activity traditionally afforded protection. It involves directing medical providers to render treatment and generate records, along with communications among alleged participants in a scheme. It does not involve communications directed to a court or opposing party. The conduct occurred outside the litigation process and involved third parties who were not themselves the subject of a threatened suit. This distinction bears on whether the conduct invokes the protections of the Petition Clause

at all. Extending *Noerr–Pennington* protection to conduct of this nature risks expanding the doctrine beyond its intended scope. If we deemed conduct undertaken to generate evidence or support a future claim "incidental" to petitioning solely because it later appears in a complaint, the doctrine could reach virtually all prelitigation activity undertaken by a party or its agents. Such an approach would blur the distinction between petitioning activity and antecedent conduct and allow immunity for a broad range of behavior simply because a lawsuit follows. As Judge Bibas cautioned, such an approach would stretch the concept of "incidental" conduct "beyond recognition." We do not find *Noerr-Pennington* immunity extends to the pleaded pre-filing conduct.

We need not further define the precise boundary of *Noerr–Pennington* protection outside of the pleaded facts before us.

### 2.  Uber plausibly pleads the sham litigation exception applies.

But even assuming the lawyers' and doctors' challenged pre-filing conduct constitutes protected petitioning activity or conduct sufficiently incidental to it, Uber plausibly pleads the sham litigation exception to *Noerr-Pennington* immunity applies to both the alleged filing and pre-filing conduct.

Our Court of Appeals instructs we must apply one of two tests to determine whether the litigation activity is a sham—the framework detailed in *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* for a single petition and *California Motor Transportation Company v. Trucking Unlimited* for a series of petitions.[98] When an claimant alleges one sham petition, we apply a two-step test: (1) "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and (2) if so, "the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor . .

13

. through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon."[99] Step two addresses "the litigant's subjective motivations."[100] "Only if the underlying litigation is objectively meritless do[ we] address the second factor."[101]

"In contrast, a more flexible standard is appropriate when dealing with a pattern of petitioning."[102] The inquiry asks whether the series of lawsuits "were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm a market rival and restrain trade."[103] A series of lawsuits "often involve[s] more complex fact sets and a greater risk of [] harm, but the reviewing court sits in a much better position to assess whether a defendant has *misused the governmental process* . . ."[104] "[T]he question is not whether any one [lawsuit] has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival."[105] The "inquiry is prospective and asks whether the legal filings were made, 'not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment.'"[106]

We must perform a holistic review when assessing whether a lawyer filed a series of without regard to merit.[107] Our holistic review "may include looking at the defendant's filing success—i.e., win-loss percentage—as circumstantial evidence of the defendant's subjective motivations" and "other evidence of bad-faith as well as the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity (e.g., abuses of the discovery process and interference with access to governmental agencies)."[108] "The question whether a petition is a sham is generally a question of fact for the jury."[109]

14

Uber argues the sham litigation exception applies "given [it has pleaded] a series of lawsuits without regard to the merits for the improper purpose of extracting out-of-court settlements."[110] It pleads the lawyers "go beyond their role as legal counsel" and "take an active role in directing" the doctors "to create fraudulent documents" which are then used to file lawsuits in the Philadelphia Court of Common Pleas seeking over $50,000.[111] It alleges the lawyers identify claimants involved in motor vehicle accidents with minimal injuries or limited tort coverage and refer them to Drs. Burt, Harvey, and/or Piccillo. These providers then perform examinations and administer unnecessary or preselected procedures, generating fraudulent medical records which are subsequently provided to the lawyers. The lawyers then direct Dr. Yarus to review those records and prepare reports attributing the injuries to the accidents and projecting costly future care and then use these materials to support demand packages and litigation filings seeking substantial recoveries. Uber alleges the lawyers repeated this process across numerous claimants and cases over several years. "Each participant in the scheme acts with the understanding and agreement that their fraudulent medical records will be used as a basis to demand substantial settlements and assert sham claims in litigation."[112]

Uber contends this concerted practice transforms otherwise marginal claims into "million-dollar-plus lawsuits" to drive inflated settlement demands.[113] Uber further alleges when it sought discovery from Dr. Burt in underlying actions, the lawyers "quickly dismissed Uber from each of the then-pending nearly thirty cases involving [Dr.] Burt . . . so as to avoid discovery and conceal the scheme" while continuing to pursue those same actions against other defendants.[114] Uber maintains these claims would not have been filed at all—or would have been resolved through no-fault processes or compulsory arbitration—absent the alleged fabrication of medical records.[115]

15

These allegations, if true, support a plausible inference the lawyers and doctors misused the governmental process and pursued a policy of starting legal proceedings without regard to merit. The dismissal of claims against Uber (seemingly the alleged primary tortfeasor) immediately following discovery requests permits the inference the lawyers did not intend the filings to adjudicate claims on the merits but to leverage the litigation process itself. Taken together, these allegations place in dispute whether the lawyers filed the cases not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken for purposes of harassment and to extract settlement value through the process of litigation. Uber plausibly alleges a pattern of litigation aimed at obtaining settlements rather than securing relief based on the underlying merits.

The lawyers and doctors rely on the two-step test applicable to a single petition although their arguments also invoke considerations relevant to a series of filings.[116] We address those arguments to the extent they bear on whether the lawyers filed cases without regard to merit. The existence of settlements does not resolve the inquiry today.[117] "[O]rdinarily, settlement on terms favorable to a plaintiff suggests a suit is not objectively baseless."[118] But we do not find it dispositive where a person plausibly alleges she settled because of factors independent of the merits, such as litigation costs or reliance on allegedly fabricated evidence.[119] "Parties often settle litigation for a variety of reasons independent of the merits of the claims. . . . Even frivolous lawsuits can be very costly to defend and to take to trial, especially when plaintiffs, such as the defendants here, extensive resources."[120] And "[e]ven if [a] settlement [is] favorable," it may "not [be] dispositive" if "the record is clear that [the party] did not settle because it doubted its litigation position."[121] We are instructed to "only rule on the objective baselessness prong as a matter of law '[w]here there is no dispute over the predicate facts of the underlying [petitions].'"[122] At this stage

without a developed record, we cannot conclude the lawyers filed objectively baseless lawsuits "in the sense that no *reasonable* litigant could *realistically* expect success on the merits" nor can we determine whether the lawyers filed the lawsuits without regard to merit.[123]

The lawyers and doctors also argue the lawsuits cannot be subjectively baseless because the lawyers "are attempting to obtain the remedy they are seeking in court"—"financial recovery for their clients."[124] The subjective prong turns on the litigant's "subjective motivation, not its subjective belief about the merits of its claims."[125] The inquiry asks "whether the actual motivation is to dragoon the 'governmental process' itself into use as a competitive tool."[126] "[T]his often means examining 'evidence of the suit's *economic* viability,'" including whether the litigant "was indifferent" to the outcome on the merits or sought to obtain the collateral advantages the litigation process affords.[127] We again need not resolve whether the lawyers and doctors acted with such a purpose at this stage. Uber plausibly pleads the lawyers filed the cases without regard to merit as to the amount of damages claimed. The lawyers and doctors' subjective motivations render the litigation a sham presents a fact question not appropriate for our decision today.[128]

### 3. Uber pleads facts allowing us to plausibly infer the fraudulent misrepresentation exception to *Noerr-Pennington*.

The lawyers and doctors further argue the alleged fraudulent misrepresentations cannot trigger the sham exception because they do not "infect the core" of the underlying claims.[129] They contend the alleged misrepresentations at most inflate the extent of injury but do not alter the negligence theory underlying the claims or deprive the litigation of legitimacy.[130] Uber counters "the First Amendment does not protect fraud" and "the petitioning 'protection afforded by *Noerr-Pennington* is no more absolute or extensive than that provided by other First Amendment guarantees.'"[131] It further emphasizes our Court of Appeals has not addressed whether fraudulent conduct in litigation falls outside *Noerr-Pennington* protection outside the antitrust context.[132]

Our Court of Appeals has not recognized a standalone "fraudulent misrepresentation" exception to *Noerr-Pennington* immunity but "recognized that a party's knowing fraud or intentional misrepresentation may be sufficient to trigger the sham exception."[133] It explained "[i]f the alleged misrepresented facts do not infect the core of [the] claim and the government's resulting actions, then the petition had an objective basis and will receive *Noerr-Pennington* immunity."[134] But "a *material* misrepresentation that affects the very core of a litigant's [ ] case will preclude *Noerr-Pennington* immunity, [though] not every misrepresentation is material to the question of whether a petition . . . had an objective basis."[135] "This exception is based on the idea that a party does not have a First Amendment right to misrepresent material facts while petitioning for government action during a[ ] proceeding."[136]

Uber plausibly alleges material misrepresentations as to the amount of damages—including whether to even bring the case—affected the core of the underlying claims. It alleges the lawyers and doctors did not merely exaggerate the severity of injuries but instead directed the creation of false medical records and reports attributing injuries to the accidents and prescribing unnecessary or preselected procedures. The lawyers then used fraudulent records to file lawsuits, support demand packages, and project costly future care. Uber argues these alleged misrepresentations concern the claims, including the existence, cause, and medical necessity of the claimed injuries, rather than the extent of damages.[137]

We also find the facts reviewed by our Court of Appeals in *In re Merck Mumps Vaccine Antitrust Litigation* distinguishable. Our Court of Appeals rejected a misrepresentation exception in the antitrust context absent an allegation of "injury from the process at all" and failed to show the invocation of governmental process itself caused harm.[138] Uber, by contrast, alleges injury from the process itself—the use of allegedly fabricated evidence to file and maintain a case to

extract settlements. This case also arises at the pleading stage not on summary judgment with a developed record as presented in *In re Merck Mumps Vaccine*.

Uber's extensive allegations suffice to place in dispute whether the alleged misrepresentations "infect the core" of the underlying claims at this stage.

### 4.  We are not persuaded by the reasoning in *Ford*.

The lawyers and doctors largely ask us to wholesale adopt Judge Court's reasoning as to a wider scope of petitioning activity in *Ford Motor Company v. Knight Law Group*.[139]  We are not persuaded to apply her reasoning today. Ford sued lawyers who prosecuted California Lemon Law cases against it, alleging they created inflated billing records and used those records in fee petitions after prevailing or resolving the underlying cases.[140] Ford alleged the lawyers billed impossible or inflated time entries and used the fee process to extract inflated payments.[141]

Judge Court found the challenged conduct constituted petitioning activity because the lawyers "prepared the allegedly false billing statements both based on litigation activity and in anticipation of submitting fee petitions."[142] She reasoned protected petitioning activity includes "bringing a lawsuit, defending a lawsuit brought by another, and filing papers with a court" and also includes documents "in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something."[143] Judge Court found the challenged conduct "directly connected to litigation" and "incidental to the prosecution of the suit" because the alleged mail and wire fraud consisted of billing records and fee petitions submitted in identified cases. [144]

Judge Court also rejected Ford's effort to characterize the case as one about billing fraud rather than litigation activity. She explained Ford's theory "ignore[d] the activities for which Defendants were billing: litigation" and the fact the lawyers submitted fee petitions to courts in

19

nearly all referenced cases.[145] Unlike cases involving fraud before any relevant proceeding began, the billing in *Ford* "stemmed from ongoing litigation or preparation for litigation."[146]

Judge Court also found the sham exception did not apply. She first concluded neither the Lemon Law suits nor the fee petitions were objectively baseless because the lawyers and their clients had prevailed in the underlying litigation and fee proceedings and explained "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."[147] She then rejected Ford's series-of-petitions theory because Ford had not plausibly shown the lawyers filed cases without a genuine interest in redressing grievances or as a pattern of harassment.[148] She distinguished a case in our Court of Appeals where the tactics suggested delay rather than redress; by contrast, the complaint in *Ford* alleged the lawyers had an interest in prevailing in the Lemon Law suits and fee petitions.[149] Judge Court lastly rejected Ford's fraud-based sham theory because the alleged fee inflation did not deprive the underlying Lemon Law litigation or fee proceedings of legitimacy.[150] Ford did not allege the inflated fee petitions undermined the clients' substantive Lemon Law claims, and even as to fees, it alleged inflated fee requests rather than no entitlement to fees at all.[151] Judge Court concluded the alleged fictitious work did not deprive "the entire fee petition process—let alone the entire lawsuit—of legitimacy."[152]

The lawyers and doctors before us almost wholly rely on *Ford* to argue the challenged medical records and reports constitute protected petitioning activity because they allegedly prepared them in anticipation of litigation later used to support court filings and settlement demands.[153] They analogize the medical records to the billing records in *Ford*, which Judge Court found protected because the lawyers prepared them based on litigation activity and "in anticipation of submitting [the] fee petitions."[154] The lawyers and doctors emphasize Uber's own allegations

describing the records as documents created to support lawsuits and demand substantial settlements.[155] They argue the alleged misrepresentations are "fraudulent" only because the lawyers later used them for litigation purposes against Uber and therefore the same alleged misrepresentations constitute petitioning activity whether made before or after litigation began.[156] The lawyers and doctors before us further invoke Judge Court's fraud-based sham analysis, arguing the alleged misrepresentations at most inflated the claimants' injuries or damages and did not deprive the underlying negligence claims of legitimacy.[157]

But we face materially different facts than Judge Court. Her analysis in *Ford* involved lawyers' billing records and fee petitions arising from litigation work in Lemon Law cases after the clients prevailed or resolved their claims. The challenged conduct involved lawyers seeking fees through court filings. It did not involve prelitigation communications with third parties or the creation of non-litigation records by medical providers. The alleged fraud concerned payment for legal work after the clients had claims capable of adjudication on their own merits.

Uber alleges a different kind of conduct. It alleges the lawyers and doctors manufactured medical evidence needed to create, support, and maintain the personal injury claims in the first instance. It alleges the lawsuits depended on the challenged conduct because the medical records supplied the serious-injury, causation, treatment, and future-care predicates used to avoid ordinary resolution and extract inflated settlements.

This core fact distinction is critical to the sham exception analysis. In *Ford*, the alleged fee inflation did not undermine the clients' substantive Lemon Law claims or show the lawyers lacked entitlement to any fees. Uber distinctively alleges the misrepresentations went to the factual predicate of the underlying negligence claims themselves: whether the claimants suffered serious accident-related injuries, whether the treatment was medically necessary, whether future care

would be required, and whether the claims belonged in litigation rather than no-fault resolution or compulsory arbitration. If proven, those alleged misrepresentations could deprive the litigation of legitimacy in a way inflated fee petitions in otherwise viable Lemon Law cases did not. We do not read *Ford* to require *Noerr–Pennington* immunity here.

### B.  Res judicata does not bar Uber's claims.

We are also mindful we are now reviewing the merits of resolutions in some but not all of the pleaded Philadelphia court cases. The lawyers and doctors argue the doctrine of res judicata bars Uber's claims arising from concluded litigations involving the same underlying events, involve the same parties or their privies, and could have been raised in those earlier proceedings.[158] Uber counters res judicata does not apply because there is no final judgment in several of the underlying actions, those lawyers and doctors were not parties to those cases and could only have been joined through permissive impleader, and this action arises from a distinct racketeering scheme rather than the personal injury claims litigated in state court.[159] We disagree with the lawyers and doctors.

Res judicata bars a claim where there has been "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action."[160] Our Court of Appeals "disavow[s] attempts to create a simple test for determining what constitutes a cause of action for res judicata purposes."[161] We are to focus on the "essential similarity of the underlying events giving rise to the various legal claims" and relevant factors include "(1) whether the acts complained of were the same; (2) whether the material facts alleged in each suit were the same; and (3) whether the witnesses and documentation required to prove such allegations were the same."[162]

This action does not arise from the same cause of action as the underlying personal injury cases. The underlying lawsuits concerned liability for injuries arising from motor vehicle accidents. This case concerns an alleged racketeering scheme involving the creation and use of fraudulent medical records and reports to generate and inflate claims. Although the underlying events provide factual context, the acts complained of, the material facts alleged, and the proof required differ in meaningful ways. The racketeering claims turn on the existence of an alleged scheme, the roles of multiple participants, and the use of interstate mail and wires, none of which resolved in the underlying personal injury actions. Res judicata does not apply.

### C. *Rooker-Feldman* doctrine does not bar Uber's claims.

The lawyers and doctors argue the *Rooker–Feldman* doctrine deprives us of subject matter jurisdiction because Uber "complain[s] of injuries caused by state-court judgments" and seeks relief which "requires setting aside the final judgments and undoing the settlements that are now part of final judgments."[163] Uber counters *Rooker–Feldman* does not apply because it is not a state court "loser" and does not seek to overturn a state-court judgment but instead challenges an independent fraud scheme.[164]

The *Rooker-Feldman* doctrine instructs "federal district courts lack jurisdiction over suits that are essentially appeals from state-court judgments."[165] *Rooker-Feldman* applies where: "(1) the federal plaintiff lost in state court; (2) the plaintiff 'complains of injuries caused by the state-court judgments'; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments."[166] But "the federal court has jurisdiction as long as the federal plaintiff presents some independent claim, even if that claim denies a legal conclusion reached by the state court."[167] "In other words, if the federal court's review does not concern the bona fides of the prior judgment, the federal court is not conducting

prohibited appellate review even if the claim for relief if granted would as a practical matter undermine a valid state court order."[168]

Uber does not invite us to review or reject a state-court judgment. Uber instead challenges the lawyers' and doctors' conduct in pursuing and resolving the underlying actions and seeks damages for an alleged fraud scheme. We may adjudicate these claims without overturning a state-court judgment even if relief may as a practical matter undermine those outcomes.[169] Prong four is not met. *Rooker-Feldman* does not apply.

### D. Uber sufficiently pleads racketeering claims.

The lawyers and doctors next turn to challenge the factual and legal sufficiency of Uber's amended and exhaustive detailed allegations. They argue Uber did not plead predicate racketeering acts, the conduct of an enterprise, proximate causation of their alleged injuries, or a racketeering conspiracy. Uber responds it specifically pleads extensive facts meeting the applicable pleading standards.

Congress through the Act prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . ."[170] An injured party must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus (5) an injury to business or property, and (6) the racketeering activity must have been the 'but for' cause as well as the proximate cause of the injury" to establish civil liability.[171] A "pattern of racketeering activity" requires "at least two" predicate racketeering acts.[172] Predicate acts include mail fraud and wire fraud.[173] Congress also makes it "unlawful for any person to conspire to violate any of the provisions" of the Act.[174]

24

"[E]ach element of a conspiracy 'may [be] prove[n] . . . solely through circumstantial evidence.'"[175]

Uber pleads ample facts, mindful of our required deference to their allegations at this stage, to allow us to infer a plausibly basis for their varied racketeering claims.

### 1. Uber pleads predicate racketeering acts.

The lawyers and doctors argue Uber fails to plead the required predicate acts for a racketeering claim because fraudulent litigation activity cannot serve as a predicate offense and Uber otherwise does not satisfy the pleading standards under Rules 8 and 9.[176] Uber responds the alleged racketeering conduct is not confined to litigation filings but includes the creation and transmission of false records and maintains its allegations plausibly plead mail and wire fraud with particularity.[177]

We begin with whether Uber plausibly pleads predicate acts of mail and wire fraud. "Mail or wire fraud consists of (1) a scheme to defraud, (2) use of the mail or interstate wires to further that scheme, and (3) fraudulent intent."[178] Fraud may be "measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community."[179] "A scheme to defraud may be adequately pled by alleging 'some sort of fraudulent misrepresentation or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'"[180]

Allegations of racketeering activity based on mail or wire fraud as the predicate act "are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b), which states that 'a party must state with particularity the circumstances constituting fraud.'"[181] The Rule 9(b) requirements "may be satisfied if the complaint describes the circumstances of the alleged fraud with 'precise allegations of date, time, or place' *or* by using some means of 'injecting

25

precision and some measure of substantiation into their allegations of fraud.'"[182] "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally" and we may "rely on circumstantial evidence to infer a defendant's knowledge."[183]

The lawyers and doctors argue Uber fails to sufficiently plead mail and wire fraud "because there are no allegations of *when* each Defendant used mailings or wires to transmit their allegedly fraudulent documents" and the allegations of fraudulent intent are "entirely conclusory."[184] Uber responds it pleads the participants, the nature of the allegedly fraudulent records, and the manner in which those records were created, transmitted, and used and Rule 9(b) does not require the precise date and time of every communication.[185]

We disagree with the lawyers and doctors. Uber's allegations readily exceed Rule 9(b)'s pleading standard and we need not recite them in full. It alleges the lawyers operated a "conveyor belt" referring claimants to Drs. Harvey, Piccillo, and/or Burt and directing these providers to generate fraudulent medical records reflecting serious and permanent injuries.[186] It further alleges the lawyers directed Dr. Yarus to prepare reports based on the fraudulent records attributing those injuries to the underlying incidents and recommending future treatment.[187] Uber pleads numerous specific examples identifying the participants in the scheme, the nature of the records, each professional's role, and the mechanism by which the doctors transmitted records through interstate wires and incorporated those records into demands and litigation filings.[188] It further alleges this conduct occurred repeatedly over a defined period, including dozens of lawsuits filed in 2022 through 2024 based on those records.[189] These allegations provide the requisite precision and provide sufficient substantiation to satisfy Rule 9(b)'s particularity requirement.

We are also not persuaded by the lawyers' and doctors' arguments claiming the fraud allegations are conclusory. Mail and wire fraud "require proof of specific intent."[190] Specific intent

"may be found from a material misstatement of fact made with reckless disregard for the truth."[191] Rule 9(b) permits intent to be alleged generally. Uber's pleaded facts viewed in their totality support a reasonable inference the lawyers and doctors acted with fraudulent intent, or at minimum reckless disregard for the truth, in using the mails and interstate wires to transmit false or misleading medical documents in furtherance of the alleged scheme. These allegations are sufficient at this stage to plausibly plead fraudulent intent.

We next address the lawyers' and doctors' argument the pleaded litigation activity cannot be a predicate act. They rely on a decision of our Court of Appeals almost four years ago in *Applebaum v. Fabian* affirming dismissal of a predicate act "premised on . . . alleged misrepresentations throughout state court proceedings," concluding such allegations do not state a claim because "it is well established that fraudulent litigation activity 'cannot act as a predicate offense for a civil-[racketeering] claim.'"[192] But we do not read this one-sentence disposition to impose a categorical bar on all claims involving litigation-related conduct. The underlying allegations in *Applebaum* consisted of assertions of "litigation fraud" and perjury tied to filings in a single probate dispute.[193] The allegedly injured party did not identify a cognizable predicate offense nor did she plead conduct constituting mail or wire fraud or facts supporting a broader scheme to defraud.[194]

So, in this challenge to the pleading, the lawyers and doctors characterize all of their alleged conduct as litigation activity and argue the only predicate acts attributed to the lawyers are the filing and serving complaints and, as to the doctors, the "preparation of medical reports in anticipation of and used in those litigations."[195] We agree (as we did in reviewing *Noerr-Pennington* immunity earlier) the lawyers filing and serving complaints constitutes litigation activity. We also agree the filing of complaints alone cannot support a racketeering predicate act.

27

But Uber contends its claims do not rest solely on litigation activity but instead arise from a broader fraudulent scheme involving predicate acts of mail and wire fraud in the creation and transmission of false medical and billing records.[196] It alleges the lawyers "orchestrated and directed" the doctors to generate the false records and arranged for them to be transmitted through interstate mail and wires and their subsequent use in demand letters and litigation, and the doctors knowingly created and transmitted those records to further the scheme.[197]

Our Court of Appeals in *Applebaum* did not resolve this dispute. It does not address whether alleged acts of mail and wire fraud may constitute predicate acts where an allegedly injured party pleads a coordinated scheme extending beyond the litigation itself. Nor does it hold conduct otherwise qualifying as mail or wire fraud cannot serve as a predicate act because it is committed in connection with litigation. Neither party identifies, and we have not identified, precedential guidance from our Court of Appeals addressing this issue.[198]

We then looked to the out-of-Circuit cases cited by our Court of Appeals in *Applebaum*. We do not find *Snow Ingredients, Inc. v. SnoWizard, Inc.* analogous. The plaintiff in *Snow Ingredients* alleged a series of obstructive acts across multiple proceedings but did not plead conduct constituting a predicate offense.[199] The Court of Appeals for the Fifth Circuit affirmed dismissal because the plaintiff did not allege "actual criminal activity" as required to state a racketeering claim.[200] It relied in part on its earlier decision in *St. Germain v. Howard*, where the plaintiff alleged mail and wire fraud but conceded the challenged conduct did not satisfy the criminal elements of those offenses and instead amounted only to violations of professional obligations.[201] Here, by contrast, Uber sufficiently pleads conduct which, if proven, satisfies the elements of mail and wire fraud rather than merely improper litigation activity or violations of professional obligations.

The Court of Appeals in *Snow Ingredients, Inc.* also cited a distinguishable district court decision permitting a racketeering claim to proceed. Judge Sullivan in *Feld Entertainment v. American Society for the Prevention of Cruelty to Animals* recognized a critical distinction: "courts have refused to allow 'litigation activities' such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for [racketeering], but only in circumstances where such acts constitute 'the only allegedly fraudulent conduct.'"[202] "On the other hand, where 'additional allegations of extortion or some other pattern of racketeering activity' are involved, courts 'have found that alleged mail and wire fraud violations arising out of malicious prosecution or abuse of process could be [racketeering] predicate acts.'"[203] Judge Sullivan allowed the claim to proceed because the allegations were "not limited to claims that defendants filed false documents with the Court or otherwise engaged in frivolous and harassing litigation; they claim the entire lawsuit was based on bribery of the lead plaintiff and witness."[204] This distinction underscores the relevant inquiry turns on whether our colleagues reviewed alleged additional racketeering conduct beyond litigation activity alone.

Our Court of Appeals in *Applebaum* also cited *Deck v. Engineered Laminates* and *Raney v. Allstate Insurance Company* but we do not find the analysis in those cases persuasive today.[205] Both cases involved racketeering claims premised on extortion theories arising from litigation conduct. The Court of Appeals for the Tenth Circuit in *Deck* found bad-faith or fraudulent litigation does not constitute "wrongful" conduct under the Hobbs Act and therefore cannot support an extortion-based predicate.[206] But it separately recognized adequately pleaded allegations of mail and wire fraud based on misrepresentations in a settlement agreement.[207] The Court of Appeals for the Eleventh Circuit in *Raney* likewise rejected an extortion predicate because "neither the

threat to litigate nor the fabrication of evidence behind the lawsuit made the action 'wrongful' within the meaning of" the Hobbs Act.[208]

We find *Kim v. Kimm* and related Second Circuit authority most instructive. The alleged scheme in *Kim* arose from a single lawsuit supported by allegedly false filings with no broader pattern of fraudulent activity leading the Court of Appeals to hold "frivolous, fraudulent, or baseless litigation activities—*without more*—cannot constitute a [racketeering] predicate act."[209] It "decline[d] to reach the issue of whether all [racketeering] actions based on litigation activity are categorically meritless."[210] It also emphasized "compelling policy arguments" against treating litigation activity as racketeering predicates, citing risks of retaliatory suits, disruption of existing sanctions regimes, comity concerns, and chilling access to the courts.[211]

Our colleagues applying *Kim* "have generally required that, for a litigation activity to serve as a [racketeering] predicate act, a plaintiff allege facts beyond that a lawsuit was brought by legitimate means. Rather, a complaint must allege more concerted abuse of the legal system."[212] For example, Judge McAvoy found a plausible racketeering claim where the plaintiff alleged a pattern of mail and wire fraud supporting "a large-scale fraud scheme" and the "predicate acts [were] not limited to fraudulent activities in [an individual case], but rather include those activities necessary to support the massive fraud scheme he contends existed."[213] And the Court of Appeals has since reinforced this distinction, explaining litigation "involving hundreds of baseless state-court proceedings that are part of a massive fraudulent scheme [] may itself further a [racketeering] violation, which . . . consist[ed] of alleged repeated violations of the federal mail fraud statute," while declining to decide "whether the state-court proceedings . . . constitute predicate acts."[214] It found "[t]he instant action is distinguishable from *Kim*" because the plaintiff did not "contend that the state-court proceedings [were] predicate acts . . . but instead that they

help[ed] further the [racketeering] violation, which consist[ed] of a pattern of racketeering activity under the mail fraud statute through other fraudulent activities alleged in the complaint."[215] "In other words, the issue is not whether the state-court proceedings are *themselves* predicate acts, but rather that they are allegedly designed to perpetuate and monetize the [racketeering] scheme."[216]

Uber alleges a scheme extending beyond litigation activity alone. This is not a case involving a single lawsuit supported by allegedly false filings. Accepting the pleaded facts as true, Uber alleges a coordinated, multi-actor scheme spanning dozens of lawsuits over several years, supported by the repeated creation and transmission of materially false medical and billing records. The alleged conduct includes directing claimant referrals, controlling medical treatment, and generating standardized or fabricated records for use across numerous claims. These allegations describe coordinated conduct occurring before, during, and outside litigation. Uber alleges the filing and serving of lawsuits serve to further and monetize a scheme predicated on independently actionable conduct—repeated use of the mails and interstate wires to transmit fraudulent records—making litigation one component of the scheme, not its entirety. These allegations plausibly describe "more concerted abuse of the legal system" rather than isolated litigation misconduct.

The Court of Appeals's policy concerns underlying *Kim* are not implicated in these allegations. Recognizing liability here does not risk transforming every unsuccessful lawsuit into a racketeering claim or a retaliatory action. Nor does it displace existing sanctions regimes governing ordinary litigation misconduct. Uber alleges a systemic mass scheme across numerous cases and actors, for which case-by-case sanctions would not provide a meaningful remedy.

The lawyers' and doctors' characterization of their alleged conduct as mere litigation activity does not allow us to dismiss Uber's claim at this stage. Uber plausibly alleges the requisite predicate acts to support a racketeering claim.

31

### 2.  Uber sufficiently pleads the enterprises necessary for racketeering.

The lawyers and doctors argue Uber does not plead facts allowing us to plausibly infer the existence of a racketeering enterprise. They contend the alleged "Simon & Simon" and "Premier Pain & Rehab Center" enterprises "are not [racketeering] enterprises because those entities are themselves 'persons' alleged to have conducted the racketeering activity" and liability therefore fails as a matter of law.[217] They further argue the alleged association-in-fact lacks the structure, continuity, and separateness required to constitute a racketeering enterprise.[218]

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[219] "[W]hen the enterprise asserted is a legal identity, such as 'a legitimate business or organization . . . , the need to allege and prove the existence of enterprise structure can be met without great difficulty, since all aspects of the enterprise element . . . are satisfied by the mere proof that the entity does in fact have a legal existence.'"[220] "An association-in-fact enterprise may be pled by showing: '(i) that there exists an ongoing organization, formal or informal; (ii) that the various associates of the organization function as a continuing unit; and (iii) that the organization has an existence separate and apart from the alleged pattern of racketeering activity.'"[221] "The existence of the enterprise may be inferred 'from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity.'"[222]

"[T]o establish liability under [the Act] one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."[223] Uber alleges Simon & Simon is the "enterprise" and Attorney Simon is the "person" who conducted its affairs through a pattern of racketeering activity in Count I.[224] Uber likewise alleges in Count II Premier Pain & Rehab is the "enterprise" and Attorney Simon,

32

Dr. Burt, and Simon & Simon conducted its affairs.[225] These theories satisfy the distinctness requirement because the alleged enterprises are legal entities separate from the individuals and entities alleged to have conducted their affairs.[226] Uber may also "allege alternative enterprise theories in [its] complaint without limit."[227]

Uber also sufficiently alleges an association-in-fact enterprise conducted by Attorney Simon, Simon & Simon, Dr. Burt, and Premier Pain & Rehab. An association-in-fact enterprise "must have at least three structural features: (i) a purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to permit these associates to pursue the enterprise's purpose."[228] The enterprise need not possess a formal hierarchy, chain of command, fixed roles, regular meetings, or other formal structural features traditionally associated with an organization.[229] Uber asserts it pleads each of these elements and we agree. It alleges (1) a shared purpose—manufacturing fraudulent evidence of accident-induced serious injuries to enable [the lawyers] to extract artificially inflated settlements;" (2) relationships among the relevant defendants, including describing how they communicate and coordinate;" and, (3) "longevity, describing the association's conduct back to 2020."[230] These allegations plausibly plead an enterprise functioning as a continuing unit and involving "interpersonal relationships and a common interest."[231]

The lawyers' and doctors' characterization of the allegations as mere referral relationships or parallel conduct does not warrant dismissal at this stage. Viewing the pleaded facts in the light most favorable to Uber, it alleges more than independent actors pursuing their own business interests. It alleges repeated coordination among the same participants in furtherance of a shared objective, including recurring referrals to Dr. Burt, Dr. Burt's standardized reporting practices, and repeated use of the same procedures and fraudulent records to support claims. Nor does the

involvement of additional nonparty actors defeat the existence of an enterprise.[232] We are likewise not persuaded by the lawyers' and doctors' separateness argument. An association-in-fact enterprise need not possess a "purpose or economic significance beyond or independent of the group's pattern of racketeering activity."[233] Uber plausibly alleges three racketeering enterprises.

### 3. Uber sufficiently pleads the proximate cause necessary for standing.

The lawyers and doctors also argue Uber lacks standing because the alleged racketeering activity did not proximately cause its asserted injuries.[234] They contend the alleged predicate acts of mail and wire fraud require some form of reliance but Uber "defied" the alleged misrepresentations rather than relied on them.[235] They argue any settlement-related injury fails because the settlement agreements allegedly contain fraud-insulating integration clauses, Uber does not plausibly allege it paid the settlements, and Uber settled with knowledge of the facts it now calls fraudulent.[236] And the lawyers and doctors finally assert damages cannot be apportioned without speculation, insurers or drivers are more immediate victims better positioned to sue, and no third-party reliance plausibly caused Uber's harm.[237]

"Any person *injured in his business or property* by reason of a violation of [the Act] may sue."[238] "The meaning of the relevant phrase is therefore straightforward: A plaintiff has been 'injured in his business or property' if his business or property has been harmed or damaged."[239] The Act "requires nothing more."[240] "In order to have standing to litigate a civil [racketeering] claim, a plaintiff must show that [he] suffered an injury to [his] business or property and that the injury was proximately caused by the defendant's racketeering activities."[241] Proximate cause requires a showing there is "some direct relation between the injury asserted and the injurious conduct alleged."[242] "The focus [of proximate causation] is on the directness of the relationship between the conduct and the harm" rather than "the concept of foreseeability."[243] We are to

consider three factors when determining proximate cause: "(1) the directness of the injury, (2) the difficulty of apportioning damages, and (3) whether there are direct victims of the alleged violation that could better vindicate the policies underlying [the Act]."[244]

We are not persuaded by the lawyers' and doctors' threshold reliance argument. The proximate causation element of a racketeering claim "[do] not necessitate first-party reliance on the alleged misrepresentations."[245] We also find Uber plausibly pleads proximate causation. It alleges the lawyers and doctors created and transmitted false records and reports for the purpose of inflating personal-injury claims against it. It further alleges the lawyers and doctors used those materials to create litigation leverage, increase the apparent value of the underlying claims, cause Uber to incur defense costs, and induce inflated settlements. The pleaded injuries flow directly from the alleged scheme. It alleges the lawyers and doctors intended it to be the target of the scheme and paid defense costs and settlement amounts it would not have paid, or would have paid in lower amounts, absent the lawyers' and doctors' alleged fraud.

The lawyers' and doctors' settlement-agreement, knowledge, apportionment, insurer, and third-party-reliance arguments do not defeat proximate cause at the pleading stage. Their settlement arguments ask us to resolve fact questions about what Uber knew, why it settled, who paid, and what effect the settlement terms have on causation. Their apportionment argument likewise depends on a damages record not yet developed. Uber need only plausibly allege a direct relation between the predicate acts and its injury. It has done so by alleging the lawyers and doctors manufactured and transmitted false medical materials to inflate claims against Uber and thereby caused Uber to incur legal fees and inflated settlement costs. We decline to dismiss for lack of standing based on fact issues on proximate causation.

### 4. Uber pleads a conspiracy.

The lawyers and doctors argue Uber does not plead facts allowing us to plausibly infer a racketeering conspiracy claim. They first argue the conspiracy claim fails because the substantive racketeering claims fail.[246] This derivative argument is not persuasive because Uber adequately pleads substantive racketeering claims.[247] The lawyers and doctors further argue Uber does not plausibly allege facts showing knowledge of the alleged racketeering scheme or an agreement to facilitate it.[248] They contend the doctors rendered lawful professional services, there are "no allegations plausibly demonstrating that the Simon Defendants knew information in any of the" doctors' records and reports "were false," and the allegations amount to nothing more than parallel conduct and conclusory assertions of agreement unsupported by facts plausibly demonstrating coordinated action or a shared conspiratorial objective.[249]

An injured party must plead "(1) agreement to commit the predicate acts of fraud and (2) knowledge that those acts were a part of a pattern of racketeering activity conducted in such a way as to violate" the Act to state a conspiracy claim.[250] "There is no requirement of an overt act and, thus, 'a defendant may be held liable for conspiracy to violat[e the Act] if he knowingly agrees to facilitate a scheme which includes the operation or management of a [racketeering] enterprise.'"[251]

Uber plausibly alleges the doctors knew the lawyers "le[d] a corrupt enterprise to fraudulently manufacture evidence of non-existent serious injuries that could be used to extract artificially inflated settlements, and that they agreed to facilitate the scheme."[252] For example: the lawyers repeatedly referred claimants to the same medical providers over several years—Drs. Harvey, Piccillo, and Burt; the doctors generated records and reports used to support serious-injury claims; Dr. Yarus prepared causation reports and future care projections based on those materials; and the resulting records and reports were repeatedly transmitted and used in demand packages

36

and litigation filings. These allegations plausibly suggest coordinated participation in a shared scheme rather than isolated professional services or unrelated parallel conduct.

Uber's allegations also support a plausible inference of knowledge. Uber alleges the records and reports followed recurring templates across numerous clients, attributed serious accident-related injuries despite allegedly minimal injuries, documented unnecessary or unperformed treatment, and projected false extensive future care repeatedly over several years. These alleged patterns, together with the repeated involvement of the same participants, support a reasonable inference the lawyers and doctors understood their conduct played a central part of an ongoing scheme rather than a series of isolated transactions.

The lawyers' and doctors' contrary arguments largely ask us to draw competing factual inferences from the pleadings and materials outside the amended Complaint. Whether the lawyers and doctors acted innocently, exercised legitimate professional judgment, or lacked awareness of the alleged scheme presents fact disputes not appropriately resolved today. Drawing all reasonable inferences in Uber's favor, Uber plausibly pleads a racketeering conspiracy claim.

III.    Conclusion

We find no basis to dismiss Uber and FedEx's racketeering claims based upon res judicata or *Rooker-Feldman*. Immunity under the *Noerr-Pennington* doctrine designed to protect the right to petition the courts poses an interesting issue addressed by our colleagues now outside of the historical antitrust context from which it arose. We recognize petitioning activities are generally entitled to immunity under the Petition Clause as we do not want to chill  rights to seek remedies. But this immunity to freely petition has limits like most First Amendment rights. Not all conduct leading to a lawsuit can be litigation activity with immunity. And a lawyer and his experts cannot create false documents under the guise of the Petition Clause and then be immune for their fraud.

37

The question before us – and eventually to be resolved after discovery and possibly by the jury– is whether the lawyers' identified filed complaints in Philadelphia courts undisputedly constituting petitioning activity fraudulently misrepresent the lawyers' view of their clients' case including damages. But Uber and FedEx sufficiently pleaded these state court allegations are fraudulent subject to our review following discovery. Uber and FedEx pleaded details allowing us to plausibly infer each element of its racketeering claims.  It will now need to adduce evidence to support its liability and damages theories.

---

[1] ECF 71 ¶ 32. We will refer to only Uber for ease of reference although all claims and allegations are asserted by both Uber and FedEx.

Simon & Simon, P.C. is a personal injury law firm with its principal place of business in Pennsylvania. *Id.* ¶ 19. Marc Simon is a member of the Pennsylvania Bar and the managing partner at Simon & Simon. *Id.* ¶ 20. Attorney Simon founded Simon & Simon in 2010 and "serves as its [Chief Executive Officer] and full owner." *Marc I. Simon*, Simon & Simon, https://www.gosimon.com/about/attorneys/marc-i-simon/ [https://perma.cc/FAC8-CKJR].

[2] *Id.* ¶ 33.

[3] *Id.* ¶ 96.

[4] *Id.* ¶ 63.

[5] *Id.*

[6] *Id.* ¶¶ 24–25.

[7] *Id.* ¶¶ 21–22.

[8] *Id.* ¶ 26.

[9] *Id.* ¶ 36.

[10] *See, e.g., id.* ¶¶ 64, 103, 121, 152, 170, 215, 279, 377, 407.

[11] *See, e.g., id.* ¶¶ 70, 105, 123, 156, 173, 218, 280, 378, 409.

[12] *Id.* ¶ 71.

[13] *See, e.g., id.* ¶¶ 105, 123, 156, 218, 254, 267, 280, 335, 378.

[14] *See, e.g., id.* ¶¶ 103, 121, 152, 170, 216, 279, 289, 377, 407–08.

[15] *See, e.g., id.* ¶¶ 104, 122, 153, 170-71, 179, 217, 291.

[16] *See, e.g., id.* ¶¶ 104, 154.

[17] *See, e.g., id.* ¶¶ 175, 220, 462, 466, 472, 475, 482, 489, 490.

[18] *See, e.g., id.* ¶¶ 44, 106, 124, 141, 157, 176, 193, 221, 240, 255, 268, 286, 299, 318.

[19] *Id.* ¶¶ 45–46.

[20] *Id.* ¶ 45.

[21] *Id.* ¶ 46.

[22] *Id.* ¶¶ 46–49.

[23] *See, e.g., id.* ¶¶ 40–41, 107, 125, 142, 158, 177, 194, 222, 240, 256, 269, 290, 291.

[24] *See, e.g., id.* ¶¶ 69, 107, 125, 142, 158, 177, 194, 222, 256, 269, 287, 290.

[25] *Id.* ¶ 51.

[26] *See, e.g., id.* ¶¶ 51, 53–56, 107, 125-26, 142-43, 159, 195, 223, 301.

[27] *See, e.g., id.* ¶¶ 54–56, 107, 125, 142, 158, 177, 205, 222, 291, 320.

[28] *See, e.g., id.* ¶¶ 126, 143, 159-61, 178, 195, 206, 223, 301, 320.

[29] *See, e.g., id.* ¶¶ 461, 465, 469, 471, 474, 478, 481, 485, 491, 493, 496.

[30] *Id.* ¶¶ 58, 196.

[31] *Id.*

[32] *Id* ¶ 58.

[33] *See, e.g., id.* ¶¶ 73–75, 108, 127, 180, 198, 224, 242, 257, 270, 302.

[34] *See, e.g., id.* ¶¶ 73, 110, 130, 180, 305.

[35] *Id.* ¶ 76.

[36] *Id.* ¶ 77.

[37] *Id.*

[38] *See, e.g., id.* ¶¶ 78–81, 109, 129, 198, 208, 225, 245, 258, 271, 304

[39] *Id.* ¶ 86.

[40] *Id.* ¶ 94.

[41] *See, e.g., id.* ¶¶ 463, 467, 476, 479, 483, 486, 494.

[42] *See, e.g., id.* ¶¶ 94, 114, 134, 182, 201, 228, 246, 261, 274, 309.

[43] *Id.* ¶¶ 92, 95; *see also id.* ¶¶ 115, 135, 147, 165, 184, 210, 231, 248, 262, 274, 292, 310, 324

[44] *Id.* ¶¶ 73, 92; *see also id.* ¶¶ 115, 135, 147, 165, 184, 210, 231, 248, 292, 310.

[45] *Id.* ¶ 438.

[46] *Id.* ¶¶ 72, 438.

[47] *Id.* ¶ 40.

[48] *Id.* ¶ 84.

[49] *Id.* ¶¶ 59, 87.

[50] *Id.* ¶ 87.

[51] *Id.* ¶ 33.

[52] *Id.* ¶ 96.

[53] *Id.* ¶ 73.

[54] *Id.* ¶ 84.

[55] *Id.* ¶ 92.

[56] *Id.* ¶ 98.

[57] *Id.* ¶¶ 97–98.

[58] *Id.* ¶ 99.

[59] *Id.* ¶¶ 4–9.

[60] *Id.* ¶¶ 514–39.

[61] *Id.* ¶¶ 519, 526, 532, 538.

[62] *Id.* ¶¶ 1–3.

[63] *Id.* at 137.

[64] *See generally* ECF 82-1.

[65] *Id.* at 7–9.

[66] *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015).

[67] *See, e.g.*, *Campbell v. Pa. Sch. Bds. Ass'n*, 972 F.3d 213, 220 (3d Cir. 2020) ("For instance, [the doctrine] shields constitutionally protected protesters from civil suits. It has also been applied . . . to bar § 1983 claims by state actors based upon constitutionally protected conduct."); *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159–61 (3d Cir. 2001) (summarizing *Noerr-Pennington*'s applicability to various areas of law); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 160 (3d Cir. 1988) (finding *Noerr-Pennington* immunized defendants in civil conspiracy action).

[68] *See We, Inc. v. City of Phila.*, 174 F.3d 322, 326–27 (3d Cir. 1999) (The doctrine "offer[s] protection to citizens' petitioning activities. . . . Thus, the purpose of *Noerr–Pennington* as applied in areas outside the antitrust field is the protection of the right to petition."); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57 (1993) ("*PRE*") (recognizing *Noerr-Pennington* extends to "the approach of citizens . . . to administrative agencies . . . and to courts") (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).

[69] *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 622 F. Supp. 3d 22, 76 (E.D. Pa. 2022) (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 503, 497 (1988)).

[70] *Id.* (first quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 243 (3d Cir. 2006); then quoting *Allied Tube*, 486 U.S. at 499).

[71] *Campbell*, 972 F.3d at 219.

[72] *Hanover 3201 Realty*, 806 F.3d at 178.

[73] *Cap. Builders, Inc. v. Twp. of Robinson*, No. 21-1069, 2024 WL 1285776, at *10 (W.D. Pa. Mar. 26, 2024) (citing *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) ("A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay.")).

[74] *In re Merck Mumps Vaccine Antitrust Litig.*, No. 23-3089, 2024 WL 4432076, at *4 (3d Cir. Oct. 7, 2024), *cert. denied sub nom., Chatom Primary Care, P.C. v. Merck & Co.*, 146 S. Ct. 325 (2025).

[75] ECF 82-1 at 7.

[76] *Id.* at 8–9.

[77] *Id.* at 9–10.

[78] *Id.* at 10–13.

[79] *Id.* at 11.

[80] *Id.*

[81] *Id.* at 4–9.

[82] *Id.* at 10–13.

[83] *Montway LLC v. Navi Transp. Servs. LLC*, No. 25-381, 2026 WL 866290, at *3 (D. Del. Mar. 30, 2026) (first quoting *Sweet Street Desserts, Inc. v. Chudleigh's, Ltd.*, 655 F. App'x 103, 110 (3d Cir. 2016); then quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006)).

[84] *Id.* (quoting *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 252 (3d Cir. 2001)).

[85] *Id.* at *2.

[86] *Id.* at *1, *3.

[87] *Id.* at *2.

[88] *Id.* at *3–4.

[89] *Id.* at *3 ("*Noerr-Pennington* immunizes actions 'incidental' to filing a lawsuit because holding a plaintiff liable for 'prelitigation conduct when the same demands asserted in a petition to the court [would be] protected would render the entire litigation process more onerous,' indirectly burdening the plaintiff's rights under the Petition Clause.") (quoting *Sosa*, 437 F.3d at 936).

[90] *Id.* at *4 (collecting cases).

[91] *Id.* at *3 (quoting *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1132 (D. Minn. 2016)).

[92] *Id.* at *4

[93] *Id.* at *3.

[94] ECF 95 at 3–4 (emphasis in original).

[95] *Id.* at 5–6.

[96] ECF 96 at 3–5.

[97] *Id.* at 5–6.

[98] *Hanover 3201 Realty*, 806 F.3d at 180 (citing *PRE*, 508 U.S. 49; *California Motor*, 404 U.S. 508).

[99] *Id.* at 179 (quoting *PRE*, 508 U.S. at 60–61) (emphasis in original).

[100] *Id.*

[101] *Id.* (quoting *PRE*, 508 U.S. at 60); *see also id.* at 180 ("Thus, *Professional Real Estate* requires a showing of objective baselessness before looking into subjective motivations in order to prevent any undue chilling of First Amendment activity.").

But the objective and subjective baselessness prongs "are interrelated. To see how, consider the following syllogism: (1) A lawsuit is objectively baseless if no reasonable litigant could realistically expect success on the merits; (2) and a litigant who files an objectively baseless lawsuit must have had some subjective motivation for suing; (3) but because the lawsuit was objectively baseless, the litigant's subjective motivation could not have been success on the merits, unless the litigant was unreasonable; (4) thus, a reasonable litigant's subjective motivation for filing an objectively baseless lawsuit must be something besides success on the merits." *Fed. Trade Comm'n v. AbbVie Inc.*, 976 F.3d 327, 370 (3d Cir. 2020) ("*AbbVie II*") (citation omitted).

[102] *Hanover 3201 Realty*, 806 F.3d at 180.

[103] *Id.*

[104] *Id.* (emphasis added).

[105] *Id.* (quoting *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL– CIO*, 31 F.3d 800, 811 (9th Cir. 1994)).

[106] *Id.* (quoting *USS–POSCO Indus.,* 31 F.3d at 811). "The word 'genuine' has both objective and subjective connotations. On one hand, 'genuine' means 'actually having the reputed or apparent qualities or character.'" *PRE*, 508 U.S. at 61 (quoting Webster's Third New International Dictionary 948 (1986)). "'Genuine' in this sense governs Federal Rule of Civil Procedure 56, under which a 'genuine issue' is one 'that properly can be resolved only by a finder of fact because [it] may *reasonably* be resolved in favor of either party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)) (emphasis in original). "On the other hand, 'genuine' also means 'sincerely and honestly felt or experienced.' To be sham, therefore, litigation must fail to be 'genuine' in both senses of the word." *Id.* (quoting Webster's Dictionary at 948).

[107] *Hanover 3201 Realty*, 806 F.3d at 180.

[108] *Id.* at 180-81 (citing *PRE,* 508 U.S. at 68 (Stevens, J., concurring); *see also Bayer Healthcare LLC v. Second Stone Enters. LLC*, No. 24-7618, 2025 WL 1531237, at *3–4 (D.N.J. May 29, 2025).

[109] *In re Flonase Antitrust Litig.*, 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011) (citation omitted); *see also, e.g., Burke v. Bachert*, 702 F. Supp. 3d 347, 359 (E.D. Pa. 2023) (finding the sham litigation exception "better resolved at the summary judgment stage due to its fact-intensive nature"); *Fed. Trade Comm'n v. Shire ViroPharma Inc.*, No. 17-131, 2018 WL 1401329, at *7 (D. Del. Mar. 20, 2018), *aff'd*, 917 F.3d 147 (3d Cir. 2019) (Whether the litigation "was in fact a sham under either standard is a factual inquiry, which cannot be resolved at the motion to dismiss stage."); *Otsuka*

*Pharm. Co. v. Torrent Pharms. Ltd.*, 118 F. Supp. 3d 646, 657 (D.N.J. 2015) (denying motion to dismiss where baselessness determinations "require[d] inquiry into issues of fact, which [could not] be resolved in the context of a motion to dismiss, and prior to discovery"); *S3 Graphics Co. v. ATI Techs. ULC*, No. 11-1298, 2014 WL 573358, at *3 (D. Del. Feb. 11, 2014) (finding resolution of *Noerr-Pennington* immunity "not proper before discovery").

[110] ECF 86 at 11.

[111] ECF 71 ¶¶ 31–32.

[112] *Id.* ¶ 37

[113] *Id.* ¶¶ 95–97.

[114] *Id.* ¶ 99. For example, the lawyers allegedly filed suit in one case on December 30, 2024, demanded "more than $600,000" at an unpleaded time, and then voluntarily dismissed Uber on May 12, 2025 after Uber served discovery subpoenas on Dr. Burt, while continuing the litigation against remaining defendants. *Id.*¶¶ 115–17. The lawyers and doctors advise the case settled in February 2026 but at this stage we accept the allegations as pleaded. ECF 82-1 at 23 n.21. The lawyers filed another suit on June 20, 2024, demanded $1,500,000 at an unpleaded time, voluntarily dismissed Uber on May 12, 2025 after Uber served similar discovery subpoenas, and the case later ended in a full defense verdict as to the remaining defendant. ECF 71 ¶¶ 135–37.

[115] *Id.* ¶ 96.

[116] ECF 82-1 at 9–13.

[117] *See id.* at 10–11 ("Of the 13 suits against Uber and FedEx that are actually detailed in the Amended Complaint, Plaintiffs plead that 7 have resulted in settlements for the Simon Defendants' clients. . . . This itself shows the suits were not objectively baseless.") (citing *Mover's & Warehousemen's Ass'n of Greater New York, Inc. v. Long Island Moving & Storage Ass'n, Inc.*, No. 98-5373,1999 WL 1243054, at *6 (E.D.N.Y. Dec. 16, 1999)); *see also id.* at 10–11 n.13.

[118] *AbbVie II*, 976 F.3d at 367 (citing *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1008 (9th Cir. 2008); *New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007)).

[119] *See, e.g.,* ECF 71 ¶¶ 9–10 ("The phantom damages reflected in [Dr. Yarus's expert] reports [based on the fraudulent medical records produced by any of the doctors] allow Simon & Simon to maximize their leverage to demand large settlements. . . . The scheme is intended to and does in fact result in litigation costs and expenses, including settlement costs, that would not have otherwise been incurred by its targets."); *see id.* ¶ 14 (Uber's "reliance [on Defendants' misrepresentations] resulted in, among other things, settlement payments that would not have been made or that would have been made in a lesser amount but for the fraud.").

[120] *Fed. Trade Comm'n v. AbbVie Inc.*, 329 F. Supp. 3d 98, 123 (E.D. Pa. 2018) ("*AbbVie I*"), *aff'd in part, rev'd in part and remanded on other grounds*, *AbbVie II*.

[121] *AbbVie II,* 976 F.3d at 367–68; *see id.* at 368 (The settling party "estimated it had a 75 percent chance of victory, which, given the uncertainties inherent in litigation, is a strong probability. Thus, as the District Court found, [the party] settled for reasons 'independent of the merits of [the underlying] claims,' including especially the cost of litigating." (citing *AbbVie I,* 329 F. Supp. 3d at 123)).

[122] *In re Flonase Antitrust Litig.,* 795 F. Supp. 2d at 310 (quoting *PRE,* 508 U.S. at 60–61).

[123] *See AbbVie II,* 976 F.3d at 367 (affirming finding of objective baselessness where the district court "assessed whether a reasonable litigant would believe it had a chance of winning" and concluded "any reasonable person who reads the prosecution history . . . can reach no other conclusion . . .").

[124] ECF 82-1 at 12.

[125] *AbbVie II,* 976 F.3d at 369 (citing *PRE,* 508 U.S. at 60–61; *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 556 (2014)).

[126] *Campbell,* 972 F.3d at 219 (quoting *Omni Outdoor Advert.,* 499 U.S. at 380); *see also AbbVie II,* 976 F.3d at 360 ("[A] plaintiff must show the defendant 'brought baseless claims in an attempt to thwart competition (*i.e.,* in bad faith).'") (quoting *Octane Fitness,* 572 U.S. at 556).

[127] *Campbell,* 972 F.3d at 219 (quoting *PRE,* 508 U.S. at 61) (emphasis in original); *see also AbbVie II,* 976 F.3d at 360–61 ("Some factors relating to a defendant's 'economic motivations' in bringing suit include whether the defendant was 'indifferent to the outcome on the merits of the . . . suit, whether any damages for infringement would be too low to justify . . . investment in the suit, or whether [the defendant] had decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process.'" (quoting *PRE,* 508 U.S. at 65–66)).

[128] *See e.g., Mylan Pharms. Inc. v. Sanofi-Aventis U.S. LLC,* No. 23-836, 2026 WL 201152, at *17 (W.D. Pa. Jan. 27, 2026) ("Considering the overarching standard in this Circuit for resolving motions to dismiss, the Court is to consider whether further factual development via discovery is appropriate to determine whether the litigation was in fact objectively baseless and motivated by anticompetitive intent. The Court concludes that it is."); *ADP, LLC v. Ultimate Software Grp., Inc.,* No. 16-8664, 2018 WL 1151713, at *4 (D.N.J. Mar. 5, 2018) ("At the motion-to-dismiss stage and without the benefit of discovery . . . , it is too early to decide whether the series of litigations . . . constitute 'sham litigation.' So far, [the plaintiff] has sufficiently pled claims . . . that fall outside the immunity granted by the *Noerr–Pennington* doctrine, as it has alleged both that [the defendant] had the subjective intent and that the litigation, as a series of actions, was a sham.").

[129] ECF 82-1 at 11.

[130] *Id.*

[131] ECF 86 at 11 (citing *We, Inc.,* 174 F.3d at 327).

[132] *Id.* at 12–13.

45

---

[133] *Cap. Builders*, 2024 WL 1285776, at *10 (citing *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123–24 (3d Cir. 1999)); *see also In re Flonase Antitrust Litig.*, 795 F. Supp. 2d at 310 (Our Court of Appeals "has created a test for the subset of petitioners who misrepresented facts at the core of their petition.").

[134] *Cheminor Drugs,* 168 F.3d at 123.

[135] *Id.* at 124 (emphasis in original); *see also Indivior Inc. v. Alvogen Pine Brook LLC*, 681 F. Supp. 3d 275, 298 (D.N.J. 2023) ("[A] a plaintiff loses *Noerr-Pennington* immunity when it makes misrepresentations that pertain to the 'very core' of the case.").

[136] *In re Merck Mumps Vaccine Antitrust Litig.*, No. 23-3089, 2024 WL 4432076, at *10 (3d Cir. Oct. 7, 2024), *cert. denied sub nom. Chatom Primary Care, P.C. v. Merck & Co.*, 146 S. Ct. 325, 223 L. Ed. 2d 162 (2025) (Schwartz, J., dissenting) (citing *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1062–63 (9th Cir. 1998) (A petitioner's misrepresentations to a government agency "deprive[s] the entire [adjudicative] proceeding of its legitimacy."); *Cal. Motor*, 404 U.S. at 513 ("Misrepresentations . . . are not immunized when used in the adjudicatory process."); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011) (For the exception to apply, the misrepresentation must have been (1) "intentionally made, with knowledge of its falsity[,]" and (2) "material, in the sense that it actually altered the outcome of the proceeding.")).

[137] *See, e.g., Cap. Builders*, 2024 WL 1285776, at *11 (denying summary judgment where the evidence permitted a finding the defendant's "misrepresentations go to the heart of [the] petitions as they directly relate to the relief [he] was seeking" and "a reasonable jury could conclude that at least some of the [government]'s actions towards [p]laintiffs were directly induced by [the defendant]'s misrepresentations, and therefore, could also conclude that his actions were not valid petitioning activity"); *see also United States v. Koziol*, 993 F.3d 1160, 1172 n.12 (9th Cir. 2021) (The petitioner's "falsified evidence, if included in a filed complaint or otherwise submitted to the court, would certainly qualify as intentional misrepresentations to the court. And even if [the petitioner] had filed a complaint omitting the falsified evidence, the incongruity between his settlement demands and the complaint would be probative evidence of sham litigation as well, especially when considered with the evidence that [the petitioner] knew he had no lawful claim to the settlement he demanded.").

[138] *In re Merck Mumps Vaccine Antitrust Litig.*, 2024 WL 4432076, at *6.

[139] *Ford Motor Co. v. Knight L. Grp.*, No. 25-4550, 2025 WL 3306280 (C.D. Cal. Nov. 24, 2025).

[140] *Id.* at *5–6.

[141] *Id.* at *2–5.

[142] *Id.* at *8.

[143] *Id.* (first quoting *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 813, 825 (N.D. Cal. 2019); then quoting *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005)).

[144] *Id.*

46

[145] *Id.*

[146] *Id.*

[147] *Id.* at *9 (quoting *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000)).

[148] *Id.* at *10.

[149] *Id.*

[150] *Id.* at *10–11.

[151] *Id.* at *11.

[152] *Id.*

[153] ECF 82-1 at 8.

[154] *Id* (quoting *Ford*, 2025 WL 3306280, at *8).

[155] *Id.*

[156] *Id.* at 9.

[157] *Id.* at 11.

[158] *Id.* at 36–38.

[159] ECF 86 at 42-43.

[160] *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2009).

[161] *Marmon Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 726 F.3d 387, 394 (3d Cir. 2013) (quoting *Duhaney v. Att'y Gen.*, 621 F.3d 340, 348 (3d Cir. 2010)).

[162] *Id.* at 394–95 (citation omitted).

[163] ECF 82-1 at 38–39.

[164] ECF 86 at 44–45.

[165] *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir. 2010); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (explaining the doctrine bars review of "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments").

[166] *Pilchesky v. Henry*, No. 25-1811, 2026 WL 473510, at *2 (3d Cir. Feb. 19, 2026) (quoting *Great W. Mining*, 615 F.3d at 166 (3d Cir. 2010)).

[167] *Vuyanich v. Smithton Borough*, 5 F.4th 379, 387 (3d Cir. 2021) (quoting *In re Phila. Ent. & Dev. Partners*, 879 F.3d 492, 500 (3d Cir. 2018)).

[168] *Id.* (citation modified).

[169] *See, e.g., Vuyanich*, 5 F.4th at 387 (Plaintiffs "did not ask the District Court to overturn the . . . state-court order, but rather sought damages for the actions Defendants took under the guise of implementing that order."); *see also Great W. Mining*, 615 F.3d at 173) ("[W]hile [plaintiff's] claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for Great Western to prevail."); *Dockery v. Heretick*, No. 17-4144, 2019 WL 2122988, at *10 (E.D. Pa. May 14, 2019) (Plaintiff's "claims turn on a determination of whether Defendants acted in concert to pursue a pattern of racketeering activity that ultimately mistreated Plaintiff, the putative class members, and the state court itself. Although Plaintiff's [racketeering] . . . claims may raise issues that were considered by the state court, they do not require this Court to decide the state judges' decisions anew.").

[170] 18 U.S.C. § 1962(c).

[171] *LabMD Inc. v. Boback*, 47 F.4th 164, 179 (3d Cir. 2022) (citation modified).

[172] 18 U.S.C. § 1961(5).

[173] *See id.* § 1961(1)(B) ("'[R]acketeering activity' means . . . any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . .").

[174] *Id.* § 1962(d).

[175] *AR Network, LLC, et al. v. Wireless Guardian, et al.*, No. 25-1447, 2026 WL 973498, at *35 (E.D. Pa. Apr. 10, 2026) (quoting *United States v. Williams*, 974 F.3d 320, 370 (3d Cir. 2020)).

[176] ECF 82-1 at 27–33.

[177] ECF 86 at 27–34.

[178] *Jaye v. Oak Knoll Vill. Condo. Owners Ass'n, Inc.*, 751 F. App'x 293, 297 (3d Cir. 2018) (citing *United States v. Pharis*, 298 F.3d 228, 233-34 (3d Cir. 2002)).

[179] *In re Insulin Pricing Litig.*, No. 23-20932, 2025 WL 3773210, at *8 (D.N.J. Dec. 30, 2025) (quoting *United States v. Riley*, 621 F.3d 312, 327 n.19 (3d Cir. 2010)).

[180] *Katz v. DeLuca*, No. 23-1188, 2024 WL 2188905, at *6 (E.D. Pa. May 15, 2024), *appeal dismissed sub nom. Katz v. Great Am. Abstract LLC*, No. 24-2026, 2025 WL 1589263 (3d Cir. Apr. 24, 2025), and *reconsideration denied sub nom. Katz v. Great Am. Abstract, LLC*, No. 23-1188, 2025 WL 2318931 (E.D. Pa. July 9, 2025) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991)).

[181] *Jaye*, 751 F. App'x at 297–98 (quoting Fed. R. Civ. P. 9(b)).

[182] *AR Network*, 2026 WL 973498, at *41 (quoting *Bd. of Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 n.10 (3d Cir. 2002)) (emphasis in original).

[183] Fed. R. Civ. P. 9(b); *AR Network*, 2026 WL 973498, at *31 (citing *Liberty Bell Bank v. Rogers*, 726 F. App'x 147, 154–55 (3d Cir. 2018); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n.8 (3d Cir. 1997)).

[184] ECF 82-1 at 31–32 (emphasis in original). The Medical Defendants also contend their conduct is too attenuated to qualify as predicate acts. *Id.* at 30–31. This argument invokes proximate cause principles rather than Rule 9(b)'s pleading requirements and we address it in our causation analysis.

[185] ECF 86 at 32–34.

[186] ECF 71 ¶¶ 30–31, 36–38, 40–51, 63–85.

[187] *Id.*

[188] *Id.* ¶¶ 101–329, 460–513.

[189] *Id.*

[190] *Funari v. Funari*, No. 19-2833, 2022 WL 990871, at *13 (E.D. Pa. Mar. 31, 2022) (citation modified).

[191] *Id.*; *see also Sunlight Elec. Contracting Co. v. Turchi*, 918 F. Supp. 2d 392, 402 (E.D. Pa. 2013) ("The scheme 'must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'" (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978))); *accord Kehr Packages, Inc.*, 926 F.2d at 1415 ("The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies the deprivation of something of value by trick, deceit, chicane or overreaching." (citation modified)).

[192] *Applebaum v. Fabian*, No. 22-1049, 2022 WL 17090172, at *1 (3d Cir. Nov. 21, 2022) ("*Applebaum II*") (quoting *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016)).

[193] *Applebaum v. Fabian,* No. 18-11023, 2021 WL 5833454, at *9 (D.N.J. Dec. 9, 2021) ("*Applebaum I*"), *aff'd, Applebaum II.*

[194] *See id.* ("First, litigation fraud and perjury are not listed as eligible predicate racketeering acts under the [racketeering] statute. 18 U.S.C. §§ 1961–64. Second, despite twenty pages of rambling accusations, the Second Amended Complaint does not set forth actual fraudulent activity in relation to these filings; it merely asserts that standard filings in a contested probate case were nefarious.").

[195] ECF 82-1 at 27–28.

[196] ECF 86 at 27–31.

[197] *Id.* at 28; ECF 71 ¶¶ 455–58.

[198] Our colleagues within this Circuit have rejected racketeering claims premised on litigation activity in circumstances not before us today. Judge Jones III held "the filing of court documents [in a single action] *alone* does not constitute mail fraud for reasons of public policy." *Meade v. Guar. Bank*, No. 12-1559, 2013 WL 5438750, at *10 (M.D. Pa. Sept. 27, 2013) (emphasis added). Judge Vazquez, relying on out-of-circuit authority, rejected "the theory that the filing of complaints, along with other litigation activity, can be the basis of wire or mail fraud" and distinguished the facts before him from a case involving attorneys "going far beyond their role as legal representatives in perpetuating their fraud scheme," noting plaintiffs had not plausibly alleged facts "Defendants paid witnesses to testify falsely, paid unfavorable witnesses to not testify, or created false evidence for use [in] their cases." *Winters v. Jones*, No. 16-9020, 2018 WL 326518, at *9–10 (D.N.J. Jan. 8, 2018). Judge Vazquez also rejected a claim based on a certification submitted in a patent invalidation petition where the alleged conduct fell within traditional attorney advocacy. *Verify Smart Corp. v. Bank of Am., N.A.*, No. 17-4248, 2019 WL 1594474, at *11 (D.N.J. Apr. 15, 2019). Judge Shipp dismissed claims where plaintiffs failed to plausibly allege criminal conduct constituting racketeering activity and instead relied on two tax lien foreclosure actions filed in a court without jurisdiction as the predicate acts. *Irene Schneider Fam. Tr. v. Christiana Tr.*, No. 23-1980, 2024 WL 4263309, at *7 (D.N.J. Sept. 23, 2024). And Judge Cecchi rejected an obstruction-based predicate act where the alleged conduct arose from a divorce proceeding and did not involve a recognized racketeering predicate offense, leaving no viable predicate act beyond insufficient litigation-related fraud allegations. *Matta v. Kaur*, No. 24-5743, 2025 WL 2987103, at *4 (D.N.J. Oct. 23, 2025). Each of these cases addressed allegations limited to litigation conduct alone or failed to identify a cognizable predicate offense.

[199] *Snow Ingredients, Inc.*, 833 F.3d at 524–25.

[200] *Id.* at 525.

[201] *Id.* (citing *St. Germain v. Howard,* 556 F.3d 261, 263 (5th Cir. 2009)).

[202] *Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012) (quoting *Daddona v. Gaudio,* 156 F. Supp. 2d 153, 162 (D. Conn. 2000)).

[203] *Id.* at 318–19 (quoting *Daddona,* 156 F. Supp. 2d at 163 (collecting cases)). Judge Arterton noted the Court of Appeals for the Second Circuit acknowledged "tension" between including mail fraud and excluding perjury as predicate acts but found "where a fraudulent scheme falls within the scope of the federal mail fraud statute and the other elements of [racketeering] are established, . . . *it will not be the fact of the perjuries alone that suffices to bring the matter within the scope of [the Act]*." *Daddona,* 156 F. Supp. 2d at 163 (quoting *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992) (emphasis in original)). The Court of Appeals in *Eisen* held mail and wire fraud violations arising from a coordinated scheme by a law firm to deprive civil defendants and their insurers of money through fraudulent lawsuits, including bribery and intimidation of witnesses and

the creation of false photographs, documents, and other evidence for use at trial, could constitute predicate acts under the Act. *Eisen*, 974 F.2d at 251–54.

[204] *Feld Ent. Inc.,* 873 F. Supp. 2d at 319.

[205] *Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086 (11th Cir. 2004).

[206] *Deck*, 349 F.3d at 1257–58.

[207] *Id.* at 1258–59; *see id.* at 1258 ("Defendant Illig 'made false and material representations in the form of one or more proposed settlement agreements promising payment over a four year period in order to induce Plaintiff into accepting the settlement agreement.' Before executing the settlement agreement, Illig and Defendant McCallum had 'agreed to a plan wherein they would be able to liquidate [EL] without paying its obligation to [Plaintiff].' Thus, Illig and McCallum knew that EL would be unable to make payments over the four years promised in the proposed settlement agreement. They concealed this information from Plaintiff, intending that he 'rely upon [their] misrepresentations.' As a result, Plaintiff was "fraudulently induc[ed] to dismiss valid claims.'") (citation modified).

[208] *Raney*, 370 F.3d at 1087–88.

[209] *Kim v. Kimm*, 884 F.3d 98, 104–05 (2d Cir. 2018) (emphasis added).

[210] *Id.* at 105.

[211] *Id.* at 104.

[212] *Black v. Ganieva*, 619 F. Supp. 3d 309, 342 (S.D.N.Y. 2022), *aff'd,* No. 22-1524, 2023 WL 2317173 (2d Cir. Mar. 2, 2023) (collecting cases).

[213] *Carroll v. U.S. Equities Corp.*, No. 18-667, 2020 WL 11563716, at *9 (N.D.N.Y. Nov. 30, 2020) (citing *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 425 (S.D.N.Y. 2010) ("[P]laintiffs have pleaded with particularity a pattern of racketeering activity, including at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail and wires over three years, in furtherance of the alleged fraud.")); *see also id.* ("[S]ome of the acts of this scheme, such as buying uncollectable debts that lacked proof that the debts were owed, conspiring to use a process serving firm that engaged in sewer service to ensure that defendants would not contest the debt-collection actions, using an individual who filed false affidavits of merit in every case, and pressuring defendants to compromise on illegally obtained default judgments were actions external to the individual suits in the state courts, involved matters beyond proper legal representation and went beyond any of the particular disputes between the litigants in the underlaying debt collection actions.").

[214] *State Farm Mut. Auto. Ins. Co. v. Tri-Borough N.Y. Med. Prac. P.C.*, 120 F.4th 59, 98 & n.14 (2d Cir. 2024).

[215] *Id.* at 98 n.14.

[216] *Id.* (emphasis in original).

[217] ECF 82-1 at 33.

[218] *Id.* at 33–36.

[219] 18 U.S.C. § 1961(4).

[220] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 364 (3d Cir. 2010).

[221] *AR Network*, 2026 WL 973498, at *23 (quoting *Schwartz v. Laws. Title Ins. Co.*, 680 F. Supp. 2d 690, 706 (E.D. Pa. 2010)).

[222] *Funari*, 2022 WL 990871, at *11 (quoting *Boyle v. United States*, 556 U.S. 938, 947 (2009)).

[223] *AR Network*, 2026 WL 973498, at *24 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)).

[224] ECF 71 ¶¶ 514–20.

[225] *Id.* ¶¶ 521–27.

[226] *See Funari*, 2022 WL 990871, at *12 ("[C]ourts often find the distinctiveness requirement met when the plaintiff alleges that the 'enterprise' is a corporation and the 'person[s]' are the owners of that corporation.") (quoting *Cedrick Kushner Promotions, Ltd.*, 533 U.S. at 162)).

[227] *Kyko Glob., Inc. v. Prithvi Info. Sols. Ltd.*, No. 18-1290, 2020 WL 1159439, at *21 (W.D. Pa. Mar. 10, 2020) (quoting *Schwartz v. Lawyers Title Ins. Co.*, 970 F. Supp. 2d 395, 403 (E.D. Pa. 2013)).

[228] *Boyle*, 556 U.S. at 946.

[229] *AR Network*, 2026 WL 973498, at *27 (quoting *Boyle*, 556 U.S. at 948).

[230] ECF 86 at 37 (citing ECF 71 ¶¶ 9, 30, 36, 39, 40, 43, 45–49, 58–60, 68–72, 110, 113, 244, 305, 308, 324, 354, 401, 420, 415, 433, 438, 439, 447).

[231] *See Zakheim v. Curb Mobility LLC*, No. 22-4594, 2023 WL 5339606, at *2 (E.D. Pa. Aug. 18, 2023) (The enterprise "must at the very least function as a 'continuing unit' and involve 'interpersonal relationships and a common interest.'") (quoting *Boyle*, 556 U.S. at 946, 948).

[232] *See United States v. Urban*, 404 F.3d 754, 782 (3d Cir. 2005) ("[A]n enterprise "may be comprised only of defendants, or of defendants and non-defendants.").

[233] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 368.

[234] ECF 82-1 at 13–14.

[235] *Id.* at 14–18.

[236] *Id.* at 18–23

[237] *Id.* at 23–27.

[238] *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 600–01 (2025) (quoting 18 U.S.C. § 1964(c)) (emphasis in original).

[239] *Id.* at 601.

[240] *Id.*

[241] *Fata, v. Young, et al.*, No. 26-828, 2026 WL 949103, at *5 (E.D. Pa. Apr. 8, 2026) (quoting *Miller v. Pocono Ranch Lands Prop. Owners Ass'n Inc.*, 557 F. App'x 141, 145 (3d Cir. 2014)); *see also St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 300 (3d Cir. 2020) ("As distinct from Article III standing, a plaintiff bringing a civil [racketeering] claim must additionally state an injury to business or property and that a [racketeering] predicate offense not only was a 'but for' cause of injury, but was the proximate cause as well.'") (citation omitted).

[242] *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015) (internal citation omitted).

[243] *St. Luke's Health Network*, 967 F.3d at 300 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010)).

[244] *Knopick v. UBS Fin. Servs., Inc.*, 121 F. Supp. 3d 444, 460 (E.D. Pa. 2015) (citing *Holmes v. Sec. Inv. Prot.*, 503 U.S. 258, 269–70 (1992)).

[245] *Humana, Inc. v. Indivior Inc.*, No. 20-4602, 2021 WL 3101593, at *9 (E.D. Pa. July 22, 2021), *aff'd*, No. 21-2573, 2022 WL 17718342 (3d Cir. Dec. 15, 2022) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008)); *see also Bridge*, 553 U.S. at 649 (Under the racketeering statute, "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud.").

[246] ECF 82-1 at 39.

[247] Uber pleads substantive racketeering claims against Marc Simon and the law firm, Dr. Burt, and Premier Pain & Rehab. "Without adequately pleading a substantive violation under § 1962(c), a plaintiff proceeding under § 1962(d) must allege 'an endeavor which, if completed, would satisfy all of the elements of a substantive [racketeering] offense.'" *AR Network*, 2026 WL 973498, at *34 (quoting *In re Ins. Brokerage Litig.*, 618 F.3d at 383). Drs. Harvey, Piccillo, and Yarus do not separately develop any argument on this issue beyond a single passing assertion the conspiracy claim necessarily fails if the substantive claims fail. *See* ECF 82-1 at 39. We do not separately address whether the amended Complaint sufficiently alleges a substantive racketeering violation as to those doctors for purposes of the conspiracy claim.

[248] *Id.*

54

[249] *Id.* at 39–45.

[250] *AR Network*, 2026 WL 973498, at *34 (citation modified).

[251] *Humana, Inc.,* 2021 WL 3101593, at *7 (quoting *Smith v. Berg*, 247 F.3d 532, 538 (3d Cir. 2001)).

[252] ECF 86 at 39.