**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UBER TECHNOLOGIES, INC., *et al.*** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 25-5365** |
| | : | |
| **SIMON & SIMON P.C., *et al.*** | : | |

# MEMORANDUM

**KEARNEY, J.** **August 27, 2026**

We appreciate experienced personal injury lawyers and doctors do not like reading their names in federal court complaints alleging their specific roles in alleged racketeering conduct. Especially when those allegations are made by companies Uber and FedEx whom they often sue in Philadelphia County seeking to recover for alleged personal injury losses subject to the state court judge's and jury's scrutiny. And then these allegations show up in press reports.

We promptly ordered the parties work to resolve the claims given the expected expense in racketeering litigation. Uber opened these court-ordered settlement discussions by demanding the personal injury lawyer forfeit his professional license, among other demands.

The parties could not then find common ground to resolve their dispute. So we focused on the merits. We allowed Uber's and FedEx's amended racketeering claims to proceed into discovery after oral argument and extensive analysis detailed in a fifty-four-page opinion. The lawyers and doctors timely answered the allegations. But the lawyers and one set of doctors also responded by suing Uber and FedEx. One set of doctors sued Uber for defamation and false light invasion of their privacy based on press reports of Uber's lawsuit. The lawyers sued Uber for civil extortion and abuse of process arising from its opening settlement demand of forfeiting a professional license, and well as seeking their attorney's fees they choose to spend in this case

because they believe the racketeering lawsuit lacks a subjective or objective basis notwithstanding our findings Uber and FedEx sufficiently pleaded their racketeering claims and the availability of established remedies provided by the Supreme Court and Congress for bad faith or vexatious litigation.

Uber and FedEx now move to dismiss these claims against them. We again studied the extensive briefing and welcomed oral argument. Our analysis confirms the lawyers cannot proceed on a civil extortion claim as a matter of law. The lawyers also do not plead facts allowing us to adopt a sham litigation theory as we already found the companies sufficiently pleaded the detail necessary to proceed on their racketeering claims. The lawyers also do not plead facts allowing us to find Uber's opening settlement demand is an abuse of process. The doctors do not plead facts allowing us to extend defamation law to cover general press coverage.

We dismiss the lawyers' civil extortion claim with prejudice under Pennsylvania law. We dismiss the doctors' defamation and false light claims and the lawyers' sham litigation and abuse of process claims without prejudice.

## I. Alleged facts and authentic documents central to the counterclaims.[1]

Philadelphia lawyer Marc Simon and the law firm Simon & Simon, P.C. filed dozens of identified lawsuits in the last four years in Philadelphia County against Uber Technologies, Inc. and Federal Express Corporation on behalf of persons involved in motor vehicle accidents with their drivers.[2] Simon & Simon referred its clients to a group of medical providers, including chiropractors Drs. Ethel Harvey and Daniel Piccillo at Philadelphia Spine Associates and pain-management physician Dr. Clifton Burt at Premier Pain & Rehab Center.[3] Drs. Harvey and Piccillo provided chiropractic treatment and referred clients for magnetic resonance imaging (MRI) before Dr. Burt performed radiofrequency ablations.[4] Simon & Simon then allegedly referred certain

clients to Dr. Lance Yarus, who performed medical examinations and prepared expert reports addressing injury, causation, permanency, and future medical care.[5] Simon & Simon used the resulting medical records and expert reports to support personal injury lawsuits claiming damages in excess of $50,000 and settlement demands against Uber, FedEx, and their drivers.[6] Some identified cases settled, some proceeded to trial, and others remained pending or Simon & Simon dismissed the cases without prejudice.[7]

***Uber sues the doctors and lawyers leading to press coverage.***

Uber, while continuing to dispute each case on an individual basis in Philadelphia state courts where it could fully evaluate the medical records and challenge their admissibility and bias before the assigned Philadelphia trial judge, sought to create a new front to challenge the Simon lawyers like it had chosen to do with other personal injury lawyers in New York, Miami, and Los Angeles who repeatedly sued it.

Uber sued Marc Simon, Simon & Simon, Clifton Burt, Premier Pain and Rehab Center, Philadelphia Spine Associates, Daniel Piccillo, Ethel Harvey, and Lance Yarus on September 18, 2025 under the Racketeer Influenced and Corrupt Organizations Act.[8] It alleged the Simon lawyers and doctors orchestrated a scheme to generate and litigate fraudulent personal injury claims in Philadelphia courts including by falsely swearing to injuries or inflating the alleged injuries about the $50,000 threshold for mandatory arbitration arising from motor vehicle accidents in Philadelphia involving Uber drivers.[9]

Press outlets found the issues worthy of informing their readers and Uber did not shy away from describing its intent to challenge what it perceived to be a concerted strategy of false court filings costing them money. Law.com published an article about Uber's lawsuit the same day.[10] Law.com reported Uber accused Simon & Simon, Attorney Simon, and "numerous health care

professionals and centers" of working together to fabricate fraudulent personal injury claims.[11] The article explained Uber accused Simon & Simon of directing clients "with little to no injuries to a network of preselected medical providers" paid to "diagnose nonexistent injuries and falsify medical records to reflect the need for years of expensive medical care."[12] It quoted the Complaint and then quoted Uber's Senior Director of Public Policy and Communications Adam Blinick: "Lawsuit abuse, including fraudulent personal injury claims, directly contributes to the higher prices that consumers end up paying on everything from Uber rides to dining out at a restaurant. When we see it happening on our platform, we are going to step in and take action by any means appropriate—like you're seeing here with this civil [racketeering] lawsuit."[13] Neither Law.com nor Senior Director Blinick identified Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey by name.[14]

Metro Philadelphia published an article about Uber's lawsuit three days later.[15] Metro Philadelphia, quoting the Complaint, reported Uber accused Simon & Simon and Attorney Simon "of orchestrating a scheme 'designed to fraudulently transform otherwise low-value claims into million-dollar-plus lawsuits against Uber.'"[16] It reported Simon & Simon "funneled" clients to Dr. Burt and "hand-picked chiropractors, including Ethel Harvey and Daniel Piccillo, both of Philadelphia Spine Associates LLC, according to the complaint."[17] Metro Philadelphia, citing "court documents," also reported one claimant "made [twenty-seven] appointments at Philadelphia Spine Associates though Uber's legal team suspects some of the documents were fraudulent."[18] It then repeated the same quote from Senior Director Blinick, identifying it as a "statement" he made a week earlier: "Lawsuit abuse, including fraudulent personal injury claims, directly contributes to the higher prices that consumers end up paying on everything from Uber rides to dining out at

a restaurant. When we see it happening on our platform, we are going to step in and take action by any means appropriate—like you're seeing here with this civil [racketeering] lawsuit."[19]

***Court-ordered settlement discussions and more press coverage.***

We directed the parties on October 14, 2025 to meaningfully confer about "settlement structures and potential resolution avenues" and report their progress in ongoing settlement efforts.[20]

Reuters published an article two days later about Uber's racketeering lawsuits in New York, Florida, California, and Pennsylvania.[21] Reuters reported Uber accused "plaintiffs' lawyers of funneling clients to 'unscrupulous' medical providers" who "performed unnecessary procedures to treat negligible or non-existing injuries, creating false evidence of injuries to drive up the cost of settling the cases."[22] Senior Director Blinick told Reuters via email: "That kind of legal abuse drives up prices, harms accident victims, and erodes the public's trust—so when we see fraud and abuse occur on our platform, we will not hesitate to take action to protect consumers and drivers."[23] Reuters did not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey by name.[24]

Insurance Journal published an article the next day about a panel discussion at the American Property Casualty Insurance Association's annual meeting involving Senior Director Blinick and other industry representatives.[25] Insurance Journal reported "Uber has filed [racketeering] lawsuits in New York, Florida, California, and Pennsylvania against lawyers and medical providers it thinks are committing fraud and driving up costs" and discussed efforts by businesses and insurers to combat perceived "legal system abuse" through litigation, political giving, coalition building, and public messaging.[26] Senior Director Blinick discussed Uber's racketeering lawsuits and stated: "Our desire is not to settle these things out. We want to see them through. Let's build the case to show the kinds of information we could be sharing amongst

ourselves to get to the root of fraud and billing malpractice and the like, and make a case for reform."[27] Insurance Journal did not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey.[28]

***Uber issues a court-ordered opening settlement demand and then amends its Complaint.***

Uber notified us on December 22, 2025 of its intent to amend its Complaint.[29] We directed Uber to provide each lawyer and doctor "a confidential fulsome Rule 408 demand for a compromise resolution including both economic and non-economic terms" by January 20, 2026.[30] Uber sent its settlement demand to the Simon lawyers on January 20, 2026.[31] Uber demanded, among other terms, Attorney Simon "surrender his law license" and sought to "impos[e] monitors and controls on his practice moving forward.[32]

Senior Director Blinick continued publicly discussing litigation reform. The Consumer Technology Association posted a January 2026 presentation featuring Senior Director Blinick titled "The Litigation Tax: How Lawsuits Stifle U.S. Innovation."[33] An audience member asked Senior Director Blinick an inaudible question and Senior Director Blinick responded Uber filed four racketeering lawsuits in New York, Philadelphia, Miami, and Los Angeles.[34] He did not mention medical providers and did not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey.[35]

Uber filed its amended Complaint on January 26, 2026.[36] It added FedEx and revised the personal injury cases supporting the racketeering claims.[37]

Punchbowl News posted a video over three weeks later on February 17, 2026 titled "Punchbowl News @ the PACT Summit: Protecting Consumers from Lawsuit Abuse."[38] The brief interview with Senior Director Blinick did not mention this case or other pending racketeering cases and did not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey.[39]

The Insurance Information Institute "Triple-I Blog" published an interview with Senior Director Blinick over five weeks later on March 25, 2026 titled "Uber Joins Effort to Drive Legal System Reform."[40] The Blog identifies Senior Director Blinick discussing rideshare claim litigation, including alleged fraud involving networks of "the law firm, the medical providers, the body shops, the lenders themselves . . . all across the board."[41] The Blog did not mention this case or any other pending racketeering action and did not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey.[42]

***Philadelphia Spine Associates and Simon & Simon countersue.***

Philadelphia Spine Associates, Dr. Piccillo, and Dr. Harvey counterclaimed against Uber.[43] They allege Uber, through Senior Director Blinick and others acting on its behalf, republished Uber's allegedly false racketeering accusations in the press, online, and in other public forums.[44] They allege Uber pursued this publicity to influence legislators and the public while seeking reforms limiting its exposure to personal injury claims.[45] Philadelphia Spine Associates and its doctors claim defamation; Drs. Piccillo and Harvey separately counterclaim for false light invasion of privacy.[46]

Simon & Simon and Attorney Simon counterclaimed three days later.[47] They sue on a theory of "sham litigation" against Uber for abuse of process and civil extortion.[48] They allege Uber and FedEx pursue this racketeering action for an ulterior purpose of chilling personal injury litigation against them and allege Uber abused the settlement process by demanding Attorney Simon surrender his law license.[49]

## II. Analysis

Uber moves to dismiss the Philadelphia Spine Associates and its doctors' defamation and false light invasion of privacy counterclaims.[50] It argues: (1) directing reporters to a judicially

privileged pleading does not support a defamation claim; (2) its out-of-court statements do not concern Philadelphia Spine Associates or the doctors and, in any event, constitute non-actionable opinion; (3) the Philadelphia Spine Associates and doctors do not adequately plead general or special damages; and (4) the false light counterclaims fail for the same reasons.[51]

Uber and FedEx separately move to dismiss the Simon lawyers' counterclaims. They argue: (1) no standalone cause of action for sham litigation exists outside the antitrust context; (2) Pennsylvania does not recognize a civil cause of action for extortion and the claim also fails under California law; and (3) the Simon lawyers do not plead an abuse of process claim because a settlement demand does not constitute legal process.[52]

We agree with Uber and FedEx. We dismiss with prejudice the Simon lawyers' civil extortion claim. We dismiss the Philadelphia Spine Associates and doctors' defamation and false light claims and the Simon lawyers' sham litigation and abuse of process claims without prejudice.

### A. Philadelphia Spine Associates does not plausibly allege Uber published a defamatory statement concerning them.

Philadelphia Spine Associates counterclaim against Uber for defamation and Drs. Piccillo and Harvey separately counterclaim against Uber for false light invasion of privacy.[53] They allege Uber, through Senior Director Blinick and others acting on Uber's behalf, publicly republished and endorsed the publicly-filed racketeering accusations through articles, interviews, industry panels, and other media appearances, causing readers and listeners to understand Uber as accusing them of fraud and professional misconduct.[54]

Uber moves to dismiss arguing Philadelphia Spine Associates and its doctors do not identify a defamatory out-of-court statement published by Uber concerning Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey.[55] Uber further argues its judicial pleadings are absolutely privileged, the media's descriptions of those pleadings cannot be attributed to Uber, Senior

Director Blinick's alleged statements are generalized non-actionable opinions not "of and concerning" the Philadelphia Spine Associates and doctors, and the Philadelphia Spine Associates and doctors inadequately plead damages.[56] Uber argues the false light claims must also be dismissed for the same reasons.[57]

The Philadelphia Spine Associates and doctors counter Uber did more than steer reporters to judicially privileged pleadings. They argue Senior Director Blinick conducted a coordinated media campaign outside the judicial process, vouched for the truth of Uber's racketeering allegations, and repeatedly invoked "fraudulent personal injury claims," "fraud and billing malpractice," and similar accusations in contexts allowing reasonable recipients to understand the statements as referring to them.[58] They further argue the statements satisfy the "of and concerning" requirement under the small group doctrine or by implication, constitute factual accusations of professional fraud rather than protected opinion, and amount to defamation per se eliminating a requirement to plead special damages.[59] They separately argue false light survives because Uber's broader media campaign allegedly placed them before the public in a misleading and highly offensive context even when individual statements are "literally accurate."[60]

We turn to the well-established law. Pennsylvania law requires a plaintiff like Philadelphia Spine Associates claiming defamation allege facts allowing us to plausibly infer: "(1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion."[61] "A statement is defamatory if it 'tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with

him' or if it 'ascribes to another conduct, character or condition that would adversely affect his fitness for the proper conduct of his proper business.'"[62]

Two requirements guide our review of the challenged publications: the communication must apply to the Philadelphia Spine Associates and Uber must have published it. A "defamatory statement 'must refer to some ascertained or ascertainable person, and that person must be the plaintiff.'"[63] The allegedly defamed Philadelphia Spine Associates must therefore "demonstrate that the complained-of statement applies to her, i.e., whether it is 'of and concerning' her."[64] "It is not enough that plaintiff understands the communication to be about [her]."[65] But "the publication need not specifically name the plaintiff."[66] Our Court of Appeals instructs us to "look at the context and ask whether 'the defamatory material was capable of being reasonably understood as intended to refer to the [plaintiff].'"[67] An unnamed plaintiff may recover "if she is pointed to by description or circumstances tending to identify her."[68]

Pennsylvania law also requires publication by the defendant. A defendant may be responsible for publication where he "either personally published the communication, or directed or participated in the publication of a defamatory communication by another."[69] We distinguish between statements published by Senior Director Blinick or another Uber representative and descriptions supplied by reporters recounting allegations in Uber's judicial pleadings.[70]

We first dispose of three publications with no reasonable application to the Philadelphia Spine Associates. The Punchbowl News interview and Triple-I blog do not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey, this action, Philadelphia, Pennsylvania, or any other circumstance permitting a reader or listener to connect the challenged statements to them. The Consumer Technology Association presentation identifies one of Uber's four racketeering actions as filed in Philadelphia, but Senior Director Blinick does not identify Philadelphia Spine

Associates, Dr. Piccillo, Dr. Harvey, medical providers generally, or an allegation concerning their alleged conduct. Philadelphia Spine Associates instead relies on these materials as part of Senior Director Blinick's broader public-relations campaign concerning litigation abuse, fraud, and tort reform. But the alleged broader campaign cannot substitute for the required connection between the challenged communication and the claimant. None of these three publications points to the Philadelphia Spine Associates by name, description, circumstance, or subject matter. No reasonable recipient could understand these communications as referring to it or their co-Defendant doctors. We dismiss the defamation claims with prejudice to the extent they rely on the Punchbowl News interview, Consumer Technology Association presentation, and Triple-I blog.

The four earlier publications require closer review because each concerns Uber's racketeering claims before us. We consider both whether the challenged communication reasonably refers to Philadelphia Spine Associates and whether Uber published or participated in publishing the allegedly defamatory material.

The Insurance Journal article does not reasonably apply Senior Director Blinick's own statements to Philadelphia Spine Associates or its doctors. The Insurance Journal discusses Uber's racketeering actions in several jurisdictions and broader efforts to combat alleged legal system abuse. Senior Director Blinick reportedly states Uber wants to "see [the cases] through" and "get to the root of fraud and billing malpractice." Neither Senior Director Blinick's quoted statement nor other statement attributed to Uber identifies Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey. Any broader description of the alleged misconduct comes from the Insurance Journal's discussion of Uber's litigation, not from an Uber statement identifying Philadelphia Spine Associates or its doctors.

Reuters also does not identify Philadelphia Spine Associates and separates the author's descriptions from Senior Director Blinick's reported words. Reuters describes Uber's allegations against plaintiffs' lawyers and medical providers across several racketeering actions. Senior Director Blinick reportedly separately states: "That kind of legal abuse drives up prices, harms accident victims, and erodes the public's trust—so when we see fraud and abuse occur on our platform, we will not hesitate to take action to protect consumers and drivers." Rueters' more specific references to medical providers come from the author's account of Uber's allegations, not from Senior Director Blinick. Senior Director Blinick's reported statement does not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey by name, description, or circumstance.

Law.com presents a closer contextual question because its article concerns this action but the same distinction applies. Law.com describes Uber as accusing Simon & Simon and "numerous health care professionals and centers" of participating in fraudulent personal injury claims and reports Uber alleged the Simon lawyers directed its clients to "a network of preselected medical providers" paid to "diagnose nonexistent injuries and falsify medical records." Those descriptions come from the reporter's account of the pleadings before us. Senior Director Blinick's separately quoted statement discusses "lawsuit abuse" and "fraudulent personal injury claims" generally. His reported statement does not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey, while Law.com's more specific descriptions of medical providers are not words attributed to Uber outside the judicial pleadings.

The reporting in Metro Philadelphia presents the closest question because it expressly identifies Philadelphia Spine Associates and Drs. Harvey and Piccillo. Metro Philadelphia describes Drs. Harvey and Piccillo as "hand-picked chiropractors" and recounts allegations now before us concerning Philadelphia Spine Associates. Those identifying descriptions come from the

reporter. Philadelphia Spine Associates's counsel admitted at oral argument no Uber representative used the phrase "hand-picked chiropractors," Metro Philadelphia supplied it, and the Complaint does not contain those words.[71] Senior Director Blinick's separately quoted statement again discusses "lawsuit abuse" and "fraudulent personal injury claims" generally. So Metro Philadelphia identifies Philadelphia Spine Associates, but the allegedly defamatory identification comes from the reporter and the Philadelphia Spine Associates Counter-Defendants allege no facts plausibly attributing this language to Uber. Uber's own quoted statement does not identify them by name, description, or circumstance.

Philadelphia Spine Associates's broader allegation of an Uber-orchestrated media campaign does not bridge this gap. It generally alleges Uber promoted its racketeering accusations through the media, but they do not plead facts plausibly showing Uber supplied, directed, or participated in crafting the particular reporter-authored descriptions at issue. Their generalized media-campaign allegations do not permit us to attribute the reporters' identifying language to Uber.

Philadelphia Spine Associates nevertheless argues Senior Director Blinick's statements must be considered in context and could reasonably refer to them even without identifying them by name. Our colleagues' decisions illustrate when surrounding circumstances suffice. A doctor sued, among others, the author of the challenged publication in *Monge v. University of Pennsylvania*.[72] The publication did not name the doctor but it discussed work she alleged only she performed because she was the sole scientist identifying the remains at issue.[73] Judge Pratter concluded these circumstances permitted a reasonable reader to understand the publication as referring to her.[74] No comparable circumstance exists here. Senior Director Blinick's generalized references to fraud, billing malpractice, lawsuit abuse, and fraudulent personal injury claims do

not uniquely point to Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey among the several lawyers, medical providers, and other persons implicated in Uber's racketeering litigation.

Chief Judge Beetlestone's analysis two years ago in *Mehdizadeh v. Starbucks Corporation* offers further guidance. The plaintiff there publicly challenged Starbucks Workers United as a company-controlled union, filed administrative charges advancing this position, and contacted reporters about his concerns.[75] The challenged articles later discussed Starbucks Workers United's organizing campaign and negotiations with Starbucks but they did not identify the plaintiff or discuss his allegations about the union.[76] The plaintiff nevertheless claimed the articles formed part of a coordinated effort to discredit and intimidate him.[77] Chief Judge Beetlestone dismissed the defamation claims because the publications did not point to the plaintiff by name, description, or surrounding circumstance permitting a reasonable reader to understand the statements as referring to him.[78] The same problem exists here with Senior Director Blinick's reported statements. His comments do not identify Philadelphia Spine Associates or its doctors or supply circumstances permitting a reasonable recipient to understand his generalized references to fraud, billing malpractice, or lawsuit abuse as referring to them.

And Judge Robreno's analysis sixteen years ago in *Mzamane v. Winfrey* presented materially different circumstances. The headmistress of Oprah Winfrey's Leadership Academy for Girls sued Ms. Winfrey for defamation.[79] Ms. Winfrey expressly discussed the headmistress's departure from the school during a parents' meeting.[80] Ms. Winfrey then made broader statements during the same meeting, and later at a press conference, about failed leadership, students being "silenced," and responsibility for misconduct at the school.[81] Judge Robreno concluded reasonable listeners could understand the later generalized statements as referring to the headmistress because Ms. Winfrey first identified her and then made the broader statements in the same fact context.[82]

We do not face similar facts. Senior Director Blinick did not identify Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey before making his broader comments. The reporter supplied the identifying material in the Metro Philadelphia article. The Law.com, Reuters, and Insurance Journal publications do not identify Philadelphia Spine Associates or its doctors. The surrounding circumstances therefore do not plausibly transform Senior Director Blinick's generalized statements into communications reasonably understood as referring to Philadelphia Spine Associates or its doctors.

Philadelphia Spine Associates then argues the challenged statements satisfy the "of and concerning" requirement under Pennsylvania's small-group doctrine.[83] Our Court of Appeals recognizes an individual defamation claim based on statements about a group where "the statements were directed toward a comparatively small class or group all of whose constituent members may be readily identified and the recipients of the [statements] are likely to identify some, if not all, of them as intended objects of the defamation."[84] But we have no facts allowing us to plausibly infer Senior Director Blinick directed his challenged statements toward the eight defendants in this action, the Philadelphia medical-provider defendants, or another comparatively small class or group. His alleged generalized references to "fraudulent personal injury claims," "fraud and billing malpractice," and litigation abuse concern broader categories of conduct. Philadelphia Spine Associates instead rely on Uber's judicial allegations and reporter-authored descriptions to define the small group they say Senior Director Blinick defamed. The small-group doctrine therefore does not make Senior Director Blinick's own statements "of and concerning" Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey.

Philadelphia Spine Associates also argues Senior Director Blinick's statements defame them by implication.[85] Our Court of Appeals explains "'[d]efamation by implication' occurs when

a defendant juxtaposes a series of facts to imply a defamatory connection between them."[86] Philadelphia Spine Associates does not allege facts allowing us to plausibly infer such an implication from Senior Director Blinick's reported statements. He does not juxtapose facts concerning Philadelphia Spine Associates, Dr. Piccillo, or Dr. Harvey to imply they committed fraud. The alleged connection instead depends on combining his generalized comments with Uber's judicial allegations and the reporters' descriptions of those allegations. We decline to create an actional implication by combining Senior Director Blinick's generalized statements with separate judicial allegations and reporter-authored descriptions Uber did not communicate.

Philadelphia Spine Associates does not allege facts allowing us to plausibly infer Uber published an out-of-court defamatory communication reasonably understood as referring to it or its doctors. We need not reach Uber's alternative arguments concerning protected opinion or damages. We dismiss the defamation claims.

### B. We dismiss the false light invasion of privacy claims for the same reasons as the defamation claims.

Drs. Piccillo and Harvey separately counterclaim against Uber for false light invasion of privacy based on the same alleged media campaign underlying the defamation claims.[87] Uber moves to dismiss arguing we must dismiss the false light claims as they rely on the same non-actionable statements underlying the defamation claims.[88] Drs. Piccillo and Harvey respond Uber's media campaign publicly portrayed them as participants in fraud by endorsing the truth of the racketeering allegations and presented them to a national audience in a false and highly offensive light.[89] We disagree based on the alleged facts.

The tort of false light invasion of privacy under Pennsylvania law "imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'"[90] Pennsylvania courts

"consistently apply the same analysis" to defamation and false light claims when the causes of action are based on the same set of underlying facts.[91]

Drs. Piccillo and Harvey's false light claims fail for the same reasons as the defamation claim. Although a false light claim does not always require a defamatory statement, Drs. Piccillo and Harvey still must plausibly allege Uber publicized false material placing them before the public in a highly offensive false position.[92] As explained, Senior Director Blinick's reported statements do not reasonably refer to Drs. Piccillo or Harvey. The reporters supplied the more specific identifying descriptions and the doctors do not allege facts today allowing us to plausibly attribute this language to Uber. Their allegations therefore do not show Uber placed either doctor before the public in a false light.

We dismiss the false light invasion of privacy claims.

### C. We dismiss the Simon lawyers' sham litigation claim.

The Simon lawyers counterclaim against Uber and FedEx for "sham litigation."[93] Uber and FedEx move to dismiss arguing no standalone sham litigation claim exists outside antitrust law and the sham doctrine operates only as an exception to *Noerr-Pennington* immunity rather than an independent cause of action.[94] The Simon lawyers respond our colleagues recognize sham litigation counterclaims in racketeering and other non-antitrust cases and argue they allege facts allowing us to plausibly infer Uber and FedEx are engaging in anticompetitive conduct.[95]

The *Noerr-Pennington* doctrine generally immunizes a party from liability for petitioning the government including through litigation.[96] The doctrine originated in the context of antitrust litigation but our Court of Appeals has expanded it to other areas of the law.[97] A plaintiff may invoke the "sham litigation" exception to *Noerr-Pennington* where a defendant's single petition or litigation is "nothing more than an attempt to interfere directly with the business relationships of a

competitor."[98] Our Court of Appeals instructs we apply one of two tests to determine whether the litigation is a sham.[99] When a claimant alleges one sham petition, we apply a two-step test: (1) "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and (2) if so, "the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor . . . through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon."[100] "Only if the underlying litigation is objectively meritless do [we] address the second factor."[101]

But the Simon lawyers do not invoke the sham exception to defeat *Noerr-Pennington* immunity. They instead plead sham litigation as an affirmative counterclaim seeking damages and declaratory relief.[102] We must decide whether the sham litigation doctrine supplies an independent cause of action in this racketeering case.

The Simon lawyers primarily rely on conclusory language from Chief Judge Lancaster's analysis sixteen years ago in *Simon Property Group, Inc. v. Palombaro*.[103] Chief Judge Lancaster considered a sham litigation counterclaim in a racketeering action and reasoned "if *Noerr-Pennington* immunity principles apply in the contexts [outside antitrust], then the 'sham litigation' exception to *Noerr-Pennington* immunity may apply in such contexts as well."[104] Chief Judge Lancaster recognized "a claim for 'sham litigation' is a viable counterclaim in [a racketeering] lawsuit" but dismissed the counterclaim because its factual allegations did not satisfy the pleading standards.[105]

We recognize Chief Judge Lancaster opined sham litigation as a cognizable counterclaim in a racketeering action if well-pleaded. But we are not persuaded to extend the *Noerr-Pennington* sham exception into an independent cause of action on the facts pleaded before us. *Noerr-*

*Pennington* provides immunity from liability otherwise available under an existing cause of action; its sham exception removes the immunity when petitioning activity falls outside the doctrine's protection. We have not found, and the Simon lawyers do not identify, controlling authority recognizing the sham litigation exception itself as an independent cause of action for damages.

The Simon lawyers' two other authorities do not change our analysis. Chief Magistrate Judge Eddy eight years ago recognized Chief Judge Lancaster extended *Noerr-Pennington* principles to a racketeering action in *Washington County Family Entertainment, LLC v. RNN Entertainment Inc.* but dismissed the sham litigation counterclaim.[106] Chief Magistrate Judge Eddy found "there are no allegations of the elements of a justiciable cause of action" supporting the counterclaim and questioned whether sham litigation "should . . . even apply in the unique context of th[e] case."[107] Chief Magistrate Judge Eddy's analysis in *Washington County* does not independently recognize a freestanding sham litigation cause of action.

Nor does Judge Sleet's analysis twenty-three years ago in *TruePosition v. Allen Telecom, Inc.* support recognizing one. Judge Sleet considered a defendant's "sham litigation" counterclaim in response to a patent infringement action and rejected the argument no such claim could proceed.[108] But Judge Sleet explained a sham litigation counterclaim "is, essentially, an assertion that antitrust law has been violated" and recognized "a violation of antitrust law underlies any sham exception to antitrust immunity."[109] Although the defendant had not specifically pleaded a Sherman Act violation, Judge Sleet found invocation of the sham litigation doctrine sufficient under the pleading standards to provide notice of the underlying antitrust claim.[110] Judge Sleet in *TruePosition* allowed a sham litigation theory to proceed as an antitrust claim despite the claimant's failure to expressly label it under the Sherman Act; we do not read the decision as

recognizing sham litigation as an independent cause of action untethered from an underlying antitrust violation.

The Simon lawyers confirmed at oral argument they "did not directly plead antitrust violations by Uber or FedEx."[111] They instead argued their existing allegations sufficiently state an antitrust theory under *Simon Property* and *TruePosition* because they allege Uber and FedEx joined together to pursue this action to deter personal injury firms from bringing claims against them.[112] They alternatively asked for leave to replead if we conclude their present counterclaim does not sufficiently plead an underlying antitrust violation.[113]

We decline to infer an unpleaded antitrust cause of action from the label "sham litigation." Expansion of *Noerr-Pennington* immunity beyond antitrust law does not, without more, transform its sham exception into a freestanding claim for damages. We dismiss the Simon lawyers' sham litigation claim.

**D. We dismiss the Simon lawyers' civil extortion claim under governing Pennsylvania law.**

The Simon lawyers counterclaim against Uber for civil extortion arising from Uber's settlement demand requiring Attorney Simon to surrender his Pennsylvania law license.[114] Uber moves to dismiss arguing governing Pennsylvania law does not recognize a civil cause of action for extortion.[115] The Simon lawyers counter California law applies because Uber maintains its principal place of business in California and engaged in broader tort-reform activities in California.[116] They also ask us to somehow infer Uber made the decision to issue the settlement demand from its California headquarters .[117]

We apply Pennsylvania's choice of law rules as a federal court in Pennsylvania exercising supplemental jurisdiction over state law claims.[118] We ask two questions under Pennsylvania law to determine which state's law applies to a particular claim: (1) whether there is an actual conflict

between the states' laws and (2) if there is an actual conflict, "which state has the greater interest in the application of its law."[119]

We recognize the conflict between Pennsylvania and California law on the civil extortion claim. California recognizes civil liability for extortion in appropriate circumstances.[120] Pennsylvania does not recognize a civil cause of action for extortion.[121] The Simon lawyers conceded during oral argument civil extortion is not a Pennsylvania claim.[122] The two states look at this issue differently and have interests in applying their laws to this case; we face a true conflict.[123]

We next consider whether Pennsylvania or California has "the greater interest in the application of its law."[124] The state with the greater interest is the one "having the most significant contacts or relationships with the particular issue."[125] We consider several factors to determine which state has a greater interest in applying its law to a tort claim including: (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties," and (4) "the place where the relationship, if any, between the parties is centered."[126] We analyze these factors and weigh contacts with a state "on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue."[127]

We readily conclude Pennsylvania has the greater interest here. The entire case focuses on alleged litigation strategies in one Philadelphia state court. The alleged extortion of positing a settlement demand requiring Attorney Simon forfeit his professional license arose from settlement negotiations properly directed by us. Uber complied with our Order and communicated the challenged demand to the Simon lawyers in this litigation and the demand concerned Attorney Simon's Pennsylvania law license and his continued practice of law in Pennsylvania. The Simon

lawyers allege Uber used this litigation and the prospect of continuing it to pressure Attorney Simon into surrendering his license. Their alleged injury likewise arises from defending this action and responding to the challenged settlement demand. These contacts center the parties' relationship and the alleged coercive conduct in Pennsylvania. Uber's California headquarters, the Simon lawyers' inference the settlement decision somehow originated in California, and Uber's alleged California tort-reform activities do not outweigh the Pennsylvania-centered nature of the litigation, settlement negotiations, professional license, alleged coercive mechanism, and claimed injury.

Pennsylvania law governs. It does not recognize a civil cause of action for extortion. We dismiss the Simon lawyers' civil extortion counterclaim with prejudice.[128]

### E. We dismiss the Simon lawyers' abuse of process claim based on Uber's settlement demand.

The Simon lawyers counterclaim against Uber for abuse of process based on Uber's settlement demand requiring Attorney Simon to surrender his Pennsylvania law license.[129] They allege Uber used our October 14, 2025 Order directing the parties to engage in meaningful settlement discussions to demand Attorney Simon surrender his law license as a condition of resolving this action.[130] Uber moves to dismiss arguing the settlement demand does not constitute "legal process" under Pennsylvania law because, even though Uber made it in response to our Order, the demand lacked judicial enforceability and carried no exercise of "the court's process power."[131] It also argues settlement demands need not be limited to relief the court could award and the Simon lawyers obtained no improper collateral result because they rejected Uber's demand.[132] The Simon lawyer respond Uber used our Orders directing settlement activity as legal process to make the challenged demand.[133] They further argue Uber abused this process by

threatening continued racketeering litigation unless Attorney Simon surrendered his law license—relief they contend Uber could not obtain through its racketeering claims. [134]

The Simon lawyers do not try to persuade us to apply California law on this abuse of process claim based on the same alleged conduct pleaded in their civil extortion claim. The common law tort of abuse of process under Pennsylvania law prohibits "the use of legal process against another primarily to accomplish a purpose for which it is not designed."[135] The elements of an abuse of process claim are: (1) use of a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm caused to the plaintiff.[136] It is not enough "the defendant had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive."[137] There must be "an act or threat not authorized by the process, or the process must be used for an illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action."[138]

Before addressing whether Uber's settlement demand constitutes abuse of legal process, we first address Uber's argument the Supreme Court through Federal Rule of Evidence 408 bars the Simon lawyers from relying on the demand. Uber argues the Simon lawyers cannot ground an abuse of process claim in statements made during compromise negotiations because Rule 408 prohibits use of settlement communications to "prove or disprove the validity or amount of a disputed claim."[139] Uber relies on Judge Davis's analysis in *Ciolli v. Iravani* reasoning settlement communications could not support later wrongful use of civil proceedings or abuse of process claims when the claimant used those communications to challenge the validity of the underlying litigation.[140] The Simon lawyers respond Rule 408 governs admissibility rather than pleading and does not provide blanket protection for conduct occurring during settlement negotiations.[141] They argue they do not rely on Uber's demand to disprove the validity or amount of Uber's racketeering

claims but instead offer the demand as evidence of Uber's alleged abuse of process.[142] They rely on Judge Pappert's analysis in *BTG International Inc. v. Bioactive Laboratories* distinguishing *Ciolli* and considering settlement terms offered as evidence of an alleged abuse of process rather than to challenge the validity of the underlying claim.[143]

We are persuaded by Judge Pappert's reasoning in *BTG*. The Simon lawyers do not rely on the settlement demand to establish the invalidity or amount of Uber's racketeering claims. They instead rely on the demand as evidence of the alleged abuse itself. The Supreme Court through Rule 408 does not insulate allegedly improper conduct merely because it occurs during settlement negotiations.[144] We consider Uber's settlement demand in deciding whether the Simon lawyers pleaded facts allowing us to plausibly infer an abuse of process claim.

We need not decide whether our Orders directing settlement activity and the proceedings flowing from them constitute "legal process" because the Simon lawyers do not allege facts allowing us to plausibly infer Uber used a process primarily for a purpose for which it was not designed. Judge Baylson's reasoning in *Woods Services, Inc. v. Disability Advocates, Inc.* is instructive.[145] The defendant there alleged the plaintiff's settlement demands revealed an improper agenda and sought terms the defendant considered objectionable and unlawful.[146] Judge Baylson rejected the abuse of process claim because the plaintiff's "primary purpose in making those demands was to present an opening offer to settle th[e] case—the very purpose for which the settlement process was designed."[147] The defendant rejected the proposal and Judge Baylson concluded the settlement process reached its authorized conclusion.[148]

Judge Pappert in *BTG* reviewed a different alleged primary purpose. The defendants there allegedly invoked an administrative proceeding and then proposed a settlement demanding millions of dollars and other relief for claims unrelated to the subject matter of the proceeding.[149]

Judge Pappert concluded those settlement terms supported an inference the defendants used the administrative proceeding primarily "as a threat and a club" to extract collateral relief unavailable through the administrative process.[150] As Judge Baylson in *Woods Services* explained two years after *BTG*, the settlement demand in *BTG* served as evidence of the allegedly extortionate purpose behind invoking the separate administrative proceeding; the demand itself was not the legal process allegedly abused merely because it sought objectionable or unavailable relief.[151]

The Simon lawyers' pleaded facts align more closely with *Woods Services* than *BTG*. Our Orders directed the parties to engage in settlement efforts and ultimately required Uber to provide a confidential Rule 408 demand containing economic and non-economic terms. Uber used those proceedings to propose terms for resolving this action. The Simon lawyers object to one proposed term—Attorney Simon's surrender of his law license—and contend Uber could not obtain such relief through its racketeering claims. But, as in *Woods Services*, the inclusion of an objectionable or allegedly unlawful settlement term in an opening demand as part of an anticipated ongoing settlement process required in all cases does not itself plausibly show Uber's primary purpose in using the settlement process to do anything other than resolve this litigation. Nor do the allegations resemble *BTG*. Uber did not invoke a separate judicial or administrative proceeding and then use the burden of the proceeding to extract relief on claims unrelated to its subject matter. The challenged demand instead arose within court-ordered settlement discussions concerning the same racketeering action Uber sought to resolve. The Simon lawyers do not plausibly allege Uber used the settlement process as a coercive vehicle to obtain collateral relief unrelated to the litigation before us.

We dismiss the Simon lawyers' abuse of process counterclaim without prejudice.

## III. Conclusion

We dismiss with prejudice the Simon lawyers' civil extortion claim. We dismiss the Philadelphia Spine Associates and doctors' defamation and false light claims and the Simon lawyers' sham litigation and abuse of process claims without prejudice.

---

[1] Our Court of Appeals instructs we may consider a document outside the complaint on a motion to dismiss when the complainant's claims rely on the document and no party disputes its authenticity. *See Smith v. Pallman*, 420 F. App'x 208, 213 (3d Cir. 2011) (citing *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.")); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] document integral to or explicitly relied on in the complaint may be considered without converting the motion to dismiss into one for summary judgment. . . . [W]hat is critical is whether the claims in the complaint are based on an extrinsic document and not merely whether the extrinsic document was explicitly cited. Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.") (citations and quotations omitted).

[2] ECF 71 ¶ 32. We will refer to only Uber for ease of reference although all claims and allegations are asserted by both Uber and FedEx.

Simon & Simon, P.C. is a personal injury law firm with its principal place of business in Pennsylvania. *Id.* ¶ 19. Marc Simon is a member of the Pennsylvania Bar and the managing partner of Simon & Simon. *Id.* ¶ 20. Attorney Simon founded Simon & Simon in 2010 and "serves as its [Chief Executive Officer] and full owner." *Marc I. Simon*, Simon & Simon, https://www.gosimon.com/about/attorneys/marc-i-simon/ [https://perma.cc/FAC8-CKJR].

[3] ECF 71 ¶¶ 21–25, 36, 63.

[4] *See, e.g., id.* ¶¶ 64–72, 103–08.

[5] *See, e.g., id.* ¶¶ 26, 73–86.

[6] *See e.g., id.* ¶¶ 73, 84, 92, 95–98.

[7] ECF 119 at 113–14. The Simon lawyers today identify twenty cases in the counterclaim. And then plead Uber settled thirteen of these twenty, three resulted in jury verdicts for the Philadelphia County plaintiffs, one resulted in a defense verdict, and three remained ongoing or the Simon lawyers dismissed without prejudice. *Id.* at 111–12.

[8] ECF 1. We will refer to only Uber for ease of reference although all claims and allegations are asserted by both Uber and FedEx. *See generally* ECF 71.

[9] *See generally id.*

[10] ECF 133-5. Uber attaches the articles identified in the Doctors' counterclaims to its Motion to dismiss. *See* ECFs 133-3–133-8; 133-10. The Doctors do not dispute the authenticity of the articles and base their counterclaims on the articles. *See supra* note 1. We may properly consider the articles in deciding Uber's Motion to dismiss.

[11] ECF 133-5 at 2.

[12] *Id.* at 2–3.

[13] *Id.* at 3.

[14] Philadelphia Spine Associates and its doctors allege the Law.com article "characterized [them] as receiving payment from the Simon firm 'to diagnose nonexistent injuries and falsify medical records.'" ECF 115 at 56.

[15] ECF 133-6.

[16] *Id.* at 3.

[17] *Id.* at 4.

[18] *Id.* at 5.

[19] *Id.* at 7. Philadelphia Spine Associates and its doctors allege the Metro Philadelphia article, "in which [Senior Director] Blinick was directly quoted, . . . described [them] as 'hand-picked chiropractors' who conspired to fabricate fraudulent personal injury claims." ECF 115 at 56. They conceded at oral argument no quotation attributes "hand-picked chiropractors" to Uber or FedEx, Metro Philadelphia's reporter wrote the phrase, and Uber did not use those words. ECF 186 at 10:15–11:3.

[20] ECF 119 at 116; *see also* ECF 32.

[21] ECF 133-4.

[22] *Id.* at 5.

[23] *Id.* at 4.

[24] Philadelphia Spine Associates and its doctors allege Reuters "specifically identified" Philadelphia Spine Associates, Dr. Piccillo, and Dr. Harvey by name and as "unscrupulous" medical providers "providing unnecessary procedures" for nonexistent injuries. ECF 115 at 56. Its lawyer conceded at oral argument Reuters does not identify them by name but instead "by implication." ECF 186 at 5:18–6:3.

Philadelphia Spine Associates also cited the Reuters article using a hyperlink ending in "source=chatgpt.com." ECF 115 at 56. When we asked why the citation referenced ChatGPT, its lawyer denied using artificial intelligence and explained he "used a search engine to locate articles

in which [Senior Director Blinick] was quoted" and included the hyperlink "[s]imply [to identify] its existence." ECF 186 at 6:4–13, 7:2–5.

[25] ECF 133-3.

[26] *Id.*

[27] *Id.*

[28] Philadelphia Spine Associates and its doctors allege Senior Director Blinick "was quoted as promoting Uber's [racketeering] lawsuits as blueprints other corporations can and should exploit similarly in furtherance of profit" and "bragged that Uber's [racketeering] lawsuits had spurred other corporations to seek Uber's advice on methodologies for using [racketeering] lawsuits as a profit generator." ECF 115 at 55–56.

[29] ECF 57.

[30] ECF 68 at 2.

[31] ECF 119 at 116.

[32] *Id.*

[33] ECF 133-8.

[34] *Id.*

[35] *Id.* Philadelphia Spine Associates and its doctors allege Senior Director Blinick's "[public relations] blitz republishing the allegations against [them] continued unabated" in the Consumer Technology Association presentation. ECF 115 at 65. It also notes "[a] notable fellow speaker listed at [the] presentation was John Lee, Chief Counsel for Intellectual property, U.S. House of Representatives – Committee on the Judiciary." *Id.*

[36] ECF 71.

[37] *See generally id.* The lawyers and doctors jointly moved to dismiss arguing: (1) *Noerr-Pennington* doctrine bars these racketeering claims; (2) Uber lacks standing because it fails to plead proximate causation; (3) lawyers' litigation activities are not predicate acts and the doctors' alleged acts are not wire or mail fraud; (4) Uber fails to plead conduct of an enterprise; (5) res judicata doctrine bars Uber's claims; (6) *Rooker-Feldman* doctrine bars Uber's claims; and (7) Uber fails to state a conspiracy claim under the Act. *See* ECF 82-1. We denied the lawyers and doctors' motion to dismiss in its entirety. *See* ECF 99.

[38] ECF 133-7.

[39] *Id.* Philadelphia Spine Associates asserts the "promotional video on Punchbowl News" is titled "Adam Blinick of Uber on companies' role in shaping tort reform policy" and allege Senior Director Blinick agreed during the interview "'shaping policy' and 'educating lawmakers' and

'educating citizens' were the entire point of his relentless amplification of Uber's [racketeering] allegations." ECF 115 at 65. They also allege Senior Director Blinick's "[public relations] blitz republishing the allegations against [them] continued unabated" in the Punchbowl News video. *Id.*

[40] ECF 133-10.

[41] *Id.* at 4.

[42] These facts are seemingly lost on Philadelphia Spine Associates which pleads Senior Director Blinick's "[public relations] blitz republishing the allegations against [them] continued unabated" in the Insurance Information Institute article. ECF 115 at 65.

[43] ECF 115.

[44] *Id.* at 55–57, 64–65.

[45] *Id.*

[46] *Id.* at 66–72.

[47] ECF 119.

[48] *Id.* at 118–21.

[49] *Id.* at 115–16, 119–21.

[50] ECF 133.

[51] ECF 133-1 at 7–20.

[52] ECF 141-1 at 7–19.

[53] ECF 115 at 66–72.

[54] *Id.* at 55–57, 64–72.

[55] ECF 133-1 at 1, 9–13.

[56] *Id.* at 2–18.

[57] *Id.* at 18–19.

[58] ECF 150-1 at 4–13.

[59] *Id.* at 9–18.

[60] *Id.* at 22–23.

[61] *Salaam v. Trump*, 777 F. Supp. 3d 414, 423–24 (E.D. Pa. 2025) (citing 42 Pa. Cons. Stat. § 8343(a)).

[62] *Jones v. N. Children's Servs.*, No. 23-4349, 2024 WL 3889093, at *2 (E.D. Pa. Aug. 20, 2024) (quoting *Maier v. Maretti*, 671 A.2d 701, 704 (Pa. Super. Ct. 1996)).

[63] *Cheney v. Daily News L.P.*, 654 F. App'x 578, 581 (3d Cir. 2016) (quoting *Schoneck v. WJAC, Inc.*, 258 A.2d 504, 507 (Pa. 1969)).

[64] *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 479 (E.D. Pa. 2010) (citing 42 Pa.C.S. § 8343(a)(3), (5)).

[65] *Id.* at 479 (quoting *Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 410 (E.D. Pa. 1983)).

[66] *Cheney*, 654 F. App'x at 581 (quoting *Schoneck*, 258 A.2d at 507).

[67] *Id.* (quoting *Harris v. Easton Publ'g Co.*, 335 Pa. Super. 141, 483 A.2d 1377, 1385 (1984)).

[68] *Mzamane*, 693 F. Supp. 2d at 479 (quoting *Weinstein v. Bullick,* 827 F. Supp. 1193, 1199 (E.D. Pa. 1993)); *see also Mehdizadeh v. Starbucks Corp.*, No. 24-3339, 2024 WL 3927217, at *3 (E.D. Pa. Aug. 23, 2024) (The allegedly defamatory statement "must at least 'point to' the plaintiff 'by description or circumstances tending to identify him.'") (quoting *Schoneck*, 258 A.2d at 507).

[69] *Byars v. Sch. Dist. of Phila.*, 942 F. Supp. 2d 552, 564 (E.D. Pa. 2013) (citing *Ertel v. Patriot-News Co.*, 674 A.2d 1038, 1043 (Pa. 1996)).

[70] *See St. Clair v. Harris*, No. 21-1837, 2023 WL 4086286, at *21 (W.D. Pa. June 20, 2023) (rejecting defamation claim absent evidence the defendant published or caused publication of the allegedly defamatory remarks).

[71] ECF 186 at 10:5–23.

[72] *Monge v. Univ. of Pennsylvania*, No. 22-2942, 2023 WL 4032661, at *8 (E.D. Pa. June 14, 2023).

[73] *Id.*

[74] *Id.*

[75] *Mehdizadeh v. Starbucks Corp.*, No. 24-3339, 2024 WL 3927217, at *1 (E.D. Pa. Aug. 23, 2024).

[76] *Id.*

[77] *Id.*

[78] *Id.* at *3.

[79] *Mzamane*, 693 F. Supp. 2d at 462–63.

[80] *Id.* at 465.

[81] *Id.*

[82] *Id.* at 480, 482–83.

[83] ECF 150-1 at 11–13.

[84] *Mzamane,* 693 F. Supp. 2d at 484 (quoting *Alvord–Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994)).

[85] ECF 150-1 at 15–16.

[86] *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 89 (3d Cir. 2013) (internal citation omitted).

[87] ECF 115 at 72–73.

[88] ECF 133 at 20.

[89] ECF 150-1 at 22–23.

[90] *Tannous v. Cabrini Univ.*, 702 F. Supp. 3d 317, 320–21 (E.D. Pa. 2023) (quoting *Graboff v. Colleran Firm*, 744 F.3d 128, 136 (3d Cir. 2014)).

[91] *Williams v. Roc Nation, LLC*, No. 20-3387, 2020 WL 6158242, at *6 (E.D. Pa. Oct. 21, 2020).

[92] *See, e.g., Bank v. Cmty. Coll. of Philadelphia,* No. 22-293, 2022 WL 2905243, at *4 (E.D. Pa. July 22, 2022) ("It is not [ ] necessary to the action for invasion of privacy that the plaintiff be defamed." (citing Restatement (Second) of Torts § 652E cmt. b)).

[93] ECF 119 at 118–20.

[94] ECF 141-1 at 8–11.

[95] ECF 152 at 8–14.

[96] *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 178 (3d Cir. 2015); *see also We, Inc. v. City of Phila.*, 174 F.3d 322, 326–27 (3d Cir. 1999) (The doctrine "offer[s] protection to citizens' petitioning activities. . . . Thus, the purpose of *Noerr–Pennington* as applied in areas outside the antitrust field is the protection of the right to petition."); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57 (1993) ("*PRE*") (recognizing *Noerr-Pennington* extends to "the approach of citizens . . . to administrative agencies . . . and to courts") (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).

[97] *See, e.g.*, *Campbell v. Pa. Sch. Bds. Ass'n*, 972 F.3d 213, 220 (3d Cir. 2020) ("For instance, [the doctrine] shields constitutionally protected protesters from civil suits. It has also been applied . . . to bar § 1983 claims by state actors based upon constitutionally protected conduct."); *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159–61 (3d Cir. 2001) (summarizing *Noerr-Pennington*'s applicability to various areas of law); *Brownsville Golden Age Nursing Home, Inc.*

*v. Wells*, 839 F.2d 155, 160 (3d Cir. 1988) (finding *Noerr-Pennington* immunized defendants in civil conspiracy action).

[98] *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180–81 (3d Cir. 2015).

[99] *Id.* at 180–81.

[100] *Id.* at 179 (quoting *PRE*, 508 U.S. at 60–61).

[101] *Id.* (quoting *PRE*, 508 U.S. at 60); *see also id.* at 180 ("Thus, *Professional Real Estate* requires a showing of objective baselessness before looking into subjective motivations in order to prevent any undue chilling of First Amendment activity.").

[102] ECF 119 at 118–21. The Simon lawyers seek, among other relief, compensatory damages and "[a] declaration that the [racketeering] action filed by Uber and FedEx constitutes sham litigation." *Id.* at 121–22.

[103] ECF 152 at 9–12; *Simon Prop. Grp., Inc. v. Palombaro*, 682 F. Supp. 2d 508 (W.D. Pa. 2010).

[104] *Simon Prop. Grp.*, *Inc.*, 682 F. Supp. 2d at 510–11.

[105] *Id.* at 511.

[106] *Washington Cty. Fam. Ent., LLC v. RNN Ent. Inc.*, No. 17-807, 2018 WL 4610822, at *2–3 (W.D. Pa. June 4, 2018).

[107] *Id.* at *3.

[108] *TruePosition v. Allen Telecom, Inc.*, No. 01-823, 2003 WL 151227, at *3–4 (D. Del. Jan. 21, 2003).

[109] *Id.* at *4.

[110] *Id.* at *4 n.4 ("Although the defendant has not specifically pled a violation of the Sherman Act in Counterclaim V, the invocation of the sham litigation doctrine is sufficient to give notice of the basis of its claim."). Judge Sleet also emphasized the close analogy between the patent infringement action before him and the copyright infringement action in *PRE*, where the defendant expressly alleged violations of Sections 1 and 2 of the Sherman Act. *Id.* at *4–5.

[111] ECF 186 at 42:15–43:19.

[112] *Id.*

[113] *Id.*

[114] ECF 119 at 116, 121–22.

[115] ECF 141-1 at 13–14.

[116] ECF 152 at 22–23.

[117] *Id.* at 24.

[118] *See Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008) ("When deciding a substantive state law matter, a federal court exercising supplemental jurisdiction must "perform a choice-of-law analysis to determine which state's substantive law applies.").

[119] *LeJeune v. Bliss-Salem, Inc.*, 85 F.3d 1069, 1071 (3d Cir. 1996) (citing *Cipolla v. Shaposka*, 267 A.2d 854 (Pa. 1970)); *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 & n.15 (3d Cir. 1991)); *see also Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229–30 (3d Cir. 2007) (describing the first question as "determining if there is an *actual* or real conflict between the potentially applicable laws" (emphasis in original)).

[120] *See Tran v. Nguyen*, 97 Cal. App. 5th 523, 525 (2023) ("Civil Code sections 1566, 1567, and 1570 establish a right to rescission in cases in which a person's consent to a transaction was obtained by 'menace': threats of confinement, of unlawful violence to the person or his or her property, or of injury to a person's character. This is effectively the civil version of extortion.").

[121] *Ballard v. City of Philadelphia*, No. 11-7926, 2013 WL 12132054, at *6 (E.D. Pa. Apr. 29, 2013), *aff'd*, 541 F. App'x 143 (3d Cir. 2013).

[122] ECF 186 at 59:1-2.

[123] *See Hammersmith*, 480 F.3d at 230 (explaining there is a true conflict if both "jurisdictions' interests would be impaired by the application of the other's laws"); *Barbey v. Unisys Corp.*, No. 05-1323, 2006 WL 8459436, at *4–5 (E.D. Pa. May 10, 2006) (finding a true conflict existed between Pennsylvania and Swiss law for wrongful termination claims where they defined employer differently, applying them would "produce[] different results," and both jurisdictions had interests in regulating employment relationships or deterring harm), *aff'd*, 256 F. App'x 532 (3d Cir. 2007)).

[124] *LeJeune*, 85 F.3d at 1071.

[125] *Budget Rent-A-Car Sys., Inc. v. Chappell*¸ 407 F.3d 166, 170 (3d Cir. 2005) (citing *In re Est. of Agostini*, 457 A.2d 861, 871 (Pa. Super. Ct. 1983)).

[126] Restatement (Second) Conflict of Laws § 145; *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 463 (3d Cir. 2006) ("The Second Restatement dictates different approaches depending on the substantive law at issue . . . . [W]e must first characterize the particular issue before the court as one of tort, contract, or corporate law . . . ."); *Taylor v. Mooney Aircraft Corp.*, 430 F. Supp. 2d 417, 429 (E.D. Pa. 2006) (applying section 145 to a tort claim); *Russo v. Allegheny Cnty.*, 125 A.3d 113, 118 (Pa. Commw. Ct. 2015) (referring to a wrongful termination claim as a tort claim).

[127] *Hammersmith*, 480 F.3d at 231 (quoting *Shields v. Consol. Rail Corp.*, 810 F.2d 397, 400 (3d Cir. 1987)).

[128] We need not address Uber's alternative argument the Simon Counter-Defendants fail to plead civil extortion even under California law. *See* ECF 141-1 at 15.

[129] ECF 119 at 116, 120–21.

[130] *Id.*

[131] ECF 141-1 at 16–17 (quoting *Morris v. Scardelletti*, No. 94-3557, 1994 WL 675461, at *11 (E.D. Pa. Nov. 23, 1994)); *id.* at 17 ("A fortiori, the transmission of a demand letter, even in response to a Court order, is not legal process—the demand letter is not judicially enforceable and has no legal effect.").

[132] *Id.* at 12, 17–18.

[133] ECF 152 at 18–20. The Simon Counter-Defendants rely on our October 14, 2025 Order directing the parties to meaningfully confer about "settlement structures and potential resolution avenues," our November 20, 2025 Order continuing the parties' settlement efforts, and our January 2026 Order directing Uber to provide each Defendant a confidential Rule 408 demand addressing economic and non-economic terms. *Id.*; *see also* ECFs 32, 40, 68.

[134] *Id.* at 21–22.

[135] *Rice Drilling B, LLC v. Scott*, 324 A.3d 663, 680 (Pa. Super. Ct. 2024).

[136] *Id.*

[137] *Lower Bucks Cnty. Joint Mun. Auth. v. Koszarek*, 244 A.3d 54, 72 (Pa. Commw. Ct. 2020) (quoting *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 192 (Pa. Super. Ct. 1994)).

[138] *Id.*

[139] ECF 141-1 at 11 (quoting Fed. R. Evid. 408).

[140] *Id.* at 11–12 (citing *Ciolli v. Iravani*, 625 F. Supp. 2d 276, 288–89 (E.D. Pa. 2009).

[141] ECF 152 at 14–15 (quoting *BTG Int'l Inc. v. Bioactive Lab'ys*, No. 15-4885, 2016 WL 3519712, at *11 (E.D. Pa. June 28, 2016)).

[142] *Id.* at 15.

[143] *Id.*

[144] *See BTG*, 2016 WL 3519712 at *10 ("Rule 408 should not be read to effectively immunize [defendants] from their alleged conduct in the [] process. Such an interpretation would not only contravene Rule 408's text, but also could allow a party to easily insulate itself from an abuse of process claim by labeling as settlement discussions its purportedly improper and possibly illegal demands. [Plaintiff] does not reference the Proposed Settlement in its amended complaint 'either to prove or disprove the validity . . . of a disputed claim,' Fed. R. Evid. 408, *i.e.*, to demonstrate

the invalidity of the underlying [claim]. Indeed, an abuse of process claim is not dependent on whether the underlying litigation involved a valid claim.").

[145] *Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592 (E.D. Pa. 2018).

[146] *Id.* at 606.

[147] *Id.* at 606–07.

[148] *Id.* at 607.

[149] *BTG*, 2016 WL 3519712, at *12–13.

[150] *Id.* at *12.

[151] *Woods Servs.,* 342 F. Supp. 3d at 606 n.7.