# EXHIBIT A

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

UBER TECHNOLOGIES, INC. AND FEDERAL EXPRESS CORPORATION
*Plaintiff*
v.
SIMON & SIMON P.C., MARC SIMON, CLIFTON BURT, PREMIER PAIN & REHAB CENTER, PC, ETHEL HARVEY, DANIEL PICCILLO, PHILADELPHIA SPINE ASSOCIATES, LLC, and LANCE YARUS
*Defendant*

Civil Action No. 2:25 cv 05365 MAK

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Yasmeen Bailey

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See Exhibit A attached

| Place: Rohn Kurland, P.C.<br>1700 Market St, Suite 1005<br>Philadelphia, PA 19103 | Date and Time: |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: ______________

*CLERK OF COURT*

_________________________
*Signature of Clerk or Deputy Clerk*

OR

/s/ Michael Wadden
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Uber Technologies, who issues or requests this subpoena, are:

Michael Wadden; 700 13th Street, NW, Suite 800, Washington DC 20005; MichaelWadden@ashurst.perkins.com; 202-434-1683

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 2:25 cv 05365 MAK

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________________
______________________________________________________
______________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**EXHIBIT A**

**REQUESTS FOR DOCUMENTS**

1. Please send us all medical records or other documents that show whether you got the treatment your lawyers or their expert said you needed for your injuries in *Yasmeen Bailey v. Kianu T. Walker, et al*, such as those described in the attached report. This includes records for any more radiofrequency ablations, more MRIs, surgeries, or any other treatment they said you needed.

**REGIONAL ORTHOPEDIC ASSOCIATES, P.C.**
**TALL OAKS PAIN MANAGEMENT**

Two Logan Square
100 North 18th Street, Suite 300
Philadelphia, Pa. 19103-2733
1-877-734-6784 fax: 1-484-558-0899
lowen@regionalorthopedic.net

Lance Yarus, D.O. FAASOS, FACFE, BCFE
Board Certified,Emeritus Diplomate, B.C. O. S.
Fellow, F.A.A.S.O.S.
Board Certified, Diplomate A.A.P.M.
Board Certified, Diplomate, Fellow A.B.F.E.
Senior Disability Analyst and Diplomate, A.B.D.A.

August 21, 2023

Marc I. Simon, Esquire
Simon and Simon, P.C.
Injury Lawyers
18 Campus Blvd, Suite 100
Newtown Square, Pennsylvania 19073

RE: Yasmeen Bailey
DOB: 11/04/1994
DOL: November 12, 2022.

Dear Attorney Simon:

I had the pleasure and privilege of evaluating Yasmeen Bailey in person in my Philadelphia office on August 21, 2023.

**CHIEF COMPLAINTS**: At the time the subject incident: neck pain and low back pain.

**HISTORY OF PRESENT ILLNESS**: Ms. Bailey was the passenger in an Uber/Lyft vehicle. She was a passenger sitting in the back seat behind the passenger's side. Another vehicle struck the vehicle in which she was traveling. She hit the seat in front of her. There was no airbag deployment, no ambulance. She was jerked from the impact. She did not suffer loss of consciousness.

She was seen and evaluated at Temple Health Emergency Facility on November 14, 2022.

Ms. Bailey came under the care of Philly Spine Center, Incorporated. She treated from November 23, 2022, through March 29, 2023.

1. November 23, 2022:
   a. Chief complaints: Neck pain and back pain, rated 9/10.
   b. Diagnoses: Sprained ligaments, cervical spine; strain of muscle tendon back wall of thorax; sprained ligaments of lumbar spine.
   c. Prognosis: Guarded.
   d. Treatment scheduled three times weekly.
   e. Treatment rendered: Mechanical traction therapy; infrared therapy and electrical stimulation.
2. March 29, 2023: Follow-up.
   a. Complaints: Back and neck pain, rated 6/10.
   b. Diagnosis: Unchanged.
   c. Prognosis: Unchanged.
   d. Treatment plan: Treat two times weekly.
   e. Treatment rendered: Mechanical traction; electrical stimulation.

Ms. Bailey had diagnostic imaging at Open MRI of Bala Cynwyd.

1. Cervical spine MRI, March 9, 2023: Report and hard copy films were reviewed.
   a. C2-3 showed no discopathic or facetogenic changes.
   b. C3-4 showed peripheral annular tear with symmetrical disk bulging. No foraminal encroachment, no root compression, no central canal stenosis.
   c. C4-5 showed peripheral annular tear, bulging disk, no extrusion, no occupation of the foramina, no root compression, no central canal stenosis.
   d. C5-6, C6-7 showed physiologic disk bulging. There was reversal of the normal lordosis due to muscle spasm.
2. MRI lumbar spine, March 9, 2023, report and hard copy films for review.
   a. L1-2 through L5-S1 showed no discopathic or facetogenic changes; negative examination.

Ms. Bailey had examination at Regen Doctors, November 30, 2022, Christy Menkhaus, PA-C.

1. Chief complaint: MVA November 12, 2022; neck pain, back pain.
2. The subject incident was referenced.
3. She was seen at Temple several days later, evaluated, with no imaging obtained. She was discharged in stable condition after receiving injection for pain.
4. Complaints: Neck pain, back pain. She had recently started therapy. Pain rated 7/10.
5. Assessment: Cervicalgia; cervical strain; low back pain; and lumbar strain.
6. Treatment: Awaiting MRI results.

Ms. Bailey had electrodiagnostic testing at Regen Doctors with Gene V. Levinstein, MD, March 23, 2023.

1. Matrix data and graphs show evidence of a right C5 nerve root radiculopathy.

Ms. Bailey treated at Premier Pain and Rehab Center, P.C., Clifton Burt MD, May 18, 2023.

1. Report of Dr. Burt.
   a. Dr. Burt references the subject incident of November 12, 2022.
   b. Complaints: Cervical spine pain rated 8/10 on the VAS, numbness and tingling into the left hand.
   c. Physical examination findings: Cervical flexion 40 degrees, extension 35 degrees. Cervical facet loading positive C6, sensory 2/2 normal bilateral, motor 5/5 bilateral.
   d. Cervical dorsopathy/facet syndrome.
2. Procedures: Cervical medial facet branch nerve blocks with fluoroscopy, bilateral C6.
   a. After Dr. Burt provided MBBs, there was 40% improvement for 20 minutes.
   b. Decision was made to proceed to radiofrequency ablation.
3. Procedures: Radiofrequency ablations, cervical medial facet branch nerves with fluoroscopy, bilateral C6.

Despite treatment provided, Ms. Bailey continues to complain of neck pain and lumbar spine pain. The neck has improved since the radiofrequency ablation. She still has pain level 8/10 on the analog scale. She has radiating pain to the shoulder area. She has worsening modifying factors of walking too long, standing too long. Improvement is noted with medication and therapy as well. Associated signs and symptoms are stiffness in the back and headaches.

**PRE-EXISTING CONDITIONS**: Denied.

**POST-INJURY INJURIES**: Denied.

**WORK AT THE TIME OF INJURY**: Unemployed.

**CURRENT JOB ACTIVITIES**: She works at All American Home Care as a CNA.

**EFFECT ON ACTIVITIES**: She has difficulty standing too long.

**MEDICATIONS**: Prior to the subject incident denied.

**CURRENT MEDICATIONS**: Muscle relaxer, accident-related.

**ALLERGIES**: Denied to medications.

**FAMILY HISTORY**: Mother is alive. Father is deceased.

**FAMILY PHYSICIAN**: Dr. Wanda.

**PAST MEDICAL HISTORY**: Includes headaches.

**SURGICAL HISTORY**: Unremarkable.

**SOCIAL HISTORY**: She does not smoke. She does utilize caffeine products occasionally. Alcohol use is occasional. Marital status: Single.

**REVIEW OF SYSTEMS**: Unremarkable.

**PHYSICAL EXAMINATION**: She is 5 feet 10 inches tall, 195 pounds.

**HEAD:** Normocephalic, No bruises or lesions.

Alert/oriented, mentation intact, no abnormal facies.
**Eyes:** Vision intact, PERRLA, EOMI, sclerae are non-icteric, no strabismus or nystagmus.
**Ears:** Canals are patent, able to hear a whisper.
**Nasal:** Septum mid-line, mucosa moist, sinuses clear.
**Throat:** Tongue mid-line, pharnyx clear, no infection.
**Lungs:** clear to ascultation, no rales or ronchi, no wheezes.
**Cardiac:** No arrhythmias, skips, murmurs, thrills, gallops, rubs.
**Abdomen:** Soft, non-tender, no organomegaly. No bruits.
**GU:** Deferred.

**Neck:** Veins non-distended, thyroid mid-line. There is a loss of lordosis. There is spasm and hypertonicity @ C4-5, C5-6, B/L.
**Range of motion:** FF 20 deg. E 10 deg. Rot R 25 deg. L 25 deg. SB R 25 deg. L 20 deg.
**Trapezius:** there is tenderness, spasm, hypertonicity, and cord-like formation @ the upper segments.
**Adson's, Spurling's compression, Valsalva, L'hermitte signs:** Negative.
**Facet loading:** C4-5, C5-6, B/L.
**Capillary filling:** intact in the upper and lower extremities.
**Reflex testing:** Biceps: +3/3 R +3/3 L Triceps: +3/3 R +3/3 L Brachioradialis: +3/3 R +3/3 L
**Dermatomal pattern deficits:** Negative.

**Extremity Examination:**
**Vascular:** There is no edema. Homan's and Hoffman's signs are not present. There are no painful varicosities. There are no masses in the upper or lower extremities.
**Pulses:** Radial, ulnar, femoral, popliteal, dorsalis pedis, and posterior tibial pulses are intact.

**Lymphatics:** Neck, supraclavicular, axillary, non-ingorged.
**Dermatologic:** There are no signs of abnormal temperature and/or sweat-pattern asymmetry.
**Pelvic and Rectal:** Deferred.

**RECORDS REVIEW**: The following records were reviewed in conjunction with the history and physical examination conducted at this time.

1. Hospital Records from Temple Health
2. MRI Report from Open MRI of Bala Cynwyd
3. RFA Report from Premier Pain and Rehab Centre
4. EMG Records from Regen Doctors
5. Treatment Records from Philly Spine Center

6. Billing and invoicing for testing and treatment facilities:
   a. Regen Doctors.
   b. Open MRI Center, Philly Spine Associates.

**CONCLUSIONS**: The following injuries occurred as a result the subject incident in which Ms. Bailey was involved occurring on November 12, 2022.

1. Cervical strain/sprain cervical myositis, somatic and segmental dysfunction of cervical spine, enthesopathy of the cervical spine.
2. Facetogenic pain mediated by C4-5, C5-6 injured in the subject incident of November 12, 2022.
3. Cervical dorsopathy/cervical facet syndrome.
4. C5 radiculopathy.
5. Chronic pain secondary to subject incident-related injuries sustained on November 12, 2022.
6. Alteration of activities secondary to subject incident-related injuries sustained on November 12, 2022.

**CAUSATION STATEMENT:**
Based on the current history, examination findings, the opportunity to review submitted records, hardcopy study review of the imaging studies, clinical experience, and any applicable research, it is my opinion that the injuries and conditions as they are outlined herein were directly caused by the subject incident of November 12, 2022.

**TREATMENT VALIDITY:**
The type, intensity, frequency, and duration of the provided treatment, services, products, including the interventional procedures are consistent with accepted medical standards and appropriate for the severity of the documented injuries and/or conditions that arose from the subject incident of November 12, 2022.

**TESTING VALIDIT November 12, 2022Y:**
The usage and/or timing of the diagnostic imaging, and/or electrodiagnostic testing, is/are consistent with excepted medical standards and appropriate for the specific conditions that were being evaluated and treated.

The clinical findings, the findings of the radiologic imaging, the findings of the electrodiagnostic testing, and the findings of the treating individuals are all supportive of the diagnosis set forth in the clinical records reviewed that pertain to the subject incident of November 12, 2022.

It is therefore my opinion that the provided treatment, including services, products, testing, care, and any interventional procedures performed, as well as any surgery performed, were medically necessary reasonable and causally related to the subject incident of November 12, 2022.

**COSTS:**
Any and all costs associated with the treatment provided, are to be considered medically necessary, reasonable, and causally related to the subject incident; the billing and invoicing for the testing and treatment facilities reviewed, reflects fair and usual customary fees for services provided.

**PROGNOSIS:** Prognosis for this individual is guarded.

As the injuries that were sustained in the subject incident are permanent and highly susceptible to re-injury, recurrence and/or aggravation of any underlying conditions that were not symptomatic before the subject incident occurred, the prognosis is designated anticipating the consequences and effects of the sustained injuries in terms of disruption of activities of daily living, discomfort, residual pain, the need for further conservative and/or interventional treatments, and consideration of surgery.

The prognosis assists in providing recommendations for further treatment irrespective of the category selected. The prognosis will be influenced by age, the timing of the injury, the current severity of the injury still manifesting, systemic abnormalities and other co-morbidities, patient input, and most significant, anatomic factors and physical findings associated with the outlined injuries that were sustained in the subject incident. A recovery from the injuries sustained in the subject incident is not anticipated.

The information that pertains to a specific injury will mediate the decision for additional care, including expected outcomes and recommendations for treatment in the future, natural history of the injuries sustained, clinical experience, any research specific to the areas of injury, and the knowledge of factors that pertain to the status of the individual being evaluated subsequent to the injuries sustained. These factors will facilitate additional recommendations. The recommendations for future evaluations and treatments are not speculative, rather, they are predicated on the specifics that are known as to effective treatments for the specific injuries sustained. The past experience with specific injuries leads to the ability to provide for effective additional evaluations and treatments for the future.

Status of the impairments/medical basis for future required care including evaluations and treatments:
It is my opinion that this individual requires additional evaluations and treatments based on the current status the injuries that were sustained in the subject incident as outlined.
It is my opinion that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident.

**PERMANENCY:**
There is permanency to the injuries sustained in that this individual is no longer enjoying the same lifestyle, level of comfort, nor activity involving full use of the areas of injury to which they were custom prior to sustaining injury in the subject incident.

The injuries sustained to the spinal column in the subject incident have contributed to the compromise integrity of the discs, neural structures, and the ligamentous and skeletal components of the spinal column (known as the in enthesis). There has been an adverse effect placed on the nerve distribution. It is therefore my opinion that further evaluations and treatments are required based on the current findings given that this individual has not recovered from the effects of the injury sustained in the subject incident, future care is required.

**FUTURE CARE:**
In regard to future care, Ms. Bailey remains symptomatic, irrespective of the outlined treatment provided to Ms. Bailey at this point in time, and irrespective of the response to the treatments provided during presentation for the subject incident injuries. The last interaction and outcome with a treating individual, either therapist, chiropractor, physician, or sub-specialist, will not mediate the requirement for additional care. The severity of the injuries Ms. Bailey sustained will be a factor considered for required additional evaluations and treatments in the future. Because of the permanent nature of the documented injuries, Ms. Bailey still remains symptomatic and still requires additional evaluations and treatments, irrespective of the time frame in which he/she has sought the evaluations and treatments.

It is reasonably probable that this individual will require the following:
1. Ongoing evaluations, medical treatments, and medical management.
2. Medical Surveillance: It is my opinion that this individual will require follow-up MRI studies for the cervical spine every other year due to the injuries that were sustained to these areas in the subject incident.
3. It is my opinion that this individual continues to require repeat visits to the treating chiropractors, 6-12 times annually, for chiropractic modalities, the same as previously treated with, for maintenance purposes.
4. Additionally, this individual continues to require 2-4 annual visits to an orthopedist/physiatrist for further referrals and additional monitoring purposes.
5. Interventional procedures:
a. Epidural and/or facet injections: It is my opinion that this individual requires epidural and/or facet injections for the targets of C4-5, C5. The epidural and/or facet injections are required at the frequency of 3 injections every 6 months, for an additional 3 years.
b. Rhyzotomy/neurotomy/radiofrequency ablations: As reported above, this individual underwent radiofrequency ablation procedures for the cervical spine, also known as rhizotomy/neurotomy procedures.
c. Radiofrequency ablation procedures are provided to temporarily turn off the medial facet branch nerves' ability to transmit pain signals to the brain. In this individual's case, the target levels are at C4-5, C5-6.
d. Radiofrequency ablation procedures are palliative and will not change the underlying conditions that are causing symptomatology, that being the discs that are out of their containment fibers, causing neural compression,

neural symptomatology, and resultant pain. In regard to the facets, there are inflammatory and pain mediated signals being sent from the medial facet branch nerves to the brain involving the levels of C4-5, C5-6.
e. Over time, the medial facet branch nerves that are ablated, have the ability to regenerate, within 6 to 8 months to a year. It is, therefore, my opinion that this individual will require radiofrequency ablations every 12 to 18 months, targeting the identified levels of injury that were sustained in the subject incident.
6. Additional treatment for the spinal column injured in the subject incident:
a. Surgical intervention: Because conservative care and interventional procedures will not affect the underlying conditions that are causing symptomatology at the targets identified as being injured in the subject incident, additional treatment will specifically require laminectomies, discectomies, and facetectomies for each of the targeted levels identified at C4-5, C5-6.The surgery will be required within the next five years.
b. Physical therapy as a one-time postoperative regimen: Physical therapy as a one-time postoperative regimen is required subsequent to the laminectomies, discectomies, and facetectomies for each of the targeted levels identified, 2-3 times per week, for period of 8 to 10 weeks, at 1 hour per session.
c. Fusion and stabilization procedures: During the course of this individual's life-time they will require fusion and stabilization procedures. There are injuries identified at the targeted levels. Once the laminae, discs, and facets are removed from the target levels, there will no longer be support for the vertebrae, resulting in recurrent pain, difficulty in functioning, and wear and tear on the operated levels. There will also be stress risers created above and below the operated levels. The fusion and stabilization procedures will therefore be required because of bone removal, disc removal, and creation of stress risers. The fusion and stabilization at the target levels identified as being injured in the subject incident will be required within 7 years of the laminectomies, discectomies, and facetectomies being performed for the injured levels.
d. Postoperative physical therapy: Postoperative physical therapy will be required after the fusion and stabilization procedures, at the same frequency as for the laminectomies, discectomies, and facetectomies that were performed for the injured levels.

**OTHER TYPES OF INJECTION PROCEDURES AND PALLIATIVE MEASURES FOR CARE:**

1. Selective nerve root injections.
2. PENS treatment.
3. Trigger injections for soft tissue component of the injury.
4. Spinal cord stimulation; trial and then permanent implantation.

° Selective nerve root injection: Selective nerve root injections deliver medication directly into an inflamed nerve root that exits the spinal cord, stopping the pain from traveling along the nerve branches. A small needle is guided by ultrasound to the nerve root sleeve and a local anesthetic and corticosteroid anti-inflammatory medication is delivered. Up to three injections may be given within a six month timeframe.
° Percutaneous electrical nerve stimulation (PENS): PENS treatments use acupuncture needles placed in soft tissue and muscle to deliver an electrical impulse for pain relief. The benefit of PENS therapy may be varied. Some patients will have total pain relief, others experience prolonged pain relief for 3 months or more and others get relief for shorter periods of time. Some may not get any benefit at all from the procedures. General risks may include some local bruising and tenderness at the probe insertion site(s). There is very small risk of infection.
° Injection therapies/Trigger injections: Injection therapies are a medically recognized set of procedures that are frequently utilized for conditions involving musculoskeletal injuries to the soft tissues precipitating long-standing pain and discomfort. In almost all cases injection therapy is considered safe and minimally invasive with minimal risk of complications. Injections are given in multiple areas of the fascia covering the muscle providing reduction in swelling and thereby providing relief of pain. The procedures are done in a series of 3, at 6 month intervals.
° Spinal cord stimulation: Spinal cord stimulation (SCS) helps relieve neuropathic pain symptoms such as sharp, clicking or stabbing pain. The implant transmits mild electrical impulses to the spinal cord, substituting the feeling of pain with a more pleasing tingling sensation called paresthesia. With SCS, patients have control and can adjust the intensity, and turn on and off the system in response to varying levels of pain.

**PROCEDURE DEFINITIONS/ RECOMMENDATION FOR SPINAL TREATMENTS:**
**EPIDURAL STEROID INJECTION:**

Based on this individual's history, physical examination, imaging review, clinical experience and any applicable research, the recommendation is made for a series of epidural steroid injections. Injections are provided to decrease the inflammation components contributing to pain. The individual's complaints are the result of nerve root

inflammation, irritation of the nerve root, and/or impingement of the nerve root by a disk(s). The series of lumbar epidural steroid injections will temporarily reduce symptoms.

Indications for RFA: A viable option for chronic pain that treats a number of conditions, including neck pain, back pain, spondylosis, sacroiliitis, facitogenic mediated pain,knee pain, pelvic pain, peripheral neuropathy, complex regional pain syndrome, trigeminal neuralgia, headaches and facial pain, painful disks known as diskogenic pain.

**RFA:** Radiofrequency ablation uses a special type of needle to apply radio waves to the targeted medial branch nerves, providing relief of pain. The procedure has different names, including RF, RFA, rhizotomy, and neurotomy. There are four different types of radiofrequency ablations:
1. Thermal or conventional RFA, (CRF): A high-voltage radiofrequency current is created using a needle. The energy converts into heat at the tip of the needle to 140 to 176 degrees Fahrenheit which creates a small lesion on the nerve, rendering the nerve inactive.
2. Pulsed RFA, (PRF). This is similar to thermal RFA, however, a short bursts of voltage is used. Pulsing is used to disperse the energy more easily. It takes less heat to generate, 107 degrees Fahrenheit. This particular type of RFA is shocking the A-delta and C-fibers (pain conductors).
3. Water cooled or cooled RFA, (WCRF). A special multichannel electrode (needle) is used. The radiofrequency current is prevented from reaching temperatures that are high, by heating up to 140 degrees Fahrenheit, but also cooled by a continuous flow of water; this prevents the needle tip from being over-heated. This creates a larger and more complete lesion.
4. Genicular nerve ablations: Knee injuries: Some types of injections can be provided for knee injuries, including steroid injection and/or viscosupplementation to reduce inflammation contributing to pain. Genicular nerve ablations can be provided.

**RFA success rates:** RFA performed for the facet joints provides pain relief for 45% to 60% of patients. RFA for the sacroiliac joint provides 75% to 86% relief for patients. If effective, RFA will provide pain relief lasting six to eight months, up to a year. Some studies have shown two to three years.
CRF and PRF: Produces well defined, small lesions, while WCRF produces larger lesions involving larger tissue areas. The magnitudes of the heat lesions depend on the temperatures and sizes of the needles, as well as the duration of the procedure.

**MONITORING DURING THE RHYZOTOMY/RFA/ABLATION PROCEDUES:**
HRV: Heart rate variability testing evaluates the balancing act between the sympathetic nervous system (fight and flight) and the parasympathetic nervous system (rest and digest). The imbalance in the HRV is the number one risk factor for sudden cardiac death. A simple hand electro-sensor test shows a report on the balance between the heart and nervous system in minutes. This is an effective predictor of non-specific health risk as an accurate and reliable reflection of many physiological factors modulated in the normal rhythm of the heart. It provides the means for observing interplay between the sympathetic and parasympathetic autonomic nervous systems. This is obtained before interventional procedures.
DPA: Digital pulse analysis. We utilize this analysis to identify arterial vessels (cardiovascular risks secondary to comorbidities). This uses an infrared light sent to the fingertips that obtains a pulse wave with light-absorbing characteristics of hemoglobin in the arterial blood. This measures the overall health of the arteries. It does not tell you if you have plaques in the arteries, but it helps us determine the overall risk for developing them. We utilize this to monitor the pulse during the course of any interventional procedures performed.

Spinal fusion: This procedure involves the use of your own bone (autogenous), artificial bone, or bone from a cadaver to stimulate bony union of the spine. This may, or may not be combined with spinal instrumentation. Risks include infection, non-union, transmission of infectious disease (from cadaveric bone), bleeding and nerve/spinal cord injury. Supplementing the fusion is spinal instrumentation. Instrumentation is a combination of a variety of screws, rods, or wires. Risks include infection, dural leak, bleeding, incomplete relief of pain, and nerve/spinal cord injury.

**FACET JOINTS (CERVICAL, LUMBAR, THORACIC):**
The facet joints are implicated in pain in the areas of the cervical, thoracic, and lumbar spine. The joints are diarthrodial. They have chondral surfaces, synovium, and a meniscoid tissue. These joints are susceptible to

inflammation, chondral damage and degeneration over time. It is not uncommon to have a number of pain patterns when describing pain from the joints. Oftentimes a description will be provided, including pain as a deep, dull, constant ache, or any combination of the above. The pain can be over the midline of the back and neck, and often will involve the shoulders and upper back (if cervical/neck facet joints are causing pain), as well as into the hips, buttocks, and down the legs at times (for lumbar facet joints as the source of pain).

Each facet is innervated by two nerves. The nerves are medial branches of the dorsal rami of the spinal nerves at that level. Medial branch blocks will be provided at the discretion of the surgeon. If the facet joints are causing pain, we will be looking for at least 40-50% relief with each of the diagnostic blocks prior to proceeding with a radiofrequency ablations. It is not necessary, in order to provide the RFA procedure, to have medial branch blocks; however, the target will be identified by doing the procedure before an RFA is attempted. RFAs do not have to be postponed after medial branch blocks. If the pain is reduced with the block, the RFA procedure is reasonable after the block on the same day. If the targets are known, the radiofrequency ablations can be provided. It is understood that it may take eight weeks of recovery time after radiofrequency ablations to obtain optimal medical benefit.

**``Facet Syndrome´´ Imaging and Treatment:**
Imaging for back pain syndrome is very common i.e. radiographs, MRI, CT scanning and SPECT scanning. There is no effective correlation between clinical symptoms and degenerative spinal changes (Kalichman L, kim DH, li L, Guermazi A, Hunter DJ. Computed tomography-evaluated features of Spinal degeneration prevalence, inter-correlation, and association with self-reported low back pain. Spine J 2010; 10 (3): 200-208 PMC free article pub Med google scholar).

Anatomy of facet joints: Each spinal segment consists of an intervertebral disc and posterior paired synovial joints (FJ) comprising a "three-joint complex", where each component influences the other two with degenerative changes in one joint affecting the biomechanics of the whole complex. The facet joints constitute the posterolateral articulation connecting the posterior arch between the vertebral levels. They are a paired and diarthrodal joint and are the only synovial joints in the spine, with hyaline cartilage overlying sub-chondral bone, a synovial membrane, and a joint capsule (Yahia LH, garzon S. Structure of the capsular ligaments of the facet joints. Ann anat. 1993; 175 (2): 185-188. Pub med google scholar.

Each joint comprises an anteriorly and laterally facing inferior articular process from the superior vertebral level and reciprocally a larger, posteriorly and medially facing concave superior, articular process from the inferior vertebral level. Facet joints play an important role in load transmission, providing a posterior load-bearing helper, stabilizing the motion segment in flexion and extension. They are also involved in the mechanism of rotational kinematics by restricting the axial rotation. This is achieved through a collagenous tissue of the fibrous capsule layered in a transverse plane providing resistance to flexion motions. There is a high level of mobility which plays an important role in influencing the lumbar area. They can develop significant degenerative changes and be a potential source of pain.

The capsule the facet joints, sub-chondral bone, and synovium are richly innervated with nociceptive and autonomic nerve fibers. Substance P nerve fibers have been identified in the sub-chondral bone in degenerative lumbar facet joints. There are inflammatory mediators such as prostaglandins and cytokines (IL6, TNF alpha) to have been found in cases of degenerative disorders. This will partly explain the origin of low back pain in the case of facet joint degeneration.

Bogduka et al (Bogduk N, Wilson AS, Tynan W. the human lumbar dorsal rami. J Anat. 1982; 134 (pt2): 383-392 pubmed google scholar, described the three ramifications of dorsal branch (medial, intermediate and lateral branch) of the spinal nerve, which spread within the dorsal muscles from L1 to L4 segments. Each lumbar facet joint is innervated by the medial branch of the dorsal rami (MBDR)as it emerges from the inter-transversal ligament. This branch crosses the superior margin of the medial termination of the transverse process, passing through the caudal root of the superior articulate process (SAP), one level below. That is to say that the capital MVDR of the L4 level passes around the SAP of L5. At this level the nerve runs downward and is fixed by the mamillo-accessory ligament (MAL) and then enters the multifidus muscle. The intermediate and lateral branches emerge from dorsal ramus, run caudally and laterally, and enter respectively, the longissimus and iliocostalis muscles. Each joint is innervated by a dual supply from the medial branch at the same level and the level above with ascending and descending branches.

The L5 segment has a different distribution of branches which should be considered in facet joint denervation. First the dorsal ramus is longer; it emerges dorsally in the inferior region on the top of the sacrum wing, along the groove formed between the ala of the sacrum and the root of the S1 SAP, and runs near the inferior portion of the articular process. The nerve and ramifies in an intermediate and medial branch. There is no lateral branch; the MBDR lies caudally to the process, running into a fibrous tissue equivalent to the MAL, with communicating branches with the S1 dorsal ramus.

There are four factors described for an anatomical structure to be deemed a cause of back pain: Nerve supply to the structure, the ability of structure to cause pain similar to that seen clinically in normal volunteers, the structure's susceptibility to painful diseases or injuries, and the demonstration that the structure can be a source of pain in patients using diagnostic techniques of known reliability and validity. Owing to this definition, lumbar facet joints are implicated in generating low back pain due to their nerve supply, especially in cases of capsular stretching. The fact that pain can originate from the facet joint is widely accepted in the literature and supported by investigations implying articular joint blocks. (Borenstein D. Does osteoarthritis of the lumbar spine cause chronic low back pain? Curr pain headache Rer. 2004; 8 (6): 512-517. Pub med google scholar.

Facet joints as a source of low back pain, was described initially 1911 by Golthwaite and Ghormahley. They used the term ``facet syndrome´´ to describe the symptoms originating from the facet joint. It was initially described as lumbosacral pain with or without sciatica in 1933. Then years later Badgley et. al. suggested that the facet joint was a source of up to 80% of back pain. Facet joint syndrome included local pain and pseudo-radicular radiation with variability and distribution of referral patterns of pain. There are also studies investigating facet joint pain as the source of the patient's symptoms, suggesting that the currently available tests have limited or no diagnostic fluidity. Moreover, history and physical examination may suggest, but not confirm facet joints as the source of pain.

The superior sensitivity of MRI compared to CT imaging is well known. CT and MR are equally useful in demonstrating morphological changes in facet joints. MRI clearly presents advantages of better assessing the immediate consequences of facet joint degeneration, such as surrounding neural structure impingement, exaggerated fluid in the joints of the facets, and synovial cysts seen on axial MRI suggestive of spondylolisthesis and its instability, but not specific of facet joint origin of pain. Recent studies using fat-suppressed MRI sequences have demonstrated that sub-chondral bone edema is present in the lumbar facet joint articular processes in 14 to 41 percent of patients with back pain; enhancement of the facet joint rim after gadolinium administration will establish the diagnosis of synovitis. Fujiwara did a study showing that MRI tends to underestimate the severity of osteoarthritis in the facet joints as compared to CT. The fluid-sensitive sequences on MRI are generally preferred over CT for imaging facet joint effusions and juxta-facet cysts, however they are less sensitive in depicting the joints, bony cortices and are less accurate in quantifying the amount of sclerosis present. An additional limitation of MRI is that it cannot accurately measure cartilage thinning and chemical-shift artifact inherent in this type of imaging. CT is better to demonstrate the degenerative changes of the facet joints because of high contrast between bony structures and surrounding soft tissues. There is a suggestion that TFC T2 fat saturation sequences and, when indicated, gadolinium administration with T1 fat saturation sequences enhanced the sensitivity and diagnostic specificity of the MR scan. Gadolinium will disclose the active inflammatory state of degenerative process identifying new therapeutic targets for percutaneous treatment. SPECT single photon emission computed tomography is more useful for facet joint inflammation detection rather than using the MRI.

First-line therapy for facet syndrome consists of conservative multi-modal management such as pain medication, muscle relaxants, anti-inflammatories, antidepressants physiotherapy, accupuncutre, and psychotherapy. No clinical features or diagnostic imaging studies can determine whether a facet joint is painful or not. Controlled blocks are the only reliable tool in the diagnosis of facet joint pain as a cause of low back pain. Bogduk defined the specific criteria for optimal selection as an anatomically accurate block under guidance, with ideally complete relief of pain following an MBDR block. Manchikanti et all defined at least an 80% reduction of pain and the ability to perform previously painful movements. More liberal criteria have also been reported, such as greater than 50% relief of pain. A definitive diagnosis of facet joint mediated pain may require blocks at two separate locations in the spine. It was noted that there were high false positive rates at 30-45 percent with the one level being addressed. Cohen et. al. showed that there was a success rate of approximately 39% after single block, and 64% after double block. Because of the dual nerve supply of the facet joints at the same level and the level above, diagnostic blocks should be performed with a minimum of two levels.

The ideal candidate for facet joint denervation is the patient who underwent medial branch infiltration with significant pain relief after failure of conservative management. Because of the dual nerve supply of a given facet joint, electrodes or cryoprobes should be placed at two subsequent levels. Nerves can therefore be destroyed by physical means, heat, radiofrequency or cold cryo neurolysis or by chemical means, alcohol/phenol. Whatever technique is used, however, neurolysis does not allow for definitive pain relief. The destroyed nerve will eventually regenerate and in consequence, recurrence of pain will occur. The procedures can be repeated.

Other techniques or imaging guidance have been described in the literature. Wu et al recently compared to the effectiveness of safety between autologous platelet-rich plasma (PRP) and local anesthesia/corticosteroid in intra-articular injection for the treatment of facet joint syndrome. The PRP presented as superior efficacy with longer duration. Kirshner et al also confirmed the same efficacy with longer duration using PRP. Iwatsuki et. al. performed laser radiation of the dorsal surface of facet capsule in 21 patients. There was greater than 70% pain relief for least a year in 81% of the patient's.

We have known that inter-rater and intra-rater agreements as to magnetic resonance imaging findings in the lumbar spine show significant variability across interpretation of morphologic ``degenerative conditions´´. In that regard, the use of medial facet branch blocks and the appropriate implementation of blocks in the correct anatomic areas are of more significant benefit than relying on the use of MRIs per se to determine whether clinical efficacy will be achieved or not.

General principles that guided the regional documentation for radiologic nomenclature and interpretation, and the revision, known as Spine 2014 2.0, have not changed in their precepts of understanding that the definitions of diagnoses are not intended to imply external etiologic events, such as trauma, and they do not imply relationships to symptoms and do not define or imply the need for a specific treatment. MRIs are excellent in some respects, but detrimental in others. In the case of facet joint syndrome, obviously, MRI is of little benefit in assessing the morphologic changes consistent with the clinical findings with reproduction of symptoms at the facet levels that are causing pain, particularly borne out of trauma. The fat suppression use of MRI is more beneficial than relying on non-enhanced MRI per se; ie., the MRI is not as effective as CT SPECT scanning. In that regard, these are the recommendations that will be required for individuals who are presenting with low back pain and chronic pain, not responding to conservative care particularly.

The opinions expressed and provided herein are currently based on the history, physical examination, review of submitted records, as outlined, including imaging studies, clinical experience, and any applicable research. In the event that there is additional information provided, a supplemental report will be forthcoming.

The opinions that are rendered in regard to future care, including evaluations and treatments, are given to a reasonable degree of medical probability.

All of the opinions provided herein are given to a reasonable degree of medical certainty. If I can be of any further service to Ms. Bailey, please do not hesitate to contact our office.

Sincerely,

Lance Owen Yarus, DO, FAASOS, FACFE, BCFE
LOY/UW
1009174438r1