# EXHIBIT C

# ITEMIZED CHARGES

Date Printed: 06/10/2026

**REGIONAL ORTHOPEDIC ASSOCIATES PC**
100 N. 18TH ST
2 LOGAN SQUARE, SUITE 300
PHILADELPHIA, PA 19103
(877) 734-6784
Tax ID# 232461007

| | | |
|---|---|---|
| Patient: (182995)<br>DAJUAN SPEAKS | (RP19958)<br>SIMON & SIMON PC<br>1818 MARKET STREET<br>SUITE 2000<br>PHILADELPHIA, PA 19103 | Itemized Statement of Charges<br>Case: NARRATIVE REPORTS<br>Including Credits |

| Date | Patient | Description | Provider | Charge | Payment | Write Off | Balance |
|---|---|---|---|---|---|---|---|
| 12/03/2024 | DAJUAN SPEAKS | [ NARREP ] NARRATIVE REPORT | LANCE O. YARUS- | $750.00 | | | $750.00 |
| ICD9: | (LEG) LEGAL | | | | | | |
| | 12/29/2024 | Credit Applied From 12/13/2024 | | | $750.00 | | $0.00 |
| 12/13/2024 | DAJUAN SPEAKS | | LANCE O. YARUS- | | | | $-750.00 |
| | 12/13/2024 | Check | | | $750.00 | | -$750.00 |
| | 12/29/2024 | [RAB] Refund Applied to Balance | | | -$750.00 | | $0.00 |
| | | | **Total** | **$750.00** | **$750.00** | **$0.00** | **$0.00** |

## Case Balance Summary

| | Not Yet Billed | 0-30 days | 31-60 days | 61-90 days | 91-120 days | Over 120 days | Total | Today |
|---|---|---|---|---|---|---|---|---|
| **Patient** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| **Insurance** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | |
| **Total** | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | |

## Next Appointment

| Patient | Date | Time | Provider |
|---|---|---|---|

Provider Signature

Date: 12/3/24

**Type of Incident:** ✓ **MVA** ___**S/F** ___**T/F** ___**Ped. vs. Vehicle** ___**Bicycle vs. Vehicle** ___**Sports** ___**WC**

___**Patient** ✓ ___**IME**

**Office Location:** ✓ **Phl.** ___**Leb**

**Name:** Dujuan Speaks - in Person

**DOB:** 8/8/78

**DOL:** 4/26/24

✓ **M** ___**F** ___**TG** ___**Other**

**Translator:** ___**present** ___**phone** ___**Zoom** **Name of Translator:** ___________

**People in the room:** ✓ NA

**Hand Dominance:** ✓ **R** __**L** __**Ambidextrous**

**Introduction:** The following Independent Medical Evaluation is based on subjective complaints, history provided by the injured party, based on specific questioning; a review of submitted records if available; a review of imaging information if available, either by reports and/or by hard copy film review; electrodiagnostic testing if obtained; physical examination findings if conducted, either in person , or via a tele-health portal. The lack of, or cursory nature of the physical examination in a tele-medicine setting does not preclude the examiner's ability to render opinions and conclusions in regard to subject incident impact on the structural integrity and function of anatomical areas injured. The physical examination has been shown to be less significant than once thought and a very small percentage (14.9%) of the conclusionary information leading to recommendations for care, allowing for conclusions to be rendered as to the significance of injuries sustained in traumatic incidents. Directed evaluations and treatments required for future care can therefore be made in the absence of such information.

**MECHANISM OF INJURY:**

1. Chief complaints at the time of the incident: lumbar, neck

2. History of Present Illness: Where/location: ___store ___business ___street ___sidewalk ___parking lot — Phila PA Green + Manheim Str.

Describe: hit by another car

3. Current chief complaints related specifically to the subject incident: residuals, WC: accepted injury.

_______________

(MVA) Operator of Vehicle: ✓ Yes. ___No.; Passenger: ___Yes. ___ Front Seat ___Back Seat, ___Behind Passenger. ___Behind Driver. ___Siiting in Middle of Back Seat

4. Parts of body contacting the internal vehicle/external impact for pedestrian/bicycle/motorcycle rider, air bag deployed, ambulance on scene, rode to ED?:
(MVA) hit window, steering wheel, head (–) airbag (–) ambulance

5. Body movement/position at the time of impact:

_______________

6. Loss of consciousness: ___ Yes. ✓ No.

7. Emergent hospital care visit/urgent care visit: When. Where. Returned to same facility.
NA

8. Treatment subsequent to the subject incident: physicians, chiropractors, facilities where care was provided, neurology, neurosurgery, family physician, acupuncturist, pain management specialist, orthopedic specialists:
PT - ??

9. Interventional/pain mgt. treatments provided and response to treatment: Injections, type.
inj - lumbar

10. Response to chiropractic care injections and/or therapy:
inj helped w/ pain.

11. Physical limitations and/or physical restrictions resulting from the subject incident-related injuries:

12. History of any other subsequent evaluations and treatments: Imaging and/or electrodiagnostic testing ordered/obtained:
MRI - lumbar

13. Numbness and tingling of upper or lower extremities: radiation/where, paresthesias (abnl. sensation, Tingling or pricking, pins and needles due to damage to peripheral nerves, not from the spine)
bi-hand/feet but subsided since injection

14. Subsequent Hospital admissions/dates of treatment; Additional ED visits:
NA

15. Time-frame in which the pain is occurring: ✓ Constant ___ Occasional ___ Intermittent ___ Unpredictable

16. Current pain analog scale number: 5/10.
neck, lumbar sore achy

17. Pain radiation, upper and/or lower extremities: Not including numbness or tingling, just the pain.
used to radiate but not since injection

18. Muscle weakness, upper and/or lower extremities:
legs are a little weak but never gave out.

19. Worsening or modifying factors:
bending/working on cars, sudden movements.

20. Improvement of pain provided by:
OTC meds: Tylenol, heat pad, ice

21. Associated signs and symptoms:
cracking, stiffness, HA/dizzy w/ standing on hard job @ work

Pre-existing conditions. Type of injury, the same as or similar to the subject incident.

**Previous Injury History:** ∅ denies previous injuries or similar conditions compared to the subject incident injuries and/or conditions.

She/He has never sought medical care or suffered functional limitations similar to, or the same as, the injuries to/in the affected areas of current injury prior to the subject incident. There are no reported events that would account for the current symptoms arising from the subject incident.

22. Treatment/Imaging studies/electrodiagnostic testing for the pre-existing/prior conditions. Recovered?:

23. Post-injury injuries: Date: ______. Type of injury, similar to or the same as subject incident. Recovered?:

24. Treatment/Imaging studies/electrodiagnostic testing for the post-injury conditions. Recovered?: Still treating?

25. Work at the time of injury: Was the subject incident a work-related injury? More than one job?
Devine Touch Home Care – HHA, Self Employed – 12K Auto Mechanic

26. Missed time from work, duration:
Missed few day off/on – pain

27. Time-frame in which a return to work occurred: Date RTW: ______ Restrictions: ✓ yes __ no
light duty at HHA job.

28. Current job activities. Status: __ Laid Off __ SSD/SSI __ Terminated __ Not working
reduced work as mechanic

29. Effect on activities:
1. Sports/Recreational/Hobbies: Ø
2. Social activities:
3. Activities in the house, cleaning, yard work: Getting ___, standing to cook
4. Activities with children, if applicable: taking care, picking up kids
5. Personal/interpersonal activities:
6. Physical functional deficits: work jobs – hired help

**MEDICATIONS:**

1. Prior to the incident: Ø
**Patients only:** Opiate Questions: Pain change: _y _n Health change _y _n Relief _y _n
Helps activities _y _n Behavior change _y _n PA DOH PDMP accessed _y _n

2. Current medications/accident-related: Ø

**ALLERGIES:** To medications/foods: Ø

**FAMILY HISTORY:** Mother, father alive or deceased: M – alive F – dec

**FAMILY PHYSICIAN OR FACILITY:** Ø

**PAST MEDICAL HISTORY:** Ø

**PAST SURGICAL HISTORY:**

1. Not related to the subject incident: Ø
2. Any surgery performed related to the subject incident: inj-lumbar

**SOCIAL HISTORY:** Smoking. Caffeine intake. Alcohol use. Marital status: marr
caff-Ø, Øsmoke, alc/drugs

**REVIEW OF SYSTEMS:** Other than as stated in history of present illness or general history, the following is reviewed:

1. Constitutional: ____
2. Head, eyes, ears, nose, and throat: ____
3. Cardiac: ____
4. Respiratory: ____
5. Gastrointestinal: ____
6. Genitourinary: ____
7. Musculoskeletal: ____
8. Skin: ____
9. Neurological: ____
10. Emotional/psychological: ____
11. Hematologic/cancer history: ____
12. Endocrinologic: ____

**PHYSICAL EXAMINATION:**

1. Vital signs: ____
2. Temperature: ____
3. Pulse: ____
4. Respiratory rate: ____
5. Height: 5'10
6. Weight: 155
7. Physical examination findings: ____

**HEAD:** Normocephalic, No bruises or lesions.

Alert/oriented, mentation intact, no abnormal facies.

**Eyes:** Vision intact, PERRLA, EOMI, sclerae are non-icteric, no strabismus or nystagmus.

**Ears:** Canals are patent, able to hear a whisper.

**Nasal:** Septum mid-line, mucosa moist, sinuses clear.

**Throat:** Tongue mid-line, pharynx clear, no infection.

**Lungs:** clear to ascultation, no rales or ronchi, no wheezes.

**Cardiac:** No arrhythmias, skips, murmurs, thrills, gallops, rubs.

**Abdomen:** Soft, non-tender, no organomegaly. No bruits.

**GU:** Deferred.

**Neck:** Veins non-distended, thyroid mid-line.

**Range of motion:** FF deg. E deg. Rot R deg. L deg. SB R deg. L deg.

**Trapezius:** there is tenderness, spasm, hypertonicity, cord-like formation @

**Adson's, Spurling's compression, Valsalva, L'hermitte signs:**

**Facet loading:**

**Capillary filling:** intact in the upper and lower extremities.

**Reflex testing:** Biceps /3 R /3 L Triceps /3 R /3 L Brachioradialis /3 R /3 L

**Dermatomal pattern deficits:**

**Lumbar Spine:** There is a loss of lordosis. There is spasm and hypertonicity @

**Sitting Root and Straight Leg Raising Signs:** R / L /

**Range of motion:** FF deg. E deg. Rot R deg. L deg. SB R deg. L deg.

**Tinnel's:** Is negative at the medial malleoli.

There are no long tract signs or clonus in the lower extremities.

**SI Joints:** (Depression, Hypomobility): Hypomobility of the left/right/both. Depression right/left/both.

**Facet Loading:**

Reflex Testing: Patellar /3 R /3 L Achilles: /3 R /3 L EHL: /5 R /5 L

Gait Pattern: Antalgic. Not able to toe and heel walk.

**Dermatomal pattern deficits:**

**Extremity Examination:**

**Vascular:** There is/is no edema. Homan's and Hoffman's signs are/are not present. There are/are no painful varicosities. There are/are no masses in the upper or lower extremities.

**Pulses:** Radial, ulnar, femoral, popliteal, dorsalis pedis, and posterior tibial pulses are intact.

**Lymphatics:** Neck, supraclavicular, axillary, non-ingorged.

**Dermatologic:** There are no signs of abnormal temperature and/or sweat-pattern asymmetry.

**Pelvic and Rectal:** Deferred.

Revised 09-04-2023

**REGIONAL ORTHOPEDIC ASSOCIATES, P.C.**
**TALL OAKS PAIN MANAGEMENT**

Two Logan Square
100 North 18th Street, Suite 300
Philadelphia, Pa. 19103-2733
1-877-734-6784 fax: 1-484-558-0899
lowen@regionalorthopedic.net

Lance Yarus, D.O. FAASOS, FACFE, BCFE
Board Certified, Emeritus Diplomate, B.C. O. S.
Fellow, F.A.A.S.O.S.
Board Certified, Diplomate A.A.P.M.
Board Certified, Diplomate, Fellow A.B.F.E.
Senior Disability Analyst and Diplomate, A.B.D.A.

December 03, 2024

Marc I. Simon, Esquire
Simon and Simon, PC
Injury Lawyers
18 Campus Blvd, Suite 100
Newtown Square, Pennsylvania 19073.

RE: Dajuan Speaks
DOB: 08/08/1978
DOL: 04/26/2024

Dear Attorney Simon:

I had the pleasure and privilege of evaluating Dajuan Speaks in person in my Philadelphia office on December 3, 2024.

**CHIEF COMPLAINT:** At the time of the subject incident: Neck pain and low back pain.

**HISTORY OF PRESENT ILLNESS:** Mr. Speaks was the operator of a vehicle, struck by another vehicle. From the impact, he hit the window with his head and also hit the steering wheel. He did not suffer loss of consciousness. There was no airbag deployment and no ambulance on scene.

Mr. Speaks came under the care of Philadelphia Spine Associates treating from May 8, 2024, through August 15, 2024, (approximately 27 visits).

1. May 8, 2024, chief complaints: Headaches, neck pain, low back pain, mid-back pain.
   a. Assessments: Sprained ligaments cervical, thoracic, and lumbar spine.
   b. Treatment provided: Office visit new; chiropractic manipulation three to four regions; mechanical traction therapy; infrared therapy; unlisted modalities; electrical stimulation, other than wound.
   c. Plan: Treat two times a week.
   d. Prognosis: Guarded.
2. August 15, 2024, chief complaints: Headaches, neck pain, low back pain, mid-back pain.
   a. Diagnoses the same.
   b. Treatment: Mechanical traction therapy; unlisted modality.
   c. Prognosis: Guarded.

Mr. Speaks had diagnostic imaging at open MRI of Bala Cynwyd, August 5, 2024.

1. MRI cervical spine, report and hard copy films for review.
   a. C1-2 through C7-T1 showed no discopathic or facetogenic changes (see below for information regarding SPECT CT scanning and/or fat suppression MRIs to further evaluate in more detail posttraumatic disc and facet injury).
2. MRI lumbar spine, report and hard copy films for review.
   a. L1-2 through L5-S1 showed no discopathic or facetogenic changes (see below for information regarding SPECT CT scanning and/or fat suppression MRIs to more accurately evaluate disc and facet injuries posttraumatically.

Mr. speaks a treated at Premier Pain and Rehab Center, P.C. with Clifton Burt, MD, November 12, 2024.

1. History of present illness: The subject incident was referenced from April 26, 2024.
2. Chief complaints: Lumbar spine pain rated 9/10; occasional numbness and tingling in the left foot.
3. Past medical history: Noncontributory.
4. Past surgical history: Noncontributory.
5. Allergies: No known drug allergies.
6. Medications: None.
7. Social history: Nonsmoker.
8. Exam findings: Lumbar flexion 85 degrees with pain; bilateral rotation 30 degrees with pain; lumbar extension 30 degrees with pain; facet loading test positive L5; sensory 2/2 normal bilateral; motor 5/5 bilateral.
9. Assessments: Radiculopathy, lumbar region; lumbar dorsopathy/facet syndrome.
10. Dr. Burt indicated the back facet joint pain was the worst pain based on the findings. He indicated it was medically necessary to perform L5 medial facet branch nerve blocks followed by bilateral L5 radiofrequency ablations.
    a. Procedures: Lumbar medial facet branch nerve blocks with fluoroscopy, bilateral L5.
        i. After Dr. Burt provided MBBs, there was 40% improvement for 2 minutes. Decision was made to proceed to radiofrequency ablations.
    b. Procedures: Radiofrequency ablations medial facet branch nerves with fluoroscopy, bilateral L5.

**STATUS OF THE INJURIES SUSTAINED BY MR. SPEAKS IN THE SUBJECT INCIDENT OF APRIL 26, 2024:**

1. Mr. Speaks continues to complain of neck pain, low back pain, sore and aching, rated 5/10.
2. Pain radiation: not since undergoing the radiofrequency ablation.
3. Muscle weakness. No significant Manna muscle weakness.
4. Worsening and/or modifying factors: Bending, working on cars, sudden or fast movements.
5. Improvement: noted by Tylenol, heating pad application, ice application.
6. Associated signs symptoms: Stiffness, cracking.

**PREVIOUS INJURY HISTORY:** Mr. Speaks denies any previous injuries similar to the same as sustained in April 26, 2024 subject incident. He never sought medical care or suffered functional limitations similar to the same as the injuries to the neck and low back from the subject incident. There is no reported events that would therefore account for his symptoms but for the subject incident of April 26, 2024.

**POST-INJURY INJURIES:** Denied.

**WORK AT THE TIME OF INJURY:** At the time of subject incident of April 26, 2024, he worked at Devine Touch Home Care as a home health aide. She also self-employed at 12K auto as a mechanic. He missed a few days from work off and on due to pain. He was in light duty in his home health aide job. He reduced his work as a mechanic as well.

**CURRENT JOB ACTIVITIES:** Working for Devine Touch Home Care and working as an auto mechanic.

**EFFECT ON ACTIVITIES:** He has difficulty getting out of bed, standing to cook, taking care of and picking up his children, work jobs that he has hired to help.

**MEDICATION:** Prior to the subject incident, denied. Current medications, accident-related, denied.

**ALLERGIES:** To medications, denied next.

**FAMILY HISTORY:** Mother alive. Father deceased.

**FAMILY PHYSICIAN OR FACILITY:** Not indicated.

**PAST MEDICAL HISTORY:** Not indicated.

**PAST SURGICAL HISTORY:** Not indicated.

**SOCIAL HISTORY:** He does not smoke. He does not use caffeine products. Alcohol use is denied. Marital status married.

**REVIEW OF SYSTEMS:** Other than stated in the history of present illness, general history is unremarkable.

**PHYSICAL EXAMINATION:** He is 5 feet 10 inches tall 155 pounds.
**HEAD:** Normocephalic, No bruises or lesions.

Alert/oriented, mentation intact, no abnormal facies.
**Eyes:** Vision intact, PERRLA, EOMI, sclerae are non-icteric, no strabismus or nystagmus.
**Ears:** Canals are patent, able to hear a whisper.
**Nasal:** Septum mid-line, mucosa moist, sinuses clear.
**Throat:** Tongue mid-line, pharnyx clear, no infection.
**Lungs:** clear to ascultation, no rales or ronchi, no wheezes.
**Cardiac:** No arrhythmias, skips, murmurs, thrills, gallops, rubs.
**Abdomen:** Soft, non-tender, no organomegaly. No bruits.
**GU:** Deferred.
**Neck:** Veins non-distended, thyroid mid-line. There is a loss of lordosis. There is spasm and hypertonicity @ C3-4, C4-5, and C5-6, bilateral.

> **Range of motion:** Forward flexion 15 degrees, extension 10 degrees; rotation right 5 degrees, left 10 degrees; side bending right 10 degrees, left 5 degrees.
> **Trapezius:** there is tenderness, spasm, hypertonicity, cord-like formation @ the upper and mid segments, bilateral.
> **Adson's, Spurling's compression, Valsalva, L'hermitte signs:** Negative.
> **Facet loading:** Negative.
> **Capillary filling:** intact in the upper and lower extremities.
> **Reflex testing:** Biceps +1/3 R +1/3 L Triceps +2/3 R +2/3 L Brachioradialis +3/3 R +3/3 L
> **Dermatomal pattern deficits:** There are no dermatomal pattern deficits in the upper extremities.

**Lumbar Spine:** There is a loss of lordosis. There is spasm and hypertonicity @ L3-4, L4-5, and L5-S1, bilateral.

> **Sitting Root and Straight Leg Raising Signs:** Negative.
> **Range of motion:** Flexion 35 degrees, extension 0 degrees; rotation right 10 degrees, left 10 degrees; side bending right 10 degrees, left 15 degrees.
> **Tinnel's:** Is negative at the medial malleoli.
> There are no long tract signs or clonus in the lower extremities.
> **SI Joints:** (Depression, Hypomobility): Hypomobility of both. Depression is symmetrical for both.
> **Facet Loading:** Positive for L3-4, L4-5, and L5-S1, bilateral.
> Reflex Testing: Patellar +3/3 R +3/3 L Achilles: +1/3 R +1/3 L EHL: +5/5 R +5/5 L
> Gait Pattern: Antalgic. Not able to toe and heel walk.
> **Dermatomal pattern deficits:** There are no dermatomal pattern deficits in the lower extremities.

**Extremity Examination:**

> **Vascular:** There is no edema. Homan's and Hoffman's signs are not present. There are no painful varicosities. There are no masses in the upper or lower extremities.
> **Pulses:** Radial, ulnar, femoral, popliteal, dorsalis pedis, and posterior tibial pulses are intact.
> **Lymphatics:** Neck, supraclavicular, axillary, non-ingorged.
> **Dermatologic:** There are no signs of abnormal temperature and/or sweat-pattern asymmetry.
> **Pelvic and Rectal:** Deferred.

**RECORDS REVIEW:** The following records were reviewed in conjunction with the history and physical examination conducted at this time:

1. Records of Philadelphia Spine Associates, May 8, 2024, through August 15, 2024, (approximately 27 visits).
2. Open MRI of Bala Cynwyd, MRIs of cervical and lumbar spine, August 5, 2024, reports and hard copy films for review.

3. Radiofrequency ablation report Premier Pain and Rehab Center, P.C., November 12, 2024.
4. Billing and invoicing for the following testing and treatment facilities.
   a. Philadelphia Spine Associates.
   b. Premier Pain and Rehab Center, P.C.
   c. Open MRI Center.

**CONCLUSIONS:** The following injuries occurred as a result of the subject incident in which Mr. Speaks was involved occurring on April 26, 2024:

1. Cervical strain and sprain, cervical myositis, somatic and segmental dysfunction cervical spine, enthesopathy of the cervical spine.
2. Lumbar strain and sprain, lumbar myositis, somatic and segmental dysfunction lumbar spine, enthesopathy lumbar spine.
3. Facetogenic pain mediated by L3-4, L4-5 and L5-S1 injured in the subject incident of April 26, 2024.
4. Chronic pain secondary to subject incident-related injuries sustained April 26, 2024.
5. Alteration of activities secondary to subject incident-related injuries sustained on April 26, 2024.

CAUSATION STATEMENT:
Based on the current history, examination findings, the opportunity to review submitted records, hard copy study review of the imaging studies, clinical experience, and any applicable research, it is my opinion, to a reasonable degree of medical certainty, that the injuries and conditions, as they are outlined herein were directly caused by the subject incident of April 26, 2024.

TREATMENT VALIDITY:
The type, intensity, frequency, and duration of the provided treatment, services, and products, are consistent with accepted medical standards and appropriate for the severity of the documented injuries and/or conditions that arose from the subject incident of April 26, 2024.

TESTING VALIDITY:
The usage and/or timing of the diagnostic imaging, is consistent with accepted medical standards and appropriate for the specific conditions that were being evaluated and treated.

CLINICAL FINDINGS/TREATMENT FINDINGS:
The clinical findings, the findings of the radiologic imaging, and the findings of the treating individuals, are all supportive of the diagnosis set forth in the clinical records reviewed that pertain to the subject incident of April 26, 2024.

It is therefore my opinion, to a reasonable degree of medical certainty, that the provided treatment, including services, products, testing, care, and any interventional procedures performed, were medically necessary reasonable and causally related to the subject incident of April 26, 2024.

COSTS:
Any and all costs associated with the treatment provided, are to be considered medically necessary, reasonable, and causally related to the subject incident; the billing and invoicing for the testing and treatment facilities reviewed, reflects fair and usual customary fees for services provided.

PROGNOSIS: Prognosis for this individual is guarded.

As the injuries that were sustained in the subject incident are permanent and highly susceptible to re-injury, recurrence and/or aggravation of any underlying conditions that were not symptomatic before the subject incident occurred, the prognosis is designated anticipating the consequences and effects of the sustained injuries in terms of disruption of activities of daily living, discomfort, residual pain, the need for further conservative and/or interventional treatments, and consideration of surgery.

The prognosis assists in providing recommendations for further treatment irrespective of the category selected. The prognosis will be influenced by age, the timing of the injury, the current severity of the injury still manifesting,

systemic abnormalities and other co-morbidities, patient input, and most significant anatomic factors and physical findings associated with the outlined injuries that were sustained in the subject incident. A recovery from the injuries sustained in the subject incident is not anticipated.

The information that pertains to a specific injury will mediate the decision for additional care, including expected outcomes and recommendations for treatment in the future, natural history of the injuries sustained, clinical experience, any research specific to the areas of injury, and the knowledge of factors that pertain to the status of the individual being evaluated subsequent to the injuries sustained. These factors will facilitate additional recommendations. The recommendations for future evaluations and treatments are not speculative, rather, they are predicated on the specifics that are known as to effective treatments for the specific injuries sustained. The past experience with specific injuries leads to the ability to provide for effective additional evaluations and treatments for the future. In regard to the future recommendation for treatments, the theory for treatment has been tested, the theory for treatments has been peer-reviewed and published as is indicated in the applicable references, the known or potential error rates are noted and do not exceed the benefits to be derived from additional required care, and there is general acceptance in the applicable scientific community particularly in regard to pain management recommendations for future care.

Status of the impairments/medical basis for future required care including evaluations and treatments:
It is my opinion that this individual requires additional evaluations and treatments based on the current status the injuries that were sustained in the subject incident as outlined.

It is my opinion, to a reasonable degree of medical certainty, that this individual sustained a serious and permanent impairment of function in regard to the injuries sustained in the subject incident.

Reference: 18 Pa. C.S. § 2301. "Serious bodily injury": Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss, or impairment of the function of any bodily member or organ. Determining if the impairment is serious, several factors are considered: #1 the extent of the impairment, number to the particular body function impaired, #3 the length of time the impairment lasted, #4 the treatment required to correct the impairment, #5 and any other relevant factors. An impairment need not be permanent to be serious.

PEMANENCY: There is permanency to the injuries sustained in that this individual is no longer enjoying the same lifestyle, level of comfort, nor activity involving full use of the areas of injury to which they were accustomed prior to sustaining injury in the subject incident.

The injuries sustained to spine in the subject incident have contributed to the compromise integrity of the discs, neural structures, and the ligamentous and skeletal components of the spinal column (known as the in enthesis). There has been an adverse effect placed on the nerve distribution. It is therefore my opinion that further evaluations and treatments are required based on the current findings given that this individual has not recovered from the effects of the injury sustained in the subject incident, future care is required.

SOFT TISSUE EFFECTS ON THE SPINAL COLUMN:
The injuries that are contained in the conclusions, that are soft tissue in nature, have resulted from a traumatic insult to the vertebral structures and soft tissues in the spinal column. There has been an effect on the sacroiliac joints as well. The injuries that are outlined, occurring from the subject incident, have caused the muscles that support the damaged areas to go into spasm, attempting to immobilize and protect them from further damage. Soft tissue findings palpated on the clinical examination, and documented, results from the healing and replacement of the injury to the soft tissue structures and the muscle with scar tissue. The scar tissue is weaker and less elastic than the original connective tissue contained within the muscles. The injuries have resulted in permanent limitations of normal ranges of motion. The findings on the clinical examination are therefore a direct result of decreased elasticity of the original connective tissue, now replaced with scar in the muscle groups directly and causally related to the subject incident.

Because there is abnormal motion in the spinal column when injury occurs, objectively, the facet joint wear and tear will translate into decreased range of motion pain and symptoms that can be reported reproduced on examination. In response to injury or inflammation, cells at the site of pain release and number of biomechanical mediators including, but not limited to, prostaglandins (PGE2), cytokines (TNKa), interleukins IL-1 beta, IL-6) and a

neutrophin termed nerve growth factor (NGF). NGF plays a role in driving chronic pain, in addition to the mechanical compressive phenomena on the nerves after injury occurring in the spinal column. Excess and GFR will change the way nerves signal pain. In the periphery, excess MGF will lead to peripheral (3-5) and central sensitization (2,4,6), amplifying the pain signal and heightening the perception of pain (1,2). These types of injuries are amenable to interventional procedures that are required for an individual to have a reduction in the ability to function.

References:
1. Phino-Ribeiro FRet al. Trends Immunol. 2017;38:5-19.
2. Mantyh PW, ey al. Anesthesiology. 2011; 115:189-204.
3. Latremoliere A, Woolf Q. J Pain 2009; 10:895-926.
4. National Pharmaceutical Council; Joint Commission on Accreditation of Healthcare Organizations, December 2001.
5. McGreevy et al. Eur J Pain Suppl. 2011;5:365-372.
6. Su YS,et al. World J Anesthesiol. 2014; 3:71-81.

All foregoing opinions have been given to a reasonable degree of medical certainty.

FUTURE CARE:
In regard to longitudinal future care, Mr. Speaks remains symptomatic, irrespective of the outlined treatment provided to Mr. Speaks at this point in time, and irrespective of the response to the treatments provided during presentation for the subject incident injuries. The last interaction and outcome with a treating individual, either therapist, chiropractor, physician, or sub-specialist, will not mediate the requirement for additional care. The severity of the injuries Mr. Speaks sustained will be a factor considered for required additional evaluations and treatments in the future. Because of the permanent nature of the documented injuries, Mr. Speaks still remains symptomatic and still requires additional evaluations and treatments, irrespective of the time frame in which the evaluations and treatments take place.

It is reasonably probable that this individual will require the following protocols for future required care:

1. Ongoing medical management, medical treatments, and medical evaluations.
   a. Medical surveillance: It is my opinion that this individual will require follow-up imaging for the injuries that were sustained in the subject incident.
      i. MRI and/or SPECT CT and/or fat suppression MRIs, for specific evaluation of posttraumatic injuries.
         a. Frequency: Every other year.
      ii. Use of MRIs for surgical planning: Surgical planning requires an up-to-date MRI six months before procedures are contemplated so that there is up-to-date information in regard to any changes in the morphology that may have occurred after the subject incident injury was sustained.
         a. Reference: Revord MD, J P. Understanding the clinical diagnosis of a herniated disc. www.spine–health.com/condition/herniated–disc/understanding–clinical–diagnosis–8–herniated–disc.
            I. MRI scans and other diagnostic tests are not used to diagnose the patient's pain; rather, they are only used to confirm the presence of an anatomical problem that was identified or suspected through the medical history and physical exam. For this reason, while the radiographic findings on an MRI scan or other testing are important, they are not significant diagnosing the cause of the patient's pain (the clinical diagnosis) as are the findings from the medical history and physical exam. Often, an MRI scan or other type of test will be used mainly for the purpose of surgical planning–for example, so the surgeon can see exactly where the herniated disc is and how it is impinging on the nerve root, if it is in fact. (Also cited in radiologic nomenclature, 2.0, Spine, 2014).

   b. Chiropractic care: This individual continues to require repeat visits to their treating chiropractors, 6-12 times annually, for chiropractic modalities, the same as they previously treated with for maintenance purposes.
2. Subspecialty care: Referals to an orthopedic surgeon, physiatrist, neurologist, and/or pain specialist. This will be in regard to further referrals and additional monitoring purposes.
      i. Frequency: two-to-four times annually.

3. Interventional procedure protocols:
  a. Epidural (including caudal) and/or facet injections: It is my opinion that this individual requires epidural and/or facet injections targeting the areas of injury and the focal points of pain that were identified from the subject incident for the lumbar spine.
     i. Frequency: Three injections, every six months, for an additional three years.
  b. Trigger point and/or PENS treatments.
     i. Frequency: Three trigger point injections, for the cervical and cervical and lumbar spine, every six months, for an additional three years.
     ii. Frequency: Frequency: PENS treatments are given, for the cervical and lumbar spine one per month, for an additional three years, (36 treatments in total.)

4. Rhizotomy/neurotomy/radiofrequency ablations: This individual requires radiofrequency ablation procedures for the spinal column focal points of injury in the lumbar spine, that were determined resulting from the subject incident, also known as rhizotomy/neurotomy procedures.
     i. Spinal radiofrequency ablation procedures are provided to essentially turn off the medial facet branch nerve's ability to transmit pain signals to the brain. In the case of the injury sustained to the spinal column, the targets for this individual are located at L3-4, L4-5, and L5-S1.
     ii. In regard to facetogenic-mediated injuries, these are inflammatory and pain-mediated signals that are sent from the medial facet branch nerves to the brain involving injured levels of L3-4, L4-5, and L5-S1.
        a. The MRI will not show a nerve injury per se, nor will there be signs of medial facet branch nerve injury. An MRI is not utilized to make diagnoses of the pain generator or injury. The MRI will be useful in cases of discogenic injury, but limited as to cause and etiology of morphology changes per the Radiologic Nomenclature, 2.0 delineates.
        b. Methodology: The levels of injury are confirmed by two methods, one, the clinical examination with facet loading, and two, the targeting that is done as the first portion of the radiofrequency ablation procedures.

References:

a. Boswell, M et. al. Evidenced based guidelines for interventional techniques in the management of chronic spine pain, Pain Physician 2003; 6: 3–8.
b. Cohen S and Raja S., Pathogenesis, diagnosis and treatment of the lumbar zygoapophyseal, ie facet pain, Anesthesiology, 106, No. 3: 591–14, 2007.

     iii. Frequency for spinal RFAs: The medial facet branch nerves that are ablated have the ability to regenerate within 6-8 months to a year. It is therefore my opinion that this individual will require radiofrequency ablations every 12-18 months targeting the identified levels of injury.

5. Surgical intervention for spinal column injuries: Because conservative care and interventional procedures will not affect any of the underlying conditions causing symptomatology at the targets identified, being injured in the subject incident, additional treatment will specifically require laminectomies, discectomies, and facetectomies for each of the targeted levels identified at L3-4, L4-5, and L5-S1.
  a. Frequency: Surgery will be required within the next 5 years.

6. Physical therapy as a one-time postop regimen: After the spinal column surgery is performed, physical therapy will be required after laminectomies, discectomies, and facetectomies are completed for each of the target levels identified as injured in the subject incident.
  a. Frequency: 2-3 times a week, for period of 8 to 10 weeks, at 1 hour per session.

7. Fusion and stabilization procedures: During the course of this individual's lifetime, they will require fusion and stabilization procedures subsequent to the laminectomies, discectomies, and facetectomies at the target levels injured in the subject incident. Once the laminae, discs and facets are removed from the target levels, there will no longer be support for the stabilizing structures, resulting in recurrent pain, difficulty in functioning, and wear and tear sustained at the operated levels. Stress risers will also be created above and below the operated levels. The fusion and stabilization procedures will therefore be required because of bone removal, disc removal and creation of stress risers.
  a. Frequency: Fusion and stabilization procedures will be required within 7 years of the laminectomies, discectomies and facetectomies being performed for the injured levels in the subject incident.

8. Therapy as a one-time postoperative regimen subsequent to the fusion and stabilization procedures.
   a. Frequency: Subsequent to the fusion and stabilization procedures, therapy will be provided, 2-3 times per week, for period of 8 to 10 weeks, at 1 hour per session.

PROCEDURE DEFINITIONS/ RECOMMENDATION FOR SPINAL TREATMENTS

EPIDURAL STEROID INJECTION:
Based on this individual's history, physical examination, imaging review, clinical experience and any applicable research, the recommendation is made for a series of epidural steroid injections. Injections are provided to decrease the inflammation components contributing to pain. The individual's complaints are the result of nerve root inflammation, irritation of the nerve root, and/or impingement of the nerve root by a disk(s). The series of epidural steroid injections will temporarily reduce symptoms.

FACET JOINTS (CERVICAL, LUMBAR, THORACIC):
The facet joints are implicated in pain in the areas of the cervical, thoracic, and lumbar spine. The joints are diarthrodial. They have chondral surfaces, synovium, and a meniscoid tissue. These joints are susceptible to inflammation, chondral damage and degeneration over time. It is not uncommon to have a number of pain patterns when describing pain from the joints. Oftentimes a description will be provided, including pain as a deep, dull, constant ache, or any combination of the above. The pain can be over the midline of the back and neck, and often will involve the shoulders and upper back (if cervical/neck facet joints are causing pain), as well as into the hips, buttocks, and down the legs at times (for lumbar facet joints as the source of pain).

Each facet is innervated by two nerves. The nerves are medial branches of the dorsal rami of the spinal nerves at that level. Medial branch blocks will be provided at the discretion of the surgeon. If the facet joints are causing pain, we will be looking for at least 30-50% or greater relief with each of the diagnostic blocks prior to proceeding with a radiofrequency ablations. It is not necessary, in order to provide the RFA procedure, to have medial branch blocks; however, the target will be identified by doing the procedure before an RFA is attempted. RFAs do not have to be postponed after medial branch blocks. If the pain is reduced with the block, the RFA procedure is reasonable after the block on the same day. If the target is known, the radiofrequency ablation can be provided. It is understood that it may take eight weeks of recovery time after radiofrequency ablation to obtain optimal medical benefit.

Facet blocks and radiofrequency ablations, foundation literature supporting opinions and accepted standards of care.

1. Steven P. Cohen, et al. Clinical Guidelines for Facet Blocks and Radiofrequency Ablation for Low Back Pain and Neck Pain; Consensus Practice Guidelines on the Interventions for Lumbar Facet Joint Pain from a Multispecialty, International Working Group, Regional Anesthesia, and Pain Medicine https://rapm.bmj.com.
2. JL Bykowski and WHW Wong. Role of Facet Joints in Spine Pain and Image-Guided Treatment: A Review. American Journal of Neuroradiology, September 2012,33(8) 1419-1426; DOI.https://doi.org/10.3174/ajnr.A2696.
   a. Here, the source of pain is identified with trrgeting and definitive nerve identification sending the pain signal from injured disc and /or facets.The MRI is not the tool for diagnosis, or determination of injury.

"FACET SYNDROME" Imaging and Treatment:
Imaging for back pain syndrome is very common i.e. radiographs, MRI, CT scanning and SPECT scanning. There is no effective correlation between clinical symptoms and degenerative spinal changes (Kalichman L, kim DH, li L, Guermazi A, hunter dj. Computed tomography-evaluated features of spinal degeneration prevalence, intercorrelation, and association with self-reported spinal pain. Spine J 2010; 10 (3): 200-208 [PMC free article] [pub Med] [Google scholar]).

Anatomy of facet joints: Each spinal segment consists of an intervertebral disc and posterior paired synovial joints (FJ) comprising a "three-joint complex", where each component influences the other two with degenerative changes in one joint affecting the biomechanics of the whole complex. The facet joints constitute the posterolateral articulation connecting the posterior arch between the vertebral levels. They are a paired and diarthrodal joint and are the only synovial joints in the spine, with hyaline cartilage overlying sub-chondral bone, a synovial membrane, and a joint capsule (Yahia LH, garzon S. Structure of the capsular ligaments of the facet joints. Ann anat. 1993; 175 (2): 185-188. [Pub med] [Google scholar].

Each joint comprises an anteriorly and laterally facing inferior articular process from the superior vertebral level and reciprocally a larger, posteriorly and medially facing concave superior, articular process from the inferior vertebral level. Facet joints play an important role in load transmission, providing a posterior load-bearing helper, stabilizing the motion segment in flexion and extension. They are also involved in the mechanism of rotational kinematics by restricting the axial rotation. This is achieved through a collagenous tissue of the fibrous capsule layered in a transverse plane providing resistance to flexion motions. There is a high level of mobility which plays an important role in influencing the spinal column. They can develop significant degenerative changes and be a potential source of pain.

The capsule of the facet joints, sub-chondral bone, and synovium are richly innervated with nociceptive and autonomic nerve fibers. Substance P nerve fibers have been identified in the sub-chondral bone in degenerative lumbar facet joints. There are inflammatory mediators such as prostaqglandins and cytokines (IL6, TNF alpha) to have been found in cases of degenerative disorders. This will partly explain the origin of neck and low back pain in the case of facet joint degeneration.

Bogduka et al (Bogduk N, Wilson AS, Tynan W. The human lumbar dorsal rami. J anat. 1982; 134 (pt2): 383-392 [pubmed] [Google scholar], described the three ramifications of dorsal branch (medial, intermediate and lateral branch) of the spinal nerve, which spread within the dorsal muscles from L1 to L4 segments. Each lumbar facet joint is innervated by the medial branch of the dorsal rami (MBDR) as it emerges from the inter-transversal ligament. This branch crosses the superior margin of the medial termination of the transverse process, passing through the caudal root of the superior articulate process (SAP), one level below. That is to say, that the capital MVDR of the L4 level passes around the SAP of L5. At this level, the nerve runs downward and is fixed by the mamillo-accessory ligament (MAL) and then enters the multifidus muscle. The intermediate and lateral branches emerge from dorsal ramus, run caudally and laterally, and enter respectively, the longissimus and iliocostalis muscles. Each joint is innervated by a dual supply from the medial branch at the same level and the level above with ascending and descending branches. The L5 segment has a different distribution of branches, which should be considered in facet joint denervation. First the dorsal ramus is longer; it emerges dorsally in the inferior region on the top of the sacrum wing, along the groove formed between the ala of the sacrum and the root of the S1 SAP, and runs near the inferior portion of the articular process. The nerve and ramifies in an intermediate and medial branch. There is no lateral branch; the MBDR lies caudally to the process, running into a fibrous tissue equivalent to the MAL, with communicating branches with the S1 dorsal ramus.

There are four factors described for an anatomical structure to be deemed a cause of back pain: Nerve supply to the structure, the ability of structure to cause pain similar to that seen clinically and normal volunteers, the structure's susceptibility to painful diseases or injuries, and the demonstration that the structure can be a source of pain in patients using diagnostic techniques of known reliability and validity. Owing to this definition, lumbar facet joints are implicated in generating low back pain due to their nerve supply, especially in cases of capsular stretching. The fact that pain can originate from the facet joint is widely accepted in the literature and supported by investigations implying articular joint blocks. (Borenstein D. Does osteoarthritis of the lumbar spine cause chronic low back pain? Curr pain headache Rer. 2004; 8 (6): 512-517. [Pub med] [Google scholar].)

Facet joints as a source of low back pain, was described initially 1911 by Golthwaite and Ghormahley. They used the term ``facet syndrome'' to describe the symptoms originating from the facet joint. It was initially described as lumbosacral pain with or without sciatica in 1933. Then years later Badgley, et al., suggested that the facet joint was a source of up to 80% of back pain. Facet joint syndrome included local pain and pseudo-radicular radiation with variability and distribution of referral patterns of pain.

There are also studies investigating facet joint pain as the source of the patient's symptoms, suggesting that the currently available tests have limited or no diagnostic fluidity. Moreover, history and physical examination may suggest, but not confirm facet joints as the source of pain.

The superior sensitivity of MRI compared to CT imaging is well known. CT and MR are equally useful in demonstrating morphological changes in facet joints. MRI clearly presents advantages of better assessing the immediate consequences of facet joint degeneration, such as surrounding neural structure impingement, exaggerated fluid in the joints of the facets, and synovial cysts seen on axial MRI suggestive of spondylolisthesis and its

instability, but not specific of facet joint origin of pain. Recent studies using fat-suppressed MRI sequences have demonstrated that sub-chondral bone edema is present in the lumbar facet joint articular processes in 14 to 41 percent of patients with back pain; enhancement of the facet joint rim after gadolinium administration will establish the diagnosis of synovitis. Fujiwara did a study showing that MRI tends to underestimate the severity of osteoarthritis in the facet joints as compared to CT. The fluid-sensitive sequences on MRI are generally preferred over CT for imaging facet joint effusions and juxta-facet cysts, however, they are less sensitive in depicting the joints, bony cortices and are less accurate in quantifying the amount of sclerosis present. An additional limitation of MRI is that it cannot accurately measure cartilage thinning and chemical-shift artifact inherent in this type of imaging. CT is better to demonstrate the degenerative changes of the facet joints because of high contrast between bony structures and surrounding soft tissues. There is a suggestion that TFC T2 fat saturation sequences and, when indicated, gadolinium administration with T1 fat saturation sequences, enhanced the sensitivity and diagnostic specificity of the MR scan. Gadolinium will disclose the active inflammatory state of degenerative process identifying new therapeutic targets for percutaneous treatment. SPECT single photon emission computed tomography is more useful for facet joint inflammation detection rather than using the MRI.

The concepts of disc bulging and disc herniation are distinct. The following foundation literature supports opinions in regard to disc injury and proper terminology in radiologic nomenclature:

1. Narrative review: Disc Herniation After Motor Vehicular Trauma, Moheimani RS, Arastoo S, David Geffen School of Medicine at UCLA, Coast Spine and Sports Medicine.
2. Milette, Pierre C. The proper terminology for reporting lumbar intervertebral disc disorders. AJNR 18:1859-1866, Nov 1997 0195-6108/97/1810-1859 © American Society of Neuroradiology.
3. McLain MD, Robert F. Determining treatment of lumbar disc protrusion and disc extrusion. The Journal of musculoskeletal medicine, April 2009, 136–141.

First-line therapy for facet syndrome consists of conservative multi-modal management such as pain medication, muscle relaxants, anti-inflammatories, antidepressants physiotherapy, accupuncutre, and psychotherapy. No clinical features or diagnostic imaging studies can determine whether a facet joint is painful or not. Controlled blocks are the only reliable tool in the diagnosis of facet joint pain as a cause of low back pain. Bogduk defined the specific criteria for optimal selection as an anatomically accurate block under guidance with ideally complete relief of pain following an MBDR block. Manchikanti, et al., defined at least an 80% reduction of pain and the ability to perform previously painful movements. More liberal criteria have also been reported, such as greater than 50% relief of pain. A definitive diagnosis of facet joint mediated pain may require blocks at two separate locations in the spine. It was noted that there were high false positive rates at 30-45 percent with the one level being addressed, Cohen, et al., showed that there was a success rate of approximately 39% after single block, and 64% after double block. Because of the dual nerve supply of the facet joints at the same level and the level above, diagnostic blocks should be performed with a minimum of two levels to block a single joint.

The ideal candidate for facet joint denervation is the patient who underwent medial branch infiltration with significant pain relief after failure of conservative management. Because of the dual nerve supply of a given facet joint, electrodes or cryoprobes should be placed at two subsequent levels. Nerves can therefore be destroyed by physical means, heat, radiofrequency or cold cryo neurolysis or by chemical means, alcohol/phenol. Whatever technique is used, however, neurolysis does not allow for definitive pain relief. The destroyed nerve will eventually regenerate and in consequence, recurrence of pain will occur. The procedure can be repeated.

Other techniques or imaging guidance have been described in the literature. Wu, et al., recently compared to the effectiveness of safety between autologous platelet-rich plasma (PRP) and local anesthesia/corticosteroid in intra-articular injection for the treatment of facet joint syndrome. The PRP presented as superior efficacy with longer duration. Kirshner et al also confirmed the same efficacy with longer duration using PRP. Iwatsuki et al performed laser radiation of the dorsal surface of facet capsule in 21 patients. There was greater than 70% pain relief for least a year in 81% of the patient's.

We have known that inter-reader and intra-reader agreements as to magnetic resonance imaging findings in the lumbar spine show significant variability across interpretation of morphologic ``degenerative conditions''. In that regard, the use of medial facet branch blocks, and the appropriate implementation of blocks in the correct anatomic areas, are of more significant benefit than relying on the use of MRIs per se to determine whether clinical efficacy will be achieved or not.

In regard to MRI being read inappropriately or variability shown in agreement of MRI imaging findings, foundation literature.


a. Spine J.2014 Oct 1;14(10):2442-8.DOI:10.1016/J.
b. Spine E.2014.03.010.EPUB 2014 Mar15.
c. Brady AP. Error and Discrepancy in Radiology: Inevitable or Avoidable? Insights into Imaging. 2016;8:171-82.
d. Bruno MA, et al. Understanding and Confronting Our Mistakes: The Epidemiology of Error in Radiology and Strategy for Error Reduction. Radio Graphics 2015;35:1668-76.DOI:10.1148/rg.2015150023.
e. Trentu.CA (Internet).Coughlan R. Technology Idolatry: An Exploration of Health Care's Love Affair with Machines That Go "Bing"; 2004 Jan (Cited 15Mar17). Pain SCI Bibliography 56019.
f. Deyo RA, Weinstein, DO. Low Back Pain. N ENGL J MED 2001 Feb; 344 (5):363-70.PUBMED 11172169.
i. This discusses the correlation between imaging results and symptoms in absence of any clear pathophysiological mechanism to explain the etiology of back pain.
h. Herzog R, Elgort DR, et al. Variability and Diagnostic Error Rates of 10 MRI Centers Performing Lumbar Spine MRI Examinations on the Same Patient Within a Three-Week Period of Time. Spine J.2016 Nov.PUBMED 27867079.
i. Haig AJ, et al. Spinal Stenosis, Back Pain, or No Symptoms At All? A Masked Study Comparing Radiologic and Electrodiagnostic Diagnoses to the Clinical Impression. Archives of Physical Medicine and Rehabilitation.2006 Jul;87(7):897-903.PUBMED 16813774.
    a. People were assessed for back pain in different ways, including MRI. Radiologic and clinical impressions had no relation. There was no useful similarity between evaluation of the patient with MRI and evaluation by examination and taking a history. Narrowing of the spinal canal does not cause back pain.
j. El Barzouhi A, et al. Prognostic Value of Magnetic Resonance Imaging Findings in Patients with Sciatica. J Neurosurg.spine.2016 Jun;24(6):978-85.PUBMED 26871651 Pain SCI Bibliography 53585.
k. Sher JS, et al. Abnormal Findings on Magnetic Resonance Images of Asymptomatic Shoulders. J Bone Joint Surg. AM.1995;77(1):10-15.
l. Simon, Maciej J. Utilization of MRI in surgical decision making in the shoulder. BMC Musculoskeletal Disorders.
m. Englund M, et al. Incidental Meniscal Findings on Knee MRI in Middle-Aged and Elderly Persons. N ENGL J MED.2008;359(11):1108-1115.
n. Jarvik MD, J G. Moderate versus Mediocre: Reliability of spine MR Data Interpretations. http://radiology.rsna.org/content/250/1/15.full.
o. Terk, MR, Hume-Neal, M. Injury of the posterior ligament complex in pateients with acute spinal trauma: evaluation by MR imaging. AJR AM J Roentgenol. 1997; 168: 1481-6.
p. Benedetti, PF, et al. MR imaging findings in spinal ligamentous injury. AJR AM J Roentgenol. 2000; 175: 661-5.
q. Davis, SJ, et al .Cervical spine hyperextension injuries: MR findings. Radiology. 1991; 180: 245-51.


General principles that guided the regional documentation for radiologic nomenclature and interpretation, and the revision, known as Spine 2014, 2.0, have not changed in their precepts of understanding that the definitions of diagnoses are not intended to imply external etiologic events such as trauma and they do not imply relationships to symptoms and do not define or imply the need for a specific treatment. I have opined previously that the MRIs are excellent in some respects, but detrimental in others. In the case of facet joint syndrome, obviously, MRI is of little benefit in assessing the morphologic changes consistent with the clinical findings with reproduction of symptoms at the facet levels that are causing pain, particularly borne out of trauma. The fat suppression MRI is more beneficial than relying on non-enhanced MRI per se; ie., the MRI is not as effective as CT SPECT scanning. In that regard, these are the recommendations that will be made for individuals who are presenting with neck and/or low back pain and chronic pain, not responding to conservative care particularly.

In regard to the premise of high-intensity zones on MRI and low back pain, the following is supportive foundation literature for a lack of meaningful use:


1. Deraguchi M, et al. The Association of High-Intensity Zones on MRI and Low Back Pain: A Systematic Review. Scoliosis 13,22(2018). Https//doa.org/10.1186/s13013-018-0168-9.
    a. This indicates the questionable use of MRI for low back pain. It is indicated that there is a discrepancy between what is noted on MRI and the clinical profile, ie. the source of pain, leading to criticism regarding its utility in low back pain management. There is a lack of studies having comparative symptomatic or control groups utilizing heterogeneous populations. HIZ may be a specific marker of discogenic low back pain because of its correlation with pain only after provocation discography. There is a high prevalence of high-intensity zone findings in asymptomatic individuals with degenerative disc disease. At 25%, it is too high for meaningful clinical use. After injection for discography, the same percentage of asymptomatic and symptomatic discs with a high-intensity zone were shown to be painful.
2. In regard to HIZ zones:
a. Blei Yang, Wenhao Li, et al. The Correlation Between the Lumbar Disc MRI High-Intensity Zone and the Discogenic Low Back Pain: A Systematic Review and Meta-Analysis. J ORTHOP SURG RES.2023;18:758, published online 2023, October 7. doi:10.1186/s13018-023-04187-5.


Indications for RFA: A viable option for chronic pain that treats a number of conditions, including neck pain, back pain, spondylosis, sacroiliitis, knee pain, pelvic pain, peripheral neuropathy, complex regional pain syndrome, trigeminal neuralgia, headaches and facial pain, painful disks known as diskogenic pain.

RFA: Radiofrequency ablation uses a special type of needle to apply radio waves to the targeted medial branch nerves, providing relief of pain. The procedure has different names, including RF, RFA, rhizotomy, and neurotomy.

There are four different types of radiofrequency ablation:
1. Thermal or conventional RFA, (CRF): A high-voltage radiofrequency current is created using a needle. The energy converts into heat at the tip of the needle to 140 to 176 degrees Fahrenheit which creates a small lesion on the nerve, rendering the nerve inactive.
2. Pulsed RFA, (PRF). This is similar to thermal RFA, however, a short bursts of voltage is used. Pulsing is used to disperse the energy more easily. It takes less heat to generate, 107 degrees Fahrenheit. This particular type of RFA is shocking the A-delta and C-fibers (pain conductors).
3. Water cooled or cooled RFA, (WCRF). A special multichannel electrode (needle) is used. The radiofrequency current is prevented from reaching temperatures that are high, by heating up to 140 degrees Fahrenheit, but also cooled by a continuous flow of water; this prevents the needle tip from being over-heated. This creates a larger and more complete lesion.
4. Genicular nerve ablations: Knee injuries: Some types of injections can be provided for knee injuries, including steroid injection and/or viscosupplementation to reduce inflammation contributing to pain. Genicular nerve ablations can be provided.

RFA success rates: RFA performed for the facet joints provides pain relief for 45% to 60% of patients. RFA for the sacroiliac joint provides 75% to 86% relief for patients. If effective, RFA will provide pain relief lasting six to eight months, up to a year. Some studies have shown two to three years.

CRF and PRF: Produces well defined, small lesions, while WCRF produces larger lesions involving larger tissue areas. The magnitudes of the heat lesions depend on the temperatures and sizes of the needles, as well as the duration of the procedure.

MONITORING DURING THE RHYZOTOMY/RFA/ABLATION PROCEDURES:
HRV: Heart rate variability testing evaluates the balancing act between the sympathetic nervous system (fight and flight) and the parasympathetic nervous system (rest and digest). The imbalance in the HRV is the number one risk factor for sudden cardiac death. A simple hand electro-sensor test shows a report on the balance between the heart and nervous system in minutes. This is an effective predictor of nonspecific health risk as an accurate and reliable reflection of many physiological factors modulated in the normal rhythm of the heart. It provides the means for observing interplay between the sympathetic and parasympathetic autonomic nervous systems. This is obtained before interventional procedures.

DPA: Digital pulse analysis. We utilize this analysis to identify arterial vessels (cardiovascular risks secondary to comorbidities). This uses an infrared light sent to the fingertips that obtains a pulse wave with light-absorbing characteristics of hemoglobin in the arterial blood. This measures the overall health of the arteries. It does not tell you if you have plaques in the arteries, but it helps us determine the overall risk for developing them. We utilize this to monitor the pulse during the course of any interventional procedures performed.

° Spinal fusion: This procedure involves the use of your own bone (autogenous), artificial bone, or bone from a cadaver to stimulate bony union of the spine. This may or may not be combined with spinal instrumentation. Risks include infection, nonunion, transmission of infectious disease (from cadaveric bone), bleeding and nerve/spinal cord injury. Supplementing the fusion is spinal instrumentation. Instrumentation is a combination of a variety of screws, rods, or wires. Risks include infection, dural leak, bleeding, incomplete relief of pain, and nerve/spinal cord injury.

OTHER TYPES OF INJECTION PROCEDURES AND PALLIATIVE MEASURES FOR CARE:
1. Selective nerve root injections.
2. PENS treatment.
3. Trigger injections for soft tissue component of the injury.
4. Spinal cord stimulation; trial and then permanent implantation.

° Injection therapies/Trigger injections: Injection therapies are a medically recognized set of procedures that are frequently utilized for conditions involving musculoskeletal injuries to the soft tissues precipitating long-standing pain and discomfort. In almost all cases injection therapy is considered safe and minimally invasive with minimal risk of complications. Injections are given in multiple areas of the fascia covering the muscle providing reduction in swelling and thereby providing relief of pain. The procedures are done in a series of 3 at 6 month intervals.

° Selective nerve root injection: Selective nerve root injections deliver medication directly into an inflamed nerve root that exits the spinal cord, stopping the pain from traveling along the nerve branches. A small needle is guided by ultrasound to the nerve root sleeve and a local anesthetic and corticosteroid anti-inflammatory medication is delivered. Up to three injections may be given within a six month time-frame.

° Percutaneous electrical nerve stimulation (PENS): PENS treatments use acupuncture needles placed in soft tissue and muscle to deliver an electrical impulse for pain relief. The benefit of PENS therapy may be varied. Some patients will have total pain relief, others experience prolonged pain relief for 3 months or more and others get relief for shorter periods of time. Some may not get any benefit at all from the procedures. General risks may include some local bruising and tenderness at the probe insertion site(s). There is very small risk of infection.

° Injection therapies/Trigger injections: Injection therapies are a medically recognized set of procedures that are frequently utilized for conditions involving musculoskeletal injuries to the soft tissues precipitating long-standing pain and discomfort. In almost all cases injection therapy is considered safe and minimally invasive with minimal risk of complications. Injections are given in multiple areas of the fascia covering the muscle providing reduction in swelling and thereby providing relief of pain. The procedures are done in a series of 3 at 6 month intervals.

° Spinal cord stimulation: Spinal cord stimulation (SCS) helps relieve neuropathic pain symptoms such as sharp, clicking or stabbing pain. The implant transmits mild electrical impulses to the spinal cord, substituting the feeling of pain with a more pleasing tingling sensation called paresthesia. With SCS, patients have control and can adjust the intensity, and turn on and off the system in response to varying levels of pain.

The opinions expressed and provided herein are currently based on the history, physical examination, review of submitted records, as outlined, including imaging studies, clinical experience, and any applicable research. The methods utilized to arrive at the conclusions and recommendations for future care are standard practice in orthopedics and pain management. The diagnoses are consistent with this individuals' reported symptoms related to the subject incident. The conclusions are supported by multiple peer-reviewed studies. The error rates for treatment methods are low and therefore within the accepted standards of care included in standard medical guidelines. In the event that there is additional information provided, a supplemental report will be forthcoming

The opinions that are rendered in regard to future care, including evaluations and treatments, are given to a reasonable degree of medical probability.

All of the foregoing opinions have been given to within a reasonable degree of medical certainty. If I can be of any further service, please do not hesitate to contact our office.

Sincerely,

Lance Owen Yarus, DO, FAASOS, FACFE, BCFE
LOY/SH
1048119002




DEC 0 5 2024