# EXHIBIT D

**In the Matter Of:**

*FRANK LUCAS vs*

*AMBER RUBIN, et al.,*

*LANCE O. YARUS, D.O.*

*June 27, 2024*

LEXITAS™

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA
- - -

| | | |
|---|---|---|
| FRANK LUCAS, | : | NO. 220900692 |
| Plaintiff, | : | |
| vs. | : | |
| AMBER RUBIN, et al., | : | |
| Defendants. | : | |

- - -
Thursday, June 27, 2024
Remote deposition taken via Zoom Videoconferencing
- - -

Sworn video deposition of LANCE O. YARUS, D.O. was taken pursuant to notice via Zoom Videoconferencing on the above date, beginning at approximately 3:29 p.m., before Stephanie Weldon, Court Reporter and Notary Public for the State of Pennsylvania, there being present remotely.

- - -
LEXITAS LEGAL
435 DEVON PARK DRIVE, SUITE 102
WAYNE, PA 19087
888.267.1200 (PH) 267.775.3310 (FAX)
www.lexitaslegal.com

APPEARANCES via Zoom Videoconferencing:

SIMON & SIMON, P.C.
BY: JOSHUA BAER, ESQUIRE
18 Campus Boulevard, Suite 100
Newtown Square, Pennsylvania 19073
(215) 467-4666
joshuabaer@gosimon.com
Representing the Plaintiff

SWARTZ CAMPBELL, LLC
BY: MICHAEL A. COGNETTI, ESQUIRE
2001 Market Street, Suite 2815
Philadelphia, Pennsylvania 19103
(215) 564-5190
mcognetti@swartzcampbell.com
Representing the Defendant,
Amber Rubin

CITY OF PHILADELPHIA - LAW DEPARTMENT
BY: MILES DUMACK, ESQUIRE
Claims Unit, One Parkway Building
1515 Arch Street, 14th Floor
Philadelphia, Pennsylvania 19102
(215) 564-1800
miles.dumack@phila.gov
Representing the Defendant,
City of Philadelphia

ALSO PRESENT:

Caryn Trimby, Videotape Technician

# I N D E X


| WITNESS | PAGE |
|---|---|
| LANCE O. YARUS, D.O. (Witness sworn.) | |
| VOIR DIRE | |
| BY: Mr. Baer | 5 |
| BY: Mr. Cognetti | 11 |
| DIRECT EXAMINATION | |
| BY: Mr. Baer | 17, 73 |
| CROSS-EXAMINATION | |
| BY: Mr. Cognetti | 46, 79 |


# E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Yarus-1 | Curriculum Vitae | 6 |
| Yarus-2 | IME Report August 15, 2022 | 18 |
| Yarus-3 | Supplemental Report March 10, 2024 | 18 |




Uber_00137526

(It is agreed by and among counsel that the reading, signing, sealing, filing, and certification are hereby waived and all objections, except as to the form of the questions, are reserved until the time of trial.)

\- - -

THE VIDEOTAPE TECHNICIAN: We are now on the record. My name is Caryn Trimby, and I am a videographer retained by Lexitas Reporting. Today's date is June 27th, 2024, and the video time is 3:29 p.m. This deposition is being held at Regus, located at 100 North 18th Street, Suite 300, Philadelphia, Pennsylvania 19103, in the matter of Frank Lucas vs. Amber Rubin, et al. The deponent is Dr. Lance Yarus.

Would all counsel please identify themselves for the record?

MR. BAER: Good day, everyone. This is Josh Baer representing the plaintiff, Frank Lucas.

MR. COGNETTI: Good afternoon. It's Michael Cognetti, and I represent Amber Rubin and SEPTA.

MR. DUMACK: Miles Dumack for the City.

THE VIDEOTAPE TECHNICIAN: And the court reporter is Steph Weldon, and will now swear in the witness.

- - -

LANCE O. YARUS, D.O., after having been duly sworn, was examined and testified as follows:

- - -

VOIR DIRE

- - -

BY MR. BAER:

Q. Good afternoon, Doctor.
A. Good afternoon.
Q. Would you kindly introduce yourself and tell us what type of medicine you practice?
A. Sure. Good afternoon, ladies and gentlemen, Your Honor. My name is Lance Owen Yarus. I practice in the areas of orthopedics and pain management.

Q. Now, Doctor, we're going to mark preliminary Exhibit-1, which is a copy of your professional resume or your CV, and I think this is your updated one dated from March of 2024.

(Whereupon, Yarus-1 was marked as of this date and is attached hereto.)

BY MR. BAER:

Q. As we qualify you to testify as an expert here in this case, feel free to refer to it if needed. Number one, sir, can you please tell us whether or not you are pract -- licensed to practice medicine here in the Commonwealth of Pennsylvania?

A. I am licensed in the Commonwealth of Pennsylvania.

Q. How long have you been practicing medicine?

A. This will be my 37th year.

Q. Have you continuously practiced over those 37 years?

A. Yes.

Q. And sir, can you tell us what areas of medicine you practice?

A. I practice in the areas of orthopedic surgery and pain management.

Q. What is orthopedic surgery?

A. Orthopedic surgery is a subspecialty in medicine, it deals with the axial skeleton, that includes the bones, discs, and the nerves that come out to supply motor and sensory function to the extremities. In the extremities, the joints, made up of the bones, also the internal structures of the joints, and then muscles, tendons and ligaments and nerves that are in those areas as well. We take care of individuals who have fractures in the spinal column and extremities, lacerations, amputations, thing of that nature. We're able to treat individuals on an emergent basis, and also we treat for elective reasons such as replacing joints or doing procedures that are not necessarily emergent.

Q. And Doctor, are you board-certified?

A. I am, yes.

Q. And what does it mean to be board-certified?

A. It means you've met the requirements of

an independently incorporated entity. There's three in the State of Pennsylvania recognized at the state board level. And I'm certified by one of them. So you meet the criteria for the board and you receive certificates that designate you as board-certified.

Q. In what areas are you board-certified?

A. I do have certificates in orthopedic surgery and pain management.

Q. Now, sir, do you perform physical examinations of your patients?

A. Yes.

Q. Do you treat people who have been involved or hurt by trauma?

A. Yes.

Q. Do you treat -- as part of your practice, do you treat people who have suffered injuries to their low backs?

A. I do, yes.

Q. Now, Doctor, as part of your practice, do you regularly and customarily review and rely on medical records from other providers, diagnostic studies and images?

A. Yes.

Q. Does that include surgical records and operative reports?
A. It does.
Q. And does that include x-ray images, CT scans and MRIs?
A. Yes.
Q. Now, does your practice also involve making treatment recommendations to patients based on your review of those types of materials and the examinations that you perform?
A. It does, yes.
Q. Now, does your practice involve diagnosing patients?
A. Yes.
Q. And do you identify future medical care of your patients?
A. Yes.
Q. Doctor, we've talked about more of your clinical practice, but of course the jury's about to learn that you have been retained as an expert. My office has retained your services in the past, correct?
A. Correct.
Q. Could you please tell us what you're

being compensated for your time in order to provide expert medical testimony?
A. For my time today, the fee is $4200.
Q. And you authored two reports. A report initially dated August 15, 2022, and then a supplemental report dated March 10, 2024. Could you please tell us what you were compensated for your time and providing this analysis in the form of two reports?
A. So the August 15th, 2022 report would have been $500. And the March 10th, 2024 report would be $200 a page, and this would be $400, it's two pages.
Q. Doctor, this case is going to be heard in the Philadelphia Court of Common Pleas. Have you been qualified to testify as an expert in the Philadelphia Courts of Common Pleas before?
A. I have, yeah.
Q. And Doctor, we're about to hear, in a few minutes, is recommendations for future medical treatment. The treatments that you're recommending, including future radiofrequency ablations and surgery, are these procedures that you have done yourself in the past?

A. I have done these procedures, yes.
Q. And are some of these procedures ones that you still do?
A. Before COVID, I did them. After COVID, I haven't started them up again. So, I've done many of them in the past.
MR. BAER: Fair enough, Doctor. I don't have any additional questions as to your qualifications.
THE WITNESS: Thank you.
- - -
BY MR. COGNETTI:
Q. Doctor, good afternoon. I'm Michael Cognetti and I represent Amber Rubin and SEPTA. We had the good fortune of meeting many, many years ago when I practiced out west of Philadelphia and I haven't seen you in many years. However, I'm well aware of the fact that you have testified many times for Simon & Simon in the last six, seven, eight years, true?
A. I have had the privilege and honor of testifying on behalf of their clients, yes.
Q. Okay. And you are -- as I understand based upon your testimony, you are not a member

of any orthopedic society in Pennsylvania, true?
A. Not in Pennsylvania, that's correct.
Q. And Doctor, you're familiar with the American Medical Association, the AMA?
A. Sure.
Q. And the AMA provides board certification in orthopedic surgery through the American Board of Orthopaedic Surgery, right?
A. ABMS, that's what it's known as, yes.
Q. And you do not have a certification in orthopedic surgery through the American Board of Orthopaedic Surgery, true?
A. Correct.
Q. Now, if I understand your CV, and I'm not so sure that Mr. Baer brought this up, you're a doctor of osteopathic medicine, not an M.D.; is that fair to say?
A. It is. I'm a D.O., yes.
Q. And there is an organization for doctors of orthopedic medicine called the American Board of Osteopathic Medicine, right?
A. Yes.
Q. Okay. And a while ago, and actually you took a test to be -- to become board-certified

for that organization, true?
A. First test I took, yes, that's correct.
Q. In 1986?
A. I think that's correct, yes.
Q. And you failed that test?
A. I sure did. I blew it, yes.
Q. Okay. And do you have a certification from a group by the initials, AAPS?
A. Yes.
Q. And you have not renewed that certification -- well, what does that stand for, AAPS?
A. American Association of Physician Specialties.
Q. Okay. And you have not reviewed that, or renewed that certificate since 2004, correct?
A. No. That's incorrect.
Q. When did you renew it?
A. I didn't have to renew it because I was awarded an emeritus diplomate status in 2011. I completed my certificate, which went to 2012 from 2004, and I submitted that certificate so that I could become an emeritus diplomate. So, that's how that all came about.

Q. Fair enough. And you never held a fellowship in surgery; is that true?
A. I have a fellowship, it's a scientific fellowship. But I never did a fellowship as far as taking an extra year to do more surgery. I didn't need to do that in my residency.
Q. So true, correct?
A. I have a fellowship. So not -- not a fellowship the way I think you're describing.
Q. Okay. And you haven't conducted surgery since 2013; is that correct?
A. That is correct, yes.
Q. So before in qualifications when Mr. Baer was asking you about surgeries and procedures that you do, and you kind of said, "Well, I stopped after COVID," it really went back to 2013, true?
A. Right. The end of 2012, that's correct.
Q. All right. You're not on the medical staff of any hospital, correct?
A. Correct.
Q. And you don't work in any emergency rooms, true?

A. True.
Q. And you don't have any admitting privileges at any hospital, true?
A. Correct.
Q. So that means you can't admit patients to your own care, right?
A. That is correct.
Q. Okay. So when you do see your own patients, and not for litigation purposes, you have to send them to a hospital to be seen by other doctors, right?
A. No. I take care of them. If there's a need for surgery or if there's an emergent need for them to be seen, I certainly would send them. But I take care of my own patients.
Q. Okay. You're not allowed to operate on them anymore, true?
A. Well, I wouldn't use the word, "not allowed to." I voluntarily gave up my privileges in 2016. So, I don't have the privileges to operate on individuals. I certainly could do office procedures but not --
Q. Okay.
A. -- in a hospital setting.

Q. All right. And as I understand based on your testimony, you haven't published any articles on the spine or spinal surgery?
A. Not as a clinician, that's correct.
Q. And you've published no scholarly treatise on spine or spinal surgery --
A. Correct.
Q. -- true?
A. Yes.
Q. And you've never published any peer-reviewed books, articles or treatises, true?
A. Also correct.
Q. And you, yourself, have not published any books, articles or treatises that have been subjected to that kind of professional review, true?
A. I have done reviewing, but I haven't been reviewed because I haven't written any books or articles or any other treatises about what I do. I'm a clinician, not a researcher.
MR. COGNETTI: No further questions.
MR. BAER: With that, plaintiff offers Lance Yarus, D.O. as

an expert in the field of orthopedics, orthopedic surgery and pain management.

BY MR. BAER:

Q. Doctor --

MR. COGNETTI: No objections.

MR. BAER: Thank you.

- - -

DIRECT EXAMINATION

- - -

BY MR. BAER:

Q. Doctor, thank you again for making yourself available here to give trial testimony in this matter; one of great importance for Mr. Frank Lucas. I'm going to ask for your opinions here today, and as we get started, please understand that we prefer that you not give any opinions unless you can do so within a reasonable degree of medical certainty. Okay?

A. Yes. I will do that.

Q. Sir, did you examine Mr. Lucas, review his medical records and provide expert opinions at the request of my office?

A. I did, yes.

Q. And did you summarize your findings in

the two reports that I talked about earlier in this case?

A. Yes.

Q. We're going to mark those reports 1 and 2, respectively. Your initial report of August 15, 2022 and your -- and your supplemental report of March 10, 2024 as Exhibits 1 and 2. And please feel free to refer to them as needed.

(Whereupon, Yarus-2 and Yarus-3 were marked as of this date and are attached hereto.)

BY MR. BAER:

Q. Now, sir, after performing your independent medical examination, did you form any opinions to within a reasonable degree of medical certainty as to whether or not Mr. Lucas was injured as a direct result of the traumatic incident that he was involved in on November 11, 2021?

A. I did, yes.

Q. And Doctor, did you make a determination as to whether or not any of those injuries were permanent?

A. Yes.

Q. And what was your -- what was your determination as to the injuries themselves and whether or not they were permanent?
A. The injuries themselves, including soft-tissue injuries and also disc injuries in the neck and low back, were, in fact, permanent in nature.
Q. All right. We're going to get into spec -- more specificity as to the actual injuries themselves. But also, Doctor, did you give a prognosis relative to Mr. Lucas' injuries?
A. Yes, I did.
Q. And what is a prognosis, sir?
A. A prognosis is an interesting term. It encompasses information about a particular injury. We know what the natural history is, particularly in disc injury itself, soft tissue injuries to the muscles, tendons and ligaments. And because we know that, we understand by nature of the definition, there isn't going to be a recovery. So there is a permanent aspect to the injuries, and that leads to being able to talk about decisions such as we would do with a patient. But in this case, Mr. Lucas

isn't a patient, but the process is still the same. And that is to talk about future care that will give us an opportunity to improve his ability to function. So that's what the prognosis is. And no matter what the term is, the definition still applies, the terms just indicate more so whether future care is going to be as effective as we believe it will be.
Q. Thank you, Doctor. So I'm going to start asking you to take us through your analysis. When did you examine Mr. Lucas?
A. So I saw Mr. Lucas on August 15, 2022.
Q. And did he provide you a history as essentially the reason why he was being seen by you?
A. He did, yes.
Q. And what did he -- what did you learn?
A. I learned that he was an operator of a vehicle when he was moving. He was struck on the mid passenger side by a bus. Told me where the incident occurred, on Ogontz and Nedro in Philadelphia. Those are the two streets where the incident took place.
Q. And Doctor, did he tell you whether or


Uber_00137543

not he sustained injury from that crash?
A. Yes, he did.
Q. Did he tell you whether or not he received immediate medical care as a result of that crash?
A. He did, yes.
Q. And what did he tell you?
A. He was transported by EMS to Einstein Healthcare emergency facility, so that was pretty much immediate from the incident.
Q. When Mr. Lucas saw you at your offices, August 15, 2022, did he explain to you whether or not he was suffering from any pain or discomfort in any part of his body?
A. I talked about his current complaints and he had neck and low back pain. The pain was coming and going, aching and sharp. He had left upper extremity numbness, which was greater than right, and he also had radiating pain, left greater than right in the lower extremities with numbness and tingling.
Q. And Doctor, did you determine whether or not Mr. Lucas was reporting any impairments or inability to do certain things as a result of

the injuries that he suffered?
A. Yes.
Q. What did he tell you?
A. So the effect on activities was something we discussed, difficulty riding a bike, working out, doing exercises. He was able to work around the house, did some cleaning, yard work, and that was after a particular procedure that he had that is called a radiofrequency ablation, knocks out the pain perception, so that made it easier for him to carry out with those activities. He had a one-year old, so he had difficulty taking care of his child, particularly lifting his child. So those were the things that he related to me.
Q. Doctor, did you perform an examination of Mr. Lucas?
A. I did, yes.
Q. Can you please tell us what were the significant findings in your examination?
A. So on the physical exam with the neck, he had decrease in the range of motion in all the planes that I tested, that means moving forward, backward, rotating side to side and

side bending. In the trapezius, which is between the neck and the shoulder, those group of muscles showed spasm and hypertonicity and tenderness, he had a cord-like formation, left greater than right. I did maneuvers to see if I could reproduce that radiating symptom that he was talking about, and I was able to do so with the maneuvers that are called the Adson's, Spurling's, Valsalva and Lhermitte signs, and those were left greater than right at C3-4, C4-5 and C5-6. I did another maneuver called facet loading, and that's to catch the motion segments, which are on the right and left at each level of the spinal column in the neck. His findings were positive, left greater than right at C3-4, C4-5 and C5-6.

I then did a reflex testing, there's three. The biceps was one out of three on the right and left, triceps, two out of three on the right, one out of three on the left. Brachioradialis was three out of three on the right, one out of three on the left. And lastly, I did sensory testing. That's done with pinpricking and a sharp instrument. He

had decreased sensation in his left hand, that was from an old injury. So that's local. But in the sensory testing that reflex back up to the cervical spine, he had left greater than right sensory deficit at C3-4, C4-5 and C5-6.

For the lumbar spine, he had a loss of the curvature, which we call the lordosis, and that's because of spasm and hypertonicity. And this was at L3-4, L4-5 and L5-S1, left greater than right. I did two maneuvers, a sitting root and straight leg raising sign, that's to stretch the nerves in the legs. And those were positive, both right and left.

The range of motion was decreased in all the planes, again, that I tested here. In the sacroiliac area, he had hypomobility of both sacroiliac joints, right and left, and he had a depression on the right. In the lumbar spine, I also did the maneuver called facet loading, and that was positive for left L3-4, L4-5 and L5-S1. On the reflex testing, patellar reflex, that's the kneecap, or the tendon beneath the kneecap, actually, two out of three on the right, two out of three on the

left. Achilles was one out of three on the right, zero out of three on the left. There's no tap reflex for the L4-5 level in the spinal column. So we ask the person to do a great toe lift, and I push on the toe, on a five scale, four out of five on the right, three out of five on the left.

And lastly, I did the sensory testing, positive for left greater than right in the dermatomes of L3-4, L4-5 and L5-S1.

Q. Doctor, thank you, by the way.

Is it possible that you could show us or demonstrate to us the areas of the spine that you were talking about, because you talked about the cervical spine at certain levels, and then the lumbar spine at certain levels.

A. Sure.

MR. COGNETTI: Could we go off camera for a second?

THE VIDEOTAPE TECHNICIAN: Sure. We are going off the video record. The time is 3:49 p.m.

MR. COGNETTI: I'm sorry to ruin your flow. I'm just going to

make, for the record, a prophylactic objection, because I think that the doctor's going to show some demonstrative evidence that I was unaware he was going to show, number one. Number two, it wasn't listed at any pretrial report. So I'm making an objection.

MR. BAER: Okay.

MR. DUMACK: City joins.

MR. BAER: And I'm going to note that the demonstrative, much like the spine, it is typically accepted. This is certainly not, and we can certainly cure it as saying this is not a picture of or a copy of Mr. Lucas' spine, but essentially as an aid to instruct the lay jury as to the medical terms of it being used in this case.

We can go back on.

MR. COGNETTI: Same objection. Thank you.

MR. BAER: Thank you.

THE VIDEOTAPE TECHNICIAN:

Stand by, please.

BY MR. BAER:

Q. Doctor --

THE VIDEOTAPE TECHNICIAN: Hold on a second, sorry.

MR. BAER: Yeah, take your time.

THE VIDEOTAPE TECHNICIAN: Okay. We are going back on the video record. The time is 3:50 p.m.

BY MR. BAER:

Q. Doctor, can you tell us what that is?

A. So I'm holding up a small version of a model of the spinal column, and this represents -- this color here represents the neck. This color would be the mid back, and this would be the lumbar spine. And just to show the last part of the spinal column, this triangular bone is the sacrum. And as you'll see in between each of these bones that are called vertebral bodies, there's disc material. And just to show a little larger version. This is the front and this will be the back. The disc is surrounded by fibers, we call them annular

fibers. This generally will absorb the forces of the spine. When the disc comes out, it will do that and it will come in this direction toward the back, because that's the weakest part of the anatomy. So when a disc comes out, we characterize it in various terms. When we look at the back portion of the spinal column, these are the motion segments. These are called facets. They are actually joints and they function as joints. When I was talking about facet loading, I was talking about maneuvers that put pressure on these areas and we corkscrew kind of to get to each level when we're looking for whether or not we can reproduce somebody's symptoms.

These are the main nerves that come out and supply motor and sensory function. I drew in a little line here that's representing a small nerve that comes off the main one. That's called a medial facet branch nerve. It actually inserts underneath the facets on each side at each level, and it actually goes into the facets. So it innervates the actual joint. And that's the one that will send the pain

signal to the brain when the disc comes out and sits up on the main nerve and compresses it.

Q. Doctor, while you're having that demonstrative, you made mention of a radiofrequency ablation. Can you explain that procedure vis-à-vis the facet joints?

A. So these small nerves, as I said, send the pain signal. So the radiofrequency ablation addresses just these nerves, not the main ones. And we actually burn those nerves, or the nerves are burnt by somebody who has the requisite qualifications to do it. And the reason we do that is that it's going to knock out the pain perception in the brain. Those nerves send the signals to the brain. The reason we can do that to those small ones is that they will regenerate or come back. It takes about six to eight months to a year. You cannot do that to the main nerves, as I said. But that's the reason for a radiofrequency ablation procedure.

Q. Thank you, Doctor. Thank you for those explanations.

Based on your examination of Mr. Lucas,

did you find that that was a normal exam?
A. It was not a normal exam.
Q. All right. So, were you given the opportunity to review medical records pertaining to Mr. Lucas' treatment?
A. Yes.
Q. What did you have a chance to examine?
A. I did have the Einstein Healthcare Network, emergency facility records from November 11th, 2021. There was an EMS Philadelphia Fire Department trip tics, as they call it. That's the narrative that occurs when they come on to the scene. I had records from Philly Spine Center, that was November 18th, 2021 through March 10th, 2022.
There are also chiropractic treatment records from Spring Chiropractic March 22nd, 2022 through May 2nd, 2022. I had the diagnostic imaging studies, both hard copy films, and the radiologist reports for MRI of the neck known as the cervical spine, MRI of the low back, known as the lumbar spine, and they were both from December 23rd, 2021.
The treatment records from Premier Pain

and Rehab Center were the ones that pertained to radiofrequency ablation procedures and evaluations by Dr. Burt. This one was June 15th, 2022. I also, in my supplemental, had records from Premier Pain and Rehab Center, also Dr. Burt, and that was October 27th, 2022, March 29th, 2023, and February 21st, 2024.

Q. Doctor, let's talk about the chiropractic records before we talk about the findings on the MRI and the radiofrequency ablation, Premier Pain and Rehabilitation records. What were significant findings of the chiropractors, the two sets of chiropractors that treated Mr. Lucas?

A. So the first set at Philly Spine Center was for Mr. Lucas' complaints in the neck, mid back and low back. He had left shoulder and right knee pain as well for which he was undergoing treatment there. His pain levels initially were for the neck, nine out of ten, mid back, eight out of ten, low back, nine out of ten, left shoulder, eight out of ten, and right knee, seven out of ten. At the end of his treatment, neck, thoracic spine, mid back

and low back, as well as the left shoulder were rated at five out of ten. The right knee was four to six out of ten. And the treatment that he received was chiropractor treatments, including adjustments and what we call physiotherapeutic modalities, that's physical therapy, using traction, hydrotherapy, trigger point massage, and that's the treatment that he received at that facility.

At Spring Chiropractic, he also was treated for a headache, neck pain and stiffness, upper back and mid back pain, low back pain and stiffness, left shoulder pain. Here, he was documented as having pins and needles in the upper and lower extremities, difficulty sleeping and depression. The pain was rated eight out of ten. The treatments again were chiropractic manipulative therapy, therapeutic exercises, mechanical traction, hydrotherapy, EMS which stands for electromyostimulation, and he was given a home exercise program.

Q. Thank you, Doctor.

MR. COGNETTI: And can I just

-- can we go off camera for a second?
THE VIDEOTAPE TECHNICIAN: We are going off the video record. The time is 3:58 p.m.
MR. COGNETTI: I'm going to make a motion to strike the last answer by the doctor, under the case as Celotex vs. Primavera. The doctor can't simply be a mouthpiece and regurgitate what is in other records. He can use those records to form his own opinions but he simply can't read into the record what was said. That's my --
MR. DUMACK: The City joins.
MR. BAER: The response that it's a foundational -- it's a foundational question, and we'll be following up with a question to establish the doctor's established a foundation and his opinions are going to be based on -- in part, on that foundation.
MR. COGNETTI: Same objection.

Thank you.
MR. BAER: Fine.
THE VIDEOTAPE TECHNICIAN: All right. Stand by, please.
Okay. We are going back on the video record. 3:58 p.m.
BY MR. BAER:
Q. Doctor, I asked you on voir dire as to your qualifications as to whether or not it is in your practice and custom to review and rely upon the findings of other doctors in helping to form your own opinions; did the records from the Spring Chiropractic outfit and Philly Spine Center provide you with helpful information in helping you to form your opinions as to Mr. Lucas' condition?
A. Yes. Certainly.
Q. All right. Now, Doctor, I'd like to move on about other things that you reviewed, and that would be the MRI findings. And you had an opportunity to review the MRI reports and the studies themselves; is that correct?
A. Correct. Yes.
Q. And Doctor, is it true that in your

practice, it is in your routine and custom to review MRIs, studies and films as part of what you do?
A. Yes, it is.
Q. What were the findings on the MRIs of both Mr. Lucas' cervical spine, his neck, and his lumbar spine, his back?
A. So for the cervical spine, the level of the C3-4 had a protrusion/extrusion, eccentric left disc out of its containment, occupying the outer aspect of the foramen. There was no root compression, no central stenosis. It wasn't occupying the right foramen. At C4-5, also a disc protrusion, eccentric left, encroaching the left neural foramen. There was no central canal stenosis, no occupation of the right foramen. C5-6 showed a disc bulge and protrusion/extrusion-type, eccentric left, occupying the outer aspect of the foramen. And there was C5 root advice as to whether there was impingement. There were no other findings of disc or facetogenic changes on this study.
For the low back and lumbar spine, L2-3 had a protrusion, left greater than right, 3

millimeter left, 2 millimeter right. Bilateral intraforaminal occupation, no root compression, no central canal stenosis. At L4-5, there was an extrusion-type protrusion at 2.5 millimeters. There was L4 and L5 root impingement, both right and left. L5-S1 showed a normal bulge like I showed on the model; that's designed to absorb the forces. These -- this level did not show a disc out of its containment. And that is the two studies that I had the opportunity to review.

Q. Now, Doctor, moving forward to the radiofrequency ablations, I think in listing the dates of the visits, is it not the case that Mr. Lucas underwent three radiofrequency ablations over the course of four visits?

A. Right. One of the visits was a consultation. There was a decision not to do it, and the other three times, he had actually had radiofrequency ablations, you're correct.

Q. Doctor, can you please explain whether or not radiofrequency ablation is a palliative-type of treatment, whether it's permanent, whether it's something else entirely?

A. I would term it palliative, and that means that we're going to address the symptom, as I said, that come from the main nerves being compressed by the disc. They kick in the small nerves that start to send pain signals to the brain. And when you ablate those nerves or burn them, you're not doing something that's permanent and that's going to alter the condition that's underlying, which are the discs that are out. So it's a temporary measure to try and effectively help the person function better, and we saw this in Mr. Lucas' case, had he said to me that the procedures allowed for him to increase his activity level.

Q. Thank you, Doctor. Doctor, with respect to the treatment that Mr. Lucas has received to date, did you form an opinion as to whether or not that treatment was reasonable and necessary?

A. I did, yes.

Q. And what was your opinion?

A. I would characterize it, and I did characterize it as being medically necessary and reasonable, and it was related to the incident that he described.

Q. And Doctor, I think we've already talked about this, but after taking Mr. Lucas' history, examining him, reviewing the medical records and the studies, did you form an opinion as to whether or not Mr. Lucas suffered injuries in the November 11, 2021 motor vehicle crash?
A. Yes, I did.
Q. What are your opinions?
A. Mr. Lucas had soft tissue injuries to the cervical spine, and the terms for that are cervical strain and sprain, cervical myositis, somatic and segmental dysfunction of the cervical spine, and enthesopathy of the cervical spine. Same is true for the lumbar spine as far as the soft tissue injuries, it's the same terminology. In regard to the discs, he had a C3-4 bilateral disc protrusion/extrusion-type, left greater than right. L4-5 left, protrusion/extrusion-type. C5-6 disc bulge extrusion herniation eccentric left.
In regard to the facets, and they're injured as well, the terms are cervical dorsopathy, that means toward the back, and

that's where I showed those facets; and cervical facet syndrome, that's the actual precipitation of the small nerve acting to send that pain signal.

So putting the disc injuries together with the facet injuries, he had cervical discopathic and facetogenic pain secondary to the incident that was related as occurring in November of 2021. For the lumbar, spine in regard to the discs, L2-3 was an interforaminal disc protrusion/extrusion-type 3 millimeter left, 2 millimeter right. L3-4, 2.5 millimeter disc protrusion, central diameter reduction and narrowing of both neural foramen with the left being greater than the right. L4-5 disc protrusion/extrusion with impingement of the right and left L4 and right and left L5 nerve roots. And here, again, there was a lumbar dorsopathy and lumbar facet syndrome, that's the facet injuries. And then putting the discs together with the facet injuries, lumbar discopathic and facetogenic pain because of the incident of November 11th, 2021. Mr. Lucas had the radiating symptoms that we talked about,

and those are called radiculopathy. Radiculitis is an inflammatory term, also indicating that when that disc is sitting up on nerves, the main ones, it also causes what he described as the numbness and tingling in the upper and lower extremities. So we have terms for that. Cervical radiculitis, radiculopathy, and that's involving C5 and C6. Lumbar radiculitis and radiculopathy, left greater than right involving the levels of L3-4, L4-5 and L5-S1. And lastly, Mr. Lucas had chronic pain because of these injuries, and he also had an alteration or a decrease in his activity levels because of these injuries that I just outlined.

Q. Thank you, Doctor. Now, did you also form a prognosis to Mr. Lucas?

A. I did, yes.

Q. And what does that mean?

A. Prognosis is a term that's going to talk about the fact that we don't expect a recovery. We're going to talk about future care, just as we would with a patient as to what's available to try and facilitate a better

functional result for that individual, and I did the same for Mr. Lucas, who is not a patient of mine, but the process is still the same. So he had a guarded prognosis, and I reserve that specifically for talking about future care.

Q. Now, based on your diagnosis, your prognosis, obviously the examination and review of records, do you have an opinion as to whether or not Mr. Lucas will require future treatment as a result of the injuries that he suffered from the crash that we're here for today?

A. Yes.

Q. And what is your opinion?

A. Mr. Lucas requires future care for the injuries that I've outlined.

Q. Now, can you please tell us what that future care will entail?

A. So, I talk about --

MR. COGNETTI: Objection. Can we just go off again?

THE VIDEOTAPE TECHNICIAN: We are going off the video record. 4:08 p.m.

MR. COGNETTI: I'm just going to place an objection on the record that any opinions are speculative based upon the diagnosis thus far that the doctor has given.

MR. DUMACK: City joins.

MR. BAER: That's quite all right. And we will address it -- we'll simply respectfully dispute that and it will be meted out both in the examination of the doctor and in motion practice if necessary.

We can go back on.

THE VIDEOTAPE TECHNICIAN: Okay. Stand by, please.

Okay. We are going back on the record. 4:09 p.m.

BY MR. BAER:

Q. Doctor, again, what future treatment does Mr. Lucas require as a result of the injuries that he suffered in this crash?

A. So, part of the treatment is looking at studies that will be required. And those are the MRIs. Those are done every other year, if

you're just doing treatment. If you're contemplating surgery, you have to make sure that it's within six months of the surgical procedure, and that's at five years minimum. I also talked about repeat visits to the chiropractor. That's six to twelve times a year, same type of modalities that Mr. Lucas received at the two facilities. Annual visits to treating physician for referrals and monitoring purposes, that could be someone who has my credentials, physiatrist, and the chiropractor can also serve that purpose.

So getting into the type of treatments, I talked about interventional procedures. This is actually the radiofrequency ablations targeting C3-4, 4-5 and 5-6; L3-4, L4-5 and L5-S1. The procedures are designed to locate those small nerves that are sending that pain signal. And because Mr. Lucas has multiple levels, these can be done at various times. But once you do a procedure on a nerve, you have to wait at least 12 to 18 months, because the nerve, as I said, it's going to regenerate and you don't want to catch it in the process

of degenerating or you may shut it off forever.

So the targeting and the radiofrequency ablations are for five years at minimum. I then talked about surgery. Surgery involves taking the bone away in both the cervical and lumbar spine. It can be a back approach to get to the disc. In the cervical spine, it could also be a frontal approach and get to the back from the front. But when you remove these facets, which are called facetectomies, as far as procedures, you destabilize the spine. So you have to also fuse the spine and put some hardware in to make sure that you don't cause injury to the spinal cord or the spinal nerves that come off the spinal cord in the lumbar spine, it's below L1-2.

So the procedure also involves taking the discs out, that in and of itself doesn't cause instability but that bone that you take away at the facet level does. So the procedure can be done in any time frame, it doesn't have to be, one, the conservative care, two, the interventionals, three, the surgery. You can do it at any time. He's already gone through

it so he may opt for that once he hears the risk/benefits and complications. But it is required for these types of injuries. All of the future care I'm talking about is required for these types of injuries as we've outlined them.

Q. Doctor, what is the basis of your opinion as to the required future care?

A. So inherently, as I said, the natural history that we know as clinicians, what's going to happen when you have a disc herniation, protrusion/extrusion-type particularly, we listen to the history, which we elicited from Mr. Lucas. We look at what exactly he had already as far as treatment and whether it was as effective. We know it was, particularly in the interventionals that he had. So all that factored in. And looking at the MRIs will lead to the ability to talk about required care as I just did. So it's not from the air, it's not from elsewhere. It's specifically designed to, in fact, treat these particular types of injuries effectively.

Q. And sir, have you given all of your


Uber_00137568

opinions today to within a reasonable degree of medical certainty?

A. I have, yes.

MR. BAER: Thank you. No more --

THE WITNESS: You're welcome.

MR. BAER: No questions on direct exam.

MR. COGNETTI: Thank you, Mr. Baer.

\- - -

CROSS-EXAMINATION

\- - -

BY MR. COGNETTI:

Q. Doctor, just a few questions. With respect to Mr. Lucas, do you recall what he looks like?

A. I don't.

Q. Do you know what he did for a living?

A. I believe we asked that question, I can find it. At the time of the injury, he worked at Henkels & McCoy in construction, he did stop because of his pain. When I saw him, he was working at Betty the Caterer, and he was doing

catering and delivery.
Q. Did he also tell you that he took a job delivering furniture?
A. He did not.
Q. Did he tell you that at times that he puts Lidocaine patches on his lower back only?
A. We didn't talk about that.
Q. Okay. You reviewed records in preparation for giving testimony to the jury. Are you aware of that the EMS records -- or will you agree with me that they don't mention anything about his neck, his shoulder and his legs. They just mention the low back?
A. Well, in -- oh, okay. In the emergency facility records, yes, but --
Q. I'm talking --
A. -- immediately --
Q. -- about the EMS?
A. I agree with you, yes.
Q. Okay. Thank you. And are you aware that when he went to the hospital, and we can agree he went to Einstein. Will you agree with me that when they discharged him, they told him to follow-up with his PCP, his family doctor

records, and they told him to take Tylenol and rest?
A. Agreed, yes.
Q. And are you also aware that while at the hospital, they took a CAT scan of his lumbar spine and that showed no acute fracture or traumatic misalignment?
A. Agreed.
Q. And then so you're also aware that about seven days after the accident, he goes to Philadelphia Spine to start his rehab, agreed?
A. Yes.
Q. And do you know who sent him there?
A. I don't.
Q. Okay. Now, fast forward about a month or so later, he has an MRI -- he has an MRI of his lumbar spine, and that showed mild stenosis. Now, mild stenosis is not accident-related, agreed?
A. Agreed, yes.
Q. Okay. By the way, do you know who Dr. Shaer is?
A. I sure do, yes.
Q. Okay. And Dr. Shaer is a board-

certified radiologist, agreed?
A. Correct.
Q. You are not a board-certified radiologist, agreed?
A. Agreed.
Q. Okay. Now, let's fast forward a little bit. Will you agree with me that when he first -- when Mr. Lucas first went to see Dr. Burt on June 15th, 2022, there's no mention of neck pain. He was just complaining of low back pain?
A. Yes.
Q. Okay. And by the way, do you know how Mr. Lucas got to Dr. Burt? Do you know, in other words, who referred him there?
A. No. It's not important to me. As long as he got there, I'm okay with that. I don't know any referral patterns.
Q. Okay. And your office is not affiliated with Dr. Burt's office or Premier Pain?
A. Not at all.
Q. Okay. Are you aware, because you did meet with Mr. Lucas and took a history, that Mr. Lucas went to Einstein Hospital after you examined him. And when he went to the hospital,

after you examined him, I think he went to the hospital in September of 2022 and you examined him August of 2022, he didn't have one complaint of low back pain while at the hospital. Are you aware of that fact?
A. I'm not aware of that and I haven't seen any records that would address that.
Q. Okay. Similarly, are you aware that when he saw his family doctor, Dr. Soffer on April 25th, 2023, again, after you saw him, he didn't complain to his family doctor of any back pain. Are you aware of that fact?
A. I was not aware of that.
Q. Now, I met Mr. Lucas and I probably spent a little bit more time with him than you did. How long was your exam?
A. That was an interesting statement because I don't know how much time I spent. The average time is usually about 45 minutes.
Q. Okay. So you don't know how much time you spent, but the average time is 45 minutes. It could be less or more than time with the jury, right?
A. It could be. In the history like this

and exam, I would think it's about there, yes.
Q. Okay. So, Mr. Lucas told me that his lawyer's office told him to go treat with Premier Pain. Are you aware of that fact?
A. No, I'm not.
MR. BAER: Can we go off the record, please?
THE VIDEOTAPE TECHNICIAN: Sure. We are going off the record. 4:18 p.m.
MR. BAER: Going to make an objection as to relevance and also a 403 objection. The testimony speaks for itself. The doctor has already indicated that he did not know, not that it doesn't matter, and therefore, to ask the question about the lawyers referring it, although not denied, is not relevant in this doctor's examination. So I'm going to just say that the intent is really more to inflame the jury as opposed to inform it.
MR. COGNETTI: Is that the

objection?
MR. BAER: That's the objection. Yeah, it's irrelevance and a 403 objection, which is prejudicial over -- if it is relevant, that would be more prejudicial than probative.
THE VIDEOTAPE TECHNICIAN: Okay. Are you still thinking or do you want me to go back?
MR. COGNETTI: No. I think I want to respond to that, on the record, I'll have an opportunity to later on. But if I understand the doctor's testimony, neither of the two physical therapy facilities recommended that he treat with Dr. Burt. He -- the doctor's record did not recommend that Mr. Lucas treat with Dr. Burt, and those would have been the only three -- or his family doctor. Those would have been the only four entities or facilities that would have recommended him to treat with Dr. Burt. So it is relevant, in my opinion, that the

recommendation to see Dr. Burt was through your office. So...

MR. BAER: And I would submit, frankly, that this may be a subjective examination by the defense's doctors, and certainly, the admission by Mr. -- Mr. Lucas, it is what it is. However, the question's already been asked and the foundation to the question is to how Mr. Lucas became a patient of Premier Pain and Rehabilitation, which I might add, he has now been treated with for four times and had undergone three procedures to address the pain conditions that he has.

MR. COGNETTI: Well, I --

MR. BAER: But -- but the important thing here is that this doctor has testified on cross-examination that is doesn't matter to him that he didn't know and, thus, to ask the question is essentially to try to place into evidence, facts that are not in evidence. And then also with

the foundation about the two chiropractors and the PCP not referring the doctor -- not referring the client to Premier Pain and Rehab, well, that was never brought out on cross-examination to Dr. Yarus here. And so, again, it's without foundation. So --

MR. COGNETTI: Well, okay.

MR. BAER: Yeah.

MR. COGNETTI: All right. And I'll respond and then we'll move on.

MR. BAER: Yes.

MR. COGNETTI: Mr. Lucas, at his deposition, told me that it was your office who told him to go see Premier, and/or Dr. Burt. I simply asked this doctor, did he know that. And if his answer is no, I don't care who sent him, that's his answer then. Okay?

MR. BAER: We appreciate your response and we will move on.

MR. COGNETTI: Thank you.

BY MR. COGNETTI:
Q. Doctor, are you --
MR. COGNETTI: I'm sorry.
THE VIDEOTAPE TECHNICIAN: Stand by, please.
Okay. We are going back on the record. The time is 4:22 p.m.
BY MR. COGNETTI:
Q. Doctor, when I met Mr. Lucas for more than 45 minutes, he told me that the ablation procedures that he had lasted about, quote, 10 minutes if that, would I be right?
A. Counsel, I wasn't there, so in the hands of somebody who has the expertise, that may be true. I don't know, it takes about 35 minutes when I'm doing them, setup time accounts. But I don't know what Mr. Lucas' focus was or --
Q. Right.
A. -- how he was calculating the time he was there. So with all due respect, again, not important to me.
Q. You haven't done these procedures in ten years, though, right?

A. No, I did them right before COVID.
Q. Okay. I thought you said you haven't done surgery since --
A. Surgery.
Q. -- 2012?
A. No. The interventionals I did all the way up till COVID.
Q. Okay. So the jury understands, these ablations that we're talking about, they are not surgery then, in your mind's eye, they're interventionals, true?
A. They're surgical procedures.
Q. Okay. Well, if Mr. Lucas said that they lasted 10 minutes, if that, and they were fast and they were pretty simple, would you agree if that's how he characterizes them?
A. I have no basis on which to disagree. That's his opinion. And he was there, I was not.
Q. By the way, I asked him at his deposition, Doctor, if he ever met you, Dr. Yarus, and he said, "I'm not good with names. I'm not sure I've ever met him." So I'm clear, you did meet him --

A. I absolutely --
Q. -- will you agree to that?
A. Oh, absolutely. I didn't write this report and --
Q. No, I --
A. -- put false --
Q. I know.
A. -- information in it --
Q. No.
A. -- sure.
Q. Okay. He just didn't remember meeting you, that's my point.
A. I couldn't recall him either. I know I met him because I have a report here. But as far as what he looks like, I couldn't recall.
Q. Now, in all of the records that we've reviewed and the -- the three ablations that were done, no EMG was done on Mr. Lucas, agreed?
A. Agreed, yes.
Q. And an EMG does show nerve radiculopathy, or can. It's a pretty good test for nerve radiculopathy, is it not?
A. No. It has a 30 percent false positive ratio to it. But, yeah, it's pretty accurate.

I wouldn't --
Q. Thank you.
A. -- disagree with you, sure.
Q. Thank you. And similarly, anti-inflammatories -- if someone has some back pain, anti-inflammatories may help someone who has back pain, right?
A. Agreed, yes.
Q. Okay. When I met Mr. Lucas back in January of this year, he told me under oath that he is never getting surgery. Did he ever tell you that?
A. No, he did not.
Q. In fact, he told me, quote, I don't want no surgery, end quote. Did he ever tell you that?
A. No, he did not.
Q. Now, with the actual treatment that Mr. Lucas underwent, by now the jury understands, he had about four months of physical therapy at Phys -- at Philly Spine, right?
A. Yes.
Q. Two months of chiropractic treatment at

Spring Chiropractor, true?
A. Yes.
Q. And then he had four visits at Premier, three of them resulting in the interventional diagnosis that you said, or I should say, the ablations, true?
A. Correct.
Q. And they were all the lumbar area. There was no cervical --
A. Yes --
Q. -- true?
A. -- you're correct.
Q. So in your report of August 15th, and it may just be a typo, down at the bottom of page 6, where you talked about radiofrequency ablations at C3-4, that's a typo probably?
A. No --
Q. Or am I --
A. -- it's not --
Q. -- misreading it? No?
A. No. No, no. Not at all. They're targets for --
Q. Okay.
A. -- intervention. They just weren't

done yet.
Q. Okay. So they were targets not done yet. But the ablations were to the lumbar spine. You agree to that?
A. The ones that he had by Dr. Burt, yes, I agree.
Q. Okay. And you'll agree with me that you were hired to do an examination by Mr. Simon's office, by Mr. Baer's office, I should say, and that you came to your conclusions after doing such an exam. So it's fair to say that after reviewing records and examining Mr. Lucas, you came to some conclusions. So similarly, when someone like myself has to defend SEPTA, and we had to hire a doctor, Dr. Spellman, he similarly could come to conclusions as well, right?
A. Sure.
Q. Okay. And have you ever heard of Dr. Spellman?
A. I don't know him personally, but I've certainly read his work and I've seen his reports in the past. But I don't know him personally.
Q. Okay. Thank you. Now, as it relates to

prognosis, and as you were explaining to Mr. Baer, there's some -- based on your prior testimony and some transcripts, there's different gradations of prognoses, as you have said, and they could range from excellent, good, fair, guarded, questionable, variable and poor. Agreed?
A. Agreed, yes.
Q. Okay. And so your prognosis for Mr. Lucas was guarded, right?
A. Yes.
Q. So it wasn't questionable, variable or poor, but will you agree with me, and based upon testimony, that if you yield or give someone the designation of a poor prognosis, that generally yields the recommendation for future treatment, correct?
A. No. Incorrect.
Q. Poor? So if someone has a poor prognosis, you don't recommend future treatment?
A. No, not at all. That doesn't have any relevance to what the prognosis definition is. When you say "poor," the outcome may not be as good as someone who has a guarded prognosis

because you already know from the interventionals that were done on the lumbar spine that he responds. If it's poor, you may not get the kind of response you expect, but that doesn't negate the fact that you still have a requirement for that type of treatment to be given for specifically these types of injuries.

Q. So if this was your spine we were talking about, Doctor, would you want another doctor to give you a poor prognosis or a guarded prognosis?

A. I would rather have the guarded prognosis, gives a little more hope. But still, we don't expect a recovery. You're just maybe not going to get the response you expect. You still go ahead and do the interventionals irrespective of that.

Q. Fair enough. And will you agree with me that as it relates to ablations, based on how you have testified in the past, that you generally don't go to the whirlwind too many times. One or two ablations is reasonable and then you move on to other things, true?

A. I think, Counsel, I say you don't go to the well one too many times because I think there's a diminishing return each time you burn a nerve irrespective of whether it comes back or not. So I think one or two times, at a particular level, is enough before you get to the next step, which would be surgery.
Q. Okay. Or you've testified, maybe even epidurals?
A. You can bounce around, you could go with any type of treatment you want, up to and including the surgery. So it doesn't have to be in succession.
Q. Now, you were retained by Mr. Baer and Simon & Simon for the sole purpose of examining Mr. Lucas and rendering opinions in this litigation, correct?
A. I agree, yes.
Q. You were not hired to treat Mr. Lucas?
A. I'm not a treating physician. That's correct.
Q. And you did not treat Mr. Lucas?
A. I did not and I will not.
Q. And you weren't hired to prescribe any

medicine, true?
A. Correct.
Q. And you did not prescribe him any medicine, true?
A. Also correct.
Q. And you're not hired to order diagnostic exams, x-rays, MRIs, true?
A. Correct.
Q. And you did not in this particular case, right?
A. I did not, that's correct.
Q. And you were not hired to talk to any of the doctors who treated Mr. Lucas, correct?
A. Also correct, yes.
Q. Okay. So you didn't call any of the people or doctors or facilities that treated him, agreed?
A. You're correct, yes.
Q. And your sole role to come here today was to testify about your observations, agreed?
A. I'll agree to that, sure.
Q. Okay. And you were paid by Simon & Simon in this particular case, agreed?
A. I was paid for my time, yes.

Q. Yeah, okay. And you've been hired as the litigation witness by Simon & Simon before this case, agreed?
A. Yes.
Q. And you've been paid in those cases by Simon & Simon, historically, right? I hope so, right?
A. Yes, I was.
Q. Okay. And you've been hired by -- as a litigation witness, by Simon & Simon to work on this case as well, true?
A. Yes.
Q. And Doctor, can we agree that you see Simon & Simon plaintiffs for injuries to all parts of their bodies?
A. That is true, yes.
Q. So that would be from the ankle, the Achilles, all the way up to the neck and the head, true?
A. You're correct, yes.
Q. And all kinds, all different kinds of orthopedic injuries for Simon & Simon plaintiffs, true, orthopedic injuries, agreed?
A. Yes. That's correct.

Q. In varying severity, right?
A. Yes.
Q. And you've been hired by Simon & Simon many times over the years as a paid witness in lawsuits just like this one? Yes?

MR. BAER: We can go off -- we can go off the record, please.

THE VIDEOTAPE TECHNICIAN: We are going off the video record. 4:32 p.m.

MR. BAER: Going have to object to the characterization and qualification of Dr. Yarus as a, quote/unquote, paid witness. It's misleading and it's not an accurate reflexion of what the doctor is. So we're going to have to make that objection.

MR. COGNETTI: Okay. Did you -- okay. Back on?

THE VIDEOTAPE TECHNICIAN: Okay. Stand by.

Back on record. 4:33 p.m.

BY MR. COGNETTI:

Q. Doctor, did you answer the last question?
A. I don't think I did, if you'd be kind enough --
Q. Yeah, sure.
A. -- to ask it again.
Q. Have you been hired by Simon & Simon many times over the years as a paid witness in lawsuits like this?
A. Well, I'm hired as an expert in the field of orthopedics and pain management. Whether or not I become a witness is up to the process. I don't determine that.
Q. Okay. And it's fair to say you've testified hundreds of times just like you are here today, right?
A. I have, yes.
Q. And if you haven't figured this out, I'm looking at an old transcript of yours, and for example, in 2017 alone -- and I realize that it's a while ago -- you performed 479 litigation examinations of Simon & Simon clients, correct?
A. They were narratives that I did, yes.
Q. And for those exams, you charged $500,

true?
A. Before 2022, that is a correct fee.
Q. And your fee's a little bit more now, agreed?
A. It's $750, yes.
Q. Okay. And in 2017, for the 479 litigation exams, you charged $239,500 all together, true?
A. If that's the math, I'll certainly agree with it.
Q. And for some of those exams, at least, it went beyond examination and you had to give video trial deposition much like you are today, agreed?
A. Correct.
Q. And in 2017, you gave 195 videotape depositions in that year alone, agreed?
A. That is correct, yes.
Q. And back then, you were charging $3200 for a videotape deposition, agreed?
A. Yes.
Q. Today, it's a little bit more. What was the -- it was 4200 -- what was -- 4200?
A. Yes.

Q. Okay. So back in 2017, if I did my math correctly, you charged $624,000 for videotape depositions just for Simon & Simon deposition, agreed?
A. I agree.
Q. And when you add in the cost of the reports in those -- in that year, that was $850,000 total for 2017 alone?
A. That's a correct figure, yes.
Q. And then in 2018, it was a similar fee, agreed?
A. Those two years were, yes.
Q. Now, during COVID, did you testify more or less --
A. Much less.
Q. -- in litigation?
A. Much less.
Q. And is it picking up more now again?
A. It's back to where it was, I believe.
Q. And previously, you were asked in another deposition about the 400 or so videotape depositions you took or gave in 2017 and 2018 for Simon & Simon, and you were asked whether they sustained an injury in the course of the

accident or incident, and in every one of those 400 videotape depositions, you testified that they did, correct?

A. Yeah. They met the criteria for a serious and permanent injury, that is true.

Q. But my point is that, in every one of those videotape depositions, you said that, agreed?

A. Absolutely. Sure.

Q. And then in every one of those videotape depositions, you testified that the patient sustained an injury as a result of the conduct of the defendant, correct?

A. I agree, yes.

Q. And in every one of those videotape depositions, 400 plus, you've testified that the patient needed future care, correct?

A. I did, yes.

Q. And you testified here today that Mr. Lucas sustained an injury in this accident, correct?

A. He had multiple areas of injury, yes.

Q. Okay. And but you're not today, though, saying that it was caused by the defendant

herein, are you? You're just saying that it was caused by the accident, agreed?
A. The bus that struck his vehicle is the reason the injuries occurred. As to who owns the bus or who the defendants are is really of no relevance to me.
Q. Now, as it relates to this office where we are today, I'm going to represent to you it's my first time in this office, it's called Regus?
A. It's a Regus facility, yes.
Q. And what is that?
A. It's a company who owns the entire area, the suites, there's about 80 of them here, and you lease whatever space that you acquire. For instance, we're in a conference room today that's being leased not by me but by Simon & Simon for this deposition. So you're able to have office space, and it's a monthly leasing fee that's paid.
Q. So you examined Mr. Lucas in this facility?
A. On this same floor, yes.
Q. On the same floor, and it's leased by Simon & Simon?

A. No, it's --
Q. No?
A. -- leased by me.
Q. Leased by you? Okay.
And do Simon & Simon lawyers have access to this building? Do they have passes or do they have to check in like I did when I got into the lobby?
A. They have their own suites where the attorneys may come. This isn't their main office. But I have seen some attorneys that I've deposed with, so I'm aware that they use this facility as well.
MR. COGNETTI: Thank you, Doctor. No further questions.
THE WITNESS: You're welcome. Thanks.
MR. BAER: Doctor, just a couple of quick questions on re -- oh, sorry about that.
As I'm about dive into redirect examination -- Counsel for the City, do you have any questions for Dr. Yarus?

MR. DUMACK: No questions for the City. Thank you.

MR. BAER: Thank you, sir.

- - -

REDIRECT EXAMINATION

- - -

BY MR. BAER:

Q. So Dr. Yarus, you have this arrangement with the Regus office space, how many years -- strike that.

Did you have office space here in the Philadelphia -- in the City of Philadelphia?

A. I had my own office down on Lombard Street, and then on Locust Street for about 16 years.

Q. All right, Doctor. And what happened to that space?

A. I moved up to Two Logan, where we're at today.

Q. All right. And you had offices in other towns as well, correct?

A. I did, yes.

Q. Where were your other offices?

A. I had offices in West Reading,

Allentown, Lebanon, Pennsylvania, which is where I started out, and in Pittsburgh.

Q. Now, Doctor, you were asked some questions about your admitting privileges and things of that nature, is it fair to say that you have gotten out of your active clinical, surgical practice, have sold off the several offices that you've had, and now have smaller space but still perform medicine; is that a better way of putting things?

MR. COGNETTI: Objection.

THE VIDEOTAPE TECHNICIAN: We are going off the video record. The time is 4:42 p.m.

MR. COGNETTI: That was during the qualification phase of his testimony, Josh. You had the opportunity to ask that question and we're beyond that now.

MR. BAER: Oh, I strongly disagree. There was questions on cross-examination regarding the office space, and this is --

MR. COGNETTI: Office space

was one thing. You're talking about admitting privileges.

MR. BAER: Well, I think it's just the context. But --

MR. COGNETTI: That's my objection.

You can answer.

MR. BAER: Fair enough. I'm going to say that the questions that we're posed of this doctor could be used to make certain suggestions and arguments at trial, and that this was a -- this door was opened up as it were on cross-examination of the witness, and to -- and having an opportunity to respond to it on redirect will help address that and it will be now in evidence that they can be used later at trial.

THE VIDEOTAPE TECHNICIAN: Okay. Stand by, please.

MR. DUMACK: City joins.

MR. BAER: Well, hold on for just a second.

MR. COGNETTI: What did Miles say?

MR. BAER: City joins? You join in my response, defending Dr. Yarus? Thank you.

MR. DUMACK: No, I didn't have a chance to say that when -- after the objection. So just, I join in SEPTA's objection. That's it. That's pretty much all I'm doing.

MR. BAER: You have some good tones on this one, I like it.

(Whereupon, a brief discussion was held off the stenographic record.)

MR. BAER: All right. We can go back on the record and we'll wrap this up pretty quickly.

THE VIDEOTAPE TECHNICIAN: Okay. Stand by, please.

Okay. We are going back on the video record. The time is 4:43 p.m.

BY MR. BAER:

Q. Doctor, you were asked a number of

questions on cross-examination regarding what Mr. Lucas has given sworn testimony to. You've been given -- asked certain questions about testifying in the past and your examinations in the past. I'm going to ask you a very simple question: When you do an examination -- strike that.

When you examined Frank Lucas and you made the determination that he needs surgery in the future, what is that based on?

A. So the totality of the information is what leads to what's required for these types of injuries, and that includes the history that Mr. Lucas gave, my knowledge of what types of injury he incurred in the incident, what treatment he already underwent and his response to that treatment, what the MRIs are showing, what's believed to be on the MRIs, and that may vary from physician to physician. But irrespective of that, what we know will be effective for Mr. Lucas and anyone else with these types of injuries to undergo in order to facilitate an improvement in their function. And I've said it a number of times, that's what

my job is, to help improve function, as an orthopedist and also as a pain specialist.

Q. So does Mr. Lucas need surgery in the future?

A. It's a requirement for these types of injuries, whether he goes for it or he says he's not interested isn't the point. The point is what these injuries will require for an improvement. If he hears the risk/ benefits of complications and all that goes with surgery or any other procedure, and he decides not to do it, it doesn't mean he doesn't need it, it's his choice. We're still in America, we get to choose, but he has to choose with the right information.

BY MR. BAER:

Q. And Doctor, have any of the questions that have been posed to you on cross-examination changed your opinions here today?

A. Not at all.

MR. BAER: Thank you, Doctor.

I don't have any additional questions.

THE WITNESS: You're welcome.

MR. COGNETTI: Doctor, just to

follow-up.

- - -

RECROSS-EXAMINATION

- - -

BY MR. COGNETTI:

Q. When you discussed surgery with Mr. Lucas, did you tell him about the risk/ benefits?

MR. BAER: Can we go off the record really quickly?

THE VIDEOTAPE TECHNICIAN: We are going off the record. The time is 4:46 p.m.

MR. BAER: Objection. Assumes facts not in evidence. I don't know if it's been established to whether or not Dr. Yarus discussed future treatment recommendations with the witness.

MR. COGNETTI: He just testified and said it's in his report, Josh. Okay.

MR. BAER: Well, no, no, no. Listen, you can correct me. You know, I don't know -- I mean, first of all --


Uber_00137602

hold on a second. I'm making an objection and we're on the record, can you point to where there was a discussion -- how about this? How about this? I made my objection that it assumes facts not in evidence, the doctor's going to answer the question, and I made -- and I'll waive my objection if there's something in the report that said that they discussed future -- that they discussed future treatment -- like, future surgery.

MR. COGNETTI: Okay.

MR. BAER: Okay. Fair?

MR. COGNETTI: Fair.

THE VIDEOTAPE TECHNICIAN: Okay. Stand by, please.

MR. COGNETTI: Let me ask it this way then... ready?

THE VIDEOTAPE TECHNICIAN: We are going back on the video record. 4:47.

BY MR. COGNETTI:

Q. Doctor, I'm going to rephrase my

question. Did you discuss future surgery with Mr. Lucas or did you just put that in your report for Mr. Simon's office?

A. Just in my report. I would not have read the records at that point in time when I saw him. So, I did not discuss any treatment or anything that would simulate a physician/ patient relationship. So no, I did not. It's only in my report as a requirement of his injuries.

MR. COGNETTI: Thank you very much. No further questions.

THE WITNESS: You're welcome. Thank you.

MR. BAER: No additional questions. Thank you.

THE WITNESS: Thanks.

THE VIDEOTAPE TECHNICIAN: Okay. This concludes today's deposition of Dr. Lance Yarus. We are going off the record. The time is 4:47 p.m.

THE COURT REPORTER: Miles, are you getting a copy of the

transcript? I can't hear you. I'll just e-mail you.

Mr. Cognetti, are you getting a copy of the transcript?

MR. COGNETTI: Please. Mini is fine.

MR. BAER: We're in the August pool, no rush. The usual order.

- - -

(Whereupon, the deposition testimony of LANCE O. YARUS, D.O. was concluded at 4:47 p.m.)

- - -

- - -

C E R T I F I C A T I O N

- - -

I, Stephanie Weldon, Court Reporter and Notary Public, do hereby certify that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me on Thursday, June 27, 2024, and that the foregoing testimony was taken in shorthand by myself and reduced to typing under my direction and control and that this is a correct transcript of the same.

---------------------
Stephanie Weldon
Notary Public
My Notary Expires
September 06, 2025

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

## $

**$200** 10:12
**$239,500** 68:7
**$3200** 68:19
**$400** 10:13
**$4200** 10:3
**$500** 10:11 67:24
**$624,000** 69:2
**$750** 68:5
**$850,000** 69:8

## 1

**1** 18:4,7
**10** 3:19 10:6 18:7 55:11 56:14
**100** 4:14
**10th** 10:11 30:15
**11** 3:5 18:18 38:6
**11th** 30:10 39:23
**12** 43:22
**15** 3:17 10:5 18:6 20:12 21:12
**15th** 10:10 31:4 49:9 59:13
**16** 73:14
**17** 3:7
**18** 3:17,18 43:22
**18th** 4:15 30:14
**19103** 4:16
**195** 68:16
**1986** 13:3

## 2

**2** 18:5,7 36:1 39:12
**2.5** 36:4 39:12
**2004** 13:16,22
**2011** 13:20
**2012** 13:21 14:18 56:5
**2013** 14:11,17
**2016** 15:20
**2017** 67:20 68:6,16 69:1,8,22
**2018** 69:10,22
**2021** 18:19 30:10,15,23 38:6 39:9,23
**2022** 3:17 10:5,10 18:6 20:12 21:12 30:15,18 31:4,6 49:9 50:2,3 68:2
**2023** 31:7 50:10
**2024** 3:19 4:12 6:4 10:6,11 18:7 31:7
**21st** 31:7
**22nd** 30:17
**23rd** 30:23
**25th** 50:10
**27th** 4:12 31:6
**29th** 31:7
**2nd** 30:18

## 3

**3** 35:24 39:11
**30** 57:23
**300** 4:15
**35** 55:15
**37** 6:21
**37th** 6:19
**3:29** 4:13
**3:49** 25:22
**3:50** 27:10
**3:58** 33:4 34:6

## 4

**4-5** 43:16
**400** 69:21 70:2,16
**403** 51:13 52:4
**4200** 68:23
**45** 50:19,21 55:10
**46** 3:8
**479** 67:21 68:6
**4:08** 41:23
**4:09** 42:17
**4:18** 51:10
**4:22** 55:7
**4:32** 66:10
**4:33** 66:23
**4:42** 74:14
**4:43** 76:21
**4:46** 79:13
**4:47** 80:22 81:22

## 5

**5** 3:5
**5-6** 43:16

## 6

**6** 3:16 59:15

## 7

**73** 3:7
**79** 3:8

## 8

**80** 71:13

## A

**AAPS** 13:8,12
**ability** 20:4 45:19
**ablate** 37:6
**ablation** 22:10 29:5,9,21 31:2,11 36:22 55:10
**ablations** 10:23 36:13,16,20 43:15 44:3 56:9 57:17 59:6,16 60:3 62:20, 23
**ABMS** 12:9
**absolutely** 57:1,3 70:9
**absorb** 28:1 36:8
**accepted** 26:13
**access** 72:5

**accident** 48:10 70:1,20 71:2
**accident-related** 48:18
**accounts** 55:17
**accurate** 57:24 66:15
**Achilles** 25:1 65:18
**aching** 21:17
**acquire** 71:15
**acting** 39:3
**active** 74:6
**activities** 22:4,12
**activity** 37:14 40:13
**actual** 19:9 28:23 39:2 58:18
**acute** 48:6
**add** 53:12 69:6
**additional** 11:8 78:22 81:15
**address** 37:2 42:8 50:7 53:14 75:17
**addresses** 29:9
**adjustments** 32:5
**admission** 53:6
**admit** 15:5
**admitting** 15:2 74:4 75:2
**Adson's** 23:8
**advice** 35:20
**affiliated** 49:18
**afternoon** 5:1,17,18,21 11:13
**agree** 47:11,19,22 49:7 56:15 57:2 60:4,6,7 61:13 62:19 63:18 64:21 65:13 68:10 69:5 70:14
**agreed** 4:1 48:3,8,11,19,20 49:1,4,5 57:18,19 58:8 61:7,8 64:17,20,23 65:3,23 68:4,14,17,20 69:4,11 70:8 71:2
**ahead** 62:17
**aid** 26:17
**air** 45:21
**Allentown** 74:1
**allowed** 15:16,19 37:14
**alter** 37:8
**alteration** 40:13
**AMA** 12:4,6
**Amber** 4:17 5:3 11:14
**America** 78:13
**American** 12:4,7,11,20 13:13
**amputations** 7:15
**analysis** 10:8 20:11
**anatomy** 28:5
**and/or** 54:17
**ankle** 65:17
**Annual** 43:8
**annular** 27:24
**anti-inflammatories** 58:5,6
**anymore** 15:17
**applies** 20:6
**approach** 44:6,8
**April** 50:10
**area** 24:16 59:8 71:13
**areas** 5:23 6:23 7:1,12 8:7 25:13 28:12 70:22
**arguments** 75:12
**arrangement** 73:8
**articles** 16:3,11,14,19
**aspect** 19:21 35:11,19
**Association** 12:4 13:13
**assumes** 79:14 80:6
**attached** 6:6 18:11
**attorneys** 72:10,11
**August** 3:17 10:5,10 18:5 20:12 21:12 50:3 59:13
**authored** 10:4
**average** 50:19,21
**awarded** 13:20
**aware** 11:18 47:10,20 48:4,9 49:21 50:5,6,8,12,13 51:4 72:12
**axial** 7:5

**B**

**back** 14:17 19:6 21:16 24:3 26:20 27:9,16,23 28:4,7 29:17 30:22 31:17, 21,24 32:1,12,13 34:5 35:7,23 38:24 42:13,16 44:6,8 47:6,13 49:10 50:4, 11 52:9 55:6 58:5,7,9 63:4 66:20,23 68:19 69:1,19 76:16,20 80:21
**backs** 8:18
**backward** 22:24
**Baer** 3:5,7 4:22,23 5:16 6:8 11:7 12:15 14:14 16:23 17:3,6,10 18:12 26:9,11,23 27:2,6,11 33:16 34:2,7 42:7,18 46:4,7,10 51:6,11 52:2 53:3, 17 54:10,13,22 61:2 63:14 66:6,11 72:18 73:3,7 74:20 75:3,8,23 76:3,11, 15,23 78:16,21 79:9,14,22 80:14 81:15
**Baer's** 60:9
**based** 9:9 11:24 16:1 29:24 33:22 41:7 42:3 61:2,13 62:20 77:10
**basis** 7:16 45:7 56:17
**behalf** 11:22
**believed** 77:18
**bending** 23:1
**beneath** 24:23
**benefits** 78:9 79:8
**Betty** 46:24
**biceps** 23:18
**bike** 22:6
**bilateral** 36:1 38:17
**bit** 49:7 50:15 68:3,22
**blew** 13:6
**board** 8:3,5 12:6,7,11,20
**board-** 7:22 48:24
**board-certified** 7:20 8:6,7 12:24 49:3
**bodies** 27:21 65:15
**body** 21:14
**bone** 27:18 44:5,19
**bones** 7:6,9 27:20
**books** 16:11,14,19
**bottom** 59:14
**bounce** 63:10
**Brachioradialis** 23:21

**brain** 29:1,14,15 37:6

**branch** 28:20

**brought** 12:15 54:5

**building** 72:6

**bulge** 35:17 36:7 38:20

**burn** 29:10 37:7 63:3

**burnt** 29:11

**Burt** 31:3,6 49:8,13 52:16,18,23 53:1 54:17 60:5

**Burt's** 49:19

**bus** 20:20 71:3,5

### C

**C3-4** 23:10,16 24:5 35:9 38:17 43:16 59:16

**C4-5** 23:11,16 24:5 35:13

**C5** 35:20 40:8

**C5-6** 23:11,16 24:5 35:17 38:20

**C6** 40:8

**calculating** 55:20

**call** 24:7 27:24 30:12 32:5 64:15

**called** 12:20 22:9 23:8,11 24:19 27:20 28:9,20 40:1 44:10 71:9

**camera** 25:19 33:1

**canal** 35:16 36:3

**care** 7:12 9:15 15:6,12,15 20:2,7 21:4 22:13 40:23 41:6,15,18 44:22 45:4,8, 20 54:19 70:17

**carry** 22:12

**Caryn** 4:10

**case** 6:10 10:14 18:2 19:24 26:19 33:7 36:14 37:13 64:9,23 65:3,11

**cases** 65:5

**CAT** 48:5

**catch** 23:12 43:24

**Caterer** 46:24

**catering** 47:1

**caused** 70:24 71:2

**Celotex** 33:8

**Center** 30:14 31:1,5,15 34:14

**central** 35:12,15 36:3 39:13

**certainty** 17:18 18:16 46:2

**certificate** 13:16,21,22

**certificates** 8:5,8

**certification** 4:3 12:6,10 13:7,11

**certified** 7:23 8:3 49:1

**cervical** 24:4 25:15 30:21 35:6,8 38:10,11,13,14,23 39:2,6 40:7 44:5,7 59:9

**chance** 30:7 76:7

**changed** 78:19

**characterization** 66:12

**characterize** 28:6 37:21,22

**characterizes** 56:16

**charged** 67:24 68:7 69:2

**charging** 68:19

**check** 72:7

**child** 22:14

**chiropractic** 30:16,17 31:9 32:10,18 34:13 58:24

**chiropractor** 32:4 43:6,12 59:1

**chiropractors** 31:13 54:2

**choice** 78:13

**choose** 78:14

**chronic** 40:11

**City** 5:5 26:10 33:15 42:6 72:23 73:2, 12 75:22 76:3

**cleaning** 22:8

**clear** 56:24

**client** 54:3

**clients** 11:22 67:22

**clinical** 9:19 74:6

**clinician** 16:4,20

**clinicians** 45:10

**Cognetti** 3:5,8 5:1,2 11:12,14 16:21 17:5 25:18,23 26:21 32:24 33:5,24 41:20 42:1 46:9,14 51:24 52:10 53:16 54:9,11,14,24 55:1,3,8 66:19,24 72:14 74:11,15,24 75:5 76:1 78:24 79:5,19 80:13,15,18,23 81:11

**color** 27:15,16

**column** 7:14 23:14 25:4 27:14,18 28:7

**Common** 10:15,17

**Commonwealth** 6:13,15

**company** 71:12

**compensated** 10:1,7

**complain** 50:11

**complaining** 49:10

**complaint** 50:3

**complaints** 21:15 31:16

**completed** 13:21

**complications** 45:2 78:10

**compressed** 37:4

**compresses** 29:2

**compression** 35:12 36:2

**concludes** 81:19

**conclusions** 60:10,13,16

**condition** 34:16 37:9

**conditions** 53:15

**conduct** 70:12

**conducted** 14:10

**conference** 71:15

**conservative** 44:22

**construction** 46:22

**consultation** 36:18

**containment** 35:10 36:10

**contemplating** 43:2

**context** 75:4

**continuously** 6:20

**copy** 6:2 26:16 30:19 81:24

**cord** 44:14,15

**cord-like** 23:4

**corkscrew** 28:13

**correct** 9:22,23 12:2,13 13:2,4,16 14:7,11,12,19,21,22 15:4,7 16:4,7,12 34:22,23 36:20 49:2 59:7,12 61:17 63:17,21 64:2,5,8,11,13,14,18 65:20, 24 67:22 68:2,15,18 69:9 70:3,13,17, 21 73:21 79:23

**correctly** 69:2
**cost** 69:6
**counsel** 4:2,20 55:13 63:1 72:22
**couple** 72:19
**court** 5:7 10:15 81:23
**Courts** 10:17
**COVID** 11:4 14:16 56:1,7 69:13
**crash** 21:1,5 38:6 41:12 42:21
**credentials** 43:11
**criteria** 8:4 70:4
**cross-** 53:19
**cross-examination** 3:8 46:12 54:6 74:22 75:14 77:1 78:18
**CT** 9:4
**cure** 26:15
**current** 21:15
**Curriculum** 3:16
**curvature** 24:7
**custom** 34:10 35:1
**customarily** 8:21
**CV** 6:3 12:14

**D**

**D.O.** 3:3 5:10 12:18 16:24
**date** 4:12 6:6 18:10 37:17
**dated** 6:4 10:5,6
**dates** 36:14
**day** 4:22
**days** 48:10
**deals** 7:5
**December** 30:23
**decides** 78:11
**decision** 36:18
**decisions** 19:23
**decrease** 22:22 40:13
**decreased** 24:1,14
**defend** 60:14
**defendant** 70:13,24
**defendants** 71:5
**defending** 76:4
**defense's** 53:5
**deficit** 24:5
**definition** 19:20 20:6 61:22
**degenerating** 44:1
**degree** 17:18 18:15 46:1
**delivering** 47:3
**delivery** 47:1
**demonstrate** 25:13
**demonstrative** 26:4,12 29:4
**denied** 51:18
**Department** 30:11
**deponent** 4:18
**deposed** 72:12
**deposition** 4:13 54:15 56:21 68:13,20 69:3,21 71:17 81:20
**depositions** 68:17 69:3,22 70:2,7,11,16
**depression** 24:18 32:16
**dermatomes** 25:10
**describing** 14:9
**DESCRIPTION** 3:15
**designate** 8:6
**designation** 61:15
**designed** 36:8 43:17 45:22
**destabilize** 44:11
**determination** 18:21 19:2 77:9
**determine** 21:22 67:13
**diagnosing** 9:13
**diagnosis** 41:7 42:4 59:5
**diagnostic** 8:23 30:19 64:6
**diameter** 39:13
**difficulty** 22:5,13 32:16
**diminishing** 63:3
**diplomate** 13:20,23
**dire** 3:4 5:14 34:8
**direct** 3:6 17:8 18:17 46:8
**direction** 28:3
**disagree** 56:17 58:3 74:21
**disc** 19:5,17 27:21,23 28:2,5 29:1 35:10,14,17,22 36:9 37:4 38:17,20 39:5,11,13,15 40:3 44:7 45:11
**discharged** 47:23
**discomfort** 21:14
**discopathic** 39:7,22
**discs** 7:6 37:10 38:16 39:10,20 44:18
**discuss** 81:1,6
**discussed** 22:5 79:6,17 80:10,11
**discussion** 76:13 80:4
**dispute** 42:9
**dive** 72:21
**doctor** 5:17 6:1 7:20 8:20 9:18 10:14,19 11:8,13 12:3,16 17:4,11 18:21 19:10 20:9,24 21:22 22:16 25:11 27:3,12 29:3,22 31:8 32:23 33:7,8 34:8,18,24 36:12,21 37:15 38:1 40:16 42:5,11,19 45:7 46:15 47:24 50:9,11 51:14 52:20 53:19 54:3,18 55:2,9 56:21 60:15 62:10,11 65:13 66:16 67:1 72:15,18 73:16 74:3 75:10 76:24 78:17,21,24 80:24
**doctor's** 26:3 33:20 51:19 52:13,17 80:7
**doctors** 12:19 15:11 34:11 53:5 64:13,16
**documented** 32:14
**door** 75:13
**dorsopathy** 38:24 39:19
**drew** 28:17
**due** 55:21
**duly** 5:11
**Dumack** 5:4 26:10 33:15 42:6 73:1 75:22 76:6
**dysfunction** 38:12

**E**

**earlier** 18:1
**easier** 22:11



Uber_00137610

**eccentric** 35:9,14,18 38:20
**effect** 22:4
**effective** 20:8 45:16 77:21
**effectively** 37:11 45:23
**Einstein** 21:8 30:8 47:22 49:23
**elective** 7:17
**electromyostimulation** 32:21
**elicited** 45:14
**emergency** 14:23 21:9 30:9 47:14
**emergent** 7:16,19 15:13
**emeritus** 13:20,23
**EMG** 57:18,20
**EMS** 21:8 30:10 32:20 47:10,18
**encompasses** 19:15
**encroaching** 35:14
**end** 14:18 31:23 58:15
**entail** 41:18
**enthesopathy** 38:13
**entire** 71:12
**entities** 52:21
**entity** 8:1
**epidurals** 63:9
**essentially** 20:14 26:17 53:22
**establish** 33:20
**established** 33:20 79:16
**et al** 4:18
**evaluations** 31:3
**evidence** 26:4 53:23,24 75:18 79:15 80:6
**exam** 22:21 30:1,2 46:8 50:16 51:1 60:11
**examination** 3:6 17:8 18:14 22:16, 20 29:24 41:8 42:11 51:20 53:5,20 60:8 68:12 72:22 73:5 77:6
**examinations** 8:11 9:10 67:22 77:4
**examine** 17:20 20:11 30:7
**examined** 5:11 49:24 50:1,2 71:20 77:8
**examining** 38:3 60:12 63:15
**exams** 64:7 67:24 68:7,11
**excellent** 61:5
**exercise** 32:22
**exercises** 22:6 32:19
**Exhibit-1** 6:2
**Exhibits** 18:7
**expect** 40:21 62:4,15,16
**expert** 6:10 9:21 10:2,16 17:1,21 67:10
**expertise** 55:14
**explain** 21:12 29:5 36:21
**explaining** 61:1
**explanations** 29:23
**extra** 14:5
**extremities** 7:8,9,14 21:21 32:15 40:6
**extremity** 21:18
**extrusion** 38:20
**extrusion-type** 36:4
**eye** 56:10

**F**

**facet** 23:12 24:19 28:11,20 29:6 39:2, 6,19,20,21 44:20
**facetectomies** 44:10
**facetogenic** 35:22 39:7,22
**facets** 28:9,21,23 38:22 39:1 44:10
**facilitate** 40:24 77:23
**facilities** 43:8 52:15,22 64:16
**facility** 21:9 30:9 32:9 47:15 71:10, 21 72:13
**fact** 11:18 19:6 40:21 45:22 50:5,12 51:4 58:14 62:5
**factored** 45:18
**facts** 53:23 79:15 80:6
**failed** 13:5
**fair** 11:7 12:17 14:1 60:11 61:6 62:19 67:14 74:5 75:8 80:14,15
**false** 57:6,23
**familiar** 12:3
**family** 47:24 50:9,11 52:20
**fast** 48:15 49:6 56:14
**February** 31:7
**fee** 10:3 68:2 69:10 71:19
**fee's** 68:3
**feel** 6:10 18:8
**fellowship** 14:2,3,4,8,9
**fibers** 27:24 28:1
**field** 17:1 67:11
**figure** 69:9
**figured** 67:18
**filing** 4:3
**films** 30:20 35:2
**find** 30:1 46:21
**findings** 17:24 22:20 23:15 31:10,12 34:11,20 35:5,21
**Fine** 34:2
**Fire** 30:11
**floor** 71:22,23
**flow** 25:24
**focus** 55:18
**follow-up** 47:24 79:1
**foramen** 35:11,13,15,17,19 39:14
**forces** 28:1 36:8
**forever** 44:1
**form** 4:5 10:9 18:14 33:11 34:12,15 37:17 38:4 40:17
**formation** 23:4
**fortune** 11:15
**forward** 22:24 36:12 48:15 49:6
**foundation** 33:21,23 53:9 54:1,7
**foundational** 33:17,18
**fracture** 48:6
**fractures** 7:13
**frame** 44:21
**Frank** 4:17,24 17:14 77:8
**frankly** 53:4



Uber_00137611

**free** 6:10 18:8
**front** 27:23 44:9
**frontal** 44:8
**function** 7:8 20:4 28:10,17 37:12 77:23 78:1
**functional** 41:1
**furniture** 47:3
**fuse** 44:12
**future** 9:15 10:20,22 20:2,7 40:22 41:6,10,15,18 42:19 45:4,8 61:16,20 70:17 77:10 78:4 79:17 80:11,12 81:1

**G**

**gave** 15:19 68:16 69:22 77:14
**generally** 28:1 61:15 62:22
**gentlemen** 5:22
**give** 17:12,17 19:10 20:3 61:14 62:11 68:12
**giving** 47:9
**good** 4:22 5:1,17,18,21 11:13,15 56:22 57:21 61:5,24 76:11
**gradations** 61:4
**great** 17:13 25:4
**greater** 21:19,20 23:5,10,15 24:4,9 25:9 35:24 38:18 39:15 40:9
**group** 13:8 23:2
**guarded** 41:4 61:6,10,24 62:11,13

**H**

**hand** 24:1
**hands** 55:14
**happen** 45:11
**happened** 73:16
**hard** 30:19
**hardware** 44:13
**head** 65:19
**headache** 32:11
**Healthcare** 21:9 30:8
**hear** 10:19
**heard** 10:14 60:18
**hears** 45:1 78:9
**held** 4:14 14:1 76:14
**helpful** 34:14
**helping** 34:11,15
**Henkels** 46:22
**hereto** 6:7 18:11
**herniation** 38:20 45:12
**hire** 60:15
**hired** 60:8 63:19,24 64:6,12 65:1,9 66:3 67:7,10
**historically** 65:6
**history** 19:16 20:13 38:2 45:10,13 49:22 50:24 77:13
**hold** 27:5 75:23 80:1
**holding** 27:13
**home** 32:21
**honor** 5:22 11:21
**hope** 62:14 65:6
**hospital** 14:21 15:3,10,24 47:21 48:5 49:23,24 50:2,4
**house** 22:7
**hundreds** 67:15
**hurt** 8:14
**hydrotherapy** 32:7,20
**hypertonicity** 23:3 24:8
**hypomobility** 24:16

**I**

**identify** 4:21 9:15
**images** 8:23 9:4
**imaging** 30:19
**IME** 3:17
**immediately** 47:17
**impairments** 21:23
**impingement** 35:21 36:6 39:16
**importance** 17:13
**important** 49:15 53:18 55:22
**improve** 20:3 78:1
**improvement** 77:23 78:9
**inability** 21:24
**incident** 18:18 20:21,23 21:10 37:24 39:8,23 70:1 77:15
**include** 9:1,4
**includes** 7:6 77:13
**including** 10:22 19:4 32:5 63:12
**incorporated** 8:1
**incorrect** 13:17 61:18
**increase** 37:14
**incurred** 77:15
**independent** 18:14
**independently** 8:1
**indicating** 40:3
**individual** 41:1
**individuals** 7:13,16 15:21
**inflame** 51:22
**inflammatory** 40:2
**inform** 51:22
**information** 19:15 34:14 57:8 77:11 78:15
**inherently** 45:9
**initial** 18:5
**initially** 10:5 31:20
**initials** 13:8
**injured** 18:17 38:23
**injuries** 8:18 18:22 19:2,4,5,9,11,18, 22 22:1 38:5,9,15 39:5,6,20,21 40:12, 14 41:11,16 42:21 45:3,5,23 62:8 65:14,22,23 71:4 77:13,22 78:6,8 81:10
**injury** 19:16,17 21:1 24:2 44:14 46:21 69:24 70:5,12,20,22 77:15
**innervates** 28:23
**inserts** 28:21
**instability** 44:19
**instance** 71:15
**instruct** 26:18
**instrument** 23:24



Uber_00137612

**intent** 51:21
**interested** 78:7
**interesting** 19:14 50:17
**interforaminal** 39:10
**internal** 7:10
**intervention** 59:24
**interventional** 43:14 59:4
**interventionals** 44:23 45:17 56:6,11 62:2,17
**intraforaminal** 36:2
**introduce** 5:19
**involve** 9:7,12
**involved** 8:14 18:18
**involves** 44:4,17
**involving** 40:8,10
**irrelevance** 52:3
**irrespective** 62:18 63:4 77:20

J

**January** 58:10
**job** 47:2 78:1
**join** 76:4,8
**joins** 26:10 33:15 42:6 75:22 76:3
**joint** 28:23
**joints** 7:9,10,18 24:17 28:9,10 29:6
**Josh** 4:23 74:17 79:21
**June** 4:12 31:3 49:9
**jury** 26:18 47:9 50:23 51:22 56:8 58:19
**jury's** 9:19

K

**kick** 37:4
**kind** 14:15 16:15 28:13 62:4 67:3
**kindly** 5:19
**kinds** 65:21
**knee** 31:18,23 32:2
**kneecap** 24:22,23
**knock** 29:13
**knocks** 22:10
**knowledge** 77:14

L

**L1-2** 44:16
**L2-3** 35:23 39:10
**L3-4** 24:9,20 25:10 39:12 40:10 43:16
**L4** 36:5 39:17
**L4-5** 24:9,21 25:3,10 36:3 38:19 39:15 40:10 43:16
**L5** 36:5 39:17
**L5-s1** 24:9,21 25:10 36:6 40:11 43:17
**lacerations** 7:14
**ladies** 5:21
**Lance** 3:3 4:19 5:10,22 16:24 81:20
**larger** 27:22
**lasted** 55:11 56:14
**lastly** 23:23 25:8 40:11
**lawsuits** 66:5 67:9
**lawyer's** 51:3
**lawyers** 51:17 72:5
**lay** 26:18
**lead** 45:19
**leads** 19:22 77:12
**learn** 9:20 20:17
**learned** 20:18
**lease** 71:14
**leased** 71:16,23 72:3,4
**leasing** 71:19
**Lebanon** 74:1
**left** 21:18,20 23:4,10,13,15,19,20,22 24:1,4,9,13,17,20 25:1,2,7,9 31:17,22 32:1,13 35:10,14,15,18,24 36:1,6 38:18,19,21 39:12,14,17 40:9
**leg** 24:11
**legs** 24:12 47:13
**level** 8:3 23:14 25:3 28:13,22 35:8 36:9 37:14 44:20 63:6
**levels** 25:15,16 31:19 40:10,14 43:20
**Lexitas** 4:11
**Lhermitte** 23:9
**licensed** 6:12,15
**Lidocaine** 47:6
**lift** 25:5
**lifting** 22:14
**ligaments** 7:11 19:18
**listed** 26:6
**listen** 45:13 79:23
**listing** 36:13
**litigation** 15:9 63:17 65:2,10 67:21 68:7 69:16
**living** 46:19
**loading** 23:12 24:20 28:11
**lobby** 72:8
**local** 24:2
**locate** 43:17
**located** 4:14
**Locust** 73:14
**Logan** 73:18
**Lombard** 73:13
**long** 6:17 49:15 50:16
**lordosis** 24:7
**loss** 24:6
**low** 8:18 19:6 21:16 30:22 31:17,21 32:1,12 35:23 47:13 49:10 50:4
**lower** 21:20 32:15 40:6 47:6
**Lucas** 4:17,24 17:14,20 18:16 19:24 20:11,12 21:11,23 22:17 29:24 31:14 36:15 37:16 38:5,9 39:23 40:11,17 41:2,10,15 42:20 43:7,19 45:14 46:16 49:8,13,22,23 50:14 51:2 52:18 53:7, 10 54:14 55:9 56:13 57:18 58:9,19 60:12 61:10 63:16,19,22 64:13 70:20 71:20 77:2,8,14,21 78:3 79:7 81:2
**Lucas'** 19:11 26:16 30:5 31:16 34:16 35:6 37:12 38:2 55:17
**lumbar** 24:6,18 25:16 27:17 30:22 35:7,23 38:14 39:9,18,19,21 40:8 44:6,15 48:5,17 59:8 60:3 62:2



Uber_00137613

M

**M.D.** 12:17
**made** 7:9 22:11 29:4 77:9 80:5,8
**main** 28:16,19 29:2,10,19 37:3 40:4 72:10
**make** 18:21 26:1 33:6 43:2 44:13 51:11 66:17 75:11
**making** 9:8 17:11 26:7 80:1
**management** 5:24 7:2 8:9 17:2 67:11
**maneuver** 23:11 24:19
**maneuvers** 23:5,8 24:10 28:12
**manipulative** 32:18
**March** 3:18 6:4 10:6,11 18:7 30:15, 17 31:7
**mark** 6:1 18:4
**marked** 6:5 18:10
**massage** 32:8
**material** 27:21
**materials** 9:9
**math** 68:9 69:1
**matter** 4:17 17:13 20:5 51:16 53:20
**Mccoy** 46:22
**means** 7:24 15:5 22:23 37:2 38:24
**measure** 37:11
**mechanical** 32:19
**medial** 28:20
**medical** 8:22 9:15 10:2,21 12:4 14:20 17:18,21 18:14,16 21:4 26:18 30:4 38:3 46:2
**medically** 37:22
**medicine** 5:20 6:13,18,24 7:5 12:16, 20,21 64:1,4 74:9
**meet** 8:4 49:22 56:24
**meeting** 11:15 57:11
**member** 11:24
**mention** 29:4 47:11,13 49:9
**met** 7:24 50:14 55:9 56:21,23 57:14 58:9 70:4
**meted** 42:10
**Michael** 5:2 11:13
**mid** 20:20 27:16 31:16,21,24 32:12
**mild** 48:17,18
**Miles** 5:4 76:1 81:23
**millimeter** 36:1 39:11,12
**millimeters** 36:5
**mind's** 56:10
**mine** 41:3
**minimum** 43:4 44:3
**minutes** 10:20 50:19,21 55:10,12,16 56:14
**misalignment** 48:7
**misleading** 66:15
**misreading** 59:20
**modalities** 32:6 43:7
**model** 27:14 36:7
**monitoring** 43:10
**month** 48:15
**monthly** 71:18
**months** 29:18 43:3,22 58:20,24
**motion** 22:22 23:12 24:14 28:8 33:6 42:11
**motor** 7:7 28:17 38:6
**mouthpiece** 33:9
**move** 34:19 54:12,23 62:24
**moved** 73:18
**moving** 20:19 22:23 36:12
**MRI** 30:20,21 31:10 34:20,21 48:16
**MRIS** 9:5 35:2,5 42:24 45:19 64:7 77:17,18
**multiple** 43:19 70:22
**muscles** 7:11 19:18 23:3
**myositis** 38:11

N

**names** 56:23
**narrative** 30:12
**narratives** 67:23
**narrowing** 39:14
**natural** 19:16 45:9
**nature** 7:15 19:7,20 74:5
**necessarily** 7:19
**neck** 19:6 21:16 22:21 23:2,14 27:15 30:21 31:16,20,24 32:11 35:6 47:12 49:9 65:18
**Nedro** 20:21
**needed** 6:11 18:8 70:17
**needles** 32:15
**negate** 62:5
**nerve** 28:19,20 29:2 39:3,17 43:21, 23 57:20,22 63:4
**nerves** 7:6,11 24:12 28:16 29:7,9,10, 11,15,19 37:3,5,6 40:4 43:18 44:14
**Network** 30:9
**neural** 35:15 39:14
**normal** 30:1,2 36:7
**North** 4:15
**note** 26:12
**November** 18:18 30:10,14 38:6 39:9,23
**number** 6:11 26:5,6 76:24 77:24
**numbness** 21:18,21 40:5

O

**oath** 58:10
**object** 66:12
**objection** 26:2,8,21 33:24 41:20 42:2 51:12,13 52:1,3,4 66:18 74:11 75:6 76:8,9 79:14 80:2,5,9
**objections** 4:4 17:5
**observations** 64:20
**occupation** 35:16 36:2
**occupying** 35:10,13,19
**occurred** 20:21 71:4
**occurring** 39:8
**occurs** 30:12




Uber_00137614

**October** 31:6
**offers** 16:24
**office** 9:21 15:22 17:22 49:18,19 51:3 53:2 54:16 60:9 71:7,9,18 72:11 73:9,11,13 74:22,24 81:3
**offices** 21:11 73:20,23,24 74:8
**Ogontz** 20:21
**one-** 22:12
**opened** 75:13
**operate** 15:16,21
**operative** 9:2
**operator** 20:18
**opinion** 37:17,20 38:4 41:9,14 45:8 52:24 56:18
**opinions** 17:15,17,21 18:15 33:12, 21 34:12,15 38:8 42:3 46:1 63:16 78:19
**opportunity** 20:3 30:4 34:21 36:11 52:12 74:18 75:15
**opposed** 51:22
**opt** 45:1
**order** 10:1 64:6 77:22
**organization** 12:19 13:1
**Orthopaedic** 12:8,12
**orthopedic** 7:1,3,4 8:8 12:1,7,11,20 17:2 65:22,23
**orthopedics** 5:23 17:1 67:11
**orthopedist** 78:2
**osteopathic** 12:16,21
**outcome** 61:23
**outer** 35:11,19
**outfit** 34:13
**outlined** 40:15 41:16 45:5
**Owen** 5:22
**owns** 71:4,12

**P**

**p.m.** 4:13 25:22 27:10 33:4 34:6 41:24 42:17 51:10 55:7 66:10,23 74:14 76:22 79:13 81:22
**pages** 10:13
**paid** 64:22,24 65:5 66:4,14 67:8 71:19
**pain** 5:24 7:2 8:9 17:2 21:13,16,20 22:10 28:24 29:8,14 30:24 31:5,11, 18,19 32:11,12,13,16 37:5 39:4,7,22 40:12 43:18 46:23 49:10,19 50:4,12 51:4 53:11,14 54:4 58:6,7 67:11 78:2
**palliative** 37:1
**palliative-** 36:22
**part** 8:16,20 21:14 27:18 28:5 33:22 35:2 42:22
**parts** 65:15
**passenger** 20:20
**passes** 72:6
**past** 9:22 10:24 11:6 60:22 62:21 77:4,5
**patches** 47:6
**patellar** 24:22
**patient** 19:24 20:1 40:23 41:3 53:10 70:11,17 81:8
**patients** 8:11 9:8,13,16 15:5,9,15
**patterns** 49:17
**PCP** 47:24 54:2
**peer-** 16:10
**Pennsylvania** 4:16 6:14,16 8:2 12:1,2 74:1
**people** 8:13,17 64:16
**percent** 57:23
**perception** 22:11 29:14
**perform** 8:10 9:10 22:16 74:9
**performed** 67:21
**performing** 18:13
**permanent** 18:23 19:3,6,21 36:23 37:8 70:5
**person** 25:4 37:11
**personally** 60:20,23
**pertained** 31:1
**pertaining** 30:4
**phase** 74:16
**Philadelphia** 4:16 10:15,17 11:17 20:22 30:11 48:11 73:12
**Philly** 30:14 31:15 34:13 58:21
**Phys** 58:21
**physiatrist** 43:11
**physical** 8:10 22:21 32:6 52:14 58:21
**physician** 13:13 43:9 63:20 77:19 81:7
**physiotherapeutic** 32:6
**picking** 69:18
**picture** 26:16
**pinpricking** 23:24
**pins** 32:14
**Pittsburgh** 74:2
**place** 20:23 42:2 53:23
**plaintiff** 4:24 16:24
**plaintiffs** 65:14,23
**planes** 22:23 24:15
**Pleas** 10:15,17
**point** 32:8 57:12 70:6 78:7 80:3 81:5
**poor** 61:6,13,15,19,23 62:3,11
**portion** 28:7
**posed** 75:10 78:18
**positive** 23:15 24:13,20 25:9 57:23
**pract** 6:12
**practice** 5:20,23 6:13,24 7:1 8:17,20 9:7,12,19 34:10 35:1 42:12 74:7
**practiced** 6:20 11:16
**practicing** 6:17
**precipitation** 39:3
**prefer** 17:16
**prejudicial** 52:4,6
**preliminary** 6:2
**Premier** 30:24 31:5,11 49:19 51:4 53:11 54:4,17 59:3
**preparation** 47:9
**prescribe** 63:24 64:3
**pressure** 28:12
**pretrial** 26:7



Uber_00137615

**pretty** 21:10 56:15 57:21,24 76:9,17

**previously** 69:20

**Primavera** 33:8

**prior** 61:2

**privilege** 11:21

**privileges** 15:3,20,21 74:4 75:2

**probative** 52:6

**procedure** 22:9 29:6,21 43:4,21 44:17,20 78:11

**procedures** 7:18 10:23 11:1,2 14:15 15:22 31:2 37:13 43:14,17 44:11 53:14 55:11,23 56:12

**process** 20:1 41:3 43:24 67:13

**professional** 6:3 16:15

**prognoses** 61:4

**prognosis** 19:11,13,14 20:5 40:17, 20 41:4,8 61:1,9,15,20,22,24 62:11, 12,14

**program** 32:22

**prophylactic** 26:1

**protrusion** 35:14,24 36:4 39:13

**protrusion/extrusion** 35:9 39:16

**protrusion/extrusion-type** 35:18 38:18,19 39:11 45:12

**provide** 10:2 17:21 20:13 34:14

**providers** 8:22

**providing** 10:8

**published** 16:2,5,10,13

**purpose** 43:12 63:15

**purposes** 15:9 43:10

**push** 25:5

**put** 28:12 44:12 57:6 81:2

**puts** 47:6

**putting** 39:5,20 74:10

**Q**

**qualification** 66:13 74:16

**qualifications** 11:9 14:13 29:12 34:9

**qualified** 10:16

**qualify** 6:9

**question** 33:18,19 46:20 51:17 53:9, 22 67:2 74:18 77:6 80:7 81:1

**question's** 53:8

**questionable** 61:6,12

**questions** 4:5 11:9 16:22 46:7,15 72:15,19,23 73:1 74:4,21 75:9 77:1,3 78:17,22 81:12,16

**quick** 72:19

**quickly** 76:17 79:10

**quote** 55:11 58:14,15

**quote/unquote** 66:14

**R**

**radiating** 21:19 23:6 39:24

**radiculitis** 40:2,7,9

**radiculopathy** 40:1,7,9 57:21,22

**radiofrequency** 10:22 22:10 29:5,8, 20 31:2,10 36:13,15,20,22 43:15 44:2 59:15

**radiologist** 30:20 49:1,4

**raising** 24:11

**range** 22:22 24:14 61:5

**rated** 32:2,17

**ratio** 57:24

**read** 33:12 60:21 81:5

**reading** 4:2 73:24

**ready** 80:19

**realize** 67:20

**reason** 20:14 29:13,16,20 71:4

**reasonable** 17:18 18:15 37:18,23 46:1 62:23

**reasons** 7:17

**recall** 46:16 57:13,15

**receive** 8:5

**received** 21:4 32:4,9 37:16 43:8

**recognized** 8:2

**recommend** 52:17 61:20

**recommendation** 53:1 61:16

**recommendations** 9:8 10:20 79:18

**recommended** 52:15,22

**recommending** 10:22

**record** 4:9,21 25:22 26:1 27:10 33:3, 13 34:6 41:23 42:2,17 51:7,9 52:11, 17 55:7 66:7,9,23 74:13 76:14,16,21 79:10,12 80:2,21 81:21

**records** 8:22 9:1 17:21 30:4,9,13,17, 24 31:5,9,12 33:10,11 34:12 38:3 41:9 47:8,10,15 48:1 50:7 57:16 60:12 81:5

**recovery** 19:21 40:22 62:15

**RECROSS-EXAMINATION** 79:3

**redirect** 72:22 73:5 75:16

**reduction** 39:13

**refer** 6:10 18:8

**referral** 49:17

**referrals** 43:9

**referred** 49:14

**referring** 51:18 54:2,3

**reflex** 23:17 24:3,21,22 25:3

**reflexion** 66:16

**regard** 38:16,22 39:10

**regenerate** 29:17 43:23

**regularly** 8:21

**regurgitate** 33:10

**Regus** 4:14 71:9,10 73:9

**rehab** 31:1,5 48:11 54:4

**Rehabilitation** 31:11 53:11

**related** 22:15 37:23 39:8

**relates** 60:24 62:20 71:7

**relationship** 81:8

**relative** 19:11

**relevance** 51:12 61:22 71:6

**relevant** 51:19 52:5,24

**rely** 8:21 34:10

**remember** 57:11

**remove** 44:9

**rendering** 63:16
**renew** 13:18,19
**renewed** 13:10,16
**repeat** 43:5
**rephrase** 80:24
**replacing** 7:18
**report** 3:17,18 10:4,6,10,12 18:5,7 26:7 57:4,14 59:13 79:20 80:10 81:3, 4,9
**reporter** 5:7 81:23
**reporting** 4:11 21:23
**reports** 9:2 10:4,9 18:1,4 30:20 34:21 60:22 69:7
**represent** 5:2 11:14 71:8
**representing** 4:23 28:18
**represents** 27:14,15
**reproduce** 23:6 28:15
**request** 17:22
**require** 41:10 42:20 78:8
**required** 42:23 45:3,4,8,20 77:12
**requirement** 62:6 78:5 81:9
**requirements** 7:24
**requires** 41:15
**requisite** 29:12
**researcher** 16:20
**reserve** 41:5
**reserved** 4:6
**residency** 14:6
**respect** 37:15 46:16 55:21
**respectfully** 42:9
**respond** 52:11 54:12 75:16
**responds** 62:3
**response** 33:16 54:23 62:4,16 76:4 77:16
**rest** 48:2
**result** 18:17 21:4,24 41:1,11 42:20 70:12
**resulting** 59:4
**resume** 6:3
**retained** 4:11 9:20,21 63:14
**return** 63:3
**review** 8:21 9:9 16:15 17:20 30:4 34:10,21 35:2 36:11 41:8
**reviewed** 13:15 16:11,18 34:19 47:8 57:17
**reviewing** 16:17 38:3 60:12
**riding** 22:5
**risk** 78:9 79:7
**risk/benefits** 45:2
**role** 64:19
**room** 71:16
**rooms** 14:24
**root** 24:11 35:11,20 36:2,5
**roots** 39:18
**rotating** 22:24
**routine** 35:1
**Rubin** 4:18 5:3 11:14
**ruin** 25:24

**S**

**sacroiliac** 24:16,17
**sacrum** 27:19
**scale** 25:5
**scan** 48:5
**scans** 9:5
**scene** 30:13
**scholarly** 16:5
**scientific** 14:3
**sealing** 4:3
**secondary** 39:7
**segmental** 38:12
**segments** 23:13 28:8
**send** 15:10,14 28:24 29:7,15 37:5 39:3
**sending** 43:18
**sensation** 24:1
**sensory** 7:7 23:23 24:3,5 25:8 28:17
**SEPTA** 5:3 11:14 60:14
**SEPTA's** 76:8
**September** 50:2
**serve** 43:12
**services** 9:21
**set** 31:15
**sets** 31:13
**setting** 15:24
**setup** 55:16
**severity** 66:1
**Shaer** 48:22,24
**sharp** 21:17 23:24
**shoulder** 23:2 31:17,22 32:1,13 47:12
**show** 25:12 26:3,5 27:17,22 36:9 57:20
**showed** 23:3 35:17 36:6,7 39:1 48:6, 17
**showing** 77:17
**shut** 44:1
**side** 20:20 22:24 23:1 28:22
**sign** 24:11
**signal** 29:1,8 39:4 43:19
**signals** 29:15 37:5
**significant** 22:20 31:12
**signing** 4:2
**signs** 23:9
**similar** 69:10
**similarly** 50:8 58:4 60:13,15
**Simon** 11:19 63:15 64:22,23 65:2,6, 10,14,22 66:3 67:7,22 69:3,23 71:17, 24 72:5
**Simon's** 60:8 81:3
**simple** 56:15 77:5
**simply** 33:9,12 42:9 54:17
**simulate** 81:7
**sir** 6:11,23 8:10 17:20 18:13 19:13 45:24 73:3
**sits** 29:2

**sitting** 24:10 40:3
**skeleton** 7:5
**sleeping** 32:16
**small** 27:13 28:19 29:7,16 37:4 39:3 43:18
**smaller** 74:8
**society** 12:1
**Soffer** 50:9
**soft** 19:17 38:9,15
**soft-tissue** 19:5
**sold** 74:7
**sole** 63:15 64:19
**somatic** 38:12
**somebody's** 28:15
**space** 71:14,18 73:9,11,17 74:9,23, 24
**spasm** 23:3 24:8
**speaks** 51:13
**spec** 19:8
**specialist** 78:2
**Specialties** 13:14
**specifically** 41:5 45:22 62:7
**specificity** 19:9
**speculative** 42:3
**Spellman** 60:15,19
**spent** 50:15,18,21
**spinal** 7:13 16:3,6 23:14 25:3 27:14, 18 28:7 44:14,15
**spine** 16:3,6 24:4,6,19 25:13,15,16 26:13,17 27:17 28:2 30:14,21,22 31:15,24 34:13 35:6,7,8,23 38:10,13, 14,15 39:9 44:6,7,11,12,16 48:6,11, 17 58:21 60:4 62:3,9
**sprain** 38:11
**Spring** 30:17 32:10 34:13 59:1
**Spurling's** 23:9
**staff** 14:21
**stand** 13:11 27:1 34:4 42:15 55:5 66:22 75:21 76:19 80:17
**stands** 32:20
**start** 20:10 37:5 48:11
**started** 11:5 17:15 74:2
**state** 8:2,3
**statement** 50:17
**status** 13:20
**stenographic** 76:14
**stenosis** 35:12,16 36:3 48:17,18
**step** 63:7
**Steph** 5:7
**stiffness** 32:12,13
**stop** 46:22
**stopped** 14:16
**straight** 24:11
**strain** 38:11
**Street** 4:15 73:14
**streets** 20:22
**stretch** 24:12
**strike** 33:6 73:10 77:6
**strongly** 74:20
**struck** 20:19 71:3
**structures** 7:10
**studies** 8:23 30:19 34:22 35:2 36:10 38:4 42:23
**study** 35:22
**subjected** 16:15
**subjective** 53:4
**submit** 53:3
**submitted** 13:22
**subspecialty** 7:4
**succession** 63:13
**suffered** 8:17 22:1 38:5 41:11 42:21
**suffering** 21:13
**suggestions** 75:11
**Suite** 4:15
**suites** 71:13 72:9
**summarize** 17:24
**supplemental** 3:18 10:6 18:6 31:4
**supply** 7:7 28:17
**surgeries** 14:14
**surgery** 7:2,3,4 8:9 10:23 12:7,8,11, 12 14:2,5,10 15:13 16:3,6 17:2 43:2 44:4,23 56:3,4,10 58:11,15 63:7,12 77:9 78:3,10 79:6 80:12 81:1
**surgical** 9:1 43:3 56:12 74:7
**surrounded** 27:24
**sustained** 21:1 69:24 70:12,20
**swear** 5:8
**sworn** 3:3 5:11 77:2
**symptom** 23:6 37:2
**symptoms** 28:15 39:24
**syndrome** 39:2,19

**T**

**takes** 29:18 55:15
**taking** 14:5 22:13 38:2 44:5,17
**talk** 19:23 20:2 31:8,9 40:21,22 41:19 45:19 47:7 64:12
**talked** 9:18 18:1 21:15 25:14 38:1 39:24 43:5,14 44:4 59:15
**talking** 23:7 25:14 28:10,11 41:5 45:4 47:16 56:9 62:10 75:1
**tap** 25:3
**targeting** 43:16 44:2
**targets** 59:22 60:2
**TECHNICIAN** 4:8 5:6 25:20 26:24 27:4,8 33:2 34:3 41:22 42:14 51:8 52:7 55:4 66:8,21 74:12 75:20 76:18 79:11 80:16,20 81:18
**temporary** 37:10
**ten** 31:20,21,22,23 32:2,3,17 55:23
**tenderness** 23:4
**tendon** 24:23
**tendons** 7:11 19:18
**term** 19:14 20:5 37:1 40:2,20
**terminology** 38:16
**terms** 20:6 26:19 28:6 38:10,23 40:6
**test** 12:24 13:2,5 57:21
**tested** 22:23 24:15

**testified** 5:12 11:19 53:19 62:21 63:8 67:15 70:2,11,16,19 79:20

**testify** 6:9 10:16 64:20 69:13

**testifying** 11:22 77:4

**testimony** 10:2 11:24 16:2 17:12 47:9 51:13 52:14 61:3,14 74:17 77:2

**testing** 23:17,23 24:3,21 25:8

**therapeutic** 32:19

**therapy** 32:7,18 52:15 58:21

**thing** 7:15 53:18 75:1

**things** 21:24 22:15 34:19 62:24 74:5,10

**thinking** 52:8

**thoracic** 31:24

**thought** 56:2

**tics** 30:11

**till** 56:7

**time** 4:6,13 10:1,3,8 25:22 27:7,10 33:4 44:21,24 46:21 50:15,18,19,20,21,22 55:7,16,20 63:3 64:24 71:9 74:14 76:21 79:12 81:5,21

**times** 11:19 36:19 43:6,20 47:5 53:13 62:23 63:2,5 66:4 67:8,15 77:24

**tingling** 21:21 40:5

**tissue** 19:17 38:9,15

**today** 10:3 17:15 41:12 46:1 64:19 67:16 68:13,22 70:19,23 71:8,16 73:19 78:19

**today's** 4:11 81:19

**toe** 25:4,5

**told** 20:20 47:23 48:1 51:2,3 54:15,16 55:10 58:10,14

**tones** 76:12

**total** 69:8

**totality** 77:11

**towns** 73:21

**traction** 32:7,19

**transcript** 67:19

**transcripts** 61:3

**transported** 21:8

**trapezius** 23:1

**trauma** 8:14

**traumatic** 18:17 48:7

**treat** 7:16,17 8:13,16,17 45:22 51:3 52:16,18,23 63:19,22

**treated** 31:14 32:11 53:12 64:13,16

**treating** 43:9 63:20

**treatise** 16:6

**treatises** 16:11,14,19

**treatment** 9:8 10:21 30:5,16,24 31:19,24 32:3,8 36:23 37:16,18 41:10 42:19,22 43:1 45:15 58:18,24 61:16,20 62:6 63:11 77:16,17 79:17 80:12 81:6

**treatments** 10:21 32:4,17 43:13

**trial** 4:6 17:12 68:13 75:12,19

**triangular** 27:18

**triceps** 23:19

**trigger** 32:7

**Trimby** 4:10

**trip** 30:11

**true** 11:20 12:1,12 13:1 14:2,7,17,24 15:1,3,17 16:8,11,16 34:24 38:14 55:15 56:11 59:1,6,11 62:24 64:1,4,7 65:11,16,19,23 68:1,8 70:5

**twelve** 43:6

**Tylenol** 48:1

**type** 5:20 36:23 43:7,13 62:6 63:11

**types** 9:9 45:3,5,23 62:7 77:12,14,22 78:5

**typically** 26:13

**typo** 59:14,16

## U

**unaware** 26:5

**undergo** 77:22

**undergoing** 31:19

**undergone** 53:13

**underlying** 37:9

**underneath** 28:21

**understand** 11:23 12:14 16:1 17:16 19:19 52:13

**understands** 56:8 58:20

**underwent** 36:15 58:19 77:16

**updated** 6:4

**upper** 21:18 32:12,15 40:6

## V

**Valsalva** 23:9

**variable** 61:6,12

**vary** 77:19

**varying** 66:1

**vehicle** 20:19 38:6 71:3

**version** 27:13,22

**vertebral** 27:20

**video** 4:12 25:21 27:9 33:3 34:6 41:23 66:9 68:13 74:13 76:21 80:21

**videotape** 4:8 5:6 25:20 26:24 27:4,8 33:2 34:3 41:22 42:14 51:8 52:7 55:4 66:8,21 68:16,20 69:2,21 70:2,7,10,15 74:12 75:20 76:18 79:11 80:16,20 81:18

**vis-à-vis** 29:6

**visits** 36:14,16,17 43:5,8 59:3

**Vitae** 3:16

**voir** 3:4 5:14 34:8

**voluntarily** 15:19

## W

**wait** 43:22

**waive** 80:8

**waived** 4:4

**weakest** 28:4

**Weldon** 5:7

**west** 11:16 73:24

**whirlwind** 62:22

**word** 15:18

**words** 49:14

**work** 14:23 22:7,8 60:21 65:10

**worked** 46:21

**working** 22:6 46:24

**wrap** 76:16

**write** 57:3

**written** 16:18

**X**

**x-ray** 9:4

**x-rays** 64:7

**Y**

**yard** 22:8

**Yarus** 3:3 4:19 5:10,23 16:24 54:6 56:22 66:13 72:24 73:8 76:5 79:17 81:20

**Yarus-1** 3:16 6:5

**Yarus-2** 3:17 18:9

**Yarus-3** 3:18 18:10

**year** 6:19 14:5 22:13 29:18 42:24 43:7 58:10 68:17 69:7

**years** 6:21 11:16,18,20 43:4 44:3 55:24 66:4 67:8 69:12 73:9,15

**yield** 61:14

**yields** 61:16