# EXHIBIT E

**In the Matter Of:**

*NADIR JONES vs*

*EDWIN J. GOMLEY, et al.,*

---

*LANCE O. YARUS, D.O.*

*January 12, 2026*

---

LEXITAS™

IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA
- - -

NADIR JONES, : NO. 230702264
Plaintiff,
vs.
EDWIN J. GOMLEY, et al.,
Defendants.

- - -
Monday, January 12, 2026
Remote deposition taken via Zoom Videoconferencing
- - -

Sworn video-recorded deposition of LANCE O. YARUS, D.O. was taken pursuant to notice via Zoom Videoconferencing on the above date, beginning at approximately 3:30 p.m., before Stephanie Weldon, Court Reporter and Notary Public for the State of Pennsylvania, there being present virtually.

- - -
LEXITAS LEGAL
1600 MARKET STREET, SUITE 1700
PHILADELPHIA, PA 19103
888.267.1200 (PH) 267.775.3310 (FAX)
www.lexitaslegal.com



APPEARANCES via Zoom Videoconferencing:

SIMON & SIMON, P.C.
BY: CHRISTOPHER M. BURRUEZO, ESQUIRE
18 Campus Boulevard, Suite 100
Newtown Square, Pennsylvania 19073
(215) 467-4666
ChrisBurruezo@gosimon.com
Representing the Plaintiff

SWARTZ CAMPBELL, LLC
BY: MICHAEL A. COGNETTI, ESQUIRE
Two Commerce Square
2001 Market Street, Suite 2815
Philadelphia, Pennsylvania 19103
(215) 564-5190
mcognetti@swartzcampbell.com
Representing the Defendants,
SEPTA and Edwin Gomley

RICCI, TYRRELL, JOHNSON & GREY
BY: NICHOLAS SULPIZIO, ESQUIRE
1515 Market Street, Suite 1800
Philadelphia, Pennsylvania 19102
(215) 320-3260
nsulpizio@rtjglaw.com
Representing the Defendant,
M.J. Electric, LLC

ALSO PRESENT:

Kevin Reyes, Videotape Technician



I N D E X


| WITNESS | PAGE |
|---|---|
| LANCE O. YARUS, D.O. (Witness sworn.) | |
| VOIR DIRE | |
| BY: Mr. Burruezo | 5, 50 |
| BY: Mr. Sulpizio | 11 |
| BY: Mr. Cognetti | 45 |
| DIRECT EXAMINATION | |
| BY: Mr. Burruezo | 50, 155 |
| CROSS-EXAMINATION | |
| BY: Mr. Sulpizio | 81 |
| BY: Mr. Cognetti | 129 |


E X H I B I T S


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Yarus-1 | Curriculum Vitae | 5 |
| Yarus-2 | 6/12/2023 IME Report | 51 |




- - -

THE VIDEOTAPE TECHNICIAN: All right. We are now on the record. My name is Kevin Reyes. I am the videographer with Lexitas. Today's date is January 12, 2026, and the time is 3:30 p.m. Eastern. This deposition is being held remotely in the matter of Nadir Jones versus Edwin J. Gomley, et al. The deponent is Dr. Lance Yarus.

Would all counsel present please introduce themselves, after which the court reporter, Stephanie Weldon, will swear in the witness.

MR. BURRUEZO: Yeah. This is Christopher Burruezo on behalf of the plaintiff, Nadir Jones.

MR. COGNETTI: And Michael Cognetti on behalf of SEPTA and Ed Gomley.

MR. SULPIZIO: And Nicholas Sulpizio on behalf of M.J. Electric, LLC.

- - -

LANCE O. YARUS, D.O., after having been duly sworn, was examined and testified as follows:

\- - -

VOIR DIRE

\- - -

BY MR. BURRUEZO:

Q. All right. Good afternoon, Doctor. Can you please introduce yourself to the judge and jury?

**A. Sure. Good afternoon, ladies and gentlemen, Your Honor. My name is Lance Owen Yarus, D.O.**

Q. So I want to pull up on my screen a copy of a document that I will mark as Yarus-1.

(Whereupon, Yarus-1 was marked as of this date and is attached hereto.)

BY MR. BURRUEZO:

Q. Can you identify this document for the jury?

**A. Yes. This document is my curriculum vitae.**

Q. And what is contained in this document?



**A. This document has information about my education and training, licensure here in Pennsylvania, honors and awards that I received, professional memberships, hospital committees, medical staff appointments, my board certifications and fellowship. I've had some teaching affiliations, I did specialty rotations to enhance my surgical skills. I've had some appointments, then I've done some editorial activities, the --**

Q. Okay. We were -- oh. Sorry.

**A. Go ahead.**

Q. Go ahead.

**A. Yep. That's it.**

Q. Sure. And we'll briefly touch on those shortly, but are you licensed to practice medicine in the Commonwealth of Pennsylvania?

**A. Yes, I am.**

Q. And how long have you been a doctor?

**A. Well, this will be my 45th year.**

Q. And practiced continuously ever since?

**A. Actually, since 1986, that's when I finished my residency in orthopedic surgery, so that's really when I began my practice.**



Q. Can you briefly summarize your schooling for the jury here and how you became a doctor?

**A. Sure. My undergraduate schooling was at Syracuse University, I graduated there in 1977. I did some graduate work here in Philadelphia, and then I was accepted to medical school out in Des Moines, Iowa. So I went out there to complete my medical school training, which I did in 1981. After that, I came back to the East Coast here and did a rotating internship for one year, and then I started my orthopedic residency, which was a four-year program, and I completed that as chief resident in 1986, and that's the starting point from my practice.**

Q. And I know you referenced it from your CV, but are you currently board-certified?

**A. Yes, I am.**

Q. And what does it mean to be board-certified?

**A. In the surgical subspecialty, it means that I completed and passed the testing that's provided by a certain board, there's three of them that are recognized here in Pennsylvania**



**by the State Board of Medicine. The certification involves three years for the first certificate. So the first year you sit for a written test, second year you do oral boards where they present cases, and the third year is actually being observed in the operating room doing major cases by two board-certified individuals. So I got my first certificate in 1988, and then I recertified two times in blocks of ten years by sitting for written tests and passed those successfully.**

Q. And is every physician board-certified?

**A. No. Actually, in the United States, those who have licenses to practice, about half have a subspecialty certification.**

Q. And did you perform surgeries over your career?

**A. I did for 27 years, yes.**

Q. And are you still a spinal surgeon?

**A. I don't do surgery anymore. I stopped in 2013, but part of my surgical cases were spine surgeries.**

Q. And now, do you currently have an active clinical practice?

**A. I still do, yes.**
Q. And what do you -- what do you do on a daily basis for your practice?
**A. So I have certification in pain management, and I've have treated individuals for pain since 1991, in an official capacity up to the present. So I spend my time seeing my own patients for issues that involve, most of the time, it's chronic pain. Some people have acute pain we deal with. But most people are postoperative individuals or individuals who developed arthritis over the years, so they require interventions and treatment.**
Q. Okay. And can you estimate for the jury approximately how many patients you treat on average per week?
**A. I still am in that about 20 to 25 as of the end of last year.**
Q. And now, when you're treating a patient -- a patient, do you perform a physical examination?
**A. Yes.**
Q. And I think you briefly touched on it, but do you treat individuals that have been



involved in trauma?
**A. Pretty much most of the people that I see are -- are in trauma situations.**
Q. And as part of your practice, do you treat patients that have injured or suffered injuries to their neck and back?
**A. Yes.**
Q. And as part of your practice, do you regularly and customarily review and rely upon medical records from other providers, including diagnostic studies and images?
**A. Yes, I do.**
Q. Those diagnostic studies, do they include MRIs, x-rays and CT scans?
**A. Yes.**
Q. The records, do they include injection reports, surgical records or operative -- operative reports?
**A. Yes.**
Q. And does your practice also involve making treatment recommendations to patients based on your review of these kinds of materials?
**A. Yes.**



Q. Does your practice include diagnosing patients?
**A. Yes.**
Q. And as part of your practice, do you identify future recommended medical care?
**A. Yes, I do.**
Q. And are you familiar with medical billing in both your medicolegal work and as part of your personal practice?
**A. Yes.**
Q. And have you been qualified to sit as an expert in the Commonwealth of Pennsylvania before?
**A. Yes, I have.**
MR. BURRUEZO: Okay. Thank you, Doctor. At this time, I would allow other counsel to ask questions on qual -- qualifications.
\- - -
BY MR. SULPIZIO:
Q. Good afternoon, Doctor. I --
**A. Good afternoon.**
Q. -- I have some questions for you.
**A. Sure.**



Q. You and I have never met in person; is that correct?
**A. I have not. Not that I recall.**
Q. Okay. And neither I or my law firm have ever retained you for any work whatsoever, correct?
**A. Which -- which law firm are you with?**
Q. Ricci, Tyrrell, Johnson & Grey?
**A. No, I have not. That's correct.**
Q. Have you ever testified before today in a case involving the counsel that's present here for Mr. Jones, Chris Burruezo?
**A. I have, yes.**
Q. On how many times have you testified with Mr. Burruezo prior to today?
**A. Good question. I don't keep track --**
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are off the record. Time is 3:38.
MR. BURRUEZO: So I'm just noting an objection on the record that none of this speaks to his qualifications. You're surely entitled

to ask him questions about bias, but that does not come during the voir dire section. So I'm just noting my objection here.
MR. SULPIZIO: Okay. Understood.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record?
MR. BURRUEZO: Yeah. Well, wait. I'm sorry. Before we go back on, are you continuing to ask these lines of questions during voir dire?
MR. SULPIZIO: Yep.
MR. BURRUEZO: Okay. Then just give me a running objection for these questions so we don't have to keep going off the record.
MR. SULPIZIO: Just for this line of questioning, that's fine.
MR. BURRUEZO: Yeah. Correct.
THE VIDEOTAPE TECHNICIAN: All right. Ready to go back?
MR. BURRUEZO: Yes.
THE VIDEOTAPE TECHNICIAN: All



right. We are now back on the record.
The time is 3:39 p.m.
BY MR. SULPIZIO:
Q. And when did you begin testifying for Mr. Burruezo and his firm, Simon & Simon?
**A. For Mr. Burruezo's firm, probably at the beginning of 2014.**
Q. And what about Mr. Burruezo himself?
**A. I would have no idea, Counsel. I really don't keep track of that kind of information. I -- I have no idea.**
Q. Did you ever testify for Mr. Burruezo when he was a lawyer prior to him joining Simon & Simon?
**A. Not that I am aware of, not that I recall.**
Q. Did you ever testify against one of Mr. Burruezo's clients when he was a lawyer prior to joining Simon & Simon?
**A. Again, good question, but I don't know the answer to it.**
Q. Okay. Sir, is it -- am I correct in that you stopped performing orthopedic surgery in 2013?



**A. Correct. Yes.**
Q. And you have no privileges presently at any hospitals?
**A. Correct.**
Q. And all work at hospitals for yourself ended around 2016?
**A. Right. I voluntarily gave up my privileges, that's because I stopped doing the surgery.**
Q. Okay. And you are a doctor of osteopathy, not a medical doctor; is that correct?
**A. Yes. Correct.**
Q. Do doctors of osteopathy have a board?
**A. Yes.**
Q. What board is that?
**A. A board for my subspecialty?**
Q. Yes.
**A. AOAO.**
Q. And what does AOAO stand for?
**A. American Association of Osteopathic Surgeons.**
Q. Did you ever sit for boards?
**A. I did, yes.**



Q. Did you pass those boards?
**A. First time around, no, I did not.**
Q. What time around did you pass those boards?
**A. When I took them through the board that I'm certified by.**
Q. Well, you said the first time around that you did not pass those, correct?
**A. Yes, sir.**
Q. Okay. How many times did it take you to pass the boards?
**A. I passed it the second time I sat for the written, and then the two others were when I testified to; the oral boards and then actually being watched doing surgery.**
Q. Are you currently certified by that board?
**A. I still am, yes.**
Q. So your certification has not ended or expired at any point?
**A. No. It changed to an emeritus diplomat in 2011 or 2012, I'd say.**
Q. Right into my next question: Do you have an emeritus status with that board?

A. That is correct.
Q. With an emeritus status, do you have to retire from the practice of orthopedics when applying for that status?
A. Part of the criteria, and I did, yes.
Q. What are the other criteria?
A. I don't have the list in front of me. I don't recall, actually.
Q. What does it mean to retire from the practice of orthopedics?
A. For one, you're not doing surgery anymore, and for two, you're not seeing people for orthopedic-related injuries or issues.
Q. As -- am I correct in that you no longer practice orthopedics?
A. That's correct.
Q. In layman's terms, can you tell me what an orthopedist does?
A. Orthopedist does evaluations and treatment of individuals who require preservation or restoration of various forms and functions either in the spinal column or in the extremities. We take care of people who have immediate needs, such as fractures. We



can do surgery for those issues. Also, we do treatment of individuals with congenital deformities, people who develop arthritis over time. So from a conservative, interventional and procedural perspective, we have the training to do all of that.
Q. Am I correct in that you stopped being an orthopedist in 2012?
A. End of 2012, yes. That's correct.
Q. And are you completely retired from the activities of an orthopedic surgeon?
A. Yes, I am.
Q. And to remain in the emeritus status, you must remain completely retired; is that right?
A. That is true, yes.
Q. When you examined Mr. Jones for this matter that we're here for today, were you doing so as an orthopedist?
A. I have orthopedic expertise and I looked at his conditions from that perspective. I'm not a treating physician, so I'm still within the bounds of my expertise being still in play but not treating him.



Q. So the -- the description you gave me before as an orthopedist, were -- were you doing so when you examined Mr. Jones in this case as an orthopedist?
A. Let's say as a physician who has orthopedic experience, and I would say that's the perspective that I saw this gentleman.
Q. Did you tell or indicate to Mr. Jones that you were no longer a practicing orthopedist when you conducted the examination?
A. No, I did not.
Q. Would there be anything to tell or indicate to Mr. Jones that you were no longer a practicing orthopedist when you conducted your examination?
A. No. There'd be no reason to do that. I still have the expertise and, again, it's a different perspective because I'm not a treating physician. So I didn't violate any of the conditions of my retirement.
Q. Are there any certificates on your wall of your office or anything at all that says you're no longer a practicing orthopedist?
A. I have my emeritus diplomate



certificate on the wall, yes. I don't think it says that I'm not a practicing orthopedist, I still am considered an orthopedic surgeon as an honorary title. And that's the premise of being able to say you're an orthopedic surgeon but with emeritus status.
Q. And where is that emeritus status certificate located?
A. It's in the wall in my office, I don't know. I have to go look.
Q. In your private practice, do you treat patients as an orthopedist?
A. Counsel, I said no. I'm not practicing as an orthopedic surgeon.
Q. Do you tell your patients in your private practice that you're no longer an orthopedist?
A. Sometimes it comes up. I don't go advertising every time I see somebody. But people are aware that I don't do surgery anymore. They have been for the last 12 years. So, I don't treat anybody, again, from an orthopedic perspective, I don't offer surgery and I don't hold myself out as a practicing

**orthopedic surgeon.**
Q. What would be the occasions that the patients -- that you would tell those patients that you're no longer an orthopedist?
**A. I think just generally, if somebody is interested in having me treat them, I tell them I -- I'm not doing that anymore. I can treat them from a pain perspective but I don't have the capabilities as an orthopedic surgeon.**
Q. Am I correct in that you do not teach at any medical schools?
**A. Correct.**
Q. And likewise, you don't teach any medical students, correct?
**A. I haven't in probably a couple of years, but sometimes there are people that come through that want to see what we do. But very, very rare at this point in my career.**
Q. What's a couple of years?
**A. A student probably in the middle of, I think, 2024, somebody that actually is -- had just become a physician's assistant, wasn't somebody that wanted to go to medical school.**
Q. But in -- in the context of a medical



school, you haven't taught any medical students; is that correct?
**A. Not since 1994. I had two tenures of professorship at Hershey Medical Center, so that was the last time I did it. I had time at that point, and I was very honored to be asked to do it two times in a row.**
Q. And you haven't published any peer-reviewed articles since you began practicing in orthopedics; am I --
**A. Correct.**
Q. -- correct?
**A. Yes.**
Q. Exhibit-1 that counsel showed you is your curriculum vitae, correct?
**A. Yes.**
Q. And on the letterhead it says "Regional Orthopedic Associates, P.C.," correct?
**A. That's correct.**
Q. What is Regional Orthopedic Associates, P.C.?
**A. It's a registered corporation in the Commonwealth of Pennsylvania.**
Q. And are you the 100 percent owner of



that company?
**A. I am, yes.**
Q. And it's a similar letterhead to the report that was authored in this case; is that correct?
**A. I believe it is, yes.**
Q. The second line of your CV says, Tall Oaks Pain Management." Do you see where I'm referring to?
**A. I do, yes.**
Q. What is Tall Oaks Pain Management?
**A. I had five offices at one time, so we name them after trees to keep track for my accountant. So Tall Oaks is one of the offices that I had, and I actually forget where it was. But I still keep that in there for the pain management. They're registered fictitious names.**
Q. And how many offices do you have?
**A. I have one now.**
Q. At one point, you said you had five offices?
**A. Yes.**
Q. What were each of those titles of those



fictitious names for those offices?
**A. Counsel, if you held a gun to my head, I wouldn't be able to tell you. I have no idea. I have to look. I forget which one was which. It's been a long time, it's been over 20 years.**
Q. Okay. It also says that the address of your present office is 2 Logan Square at 100 North 18th Street, Suite 300, Philadelphia, PA 19103-2733; is that correct?
**A. It is, yes.**
Q. Can we agree that Simon & Simon law office has an office in that same building?
**A. There are attorneys who use the offices in the same floor that I'm on, but their main office is in Newtown Square, as far as I know.**
Q. And by attorneys, you mean Simon & Simon?
**A. Attorneys that are in that firm, yes.**
Q. Could we also agree that Simon & Simon has an office in the same suite?
**A. Same floor, yes. There's 80 suites in this particular entity, it's a Regus facility.**
Q. Are there different suite numbers on the

floor of that building?
**A. Yes.**
Q. So for example, one suite could be 300, next door could be 301?
**A. Right. To make it easy for you, I'm sitting here at 378, across the hall is 379, that's where I do my exams for my patients and independent exams.**
Q. So then what floor, Regional Orthopedic Associates is located in Suite 300?
**A. That's the floor, that's the whole floor where there's 80 suites.**
Q. So you put the whole floor as your address on your report?
**A. Yes. So we can get our mail. The mail is culminated by the receptionists that are at the desk, and I was told that's the correct address to use, not the suites.**
Q. Are there any other law offices or attorneys that share that same space?
**A. There are, I don't know who they are.**
Q. Are there any other medical offices or doctors that share that same space?
**A. I think there's maybe pediatrics this**



**year or somebody who's in neurology. But, again, I don't interact with anybody, I come do my work and I go home.**
Q. I believe you already mentioned you have two offices that you lease in that building on the same floor at 378 and 379; is that correct?
**A. Right. They're two suites, yes.**
Q. And one of those offices is for the examination of individuals, I believe you mentioned that previously in your testimony; is that right?
**A. That's correct, yes.**
Q. What number, 378 or 379 is for the examination of individuals?
**A. 379.**
Q. So then 378 would be what?
**A. This is my personal office, I'm sitting in it right now.**
Q. How often do you interact with the Simon & Simon lawyers on a weekly basis given this proximity?
**A. I don't interact with them at all. I am -- I'm in my offices doing my job. If I am in a hallway and I see somebody I recognize,**



**I'll say hello and that's pretty much the extent of it.**
Q. That emeri -- the certificate that you stated before, what office is that located in, 378 or 379?
**A. I believe it's in 379. I can take a look if you'd like.**
Q. That's okay. In your current practice, how many individuals do you see for examinations per week?
**A. I said I'm averaging 20 to 25. I haven't seen any of my own patients since the holiday but I will on Thursday.**
Q. And how many of those individuals complain of neck pain?
**A. Counsel, again, I would have no idea. I don't keep track of that kind of information, I would have no way of doing it.**
Q. And likewise, how many of those individuals complain of back pain?
**A. Again, I have no exact numbers but I -- I would say at least half of the people that I see have complaints in the spinal column, the rest have joint issues and have had injuries to**



**other parts of their extremities.**
Q. So given about half have spinal column issues, would that be around 10 to 13 individuals per week that you would see?
**A. I -- I don't think so, Counsel. I don't know the breakdown of the numbers and I don't -- I don't really want to play this game because I don't know the answers. So, I have 20 to 25 people, average, per week that I work.**
Q. Okay. Understood. And I'm just going based off your testimony where you said about half of them were regarding the spinal column, right?
**A. Right. That's -- that's a good guess. I mean, there's most people that come and have those issues, of course.**
Q. Okay. So likewise, my math, you know, pretty basic math, it'd be 10 to 12 and a half people per week with spinal column issues that you would see?
**A. Okay. If you want to do the math and that's where you want to be, that's okay.**
Q. How many of those individuals complain of neck pain and indicate they have not been

involved in any sort of accident or trauma of any kind?
A. Pretty rare. Most of the people that I see, as I said, are involved in some traumatic event.
Q. And how many of those individuals complain of back pain and indicate they have not been involved in any accident or trauma of any kind?
A. Same answer. It's pretty rare. Most of the people that I see have injuries from a traumatic event.
Q. In the course of your current practice, have you treated any patients who have presented MRI studies to you which show disc protrusions or herniations in the neck, and indicate they have had no trauma or injury in their history?
A. Never.
Q. In your core -- in your -- in the course of your current practice, have you treated any patients who have presented MRI studies to you which showed disc protrusions or herniations in the back and indicate they have not had any trauma or injury in their history?



A. No. That'd be generally why they are presenting with a study and with their history.
Q. In the course of your current practice, have you treated any patients who've presented MRI studies to you which did not show any disc protrusions or herniations but have endured some sort of trauma or injury?
A. Yes.
Q. When you conduct your examinations of examinees similar to Mr. Jones, do you refer those examinees to other physicians or surgeons?
A. Never.
Q. Why not?
A. Because I don't have a treating relationship with these individuals that are for independent exams, so I wouldn't take on that role.
Q. When was the last time you referred one of your examinees to an orthopedic surgeon?
A. I said never, I wouldn't refer an examinee to anybody.
Q. Have you ever referred anyone to Dr. Clift -- Clifton Burt?
A. No, I have not.



Q. Is Dr. Burt a surgeon?
A. I don't have familiarity with his credentials other than I know he's a physiatrist, but surgical capabilities, I know that he does interventionals. But as far as having orthopedic training as a surgeon that way, no.
Q. And what are the interventionals that you're talking about?
A. Well, he does caudal epidurals, he does epidurals, and he does radiofrequency ablations as far as I know. Otherwise, I don't know any other procedures that he's done.
Q. Are these procedures considered surgeries?
A. They are, yes.
Q. Who considers these procedures surgeries?
A. They are designated as surgeries, and that's the way that they're coded when you're doing billing. So they're considered operative interventions. If you pass through the skin, you're doing surgery. It might be semi-invasive, not cutting a large opening to



get to a particular area. But if you are violating the skin, you're doing surgery.
Q. So you're referring to billing codes; is that right?
A. I was, yes. CPT codes.
Q. Is there anyone else or anything that considers these procedures billing -- or surgeries other than billing codes?
A. I haven't talked to anybody else about it. I mean, if I ask somebody the question, I might get an answer but I haven't asked anybody that question.
Q. Am I correct in that you don't perform radiofrequency ablations on patients' cervical or umbar -- lumbar spine?
A. I don't do any RFAs anymore.
Q. Am I correct in that you're not a radiologist?
A. That's correct.
Q. Am I correct that you are not a board-certified radiologist and never held yourself out as a radiologist?
A. Yes. That's correct.
Q. In making your diagnoses for Mr. Jones,

did you rely on any authoritative medical textbooks?
**A. Not necessarily textbooks. There's a lot of articles that I have at my disposal that I rely on for the state of the art information about these issues that we talk about.**
Q. Any specific articles that you relied on for Mr. Jones case?
**A. I could get them and list them for you if you'd like. I --**
Q. Sure. Provide it to counsel afterwards.
**A. Yeah. There's about 30 pages, I'd be happy to supply that.**
Q. Has the court ever limited or precluded your opinions?
**A. Yes.**
Q. Were circumstances was -- was your opinion ever limited or precluded?
**A. Well, I had the opportunity to look at about 300 cases for pedicle screw or implantation of a hardware, and I was involved in those cases. There was remand -- remanding of the cases at some point from Philadelphia to their original states. So some judges didn't**



**want to hear the testimony as to the causation, which was my job at that time, to see if individuals fit into the multidistrict litigation here in Philadelphia. So I think there were 12 cases where my opinions were not heard.**
Q. And you just indicated about a case in Texas, are you aware that in Mallow versus Dersia [ph], the judge in Texas stated that your conclusions were influenced by litigation-driven financial motive?
**A. I've heard that. It's very rich because my billings were under the direction of Judge Bechtle and he set the fees for me. So, I wasn't driven by anything except for the opportunity that was given to me by Judge Bechtle.**
Q. And did you testify in that case that you respected the judge's opinion if that's what they wanted to conclude?
**A. I respect any judge's opinion. I may not agree with it but I'm very respectful of the process, not being an attorney but having the privilege of being in his venue. So, I**



**would not comment on a judge's opinion other than to say I might disagree with it.**
Q. Other than the pedicile [sic] screw cases, were there any other circumstances where your testimony's been limited or precluded?
**A. I think there's two cases here in Pennsylvania. One, I'm very aware of, it was a knee case. And my testimony was precluded -- by the way, not my credentials, just the testimony because I indicated that I suspected there was a meniscus tear in the knee. That doesn't rise to the legal requirement for reasonable degree of medical certainty. So I think the judge was correct. I used terminology that was not rising to that level.**
Q. Was that the Krump case?
**A. That is the Krump case, yes.**
Q. Do you agree with the judge's opinion on that matter?
**A. From -- from a layperson, I -- I can see what he was saying, and if I wasn't certain about something, it's --**
Q. [Interference.]
**A. -- reasonable degree of medical**



**certainty.**
Q. What county was the Krump case pending in?
**A. I have no idea.**
Q. If I said Philadelphia, would that ring any bells?
**A. If it is Philadelphia, I wouldn't have an argument with that.**
Q. Did the Krump decision change your practice at all?
**A. No. It just made me mindful of opinions that would have to reach the threshold of a reasonable degree of medical certainty for all the opinions, a reasonable degree of medical probability for discussing future care. Those are not medical terms, they're legal terms, and I understand what they are not being an attorney.**
Q. Have you had an opportunity to review Judge McHugh's January 27th, 2025 memorandum in the matter of Shelton vs. Chaudhry?
**A. I didn't review it, but I -- I've heard it before. I've been asked about it.**
Q. What have you been asked about it?

**A. I've been asked if the judge made whatever opinion is he made. But I don't have familiarity with it because I haven't seen it.**
Q. Okay. Hopefully this will refresh your recollection. Judge McHugh provided quote, "In this case, as in virtually every case involving Mr. Simon's firm, the plaintiff was examined by a physician after which a life-care plan was prepared. Invariably, intensive and costly medical treatment is recommended, but I have yet to see a single case involving the Simon office where any plaintiff actually pursued the recommended care. I, therefore, view these reports as litigation documents bearing little relationship to real world medical care." Does that ring any bells?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are off the record. Time is 4:04.
MR. BURRUEZO: Yeah. I'm just going to place an objection on the record for relevance, prejudicial hearsay. This is a document that was



not exchanged during discovery. So I'm just, you know, noting my objection for the record.
MR. SULPIZIO: And in combat with that, it goes directly to qualifications, it's the -- a judge for the eastern district, it's publicly obtainable opinion involving directly Mr. -- Dr. Yarus and the Simon & Simon law firm, who are both involved. So...
MR. BURRUEZO: Yeah. We can go back on. But my objection's noted --
MR. SULPIZIO: Yeah.
MR. BURRUEZO: -- we'll talk about it with the judge.
MR. SULPIZIO: Fair.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record.
MR. BURRUEZO: Yep.
THE VIDEOTAPE TECHNICIAN: We are back on the record. Time is now 4:04.
BY MR. SULPIZIO:



Q. Sir, the snippet I read you from Judge McHugh's opinion, are you familiar with that snippet of the opinion?
**A. I've heard it before, sure.**
Q. Do you respect Judge McHugh's opinion and conclusions as provided in the Shelton case?
**A. Again, if it's a judge's opinion, I respect it. I don't agree with it because the reports that are done for independent medical exams have the components that he's talking about. So I'm not sure why they're a problem for him but they're generated by both sides of the issues, including defense and plaintiff and claimant. So, I don't understand what the problem is. It's factual information and it's backed by literature and practice, which is accepted in the community where I work.**
Q. Did Judge McHugh's memorandum change your practice at all?
**A. No, not at all. I still do the same reporting with the same thought processes, and I do my best to be as accurate as I can and as honest as I can.**
Q. Have you ever been sued in your capacity



as a physician within the last three years?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are off the record. Time is 4:06.
MR. BURRUEZO: Yeah. Just going to object on the grounds of relevance, prejudicial hearsay. It's kind of getting into a clear vo -- violation code of civility, we're getting into that point. But my objections are noted.
MR. SULPIZIO: Sure. And likewise, what I just said regarding Judge McHugh's opinion, this is all publicly-viewed court documents involving the Simon & Simon law firm, Dr. Yarus, and goes directly to the qualifications that a jury should be able to consider.
MR. BURRUEZO: No. I mean, you're actually trying to get attempts for baseless allegations to be brought into this matter that have absolutely

zero relevance to the case at hand.
MR. SULPIZIO: I disagree. We can argue in front of the judge.
MR. BURRUEZO: And we will because the judge has continued to deny these allegations to be brought in, so that's fine. We can argue it.
MR. SULPIZIO: Sure. We can go back on.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. Time is 4:07.
**THE WITNESS: The answer --**
BY MR. SULPIZIO:
Q. I don't --
**A. -- is --**
Q. -- there --
**A. -- yes. The answer is yes.**
Q. What circumstances have you been sued?
**A. No comment.**
Q. How many matters have you been sued in?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We



are now off the record. Time is 4:07.
MR. BURRUEZO: Yeah. Just noted, same objection, grounds of relevance, prejudicial hearsay. This is, again, using or attempting to use the baseless allegations to elicit some kind of facts that have not been proven or ruled upon yet. So...
MR. SULPIZIO: I have the same response as my last -- the objection you just made. Do you want a continuing objection until I finish this line of questioning?
MR. BURRUEZO: Yeah. No, I --
MR. SULPIZIO: This line --
MR. BURRUEZO: -- I don't.
MR. SULPIZIO: -- of questioning.
MR. BURRUEZO: I mean, we're going to object and go off the record every single time.
MR. SULPIZIO: Okay. That's fine.
THE COURT REPORTER: Before we



go on, I have a feeling we'll probably be here way past 6:00. Can we start going just a little bit at a decent pace, because my fingers will kill me and I will need multiple breaks.
MR. SULPIZIO: Sure. I don't know if we're actually going to go past 6:00 but we'll see.
MR. BURRUEZO: We're 40 minutes into voir dire.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record?
MR. SULPIZIO: Yep.
MR. BURRUEZO: Yeah.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 4:08.
**THE WITNESS: I'm sorry. The question was, Counsel?**
BY MR. SULPIZIO:
Q. So then, how many matters were you sued?
**A. Just the one that I think you're referring to.**
Q. Who are the other named defendants in



the matter?
**A. No comment.**
Q. What's the nature of the allegations against you in that matter?
**A. No comment.**
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are now off the record. Time is 4:09.
MR. BURRUEZO: I'm objecting on the grounds of relevance, hearsay, prejudicial, the inflammatory nature of this question. It's a clear violation of the code of civility and, again, is trying to get into the baseless allegations that have not been proven or founded upon.
MR. SULPIZIO: I have the same response. So, we can go back on.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 4:09.
BY MR. SULPIZIO:
Q. Did the commencement of this litigation

45

change your practice at all?
**A. No comment.**
MR. SULPIZIO: With that, that's all the questions that I have for you at this time. I will pass the baton. Thank you.
**THE WITNESS: Thank you.**
MR. COGNETTI: Doctor, good afternoon. My name is Michael Cognetti. I represent SEPTA and Ed Gomley. I just have a few follow-up questions for you.
- - -
BY MR. COGNETTI:
Q. Doctor, with regard to the testimony that you've been accepted by courts in the past as -- as an expert, a medical expert, counsel asked you questions about this case called Krump, and I think your answer was, "Well, I'm just a layperson." In this particular case, in Mr. Jones' case, you're not testifying as a layperson, are you?
**A. No. I think, Counsel, my comment on being a layperson is concerning the level of**

46

**certainty with which I will write my information in a report like this. I didn't say I'm a layperson generally, but as far as using terms like "reasonable degree of medical certainty" and "medical probability," those are not legal -- those are not medical terms, they're legal terms with which I'm familiar. So from that perspective, I'm not an attorney, so consider myself a layperson in that regard in the realm of law, not in medicine.**
Q. All right. All right. And then -- let me just -- counsel did a nice job on -- in asking voir dire questions. Just some follow-up.
You're not a member of any orthopedic society in Pennsylvania, true?
**A. Not here in the state, that's correct.**
Q. Not in Pennsylvania, true?
**A. Yes.**
Q. Okay. And you're familiar with the American Medical Association, the AMA?
**A. Yes, I am.**
Q. And the AMA provides a board certification in orthopedic surgery through the

47

American Board of Orthopedic Surgery, true, right?
**A. That is true, yes.**
Q. All right. And you don't have a certification in orthopedic surgery from them, right?
**A. Correct.**
Q. Okay. And then there's an organization for doctors like yourself, osteopathic doctors, what is that organization called?
**A. American Osteopathic Association.**
Q. Okay. And is that what you were talking about earlier that you -- you had to take a test for that board, and is that the one that you failed?
**A. Yeah. When I first took the test, like young people who graduate law school and don't pass the bar the first time at 30 to 60 percent. The standardized test that I took was a difficult hurdle and I didn't make it that -- at that point. Certainly not a reflection of my expertise or capabilities, but a process that you have to go through in order to get, you know, the next step going.**

48

Q. All right. And you ultimately did pass a test, right? You passed that test?
**A. I passed three written tests over a span of about 20 years.**
Q. All right. And -- and my notes here, you haven't conducted surgery in quite some time; is that true?
**A. Since the end of 2012, that's correct.**
Q. Okay. And -- and you don't -- presently, you don't work in any emergency rooms, I take it then, right?
**A. Well, I worked as an orthopedic surgeon in emergency rooms but I never had --**
Q. Presently. Presently I said. Presently, you don't work?
**A. I'd like to finish the answer if you don't mind. I'm going to answer your question the way I'd like to.**
Q. All right.
**A. I don't have --**
Q. And the question is: Presently, do you work or operate in any emergency rooms?
**A. The answer would be no.**
Q. Okay. And do you have any admitting



Uber_00141765

privileges to any hospitals?
**A. I do not.**
Q. So you can't admit patients under your own care to hospitals, right?
**A. Right. When you have privileges, you can do that. When you give them up voluntarily, you don't have the opportunity to do that.**
Q. Okay. And just -- just to be clear here, you previously, on questioning, said you make recommendations to patients, right?
**A. Of course, yes.**
Q. And Mr. Jones, the plaintiff in this case, you do not have a patient-doctor relationship with him, correct?
**A. That is correct, yes.**
Q. So you don't make any recommendations to him because he's not a patient, right?
**A. Exactly, yes.**
MR. COGNETTI: Thank you, Doctor. That's all I have.
**THE WITNESS: You're welcome. Thanks.**
**- - -**



BY MR. BURRUEZO:
Q. Doctor, you retired in orthopedics and orthopedic surgery in 2012, but that was the field you practiced in for more than 30 years, correct?
**A. Exactly, yes.**
MR. BURRUEZO: Okay. At this time, I offer Dr. Lance Yarus as an expert witness in the field of orthopedics, pain management and orthopedic surgery.
- - -
DIRECT EXAMINATION
- - -
BY MR. BURRUEZO:
**A. All right. During your testimony here today, Doctor, I'm going to ask to -- you for some opinions on Mr. Nadir Jones' injuries but I don't want you to do so unless you can do so to a reasonable degree of medical certainty; is that fair?**
**THE WITNESS: It's fair and I will do that, yes.**
BY MR. BURRUEZO:



Q. Did you have a chance to meet Mr. Nadir Jones and review his medical records at my office's request?
**A. Yes, I did.**
Q. And did you summarize your findings in a report to my law firm?
**A. Yes.**
Q. Do you have a copy of that report in front of you?
**A. I do, yes.**
MR. BURRUEZO: Okay. I'm going to mark this as Yarus-2.
(Whereupon, Yarus-2 was marked as of this date and is attached hereto.)
BY MR. BURRUEZO:
Q. Doctor, please feel free to refer to that report during your testimony here today. Okay?
**A. Yes.**
Q. All right. After performing the medical examination and reviewing the medical records, did you form any opinions to within a reasonable degree of medical certainty as to whether



Mr. Jones was injured as a direct result of the traumatic collision that occurred on November 9th of 2022?
**A. I did, yes.**
Q. And what were the injuries that were caused by this collision?
**A. Mr. Jones had injuries to his neck and his low back. The neck is called the cervical spine. Per the soft tissue injuries, the terms are cervical strain and sprain, cervical myositis, somatic and segmental dysfunction of the cervical spine, and an enthesopathy of the cervical spine.**
**The next area of injury in the cervical spine was discs, the discs that were out of their containment and displaced as herniations were for C3-4, C4-5 and C5-6. The next area of the anatomy that was injured, we call the facets, and the facets are motion segments. They're at each level of the spinal column, and they are on the right and left at each level; that's where motion occurs.**
**The global term is a cervical dorsopathy and cervical facet syndrome.**

Combining the disc and facet injuries, they generate pain. So the terms are a cervical discogenic and facetogenic pain mediated by C3-4, C4-5 and C5-6; this was more left-sided than right-sided so I included that.

The next area, the low back, same type of soft tissue injuries, and these are high-grade injuries that don't go away. And the terms are the same. So we just use the anatomical area to say that there's a lumbar strain and sprain, lumbar myositis, somatic and segmental dysfunction of the lumbar spine, and an enthesopathy of the lumbar spine.

In the lumbar spine, there were no disc injuries so they weren't forced out of their containment. But there was two levels of facet injuries, so that would be at L4-5 and L5-S1. And those two levels were pain generators coming from the facets at those levels, and the general term would be a lumbar dorsopathy and lumbar facet syndrome.

The last two diagnoses have to do with Mr. Jones having chronic pain because of these injuries, and Mr. Jones was affected in his



ability to participate in activities. So that, too, is a diagnosis. So I included that.

MR. BURRUEZO: Can we take a quick break off the record?

THE VIDEOTAPE TECHNICIAN: We are now off the record. The time is 4:19.

MR. BURRUEZO: Sorry. I need, like, 15 seconds, please.

(Whereupon, a recess was taken.)

MR. BURRUEZO: So sorry about that. Ready to go back on if everyone else is.

THE VIDEOTAPE TECHNICIAN: We are now back on the record. Time is 4:20.

BY MR. BURRUEZO:

Q. All right. Doctor, I'm just going to ask that you kind of explain some of these terms and terminologies to the jury. You referenced what lumbar and cervical spines are. What is a disc protrusion/extrusion-type herniation; what does that refer to?



A. The terms that I was using refer to disc material that violate either the internal portion of the fibers that surround the disc or the external portion that we're looking at. So disc generally will absorb forces. When the disc comes out, it's either going to be a bulge, less of the material out, or it's going to go past the circumference of the bony part of the anatomy, and it's going to get into the canal where the main nerves are that supply motor and sensory function.

For the cervical spine, that's true. For the lumbar spine, not true. But that's what we're describing. And the disc will go in that direction, which is the weakest part of the anatomy, toward the back. So that's why we have the term "dorsal" for the dorsopathy, which is an abnormality, and then the "facet syndrome" comes from the joint itself being injured.

Q. And can that be caused -- can that condition be caused by a traumatic event?

A. Absolutely, yes.

Q. And can that condition be a painful



condition?

A. Yes, it is. For a couple of reasons.

Q. And you observed this at two different levels in the neck?

A. Three different -- well, in the neck, three different levels, yes.

Q. Okay. And what is facetogenic -- what -- facetogenic pain, what does that refer to?

A. So if we're looking -- this is the front part, this is the neck, this would be the lumbar spine (indicating.) If we turn, here's the facets. And we're looking at joints, these are actually joints, they have internal structures like a capsule and meniscoid tissue, which is similar to the knee, and it has chemicals in the joint.

So when forces come across and it's too great for the joint to handle, the joint will separate and that will disturb the internal structures. Getting to how that translates into pain, here's the main nerves that supply motor and sensory function to the extremities. There's a small nerve that comes off of the main one, goes back and inserts underneath the

**facet; and this is at each level, right and left, I drew that in to show. And then there's a branch that -- or two branches that go into the facet itself. So when there's disc material that sits up on the main nerve when it comes out, that'll kick that small nerve in and send the pain signal to the brain, or if it's just the facet, same principle, the facet -- medial facet branch nerves will send that pain signal to the brain. So if it's a combination of disc and facet, you get a double-whammy, so to speak. And if it's just the facets, like in the low back, two levels, the small nerves, the medial facet branch nerves are still going to send or fire that impulse that the brain will pick up and understand as pain.**
Q. And this facet-type pain, can that also be caused by a traumatic event?
**A. Yes.**
Q. Okay. And of the injuries that you've diagnosed Mr. Jones with, what do you believe are the most significant?
**A. They're both significant when you talk about disc out of its containment fibers and**



**when you have facet injury, because they don't recover. They can improve with treatment over time, most definitely surgery. But if you do interventional procedures or conservative care, you provide medication, you're going to mitigate the symptoms that are coming from those small nerves firing and the fact that you have a mechanical change in the spinal column, which will affect the individual's ability to function; that's where the alteration of activities comes in, that all fits together. So I think they're both significant, certainly the soft tissue injuries are significant because as I said or alluded to, they're high grade. They don't -- they don't have the ability to go away because scarification occurs in those structures. So it's not going to change and it's going to continue to cause symptoms, and that's why it's permanent. The permanency comes from the alteration of activities because of these entities that occur after trauma.**
Q. And because Mr. Jones was only 19 years young at the time of this incident, are these



injuries even more problematic for him moving forward?
**A. They are because they behave the same way. I'd like to say because he was a young person, he was going to surmount that type of injury and -- and get back to 100 percent recovery but that's not the case. If he had a laceration, which he did, that will heal. But these are not the type of injuries that heal so that you'll get back function, even with a scar. So it's not the same in that regard.**
Q. And we referenced it earlier, but you had a chance to review medical records for his treatment?
**A. Yes, I did.**
Q. And where did he present first for treatment?
**A. He was in the emergency facility at Thomas Jefferson University, he was actually transported there from the scene of the incident.**
Q. Transported by ambulance.
**A. Correct.**
Q. And what type of complaints did he have



when he arrived at the E -- emergency room?
**A. He had right-sided low back pain, he had a left leg laceration and abrasion in the shin area. Those were the two main areas.**
Q. Did he under -- undergo any type of tests while at the hospital?
**A. He did. He had x-rays of the left leg, which did not show any fractures. And for his abrasion, he had the area cleansed.**
Q. The abrasion or laceration, that was on his leg?
**A. Correct. In the shin area.**
Q. Where did he present for treatment next?
**A. Next, he went to a facility called Spinal Care.**
Q. And what type of continued complaints did he have when he presented for treatment there?
**A. So he had sharp and tight low back pain with occasional pain to the right gluteal musculature that's in the buttock, aching, tightness in the mid back, sharp type of pain in the neck which was radiating to the right upper trapezius. Those are the muscles between**

**the neck and the shoulder.**

Q. And did he undergo a course of therapy?

**A. He did, yes.**

Q. And during his treatment time, did he receive any type of diagnostic studies?

**A. He did, yes.**

Q. And where at and when were they performed?

**A. He had MRIs at Open MRI of Bala Cynwyd, and that was on December 15th of 2022 for both the neck and the low back.**

Q. What is an MRI?

**A. MRI stands for magnetic resonance imaging. What an MRI is is a study that uses a large magnet, it rotates at a super rapid speed above the individual, and whatever anatomy you're looking, it will be honed in on that area. And when the magnet is made to whip around really fast, it reorganizes hydrogen molecules in the body, also protons. And the computer that's hooked up to it will translate that anatomy into what looks like an x-ray or a CT scan, but it is not because it's not using radiographic beams to create it. But it's more**



**sophisticated, it will give you two basic windows to look at the anatomy. They're kind of the reverse of each other, one's a T1, standing for Tesla, and the other is a T2. So you're able to compare those -- those mirror images in the zones of anatomy. So it allows you to see disc, allows you to see the bone structures; in some case, it'll allow you to see the nerves. I know that this is a 1.5 Tesla, 16-channel unit that they use. So it's very mediocre one, there's much -- much more sophisticated ones. But you still can see anatomy and -- and make some corollaries with the history and physical exam from the study.**

Q. And is an MRI an objective test?

**A. In and of itself, yes.**

Q. Meaning the patient can't change the results of the study?

**A. Exactly. Whatever's going to be put out will be not influenced by the individual unless they move in the scanner and that will mess up the study itself. But they can't change the anatomy.**

Q. And you had a chance to review the films



and the reports of the MRIs?

**A. Yes, I did.**

Q. Okay. And that's where you diagnosed him earlier, when we talked about the extrusion/ protrusion-types, the three levels in his cervical spine, that was from the MRI?

**A. Right. The character of the anatomy is, what we call, the morphology, and I interpreted it from my perspective and used the radiologist's interpretation to facilitate that as well.**

Q. And then he was seen at Regen Doctors with Dr. Levinstein?

**A. Yes, he was.**

Q. And when was that visit?

**A. This was January 18th of 2023.**

Q. And did he have continued complaints of pain when he presented there?

MR. COGNETTI: Ob --

**THE WITNESS: He did.**

MR. COGNETTI: Objection. Can we go off?

THE VIDEOTAPE TECHNICIAN: We are now off the record. Time is 4:30.



MR. BURRUEZO: Mike?

MR. COGNETTI: Yeah. I'm sorry. One second, please. I'll withdraw that objection. Back on.

THE VIDEOTAPE TECHNICIAN: We are now back on the record. Time is 4:30.

BY MR. BURRUEZO:

Q. And what was the basis or the reason he presented to see Dr. Levinstein?

**A. He had neck pain and back pain as his chief complaints.**

Q. And any type of diagnoses that he was given at that visit?

**A. The assessment was low back pain, lumbar strain, other cervical disc displacement, mid cervical region, unspecified level. And then other cervical disc displacement at C5-6 level.**

Q. And that's the level that you also identified earlier?

**A. Correct.**

Q. And was he recommended for anything else at that visit?

A. He was recommended to have medication, which was a muscle relaxant, it's called cyclobenzaprine, schedule electrodiagnostic testing for the upper extremities, and then continue the therapy.
Q. And then you had a chance to review a procedural report.
A. I did, yes.
Q. Okay. And where was that at?
A. The facility is called Premier Pain & Rehab Center.
Q. And did he undergo any type of procedure?
A. Yes, he did.
Q. And when was that?
A. It was at the facility on February 22nd, 2023.
Q. And what type of procedure did he undergo?
A. We call it a radiofrequency ablation that has two parts to it.
Q. And what are those two parts?
A. The first part is what we call targeting, you're addressing those small nerves



I was talking about that send the pain signal. So the idea is to knock out nerves that are sending the pain signal, and that's done in the first part by targeting, seeing which of the small nerves are, in fact, doing that. So you actually numb the medial facet branch nerve, that this one was done on the right and left at C6. So we're looking at the levels of C5-6 and C6-7, same nerve that has that small nerve coming off it. And once you numb the nerve, you wait a little bit and you ask the person if they have a reduction in pain. If that is the case, then you actually get to the next part, which is burning the nerve, that's done by placing a probe over it, dialing up energy in the form of heat, and doing that for about 90 seconds, which will burn the nerve.
Now, these nerves have the ability to come back, they'll regenerate, takes six to eight months to a year, so that's why you can burn only these nerves, not the main ones. So you knock out the pain by doing that.
Q. And I think you referenced it, but those nerves regenerate, and then the pain ultimately



returns?
A. They will come back because the underlying problem isn't addressed, which is the discs that are out in the neck, particularly in the facet injuries.
Q. So it is a temporary relief of pain?
A. It's a palliative measure, temporary relief, yes.
Q. Okay. And then you had a chance to meet with Mr. Jones on June 12th of 2023?
A. Correct.
Q. Did you have -- did he have any complaints of pain when you met with him?
A. Yes, he did.
Q. And what did he tell you?
A. He, again, had complaints in the neck and low back, no numbness or tingling in the upper or lower extremities. He described the pain as coming and going and sore. On, the pain scale it was a five out of ten, no muscle weakness in the upper or lower extremities. He told me what made his pain worse and we talked about some other effects on his activities.
Q. Did you ask him about any type of prior



incidents he was involved in?
A. I did, yes.
Q. And what did he tell you?
A. None that are similar to or the same as what happened in the incident of November 9th of 2022.
Q. And did you have a, then, chance to perform an examination?
A. I did, yes.
Q. And what did that consist of?
A. Well, the first part's obtaining the history. But as far as the actual physical exam, I looked at the neck and low back.
Q. And what type of test did you perform to look at the neck and low back?
A. So the first part is observation, looking at the curves that are in the neck and low back, that's called the lordosis. When you have muscle and soft tissue injury, it gets flattened, and that was the case for Mr. Jones. So there's a loss of lordosis due to spasm and hypertonicity at C3-4, C4-5 and C5-6, and it was left greater than right.
I asked him to go through the ranges of

motion, and they were decreased. For each range that I asked, the muscles that we talked about between the neck and the shoulder; the trapezius muscles were tender, they were in spasm, they were hypertonic and cord-like when I touched them, and that was positive for the same three levels, left greater than right.

I did a test that's called facet loading. And what happens there is we're trying to isolate the actual facets going in small increments from the top to the bottom of the spinal column.

So what we're doing is rotating, side bending, and then dropping back, so we're not focusing in on the disc, that takes it away and focuses it back here. And you go in small increments so that you can isolate whether or not there's a pain response, and I did get a pain response from Mr. Jones for the same three levels, left greater than right.

The next thing I did is a reflex testing. And the reflexes reflect back up to the spinal column where those main nerves come out. So we're looking at a motor function, and



then we'll test the sensory function next. But the biceps reflex was two out of three on the right, one out of three on the left, they're both abnormal. Biceps, three out of three on the right, one out of three on the left, abnormal. And then the brachioradialis muscle, it's at the top of the forearm, that was two out of three on the right, one out of three on the left. So they're all abnormal. And then I tested the sensory side by light touch and pinprick. And, again, in the extremities, there are zones that reflect back up to the levels where those main nerves come out. So for Mr. Jones, positive for C3-4, C4-5 and C5-6.

Q. And that examination, was it consistent with the findings from the MRI?

A. Very much so, yes. It was the same three levels that kept coming up each step of the exam.

Q. And Doctor, did you form an opinion on the prognosis for Mr. Jones?

A. I did, yes.

Q. And what was that prognosis?



A. I gave him a guarded prognosis.

Q. And what is -- what does guarded prognosis mean? What is your basis for that determination?

A. When you use a term, you're talking about what response you expect from an individual. So guarded means, I don't know what his response is going to be. I only know when we talk about various types of treatment that there is going to be a good response rather than no response. So, we're not expecting a recovery, that's part of the definition. We understand these injuries very much so, and from the perspective of how they behave, what the consequences of them are, that's within the prognosis. And that gets you to the next step by doing the prognosis and understanding the nature of the types of injuries. The next step will be what we'll talk about which would be treatment. But before that, I also looked at his lumbar spine in the exam as well, so that factors into that prognosis.

Q. And in your opinion, will Mr. Nadir Jones require treatment in the future?



A. Yes, he does.

Q. And what is your basis for these opinions?

A. So my own expertise, my ability to treat individuals who have had these same types injuries, even those individuals that are not my own patients have these types of injuries, they don't change over the -- the course of the time, as far as what they do to individuals once they're sustained. So the literature supports every aspect of each category of treatment and, again, it's steeped in a lot of work done by individuals who look at these types of injuries and determine what eventually will become the standard of care.

So it's not a guess. We're not making determinations. We're just talking about what effects treatment will have on these types of injuries. I can't tell you if Mr. Jones or anybody else will go for treatment, that's certainly an unknown. But the known part of this is what I'm going to be talking about, which is how do you address these injuries.

73

Q. And based upon these injuries, can you walk us through the kind of progression that Nadir will require for the remainder of his life?
A. There is a progression, a kind of menu so-to-speak, which we present just like if we're talking to a patient, doesn't mean they have to do every single one of these, but the progression goes from conservative to very advanced care, which would be surgery. But Mr. Jones doesn't have to follow in those steps. He's actually had treatments already.
So the first thing we talk about is surveillance -- yes, sir.
MR. SULPIZIO: Yeah. Objection. Off the -- off record, please.
THE VIDEOTAPE TECHNICIAN: Time is 4:41.
MR. SULPIZIO: My objection is that the rest of this testimony regarding future care, surveillance, et cetera, that's in the doctor's note is -- and -- and opinions, are

74

speculative. That is my prophylactic objection to the --
MR. BURRUEZO: Yeah. And --
MR. SULPIZIO: -- answer -- testimony.
MR. BURRUEZO: -- the courts have repeatedly said they were not. So your objection's noted, we can go back on.
MR. SULPIZIO: Thank you.
MR. BURRUEZO: Yep.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. Time is 4:41.
THE WITNESS: So the first thing you do is the surveillance, which is talking about studies. And I alluded to this also. You want to get the kind of studies where you see the anatomy. So MRIs are important. They are not where we make the diagnosis, but we use them for surgical planning. And we also use them to see if we have a correlation with exam and history

75

information. So I talked about that.
Two to four annual visits with an orthopedic surgeon or a physiatrist who does rehab. The reason for that is it's just another set of eyes, actually, and -- and other types of referrals that can be made.
Chiropractic treatments for maintenance, six to twelve times a year, same type of treatment that he had at the Spinal Care.
There are other types of interventionals besides the radiofrequency ablation that I've talked about. One of them is an epidural and/or facet injection. If you place high-dose corticosteroid in this area where my finger is, that's the epidural space. Epi means above, dural means the covering of the nerve, also the medication will sit behind or above the disc, and also will bathe the front part of the facet. You can also inject the facet because it's a joint,

76

so you can insert a needle in there with the materials that are high-dose corticosteroid for anti-inflammatory effect, and you can also deaden the medial facet branch nerves like you do for the first part of a radiofrequency ablation, that doesn't last very long but it certainly is a recognized procedure.
The frequency for epidurals and/or facet injections is three injections every six months just for another three years. The type of procedure that we talked about which is a radiofrequency ablation, it's also known as a rhizotomy and/or neurotomy, this, again, is basically addressing the nerves that are sending the pain signal. So for the three levels of the neck, it would be C3, C4, C5 and C6, which would be the actual medial facet branch nerves. The levels are where those nerves come from.
In the lumbar spine for the

facets, it would be L4, at L5 and S1. So L5 is visualized at the lower part at L4-5 and the top part of L5-S1, it's the same nerve. So those can be ablated at any time. Once you do a nerve, as far as the ablation, you want to wait for it to regenerate so the time frame is 12 to 18 months before you do another one. If you do it before then, the consequences are you're going to kill the nerve, and it won't function in the proper way. So it tells us where the pain is being generated.

I talked about for the neck and low back surgery. Surgery involves removing the facets. So if you remove the facets, those medial facet branch nerves that I talked about, they're going to go away. So you don't have that to contend with. It's not going to come back once you remove the facets. If you take greater than 50 percent of a facet, that means more



bone than the circumference of the facet itself; you're going to destabilize it and you're going to do that because you have multiple levels that you're operating. So if you do that, you have to fuse it and put some hardware in. And I talked about that.

And I said, there's no timeframe for surgery, it could be done at any time, at least within a five-year period once the injury has been incurred. So for Mr. Jones, it's the best time, doesn't mean you can't do it after five years, it's just a time frame where it's optimal to do the surgery.

If you don't do the fusion right away, you have seven years to do a fusion because things are going to change. You operate, the enemy of the surgeon is always scar, and you're going to get a heck of a lot of scars, so that's going to come later on as far as the fusion. But that's what I



recommended in regard to the procedures.

Now, after you do surgery, you want to do therapy, just keeps the person out of trouble. Generally for spinal column surgery, it's two to three times a week for eight to ten weeks at one hour per session. That's generally accepted. If he has to go more, so be it, but that's the time frame that I think's reasonable after a surgery like this.

BY MR. BURRUEZO:

Q. Okay. And if he underwent a radi -- a repeat radiofrequency ablation, and after you saw him as predicted by you, would it have been related to this collision?

A. It would have, yes.

Q. Doctor, do you have an opinion as to a reasonable degree of medical certainty as to the reasonableness and necessity of all the treatment that he received following the subject collision?

A. Yes, I do.



Q. And what is that opinion?

A. The care that Mr. Jones received was medically necessary, I would characterize it as reasonable, and it was related to this incident that occurred on November 9th, 2022.

Q. And have your opinions regarding future treatment been given to a reasonable -- given within a reasonable degree of medical probability?

A. Yes, they have.

Q. And have your remaining opinions been given today to a reasonable degree of medical certainty?

A. Yes.

MR. BURRUEZO: Thank you, Doctor.

THE WITNESS: You're welcome.

MR. SULPIZIO: Can we go off real quick?

MR. BURRUEZO: Yeah.

THE WITNESS: Sure.

THE VIDEOTAPE TECHNICIAN: We are off the record. Time is 4:47.

MR. SULPIZIO: Does the court

reporter need a break?
(Whereupon, a recess was taken.)
THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 4:55.
- - -
CROSS-EXAMINATION
- - -
BY MR. SULPIZIO:
Q. Again, good afternoon. I'm going to continue the questioning today.
This isn't your first time being cross-examined, is it, Doctor? You're on mute.
**A. There you go. Thank you. No, it is not.**
Q. And you've been testifying in legal proceedings since 1987, correct?
**A. Yes.**
Q. How many depositions have you participated in since 1987?
**A. I don't know the exact number, it's got to be in the thousands.**
Q. When was your last trial deposition that



you participated in?
**A. My last day here was Thursday before the holiday, so it's been about four weeks.**
Q. And whose client was the last trial deposition that you participated in for?
**A. It was for Kwartler Manus, I believe.**
Q. When are you scheduled to testify next in a trial deposition?
**A. Good question. I don't know the answer to these things. I don't keep them in my head but I can look. I have a deposition Tuesday, and then Wednesday, Thursday there's depositions because I was away for a while. So we have to make up some time.**
Q. So Tuesday would have been today -- or today's Monday.
**A. Right.**
Q. I'm sorry.
**A. Tuesday's --**
Q. I apologize --
**A. -- [overlap].**
Q. -- I'm losing track of days.
Today's Monday, you have depositions scheduled for Tuesday, Wednesday, Thursday of



this week?
**A. Yes, sir.**
Q. And whose client is those depositions that you have scheduled for -- upcoming this week for?
**A. They're going to be all Simon & Simon.**
Q. Presently, how many trial depositions do you participate in, on average, per week?
**A. Well, my average last year and many years before, that's about two to three, that's all I can handle.**
Q. How long have you been testifying for two to three times per week?
**A. Pretty much my whole career. I mean, I was doing surgery before so it was very limited, but I still try to keep it at two to three if I can.**
Q. Based on my math again, you testify between 100 and 160 times per year; is that right?
**A. If you average it out over the course of the years that I've done this, yes.**
Q. How much do you charge per deposition that you participate in?



**A. My fee is $4200.**
Q. Do you charge more if a deposition takes longer than anticipated to complete?
**A. If it's an exorbitant amount of time, sure.**
Q. And who pays you for your time at a deposition?
**A. Well, whoever is the plaintiff, that will be the person that's asking me to do the deposition.**
Q. The plaintiff, Mr. Jones?
**A. In this case, yes.**
Q. Is Mr. Jones your patient?
**A. No.**
Q. Would you be -- agree with me that this deposition will be considered medicolegal work, where you get paid for your time to testify; is that right?
**A. I would agree, yes.**
Q. And you also get paid to perform examinations of individuals who are clients of law firms; is that right?
**A. I do, yes.**
Q. How many individuals do you see for



Uber_00141774

examinations in a given week on average?
**A. Anywhere from 10 to 15.**
Q. Okay. And you get paid to author opinions and conclusions from the examination of those individuals, correct?
**A. I get paid for the time invested in seeing an individual, writing the report, reviewing the records, so that's what it encompasses.**
Q. And based on the individuals you see per week, the 10 to 15 you indicated, that would be approximately 500 to 750 per year; is that right?
**A. No. That's much less. Last year, I was at 347, so it doesn't -- doesn't come to those numbers. I only work 40 weeks a year.**
Q. You said 347; is that right?
**A. I believe that's the correct number. I don't have it in front of me, but I believe those were the numbers for last year.**
Q. Am I correct that a law firm hired you for this matter, not Mr. Jones directly?
**A. That's correct.**
Q. And this is a common relationship for



you at this time, correct?
**A. Well, it's something that I do in the course of my activities as a physician, if that's what you mean by common.**
Q. And in this case, are there any other charges that you have made other than the time for your testimony here today in this matter?
**A. Other than the report, the time I spent with Mr. Jones, et cetera, no, there have been no other charges.**
Q. How much do you get paid for the preparation of the report?
**A. It's just one single fee.**
Q. Of how much?
**A. I think in this case, will be $750.**
Q. Have you been paid the sum?
**A. I believe we've been paid, yes.**
Q. Have you been paid for the testimony you're providing here today?
**A. I'm not paid for my testimony. For my time today, I've been paid.**
Q. Is this the first time that Simon & Simon has asked you to examine one of its clients?



**A. No.**
Q. Is this the first time that Simon & Simon has paid you to testify in a lawsuit?
**A. Well, again, it's not the first time that they pay me for my time in testifying on behalf of one of their clients.**
Q. Do you agree with me that you began your relationship with Simon & Simon in 2014?
**A. I received referrals from Simon & Simon to see their clients. So, I don't have a relationship with them in any other way.**
Q. Understood. You would agree with me that started in 2014, correct?
**A. Somewhere in there, yes.**
Q. Would I be correct that in between 2014 and 2023, Simon & Simon's paid you over $4 million for your services?
**A. Do the time frame again. I'm sorry.**
Q. From 2014 to 2023.
**A. I think that would be correct, yes.**
Q. How many examinees or individuals has Simon & Simon sent you since January of 2023?
**A. It would be 10 in total.**
Q. 10 in total?



**A. Since the time frame in which you asked me, yes.**
Q. January of 2023?
**A. Oh. My apologies. '23, I don't know the number exactly. If you say the numbers, I'll probably remember them.**
Q. Were the 10 individuals you provided that number for, was that for January 2026 so far?
**A. Yeah. I'm sorry. I didn't hear the '23 part. I gave you the information for '26.**
Q. Okay. So 12 days into 2026 and you've gotten 10 referrals from Simon & Simon so far?
**A. That's correct, yes.**
Q. And I believe you indicated it a little bit ago that you work approximately 40 weeks per year?
**A. Yes.**
Q. How much were you paid by Simon & Simon in 2024 for your services?
**A. I don't have it in front of me, Counsel. If you want to tell me the numbers, I'll probably agree to them if it's something I testified to before. I'm not a walking**

**compendium of every amount of money I've ever made from a particular entity. So with all due respect, I don't know offhand.**
Q. Will the figures of 476 narratives and 1036 depositions for 2024 sound right?
**A. I would agree to that, yes.**
Q. And based on my math again, that would amount to $928,200 for your services in 2024?
**A. Sounds correct, yes.**
Q. How much were you paid by Simon & Simon in 2025 for your services?
**A. Same answer. I'd -- I'd have to get the numbers out. But I think I'm -- if you, again, tell me the numbers if you know them, I would certainly know.**
Q. So just so I'm understanding, you're the 100 percent owner of your business and don't know how much revenue you generated in 2025, the year that just ended, correct?
**A. Pretty much -- yeah. Pretty much. I have somebody that does that for me. I don't keep my head in that area. Certainly, I get the information every quarter from my accountant. But I don't generally know what I**



**even have in the bank. It's just the way I am. It's not something that's of great importance. Don't forget, I'm -- I'm retiring and I'm dialing down my practice, so I'm very fortunate to have made my money as a surgeon and invest it wisely, so I'm robust. So I really don't care at this point. It's something I want to do.**
Q. When are you retiring?
**A. I'm going to get another five years out of myself if I can, if I stay as healthy as I am.**
Q. How many narratives did you prepare for Simon & Simon in 2025?
**A. I think it was 347.**
Q. How many depositions did you get for Simon & Simon in 2025?
**A. I think it was about 136, I could be off on that one. I did 101 addendums in that year as well, last year.**
Q. And that's supplemental reports that you prepare?
**A. Yeah. If there's, like, extra records, I review those and generate a report.**



Q. Do you charge for the preparation of those addendum reports?
**A. I do. For the time invested in, again, reviewing them and dictating them.**
Q. How much do you charge?
**A. It's $250 a page.**
Q. On average, how many pages are those reports?
**A. They average about three pages, not usually more than that.**
Q. So on average, it would be around $750 to prepare an addendum report?
**A. Average, yes.**
Q. Sorry. I'm just doing some math here.
**A. Sure.**
Q. So based on my math at $700 per narrative, 700 -- or excuse me.
Based on my math of $750 per narrative, $750 per addendum report and 4200 per deposition, based on the figures you give me was, would 907,200 sound right for 2025 from Simon & Simon?
**A. I'll agree to that, sure.**
Q. How many supplemental reports did you



prepare for Simon & Simon in 2024?
**A. I don't know the number offhand.**
Q. Can we agree that you also do work for other law firms that send you clients for their examinees, correct?
**A. Correct.**
Q. And you testify for those other law firms as well?
**A. I do, yes.**
Q. How many examinees have other law firms sent you since January of 2023?
**A. I have no idea, Counsel. I don't keep track. I'm always asked about Simon & Simon for some odd reason, but I'd have to go to each and every one them because we don't collect that kind of information. We don't keep it and we have no way of getting at it. So not to avoid your question but I don't have any numbers for anybody else. I -- I have -- I have estimated in interrogatories in the past, but I'm not going to do that because I don't really know.**
Q. What's the estimate that you provided in the interrogatories?

**A. I have no idea. I'd have to go back and look. I get asked occasionally now for interrogatories.**
Q. So based on what you just indicated, that you don't keep track of the law firms that owe you money for your services; is that right?
**A. That's not what I said, Counsel. I said I don't keep track of the numbers, which would be how many individuals I see that would be referred. I have somebody that does that in my practice. I don't keep my head in that.**
Q. What other law firms refer you examinees or -- or clients?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We're now off the record. The time is 5:09.
MR. BURRUEZO: Just objecting to the relevance of this question, it clearly lacks foundation on why it's even remotely part of this case. But...
MR. SULPIZIO: And just, it's



been consistent with my whole line of questioning and certainly relevant and goes to bias, and I absolutely think it's relevant.
MR. BURRUEZO: On what other firms he works with?
MR. SULPIZIO: Yes.
MR. BURRUEZO: What bias does that show? You're actually doing the exact opposite.
MR. SULPIZIO: Not -- not really. But we can agree to disagree.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record?
MR. BURRUEZO: Yep.
MR. SULPIZIO: Yep.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 5:09.
BY MR. SULPIZIO:
Q. In 2025, what percentage of your business revenue derives from Simon & Simon compared to other law firms?
**A. Probably around 50 percent. For this**



**type of work, not for any other type of work.**
Q. Is it fair to say that if I doubled my figure of $907,200 that you provided for me in 2025, if I double that figure, that would be your -- your income that you receive from all law firms in 2025?
**A. I don't know. It may be. It's just an estimate on my part, I don't know the exact number.**
Q. Who from Simon & Simon sent or referred Mr. Jones to you?
**A. Well, I can only assume, it's Mr. Burruezo's case, but I won't know that until the day of a deposition. I don't know who the attorneys are that would be representing a particular client.**
Q. Where did you first meet Mr. Jones?
**A. The only time I met him was here in my Philadelphia office.**
Q. That office base that you have in 2 Logan Square, correct?
**A. Right. This would be in 379.**
Q. And that office that you have in 379, is that a traditional medical office?



**A. What do you mean by "traditional medical office"? I -- I'd have to hear a definition of that.**
Q. Sure. Do you have -- I'll give you some examples; do you have a receptionist?
**A. I have a physician's assistant. The receptionist is what I pay for for Regus, they're out in the front greeting area.**
Q. Do you have medical equipment?
**A. Yes. I have medical equipment in there, yes.**
Q. What medical equipment do you have in that office?
**A. I have an Orthoranger II, which is a device that gives me exact degrees of motion, I have a reflex hammer. Nothing else at this point. I don't have any machinery or anything like that. I have an exam table in there.**
Q. That was my next question, do you have an exam table?
**A. I -- I do, yes.**
Q. How many examination rooms do you have?
**A. Just the one across the hallway.**
Q. Is this address the only office you

personally have?
**A. I have a virtual office in Pittsburgh, but I don't present there physically anymore.**
Q. What do you mean by virtual office?
**A. Regus facility has opportunity for an office to be held if you are paying their fees for the leasing. So, they term that a virtual office. I don't physically go there anymore. I used to.**
Q. When's the last time you utilized a physical office other than the Philadelphia location?
**A. The last time's probably in Lebanon, Pennsylvania where I had started out, probably around, I'm going to say, five, six years ago.**
Q. When you examine an individual, is there anybody in the room with you?
**A. Yes. There's always an individual, a certified physician's assistant.**
Q. For Mr. Jones, who was in the room with you during his examination?
**A. It would have been an individual known as Dahlia Pinkney [ph].**
Q. And does Dahlia Pinkney work for you?



**A. She does. She works for my corporation, yes.**
Q. And that is the physician assistant's role that you indicated?
**A. Correct.**
Q. Am I correct in that the June 12th, 2023 examination of Mr. Jones was the first and only time you saw him?
**A. That's correct, yes.**
Q. What records of Mr. Jones did you have before you porm -- performed the examination?
**A. I don't look at the records until afterwards, but the records would have been in my possession at the time I saw him. They're listed in the report.**
Q. Do you know who got Mr. Jones to your office for the examination?
**A. No, I do not.**
Q. Was he accompanied by anyone?
**A. I would have said so if he was. I don't see that there was anybody with him.**
Q. Did anyone from Simon & Simon attend the examination?
**A. No.**



Q. How long did the examination of Mr. Jones take?
**A. I don't time the examination. However long it took to take a history and then do the exam.**
Q. On average, how long do the examinations of these individuals take?
**A. A history's the most significant amount of time. So anywhere from a half hour to 40 minutes, and then my exam averages about 15 minutes or so.**
Q. So in total, if doing my math again, it would be around 45 minutes till about an hour from start to finish for the examination?
**A. I would agree to that, yes.**
Q. During the course of your examination of Mr. Jones, did he tell you that he had a certain level of pain in his neck and back?
**A. He did, yes.**
Q. Did he provide a quantifial [sic] number for that pain level at the time of the examination?
**A. Yes. I said it was a five out of ten.**
Q. Is that on the zero-to-ten pain scale?



**A. Correct.**
Q. What quantifial [sic] number did Mr. Jones provide for the pain level in his neck?
**A. It's five out of ten for the areas that he was complaining.**
Q. Was that also true for his lower back?
**A. For both, yes.**
Q. Given the level of pain Mr. Jones provided to you, did you make any recommendation for Mr. Jones to seek immediate treatment?
**A. I'm not a treating physician, so no, I do not. He was not in dire straits or having any issues that would require a direct referral to an emergency room or any other physician.**
Q. At any point during the examination, did you tell Mr. Jones of your diagnoses?
**A. No. Impossible to do that. I haven't read his records for one, and for two, I wouldn't do that anyway because he's not a patient of mine.**
Q. At any point during the examination, did you tell Mr. Jones of your prognosis for him?
**A. I didn't tell him anything about my**

101

**assessments of his condition.**
Q. Any point during the examination, did you tell Mr. Jones that you thought he required surgery in the immediate future?
**A. No. For the same reason.**
Q. Who is Mr. Jones' family doctor?
**A. Someone named Dr. Karen W. Rendulich, R-E-N-D-U-L-I-C-H.**
Q. Did you ever receive medical records from his family doctor or family medical practice?
**A. No, I did not.**
Q. Did you ever request those records?
**A. No, I did not.**
Q. Do you seek a need to have those family doctor records?
**A. In the case of Mr. Jones, no. If there's something in the records that's of relevance, I'll certainly look at it now. But I didn't have any reason to do that based on my questioning of Mr. Jones.**
Q. Did you ask him, him being Mr. Jones, why he goes to the family doctor?
**A. No, I did not.**

102

Q. Do you know if Mr. Jones has any other medical conditions?
**A. I asked him about his history, there's no history that I'm aware.**
Q. And what does Mr. Jones do for a living?
**A. At the time of the injury, he worked for UPS as a package handler. He did return to light-duty. But when I saw him, he was working at Wawa as a cashier.**
Q. Do you agree with me that lifting heavy items could cause disc herniations and protrusions in the spine?
**A. I wouldn't disagree with that statement.**
Q. What activities of daily living can Mr. Jones not perform?
**A. The ones that he talked to me about were trying sports after the injury occurred, he was having difficulty. Activities at home caused an increase in his symptoms, he didn't specify. But those types of activities were causing him to have increased symptoms.**
Q. And you would agree with me that some sports cause greater discomfort or have a

103

greater intensity than others, correct?
**A. Sure. I wouldn't disagree with that as a general statement.**
Q. Similar with activities at home, some activities could be more vigorous and intense than others?
**A. I -- I think it's a reasonable statement to make. It doesn't apply to Mr. Jones from my perspective, but sure.**
Q. Turning to some of the medical records you reviewed and in your report, did you learn from the medical records that Mr. Jones -- Mr. Jones, excuse me, presented to Jefferson immediately after the accident?
**A. Yes.**
Q. And in those medical records, did you learn that Mr. Jones' complaints consisted of right lower back pain and left leg pain, which was the cut on his shin?
**A. I did, yes.**
Q. Would you agree with me that Mr. Jones, in those Jefferson records, when he presented to the emergency room, did not complain of any neck pain?

104

**A. I would agree, yes.**
Q. The next day Mr. Jones presented to Spinal Care, correct?
**A. Yes.**
Q. Did Mr. Jones relay to you that he was referred to Spinal Care by his attorneys?
**A. No, he did not.**
Q. And am I correct that Mr. Jones' last treatment with Spinal Care was in -- January 18th of 2023?
**A. Yes. Well, as far as I had the records to reflect that, yes.**
Q. And then next, Mr. Jones went to Regen Doctors on January 18, 2023; is that correct?
**A. Yes.**
Q. Do you know who referred Mr. Jones to Regen Doctors?
**A. I don't, no.**
Q. Did Mr. Jones indicate that he was referred to Regen Doctors by his attorneys?
**A. No, he didn't.**
Q. In the series of treatment in the records, it indicates that Mr. Jones was going to have an EMG study; is that correct?



Uber_00141779

A. That was recommended to be scheduled, yes.
Q. Do you know if the EMG study was ever completed?
A. I haven't seen any EMG studies, so I don't know if he ever got one.
Q. Do you know who decided that this EMG study would not be completed?
A. I have no knowledge of that.
Q. Next in the report was the Open MRI of Bala Cynwyd on December 15th, 2022, the cervical MRI and MRI of the lumbar spine, correct?
A. Not just the report, I had the hard copy films as well.
Q. Understood. Would you agree with me that regarding the MRI of the lumbar spine, the -- on December 15, 2022, the L1-L2 through the L5-S -- to the S1 showed no discopathic or facetogenic changes?
A. On that study, you won't see that. That's correct. I agree with that.
Q. Are there any other MRI studies of the lumbar spine that you've seen that shows any discopathic or facetogenic changes?



A. No. That's why I made recommendations for advanced MRI.
Q. Do you know if that advanced MRI was completed?
A. I have no knowledge of anything that's been done after I saw him.
Q. And like you indicated in your testimony previously, the MRI studies are objective. Mr. Jones can't change the results of that study, correct?
A. Unless he moves in the scanner, sure. You can't change the anatomy, if -- if that's what you're referring to. I had testified to that already, yes.
Q. Next in the report, it indicates that Mr. Jones received treatment from Dr. Clifton Burt, correct?
A. Yes.
Q. Do you know who referred Mr. Jones to Dr. Burt?
A. I don't. Any referral patterns, I have no knowledge of, unless it's stated exactly in the record. But irrespective of that, if he gets to a person who knows what they're doing



and -- and has credentials to do it, I -- I'd have no problem with it.
Q. Do you frequently examine individuals who have also been see -- been seen by Spinal Care, Regen Doctors and Dr. Clifton Burt?
A. I think if you named the facility in the Greater Philadelphia area, I've probably seen those individuals. I don't know them personally but I've seen every facility that does this kind of work in addition to Dr. Burt, and I certainly have seen his work.
Q. Is it common for an individual sent by Simon & Simon that also has seen these facilities?
A. Well, how would I know the commonality of who sees who in any facility? I wouldn't know that.
Q. Based on other examinees that you've -- you've seen in the past.
A. Well, as I said, I've seen a number of facilities that do this kind of work, interventionals and pain med -- pain medicine or pain management. So Dr. Burt is one of them. I could name others if you'd like. But



it's one of the facilities that does this kind of work.
Q. Pain is subjective, correct?
A. Subjective, yes. I agree.
Q. What is symptom magnification?
A. Well, the person's acting inappropriately. We call it inappropriate illness behavior, not any other terminology. So if -- if a person's out of skew or behaving much more than you would expect for a particular type of injury or exhibiting bizarre behavior, that would be in that category.
Q. Did you make any specific analysis or evaluation as to whether Mr. Jones was engaging in symptom magnification during his exam?
A. No. I've been doing this a long time, I don't need any measures to see if he's forthright, answering the questions appropriately and correlating that with the information we talked about. I have no problems with him.
Q. Have you ever examined any individual referred to you by Simon & Simon who engaged in symptom magnification during his or her exam?

**A. Well, you just asked me if pain is subjective. It's subjective the way individuals will act when they have pain. Some people, with maneuvers, will have more pain than others. But I certainly can measure that on the pain scale, but that's the extent of it. We have no way of telling whether somebody's pain is or is not valid unless we look at the actual injuries and then we know. I think at five out of ten, he's very reasonable. He didn't give me a ten out of ten.**
Q. What is secondary gain?
**A. Secondary gain usually refers to people who are claiming injury or feigning an injury to receive moneys.**
Q. Did you make any specific analysis or evaluation as to whether Mr. Jones was engaging in secondary gain during -- during his examination?
**A. No. If I thought Mr. Jones didn't have bonafide injuries, I would have said so, and I -- I would have written it in the report, and that would have been the end of it.**
Q. Have you ever examined any individual



referred to you by Simon & Simon who engaged in secondary gain during his or her examination?
**A. No. I've had a pleasant experience. Most of the time, when I see individuals that are -- they're polite, they answer the questions and they behave during examination like I would expect. I don't usually have problems with people. If I did, they would be out of here. I've been doing it for a long time and I don't come across that too often.**
Q. Fair to say that you only examined Mr. Jones' cervical and lumbar spine during the examination?
**A. That's the only areas, yes.**
Q. And not his legs or knees or any other body part?
**A. No, I don't recall doing any other exams or I would have documented it.**
Q. What were the range of motions for Mr. Jones' cervical spine during examination?
**A. For forward flexion, he was at ten degrees, extension 15 degrees, rotation right 15 degrees, left 10 degrees, side bending right 5 degrees, left 10 degrees.**



Q. And what's the starting point for all those ranges of motions?
**A. Well, forward flexion could be anywhere from 25 to 30 degrees, extension 15 to 25 degrees, rotation right and left 25 to 30 degrees, and side bending right and left, anywhere from 15 to 20 degrees.**
Q. What were the mo -- range of motions for Mr. Jones' lumbar spine during the examination?
**A. Forward flexion was 90 degrees, extension 15 degrees, rotation right 10 degrees, left 10 degrees, side bending right 15 degrees, left 10 degrees.**
Q. All right. Going back to the cervical spine, what's the full range of motion for forward flexion of the cervical spine?
**A. I said anywhere from 20 to 25 degrees, some people can get to 30.**
Q. And what degrees of the full range of motion for the extension of the cervical spine?
**A. Counsel, I just answered all the questions you asked. I'm -- I'm getting the same questions again. I gave you all the ranges that are normal.**



Q. Oh. I was asking about the starting point.
**A. I'm not sure what you mean by a starting point. Starting point is neutral.**
Q. Sure. Right. So what's neutral?
**A. Neutral's 0 degrees. If you're holding your head straight, and then you move in -- in any direction, we're going to measure that in degrees.**
Q. So those degrees that you gave me for the cervical and lumbar spine, those will be the full ranges of motion for each of those?
**A. No. They're the --**
Q. Correct?
**A. -- deficits.**
**No, no. They're the deficits that Mr. Jones has from the normal. So he's not getting to any normals in the full range of motion for each of the categories I indicated.**
Q. Okay. Then let's back this up. What is the degree for a full range of motion in a -- for a forward flexion of the cervical spine?
**A. 0 to 25 degrees.**
Q. And what's the degree of the full range

113

of motion for extension of the cervical spine?
**A. They're all ranges. They're not written in stone. So it's a -- it's 0 to 15 to 20 degrees, 25, sometimes, people can get to.**
Q. And what's the degree for the full range of motion for the rotation of right and left of the cervical spine?
**A. 0 to 25 to 30. And for side bending, 0 to 15 to 25, depends on a person's agility and their ability to move in those directions.**
Q. Similar questions for the lumbar spine. The starting point would be 0; is that correct?
**A. Right.**
Q. And what's the degree for the full range of motion for forward flexion of the lumbar spine?
**A. Anywhere from 0 to 90 to 100, depends on the arm length, how tall the person is. Some people can get to even more than that. I've seen 110 actually for a full range of motion. Extension would be 0 to 15 to 20 degrees, rotation right and left 0 to 25 to 30 degrees, and side bending right and left about 0 to 15 to 20, some people can get to 25.**

114

Q. Did you util -- utilize the -- I believe you said it was an Orthoranger or any other measuring tool to determine these degrees for Mr. Jones?
**A. Not on this one, no. I started using Orthoranger later on. This is back in 2023.**
Q. When did you start using the Orthoranger?
**A. Somewhere around middle of '24, I think.**
Q. Why did you start using the Orthoranger?
**A. I've used it all my career, I happen to find it. I just moved, I actually found it so I was happy. I thought I lost it.**
Q. There's no -- there's no reason that it would help you or be more exact in your medical practice in offering your opinions?
**A. You know, Counsel, it's range of motion, okay, that's subjective for the most part. We document it as a matter of course. But in the big picture, it's not going to change anything that we've talked about as far as the degree of injury. But the ranges certainly speak to what soft tissue injuries**

115

**are in play.**
Q. So for Mr. Jones' examination, did you use any other kind of measuring tool to determine the ranges of motions and degrees?
**A. No, I didn't.**
Q. In both the cervical and lumbar spine, you noted a loss of lor -- lordosis, correct?
**A. Yes, I did.**
Q. Did you utilize any imaging equipment in making this determination?
**A. Yeah. My two eyes. I'm just looking at the curve, and if it's flattened, which his were for the neck and low back, I documented that as a loss of lordosis.**
Q. Do you have any plans to see Mr. Jones again?
**A. If I'm asked to, I'd be happy to do it. But I don't have any plans on my own. He's not a patient, so therefore, he didn't get a follow-up.**
Q. Did you review a video of the accident including the activities and movements of Mr. Jones on the bus following the accident?
**A. I didn't see any of the video.**

116

Q. Why not?
**A. It wasn't supplied to me and if it was, I wouldn't look at it. I'm not a reconstructionist and I'm not somebody who's going to comment on the forces and everything that goes along with that. It's outside of my expertise.**
Q. So you don't believe any of Mr. Jones' movements after the accident would assist you in performing your analysis or examination?
**A. No, that's not going to help me one bit. And usually these injuries don't necessarily manifest as evidence by his ER presentation. So later on he may have other issues. I saw him and I -- I observed the findings, as I said. But seeing a video isn't going to change anything either. That's for the jury to view, that's up to them. Not me.**
Q. Do you know Mr. Jones' range of motion has gotten better after the June 20 -- June 12th, 2023 examination?
**A. I don't know anything about his range or if anybody documented it. I know that he continued his treatment but I haven't seen any**



Uber_00141782

**of those records.**
Q. That was my next question, have you seen any medical records for any of Mr. Jones' treatment after June 12, 2023?
**A. I haven't seen the records for his therapy, which I believe ended in May, and I haven't seen the additional radiofrequency ablation that he received. So I didn't know that at the time I saw him.**
Q. Would you expect Mr. Jones to have made any improvement after you examined him on June 12, 2023?
**A. I don't think these injuries, per se, are going to improve drastically. But with the therapy and having an RFA, it's going to give him an opportunity to do that. But I haven't seen him after, so I can't make any comment on the degree to which he's improved, if at all.**
Q. Do you know what Mr. Jones' range of motion in his cervical and lumbar spine are today?
**A. No, I don't know anything about him except for when I saw him.**
Q. Do you know if any -- if Mr. Jones is



receiving any sort of treatment today?
**A. As I said, I think he stopped in May, from what I understand, but I haven't seen the records for that.**
Q. Would it surprise you that Mr. Jones hasn't sought any treatment for his alleged injuries since September of 2023?
**A. It wouldn't surprise me, no.**
Q. Why not?
**A. Because conservative care basically won't give as much opportunity for a more lengthy period of time than the other options past conservative care. They're valuable, and I said six to twelve maintenance sessions, but that's just to keep things moving. But it's not going to change the underlying condition overall.**
Q. Can you say with any certainty that Mr. Jones will ever seek treatment again?
**A. That's a part that I said in my testimony, that's certainly speculative. As far as what's required for these types of injuries, that's not a guess and that's not out of the air, it's very steeped in a lot of**



**history and creating the standards of care, so that's where they're at. But as far as he goes or not, that's certainly something I wouldn't know. But he still requires those types of treatments I outlined.**
Q. So no, correct?
**A. I answered it, Counsel. The answer is, I don't know what he's going to do but he still needs to be given that opportunity to have the treatment that's required for these injuries.**
Q. Is this the first time you ever issued a report for an individual referred to you by Simon & Simon where you provided a future medical care plan for someone with a neck and back injury?
**A. No, it is not.**
Q. And Mr. Jones requires ongoing evaluations, medical treatment, medical management, correct?
**A. As part of the options for his future care, yes.**
Q. And part of that care, you indicated medical surveillance like MRI imaging of the cervical and lumbar spine every other year,



correct?
**A. Correct.**
Q. And chiropractic treatment, six to twelve times annually, correct?
**A. Yes.**
Q. And two to four annual visits to an orthopedist or psychiatrist for referrals and continuous monitoring?
**A. Correct.**
Q. Epidural and facet injections, targeting both the cervical and lumbar spines in the frequency of three injections every six months for three years?
**A. Correct.**
Q. Radiofrequency ablations every 12 to 18 months?
**A. For the cervical and lumbar spine, yes.**
Q. Surgeries such as laminectomy, discectomies and facet -- facetectomies for the lumbar spine within five years of the examination?
**A. Correct.**
Q. And phy -- physical therapy following these procedures, correct?

121

A. Correct.
Q. And then fusion stabilization procedures, correct?
A. For the parameters that I outlined, yes.
Q. And then additional physical therapy following these fusion and stabilization procedures, correct?
A. If they're done at a later time, yes.
Q. Would you agree with me that it's been 2 and a half years since your examination of Mr. Jones?
A. I would, yes.
Q. Do you know if Mr. Jones has completed any of the treatment you outlined as required and reasonably probable?
A. I don't have no knowledge of anything that he's done except for what I stated.
Q. And all of these future care treatments are for Ms. Jones' cervical and lumbar spine, correct?
A. Those are where the injuries were, yes.
Q. And these future care treatments are based on your examination of Mr. Jones as well

122

as the medical records you reviewed, correct?
A. No, just in part. Certainly, my experience and, again, the experience of others who have done the work to tell whether or not these would be standards of care that eventually come about from research.
Q. And you'd agree with me that the MRI study on December 15th, 2022 of Mr. Jones' lumbar spine showed, quote, no discopathic or facetogenic changes, correct?
A. Right. Because it's a 1.5 Tesla 16-channel. We have 3D and 3T studies with 32-channels available. So it's a mediocre scanner. So, of course it's not going to see those structures because the fat's in the way, particularly in the facets. You have to have something more advanced and more sophisticated. No disrespect to anybody who's using the scanner but it's just not effective as more advanced studies.
Q. Well, that same scanner was reliable for the cervical spine; is that right?
A. It's not reliable and it's not where you make a diagnosis. All it's doing is

123

telling whether or not you can correlate findings with what you see on exam. But I wouldn't accept that as the end all and be all study. It's certainly reasonable to get one, but why wouldn't you get the most advanced you can have? They're out there. They're available in this area.
Q. But you're not questioning the results of the cervical spine MRI study; is that correct?
A. I would certainly say I could see what I indicated. You can't see the facets very well. And the facet injuries were the result of my clinical exam. I didn't see those on the -- of the MRI, and I didn't say that I did. I said they're the result of the exam for both the neck and the low back.
Q. Is it common for you to recommend the scope of required and reasonably probable treatment for an individual who showed no discopathic or facetogenic changes on an MRI study?
A. Yeah. You don't use the MRI to make your determinations. You use it for surgical

124

planning, and that means that you want to see if there's any progressive changes from the time of the injury to the point where you get another study. That's all it's used for.
Q. Would you agree with me that that lumbar MRI study showed no surgical -- or no changes, correct?
A. There's no change because it's a 1.5 Tesla, 16-channel. You're not going to see the facets on that kind of scanner. It's -- that's why they have newer scanners with more sophistication, fat suppressing using a SPECT/CT along with it. That scanner is not the end all and be all, it's a mediocre scanner.
Q. And you'd agree with me that you could see those changes on the cervical MRI study, correct?
A. I already did, Counsel. What I saw is what I interpreted from that study because I had it to review. I had made my opinions based on the history, physical exam, and the findings of that particular study, but I wouldn't accept that as a study that's the best that you can

**get. So when he gets repeat studies every other year, they should be more sophisticated.**
Q. Are all of Mr. Jones' current physical problems due to the November 9th, 2022 accident?
**A. Well, the physical problems I outlined, if he has other physical problems that aren't related, I would certainly exclude those. But as far as the neck and the low back, those injuries that I've outlined directly resulted from that incident in my opinion.**
Q. Do you know any other causes of any of the pathology you've described in Mr. Jones' neck or back other than the November 9th, 2022 accident?
**A. Well, I explored that with Mr. Jones and I'm not aware of any. So unless you're going to show me something to the contrary, I would still hold the same opinions about what caused his injuries.**
Q. Is it possible for the findings of the MRI of Mr. Jones' cervical spine to be existing before November 9th, 2022?
**A. Doubtful, no. I would say discs out of their containment would have caused him the**



**same type of pain. So that -- that's not something that would be asymptomatic. He would have symptoms from it.**
Q. Do you know how Mr. Jones is doing today in terms of his pain and pain complaints?
**A. No, I don't.**
Q. Do you know how Mr. Jones walks when he's not in your office?
**A. I have no idea. What -- what do you mean -- what do you mean, how he walks?**
Q. Yeah. His gait, how he walks when he's not in your office.
**A. I understand. No, I haven't seen him. So if I see him, I'll certainly observe that.**
Q. Do you know Mr. Jones' range of motion in his cervical spine when he's not in your office?
**A. No, I don't.**
Q. Do you know Mr. Jones' range of motion in his lumbar spine when he's not in your office?
**A. No, I don't.**
Q. Did you ever read the report of Dr. Wolf, who performed an examination of



Mr. Jones on behalf of the defendants?
**A. I haven't seen his report, no.**
Q. Would it surprise you that Mr. Jones had full pain-free range of motion in his cervical and lumbar spine during that examination?
**A. Nothing surprises me. I'd have to see the whole report and I'd provide a rebuttal if -- if I needed to. But his opinions, Dr. Wolf's opinions are his and I would respect those, but I may disagree with them respectfully.**
Q. Can we agree that 100 percent of the time you testify in court cases, your opinion, at least when it comes to testifying for plaintiffs, is that the person has a permanent injury?
**A. If it meets those criteria, yes. But I don't do it --**
Q. Okay.
**A. -- in every single case if it doesn't apply. So it's the same as looking at a fracture. You have a fractured tibia, you're going to have a certain type of fracture and you're going to look at it and you're going to**



**have a list of items that would be appropriate for the care of that particular entity. So it's no different in the spinal column, yes. We see billions of people who are injured every year, around the world, in the cervical and lumbar spine for various reasons. So it's not unusual. So if it is present and accounted for, I'll make that opinion.**
MR. SULPIZIO: Thank you, sir. That's all the questions I have for you at this time. I appreciate your time and I'll pass the baton again. Thank you --
**THE WITNESS: You as well. Thank you.**
MR. COGNETTI: Doctor, it's Michael Cognetti again. Just some follow-up questions. I don't think I'm going to be as long but I do want to clear up some things.

\- - -

CROSS-EXAMINATION

\- - -

BY MR. COGNETTI:

Q. On your report on page 4 where it begins with "Physical Examination." When --
**A. Yes.**
Q. When I read -- when I read your report today in preparation for this examination, it looks like the font, the font, F-O-N-T, is different. Can you explain that?
**A. I like it that way. It looks good on the report, I think, and it's readable. I -- I change it from a 10 to a 9, Times Roman is the font that I use. And I've done that all my career, actually.**
Q. So it has nothing to do with cutting and pasting or your physician assistant preparing part of this report?
**A. My assistant doesn't prepare the report in any way, shape or form. As far as the template, it is certainly in keeping with how you do an exam in a controlled and very systematic way. So every part of that exam is present in every exam that I do no matter for what.**
Q. Okay. So just so I'm clear here, and the jury's clear, so the font is different on



page 4 because you like it that way; that's your testimony?
**A. I like it, yeah. It --**
Q. Okay.
**A. -- fits -- as you read the report, you see exactly where that exam is coming in, and I have done that just as a matter of aesthetics, I like it.**
Q. Aesthetics --
**A. I --**
Q. -- okay.
**A. -- can read it. I could still see it at the age I'm at. So it's good, I like it.**
Q. Now, you were asked a whole bunch of questions about the MRI of the cervical and lumbar spine, and you said that you saw a hard copy of that MRI, true?
**A. Yes, I did.**
Q. Okay. And for you to see a hard copy, did Mr. Jones bring that into your office?
**A. No, he did not.**
Q. Who provided you with a copy of the MRI?
**A. The Simon & Simon law firm provides me with all the records including the hard copies.**



Q. Okay. And do they provide it to you, do they walk it over -- because they have a suite close to you on the same floor, do they walk it over to you or do they send it in the mail?
**A. Nobody walks anything over to me. I have no interaction with them generally unless I see them in the hallway --**
Q. Is it sent --
**A. [Overlap].**
Q. -- electronically?
**A. I was just about to get there, Counsel. But yes, it's sent electronically.**
Q. Okay. So when you say a "hard copy," it's not actually the film, it's an electronic version of the MRI, true?
**A. Right. We call that hard copy, it's still like an old terminology, it's old-school. It's the films but we're not tangibly holding them like we would ordinarily.**
Q. Old-school kind of like me, right?
**A. I wasn't going to go there, I -- I --**
Q. Okay.
**A. -- probably am in the same range, but I don't --**



Q. All right. Thank you. All right.
So let's talk about Mr. Jones a little bit.
**A. Yeah.**
Q. Do you know that no provider that saw him ever prescribed any medicine or prescription for his injuries; did you know that?
**A. Well, I wouldn't agree with that because at Regen, he did receive a medication for muscle relaxation.**
Q. Okay. Well, then -- then my question was not clear. Let me tell you that at his deposition, Mr. Jones said he was never prescribed any medicine or prescription for his injuries nor did he ever take any over-the-counter medicine. Did you know that?
**A. I didn't see his deposition transcript, and I didn't know that. But in the record, he was prescribed cyclobenzaprine.**
Q. Okay. So the answer to the question is, you didn't know that because you didn't read his deposition testimony, right?
**A. That part of it, yes, that's correct.**
Q. Did you know that he worked for Amazon

after this accident as a package handler?
**A. No, I did not.**
Q. Okay. In your report, you indicate that his current job activity was at Wawa, true?
**A. As a cashier, yes.**
Q. Okay. So when you met him in June of 2023, he told you he worked at Wawa and that's in your report?
**A. Correct.**
Q. Okay. In his deposition he said he stopped working at Wawa in early 2022, okay, did he tell you that?
**A. No, he did not. He told me what's in the report.**
Q. Okay. Do you know why he would tell you he was working for Wawa when he met you when he stopped working there in 2022, and only worked there for four or five months because he got tired of the fast food-type of job; do you know why he would say that?
**A. I have no idea. I can only tell you what he told me from his recollection, and that's the extent of it.**
Q. Okay. Well, when you say "that's the



extent of it," your history, according to your testimony that you just told the jury and us, takes a half hour to 40 minutes, true?
**A. Somewhere in there, yes.**
Q. Okay. And in that half hour to 40 minutes, all you were able to glean from interviewing him was his job at Wawa and we now know that to be incorrect, that's true, right?
**A. I have no problem with that, Counsel. If his recollection was incorrect when he saw me or he doesn't remember or he has a different version, I'm okay with that because in the big picture he still got injured from the incident that we're talking about. So little changes like that aren't going to sway any of the opinions about what injuries he had.**
Q. Well, let's talk about the little changes then, because we took his deposition back in, I think it was March of this year, and we asked him about his injuries. Okay? And under oath, he said that his leg and his scar is better, does that comport with your understanding when you met him?
**A. Right. It's not a part of what I wrote**



**or -- or any of the injuries that he sustained. We know that --**
Q. Okay. Well --
**A. -- have the injury.**
Q. Okay. Let's talk about the neck and the back then, Doctor. Under oath, he said that he has just a little pain in his low back, and does that comport with your examination in June of 2023, a little pain in his low back, is that what he told you?
**A. So Counsel, I get where you're going and he told me he had a five out of ten, I said that's reasonable for what I observed.**
Q. All right. I'm not going anywhere. I just want to know your recollection, and now taking it forward to what Mr. Jones said under oath. Under oath, he told us that he just has a little pain in his low back.
**A. Well, was that --**
Q. Is that --
**A. -- that --**
Q. -- what he told you?
**A. Did you ask him the time frame or was it that day? I don't know --**



Q. Presently --
**A. -- what time --**
Q. -- yes.
**A. -- frame --**
Q. Presently, we did ask him the time frame.
**A. All right. So he was doing well that day -- that day. Is he --**
Q. Thank --
**A. -- going to --**
Q. -- you. Okay.
**A. -- [overlap] after that, is he going to be not okay before that, he wasn't when I saw him. So --**
Q. Okay.
**A. -- it waxes and wanes, it doesn't stay the same.**
Q. Okay. Then -- and I'm going to tell you what he said about his neck pain when we took his deposition. He said the next -- neck pain is just a little here and there; those are his words, "it's here and there," is that what he told you when you interviewed him for a half hour to 40 minutes?

**A. Counsel, I already testified to what he told me. He had complaints in the neck and back, he had no numbness or tingling, upper or lower extremities. It was coming and going. So he told me pretty much the same thing, it waxes and wanes, comes and goes.**
Q. Did he tell you that when he did therapy, when he was at Spinal Care, that his pain level was almost zero at times? Did he tell you that; yes or no?
**A. Well, first of all, he didn't tell me that, and I'll answer the questions the way I'd like to, with all due respect.**
Q. Well...
**A. Don't badger me, it's not going to work.**
Q. I'm not badgering you. I just want to know your recollection versus what he testified to under oath at a deposition. That's not badgering, Doctor.
**A. Well, your tone is a little bit badgering to me. I -- I don't appreciate it. So, again, with all due respect, ask your question and I'll answer to the best of my**



**ability.**
Q. Did he tell you that when he was at physical therapy, his pain was almost zero at times?
**A. He did not.**
Q. Okay. Did he tell you that the law firm of Simon & Simon told him to go for injections, or an injection?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are now off the record. The time is 5:54.
MR. BURRUEZO: Yeah. And it's just completely inappropriate and not remotely what was testified to or what was said in here. So I'm not going to let you phrase a question that way to get that in front of the jury.
MR. COGNETTI: Is that your objection, the way I phrased it?
MR. BURRUEZO: Correct. Yeah. We're not a medical provider here. We don't refer anybody out, certainly not



for injections. The doctor makes those determinations.
MR. COGNETTI: Okay.
MR. BURRUEZO: And he was already asked this question before.
MR. COGNETTI: Okay. Let's go back on the record then.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. Time is 5:55.
BY MR. COGNETTI:
Q. Doctor, did Mr. Jones tell you that his lawyers told him to go to Spinal Care, the first treatment after Jefferson?
**A. No.**
Q. Do you know whether it was Spinal Care who referred Mr. Jones for inject -- for -- to go to Regen?
**A. I'm not -- Regen, you mean? No, I don't know. I have no idea.**
Q. And same question, do you know whether it was Spinal Care who referred him to Dr. Burt?
**A. Again, Counsel, as I said, I don't have any idea what referrals were made, and I really**



**don't care one way or the other, it's not my business. And if they do refer from that firm or any other firm, it's -- it's acceptable in Pennsylvania. It's not against the law. They can make referrals if they choose to do so. Just not directing care. That's what it says in the -- in the Pennsylvania codes for that.**
Q. Okay. When you interviewed Mr. Jones, did he tell you that he was able to do his job without any physical restrictions?
**A. I didn't ask him and he didn't tell me any detail for that.**
Q. And Doctor, were you retained by the law firm of Simon & Simon for the sole purpose of examining Mr. Jones and rendering opinions in this litigation?
**A. Yes.**
MR. BURRUEZO: Could we go off the record?
MR. COGNETTI: I'm almost done here. Oh, who's that? Who wants to go off the record? I didn't hear.
MR. BURRUEZO: That -- that was me.

MR. COGNETTI: All right.
THE VIDEOTAPE TECHNICIAN: We are now off the record. Time is 5:57.
MR. BURRUEZO: I'm sorry. It felt like, to me, I could see everybody moving except, Mike, I thought you froze, maybe I froze. I'm not sure.
MR. COGNETTI: Okay. I'm sorry. Let's go back then.
MR. BURRUEZO: We can go back on.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. Time is 5:57.
BY MR. COGNETTI:
Q. All right. Doctor, in this case, you didn't order any diagnostic exams, x-rays, MRIs, true?
**A. Yes.**
Q. And you weren't hired to talk to any of the doctors who treated Mr. Jones, correct?
**A. It wouldn't be part of my responsibilities as an independent evaluator, so I did not.**



Q. And your sole role today was to come here to testify about your observations that you made during your exam, agreed?
**A. Well, not just observations, I did more than just observe. But yes, I did a history taking, physical exam and records review, and review of the imaging.**
Q. And counsel has already gone through, I don't want to regurgitate all the testimony about the times and your dollars that you made by examining folks that are plaintiffs that are -- are represented by Simon & Simon, but I do want to go back, and I think I met you once before only, you have examined clients for them for many years, right?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are now off the record. Time is 5:59.
MR. BURRUEZO: I mean, this has clearly been asked and answered. He's already talked about his testimony, specifically when he started testifying and -- and reviewing



patients on behalf of Simon & Simon. So if there's a new question you would like to ask him, I'm certainly open to it. But if we're going to go down the same path that he's already answered, I feel like it's time to move on.
MR. COGNETTI: Well, okay. I think I'm allowed to ask that question. So I'm going to ask it and continue --
MR. BURRUEZO: But he's --
MR. COGNETTI: -- to ask it.
MR. BURRUEZO: -- he's already answered that, Mike.
MR. COGNETTI: Well, not -- not the years that I'm going to point him to.
MR. BURRUEZO: Well then, that's what I'm saying. If there's new questions, absolutely.
MR. COGNETTI: All right.
MR. BURRUEZO: Let's bring those up.
MR. COGNETTI: Well, let's move on then. Okay. Thank you.



THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 6:00.
BY MR. COGNETTI:
Q. Doctor, do you recall testifying that in 2017, you conducted about 195 videotape depositions?
**A. I've testified to that before, yes.**
Q. Okay. And in those opinions that you've given, you've offered opinions about permanency in all the 195 cases, true?
**A. Ones I testified, yes.**
Q. Okay. And then in 2018, you gave 195 videotape depositions like you are today, correct?
**A. Yes.**
Q. And in those 195 cases, you've offered an opinion that there was permanency in all the cases, correct?
**A. If it met the criteria, that is correct.**
Q. Okay. Well, let's cut to the chase then. In all 945 videotape depositions that you've done, that I was able to determine, from

145

2017 to 2024 only -- forget -- forget this past year, 2025 -- in all those years, 945 videotape depositions, you offered an opinion about permanency in all 945, correct?
**A. Definitely, yes.**
Q. In fact, you've never once testified for any of the Simon & Simon clients that there wasn't permanency, correct?
**A. The ones I testified in, yes. The ones I've written reports for, different story. But in testimony, yes.**
Q. Now, counsel had asked you about a case that you're involved in presently where you're a named defendant, do you remember that?
**A. Yes.**
MR. BURRUEZO: Objection. Off the record.
MR. COGNETTI: Okay.
THE VIDEOTAPE TECHNICIAN: We are now off the record. The time is 6:02.
MR. BURRUEZO: Same objection. Objecting on the grounds of relevance, prejudicial, it's hearsay, clearly

146

based on inflammatory statements and to elicit, you know, baseless allegations that are both unproven and unfounded.
MR. COGNETTI: Okay. You want a continuing objection?
MR. BURRUEZO: I -- no. We're going to do this every time.
MR. COGNETTI: Okay.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record?
MR. BURRUEZO: Yep.
THE VIDEOTAPE TECHNICIAN: We are now back --
BY MR. COGNETTI:
Q. Doc --
THE VIDEOTAPE TECHNICIAN: -- on the record. The time is 6:02.
BY MR. COGNETTI:
Q. You are aware of that lawsuit in which you're a named defendant, that RICO lawsuit, true?
**A. I'm aware of it, yes.**
Q. Okay. And are you aware that's in federal court?

147

**A. I am, yes.**
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are off the record. The time is 6:03.
MR. BURRUEZO: Objection on the grounds of relevance, it's prejudicial hearsay, the inflammatory nature of the question, and probably get into the violation of code of civility, that we're examining this section again, twice, and lastly, again, attempts to elicit baseless allegations that are both unfounded and untrue.
MR. COGNETTI: Okay.
You can answer.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record?
MR. BURRUEZO: Yeah.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 6:03.
**THE WITNESS: Yes. I'm aware**

148

**of where it is.**
BY MR. COGNETTI:
Q. And do you -- you may not but you might remember, do you remember I took your deposition once back in June of 2024, and I was asking you questions about Dr. Burt, and much like today, Doctor, your answer was -- and it was about who referred who to Dr. Burt, right, and your answer was, "It's not important to me, as long as he got there, I'm okay with that. I don't know any referral patterns." Okay. Right? And that's pretty much what you said today about referral patterns, right?
**A. Because it's still true today. I don't care who's referring who where, it doesn't matter to me. What -- what possible relevance is it to me as a medical specialist --**
Q. Right. Okay --
**A. -- who knows where the referrals are going.**
Q. Here's my point. I didn't mention the word "referral patterns," what do you mean by that in your testimony?
**A. Well, that's how I speak. Whatever**



Uber_00141790

**referrals are being made by whomever, they're patterns, perhaps. But I don't know who's going where and I really don't care.**
Q. Okay. Well, before this recent RICO statute, were you aware of any referral patterns?
MR. BURRUEZO: Objection. Off the record.
THE VIDEOTAPE TECHNICIAN: We are now off the record. The time is 6:05.
MR. BURRUEZO: First off, objection to the form of the question, I believe you said RICO stature, but, again, objecting on the grounds of relevance, hearsay, prejudicial, this, again, is attempting to elicit baseless allegations in the form of question which have both been unproven and not founded upon.
MR. COGNETTI: Back on.
THE VIDEOTAPE TECHNICIAN: We are back on the record. The time is 6:05.



BY MR. COGNETTI:
Q. Can you answer that question?
**A. Ask it again, please. I don't remember exactly what you're getting at, but if you would be kind enough to do that.**
Q. Sure. Before you were served and are now a defendant in the RICO lawsuit, were you aware of any referral patterns?
**A. Yeah, because I get asked the question all the time when it comes to Simon & Simon. It's just bizarre to me but it's not something I'm concerned about and I really don't care one way or the other. If they got to a place where they're getting good care, as I said to you when you asked me, I'll still say the same thing today, that's what's important to Mr. Jones. I'm not involved in that process, so it has nothing of relevance to me.**
Q. Okay. So fast forward then. Now that you have been named as a defendant in the RICO lawsuit, are you concerned about any referral patterns?
MR. BURRUEZO: Objection. Off the record.



THE VIDEOTAPE TECHNICIAN: We are off the record. The time is 6:06.
MR. BURRUEZO: Yeah. Objecting on the grounds of relevance. Again, prejudicial, hearsay. This is a little -- getting to the level of certainty, but also, again, objecting to the attempt to elicit baseless allegations in the form of a question that are both been unproven and not founded upon.
MR. COGNETTI: Doc -- okay. Back on.
THE VIDEOTAPE TECHNICIAN: We are now back on the record. The time is 6:07.
BY MR. COGNETTI:
Q. Can you answer that question, Doctor?
**A. I'm going to ask you to do it again, Counsel. I'm sorry. There's back and forth and I'm just getting real tired at this point. But if you'd be kind enough to ask again, I'd appreciate it.**
Q. Sure. Now that you are a named



defendant in the RICO civil lawsuit, are you aware of any referral patterns that you were not before?
**A. Well, first of all, being accused or having a lawsuit doesn't change my knowledge of questions that are posed about this issue, so that's the only way I know when I get asked. And again, it doesn't matter to me who makes referrals. As far as I know, it's not illegal to do that, as long as there's no undue pressure or treatment recommendations from non-treating physicians. So, I don't see what the big deal is, whether somebody gets to go to a good facility and they can facilitate that for that individual, that's fine.**
Q. Okay. Did -- okay. Did you know that Mr. Jones, the plaintiff in this case, told us at his deposition, under oath, that his lawyers were the ones to not only tell him -- tell him to go treat at Spinal Care but also Premier Pain, Dr. Burt, and also to go to you for an exam; did you know that?
**A. No comment.**
Q. And if I were to tell you that there are



Uber_00141791

thousands of cases where you have done an exam for Simon & Simon where the patients have also been treated at Spinal Care or Dr. Burt, you do not believe that that is a referral pattern, do you?
MR. BURRUEZO: Objection. Off the record.
MR. COGNETTI: All right.
THE VIDEOTAPE TECHNICIAN: We are now off the record. The time is 6:09.
MR. BURRUEZO: Yeah. I'm objecting that this clearly lacks any type of foundation, objecting on the relevance, it's prejudicial and, again, it's attempting to elicit baseless allegations which have not been proven or founded upon.
MR. COGNETTI: Okay. And, you know, obviously we'll let a judge decide this. But, Counsel, when you say "it's prejudicial," what do you mean by that?
MR. BURRUEZO: Well, you're --



MR. COGNETTI: What do you mean --
MR. BURRUEZO: -- attempting to bring into -- you are attempting to bring into a lawsuit that is never going to come in. So, you're trying to manage the way that this question comes in when you know it's not. You're doing it because of the prejudicial nature of that. That's why.
MR. COGNETTI: Okay. And you don't believe it's prejudicial that Dr. Yarus has testified over a thousand times.
MR. BURRUEZO: That's come in.
MR. COGNETTI: Pardon?
MR. BURRUEZO: That's come in. You've already got that.
MR. COGNETTI: Right. And in every one has said that the plaintiff has a permanent injury caused by whatever the basis of negligence was.
MR. BURRUEZO: Are we -- are we trying the case here? Is that what



we're doing?
MR. COGNETTI: Well, no. Well, you're placing it on the rec -- you're placing your objection on the record, I just wanted to know what the basis of prejudice was. And I've -- if you've answered it, great, if you're satisfied with that. But we'll -- I guess we'll discuss it later.
MR. BURRUEZO: We sure will.
MR. COGNETTI: Okay.
THE VIDEOTAPE TECHNICIAN: Ready to go back on the record?
MR. COGNETTI: Yes.
THE VIDEOTAPE TECHNICIAN: We are back on the record. The time is 6:10.
MR. COGNETTI: I'm going to pass the witness at this time.

\- - -
REDIRECT EXAMINATION
\- - -

BY MR. BURRUEZO:
Q. All right. Doctor, I think I heard your



testimony pretty clear about this, but pain complaints can come and go, correct?
**A. Yes.**
Q. Meaning, you could have a good day, you would have a bad day?
**A. Sure. Yes.**
Q. And just because someone hasn't gotten the treatment doesn't mean they don't need the treatment, correct?
**A. I've been trying to make that point all through my testimony. I agree, yes.**
Q. And counsel had brought up certain fee arrangements that you have. If you weren't here testifying, what would you be doing?
**A. Well, we're getting on the 6:00, I'd be going home. But if it was earlier, I'd still be seeing my own patients or independent examinations in this case.**
Q. So the fee you charge kind of compensates you for money that you're missing out by not treating your own patients?
**A. We -- we base it on that, yes.**
Q. Have any of counsel's questions changed your opinions -- been given here today?



Uber_00141792

157

**A. No. Respectfully to both counsel, I would still hold the same opinions.**
Q. And your opinions remain given to a reasonable degree of medical certainty?
**A. They have, yes.**
MR. BURRUEZO: Thank you, Doctor.
**THE WITNESS: You're welcome. Thanks.**
MR. SULPIZIO: I don't have any questions.
**THE WITNESS: Thank you, Counsel. Thanks.**
MR. BURRUEZO: Thank you, Doctor.
**THE WITNESS: You're welcome.**
MR. BURRUEZO: We can go off the record.
THE VIDEOTAPE TECHNICIAN: The time now is 6:12, and we are off the record.
THE COURT REPORTER: I will get the orders really quickly before we conclude. Sorry.

158

MR. BURRUEZO: I'd like a mini, please. E-mailed. No, there's no rush. Yeah, I'll take a copy of the video, please.
MR. SULPIZIO: Preferred mini, if you could. No rush. No video at this time but we'll let you know.
MR. COGNETTI: Mini is fine. I'll check in with you if I need it sooner than that. Video, same here, too.

\- - -

(Whereupon, the deposition testimony of LANCE O. YARUS, D.O. was concluded at 6:12 p.m.)

\- - -

159

\- - -

C E R T I F I C A T I O N

\- - -

I, Stephanie Weldon, Court Reporter and Notary Public, do hereby certify that the proceedings and evidence are contained fully and accurately in the stenographic notes taken by me on Monday, January 12, 2026, and that the foregoing testimony was taken in shorthand by myself and reduced to typing under my direction and control and that this is a correct transcript of the same.



Stephanie Weldon
Notary Public
My Notary Expires
September 10, 2029

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)



Uber_00141793

**$**

**$250** 91:6
**$4** 87:16
**$4200** 84:1
**$700** 91:16
**$750** 86:15 91:11,18,19
**$907,200** 95:3
**$928,200** 89:8

**0**

**0** 112:6,23 113:3,8,12,17,21,22,24

**1**

**1.5** 62:9 122:11 124:8
**10** 28:3,18 85:2,11 87:23,24 88:7,13 110:23,24 111:11,12,13 129:10
**100** 22:24 24:8 59:6 83:19 89:17 113:17 127:12
**101** 90:19
**1036** 89:5
**11** 3:5
**110** 113:20
**12** 4:6 20:21 28:18 34:5 77:8 88:12 117:4,12 120:15
**129** 3:9
**12th** 67:10 98:6 116:21
**13** 28:3
**136** 90:18
**15** 54:9 85:2,11 99:10 105:17 110:22, 23 111:4,7,11,12 113:3,9,21,24
**155** 3:7
**15th** 61:10 105:11 122:8
**16-** 122:11
**16-channel** 62:10 124:9
**160** 83:19
**18** 77:8 104:14 120:15
**18th** 24:9 63:16 104:10
**19** 58:23
**19103-2733** 24:10
**195** 144:6,11,13,17
**1977** 7:5
**1981** 7:9
**1986** 6:22 7:14
**1987** 81:18,21
**1988** 8:9
**1991** 9:6
**1994** 22:3

**2**

**2** 24:8 95:20 121:10
**20** 9:17 24:6 27:11 28:9 48:4 111:7,17 113:4,21,24 116:20
**2011** 16:22
**2012** 16:22 18:8,9 48:8 50:3
**2013** 8:21 14:24
**2014** 14:7 87:8,13,15,19
**2016** 15:6
**2017** 144:6 145:1
**2018** 144:13
**2022** 52:3 61:10 68:6 80:5 105:11,17 122:8 125:4,13,22 133:11,17
**2023** 63:16 65:17 67:10 87:16,19,22 88:3 92:11 98:6 104:10,14 114:6 116:21 117:4,12 118:7 133:7 135:9
**2024** 21:21 88:20 89:5,8 92:1 145:1 148:5
**2025** 36:20 89:11,18 90:14,17 91:21 94:21 95:4,6 145:2
**2026** 4:6 88:8,12
**22nd** 65:17
**23** 88:4,11
**24** 114:9
**25** 9:17 27:11 28:9 111:4,5,17 112:23 113:4,8,9,22,24
**26** 88:11
**27** 8:18
**27th** 36:20

**3**

**30** 33:12 47:18 50:4 111:4,5,18 113:8, 22
**300** 24:9 25:3,10 33:20
**301** 25:4
**32-** 122:12
**347** 85:15,17 90:15
**378** 25:6 26:6,13,16 27:5
**379** 25:6 26:6,13,15 27:5,6 95:22,23
**3:30** 4:7
**3:38** 12:20
**3:39** 14:2
**3D** 122:12
**3T** 122:12

**4**

**4** 129:1 130:1
**40** 43:9 85:16 88:16 99:9 134:3,5 136:24
**4200** 91:19
**45** 3:6 99:13
**45th** 6:20
**476** 89:4
**4:04** 37:20 38:23
**4:06** 40:5
**4:07** 41:12 42:1
**4:08** 43:17
**4:09** 44:9,22
**4:19** 54:7
**4:20** 54:17
**4:30** 63:24 64:7
**4:41** 73:19 74:14
**4:47** 80:23
**4:55** 81:6

**5**

**5** 3:5,17 110:24
**50** 3:5,7 77:23 94:24
**500** 85:12
**51** 3:18
**5:09** 93:18 94:19
**5:54** 138:13
**5:55** 139:10
**5:57** 141:3,14
**5:59** 142:19

**6**

**6/12/2023** 3:18
**60** 47:18
**6:00** 43:2,8 144:3 156:15
**6:02** 145:21 146:17
**6:03** 147:5,23
**6:05** 149:11,24
**6:06** 151:2
**6:07** 151:16
**6:09** 153:11
**6:10** 155:17
**6:12** 157:20

**7**

**700** 91:17
**750** 85:12

**8**

**80** 24:22 25:12
**81** 3:9

**9**

**9** 129:10
**90** 66:16 111:10 113:17
**907,200** 91:21
**945** 144:23 145:2,4
**9th** 52:3 68:5 80:5 125:4,13,22

**A**

**ability** 54:1 58:9,16 66:18 72:5 113:10 138:1
**ablated** 77:5
**ablation** 65:20 75:14 76:7,15 77:6 79:15 117:8
**ablations** 31:11 32:14 120:15
**abnormal** 70:4,6,9
**abnormality** 55:18
**abrasion** 60:3,9,10
**absolutely** 40:24 55:23 94:3 143:19
**absorb** 55:5
**accept** 123:3 124:23
**acceptable** 140:3
**accepted** 7:6 39:17 45:16 79:9
**accident** 29:1,8 103:14 115:21,23 116:9 125:4,14 133:1
**accompanied** 98:19
**accountant** 23:14 89:24
**accounted** 128:7
**accurate** 39:22
**accused** 152:4
**aching** 60:21
**act** 109:3
**acting** 108:6
**active** 8:23
**activities** 6:10 18:11 54:1 58:11,21 67:23 86:3 102:15,19,21 103:4,5 115:22
**activity** 133:4
**actual** 68:12 69:10 76:21 109:9
**acute** 9:10
**addendum** 91:2,12,19
**addendums** 90:19
**addition** 107:10
**additional** 117:7 121:6
**address** 24:7 25:14,18 72:24 96:24
**addressed** 67:3
**addressing** 65:24 76:17
**admit** 49:3
**admitting** 48:24
**advanced** 73:10 106:2,3 122:17,20 123:5
**advertising** 20:19
**aesthetics** 130:7,9
**affect** 58:9
**affected** 53:24
**affiliations** 6:7
**afternoon** 5:8,11 11:21,22 45:9 81:11
**age** 130:13
**agility** 113:9
**agree** 24:12,20 34:22 35:18 39:8 84:15,19 87:7,12 88:23 89:6 91:23 92:3 94:12 99:15 102:10,23 103:21 104:1 105:15,21 108:4 121:10 122:7 124:5,16 127:12 132:8 156:11
**agreed** 142:3
**ahead** 6:12,13
**air** 118:24
**allegations** 40:23 41:6 42:6 44:3,16 146:2 147:14 149:18 151:9 153:17
**alleged** 118:6
**allowed** 143:8
**alluded** 58:14 74:18
**alteration** 58:10,20
**AMA** 46:21,23
**Amazon** 132:24
**ambulance** 59:22
**American** 15:21 46:21 47:1,11
**amount** 84:4 89:1,8 99:8
**analysis** 108:13 109:16 116:10
**anatomical** 53:10
**anatomy** 52:18 55:9,16 61:16,22 62:2,6,13,23 63:7 74:20 106:12
**and/or** 75:16 76:11,16




Uber_00141795

**annual** 75:2 120:6
**annually** 120:4
**answering** 108:18
**answers** 28:8
**anti-inflammatory** 76:3
**anticipated** 84:3
**anymore** 8:20 17:12 20:21 21:7 32:16 97:3,8
**AOAO** 15:19,20
**apologies** 88:4
**apologize** 82:20
**apply** 103:8 127:21
**applying** 17:4
**appointments** 6:5,9
**appropriately** 108:19
**approximately** 9:15 85:12 88:16
**area** 32:1 52:14,17 53:6,10 60:4,9,12 61:18 75:18 89:22 96:8 107:7 123:7
**areas** 60:4 100:5 110:14
**argue** 41:3,7
**argument** 36:8
**arm** 113:18
**arrangements** 156:13
**arrived** 60:1
**art** 33:5
**arthritis** 9:12 18:3
**articles** 22:9 33:4,7
**aspect** 72:12
**assessment** 64:15
**assessments** 101:1
**assist** 116:9
**assistant** 21:22 96:6 97:19 129:14, 16
**assistant's** 98:3
**Associates** 22:18,20 25:10
**Association** 15:21 46:21 47:11
**assume** 95:12
**asymptomatic** 126:2
**attached** 5:17 51:14
**attempt** 151:8
**attempting** 42:5 149:17 153:16 154:3,4
**attempts** 40:22 147:13
**attend** 98:22
**attorney** 34:23 36:18 46:8
**attorneys** 24:14,17,19 25:20 95:15 104:6,20
**author** 85:3
**authored** 23:4
**authoritative** 33:1
**average** 9:16 28:9 83:8,9,21 85:1 91:7,9,11,13 99:6
**averages** 99:10
**averaging** 27:11
**avoid** 92:18
**awards** 6:3
**aware** 14:15 20:20 34:8 35:7 102:4 125:16 146:19,22,23 147:24 149:5 150:8 152:2

**B**

**back** 7:10 10:6 13:8,10,22 14:1 27:20 29:7,23 38:12,19,22 41:9,11 43:12,16 44:19,21 52:8 53:6 54:13,16 55:16 56:24 57:13 59:6,10 60:2,19,22 61:11 64:4,6,11,15 66:19 67:2,17 68:13,15, 18 69:14,16,22 70:12 74:8,13 77:16, 22 81:5 93:1 94:14,18 99:18 100:7 103:18 111:14 112:20 114:6 115:13 119:15 123:17 125:8,13 134:19 135:6,7,9,18 137:3 139:7,9 141:9,10, 13 142:13 144:2 146:10,13 147:19,22 148:5 149:21,23 151:13,15,20 155:13,16
**backed** 39:16
**bad** 156:5
**badger** 137:15
**badgering** 137:17,20,22
**Bala** 61:9 105:11
**bank** 90:1
**bar** 47:18
**base** 95:20 156:22
**based** 10:22 28:11 73:1 83:18 85:10 89:7 91:16,18,20 93:4 101:20 107:18 121:24 124:21 146:1
**baseless** 40:23 42:6 44:15 146:2 147:13 149:17 151:8 153:16
**basic** 28:18 62:1
**basically** 76:17 118:10
**basis** 9:3 26:20 64:9 71:3 72:3 154:22 155:6
**bathe** 75:22
**baton** 45:6 128:12
**beams** 61:24
**bearing** 37:14
**Bechtle** 34:14,17
**began** 6:24 22:9 87:7
**begin** 14:4
**beginning** 14:7
**begins** 129:1
**behalf** 4:16,19,22 87:6 127:1 143:1
**behave** 59:3 71:15 110:6
**behaving** 108:9
**behavior** 108:8,12
**bells** 36:6 37:16
**bending** 69:14 110:23 111:6,12 113:8,23
**bias** 13:1 94:3,8
**biceps** 70:2,4
**big** 114:21 134:12 152:13
**billing** 11:8 31:21 32:3,7,8
**billings** 34:13
**billions** 128:4
**bit** 43:3 66:11 88:16 116:12 132:3 137:21
**bizarre** 108:11 150:11
**blocks** 8:10
**board** 6:6 7:23 8:1 15:14,16,17 16:5, 17,24 46:23 47:1,14
**board-** 7:19 8:7
**board-certified** 7:17 8:12 32:21



Uber_00141796

**boards** 8:5 15:23 16:1,4,11,14
**body** 61:20 110:16
**bonafide** 109:21
**bone** 62:7 78:1
**bony** 55:8
**bottom** 69:11
**bounds** 18:23
**brachioradialis** 70:6
**brain** 57:7,10,15
**branch** 57:3,9,14 66:6 76:5,22 77:18
**branches** 57:3
**break** 54:4 81:1
**breakdown** 28:6
**breaks** 43:5
**briefly** 6:15 7:1 9:23
**bring** 130:20 143:21 154:4,5
**brought** 40:23 41:6 156:12
**building** 24:13 25:1 26:5
**bulge** 55:7
**bunch** 130:14
**burn** 66:17,21
**burning** 66:14
**Burruezo** 3:5,7 4:15,16 5:7,19 11:15 12:12,15,17,21 13:9,14,20,23 14:5,8, 12 37:17,21 38:11,15,20 40:2,6,21 41:4,22 42:2,14,16,19 43:9,14 44:6, 10 50:1,7,15,24 51:11,16 54:3,8,12, 18 64:1,8 74:3,6,11 79:13 80:15,20 93:14,19 94:5,8,15 138:9,14,22 139:4 140:18,23 141:4,10 142:16,20 143:10,12,17,21 145:16,22 146:6,11 147:2,6,20 149:7,12 150:23 151:3 153:6,12,24 154:3,15,17,23 155:10, 23 157:6,14,17
**Burruezo's** 14:6,18 95:13
**Burt** 30:23 31:1 106:17,20 107:5,10, 23 139:22 148:6,8 152:21 153:3
**bus** 115:23
**business** 89:17 94:22 140:2
**buttock** 60:21

### C

**C3** 76:20
**C3-4** 52:17 53:4 68:22 70:14
**C4** 76:20
**C4-5** 52:17 53:4 68:22 70:14
**C5** 76:20
**C5-6** 52:17 53:4 64:19 66:8 68:22 70:15
**C6** 66:8 76:20
**C6-7** 66:9
**call** 52:18 63:8 65:20,23 108:7 131:16
**called** 45:18 47:10 52:8 60:14 65:2, 10 68:18 69:8
**canal** 55:10
**capabilities** 21:9 31:4 47:22
**capacity** 9:6 39:24
**capsule** 56:14
**care** 11:5 17:23 36:15 37:13,15 49:4 58:4 60:15 72:16 73:10,22 75:11 80:2 90:7 104:3,6,9 107:5 118:10,13 119:1,14,21,22 121:19,23 122:5 128:2 137:8 139:13,16,22 140:1,6 148:15 149:3 150:12,14 152:20 153:3
**career** 8:17 21:18 83:14 114:12 129:12
**case** 12:11 19:3 23:4 33:8 34:7,18 35:8,16,17 36:2 37:6,11 39:6 41:1 45:18,20,21 49:14 59:7 62:8 66:13 68:20 84:12 86:5,15 93:22 95:13 101:17 127:20 141:16 145:12 152:17 154:24 156:18
**cases** 8:5,7,21 33:20,22,23 34:5 35:4,6 127:13 144:11,17,19 153:1
**cashier** 102:9 133:5
**categories** 112:19
**category** 72:12 108:12
**caudal** 31:10
**causation** 34:1
**caused** 52:6 55:21,22 57:18 102:20 125:19,24 154:21
**causing** 102:22
**Center** 22:4 65:11
**certainty** 35:13 36:1,13 46:1,5 50:20 51:24 79:20 80:13 118:18 151:7 157:4
**certificate** 8:3,9 20:1,8 27:3
**certificates** 19:21
**certification** 8:2,15 9:4 16:19 46:24 47:5
**certifications** 6:6
**certified** 7:20 8:8 16:6,16 97:19
**cervical** 32:14 52:8,10,12,13,14,23, 24 53:2 54:22 55:12 63:6 64:16,17,18 105:11 110:12,20 111:14,16,20 112:11,22 113:1,7 115:6 117:20 119:24 120:11,17 121:20 122:22 123:9 124:17 125:21 126:16 127:4 128:5 130:15
**cetera** 73:23 86:9
**chance** 51:1 59:13 62:24 65:6 67:9 68:7
**change** 36:9 39:18 45:1 58:8,18 62:17,23 72:9 78:20 106:9,12 114:22 116:17 118:16 124:8 129:10 152:5
**changed** 16:21 156:23
**channel** 122:12
**channels** 122:13
**character** 63:7
**characterize** 80:3
**charge** 83:23 84:2 91:1,5 156:19
**charges** 86:6,10
**chase** 144:22
**Chaudhry** 36:21
**chemicals** 56:16
**chief** 7:14 64:12
**chiropractic** 75:8 120:3
**choose** 140:5
**Chris** 12:12
**Christopher** 4:16
**chronic** 9:9 53:23
**circumference** 55:8 78:1
**circumstances** 33:17 35:4 41:19



Uber_00141797

**civil** 152:1
**civility** 40:10 44:14 147:11
**claimant** 39:14
**claiming** 109:14
**cleansed** 60:9
**clear** 40:9 44:13 49:9 128:20 129:23, 24 132:12 156:1
**client** 82:4 83:3 95:16
**clients** 14:18 84:21 86:24 87:6,10 92:4 93:13 142:14 145:7
**Clift** 30:23
**Clifton** 30:23 106:16 107:5
**clinical** 8:24 123:14
**close** 131:3
**Coast** 7:10
**code** 40:10 44:14 147:10
**coded** 31:20
**codes** 32:3,5,8 140:7
**Cognetti** 3:6,9 4:18,19 45:8,10,14 49:20 63:19,21 64:2 128:16,17,24 138:20 139:3,6,11 140:20 141:1,8,15 143:7,11,14,20,23 144:4 145:18 146:4,8,14,18 147:16 148:2 149:21 150:1 151:12,17 153:8,19 154:1,11, 16,19 155:2,11,14,18
**collect** 92:15
**collision** 52:2,6 79:17,23
**column** 17:22 27:23 28:2,12,19 52:20 58:8 69:12,23 79:6 128:3
**combat** 38:4
**combination** 57:10
**Combining** 53:1
**commencement** 44:24
**comment** 35:1 41:20 44:2,5 45:2,23 116:5 117:17 152:23
**committees** 6:5
**common** 85:24 86:4 107:12 123:18
**commonality** 107:15
**Commonwealth** 6:17 11:12 22:23
**community** 39:17
**company** 23:1
**compare** 62:5
**compared** 94:23
**compendium** 89:1
**compensates** 156:20
**complain** 27:15,20 28:23 29:7 103:23
**complaining** 100:6
**complaints** 27:23 59:24 60:16 63:17 64:12 67:13,16 103:17 126:5 137:2 156:2
**complete** 7:8 84:3
**completed** 7:13,22 105:4,8 106:4 121:14
**completely** 18:10,14 138:15
**components** 39:10
**comport** 134:22 135:8
**computer** 61:21
**concerned** 150:12,21
**conclude** 34:20 157:24
**conclusions** 34:10 39:6 85:4
**condition** 55:22,24 56:1 101:1 118:16
**conditions** 18:21 19:20 102:2
**conduct** 30:9
**conducted** 19:10,14 48:6 144:6
**congenital** 18:2
**consequences** 71:15 77:10
**conservative** 18:4 58:4 73:9 118:10, 13
**considered** 20:3 31:14,21 84:16
**considers** 31:17 32:7
**consist** 68:10
**consisted** 103:17
**consistent** 70:16 94:1
**contained** 5:24
**containment** 52:16 53:16 57:24 125:24
**contend** 77:21
**context** 21:24
**continue** 58:18 65:5 81:12 143:9
**continued** 41:5 60:16 63:17 116:24
**continuing** 13:11 42:12 146:5
**continuous** 120:8
**continuously** 6:21
**contrary** 125:17
**controlled** 129:19
**copies** 130:24
**copy** 5:14 51:8 105:14 130:17,19,22 131:13,16
**cord-like** 69:5
**core** 29:19
**corollaries** 62:13
**corporation** 22:22 98:2
**correct** 12:2,6,9 13:20 14:22 15:1,4, 12,13 16:8 17:1,14,16 18:7,9 21:10, 12,14 22:2,11,12,15,18,19 23:5 24:10 25:17 26:6,12 32:13,17,19,20,23 35:14 46:17 47:7 48:8 49:15,16 50:5 59:23 60:12 64:22 67:11 81:18 85:5, 18,21,23 86:1 87:13,15,20 88:14 89:9,19 92:5,6 95:21 98:5,6,9 100:1 103:1 104:3,8,14,24 105:12,21 106:10,17 108:3 112:14 113:12 115:7 119:6,19 120:1,2,4,9,14,22,24 121:1, 3,8,21 122:1,10 123:10 124:7,18 132:23 133:9 138:22 141:21 144:15, 19,21 145:4,8 156:2,9
**correlate** 123:1
**correlating** 108:19
**correlation** 74:24
**corticosteroid** 75:17 76:3
**costly** 37:9
**counsel** 4:11 11:17 12:11 14:9 20:13 22:14 24:2 27:16 28:5 33:11 43:19 45:17,23 46:12 88:22 92:12 93:7 111:21 114:18 119:7 124:19 131:11 134:9 135:11 137:1 139:23 142:8 145:12 151:20 153:21 156:12 157:1, 13
**counsel's** 156:23
**counter** 132:16
**county** 36:2
**couple** 21:15,19 56:2
**court** 4:13 33:14 40:16 42:24 80:24 127:13 146:24 157:22

**courts** 45:16 74:6
**covering** 75:20
**CPT** 32:5
**create** 61:24
**creating** 119:1
**credentials** 31:3 35:9 107:1
**criteria** 17:5,6 127:17 144:20
**cross-** 81:13
**CROSS-EXAMINATION** 3:8 81:8 128:22
**CT** 10:14 61:23
**culminated** 25:16
**current** 27:8 29:13,20 30:3 125:3 133:4
**curriculum** 3:17 5:22 22:15
**curve** 115:12
**curves** 68:17
**customarily** 10:9
**cut** 103:19 144:22
**cutting** 31:24 129:13
**CV** 7:17 23:7
**cyclobenzaprine** 65:3 132:19
**Cynwyd** 61:9 105:11

**D**

**D.O.** 3:3 5:1,13
**Dahlia** 97:23,24
**daily** 9:3 102:15
**date** 4:6 5:17 51:14
**day** 82:2 95:14 104:2 135:24 136:8 156:4,5
**days** 82:22 88:12
**deaden** 76:4
**deal** 9:10 152:13
**December** 61:10 105:11,17 122:8
**decent** 43:3
**decide** 153:21
**decided** 105:7
**decision** 36:9
**decreased** 69:1
**defendant** 145:14 146:20 150:7,20 152:1
**defendants** 43:24 127:1
**defense** 39:13
**deficits** 112:15,16
**definition** 71:13 96:3
**deformities** 18:3
**degree** 35:13,24 36:13,14 46:4 50:20 51:24 79:20 80:8,12 112:21,24 113:5, 14 114:23 117:18 157:4
**degrees** 96:15 110:22,23,24 111:4,5, 6,7,10,11,12,13,17,19 112:6,9,10,23 113:4,22,23 114:3 115:4
**deny** 41:5
**depends** 113:9,17
**deponent** 4:10
**deposition** 4:7 81:24 82:5,8,11 83:23 84:2,7,10,16 91:20 95:14 132:13,17,22 133:10 134:18 136:20 137:19 148:4 152:18
**depositions** 81:20 82:13,23 83:3,7 89:5 90:16 144:7,14,23 145:3
**derives** 94:22
**Dersia** 34:9
**Des** 7:7
**describing** 55:14
**description** 3:16 19:1
**designated** 31:19
**desk** 25:17
**destabilize** 78:3
**detail** 140:12
**determination** 71:4 115:10
**determinations** 72:18 123:24 139:2
**determine** 72:15 114:3 115:4 144:24
**develop** 18:3
**developed** 9:12
**device** 96:15
**diagnosed** 57:21 63:3
**diagnoses** 32:24 53:22 64:13 100:17
**diagnosing** 11:1
**diagnosis** 54:2 74:21 122:24
**diagnostic** 10:11,13 61:5 141:17
**dialing** 66:15 90:4
**dictating** 91:4
**difficult** 47:20
**difficulty** 102:19
**diplomat** 16:21
**diplomate** 19:24
**dire** 3:4 5:5 13:2,12 43:10 46:13 100:13
**direct** 3:7 50:13 52:1 100:14
**directing** 140:6
**direction** 34:13 55:15 112:8
**directions** 113:10
**directly** 38:5,8 40:18 85:22 125:9
**disagree** 35:2 41:2 94:12 102:13 103:2 127:10
**disc** 29:15,22 30:5 53:1,14 54:23 55:2,3,5,6,14 57:4,11,24 62:7 64:16, 18 69:15 75:22 102:11
**discectomies** 120:19
**discogenic** 53:3
**discomfort** 102:24
**discopathic** 105:18,24 122:9 123:21
**discovery** 38:1
**discs** 52:15 67:4 125:23
**discuss** 155:9
**discussing** 36:15
**displaced** 52:16
**displacement** 64:17,19
**disposal** 33:4
**disrespect** 122:18
**district** 38:7
**disturb** 56:19
**Doc** 146:15 151:12
**doctor** 5:8 6:19 7:2 11:16,21 15:10, 11 45:8,15 49:21 50:2,17 51:17 54:19



Uber_00141799

70:21 79:19 80:16 81:14 101:6,10,16, 23 128:16 135:6 137:20 139:1,12 140:13 141:16 144:5 148:7 151:18 155:24 157:7,15

**doctor's** 73:23

**doctors** 15:14 25:23 47:9 63:12 104:14,17,20 107:5 141:21

**document** 5:15,20,22,24 6:1 37:24 114:20

**documented** 110:18 115:13 116:23

**documents** 37:14 40:16

**dollars** 142:10

**door** 25:4

**dorsal** 55:17

**dorsopathy** 52:24 53:20 55:17

**double** 95:4

**double-whammy** 57:11

**doubled** 95:2

**Doubtful** 125:23

**drastically** 117:14

**drew** 57:2

**driven** 34:15

**dropping** 69:14

**due** 68:21 89:2 125:4 137:13,23

**duly** 5:2

**dural** 75:20

**dysfunction** 52:11 53:12

**E**

**earlier** 47:13 59:12 63:4 64:21 156:16

**early** 133:11

**East** 7:10

**eastern** 4:7 38:7

**easy** 25:5

**Ed** 4:19 45:10

**editorial** 6:10

**education** 6:2

**Edwin** 4:9

**effect** 76:4

**effective** 122:19

**effects** 67:23 72:19

**Electric** 4:22

**electrodiagnostic** 65:3

**electronic** 131:14

**electronically** 131:10,12

**elicit** 42:6 146:2 147:13 149:17 151:8 153:16

**emergency** 48:10,13,22 59:18 60:1 100:15 103:23

**emeri** 27:3

**emeritus** 16:21,24 17:2 18:13 19:24 20:6,7

**EMG** 104:24 105:3,5,7

**encompasses** 85:9

**end** 9:18 18:9 48:8 109:23 123:3 124:14

**ended** 15:6 16:19 89:19 117:6

**endured** 30:6

**enemy** 78:20

**energy** 66:15

**engaged** 108:23 110:1

**engaging** 108:14 109:17

**enhance** 6:8

**enthesopathy** 52:12 53:13

**entities** 58:21

**entitled** 12:24

**entity** 24:23 89:2 128:2

**Epi** 75:19

**epidural** 75:16,19 120:10

**epidurals** 31:10,11 76:10

**equipment** 96:9,10,12 115:9

**ER** 116:13

**estimate** 9:14 92:23 95:8

**estimated** 92:20

**evaluation** 108:14 109:17

**evaluations** 17:19 119:18

**evaluator** 141:23

**event** 29:5,12 55:22 57:18

**eventually** 72:15 122:6

**evidence** 116:13

**exact** 27:21 81:22 94:10 95:8 96:15 114:16

**exam** 62:14 68:13 70:20 71:22 74:24 96:18,20 99:5,10 108:15,24 123:2,14, 16 124:22 129:19,20,21 130:6 142:3, 6 152:22 153:1

**examination** 3:7 9:21 19:10,15 26:9, 14 50:13 51:22 68:8 70:16 85:4 96:22 97:21 98:7,11,17,23 99:1,3,14,16,22 100:16,22 101:2 109:19 110:2,6,13, 20 111:9 115:2 116:10,21 120:21 121:11,24 126:24 127:5 129:2,5 135:8 155:21

**examinations** 27:9 30:9 84:21 85:1 99:6 156:18

**examine** 86:23 97:16 107:3

**examined** 5:2 18:17 19:3 37:7 81:14 108:22 109:24 110:11 117:11 142:14

**examinee** 30:21

**examinees** 30:10,11,19 87:21 92:5, 10 93:12 107:18

**examining** 140:15 142:11 147:11

**examples** 96:5

**exams** 25:7,8 30:16 39:10 110:18 141:17

**exchanged** 38:1

**exclude** 125:7

**excuse** 91:17 103:13

**Exhibit-1** 22:14

**exhibiting** 108:11

**existing** 125:21

**exorbitant** 84:4

**expect** 71:6 108:10 110:7 117:10

**expecting** 71:12

**experience** 19:6 110:3 122:3

**expert** 11:12 45:17 50:9

**expertise** 18:20,23 19:17 47:22 72:5 116:7

**expired** 16:20

**explain** 54:20 129:7

**explored** 125:15

**extension** 110:22 111:4,11,20 113:1,21

**extent** 27:2 109:6 133:23 134:1

**external** 55:4

**extra** 90:23

**extremities** 17:23 28:1 56:22 65:4 67:18,21 70:11 137:4

**extrusion** 63:4

**eyes** 75:5 115:11

F

**F-O-N-T** 129:6

**facet** 52:24 53:1,16,21 55:18 57:1,4, 8,9,11,14 58:1 66:6 67:5 69:8 75:16, 23,24 76:5,11,21 77:18,24 78:2 120:10,19 123:13

**facet-type** 57:17

**facetectomies** 120:19

**facetogenic** 53:3 56:7,8 105:19,24 122:10 123:21

**facets** 52:19 53:19 56:12 57:12 69:10 77:1,17,18,23 122:16 123:12 124:10

**facilitate** 63:10 152:14

**facilities** 107:14,21 108:1

**facility** 24:23 59:18 60:14 65:10,16 97:5 107:6,9,16 152:14

**fact** 58:7 66:5 145:6

**factors** 71:22

**facts** 42:7

**factual** 39:15

**failed** 47:15

**fair** 38:17 50:21,22 95:2 110:11

**familiar** 11:7 39:2 46:7,20

**familiarity** 31:2 37:3

**family** 101:6,10,15,23

**fast** 61:19 133:19 150:19

**fat** 124:12

**fat's** 122:15

**February** 65:16

**federal** 146:24

**fee** 84:1 86:13 156:12,19

**feel** 51:17 143:6

**feeling** 43:1

**fees** 34:14 97:6

**feigning** 109:14

**fellowship** 6:6

**felt** 141:5

**fibers** 55:3 57:24

**fictitious** 23:17 24:1

**field** 50:4,9

**figure** 95:3,4

**figures** 89:4 91:20

**film** 131:14

**films** 62:24 105:14 131:18

**financial** 34:11

**find** 114:13

**findings** 51:5 70:17 116:16 123:2 124:22 125:20

**fine** 13:19 41:7 42:23 152:15

**finger** 75:18

**fingers** 43:4

**finish** 42:12 48:16 99:14

**finished** 6:23

**fire** 57:15

**firing** 58:7

**firm** 12:4,7 14:5,6 24:19 37:7 38:10 40:17 51:6 85:21 130:23 138:6 140:2, 3,14

**firms** 84:22 92:4,8,10 93:5,12 94:6, 23 95:6

**fit** 34:3

**fits** 58:11 130:5

**five-** 78:10

**flattened** 68:20 115:12

**flexion** 110:21 111:3,10,16 112:22 113:15

**floor** 24:15,22 25:1,9,11,12,13 26:6 131:3

**focuses** 69:16

**focusing** 69:15

**folks** 142:11

**follow** 73:11

**follow-up** 45:11 46:14 115:20 128:18

**font** 129:6,11,24

**food-type** 133:19

**forced** 53:15

**forces** 55:5 56:17 116:5

**forearm** 70:7

**forget** 23:15 24:4 90:3 145:1

**form** 51:23 66:16 70:21 129:17 149:13,18 151:9

**forms** 17:21

**forthright** 108:18

**fortunate** 90:4

**forward** 59:2 110:21 111:3,10,16 112:22 113:15 135:16 150:19

**found** 114:13

**foundation** 93:21 153:14

**founded** 44:17 149:20 151:11 153:18

**four-year** 7:13

**fracture** 127:22,23

**fractured** 127:22

**fractures** 17:24 60:8

**frame** 77:8 78:15 79:11 87:18 88:1 135:23 136:4,6

**free** 51:17

**frequency** 76:10 120:12

**frequently** 107:3

**front** 17:7 41:3 51:9 56:10 75:23 85:19 88:21 96:8 138:19

**froze** 141:7

**full** 111:15,19 112:12,18,21,24 113:5, 14,20 127:4

**function** 55:11 56:22 58:10 59:10 69:24 70:1 77:12

**functions** 17:22
**fuse** 78:6
**fusion** 78:17,19,24 121:2,7
**future** 11:5 36:15 72:1 73:22 80:6 101:4 119:13,20 121:19,23

G

**gain** 109:12,13,18 110:2
**gait** 126:11
**game** 28:7
**gave** 15:7 19:1 71:1 88:11 111:23 112:10 144:13
**general** 53:20 103:3
**generally** 21:5 30:1 46:3 55:5 79:5,9 89:24 131:6
**generate** 53:2 90:24
**generated** 39:12 77:14 89:18
**generators** 53:18
**gentleman** 19:7
**gentlemen** 5:12
**give** 13:15 49:6 62:1 91:20 96:4 109:11 117:15 118:11
**glean** 134:6
**global** 52:23
**gluteal** 60:20
**Gomley** 4:9,20 45:11
**good** 5:8,11 11:21,22 12:16 14:20 28:14 45:8 71:10 81:11 82:9 129:8 130:13 150:14 152:14 156:4
**grade** 53:8 58:15
**graduate** 7:5 47:17
**graduated** 7:4
**great** 56:18 90:2 155:7
**greater** 68:23 69:7,20 77:23 102:24 103:1 107:7
**greeting** 96:8
**Grey** 12:8
**grounds** 40:7 42:3 44:11 145:23 147:7 149:15 151:4
**guarded** 71:1,2,7
**guess** 28:14 72:17 118:23 155:9
**gun** 24:2

H

**half** 8:14 27:22 28:2,12,18 99:9 121:11 134:3,5 136:23
**hall** 25:6
**hallway** 26:24 96:23 131:7
**hammer** 96:16
**hand** 41:1
**handle** 56:18 83:11
**handler** 102:7 133:1
**happen** 114:12
**happened** 68:5
**happy** 33:13 114:14 115:17
**hard** 105:13 130:16,19,24 131:13,16
**hardware** 33:21 78:7
**head** 24:2 82:10 89:22 93:11 112:7
**heal** 59:8,9
**healthy** 90:11
**hear** 34:1 88:10 96:2 140:22
**heard** 34:6,12 36:22 39:4 155:24
**hearsay** 37:24 40:8 42:4 44:11 145:24 147:8 149:16 151:5
**heat** 66:16
**heavy** 102:10
**heck** 78:22
**held** 4:8 24:2 32:21 97:6
**hereto** 5:18 51:15
**herniation** 54:23
**herniations** 29:16,22 30:6 52:16 102:11
**Hershey** 22:4
**high** 58:14
**high-** 53:7
**high-dose** 75:17 76:2
**hired** 85:21 141:20
**history** 29:17,24 30:2 62:14 68:12 74:24 99:4 102:3,4 119:1 124:22 134:1 142:5
**history's** 99:8
**hold** 20:24 125:18 157:2
**holding** 112:6 131:18
**holiday** 27:13 82:3
**home** 26:3 102:19 103:4 156:16
**honed** 61:17
**honest** 39:23
**Honor** 5:12
**honorary** 20:4
**honored** 22:6
**honors** 6:3
**hooked** 61:21
**hospital** 6:4 60:6
**hospitals** 15:3,5 49:1,4
**hour** 79:8 99:9,13 134:3,5 136:24
**hurdle** 47:20
**hydrogen** 61:19
**hypertonic** 69:5
**hypertonicity** 68:22

I

**idea** 14:9,11 24:4 27:16 36:4 66:2 92:12 93:1 126:9 133:21 139:20,24
**identified** 64:21
**identify** 5:20 11:5
**II** 96:14
**illegal** 152:9
**illness** 108:8
**images** 10:11 62:6
**imaging** 61:14 115:9 119:23 142:7
**IME** 3:18
**immediately** 103:14
**implantation** 33:21
**importance** 90:2
**important** 74:20 148:9 150:16
**Impossible** 100:18

**improve** 58:2 117:14

**improved** 117:18

**improvement** 117:11

**impulse** 57:15

**inappropriate** 108:7 138:15

**inappropriately** 108:7

**incident** 58:24 59:21 68:5 80:4 125:10 134:13

**incidents** 68:1

**include** 10:14,16 11:1

**included** 53:5 54:2

**including** 10:10 39:13 115:22 130:24

**income** 95:5

**incorrect** 134:8,10

**increase** 102:20

**increased** 102:22

**increments** 69:11,17

**incurred** 78:12

**independent** 25:8 30:16 39:9 141:23 156:17

**indicating** 56:11

**individual** 61:16 62:20 71:7 85:7 97:16,18,22 107:12 108:22 109:24 119:12 123:20 152:15

**individual's** 58:9

**individuals** 8:8 9:5,11,24 17:20 18:2 26:9,14 27:9,14,20 28:4,23 29:6 30:15 34:3 72:6,7,10,14 84:21,24 85:5,10 87:21 88:7 93:9 99:7 107:3,8 109:3 110:4

**inflammatory** 44:12 146:1 147:8

**influenced** 34:10 62:20

**information** 6:1 14:11 27:17 33:5 39:15 46:2 75:1 88:11 89:23 92:16 108:20

**inject** 75:24 139:17

**injection** 10:16 75:16 138:8

**injections** 76:11,12 120:10,12 138:7 139:1

**injured** 10:5 52:1,18 55:20 128:4 134:13

**injuries** 10:6 17:13 27:24 29:11 50:18 52:5,7,9 53:1,7,8,15,17,24 57:20 58:13 59:1,9 67:5 71:13,19 72:7,8,15,20,24 73:1 109:9,21 114:24 116:12 117:13 118:7,23 119:10 121:22 123:13 125:9,19 132:7,15 134:16,20 135:1

**injury** 29:17,24 30:7 52:14 58:1 59:6 68:19 78:11 102:6,18 108:11 109:14 114:23 119:15 124:3 127:16 135:4 154:21

**insert** 76:1

**inserts** 56:24

**intense** 103:5

**intensity** 103:1

**intensive** 37:9

**interact** 26:2,19,22

**interaction** 131:6

**interested** 21:6

**Interference** 35:23

**internal** 55:2 56:13,19

**internship** 7:11

**interpretation** 63:10

**interpreted** 63:9 124:20

**interrogatories** 92:20,24 93:3

**interventional** 18:4 58:4

**interventionals** 31:5,8 75:13 107:22

**interventions** 9:13 31:22

**interviewed** 136:23 140:8

**interviewing** 134:7

**introduce** 4:12 5:9

**Invariably** 37:9

**invest** 90:5

**invested** 85:6 91:3

**involve** 9:8 10:20

**involved** 10:1 29:1,4,8 33:21 38:10 68:1 145:13 150:17

**involves** 8:2 77:16

**involving** 12:11 37:6,11 38:8 40:17

**Iowa** 7:7

**irrespective** 106:23

**isolate** 69:10,17

**issue** 152:6

**issued** 119:11

**issues** 9:8 17:13 18:1 27:24 28:3,16, 19 33:6 39:13 100:14 116:15

**items** 102:11 128:1

**J**

**January** 4:6 36:20 63:16 87:22 88:3, 8 92:11 104:9,14

**Jefferson** 59:19 103:13,22 139:14

**job** 26:23 34:2 46:12 133:4,19 134:7 140:9

**Johnson** 12:8

**joining** 14:13,19

**joint** 27:24 55:19 56:16,18 75:24

**joints** 56:12,13

**Jones** 4:9,17 12:12 18:17 19:3,8,13 30:10 32:24 33:8 49:13 51:2 52:1,7 53:23,24 57:21 58:23 67:10 68:20 69:19 70:14,22 72:1,20 73:11 78:12 80:2 84:11,13 85:22 86:9 95:11,17 97:20 98:7,10,16 99:2,17 100:3,9,11, 17,23 101:3,17,21,22 102:1,5,16 103:9,12,13,21 104:2,5,13,16,19,23 106:9,16,19 108:14 109:17,20 112:17 114:4 115:15,23 117:10,24 118:5,19 119:17 121:12,14,24 125:15 126:4,7 127:1,3 130:20 132:2,13 135:16 139:12,17 140:8,15 141:21 150:17 152:17

**Jones'** 45:21 50:18 101:6 103:17 104:8 110:12,20 111:9 115:2 116:8, 19 117:3,19 121:20 122:8 125:3,12, 21 126:15,19

**judge** 5:9 34:9,14,16 35:14 36:20 37:1,5 38:6,16 39:1,5,18 40:15 41:3,5 153:20

**judge's** 34:19,21 35:1,18 39:7

**judges** 33:24

**June** 67:10 98:6 116:20 117:4,11 133:6 135:8 148:5

**jury** 5:10,21 7:2 9:14 40:19 54:21 116:18 134:2 138:19

**jury's** 129:24

**K**

**Karen** 101:7
**keeping** 129:18
**Kevin** 4:4
**kick** 57:6
**kill** 43:4 77:11
**kind** 14:10 27:17 29:2,9 40:9 42:7 54:20 62:2 73:2,5 74:19 92:16 107:10,21 108:1 115:3 124:10 131:20 150:5 151:22 156:19
**kinds** 10:22
**knee** 35:8,11 56:15
**knees** 110:15
**knock** 66:2,22
**knowledge** 105:9 106:5,22 121:17 152:5
**Krump** 35:16,17 36:2,9 45:19
**Kwartler** 82:6

**L**

**L1-l2** 105:17
**L4** 77:1
**L4-5** 53:17 77:3
**L5** 77:1,2
**L5-s** 105:18
**L5-s1** 53:17 77:3
**laceration** 59:8 60:3,10
**lacks** 93:21 153:13
**ladies** 5:11
**laminectomy** 120:18
**Lance** 3:3 4:10 5:1,12 50:8
**large** 31:24 61:15
**lastly** 147:12
**law** 12:4,7 24:12 25:19 38:10 40:17 46:10 47:17 51:6 84:22 85:21 92:4,7,10 93:5,12 94:23 95:6 130:23 138:6 140:4,13
**lawsuit** 87:3 146:19,20 150:7,21 152:1,5 154:5
**lawyer** 14:13,18
**lawyers** 26:20 139:13 152:18
**layman's** 17:17
**layperson** 35:20 45:20,22,24 46:3,9
**learn** 103:11,17
**lease** 26:5
**leasing** 97:7
**Lebanon** 97:13
**left** 52:21 57:2 60:3,7 66:7 68:23 69:7,20 70:3,5,9 103:18 110:23,24 111:5,6,12,13 113:6,22,23
**left-sided** 53:4
**leg** 60:3,7,11 103:18 134:21
**legal** 35:12 36:16 46:6,7 81:17
**legs** 110:15
**length** 113:18
**lengthy** 118:12
**letterhead** 22:17 23:3
**level** 35:15 45:24 52:20,21 57:1 64:18,19,20 99:18,21 100:3,9 137:9 151:6
**levels** 53:16,18,19 56:4,6 57:13 63:5 66:8 69:7,20 70:13,19 76:19,22 78:4
**Levinstein** 63:13 64:10
**Lexitas** 4:5
**licensed** 6:16
**licenses** 8:14
**licensure** 6:2
**life** 73:4
**life-care** 37:8
**lifting** 102:10
**light** 70:10
**light-duty** 102:8
**likewise** 21:13 27:19 28:17 40:14
**limited** 33:14,18 35:5 83:16
**lines** 13:12
**list** 17:7 33:9 128:1
**listed** 98:15
**literature** 39:16 72:11
**litigation** 34:4 37:14 44:24 140:16
**litigation-driven** 34:10
**living** 102:5,15
**LLC** 4:23
**loading** 69:9
**located** 20:8 25:10 27:4
**location** 97:12
**Logan** 24:8 95:21
**long** 6:19 24:5 76:7 83:12 99:1,4,6 108:16 110:9 128:19 148:9 152:10
**longer** 17:14 19:9,13,23 20:16 21:4 84:3
**looked** 18:21 68:13 71:21
**lor** 115:7
**lordosis** 68:18,21 115:7,14
**losing** 82:22
**loss** 68:21 115:7,14
**lost** 114:14
**lot** 33:4 72:13 78:22 118:24
**low** 52:8 53:6 57:13 60:2,19 61:11 64:15 67:17 68:13,15,18 77:16 115:13 123:17 125:8 135:7,9,18
**lower** 67:18,21 77:2 100:7 103:18 137:4
**lumbar** 32:15 53:10,11,12,13,14,20,21 54:22 55:13 56:11 64:16 71:21 76:24 105:12,16,23 110:12 111:9 112:11 113:11,15 115:6 117:20 119:24 120:11,17,20 121:20 122:9 124:5 126:20 127:5 128:6 130:16

**M**

**M.J.** 4:22
**machinery** 96:17
**made** 36:11 37:1,2 42:11 61:18 67:22 75:7 86:6 89:2 90:5 106:1 117:10 124:21 139:24 142:3,10 149:1
**magnet** 61:15,18
**magnetic** 61:13
**magnification** 108:5,15,24
**mail** 25:15 131:4

**main** 24:15 55:10 56:21,24 57:5 60:4 66:21 69:23 70:13

**maintenance** 75:9 118:14

**major** 8:7

**make** 25:5 47:20 49:11,17 62:13 74:21 82:14 100:10 103:8 108:13 109:16 117:17 122:24 123:23 128:8 140:5 156:10

**makes** 139:1 152:8

**making** 10:21 32:24 72:17 115:10

**Mallow** 34:8

**manage** 154:7

**management** 9:5 23:8,11,17 50:10 107:23 119:19

**maneuvers** 109:4

**manifest** 116:13

**Manus** 82:6

**March** 134:19

**mark** 5:15 51:12

**marked** 5:16 51:13

**material** 55:2,7 57:5

**materials** 10:23 76:2

**math** 28:17,18,21 83:18 89:7 91:14, 16,18 99:12

**matter** 4:8 18:18 35:19 36:21 40:24 44:1,4 85:22 86:7 114:20 129:21 130:7 148:16 152:8

**matters** 41:21 43:21

**Mchugh** 37:5

**Mchugh's** 36:20 39:2,5,18 40:15

**Meaning** 62:17 156:4

**means** 7:21 71:7 75:19,20 77:24 124:1

**measure** 67:7 109:5 112:8

**measures** 108:17

**measuring** 114:3 115:3

**mechanical** 58:8

**med** 107:22

**medial** 57:9,14 66:6 76:5,21 77:18

**mediated** 53:3

**medical** 6:5 7:7,8 10:10 11:5,7 15:11 21:11,14,23,24 22:1,4 25:22 33:1 35:13,24 36:13,15,16 37:10,15 39:9 45:17 46:4,5,6,21 50:20 51:2,21,22, 24 59:13 79:20 80:8,12 95:24 96:2,9, 10,12 101:9,10 102:2 103:10,12,16 114:16 117:3 119:14,18,23 122:1 138:23 148:17 157:4

**medically** 80:3

**medication** 58:5 65:1 75:21 132:9

**medicine** 6:17 8:1 46:10 107:22 132:6,14,16

**medicolegal** 11:8 84:16

**mediocre** 62:11 122:13 124:14

**meet** 51:1 67:9 95:17

**meets** 127:17

**member** 46:15

**memberships** 6:4

**memorandum** 36:20 39:18

**meniscoid** 56:14

**meniscus** 35:11

**mention** 148:21

**mentioned** 26:4,10

**menu** 73:5

**mess** 62:22

**met** 12:1 67:13 95:18 133:6,16 134:23 142:13 144:20

**Michael** 4:18 45:9 128:17

**mid** 60:22 64:17

**middle** 21:20 114:9

**Mike** 64:1 141:6 143:13

**million** 87:17

**mind** 48:17

**mindful** 36:11

**mine** 100:21

**minutes** 43:10 99:10,11,13 134:3,6 136:24

**mirror** 62:5

**missing** 156:20

**mitigate** 58:6

**mo** 111:8

**Moines** 7:7

**molecules** 61:20

**Monday** 82:16,23

**money** 89:1 90:5 93:6 156:20

**moneys** 109:15

**monitoring** 120:8

**months** 66:20 76:12 77:8 120:12,16 133:18

**morphology** 63:8

**motion** 52:19,22 69:1 96:15 111:15, 20 112:12,18,21 113:1,6,15,21 114:19 116:19 117:20 126:15,19 127:4

**motions** 110:19 111:2,8 115:4

**motive** 34:11

**motor** 55:11 56:22 69:24

**move** 62:21 112:7 113:10 143:6,24

**moved** 114:13

**movements** 115:22 116:9

**moves** 106:11

**moving** 59:1 118:15 141:6

**MRI** 29:15,21 30:5 61:9,12,13,14 62:15 63:6 70:17 105:10,12,16,22 106:2,3,8 119:23 122:7 123:9,15,21, 23 124:6,17 125:21 130:15,17,22 131:15

**MRIS** 10:14 61:9 63:1 74:20 141:17

**multidistrict** 34:3

**multiple** 43:5 78:4

**muscle** 65:2 67:20 68:19 70:6 132:10

**muscles** 60:24 69:2,4

**musculature** 60:21

**mute** 81:14

**myositis** 52:11 53:11

**N**

**Nadir** 4:9,17 50:18 51:1 71:24 73:3

**named** 43:24 101:7 107:6 145:14 146:20 150:20 151:24

**names** 23:18 24:1

**narrative** 91:17,18

**narratives** 89:4 90:13

**nature** 44:3,12 71:18 147:9 154:10

**necessarily** 33:3 116:13

**necessity** 79:21

**neck** 10:6 27:15 28:24 29:16 52:7,8 56:4,5,10 60:23 61:1,11 64:11 67:4, 16 68:13,15,17 69:3 76:20 77:15 99:18 100:4 103:23 115:13 119:14 123:17 125:8,13 135:5 136:19,20 137:2

**needed** 127:8

**needle** 76:1

**negligence** 154:22

**nerve** 56:23 57:5,6 66:6,9,10,14,17 75:20 77:4,6,11

**nerves** 55:10 56:21 57:9,13,14 58:7 62:9 65:24 66:2,5,18,21,24 69:23 70:13 76:5,18,22,23 77:19

**neurology** 26:1

**neurotomy** 76:16

**neutral** 112:4,5

**Neutral's** 112:6

**newer** 124:11

**Newtown** 24:16

**nice** 46:12

**Nicholas** 4:21

**non-treating** 152:12

**normal** 111:24 112:17

**normals** 112:18

**North** 24:9

**note** 73:23

**noted** 38:13 40:12 42:3 74:8 115:7

**notes** 48:5

**noting** 12:22 13:3 38:2

**November** 52:2 68:5 80:5 125:4,13, 22

**numb** 66:6,10

**number** 26:13 81:22 85:18 88:5,8 92:2 95:9 99:20 100:2 107:20

**numbers** 24:24 27:21 28:6 85:16,20 88:5,22 89:13,14 92:19 93:8

**numbness** 67:17 137:3

**O**

**Oaks** 23:8,11,14

**oath** 134:21 135:6,17 137:19 152:18

**Ob** 63:19

**object** 40:7 42:20

**objecting** 44:10 93:19 145:23 149:15 151:4,7 153:13,14

**objection** 12:17,22 13:4,15 37:17,22 38:2 40:2 41:22 42:3,10,12 44:6 63:21 64:4 73:16,20 74:2 93:14 138:9,21 142:16 145:16,22 146:5 147:2,6 149:7,13 150:23 153:6 155:4

**objection's** 38:12 74:8

**objections** 40:12

**objective** 62:15 106:8

**observation** 68:16

**observations** 142:2,4

**observe** 126:14 142:5

**observed** 8:6 56:3 116:15 135:13

**obtainable** 38:8

**obtaining** 68:11

**occasional** 60:20

**occasionally** 93:2

**occasions** 21:2

**occur** 58:21

**occurred** 52:2 80:5 102:18

**occurs** 52:22 58:16

**odd** 92:14

**offer** 20:23 50:8

**offered** 144:10,17 145:3

**offering** 114:17

**offhand** 89:3 92:2

**office** 19:22 20:9 24:8,13,16,21 26:17 27:4 37:11 95:19,20,23,24 96:2,13,24 97:2,4,6,8,11 98:17 126:8, 12,17,21 130:20

**office's** 51:3

**offices** 23:12,14,19,22 24:1,14 25:19,22 26:5,8,23

**official** 9:6

**old-school** 131:17,20

**one's** 62:3

**ongoing** 119:17

**open** 61:9 105:10 143:3

**opening** 31:24

**operate** 48:22 78:20

**operating** 8:7 78:5

**operative** 10:17,18 31:21

**opinion** 33:18 34:19,21 35:1,18 37:2 38:8 39:2,3,5,7 40:15 70:21 71:24 79:19 80:1 125:10 127:13 128:8 144:18 145:3

**opinions** 33:15 34:5 36:12,14 50:18 51:23 72:4 73:24 80:6,11 85:4 114:17 124:21 125:18 127:8,9 134:16 140:15 144:9,10 156:24 157:2,3

**opportunity** 33:19 34:16 36:19 49:7 97:5 117:16 118:11 119:9

**opposite** 94:10

**optimal** 78:15

**options** 118:12 119:20

**oral** 8:4 16:14

**order** 47:23 141:17

**orders** 157:23

**ordinarily** 131:19

**organization** 47:8,10

**original** 33:24

**orthopedic** 6:23 7:12 14:23 18:11, 20 19:6 20:3,5,14,23 21:1,9 22:18,20 25:9 30:19 31:6 46:15,24 47:1,5 48:12 50:3,11 75:3

**orthopedic-related** 17:13

**orthopedics** 17:3,10,15 22:10 50:2, 10

**orthopedist** 17:18,19 18:8,19 19:2, 4,9,14,23 20:2,12,17 21:4 120:7

**Orthoranger** 96:14 114:2,6,8,11

**osteopathic** 15:21 47:9,11

**osteopathy** 15:11,14
**outlined** 119:5 121:4,15 125:5,9
**over-the-** 132:15
**overlap** 82:21 131:9 136:12
**owe** 93:6
**Owen** 5:12
**owner** 22:24 89:17

**P**

**P.c** 22:18
**P.C.** 22:21
**p.m.** 4:7 14:2
**PA** 24:9
**pace** 43:4
**package** 102:7 133:1
**pages** 33:12 91:7,9
**paid** 84:17,20 85:3,6 86:11,16,17,18, 20,21 87:3,16 88:19 89:10
**pain** 9:4,6,9,10 21:8 23:8,11,16 27:15,20 28:24 29:7 50:10 53:2,3,18, 23 56:8,21 57:7,9,16,17 60:2,19,20, 22 63:18 64:11,15 65:10 66:1,3,12, 22,24 67:6,13,19,20,22 69:18,19 76:18 77:13 99:18,21,24 100:3,9 103:18,24 107:22,23 108:3 109:1,3,4, 6,8 126:1,5 135:7,9,18 136:19,20 137:9 138:3 152:21 156:1
**pain-free** 127:4
**painful** 55:24
**palliative** 67:7
**parameters** 121:4
**Pardon** 154:16
**part** 8:21 10:4,8 11:4,9 17:5 55:8,15 56:10 65:23 66:4,13 68:16 71:12 72:22 75:23 76:6 77:2,3 88:11 93:22 95:8 110:16 114:20 118:20 119:20,22 122:2 129:15,20 132:23 134:24 141:22
**part's** 68:11
**participate** 54:1 83:8,24
**participated** 81:21 82:1,5
**parts** 28:1 65:21,22
**pass** 16:1,3,8,11 31:22 45:5 47:18 48:1 128:12 155:19
**passed** 7:22 8:11 16:12 48:2,3
**past** 43:2,7 45:16 55:8 92:20 107:19 118:13 145:1
**pasting** 129:14
**path** 143:5
**pathology** 125:12
**patient** 9:19,20 49:18 62:17 73:7 84:13 100:21 115:19
**patient-doctor** 49:14
**patients** 9:8,15 10:5,21 11:2 20:12, 15 21:3 25:7 27:12 29:14,21 30:4 49:3,11 72:8 143:1 153:2 156:17,21
**patients'** 32:14
**pattern** 153:4
**patterns** 106:21 148:11,13,22 149:2, 6 150:8,22 152:2
**pay** 87:5 96:7
**paying** 97:6
**pays** 84:6
**pediatrics** 25:24
**pedicile** 35:3
**pedicle** 33:20
**peer-reviewed** 22:9
**pending** 36:2
**Pennsylvania** 6:3,17 7:24 11:12 22:23 35:7 46:16,18 97:14 140:4,7
**people** 9:9,10 10:2 17:12,23 18:3 20:20 21:16 27:22 28:9,15,19 29:3,11 47:17 109:4,13 110:8 111:18 113:4, 19,24 128:4
**percent** 22:24 47:19 59:6 77:24 89:17 94:24 127:12
**percentage** 94:21
**perform** 8:16 9:20 32:13 68:8,14 84:20 102:16
**performed** 61:8 98:11 126:24
**performing** 14:23 51:21 116:10
**period** 78:11 118:12
**permanency** 58:20 144:10,18 145:4,8
**permanent** 58:19 127:15 154:21
**person** 12:1 59:5 66:11 79:5 84:9 106:24 113:18 127:15
**person's** 108:6,9 113:9
**personal** 11:9 26:17
**personally** 97:1 107:9
**perspective** 18:5,21 19:7,18 20:23 21:8 46:8 63:9 71:14 103:9
**ph** 34:9 97:23
**Philadelphia** 7:6 24:9 33:23 34:4 36:5,7 95:19 97:11 107:7
**phrase** 138:18
**phrased** 138:21
**phy** 120:23
**physiatrist** 31:4 75:3
**physical** 9:20 62:14 68:12 97:11 120:23 121:6 124:22 125:3,5,6 129:2 138:3 140:10 142:6
**physically** 97:3,8
**physician** 8:12 18:22 19:5,19 37:8 40:1 86:3 98:3 100:12,15 129:14
**physician's** 21:22 96:6 97:19
**physicians** 30:11 152:12
**pick** 57:16
**picture** 114:21 134:13
**Pinkney** 97:23,24
**pinprick** 70:11
**Pittsburgh** 97:2
**place** 37:22 75:17 150:13
**placing** 66:15 155:3,4
**plaintiff** 4:17 37:7,12 39:13 49:13 84:8,11 152:17 154:20
**plaintiffs** 127:15 142:11
**plan** 37:8 119:14
**planning** 74:22 124:1
**plans** 115:15,18
**play** 18:24 28:7 115:1
**pleasant** 110:3
**point** 7:15 16:20 21:18 22:6 23:21 33:23 40:11 47:21 90:7 96:17 100:16, 22 101:2 111:1 112:2,4 113:12 124:3



Uber_00141807

143:15 148:21 151:21 156:10

**polite** 110:5

**porm** 98:11

**portion** 55:3,4

**posed** 152:6

**positive** 69:6 70:14

**possession** 98:14

**postoperative** 9:11

**practice** 6:16,24 7:15 8:14,24 9:3 10:4,8,20 11:1,4,9 17:3,10,15 20:11, 16 27:8 29:13,20 30:3 36:10 39:16,19 45:1 90:4 93:11 101:11 114:17

**practiced** 6:21 50:4

**practicing** 19:9,14,23 20:2,13,24 22:10

**precluded** 33:14,18 35:5,8

**predicted** 79:16

**prejudice** 155:6

**prejudicial** 37:23 40:8 42:4 44:12 145:24 147:8 149:16 151:5 153:15,22 154:9,12

**Premier** 65:10 152:20

**premise** 20:4

**preparation** 86:12 91:1 129:5

**prepare** 90:13,22 91:12 92:1 129:16

**prepared** 37:9

**preparing** 129:14

**prescribed** 132:6,14,19

**prescription** 132:6,14

**present** 4:11 8:5 9:7 12:11 24:8 59:16 60:13 73:6 97:3 128:7 129:21

**presentation** 116:14

**presented** 29:14,21 30:4 60:17 63:18 64:10 103:13,22 104:2

**presenting** 30:2

**presently** 15:2 48:10,14,15,21 83:7 136:1,5 145:13

**preservation** 17:21

**pressure** 152:11

**pretty** 10:2 27:1 28:18 29:3,10 83:14 89:20 137:5 148:12 156:1

**previously** 26:10 49:10 106:8

**principle** 57:8

**prior** 12:15 14:13,19 67:24

**private** 20:11,16

**privilege** 34:24

**privileges** 15:2,8 49:1,5

**probability** 36:15 46:5 80:9

**probable** 121:16 123:19

**probe** 66:15

**problem** 39:11,15 67:3 107:2 134:9

**problematic** 59:1

**problems** 108:21 110:8 125:4,5,6

**procedural** 18:5 65:7

**procedure** 65:13,18 76:9,14

**procedures** 31:13,14,17 32:7 58:4 79:2 120:24 121:3,8

**proceedings** 81:18

**process** 34:23 47:22 150:17

**processes** 39:21

**professional** 6:4

**professorship** 22:4

**prognosis** 70:22,24 71:1,3,16,17,23 100:23

**program** 7:13

**progression** 73:2,5,9

**progressive** 124:2

**proper** 77:12

**prophylactic** 74:1

**protons** 61:20

**protrusion-types** 63:5

**protrusion/extrusion-type** 54:23

**protrusions** 29:15,22 30:6 102:12

**proven** 42:7 44:16 153:17

**provide** 33:11 58:5 99:20 100:3 127:7 131:1

**provided** 7:23 37:5 39:6 88:7 92:23 95:3 100:10 119:13 130:22

**provider** 132:5 138:23

**providers** 10:10

**providing** 86:19

**proximity** 26:21

**psychiatrist** 120:7

**publicly** 38:7

**publicly-viewed** 40:16

**published** 22:8

**pull** 5:14

**purpose** 140:14

**pursued** 37:12

**put** 25:13 62:19 78:6

## Q

**qual** 11:18

**qualifications** 11:18 12:24 38:6 40:19

**qualified** 11:11

**quantifial** 99:20 100:2

**quarter** 89:23

**question** 12:16 14:20 16:23 32:10, 12 43:19 44:13 48:17,21 82:9 92:18 93:20 96:19 117:2 132:11,20 137:24 138:18 139:5,21 143:2,8 147:9 149:13,18 150:2,9 151:9,18 154:7

**questioning** 13:19 42:13,18 49:10 81:12 94:2 101:21 123:8

**questions** 11:17,23 13:1,12,16 45:4, 12,18 46:13 108:18 110:6 111:22,23 113:11 128:10,18 130:15 137:12 143:19 148:6 152:6 156:23 157:11

**quick** 54:4 80:19

**quickly** 157:23

**quote** 37:5 122:9

## R

**R-E-N-D-U-L-I-C-H** 101:8

**radi** 79:14

**radiating** 60:23

**radiofrequency** 31:11 32:14 65:20 75:14 76:6,15 79:15 117:7 120:15

**radiographic** 61:24

**radiologist** 32:18,21,22

**radiologist's** 63:10

**range** 69:2 110:19 111:8,15,19 112:18,21,24 113:5,14,20 114:18 116:19,22 117:19 126:15,19 127:4 131:23

**ranges** 68:24 111:2,24 112:12 113:2 114:23 115:4

**rapid** 61:15

**rare** 21:18 29:3,10

**reach** 36:12

**read** 39:1 100:19 126:23 129:4 130:5, 12 132:21

**readable** 129:9

**Ready** 13:8,22 38:19 43:12 54:13 94:14 146:10 147:19 155:13

**real** 37:15 80:19 151:21

**realm** 46:10

**reason** 19:16 64:9 75:4 92:14 101:5, 20 114:15

**reasonable** 35:13,24 36:13,14 46:4 50:20 51:23 79:11,20 80:4,7,8,12 103:7 109:10 123:4 135:13 157:4

**reasonableness** 79:21

**reasons** 56:2 128:6

**rebuttal** 127:7

**rec** 155:3

**recall** 12:3 14:16 17:8 110:17 144:5

**receive** 61:5 95:5 101:9 109:15 132:9

**received** 6:4 79:22 80:2 87:9 106:16 117:8

**receiving** 118:1

**recent** 149:4

**receptionist** 96:5,7

**receptionists** 25:16

**recertified** 8:9

**recess** 54:10 81:2

**recognize** 26:24

**recognized** 7:24 76:8

**recollection** 37:5 133:22 134:10 135:15 137:18

**recommend** 123:18

**recommendation** 100:10

**recommendations** 10:21 49:11,17 106:1 152:11

**recommended** 11:5 37:10,13 64:23 65:1 79:1 105:1

**reconstructionist** 116:4

**record** 4:3 12:18,20,22 13:8,17 14:1 37:18,20,23 38:3,19,22 40:3,5 41:11, 23 42:1,21 43:12,16 44:7,9,21 54:4,6, 16 63:24 64:6 73:16 74:13 80:23 81:5 93:15,17 94:14,18 106:23 132:18 138:10,12 139:7,9 140:19,22 141:3, 13 142:17,19 144:2 145:17,20 146:10,17 147:3,5,19,22 149:8,10,23 150:24 151:2,15 153:7,10 155:5,13, 16 157:18,21

**records** 10:10,16,17 51:2,22 59:13 85:8 90:23 98:10,12,13 100:19 101:9, 13,16,18 103:10,12,16,22 104:11,23 117:1,3,5 118:4 122:1 130:24 142:6

**recover** 58:2

**recovery** 59:7 71:12

**REDIRECT** 155:21

**reduction** 66:12

**refer** 30:10,20 51:17 54:24 55:1 56:8 93:12 138:24 140:2

**referenced** 7:16 54:21 59:12 66:23

**referral** 100:14 106:21 148:11,12,22 149:5 150:8,21 152:2 153:4

**referrals** 75:7 87:9 88:13 120:7 139:24 140:5 148:19 149:1 152:9

**referred** 30:18,22 93:10 95:10 104:6, 16,20 106:19 108:23 110:1 119:12 139:17,22 148:8

**referring** 23:9 32:3 43:23 106:13 148:15

**refers** 109:13

**reflect** 69:22 70:12 104:12

**reflection** 47:21

**reflex** 69:21 70:2 96:16

**reflexes** 69:22

**refresh** 37:4

**regard** 45:15 46:9 59:11 79:1

**Regen** 63:12 104:13,17,20 107:5 132:9 139:18,19

**regenerate** 66:19,24 77:7

**region** 64:17

**Regional** 22:17,20 25:9

**registered** 22:22 23:17

**regularly** 10:9

**regurgitate** 142:9

**Regus** 24:23 96:7 97:5

**rehab** 65:11 75:4

**related** 79:17 80:4 125:7

**relationship** 30:15 37:15 49:15 85:24 87:8,11

**relaxant** 65:2

**relaxation** 132:10

**relay** 104:5

**relevance** 37:23 40:8 41:1 42:4 44:11 93:20 101:19 145:23 147:7 148:16 149:16 150:18 151:4 153:15

**relevant** 94:2,4

**reliable** 122:21,23

**relied** 33:7

**relief** 67:6,8

**rely** 10:9 33:1,5

**remain** 18:13,14 157:3

**remainder** 73:3

**remaining** 80:11

**remand** 33:22

**remanding** 33:22

**remember** 88:6 134:11 145:14 148:4 150:3

**remotely** 4:8 93:22 138:16

**remove** 77:17,22

**removing** 77:17

**rendering** 140:15

**Rendulich** 101:7

**reorganizes** 61:19

**repeat** 79:15 125:1

**repeatedly** 74:7

**report** 3:18 23:4 25:14 46:2 51:6,8, 18 65:7 85:7 86:8,12 90:24 91:12,19 98:15 103:11 105:10,13 106:15 109:22 119:12 126:23 127:2,7 129:1, 4,9,15,16 130:5 133:3,8,14

**reporter** 4:13 42:24 81:1 157:22

**reporting** 39:21

**reports** 10:17,18 37:14 39:9 63:1 90:21 91:2,8,24 145:10

**represent** 45:10

**represented** 142:12

**representing** 95:16

**request** 51:3 101:13

**require** 9:13 17:20 72:1 73:3 100:14

**required** 101:3 118:22 119:10 121:15 123:19

**requirement** 35:12

**requires** 119:4,17

**research** 122:6

**residency** 6:23 7:12

**resident** 7:14

**resonance** 61:13

**respect** 34:21 39:5,8 89:3 127:9 137:13,23

**respected** 34:19

**respectful** 34:22

**respectfully** 127:11 157:1

**response** 42:10 44:19 69:18,19 71:6,8,10,11

**responsibilities** 141:23

**rest** 27:24 73:21

**restoration** 17:21

**restrictions** 140:10

**result** 52:1 123:13,16

**resulted** 125:9

**results** 62:18 106:9 123:8

**retained** 12:5 140:13

**retire** 17:3,9

**retired** 18:10,14 50:2

**retirement** 19:20

**retiring** 90:3,9

**return** 102:7

**returns** 67:1

**revenue** 89:18 94:22

**reverse** 62:3

**review** 10:9,22 36:19,22 51:2 59:13 62:24 65:6 90:24 115:21 124:21 142:6,7

**reviewed** 103:11 122:1

**reviewing** 51:22 85:8 91:4 142:24

**Reyes** 4:4

**RFA** 117:15

**RFAS** 32:16

**rhizotomy** 76:16

**Ricci** 12:8

**rich** 34:12

**RICO** 146:20 149:4,14 150:7,20 152:1

**right-sided** 53:5 60:2

**ring** 36:5 37:16

**rise** 35:12

**rising** 35:15

**robust** 90:6

**role** 30:17 98:4 142:1

**Roman** 129:10

**room** 8:7 60:1 97:17,20 100:15 103:23

**rooms** 48:11,13,22 96:22

**rotates** 61:15

**rotating** 7:11 69:13

**rotation** 110:22 111:5,11 113:6,22

**rotations** 6:8

**row** 22:7

**ruled** 42:8

**running** 13:15

**S**

**S1** 77:1 105:18

**sat** 16:12

**satisfied** 155:8

**scale** 67:20 99:24 109:6

**scan** 61:23

**scanner** 62:21 106:11 122:14,19,21 124:10,13,15

**scanners** 124:11

**scans** 10:14

**scar** 59:11 78:21 134:21

**scarification** 58:16

**scars** 78:22

**scene** 59:20

**schedule** 65:3

**scheduled** 82:7,24 83:4 105:1

**school** 7:7,8 21:23 22:1 47:17

**schooling** 7:1,3

**schools** 21:11

**scope** 123:19

**screen** 5:14

**screw** 33:20 35:3

**secondary** 109:12,13,18 110:2

**seconds** 54:9 66:17

**section** 13:3 147:12

**seek** 100:11 101:15 118:19

**sees** 107:16

**segmental** 52:11 53:12

**segments** 52:19

**semi-invasive** 31:24

**send** 57:7,9,15 66:1 92:4 131:4

**sending** 66:3 76:18

**sensory** 55:11 56:22 70:1,10

**separate** 56:19

**SEPTA** 4:19 45:10

**September** 118:7

**series** 104:22

**served** 150:6

**services** 87:17 88:20 89:8,11 93:6

**session** 79:8

**sessions** 118:14
**set** 34:14 75:5
**shape** 129:17
**share** 25:20,23
**sharp** 60:19,22
**Shelton** 36:21 39:6
**shin** 60:4,12 103:19
**shortly** 6:16
**shoulder** 61:1 69:3
**show** 29:15 30:5 57:2 60:8 94:9 125:17
**showed** 22:14 29:22 105:18 122:9 123:20 124:6
**shows** 105:23
**sic** 35:3 99:20 100:2
**side** 69:13 70:10 110:23 111:6,12 113:8,23
**sides** 39:12
**signal** 57:7,10 66:1,3 76:19
**significant** 57:22,23 58:12,13 99:8
**similar** 23:3 30:10 56:15 68:4 103:4 113:11
**Simon** 14:5,13,14,19 24:12,17,18,20 26:19,20 37:11 38:9 40:17 83:6 86:22,23 87:2,3,8,9,16,22 88:13,19 89:10 90:14,17 91:22 92:1,13 94:22 95:10 98:22 107:13 108:23 110:1 119:13 130:23 138:7 140:14 142:12 143:1 145:7 150:10 153:2
**Simon's** 37:7 87:16
**single** 37:11 42:21 73:8 86:13 127:20
**sir** 14:22 16:9 39:1 73:14 83:2 128:9
**sit** 8:3 11:11 15:23 75:21
**sits** 57:5
**sitting** 8:10 25:6 26:17
**situations** 10:3
**skew** 108:9
**skills** 6:8
**skin** 31:22 32:2
**small** 56:23 57:6,13 58:7 65:24 66:5,9 69:11,16
**snippet** 39:1,3
**so-to-speak** 73:6
**society** 46:16
**soft** 52:9 53:7 58:13 68:19 114:24
**sole** 140:14 142:1
**somatic** 52:11 53:11
**somebody's** 109:7
**sophisticated** 62:1,12 122:17 125:2
**sophistication** 124:12
**sore** 67:19
**sort** 29:1 30:7 118:1
**sought** 118:6
**sound** 89:5 91:21
**Sounds** 89:9
**space** 25:20,23 75:19
**span** 48:4
**spasm** 68:21 69:5
**speak** 57:12 114:24 148:24
**speaks** 12:23
**specialist** 148:17
**specialty** 6:7
**specific** 33:7 108:13 109:16
**specifically** 142:23
**SPECT/CT** 124:13
**speculative** 74:1 118:21
**speed** 61:15
**spend** 9:7
**spent** 86:8
**spinal** 8:19 17:22 27:23 28:2,12,19 52:20 58:8 60:15 69:12,23 75:11 79:6 104:3,6,9 107:4 128:3 137:8 139:13,16,22 152:20 153:3
**spine** 8:22 32:15 52:9,12,13,15 53:12,13,14 55:12,13 56:11 63:6 71:21 76:24 102:12 105:12,16,23 110:12,20 111:9,15,16,20 112:11,22 113:1,7,11,16 115:6 117:20 119:24 120:17,20 121:20 122:9,22 123:9 125:21 126:16,20 127:5 128:6 130:16
**spines** 54:22 120:11
**sports** 102:18,24
**sprain** 52:10 53:11
**Square** 24:8,16 95:21
**stabilization** 121:2,7
**staff** 6:5
**stand** 15:20
**standard** 72:16
**standardized** 47:19
**standards** 119:1 122:5
**standing** 62:4
**stands** 61:13
**start** 43:2 99:14 114:7,11
**started** 7:12 87:13 97:14 114:5 142:23
**starting** 7:14 111:1 112:1,4 113:12
**state** 8:1 33:5 46:17
**stated** 27:4 34:9 106:22 121:18
**statement** 102:14 103:3,8
**statements** 146:1
**states** 8:13 33:24
**stature** 149:14
**status** 16:24 17:2,4 18:13 20:6,7
**statute** 149:5
**stay** 90:11 136:16
**steeped** 72:13 118:24
**step** 47:24 70:19 71:17,19
**Stephanie** 4:13
**steps** 73:12
**stone** 113:3
**stopped** 8:20 14:23 15:8 18:7 118:2 133:11,17
**story** 145:10
**straight** 112:7
**strain** 52:10 53:11 64:16
**straits** 100:13
**Street** 24:9
**structures** 56:14,20 58:17 62:8 122:15



Uber_00141811

**student** 21:20

**students** 21:14 22:1

**studies** 10:11,13 29:15,21 30:5 61:5 74:17,19 105:5,22 106:8 122:12,20 125:1

**study** 30:2 61:14 62:14,18,22 104:24 105:3,8,20 106:10 122:8 123:4,9,22 124:4,6,17,20,23,24

**subject** 79:22

**subjective** 108:3,4 109:2 114:19

**subspecialty** 7:21 8:15 15:17

**successfully** 8:11

**sued** 39:24 41:19,21 43:21

**suffered** 10:5

**suite** 24:9,21,24 25:3,10 131:2

**suites** 24:22 25:12,18 26:7

**Sulpizio** 3:5,9 4:21,22 11:20 13:5,13, 18 14:3 38:4,14,17,24 40:13 41:2,8, 14 42:9,15,17,22 43:6,13,20 44:18,23 45:3 73:15,20 74:4,10 80:18,24 81:10 93:24 94:7,11,16,20 128:9 157:10

**sum** 86:16

**summarize** 7:1 51:5

**super** 61:15

**supplemental** 90:21 91:24

**supplied** 116:2

**supply** 33:13 55:10 56:21

**supports** 72:12

**suppressing** 124:12

**surely** 12:24

**surgeon** 8:19 18:11 20:3,5,14 21:1,9 30:19 31:1,6 48:12 75:3 78:21 90:5

**surgeons** 15:22 30:11

**surgeries** 8:16,22 31:15,18,19 32:8 120:18

**surgery** 6:23 8:20 14:23 15:9 16:15 17:11 18:1 20:20,23 31:23 32:2 46:24 47:1,5 48:6 50:3,11 58:3 73:10 77:16 78:9,16 79:3,6,12 83:15 101:4

**surgical** 6:8 7:21 8:21 10:17 31:4 74:22 123:24 124:6

**surmount** 59:5

**surprise** 118:5,8 127:3

**surprises** 127:6

**surround** 55:3

**surveillance** 73:14,22 74:16 119:23

**suspected** 35:10

**sustained** 72:11 135:1

**sway** 134:15

**swear** 4:14

**sworn** 3:3 5:2

**symptom** 108:5,15,24

**symptoms** 58:6,19 102:20,22 126:3

**syndrome** 52:24 53:21 55:19

**Syracuse** 7:4

**systematic** 129:20

**T**

**T1** 62:3

**T2** 62:4

**table** 96:18,20

**takes** 66:19 69:15 84:2 134:3

**taking** 135:16 142:6

**talk** 33:6 38:15 57:23 71:9,20 73:13 132:2 134:17 135:5 141:20

**talked** 32:9 63:4 67:22 69:2 75:1,15 76:14 77:15,19 78:7 102:17 108:20 114:22 142:22

**talking** 31:9 39:10 47:12 66:1 71:5 72:18,23 73:7 74:17 134:14

**tall** 23:7,11,14 113:18

**tangibly** 131:18

**targeting** 65:24 66:4 120:10

**taught** 22:1

**teach** 21:10,13

**teaching** 6:7

**tear** 35:11

**TECHNICIAN** 4:2 12:19 13:7,21,24 37:19 38:18,21 40:4 41:10,24 43:11, 15 44:8,20 54:5,15 63:23 64:5 73:18 74:12 80:22 81:4 93:16 94:13,17 138:11 139:8 141:2,12 142:18 144:1 145:19 146:9,12,16 147:4,18,21 149:9,22 151:1,14 153:9 155:12,15 157:19

**telling** 109:7 123:1

**tells** 77:13

**template** 129:18

**temporary** 67:6,7

**ten** 8:10 67:20 79:7 99:23 100:5 109:10,11 110:21 135:12

**tender** 69:4

**tenures** 22:3

**term** 52:23 53:20 55:17 71:5 97:7

**terminologies** 54:21

**terminology** 35:15 108:8 131:17

**terms** 17:17 36:16,17 46:4,6,7 52:9 53:2,9 54:20 55:1 126:5

**Tesla** 62:4,10 122:11 124:9

**test** 8:4 47:13,16,19 48:2 62:15 68:14 69:8 70:1

**tested** 70:10

**testified** 5:3 12:10,14 16:14 88:24 106:13 137:1,18 138:16 144:8,12 145:6,9 154:13

**testify** 14:12,17 34:18 82:7 83:18 84:17 87:3 92:7 127:13 142:2

**testifying** 14:4 45:21 81:17 83:12 87:5 127:14 142:24 144:5 156:14

**testimony** 26:10 28:11 34:1 35:8,10 45:15 50:16 51:18 73:21 74:5 86:7, 18,20 106:7 118:21 130:2 132:22 134:2 142:9,23 145:11 148:23 156:1, 11

**testimony's** 35:5

**testing** 7:22 65:4 69:22

**tests** 8:11 48:3 60:6

**Texas** 34:8,9

**textbooks** 33:2,3

**That'd** 30:1

**that'll** 57:6

**therapy** 61:2 65:5 79:4 117:6,15 120:23 121:6 137:8 138:3

**There'd** 19:16

**thing** 69:21 73:13 74:16 137:5 150:16

**things** 78:19 82:10 118:15 128:20

**think's** 79:11

**Thomas** 59:19

**thought** 39:21 101:3 109:20 114:14 141:6

**thousand** 154:13

**thousands** 81:23 153:1

**threshold** 36:12

**Thursday** 27:13 82:2,12,24

**tibia** 127:22

**tight** 60:19

**tightness** 60:22

**till** 99:13

**time** 4:6 9:7,9 11:16 12:20 14:2 16:2, 3,7,12 18:4 20:19 22:5 23:12 24:5 30:18 34:2 37:20 38:22 40:5 41:11 42:1,21 43:16 44:9,21 45:5 47:18 48:7 50:8 54:6,16 58:3,24 61:4 63:24 64:6 72:10 73:19 74:13 77:5,8 78:10, 13,14 79:10 80:23 81:5,13 82:14 84:4,6,17 85:6 86:1,6,8,21,22 87:2,4, 5,18 88:1 91:3 93:17 94:18 95:18 97:10 98:8,14 99:3,9,21 102:6 108:16 110:4,10 117:9 118:12 119:11 121:9 124:3 127:13 128:11 135:23 136:2,5 138:12 139:9 141:3,13 142:19 143:6 144:2 145:20 146:7,17 147:5,22 149:10,23 150:10 151:2,15 153:10 155:16,19 157:20

**time's** 97:13

**timeframe** 78:9

**times** 8:10 12:14 16:10 22:7 75:9 79:7 83:13,19 120:4 129:10 137:9 138:4 142:10 154:14

**tingling** 67:17 137:3

**tired** 133:19 151:21

**tissue** 52:9 53:7 56:14 58:13 68:19 114:24

**title** 20:4

**titles** 23:24

**today** 12:10,15 18:18 50:17 51:18 80:12 81:12 82:15 86:7,19,21 117:21 118:1 126:4 129:5 142:1 144:14 148:6,12,14 150:16 156:24

**today's** 4:5 82:16,23

**told** 25:17 67:22 133:7,13,22 134:2 135:10,12,17,22 136:23 137:2,5 138:7 139:13 152:17

**tone** 137:21

**tool** 114:3 115:3

**top** 69:11 70:7 77:3

**total** 87:23,24 99:12

**touch** 6:15 70:10

**touched** 9:23 69:6

**track** 12:16 14:10 23:13 27:17 82:22 92:13 93:5,8

**traditional** 95:24 96:1

**training** 6:2 7:9 18:6 31:6

**transcript** 132:17

**translate** 61:21

**translates** 56:20

**transported** 59:20,22

**trapezius** 60:24 69:4

**trauma** 10:1,3 29:1,8,17,24 30:7 58:22

**traumatic** 29:4,12 52:2 55:22 57:18

**treat** 9:15,24 10:5 20:11,22 21:6,7 72:6 152:20

**treated** 9:5 29:14,20 30:4 141:21 153:3

**treating** 9:19 18:22,24 19:19 30:14 100:12 156:21

**treatment** 9:13 10:21 17:20 18:2 37:10 58:2 59:14,17 60:13,17 61:4 71:9,20 72:1,13,19,21 75:10 79:22 80:7 100:11 104:9,22 106:16 116:24 117:4 118:1,6,19 119:10,18 120:3 121:15 123:20 139:14 152:11 156:8,9

**treatments** 73:12 75:8 119:5 121:19, 23

**trees** 23:13

**trial** 81:24 82:4,8 83:7

**trouble** 79:5

**true** 18:16 46:16,18 47:1,3 48:7 55:12,13 100:7 130:17 131:15 133:4 134:3,8 141:18 144:11 146:21 148:14

**Tuesday** 82:11,15,24

**Tuesday's** 82:19

**turn** 56:11

**Turning** 103:10

**twelve** 75:9 118:14 120:4

**type** 53:6 59:5,9,24 60:5,16,22 61:5 64:13 65:12,18 67:24 68:14 75:10 76:13 95:1 108:11 126:1 127:23 153:14

**types** 71:9,18 72:6,8,15,19 75:6,12 102:21 118:22 119:4

**Tyrrell** 12:8

**U**

**ultimately** 48:1 66:24

**umbar** 32:15

**undergo** 60:5 61:2 65:12,19

**undergraduate** 7:3

**underlying** 67:3 118:16

**underneath** 56:24

**understand** 36:17 39:14 57:16 71:13 118:3 126:13

**understanding** 71:18 89:16 134:23

**Understood** 13:6 28:10 87:12 105:15

**underwent** 79:14

**undue** 152:10

**unfounded** 146:3 147:14

**unit** 62:10

**United** 8:13

**University** 7:4 59:19

**unknown** 72:22

**unproven** 146:3 149:19 151:10

**unspecified** 64:17

**untrue** 147:15

**unusual** 128:7

**upcoming** 83:4

**upper** 60:24 65:4 67:18,21 137:3

**UPS** 102:7

**util** 114:1
**utilize** 114:1 115:9
**utilized** 97:10

V

**valid** 109:8
**valuable** 118:13
**venue** 34:24
**version** 131:15 134:12
**versus** 4:9 34:8 137:18
**video** 115:21,24 116:16
**videotape** 4:2 12:19 13:7,21,24 37:19 38:18,21 40:4 41:10,24 43:11, 15 44:8,20 54:5,15 63:23 64:5 73:18 74:12 80:22 81:4 93:16 94:13,17 138:11 139:8 141:2,12 142:18 144:1, 6,14,23 145:2,19 146:9,12,16 147:4, 18,21 149:9,22 151:1,14 153:9 155:12,15 157:19
**view** 37:13 116:18
**vigorous** 103:5
**violate** 19:19 55:2
**violating** 32:2
**violation** 40:10 44:13 147:10
**virtual** 97:2,4,7
**virtually** 37:6
**visit** 63:15 64:14,24
**visits** 75:2 120:6
**visualized** 77:2
**vitae** 3:17 5:23 22:15
**vo** 40:9
**voir** 3:4 5:5 13:2,12 43:10 46:13
**voluntarily** 15:7 49:7

W

**wait** 13:10 66:11 77:7
**walk** 73:2 131:2,3
**walking** 88:24
**walks** 126:7,10,11 131:5
**wall** 19:21 20:1,9
**wanes** 136:16 137:6
**wanted** 21:23 34:20 155:5
**watched** 16:15
**Wawa** 102:9 133:4,7,11,16 134:7 113:3 145:10
**waxes** 136:16 137:6
**weakest** 55:15
**weakness** 67:21
**Wednesday** 82:12,24
**week** 9:16 27:10 28:4,9,19 79:7 83:1, 5,8,13 85:1,11
**weekly** 26:20
**weeks** 79:8 82:3 85:16 88:16
**Weldon** 4:14
**Whatever's** 62:19
**whatsoever** 12:5
**When's** 97:10
**whip** 61:18
**who've** 30:4
**whomever** 149:1
**windows** 62:2
**wisely** 90:6
**withdraw** 64:4
**Wolf** 126:24
**Wolf's** 127:9
**word** 148:22
**words** 136:22
**work** 7:5 11:8 12:5 15:5 26:3 28:9 39:17 48:10,15,22 72:14 84:16 85:16 88:16 92:3 95:1 97:24 107:10,11,21 108:2 122:4 137:16
**worked** 48:12 102:6 132:24 133:7,17
**working** 102:8 133:11,16,17
**works** 94:6 98:1
**world** 37:15 128:5
**worse** 67:22
**write** 46:1
**writing** 85:7
**written** 8:4,11 16:13 48:3 109:22
**wrote** 134:24

X

**x-ray** 61:22
**x-rays** 10:14 60:7 141:17

Y

**Yarus** 3:3 4:10 5:1,13 38:9 40:18 50:8 154:13
**Yarus-1** 3:17 5:15,16
**Yarus-2** 3:18 51:12,13
**year** 6:20 7:11 8:3,4,6 9:18 26:1 66:20 75:10 78:11 83:9,19 85:12,14, 16,20 88:17 89:19 90:20 119:24 125:2 128:5 134:19 145:2
**years** 8:2,10,18 9:12 20:21 21:16,19 24:6 40:1 48:4 50:4 58:23 76:13 78:14,18 83:10,22 90:10 97:15 120:13,20 121:11 142:15 143:15 145:2
**young** 47:17 58:24 59:4

Z

**zero-to-ten** 99:24
**zones** 62:6 70:12