**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UBER TECHNOLOGIES, INC. and FEDERAL EXPRESS CORPORATION,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**SIMON & SIMON P.C., MARC SIMON, CLIFTON BURT, PREMIER PAIN & REHAB CENTER, PC, ETHEL HARVEY, DANIEL PICCILLO, PHILADELPHIA SPINE ASSOCIATES, LLC, and LANCE YARUS,**<br><br>**Defendants.** | CIVIL ACTION<br><br>No: 2:25-cv-05365-MAK |

**UBER TECHNOLOGIES, INC.'S MEMORANDUM IN RESPONSE TO ORDER TO SHOW CAUSE REGARDING THE SEALING OF DOCUMENTS FILED IN SUPPORT OF THE SIMON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Uber Technologies, Inc. ("Uber") respectfully submits this Memorandum in response to the Court's September 3, 2026 Order to Show Cause (ECF No. 217) regarding the sealing of certain documents filed in support of the Simon Defendants' Motion for Partial Summary Judgment. These documents contain confidential trade secrets, disclosure of which would work a competitive harm on Uber. Uber requests that the Court permit these documents to remain sealed in their entirety. In the event the Court is unwilling to seal the documents in their entirety, Uber requests an opportunity to submit versions of the documents with further redactions of specific lines as highlighted in the attached Parr Declaration.

Specifically, Uber requests that the Court maintain the seal on the following documents on the public docket: (1) the Simon Defendants' Memorandum of Law in Support of their Motion for Partial Summary Judgment (ECF No. 213-1); (2) the Simon Defendants' Statement of Material Facts in Support of their Motion for Partial Summary Judgment (ECF No. 214); (3) Ex. 10 to the Rhynhart Declaration (ECF No. 214-11); (4) Ex. 11 to the Rhynhart Declaration (ECF No. 214-12); and (5) Ex. 12 to the Rhynhart Declaration (ECF No. 214-13).[1]

## I. **<u>INTRODUCTION</u>**

The Simon Defendants' Motion for Partial Summary Judgment (the "Motion") advances a meritless argument that Uber suffered no injury and hence lacks statutory standing to pursue this action because of the involvement of an insurance company, Farmers Insurance Exchange, and certain Uber subsidiaries in the claims handling and payment process. In support of this Motion, the Simon Defendants attached three highly confidential agreements (the "Agreements") relating

[1] The documents constituting Exs. 10, 11, and 12 to the Rhynhart Declaration were produced in discovery with redactions for relevance purposes of certain economic terms that have no bearing on the claims at issue in this lawsuit. If the Court is unwilling to seal these documents in their entirety, Uber requests the opportunity to submit versions with further redactions of additional lines referenced in ¶¶ 21 through 23 of the attached Parr Declaration.

to this arrangement. These Agreements—which confirm that Uber suffered harm—contain Uber's trade secrets and were produced subject to the parties' Confidentiality Agreement. The Agreements are an Indemnity Agreement between Farmers Insurance Exchange and several Uber affiliates (Ex. 10); a subsequent Amendment to that Indemnity Agreement (Ex. 11); and a Quota Share Reinsurance Agreement between Farmers Insurance Exchange and Uber subsidiary Aleka Insurance, Inc., which is a predecessor to the Indemnity Agreement (Ex. 12). Parr. Decl. at ¶ 5.

The Agreements contain confidential trade secrets, and their disclosure would work a clearly defined and serious competitive economic injury on Uber. These Agreements are not mere insurance policies. They constitute a bespoke risk retention program involving the use of a captive insurance subsidiary by which Uber is ultimately self-funding a substantial percentage of incurred losses. As described below, Uber would suffer competitively from the disclosure of these trade secrets to two distinct sets of parties: (1) its competitors, and (2) other insurance companies. Uber therefore respectfully requests that the Court allow the Agreements to remain sealed in their entirety, and allow the redactions of the Memorandum and Statement of Facts to remain in place. Alternatively, Uber respectfully requests leave to file redacted versions of the Agreements.

## II. <u>LEGAL STANDARD</u>

While the "the common law presumes that the public has a right of access to judicial materials," the "presumption [of access] is just that, and thus may be rebutted." *In re Avandia Marketing, Sales Practices and Products Liability Lit.*, 924 F.3d 662, 672 (3d Cir. 2019). A party seeking protection from public disclosure "must show 'that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.'" *Id.* (*quoting Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994)).

The Third Circuit confirms that "courts may permissibly seal judicial records 'where they are sources of business information that might harm a litigant's competitive standing.'" *Id*. at 679. (*quoting Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 662 (3d Cir. 1991)). When determining whether to permit sealing of a document that could cause competitive harm, "[t]he critical divide is the distinction between material containing palpable trade secrets or proprietary business practices that will produce present commercial and competitive harm, on the one hand, and vague, conclusory assertions of commercial or competitive harm, or assertions that in fact appear grounded in reputational interests and embarrassment, on the other." *In re Application of Storag Etzel GmbH*, No. 19-mc-209, 2020 WL 2949742, at *11 (D. Del. Mar. 25, 2020), *adopted except for the First Amendment analysis*, 2020 WL 2915781 (D. Del. June 3, 2020).

## III. ARGUMENT

Public disclosure of the Agreements would work a clearly defined commercial and competitive harm on Uber. The Court should grant the motion to seal or, alternatively, permit Uber to file redacted versions of the Agreements.

### A. Disclosure of the Agreements would work a clearly defined commercial and competitive harm on Uber.

Public disclosure of the terms of the Agreements would cross the "critical divide … between material containing palpable trade secrets or proprietary business practices that will produce present commercial and competitive harm" and "vague, conclusory assertions of commercial or competitive harm." *In re Storag Etzel GmbH*, 2020 WL 2949742, at *11. The Agreements are not mere insurance policies—they form the basis of a complex risk retention program which constitutes one of Uber's most important trade secrets. Parr. Decl. at ¶¶ 6, 8.

Uber is, at its core, a technology company that uses proprietary technology to develop and maintain digital multi-sided marketplace platforms. *Id*. at ¶ 4. Uber has pioneered a unique busi-

ness model and novel technologies, leading to an entirely new marketplace that did not exist even fifteen years ago. *Id*. at ¶ 5. Like most businesses, Uber seeks to reduce financial uncertainty and to better facilitate the management of accidental loss and thus works with insurance partners to cover its business operations. *Id*. However, because Uber's business model is novel and is not comparable to a traditional transportation company, insurance companies generally lack the types of complex policies sufficiently tailored to Uber's business needs, requiring Uber to work with its insurers to design a highly bespoke insurance policy framework. *Id*.

The Agreements relevant to this Motion are an important piece of this framework, and are a critical component of one of Uber's most valuable trade secrets—its insurance and risk retention program. *Id.* at ¶ 8. They set forth high-level, customized provisions governing the relationship between Uber and Farmers, and include bespoke terms to address the unique risks and uncertainties in the evolving rideshare industry. *Id*. at ¶ 14. The Agreements should remain sealed.

**1. Insurance negotiations represent a significant and important investment for Uber.**

As important pieces of Uber's overall approach to insurance, these Agreements required extraordinary time, expense and innovation required to design, negotiate and draft. Insurance is one of the largest expenses for Uber and the digital multi-sided marketplace platform industry, and insurance structure directly impacts profitability, market share, and market capitalization. *Id*. at ¶ 7. Given the importance of Uber's relationship with Farmers to its overall business planning, the Agreements are the result of extensive and expensive negotiations. Each of the Agreements outlines aspects of Uber's overall insurance program that were the result of extensive and involved negotiations between Uber, Aleka and Farmers. *Id*. at ¶ 14. The negotiation of each document took at least six months. *Id*. at ¶ 17. Because the Agreements were negotiated by Uber's specialized in-

house counsel, the negotiations required serious capital investments and intensive discussions at the executive level of two major corporations. *Id*. at ¶ 19.

The manner in which Uber treats the Agreements in-house reflects their sensitivity and importance, as well as the investments made in their negotiation. The Agreements are housed in a secure internal document repository that precludes access to any employee absent authorization, and the limited set of employees who need access to the Agreements in order to perform their job duties are bound by confidentiality agreements. *Id*. at ¶ 20. Uber has never publicly produced the Agreements in connection with any litigation. *Id*. at ¶ 21. Numerous courts have decided in Uber's favor to protect the confidentiality of similar documents. *See*, *e.g.*, *Meza v. Garcia*, No. 31812/2018E, NYSCEF Doc. No. 142, *6-7 (N.Y. Sup. Ct. Bronx Cty. July 28, 2021) (granting protective order for highly negotiated Uber insurance policy considered to be trade secret); *Ramsey v. Uber Techs., Inc.*, No. MCC2000229 (Cal. Super. Ct. Riverside Cty., June 9, 2021) (same).

**2. Disclosure of the Agreements would harm Uber by revealing valuable information to its competitors.**

Disclosure of the Agreements would "harm [Uber's] competitive standing" by revealing valuable information to its competitors, allowing them to understand Uber's insurance and risk retention structure, copy it, and otherwise use it to their advantage in their own negotiations with insurers. *See In re Avandia*, 924 F.3d at 679. Uber's unique insurance structure, of which the Agreements are an important part, gives Uber a distinct, highly valuable competitive advantage over its competitors in the digital multi-sided marketplace platform industry. Parr Decl. at ¶¶ 9, 10. Disclosure of the Agreements would reveal valuable information to Uber's competitors about how Uber allocates risks between Aleka and its insurance partners, and would allow Uber's competitors to model their own insurance programs around Uber's highly bespoke design. *Id*. If Uber's competitors were to obtain the Agreements, they could copy the overall structure of Uber's insurance program or could provide their own actuarial and underwriting teams with critical negotiation and pricing information from specific terms. *Id*. Such terms include clauses that allocate under-

writing risk, set guidelines for reserves obligations, define trust account and collateral obligations, establish high-level guidelines for claims handling, and set retained liability and quota share percentages. *Id*. at ¶ 14. This competitive threat is not hypothetical. In areas where Uber's insurance-related documentation is public, Uber's competitors have copied Uber's concepts and wordings extensively, to Uber's detriment and competitive disadvantage. Parr Decl. at ¶ 10.

**3. Disclosure of the Agreements would harm Uber by revealing valuable information to other insurers.**

Disclosure of the Agreements would "harm [Uber's] competitive standing" in its negotiations with other insurers. *In re Avandia*, 924 F.3d at 672-73. Uber contracts with multiple insurers across the United States and actively negotiates economic terms with each of them. Parr Decl. at ¶ 11. The Agreements reflect the unique design and critical economic terms of Uber's relationship with Farmers, including, among other things, premiums, loss sharing, insurance arrangements, and collateral requirements. *Id*.. Each these terms are material to the economic arrangement with Farmers, and each of them could be used against Uber by other insurers in negotiations over other agreements. Disclosure of the Agreements would thus harm Uber in ongoing and future negotiations with insurers other than Farmers in a range of jurisdictions across the country.

**B. If the Agreements cannot remain sealed in their entirety, redaction of certain terms is critical to prevent Uber from suffering a serious competitive harm.**

As discussed above, the Agreements are heavily negotiated, bespoke commercial contracts. All three of the Agreements contain custom language, not form insurance terms. Because the Agreements are unique and customized, they reveal in their structure the way Uber does business. These Agreements are distinct from Uber's underlying insurance policies, which establish the insurers' obligations to a claimant in connection with a covered claim. *Id*. at ¶ 14. While redaction of certain terms such as premiums could obviate the competitive harm of disclosure of an insurance policy, the Agreements at issue here govern the relationship between two major companies at a high level. Disclosure of their structure, and of the cross-references and extensive use of defined

terms within them, would be sufficient to cause Uber to lose some degree of the competitive benefits of the novel insurance relationship it has designed, negotiated, and gone to great lengths to keep secret. There is no public interest served by disclosure of this private contractual arrangement. The Agreements should thus remain sealed in their entirety.

In the alternative, Uber respectfully requests permission to provide redacted versions of the Agreements for the public docket. The attached Parr Declaration contains a line by line table that details the specific provisions of the Agreements where disclosure would cause the greatest competitive harm to Uber. *See* Parr Decl. at ¶¶ 21-23. While disclosure of the Agreements as a whole would also harm Uber, at a minimum, the Court should fashion a sealing order that prevents the severe harm to Uber that would result from the public disclosure of these specific provisions.

## IV. <u>THE ATTACHED DEFENSE FIRM INVOICE</u>

Finally, the Simon Defendants sought to seal Ex. 5 to the Rhynhart Declaration (ECF No. 214-6). This document is an invoice from a law firm retained by Uber in connection with one of the Pattern Cases. Uber has no objection to this document being un-sealed, but requests leave to provide a version redacting: (1) bank account information; and (2) hourly rates paid to attorneys, which are trade secret disclosure of which would harm Uber in rate negotiations with other firms.

* * *

The Court should allow the Agreements and references to them in the Memorandum and Statement of Facts to remain under seal. Disclosure would result in a specific competitive harm on Uber as contemplated in *In re Avandia* and *In re Storag Etzel GmbH*. If the Court declines to allow the Agreements to remain sealed in their entirety, Uber respectfully requests leave to file versions redacting the lines in ¶¶ 21-23 of the Parr Declaration. Uber also respectfully requests an in camera hearing in the event the Court requires additional information on this sealing request.

Dated: September 10, 2026

**ROHN KURLAND, P.C.**

Amy Kurland, Bar No. 37419
AKurland@rohnkurland.com
1700 Market St, Suite 1005
Philadelphia, PA 19103
Telephone: +1.215.770.0320
Facsimile: +1.215.717.9697

**ASHURST PERKINS COIE US LLP**

By: /s/ David W. T. Daniels

David W. T. Daniels
david.daniels@ashurstperkins.com
Michael J. Wadden
michael.wadden@ashurstperkins.com
Sydney Veatch
sydney.veatch@ashurstperkins.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

David B. Massey
david.massey@ashurstperkins.com
Jacob Taber
jacob.taber@ashurstperkins.com
William Wilder
will.wilder@ashurstperkins.com
1155 Avenue of the Americas, 22nd Floor
New York, New York 10036-2711
Telephone: +1.212.262.6900
Facsimile: +1.212.977.1649

Michael R. Huston
michael.huston@ashurstperkins.com
2525 E. Camelback Road, Suite 500
Phoenix, Arizona 85016-4227
Telephone: +1.602.351.8000
Facsimile: +1.602.648.7000

*Attorneys for Plaintiffs Uber Technologies, Inc. and Federal Express Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused the foregoing to be electronically filed with the Clerk of the Court through the CM/ECF system. By electronically filing, the CM/ECF system shall send notification of such filing to counsel of record for each party and those registered to receive a Notice of Electronic Filing for this case.

Dated: September 10, 2026

**ASHURST PERKINS COIE US LLP**

By: /s/ David W. T. Daniels
David W. T. Daniels
David.daniels@ashurstperkins.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

*Counsel for Plaintiffs Uber Technologies, Inc. and Federal Express Corporation*