IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UBER TECHNOLOGIES, INC. and FEDERAL EXPRESS CORPORATION,**<br><br>**PLAINTIFFS,**<br><br>**v.**<br><br>**SIMON & SIMON P.C., MARC SIMON, CLIFTON BURT, PREMIER PAIN & REHAB CENTER, PC, ETHEL HARVEY, DANIEL PICCILLO, PHILADELPHIA SPINE ASSOCIATES, LLC, and LANCE YARUS,**<br><br>**DEFENDANTS.** | CIVIL ACTION<br><br>No: 2:25-cv-05365-MAK |

**DECLARATION OF ANDY PARR**

1. My name is Andy Parr, and I make this Declaration in support of Uber Technologies, Inc.'s Memorandum in Response to the Court's September 3, 2026 Order to Show Cause Regarding the Sealing of Certain Documents Filed in Support of the Simon Defendants' Motion for Partial Summary Judgment.

2. I am employed by Uber as Vice President of Insurance, and I have been employed by Uber since October 5, 2015. I am also a director of Aleka Insurance, Inc., Uber's captive insurance company and wholly owned subsidiary. In my current role, I oversee Uber's U.S. insurance program, insurance placement, and insurance procurement. As part of my role, I have personal knowledge of Uber's business model and Uber's commercial contracts with its insurers, including Farmers Insurance Exchange ("Farmers"). I also work with teams within Uber to draft

contracts with insurers and oversee the financial processes responsible for appropriately accounting for Uber's financial obligations associated with such contracts. Pursuant to that role, the facts stated herein are true and accurate, and based on my personal knowledge.

3. I am authorized to make these statements on behalf of Uber.

4. Uber is a technology company that uses its proprietary technology to develop and maintain digital multi-sided marketplace platforms. Some specific examples of platforms that Uber has developed include the Rides platform (connecting riders with independent drivers) and the Eats platform (connecting restaurants, grocery stores, delivery drivers, and eaters).

5. Uber has pioneered a unique business model and designed novel proprietary technologies, leading to an entirely new marketplace that did not exist even fifteen years ago. Like most businesses, Uber seeks to reduce financial uncertainty and to better facilitate the management of accidental loss, and thus relies on insurance to cover its business operations. Uber designed and, in effect, invented the method and techniques of insurance coverage in the rideshare industry. It did so by negotiating with its insurance partners to design highly specialized, unique, and bespoke insurance agreements. In the years 2015 and 2016, insurance was incredibly challenging to procure in our industry, as insurers were wary of creating an insurance program for a newly regulated, developing, and innovative rideshare industry. As each state started to pass legislation requiring transportation network companies to maintain primary commercial auto insurance on behalf of independent drivers, it was imperative for Uber to design with its insurance partners a highly specialized and tailored insurance program.

6. At issue here is an Indemnity Agreement between Farmers Insurance Exchange and several Uber affiliates, filed as Exhibit 10 to the Rhynhart Declaration (ECF No. 214-11); an Amendment to that Indemnity Agreement, filed as Exhibit 11 to the Rhynhart Declaration (ECF

No. 214-12); and a Quota Share Reinsurance Agreement between Farmers Insurance Exchange and Uber subsidiary Aleka Insurance, Inc., filed as Exhibit 12 to the Rhynhart Declaration (ECF No. 214-13) (collectively, "the Agreements"). The Quota Share Reinsurance Agreement is a predecessor agreement to the Indemnity Agreement. These Agreements were critical to development of Uber's ultimate insurance program; the program would not have been possible without the Agreements. These heavily negotiated Agreements contain custom language reflecting the unique design of Uber's insurance arrangement with Farmers. They are not form insurance agreements. They form the basis of a complex risk retention program involving the use of Uber's captive insurance subsidiary Aleka, through which Uber is self-paying a very substantial percentage of incurred losses. The details of this insurance and risk retention program are themselves highly valuable trade secrets.

7. Historically, insurance underwriters were reluctant to insure the digital multi-sided marketplace platform industry due to a dearth of historical data to assess risk. Uber undertook significant effort and expense in negotiating and designing its insurance program, including in relation to preparing the necessary factual data to allow appropriate risk assessment. Insurance remains one of the largest expenses for Uber and the digital multi-sided marketplace platform industry, and it directly impacts profitability, market share, and market capitalization.

8. Uber's insurance program is one of the most important elements of its business, making the documents reflecting the design of the insurance program some of its most important trade secrets.

9. Thus, Uber's Agreements with its insurance partners contain valuable trade secrets that competitors are interested in obtaining given the innovative (and still developing) nature of this highly competitive industry. The disclosure of the terms of these Agreements to these

competitors would result in significant economic harm to Uber. Specifically, two distinct sets of parties would benefit, to Uber's economic detriment, from disclosure of the Agreements.

10. First, if the terms of the Agreements were disclosed, Uber's competitors could freely model their insurance programs around the unique design and bespoke terms set forth in the Agreements. The design of Uber's insurance program as laid out in the Agreements gives Uber a unique competitive advantage over other companies in the rideshare industry. Thus, Uber derives significant economic value from the secrecy of the Agreements. If the Agreements were disclosed, it could provide other companies' actuarial and underwriting teams critical design and pricing information allowing them to negotiate and procure their own agreements, copying Uber's design. This threat is not hypothetical. In areas where Uber's documentation is public (i.e. insurance policies), competitors have copied Uber's concepts and wordings extensively, to Uber's economic detriment. Disclosure of the Agreements would cause Uber to lose the competitive benefits of the novel insurance program it has designed, negotiated, and gone to great lengths to keep secret. Because insurance is now such a critical component to sustained profitability in the rideshare industry, these bespoke negotiated agreements were designed with competitiveness in mind.

11. Second, if the terms of the Agreements were disclosed, other insurance companies with whom Uber works would gain an advantage in negotiations with Uber. Uber contracts with multiple insurers and actively negotiates economic terms with respect to each of them. The Agreements at issue include terms affecting among other things, premiums, loss sharing, insurance arrangements, and collateral requirements. These terms are each material to the economic arrangement between Uber and Farmers, and their disclosure would strengthen other insurers' negotiating positions as against Uber in discussions involving current and future policies and agreements. .

12. None of the Agreements have been disclosed to the public or even produced in other litigation.

13. The Agreements are distinct from Uber's actual Farmers-issued insurance policies, versions of which are often produced in underlying litigation over no objection from Uber or Farmers. Unlike the underlying insurance policies, the Agreements reflect confidential terms of the relationship between Uber and Farmers. They contain bespoke clauses that were the result of extensive negotiations between Uber, Aleka and Farmers. These include clauses that allocate underwriting risk between Uber and its insurers, clauses that set guidelines for reserves obligations, clauses that define trust account and collateral obligations, clauses that establish high-level guidelines for claims handling, and tables that set retained liability and quota share percentages on specific policies. These terms of these Agreements are different from the policies themselves, which govern the insurer's obligations to a claimant in connection with a covered claim.

14. The Agreements were critical to the creation of Uber's insurance program in the first instance. Without them, Uber would not have been able to place statutorily mandated coverage in an economically competitive manner. If the disclosure of these sensitive, bespoke commercial contracts is ordered and made discoverable, Uber will lose its advantage in placing complex and bespoke insurance programs.

15. The Agreements themselves are subject to confidentiality provisions precluding disclosure to third parties absent a court or governmental order, and only then, subject to a protective order from a court or governmental authority limiting disclosure.

16. Due to its complexity, negotiation of the insurance program, which includes the Quota Share and Indemnity Agreements, took in excess of six months, with extensive discussions.

17. The Agreements outline in detail the parties' risk retention obligations for various blanket policy lines issued by Farmers to Uber. These risk sharing provisions were also heavily negotiated and based, in part, on the parties' respective actuarial analyses of claims arising under prior issued policies and third-party claim information. The Agreements further include certain representations, warranties, acknowledgments, and guarantees to confirm the parties' obligations therein. Should this information be disclosed to Uber's competitors, those competitors could use the detailed terms and information in the Agreements to negotiate more favorable terms with their respective insurers and irreparably harm Uber's competitive advantage in the industry.

18. The actual monetary costs involved with these negotiations are difficult to estimate simply because in-house counsel for Uber specializing in complex insurance programs (a rare expertise, particularly in an entirely new industry) negotiated the terms of the Agreements. This endeavor required a serious capital investment given the drafting and negotiation of the terms occurred at the executive level of two major corporations.

19. Uber has taken reasonable measures to ensure the secrecy of the Agreements. Within Uber, the Agreements are maintained in a secure location, with limited user access. They are housed in an internal document repository that precludes access to any employee absent the granting of access permission from one of the document managers. Access is primarily granted to actuarial, risk, senior legal and claims employees who need access to perform their job duties. Furthermore, any employee that has been granted access is bound by confidentiality agreements related to their employment.

20. The Agreements have never been available on a public docket, and had never been produced in litigation at all until this case.

21. The Table below explains the competitive harm that could result from disclosure of specific terms of the Quota Share Reinsurance Agreement (Exhibit 12 to the Rhynhart Declaration).

| ***Relevant Lines*** | ***Function*** | ***Competitive Harm*** |
|---|---|---|
| **Art. I.A, Lines 7-9 of Page 2** | "Scope of Treaty" language that defines the scope of the overall agreement. | Reveals the scope of the financial obligations ceded between Farmers and Aleka, as well as the program's design and structure. |
| **Art. III.A, Lines 15-17 of Page 6** | Defines the insurance ceded and assumed between the parties. | Reveals the core economic terms of the insurance program involving transfer of certain risks and obligations between Farmers and Aleka. |
| **Art. III.B, Lines 18-25 of Page 6** | Defines Aleka's core obligations to Farmers. | Reveals the agreement's overall risk allocation terms. |
| **Art. IV, Lines 29-30 of Page 6 and Lines 1-6 of Page 7** | Explains the claims management process as between the parties. | Claims control and association rights discussed in regards to claims management methods reveal the operational governance of the insurance program. |
| **Art. VI, Lines 14-40 of Page 7 and Lines 1-23 of Page 8** | Defines and explains the insurance premium ceded between the parties. | The premium and the manner in which it is allocated reveals a core economic term of the program and the associated risk allocations between the parties. |
| **Art. VII, Lines 25-36 of Page 8** | Defines and explains the ceding commission and required reserves. | The ceding commission and reserves methodology reveal core economic terms of the program and govern how loss reserves are established and reported. |
| **Art. VIII, Lines 36-37 of Page 8 and lines 1-26 of Page 9** | Defines and explains the parties accounting responsibilities and obligations under the agreement. | Reveals core economic terms of the insurance program. |

| | | |
|---|---|---|
| **Art. XIV, Lines 9-36 of Page 13, Pages 14-16, and Lines 1-9 of Page 17** | Governs the operation of the Funds Withheld Account. | The Funds Withheld structure is the core financial architecture of the insurance arrangement. |
| **Appendix A, Rows 4-6 of Table on Page 22** | Provides applicable quota share percentages for specific underlying insurance policies. | The quota share percentage is the most critical economic term of the agreement. |

22. The below Table explains the competitive harm that could result from disclosure of certain terms of the Indemnity Agreement (Exhibit 10 to the Rhynhart Declaration).

| ***Relevant Lines*** | ***Function*** | ***Competitive Harm*** |
|---|---|---|
| **Art. I.A, Lines 7-15 of Page 2** | "Scope of Treaty" language that defines the scope of the overall agreement. | Reveals the scope of the financial obligations ceded between Farmers and Aleka, as well as the program's design and structure. |
| **Art. I.B, Lines 16-25 of Page 2** | Defines rights and obligations assumed by all parties. | Reveals structure of the relevant payment obligations, as well as Aleka's underlying capital structure. |
| **Art. I.C, Lines 26-32 of Page 2** | Defines obligations in event of insolvency. | Reveals Aleka's underlying capital structure. |
| **Art. III.A, Lines 27-32 of Page 6** | Defines reimbursement obligations. | Reveals the agreement's indemnification and reimbursement obligations, which are the agreement's core economic terms. |
| **Art. III.B, Lines 33-35 of Page 6 and Lines 1-3 of Page 7** | Defines the term "Retained Liability." | Reveals the agreement's risk allocation structure, which is a central part of the insurance program. |
| **Art. III.C, Lines 4-13 of Page 7** | Defines allocation of program expenses. | Reveals core economic terms of the insurance program. |

| | | |
|---|---|---|
| **Art. III.D, Lines 14-22 of Page 7** | Defines certain binding modifications to standard insurance practice. | Reveals the manner in which the agreement differs from standard market insurance practices. |
| **Art. III.E, Lines 23-41 of Page 7 and Lines 1-5 of Page 8** | Defines Aleka's duty to guaranty Uber subsidiaries' obligations under the agreement. | Reveals core economic terms of the insurance program. |
| **Art. VII.A, Lines 30-36 of Page 9** | Defines Aleka's duty to maintain reserves. | Reveals confidential reserving methods. |
| **Art. VIII, Page 10** | Defines and explains the parties accounting responsibilities and obligations under the agreement. | Reveals core economic terms of the insurance program. |
| **Art. XIV, Lines 29-42 of Page 13, Page 14, and Page 15** | Defines duties related to collateral deposits. | Reveals core economic terms of the insurance program. |
| **Portions of Appendix A, Rows 8-12 of Table on Page 27 and Rows 12-16 of Table on Page 32** | Defines retained liabilities on specific policies in specific jurisdictions. | The retained liability is the most critical economic term of the agreement. |

23. The below Table explains the competitive harm that could result from disclosure of certain terms of the Amendment to the Indemnity Agreement (Exhibit 11 to the Rhynhart Declaration).

| ***Relevant Lines*** | ***Function*** | ***Competitive Harm*** |
|---|---|---|
| **Amendments to Art. XIV.E, Lines 16-30 on Page 1** | Amends Aleka's collateral obligations. | Reveals core economic terms of the insurance program. |

Docusign Envelope ID: 29022279-D240-888E-82E7-C222E97DE705


| | | |
|---|---|---|
| **Addition of Art. XIV.H, Lines 32-40 on Page 1** | Amends Aleka's collateral obligations. | Reveals Aleka's capital structure. |
| **Portions of Appendix A, Rows 3-7 of Table on Page 8** | Amends retained liabilities on specific policies in specific jurisdictions. | The retained liability is the most critical economic term of the agreement. |

24. Uber considers these Agreements, and all of the relevant provisions discussed above, to be highly sensitive, confidential, proprietary and trade secret information. Disclosure of this information would cause irreparable harm to Uber (and to its insurers). These agreements should remain under seal on the public docket. To the extent they cannot remain under seal in their entirety, the specific relevant provisions listed above should be redacted.

25. The Quota Share Reinsurance Agreement was signed in March of 2018, the Indemnity Agreement was signed in March of 2023, and the Amendment to the Indemnity Agreement was signed in March of 2024. All three agreements contain the highly confidential design, bespoke economic terms, and structure of Uber's relationship with Farmers. Disclosure of any of Agreements would thus result in significant competitive harm to Uber.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed in New Jersey on September 10, 2026.

Andy Parr

Andy Parr